**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

JANE DOE, individually and on behalf
of her minor daughter, SUSAN DOE;
BRENDA BOE, individually and on
behalf of her minor son BENNETT
BOE; CARLA COE, individually and
on behalf of her minor daughter
CHRISTINA COE; FIONA FOE,                        Civil No. 4:23-cv-00114-RH-MAF
individually and on behalf of her minor
daughter FREYA FOE; GLORIA GOE,
individually and on behalf of her minor
son GAVIN GOE; and LINDA LOE,
individually and on behalf of her minor
daughter LISA LOE; PATRICIA POE,
indidivdually and on behalf of her minor
son PAUL POE,

       Plaintiffs,

         v.

JOSEPH A. LADAPO, *in his official capacity
as Florida's Surgeon General
of the Florida Department of Health*;
FLORIDA BOARD OF MEDICINE;
SCOT ACKERMAN, NICHOLAS W.
ROMANELLO, WAEL BARSOUM,
MATTHEW R. BENSON, GREGORY
COFFMAN, AMY DERICK, DAVID
DIAMOND, PATRICK HUNTER,
LUZ MARINA PAGES, ELEONOR
PIMENTEL, HECTOR VILA,
MICHAEL WASYLIK, ZACHARIAH P.
ZACHARIAH, MARIA GARCIA,
NICOLE JUSTICE, *in their official
capacities as members of the Florida*

*Board of Medicine*; FLORIDA BOARD
OF OSTEOPATHIC MEDICINE;
WATSON DUCATEL, TIFFANY
SIZEMORE DI PIETRO, GREGORY
WILLIAMS, MONICA M.
MORTENSEN, VALERIE JACKSON,
CHRIS CREEGAN, WILLIAM D.
KIRSH, *in their official capacities as
members of the Florida Board of
Osteopathic Medicine*,

        Defendants.

_____/

### FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT[1]

1.     This Action is a federal constitutional challenge brought by transgender adolescents and their parents against the bans on medical care for transgender minors adopted by the Florida Boards of Medicine and Osteopathic Medicine (the "transgender medical bans"). These transgender medical bans are effective as of March 16, 2023 (Board of Medicine, Rule 64B8-9.019, Fla. Admin. Code) and March 28, 2023 (Board of Osteopathic Medicine, Rule 64B15-14.014, Fla. Admin. Code).

2.     The transgender medical bans violate the rights of parents to make

---

[1] Plaintiffs Goe, Loe, and Poe are filing the requisite Motions for Leave to Proceed Under Pseudonym shortly after filing the Complaint.

medical decisions to ensure the health and wellbeing of their adolescent children. They prohibit parents from seeking and obtaining effective medical treatment in Florida for their adolescent children by prohibiting doctors from providing medications to adolescents in accordance with the standards of care and clinical practice guidelines for treatment of a rare and serious medical condition, gender dysphoria.

3.     The transgender medical bans also violate the guarantees of equal protection by banning essential medical treatments needed by the adolescent Plaintiffs because they are transgender.

4.     Defendants cannot demonstrate any rational basis, much less an important or compelling one, for the transgender medical bans which prevent transgender adolescents from getting safe and effective medically necessary healthcare.

5.     The plaintiffs seek declaratory and injunctive relief to enjoin enforcement of the transgender medical bans. Without the relief sought, plaintiffs will suffer real and immediate injury.

## **PARTIES**

### I. *Transgender Plaintiffs and Their Parents*

6.     Plaintiff Jane Doe is and has at all relevant times been a resident of St. Johns County, Florida. She is the mother of Plaintiff Susan Doe, an eleven-year-old

transgender girl for whom she also appears in this case as next friend. Susan Doe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Jane Doe. Plaintiff Jane Doe and Plaintiff Susan Doe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [the minor]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed on April 6, 2023, ECF 21.

7.    Plaintiff Brenda Boe is and has at all relevant times been a resident of Alachua County, Florida. She is the mother of Plaintiff Bennett Boe, a fourteen-year-old transgender boy for whom she also appears in this case as next friend. Bennett Boe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Brenda Boe. Plaintiff Brenda Boe and Plaintiff Bennett Boe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [the minor]'s transgender status and his diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18- 2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed on April 6, 2023, ECF 19.

8.    Plaintiff Carla Coe is and has at all relevant times been a resident of Duval County, Florida. She is the mother of Plaintiff Christina Coe, a nine-year-old transgender girl for whom she also appears in this case as next friend. Christina Coe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Carla Coe. Plaintiff Carla Coe and Plaintiff Christina Coe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [the minor]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed on April 6, 2023, ECF 20.

9.    Plaintiff Fiona Foe is and has at all relevant times been a resident of Orange County, Florida. She is the mother of Plaintiff Freya Foe, a ten-year-old transgender girl for whom she also appears in this case as next friend. Freya Foe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Fiona Foe.  Plaintiff Fiona Foe and Plaintiff Freya Foe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and personal nature, specifically [the minor]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18- 2552-DDC-

KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed on April 6, 2023, ECF 22.

10.     Plaintiff Gloria Goe is and has at all relevant times been a resident of Lee County, Florida. She is the mother of Gavin Goe, an eight-year-old transgender boy for whom she also appears in this case as next friend. Gavin Goe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Gloria Goe. Plaintiff Gloria Goe and Plaintiff Gavin Goe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [the minor]'s transgender status and his diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

11.     Plaintiff Linda Loe is and has at all relevant times been a resident of Miami-Dade County, Florida. She is the mother of Lisa Loe, an eleven-year-old transgender girl for whom she also appears in this case as next friend. Lisa Loe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Linda Loe. Plaintiff Linda Loe and Plaintiff Lisa Loe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that she is a minor and the disclosure of her identity "would reveal matters of a highly sensitive and

personal nature, specifically [the minor]'s transgender status and [her] diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

12. Plaintiff Patricia Poe is and has at all relevant times been a resident of Miami-Dade County, Florida. She is the mother of Paul Poe, a nine-year-old transgender boy for whom she also appears in this case as next friend. Paul Poe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Patricia Poe. Plaintiff Patricia Poe and Plaintiff Paul Poe seek to proceed in this case under a pseudonym to protect the minor plaintiff's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [the minor]'s transgender status and his diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 18-2552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019). *See* Motion to Proceed Pseudonymously, filed concurrently herewith.

**II.** *Defendants*

13. Defendant Joseph Ladapo, M.D., is sued in his official capacity as the Surgeon General of the Florida Department of Health, which is responsible for "protect[ing] and promot[ing] the health" of all Floridians. Fla. Stat. § 20.43 (2022). The Surgeon General is appointed by the Governor and serves at the pleasure of the

Governor. Fla. Stat. § 20.43(2) (2022). Defendant Ladapo, in his official capacity as Surgeon General of the Florida Department of Heatlh, initiated the process of the promulgation of the transgender medical bans pursuant to the authority granted by Fla. Stat. § 20.43(g) (2022), regarding the regulation of health practitioners. Defendant Ladapo's official place of business is located in Tallahassee, Leon County, Florida.

14.     Defendant Scot Ackerman, M.D., is a member of the Florida Board of Medicine.

15.     Defendant Nicholas W. Romanello, Esq., is a member of the Florida Board of Medicine.

16.     Defendant Wael Barsoum, M.D., is a member of the Florida Board of Medicine.

17.     Defendant Matthew R. Benson, M.D., is a member of the Florida Board of Medicine.

18.     Defendant Gregory Coffman, M.D., is a member of the Florida Board of Medicine.

19.     Defendant Amy Derick, M.D., is a member of the Florida Board of Medicine.

20.     Defendant David Diamond, M.D., is a member of the Florida Board of Medicine.

21.     Defendant Patrick Hunter, M.D., is a member of the Florida Board of Medicine.

22.     Defendant Luz Marina Pages, M.D., is a member of the Florida Board of Medicine.

23.     Defendant Eleonor Pimentel, M.D., is a member of the Florida Board of Medicine.

24.     Defendant Hector Vila M.D., is a member of the Florida Board of Medicine.

25.     Defendant Michael Wasylik, M.D., is a member of the Florida Board of Medicine.

26.     Defendant Zachariah P. Zachariah, M.D., is a member of the Florida Board of Medicine.

27.     Defendant Maria Garcia, Esq., is a member of the Florida Board of Medicine.

28.     Defendant Nicole Justice is a member of the Florida Board of Medicine.

29.     Defendant Watson Ducatel, D.O., is a member of the Florida Board of Osteopathic Medicine.

30.     Defendant Tiffany Sizemore Di Pietro, D.O., is a member of the Florida Board of Osteopathic Medicine.

31.     Defendant Gregory Williams, D.O., is a member of the Florida Board

of Osteopathic Medicine.

32.    Defendant Monica M. Mortensen, D.O., is a member of the Florida Board of Osteopathic Medicine.

33.    Defendant Valerie Jackson is a member of the Florida Board of Osteopathic Medicine.

34.    Defendant Chris Creegan is a member of the Florida Board of Osteopathic Medicine.

35.    Defendant William D. Kirsh, D.O., is a member of the Florida Board of Osteopathic Medicine.

36.    The Florida Board of Medicine is made up of fifteen members who are appointed by the Governor. Fla. Stat. § 458.307(1) (2022). Defendant members of the Florida Board of Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B-9.019 pursuant to their rulemaking authority under Fla. Stat. §§ 458.309 and 458.331(1)(v) (2022). Further, Defendant members of the Florida Board of Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B-9.019, including taking disciplinary action against any doctor for violating its provisions. Fla. Stat. § 456.072. The Florida Board of Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Medicine is, Tallahassee, Leon County, Florida.

37.     The Florida Board of Osteopathic Medicine is made up of seven members who are appointed by the Governor. Fla. Stat. § 459.004(1) (2022). Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B15-14.014 pursuant to their rulemaking authority under Fla. Stat. §§ 459.005 and 459.015(1)(z) (2022). Further, Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B15-14.014, including taking disciplinary action against any doctor for violating its provisions. Fla. Stat. § 456.072. The Florida Board of Osteopathic Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Osteopathic Medicine is, Tallahassee, Leon County, Florida.

## JURISDICTION AND VENUE

38.     The plaintiffs seek redress for the deprivation of their rights secured by the United States Constitution. This Action is initiated pursuant to 42 U.S.C. § 1983 to enjoin the defendants from enforcing the transgender medical bans and for a declaration that the transgender medical bans violate federal law.

39.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343.

40.     This Court has personal jurisdiction over the defendants because the

defendants are domiciled in Florida and the denial of the plaintiffs' rights guaranteed by federal law arises out of and relates to the defendants' official duties in Florida.

41.    Each of the defendants serve and reside in their official capacity on an agency or board for the State of Florida. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

42.    If enforced, the transgender medical bans would violate the constitutional rights of the plaintiffs in this judicial district. Therefore, venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

43.    Venue is proper in the Tallahassee Division of the Northern District of Florida under N.D. Fla. Loc. R. 3.1(B) because it is the location of the principal place of business for the defendants and where a substantial portion of the acts or omissions complained of herein occurred.

44.    This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 57 and 65, 28 U.S.C. §§ 2201 and 2202, and this Court's inherent equitable powers.

## FACTUAL ALLEGATIONS

### I. *Gender Identity and Gender Dysphoria*

45.    Gender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity. It is an essential element of human identity and a well-established concept in medicine. Everyone has a gender identity. Most

people's gender identity is consistent with their birth sex. Transgender people, however, have a gender identity that differs from their birth sex. Being made to live inconsistent with a person's gender identity causes discomfort and distress and can interfere with a person's ability to function in a productive and healthy way in matters of daily living.

46.     Gender dysphoria is the clinical diagnosis for the distress that arises when a transgender person cannot live consistent with their gender identity. To be eligible for a diagnosis of gender dysphoria, a young person must meet the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DSM-5").[2] If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

47.     In fact, 56% of transgender youth reported a previous suicide attempt and 86% of them reported suicidality. *See* Ashley Austin, Shelley L. Craig, Sandra D. Souza, and Lauren B. McInroy (2022), *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, J. of Interpersonal Violence, Vol. 37 (5-6) NP2696-NP2718.

48.     Research has shown that an individual's gender identity is hard-wired

---

[2] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*. Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012).

and cannot be changed. In the past, mental health professionals sought to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms. Today, the medical profession recognizes that such efforts put transgender minors at risk of profound harm, including dramatically increased rates of suicidality.

49.     Gender dysphoria is highly treatable. Healthcare providers who specialize in the treatment of gender dysphoria follow well-established standards of care and clinical practice guidelines that have been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

50.     The standards of care for treatment of transgender people, including transgender youth, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the most recent edition of its standards of care for the treatment of gender dysphoria

in minors and adults in 2022, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. (Coleman E, Radix AE, Bouman WP et al. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int J Transgend 2022 Sep 6;23 (suppl 1): S1-S259.)

51.    The Endocrine Society has also promulgated a standard of care and clinical practice guidelines for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults. *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinol. Metab. 3869 (2017).

52.    The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Assocation, the American Psychological Association, and other professional medical organizations also follow the WPATH and Endocrine Society standards of care and clinical practice guidelines.

53.    The treatment of gender dysphoria is designed to reduce a transgender person's clinically significant distress by permitting them to live in alignment with their gender identity. Undergoing treatment for gender dysphoria is commonly referred to as "transition," "gender transition," or "gender affirming care." There are several components to the gender transition process.

54.    The precise treatment of gender dysphoria depends on an individualized assessment of a patient's needs.

55.    Social transition involves a transgender person taking measures to live in accordance with their gender identity in all aspects of life. For transgender boys, it means living fully as a boy; for transgender girls, it means living fully as a girl. Social transition can include adopting a name, pronouns, hairstyle, and clothing consistent with that person's gender identity. The steps a transgender person takes as part of their social transition help align their gender identity with all aspects of everyday life.

56.    Gender transition may also involve taking prescribed medications, puberty blockers and hormones, to bring a person's body into alignment with their gender identity.

57.    There are no medications prescribed to transgender children before they have begun puberty.

58.    For a transgender adolescent who has begun puberty, puberty-blocking medication prevents the patient from going through the physical developments associated with puberty that exacerbate the distress experienced by the incongruence between the patient's gender identity and their body. As such, under the WPATH Standards of Care and clinical practice guidelines, puberty-blocking medication may become medically necessary and appropriate after a transgender adolescent reaches

puberty to minimize or prevent the exacerbation of gender dysphoria and the permanent physical changes that puberty would cause. In providing medical treatments to adolescents, pediatric physicians and endocrinologists work in close consultation with qualified mental health professionals experienced in the diagnosis and treatment of gender dysphoria.

59.     For older transgender adolescents, hormone therapy may also be medically necessary to bring their body into alignment with their gender identity and further treat the gender dysphoria they may experience without treatment.

60.     The treatment for gender dysphoria is highly effective. Longitudinal studies have shown that transgender children with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with those of non-transgender children. Lily Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson, et al., *Mental Health of Transgender Children Who are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, transgender children with gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

II. *The Transgender Medical Bans*

61.     On June 2, 2022, Defendant Ladapo sent a letter to the Florida Board

of Medicine and the Florida Board of Osteopathic Medicine (collectively, the "Boards") asking the Boards to "establish a standard of care" for the treatment of gender dysphoria, notwithstanding the widely accepted standards of care and clinical practice guidelines established by WPATH and the Endocrine Society.

62.    On July 28, 2022, the Florida Department of Health sent the Boards a "Petition to Initiate Rulemaking," asking the Board, among other things, to adopt a categorical ban on all treatment of gender dysphoria for people under eighteen years of age.

63.    On August 5, 2022, the Boards discussed the June 2, 2022 letter from Dr. Lapado and the July 28, 2022 Petition to Initiate Rulemaking. The Boards voted to accept the Petition to Initiate Rulemaking.

64.    On September 1, 2022, the Boards each published a Notice of Development of Rulemaking in the Florida Administrative Register (F.A.R.), proposing "rule development to clarify the practice standards for treatment of gender dysphoria in minors."

65.    On October 14, 2022, the Boards each published a Notice of Rule Workshop, which would take place on October 28, 2022.

66.    On October 28, 2022, the Boards held a Joint Workshop regarding the development of a rule related to "Practice Standards for the Treatment of Gender Dysphoria." At the conclusion of the meeting, the Boards voted in support of

proposed rules that would ban puberty blockers and hormones, with an exception for treatment performed as clinical trials under the auspices of the Institutional Review Board. The proposed rules were as follows:

> (1)  The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>> (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>> (b) Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2) Nonsurgical treatments for the treatment of gender dysphoria in minors may continue to be performed under the auspices of Institutional Review Board (IRB) approved, investigator-initiated clinical trials conducted at any of the Florida medical schools set forth in Section 458.3145(1)(i), Florida Statutes. Such clinical trials must include long term longitudinal assessments of the patients' physiologic and psychologic outcomes.
>
> (3) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

67.     On November 4, 2022, the Florida Board of Medicine voted to remove the exception from its proposed transgender medical ban.

68.     On January 9, 2023, the Boards published Notices of Public Hearing in the Florida Administrative Register, regarding a joint hearing of the Boards scheduled to take place on February 10, 2023.

69.     On February 10, 2023, during the Public Hearing, the Florida Board of Osteopathic Medicine voted to remove the exception from its proposed transgender medical bans.

70.     The Florida Board of Medicine filed the following rule with the Florida

Department of State on February 24, 2023, with an effective date of March 16, 2023:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>> (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>> (b) Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

71.     The Florida Board of Osteopathic Medicine filed the following rule with the Florida Department of State on March 8, 2023, with an effective date of March 28, 2023:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>> (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>> (b) Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

72.     The transgender medical bans include a clause that permits minors being treated with puberty blockers or hormones prior to the effective date of the transgender medical bans to continue to receive those treatments.

73.     Transgender minors who were not yet receiving puberty blockers or hormones when the transgender medical bans took effect are barred from obtaining

such treatment from a Florida doctor regardless of medical necessity.

74.    The transgender medical bans ignore the established medical and scientific consensus that these treatments are medically necessary, safe, and effective for the treatment of gender dysphoria.

75.    The transgender medical bans are in direct conflict with state laws ensuring that parents have the right to make medical decisions for their adolescent children. *See* Florida Statutes 1014.02 (which provides that "it is a fundamental right of parents to direct the upbringing, education, and care of their minor children."); Florida Statutes 1014.03 ("The state, any of its political subdivisions, any other governmental entity, or any other institution *may not infringe on the fundamental rights of a parent to direct* the upbringing, education, *health care*, and mental health of his or her minor child[.]") (emphasis added).

**III. *The Transgender Medical Bans Will Irreparably Harm the Plaintiffs***

Jane Doe and her daughter Susan Doe

76.    Susan Doe is an eleven-year-old transgender girl who resides with her mother, Jane Doe, her father, and her three siblings in St. Johns County, Florida.

77.    From an early age, Susan began telling her parents that she is a girl. She began living fully as a girl, with the support of her family and upon advice of her pediatrician by the time she started kindergarten.

78.    Susan has been diagnosed with gender dysphoria and that diagnosis has

been confirmed by many doctors, including her doctor at the Pentagon. Susan has

not been prescribed puberty blockers or hormones to treat her gender dyshporia.

79.     Susan's medical providers, including her pediatrician, pediatric

endocrinologist, and medical provider on base, continue to monitor her treatment

and concluded that it likely will be medically necessary for her to begin puberty

blocking medications after she begins puberty, which is imminent. The transgender

medical bans, however, will prevent her from obtaining treatment.

### Brenda Boe and her son Bennett Boe

80.     Bennett Boe is a fourteen-year-old transgender boy who resides in

Alachua County, Florida, with his mother, Brenda Boe.

81.     Bennett has known that he was not a girl since the third grade. After he

began puberty and started experiencing the accompanying physical changes, Bennett

grew increasingly distressed by the mismatch between his body and his sense of

himself as a boy. Around that time, Bennett experienced debilitating depression,

culminating in an incident of self-harm resulting in hospitalization.

82.     Bennett's mother Brenda took Bennett to see medical professionals

who diagnosed Bennett with gender dysphoria and recommended treatment,

including menstrual suppression medication. With Brenda's consent, Bennett began

treatment which has considerably alleviated his depression.

83.     Even with that treatment, Bennett continues to experience gender

dysphoria as a result of continued pubertal development inconsistent with his sense of himself as a boy.

84.   Bennett's doctors believe it may be medically necessary for him to begin hormone therapy after he turns sixteen.

85.   Brenda and Bennett fear that the transgender medical medical bans will prevent him from being able to treat his ongoing symptoms of gender dysphoria with hormone therapy.

### Carla Coe and her daughter Christina Coe

86.   Christina Coe is a nine-year-old transgender girl, and one of three triplets, who resides in Duval County, Florida with her mother, Carla Coe, her father, and her siblings.

87.   From an early age, Christina began to say to her parents that she is a girl.

88.   At age five Christina began to express distress including suicidal ideation and a desire to harm herself.

89.   Since entering the third grade, Christina has been living as a girl in all aspects of her life. She has not expressed a renewed desire to harm herself.

90.   Carla and her husband fear that Christina will not be able to get the medical care she needs after she begins puberty because of the transgender medical bans.

Fiona Foe and her daughter Freya Foe

91.     Freya Foe is a ten-year-old transgender girl who resides with her mother, Fiona Foe, her father, her grandmother, and her two siblings in Orange County, Florida.

92.     As soon as she could walk and talk, Freya was very feminine in her self expression, including her choices of clothing and toys.

93.     As she grew older, Freya began to express distress about being seen as a boy. Fiona and her husband took Freya to see a psychologist who diagnosed her with gender dysphoria.

94.     Shortly before her tenth birthday, Freya's doctor examined her and determined that she had reached Tanner Stage 2, meaning puberty is in progress. In the months preceding this examination, Freya had begun to express distress about the onset of puberty and her performance in school began to decline.

95.     In December 2022, Freya's doctors determined that puberty blocking medication was medically necessary for the treatment of her gender dysphoria. With the consent of her parents, Freya began puberty blocking medication. Since then, Freya's overall wellbeing and performance in school have improved.

96.     The transgender medical bans will prevent Freya's medical providers from prescribing hormones to allow her to go through female puberty, medication she may need as her peers continue to develop through puberty.

Gloria Goe and her son Gavin Goe

97.    Gavin Goe is an eight-year-old transgender boy who resides with his mother, Gloria Goe, his father, and his siblings in Lee County, Florida.

98.    Gavin identified as a boy a very young age, pointing to photographs of boys to let others around him know how he felt. Eventually, he asked his parents why he could not have a boy's name and why people did not believe he was a boy.

99.    Gradually over time, Gavin's parents supported him in taking steps to live more fully as a boy.

100.   By the time Gavin entered first grade, he was living as a boy in all aspects of his life.

101.   Gavin was assessed for gender dysphoria by his pediatrician in 2022, who referred Gavin to a pediatric endocrinologist for further assessment and treatment because of Gavin's age, development, and family history.

102.   Gloria made an appointment for Gavin with the pediatric endocrinologist at a clinic for March of 2023. She learned, just before the appointment, that it was cancelled because the clinic is no longer seeing new patients due to the transgender medical bans.

103.   Gloria and Gavin know that irreversible changes can happen in Gavin's body at any time due to the onset of puberty and that he needs to be assessed regularly by a pediatric endocrinologist to determine if and when he needs puberty

blockers to effectively treat his gender dysphoria.

Linda Loe and her daughter Lisa Loe

104.   Lisa Loe is an eleven-year-old transgender girl who resides with her mother, Linda Loe, her father, and her sibling in Miami-Dade County, Florida.

105.   As a child, Lisa identified closely with her female friends and strongly preferred toys and activities more commonly associated with girls.

106.   At age nine, Lisa said that she knew she was a girl.

107.   Lisa's parents took her to see a psychologist who assisted them in supporting Lisa to live consistently with her gender identity.

108.   Lisa was evaluated in Fall of 2022 by a pediatric endocrinologist who confirmed her diagnosis of gender dysphoria and recommended that she return for another appointment in six months because she was likely to start puberty soon.

109.   Lisa was evaluated again in March of 2023 and her doctor confirmed that she has reached puberty and advised that it would be necessary to begin puberty blockers within approximately three months. The doctor also advised that the transgender medical bans made it impossible for the doctor to prescribe puberty blockers to Lisa.

110.   Irreversible changes are occurring in Lisa's body at this time, which are causing her significant distress. Lisa and her family cannot meet her urgent medical needs because of the barriers they are facing in Florida finding the medical care she

needs.

<u>Patricia Poe and her son Paul Poe</u>

111.  Paul Poe is a nine-year-old transgender boy who resides with his mother, Patricia Poe, and his sister in Miami-Dade County, Florida.

112.  From a young age, Paul began asking consistently to use the boys' bathroom and to be referred to as a boy and a brother.

113.  Paul began wearing boys' clothing, using a boy's name when away from home, and, with the advice and support of a therapist, living as a boy at school and in all other aspects of his life.

114.  In late 2022, Paul's body began changing with the onset of puberty. Patricia took him to see a pediatric endocrinologist who determined that Paul was far enough along in puberty that he may need puberty blockers. The pediatric endocrinologist recommended that Paul see a psychologist to confirm his medical need for puberty blockers.

115.  In February 2023, a psychologist evaluated Paul and determined that he needs to begin treatment with puberty blockers to alleviate his gender dysphoria. Paul began treatment at that time.

116.  Shortly thereafter, Paul's pediatric endocrinologist told Patricia that the endocrinoligst was unable to continue prescribing or monitoring the treatment in light of the transgender medical bans. Paul's family must find medical providers

outside of Florida to secure the care he needs which presents a hardship to the family and potential harms because of disruption to the continuity of his care, as long as the transgender medical bans are in effect.

## CLAIMS FOR RELIEF

### COUNT I
Deprivation of Substantive Due Process
Parent Plaintiffs Against Defendants in Their Official Capacities
Violation of Parent Plaintiffs' Right to Direct the Upbringing of Their
Adolescent Children
U.S. Const. Amend. XIV

117.   The plaintiffs incorporate all paragraphs 1-116 of the Amended Complaint as if set forth fully herein.

118.   The parent plaintiffs bring this Count against all the defendants.

119.   The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality). That fundamental right includes the liberty to make medical decisions for their minor adolescent children, including the right to obtain medical treatments that are recognized to be safe, effective, and medically necessary to protect their adolescent children's health and well-being.

120.   The transgender medical bans violate this fundamental right by preventing the parent plaintiffs from obtaining medically necessary care for their minor adolescent children.

121.  By intruding upon parents' fundamental right to direct the upbringing of their adolescent children, the transgender medical bans are subject to strict scrutiny.

122.  The defendants have no compelling justification for preventing parents from ensuring their adolescent children can receive essential medical care. The transgender medical bans do not advance any legitimate interest, much less a compelling one.

## COUNT II
### Deprivation of Equal Protection
### All Plaintiffs Against Defendants in Their Official Capacities
### U.S. Const. Amend. XIV

123.  The plaintiffs incorporate Paragraphs 1–116 of the Amended Complaint as if set forth fully herein.

124.  All the plaintiffs bring this Count against all the defendants.

125.  The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

126.  The transgender medical bans single out transgender minors and prohibit them from obtaining medically necessary treatment based on their sex and transgender status.

127.  Under the Equal Protection Clause, government classifications based

on sex are subject to heightened scrutiny and are presumptively unconstitutional.

128.   Transgender-based government classifications are subject to heightened scrutiny because they are sex-based classifications.

129.   Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different from their birth sex, they comprise a discrete group. This defining characteristic bears no relation to a transgender person's ability to contribute to society. Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.

130.   As such, transgender classifications are subject at least to intermediate scrutiny.

131.   The transgender medical bans do nothing to protect the health or well-being of minors. To the contrary, the transgender medical bans undermine the health and well-being of transgender minors by denying them essential medical care.

132.   The transgender medical bans are not narrowly tailored to further a compelling government interest, substantially related to any important governmental interest, or even rationally related to a governmental interest. Accordingly, the transgender medical bans violate the Equal Protection Clause of the Fourteenth Amendment.

## **RELIEF REQUESTED**

WHEREFORE, the plaintiffs request that this Court:

(1) issue a judgment, pursuant to 28 U.S.C. §§ 2201-2202, declaring that the transgender medical bans violate the United States Constitution for the reasons and on the Counts set forth above;

(2) temporarily, preliminarily, and permanently enjoin the defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the transgender medical bans;

(3) declare that the transgender medical bans violate the Fourteenth Amendment to the United States Constitution;

(4) award the plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(5) grant such other relief as the Court finds just and proper.

Respectfully submitted this 24th day of April, 2023.

**SOUTHERN LEGAL COUNSEL**

By: */s/ Simone Chriss*
**Simone Chriss**
Florida Bar No. 124062
**Chelsea Dunn**
Florida Bar No. 1013541
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**HUMAN RIGHTS CAMPAIGN
FOUNDATION**

**Jason Starr**\* (NY No. 5005194)
**Ami Patel**\* (CA No. 325647)
Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 993-4180
Facsimile: (202) 628-0517
Ami.Patel@hrc.org
Jason.Starr@hrc.org

**NATIONAL CENTER FOR
LESBIAN RIGHTS**

**Christopher F. Stoll**
(CA Bar No. 179046)
**Kelly Jo Popkin**
(NY Bar No. 5698220)\*
National Center for Lesbian
Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel. 415-365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

**GLBTQ LEGAL
ADVOCATES &
DEFENDERS**

**Jennifer Levi**\*
**Chris Erchull**\*
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
cerchull@glad.org

*\* Admitted pro hac vice*

***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 24, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Counsel for Defendants stated that they would accept service via email. I certify that I served by email the foregoing on the following non-CM/ECF participant:

> Mohammad Jazil
> Counsel for Defendants
> Holtzman Vogel
> (850) 391-0503
> mjazil@holtzmanvogel.com

*/s/ Simone Chriss*

Simone Chriss
