### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF FLORIDA
**Tallahassee Division**

JANE DOE, individually and on behalf
of her minor daughter, SUSAN DOE,
et al.,

Civil No. 4:23-cv-00114-RH-MAF

        Plaintiffs,

    v.

JOSEPH A. LADAPO, *in his official capacity*
*as Florida's Surgeon General*
*of the Florida Department of Health*,
et al.,

        Defendants.

_____/

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
### AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs move for an order preliminarily enjoining the enforcement of Fla. Admin. Code R. 64B8-9.019 and Fla. Admin. Code R. 64B15-14.014.

1. The Florida Board of Medicine adopted Rule 64B8-9.019, Fla. Admin. Code (effective March 16, 2023) and the Florida Board of Osteopathic Medicine adopted Rule 64B15-14.014, Fla. Admin. Code (effective March 28, 2023). These rules (the "Bans") bar doctors from providing established medical care to transgender adolescents.

2.     Plaintiffs are Florida parents and their transgender children: Jane Doe and her daughter Susan Doe, Gloria Goe and her son Gavin Goe, and Linda Loe and her daughter Lisa Loe.

3.     Each of the Minor Plaintiffs has been diagnosed with gender dysphoria and requires ongoing medical care, but because of the Bans, their parents are unable to obtain the care their children need. Susan Doe and Gavin Goe are about to enter puberty and will need puberty blocking medications, which Florida doctors are now banned from providing to transgender adolescents. Gavin Goe had a medical appointment to be assessed for puberty blocking medication, which was cancelled due to the Bans. Lisa Loe requires puberty blocking medication now; however, because of the Bans, no doctor in the state of Florida can provide the medical care she needs. Each of these Minor Plaintiffs will continue to suffer serious and irreparable harms if denied the medical care they need.

4.     Plaintiffs are likely to succeed on the merits. The Bans violate the federal guarantee of due process by infringing upon parents' fundamental right to obtain established medical treatments for their children. In addition, the Bans violate the federal guarantee of equal protection by singling out transgender minors and prohibiting them from obtaining medically necessary treatment. The burden is on Defendants to justify these violations, but they cannot do so. The Bans' infringement on parental rights is not narrowly tailored to achieve a

compelling governmental interest. And the Bans' targeting of transgender adolescents is not substantially related to any important governmental interest.

5.    Without the requested preliminary injunctive relief, the Bans will cause irreparable harm to the Parent Plaintiffs, who will be deprived of their fundamental right to make medical decisions for their children, notwithstanding that they are fit parents, and to the Minor Plaintiffs, who will suffer a cascade of mental and physical injuries. Plaintiffs have no adequate remedy at law.

6.    The balance of equities and public interest tip sharply in favor of the Plaintiffs because the irreparable injuries far outweigh any burden on Defendants that might result from enjoining the Bans during the pendency of this case. The Bans prohibit care that is well-established and medically necessary for some transgender minors. In contrast, preventing enforcement of the Bans while this litigation proceeds poses no harm to Defendants and will preserve the status quo that has existed for many years before the Bans were adopted.

7.    The Bans permit continued treatment of transgender minors who were already receiving these medications for the treatment of gender dysphoria before the Bans took effect. If these treatments are appropriate for transgender minors *already* receiving them, as their continued provision indicates, there is no justification for denying them to transgender minors who require them in the future even under the lowest level of review, much less under the heightened scrutiny

that applies here.

8. Plaintiffs request that the Court waive the bond requirement in Fed. R. Civ. P. 65(c). *See BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Srvcs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005). Public interest litigation is a recognized exception to the bond requirement, especially where, as here, the bond would injure Plaintiffs' constitutional rights and the relief sought would not pose a hardship to Defendants.

**WHEREFORE,** Plaintiffs respectfully request an order preliminarily enjoining Defendants from enforcing Rule 64B8-9.019, Fla. Admin. Code and Rule 64B15-14.014, Fla. Admin. Code (2023).

## <u>REQUEST FOR ARGUMENT</u>

Pursuant to Local Rule 7.1(K), Plaintiffs respectfully request oral argument on this motion, estimating up to two hours for a non-evidentiary hearing.

## <u>MEMORANDUM OF LAW</u>

### I.    **Introduction**

Plaintiffs are parents and their transgender children who challenge rules adopted by the Florida Boards of Medicine and Osteopathic Medicine (the "Medical Boards") that prevent doctors from providing medical treatments that have been available to transgender minors for decades.[1] These Bans deny established care for

---

[1] By separate motions, Parent and Minor Plaintiffs are requesting to proceed under pseudonyms.

transgender minors and infringe on parents' right to make medical decisions for their children, contrary to the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Absent an injunction, Plaintiffs will suffer immediate and irreparable harms. Because of the Bans, the Parent Plaintiffs are unable to obtain medically necessary and time-sensitive care for their transgender children, and the Minor Plaintiffs are unable to receive the medical care they need.

No monetary damages could compensate parents for the loss of their fundamental right to obtain established medical care for their children or for the pain of watching their children suffer due to the denial of such care. And no amount of money could compensate transgender adolescents for the physical and mental harms they will endure as a result of being denied the care they need.

## II.    Statement of Facts

### A. The Bans Prevent Parent Plaintiffs from Making Important Medical Decisions for their Children's Health and Well-Being

#### 1. *Jane Doe and her Daughter Susan Doe*

Susan Doe is an eleven-year-old girl who is transgender and resides with her mother Jane Doe, her father, and three siblings in St. Johns County. (*See* Declaration of Jane Doe ("Doe Decl.") ¶¶ 3, 6.) Jane is a special education teacher, and her husband is a Senior Officer in the United States Military. (*Id.* ¶¶ 4–5.) Susan knew she was a girl, and told her mother she was a girl, from a very young age. (*Id.* ¶¶ 7–

8.) When Susan was three years old, she began experiencing distress about wearing male clothing. (*Id.* ¶ 9.) Eventually, Jane sought advice from Susan's pediatrician, who advised Jane to support Susan rather than seek to force her to wear male clothing. (*Id.* ¶¶ 9–10.)

Despite Jane's fears and concerns about how Susan would be treated by others, she followed the pediatrician's advice. (*Id.* ¶ 11.) When Susan was allowed to dress as a girl and when those around her, including her family members peers, interacted with her as a girl, she became happier, more secure, and flourished. (*Id.* ¶ 12.) Because Susan has lived as a girl from a young age, she has gone through her entire school experience without anyone knowing she is transgender. (*Id.* ¶ 14.) If not enjoined, the Bans will change that by preventing Susan from accessing puberty blockers, the recommended treatment for her diagnosis of gender dysphoria, thus forcing her to go through male puberty inconsistent with her gender identity and the person she knows herself, and her friends and family know her, to be. (*Id.* ¶ 15.)

Susan will soon begin puberty. (*Id.* ¶ 18.) Her psychotherapist has concluded that she has no mental health issues or other concerns that would contraindicate puberty blocking medication when the time is appropriate and advised that Susan see a pediatric endocrinologist for continued assessment. (*Id.*) Susan is a patient at the University of Florida Health's Youth Gender Program, whose multidisciplinary treatment team has been monitoring Susan's course of treatment. (*Id.* ¶ 19.) Her

doctors have all agreed that it will likely be medically necessary for Susan to initiate puberty blockers as soon as she enters Tanner Stage 2, which could be any day now. (*Id.* ¶ 20.)

If the Bans remain in effect, Susan will not be able to begin puberty blocking medication when puberty begins. (*Id.* ¶ 20.) She will experience the effects of male puberty, which will cause her to develop physical traits inconsistent with her female gender identity, bringing back and exacerbating the distress that she experienced before she socially transitioned. (*Id.* ¶¶ 21–22.; Declaration of Dr. Roe ¶¶ 9–10.) The harm this will cause has been articulated by Susan as her biggest fear, and by Jane and her husband as their worst nightmare. (Doe Decl. ¶¶ 22, 26–29.)

### 2. *Linda Loe and her Daughter Lisa Loe*

Lisa Loe is an eleven-year-old girl who is transgender and has lived with her family in Miami-Dade County her entire life. (*See* Declaration of Linda Loe ("Doe Decl.") ¶¶ 2, 4.) Lisa's father owns a small law firm in Miami, where Lisa's mother, Linda Loe, works as the financial director. (*Id.* ¶ 3.) For years, Lisa's parents have worked hard to build a small business and a life in Florida. (*Id.*)

From an early age, Lisa gravitated toward interests and activities more typically associated with girls. (*Id.* ¶ 5.) When Lisa was nine years old, she told her parents that she is a girl. (*Id.* ¶ 6.) In 2022, Lisa was diagnosed with gender dysphoria. (*Id.* ¶ 7.) Her parents sought professional guidance from a psychologist,

who counseled them on how to support Lisa in beginning to live consistently with her female gender identity. (*Id.*) As Lisa's parents allowed her to do so, they saw Lisa's overall well-being improve greatly. (*Id.* ¶¶ 7–8.)

As Lisa is beginning puberty, her pediatrician referred her to a Miami-based pediatric endocrinologist who specializes in treatment for transgender adolescents. (*Id.* ¶ 10.) The endocrinologist confirmed that Lisa has gender dysphoria and has reached puberty. (*Id.* ¶¶ 9–10.) He counseled that Lisa would need puberty blockers administered within the next few months but informed Linda that he could not prescribe this medication because of the Bans. (*Id.* ¶ 11.) Lisa is anxious about her puberty progressing and her parents have encountered significant wait times for a new patient appointment at out-of-state clinics. (*Id.* ¶ 12.) If Lisa is unable to receive the medical care she needs, her health and well-being will suffer. (*Id.* ¶¶ 14–15.)

### 3. *Gloria Goe and her Son Gavin Goe*

Gavin Goe, the youngest of four children, is an eight-year-old boy who is transgender and lives with his family in Lee County. (*See* Declaration of Gloria Goe ("Goe Decl.") ¶¶ 3, 6, 8.) Gavin has known that he is a boy from a young age. (*Id.* ¶ 9.) He told his parents that he wanted to grow up to look like his father, consistently wanting a name, haircuts, and clothing typically associated with boys. (*Id.*) Gloria Goe, Gavin's mother, and her husband thought for some time that Gavin was simply a "tomboy," but over time, due to Gavin's distress from being treated as a girl, they

allowed Gavin to wear boys' clothes to school and use male pronouns. (*Id.* ¶¶ 10–12.) Eventually, Gloria and her husband allowed Gavin to use a male name. (*Id.* ¶ 12.)

In 2021, Gavin was diagnosed with gender dysphoria by a pediatrician. (*Id.* ¶ 16.) Last year, Gavin's pediatrician examined him and, considering his older sister began puberty at age nine, recommended that Gavin see a pediatric endocrinologist as puberty might be approaching. (*Id.*) Given Gavin's family history, the pediatrician advised the family to have Gavin assessed regularly for readiness for puberty blockers, as they need to be initiated soon after puberty starts; if not, he will lose the medical benefits they confer. (*Id.* ¶ 17)

Gloria made an appointment for Gavin at Johns Hopkins All Children's Hospital in St. Petersburg for March of 2023. (*Id.* ¶ 18.) On the morning of the scheduled appointment, Gloria learned that the clinic was no longer seeing new patients because the Florida Medical Boards had issued new rules banning the prescribing of medications to treat gender dysphoria for transgender youth. (*Id.* ¶ 20.) Gloria immediately sought out another clinic, hoping that Gavin could be assessed for treatment. (*Id.* ¶ 22.) The earliest appointment she could get for Gavin is September of 2023 at a clinic in New England, but she learned that the appointment is tentative pending a recommendation by that clinic's legal counsel regarding the risk associated with seeing a patient who lives in Florida. (*Id.*)

Gavin has positive relationships and development at school. (*Id.* ¶¶ 13–14.) While some school personnel know that he is transgender, Gavin does not want his classmates to know. (*Id.* ¶ 15.) If Gavin cannot receive puberty blockers, he will begin developing characteristics that will irreversibly identify him by his birth sex and predictably cause him serious psychological distress. (Goe Decl. Ex. A (Letter by Dr. Nicole M. Bruno).)

### B. Gender Transition Is the Established Course of Medical Care for the Treatment of Gender Dysphoria

Gender identity is a person's internal sense of their sex. (*See e.g.*, Declaration of Dr. Daniel Shumer ("Shumer Decl.") ¶ 25); Declaration of Dr. Aron Janssen ("Janssen Decl. ¶ 17.) It is innate, has significant biological underpinnings, and cannot be changed. (Shumer Decl. ¶¶ 28–32; Janssen Decl. ¶ 19.) Every person has a gender identity. For most people, their gender identity aligns with their birth sex. For transgender people, however, that is not the case. (Shumer Decl. ¶ 25.)

Gender dysphoria is a serious medical condition that has been recognized and treated for decades. (Declaration of Dr. Brittany Bruggeman ("Bruggeman Decl.") ¶ 22; Shumer ¶ 35.) The diagnosis describes the clinical distress that a transgender person feels as a result of being made to live without any way to resolve the conflict between their birth sex and their gender identity. (Bruggeman Decl. ¶¶ 20; Shumer Decl. ¶ 35.) Gender dysphoria can be experienced by both youth and adults; it is rare, occurring in less than one percent of the population.

(Bruggeman Decl. ¶¶ 20, 69.) Left untreated, gender dysphoria may cause serious harms, including anxiety, depression, distress, self-harm, and suicidality. (Bruggeman Decl. ¶ 20; Shumer Decl. ¶ 39.)

The medical treatments for gender dysphoria are well-established (Bruggeman ¶ 21; Shumer Decl. ¶ 39.) When individuals with gender dysphoria receive appropriate medical care, they can thrive. (Bruggeman Decl. ¶ 49; Shumer Decl. ¶ 40.) The overall course of treatment that allows a transgender person to live consistent with their gender identity is called gender transition. (Bruggeman Decl. ¶ 24; Shumer Decl. ¶ 56.) For minors who experience gender dysphoria, being able to transition and receive appropriate medical care (often referred to as gender-affirming care) may be lifesaving. (Bruggeman Decl. ¶ 56.)

For more than four decades, medical organizations have developed standards of care for the treatment of gender dysphoria. (Bruggeman Decl. ¶¶ 22-23; Shumer Decl. ¶¶ 45–46.) The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published standards of care and guidelines for treating gender dysphoria in children, adolescents, and adults, representing an expert consensus based on the best available science on transgender healthcare.[3] (Bruggeman Decl. ¶¶ 22, 51; Shumer Decl. ¶¶ 45–51.) Endorsed by the leading major medical organizations, the standards of care confirm that transition, including the use of puberty blocking medications and

hormone therapy when medically necessary, is a safe and effective treatment for gender dysphoria. (Bruggeman Decl. ¶¶ 22, 51-52; Shumer Decl. ¶¶ 52–53; Janssen Decl. ¶ 8.)

The specific components of a patient's transition and treatment plan are based on that individual's medical and mental health needs after comprehensive evaluation by a multidisciplinary team. (Bruggeman Decl. ¶¶ 30, 39; Shumer Decl. ¶ 37.) Qualified professionals manage these treatments. (Bruggeman Decl. ¶¶ 13, 30; Shumer Decl. ¶ 37.) The American Academy of Pediatrics has adopted this treatment protocol as safe and effective for the health and well-being of adolescents suffering from gender dysphoria. (Bruggeman Decl. ¶ 51; Shumer Decl. ¶ 52.)

Before a minor begins any treatment for gender dysphoria, health care providers undertake a rigorous informed consent process. (Bruggeman Decl. ¶¶ 30, 41, 45, 57; Shumer Decl. ¶ 65; Janssen Decl. ¶¶ 34–37, 41.) Once informed consent is obtained, there is extensive parent and patient education, counseling of parents and patients, and communication and coordination among physicians. (Bruggeman Decl. ¶ 30, 41; Janssen Decl. ¶ 41.)

The standards of care for the treatment of gender dysphoria in minors consist of social transition and related medical interventions that allow a young person to live consistently with their gender identity. (Bruggeman Decl. ¶¶ 22-29; Shumer Decl. ¶¶ 55–56; Janssen Decl. ¶ 25.) Social transition can include a person

using a name and pronouns that better align with their gender identity, wearing clothing and expressing themselves consistent with their gender identity, and amending their legal identification documents to reflect their gender identity. (Bruggeman Decl. ¶ 25; Shumer Decl. ¶ 45; Janssen Decl. ¶ 25.)

After the onset of puberty, minors diagnosed with gender dysphoria may be prescribed puberty blocking medications to prevent them from continuing to undergo endogenous puberty and developing permanent physical characteristics that conflict with their gender identity. (Bruggeman Decl. ¶¶ 26-27; Shumer Decl. ¶ 61.) Puberty blocking medications pause endogenous puberty at whatever stage it is when the treatment begins, limiting the influence of a person's endogenous hormones on their body. (Bruggeman Decl. ¶ 28; Shumer Decl. ¶ 62.) For example, a transgender girl on puberty blocking medication would not experience the physical changes caused by testosterone, including facial and body hair, male muscular development, an Adam's apple, or masculinized facial structures. (Bruggeman Decl. ¶¶ 26, 53, 55; Shumer Decl. ¶ 62.) Similarly, a transgender boy on puberty blocking medication would not experience breast development, menstruation, or widening of the hips. (Bruggeman Decl. ¶¶ 26, 53; Shumer Decl. ¶ 62.)

Treatment with puberty blocking medication is reversible; if a minor stops taking the medication, endogenous puberty resumes. (Bruggeman Decl. ¶ 28;

Shumer Decl. ¶¶ 63–64.) In addition to alleviating gender dysphoria and supporting a child's social transition, puberty blocking medications may eliminate the need for future surgical treatments to treat ongoing gender dysphoria as an adult, such as chest surgery, facial and body hair electrolysis, and feminizing facial surgeries. (Bruggeman Decl. ¶ 53; Shumer Decl. ¶ 65.) Banning puberty blocking medications for transgender adolescents may require them to undergo future surgeries as adults that they could otherwise avoid. (Bruggeman Decl. ¶ 53; Shumer Decl. ¶ 65.)

Later in adolescence, a transgender young person may be prescribed hormone therapy. (Bruggeman Decl. ¶ 29; Shumer Decl. ¶ 68.) Before such therapy begins, a mental health professional must: (1) confirm the persistence of gender dysphoria; (2) assess whether any coexisting psychological, medical, or social problems that could interfere with treatment have been addressed and whether the minor's situation and functioning are stable enough to start treatment; and (3) verify that the minor has an understanding of the consequences of the treatment. (Bruggeman Decl. ¶¶ 36-37; Shumer Decl. ¶ 70.) A pediatric endocrinologist or other medical doctor must also consent to and monitor the treatment plan. (Bruggeman Decl. ¶ 38; Shumer Decl. ¶¶ 56, 68.) With this treatment, a transgender adolescent would have the same typical levels of testosterone or estrogen as their non-transgender peer. (Shumer Decl. ¶ 71.)

### C. Florida's Transgender Medical Bans

On June 2, 2022, Defendant State Surgeon General Ladapo sent a letter to Defendants Florida Board of Medicine and Board of Osteopathic Medicine to "establish a standard of care" for the treatment of gender dysphoria.[2] On July 28, 2022, the Florida Department of Health petitioned (hereinafter the "FDOH Petition") the Boards to initiate rulemaking to ban all medical treatment of gender dysphoria for minors.[3] On August 5, 2022, the Boards discussed Ladapo's June 2, 2022 letter and the FDOH Petition, voted to accept the FDOH Petition, and notified the public of the initiation of the rulemaking process.

At a joint meeting on October 28, 2022, the Medical Boards voted in support of proposed rule language that would ban puberty blockers and hormones, with an exception for nonsurgical treatment performed under an Institutional Review Board (IRB) approved clinical trial.[4] On November 4, 2022, and February 10, 2023, respectively, the Board of Medicine and the Board of Osteopathic Medicine voted to remove the exceptions from their proposed rules.

---

[2] Letter from Surgeon General Ladapo to Florida Board of Medicine (June 2, 2022), https://perma.cc/DR2F-YKHG.
[3] Florida Department of Health's Petition to Initiate Rulemaking, *In re: Petition to Initiate Rulemaking Setting the Standard of Care for Treatment of Gender Dysphoria* (hereinafter "FDOH Petition") (July 28, 2022), available at https://perma.cc/5QHF-54BP.
[4] Meeting Minutes from the Florida Board of Medicine Board Meeting (Aug. 5, 2022), https://ww10.doh.state.fl.us/pub/medicine/Agenda_Info/Public_Information/Public_Minutes/2022/August/08052022_FB_Minutes.pdf.

The Florida Board of Medicine filed Rule No. 64B8-9.019 for adoption on February 24, 2023, and the Florida Board of Osteopathic Medicine filed Rule No. 64B15-14.014 for adoption on March 8, 2023. Both final rules contained the same language, which states:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>
> > (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
> > (b) Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

The Rules became effective on March 16, 2023, and March 28, 2023, respectively.

## III.   Argument

The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. *Powers v. Sec., Fla. Dep't of Corrections*, 691 F. App'x 581, 583 (11th Cir. 2017). To obtain a preliminary injunction, a movant must show: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to

the public interest." *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)). "[A]ll of the well-pleaded allegations of [the] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

### A. Plaintiffs Will Likely Succeed on the Merits of their Claims Because the Bans are Unconstitutional

Plaintiffs are substantially likely to succeed on the merits of their claims. The Bans infringe upon the Parent Plaintiffs' constitutional right to make medical decisions for their minor children and single out transgender minors for unequal treatment. As such, the Bans are subject to, and fail, heightened scrutiny. Rather than advancing any compelling or important governmental interests, they bar treatments that are safe, effective, and necessary for some transgender youth.

Federal courts have enjoined similar bans in other states, concluding that they infringe on parental autonomy and pose a serious risk to the health and well-being of transgender adolescents. "Parents, pediatricians, and psychologists—not the State or this Court—are best qualified to determine whether transitioning medications are in a child's best interest on a case-by-case basis." *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. May 13, 2022), *appeal docketed*, No. 22-11707 (11th Cir. May 18, 2022); *see also Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D.Ark. 2021), *aff'd sub nom.*, 47 F.4th 661 (8th Cir. 2022) (finding that "Parent

Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."). The denial of this medical care will force Minor Plaintiffs to "to live with physical characteristics that do not conform to their gender identity, putting them at high risk of gender dysphoria and lifelong physical and emotional pain." *Brandt*, 551 F. Supp. 3d at 892; *see also Eknes-Tucker*, 603 F. Supp. 3d at 1150 ("without transitioning medications, Minor Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality").

### 1.   The Bans Infringe on Parental Autonomy by Preventing Parents from Obtaining Established Medical Care for their Children

The Bans violate the fundamental right of the Parent Plaintiffs to obtain established medical care for their children. The Constitution protects parents' rights to make decisions "concerning the care, custody, and control of their children," based on a "presumption" that "fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 68 (2000). This right is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id*. at 65; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (collecting cases, including *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), *and Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,* 268 U.S. 510, 535 (1925)); *May v. Anderson*, 345 U.S. 528, 533 (1953) (recognizing that parental rights are "far more precious . . . than

property rights"). Any substantial infringement of this fundamental right is subject to strict scrutiny. *Lofton v. Sec'y of Dep't of Child. & Fam. Serv.*, 358 F.3d 804, 815 (11th Cir. 2004).

A parent's ability to seek and obtain established medical care to protect a child's health is a core aspect of this fundamental right. The Due Process Clause prohibits a state, "concerned for the medical needs of a child," from "willfully disregard[ing] the right of parents to generally make decisions concerning the treatment to be given to their children." *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990). "[P]arents have the right to decide free from unjustified governmental interference in matters concerning the growth, development and upbringing of their children." *Id.* (quoting *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 313 (11th Cir. 1989)).

The Bans negate this fundamental right by preventing the Parent Plaintiffs from obtaining care that has been available for decades, that is supported by our nation's leading medical associations, and that has been deemed medically necessary for their children by the children's treating providers.

None of Defendants' likely justifications for this intrusion on parental rights have merit, much less come close to meeting the strict scrutiny test. *See Eknes-Tucker*, 603 F. Supp. 3d at 1146 (holding Alabama's law criminalizing the provision of transition medications was "not narrowly tailored to achieve a

compelling government interest"); *Brandt*, 551 F. Supp. 3d at 893 (same).

### 2.   The Bans Violate Equal Protection by Barring Medical Treatments for Transgender Adolescents

The Bans single out transgender adolescents to deny them medical care. As such, they discriminate based on transgender status and sex and may be upheld only if supported by an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 531 (1996). Because the Bans cannot meet even rational basis review, much less this much more demanding test, Plaintiffs have a substantial likelihood of proving that the Bans violate the Equal Protection Clause.

#### a.   *The Bans are Subject to Heightened Scrutiny Under Well-Established Precedent*

The Bans' discrimination against transgender people is apparent on their face. They prohibit "therapies and procedures performed for the treatment of gender dysphoria in minors," a condition experienced only by transgender minors. Rule Nos. 64B8-9.019, 64B15-14.014, Fla. Admin. Code (2023). Courts considering similar categorical exclusions have recognized that such measures facially discriminate based on a person's transgender status. *See e.g.*, *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022); *Kadel v. Folwell*, No. 19-cv-272, 2022 WL 3226731, at *19 (M.D.N.C. Aug. 10, 2022); *Fain v. Crouch*, 2022 WL 3051015, at *8 (S.D. W.Va. Aug. 2, 2022); *Eknes-Tucker*, 603 F. Supp. 3d at 1146–48; *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1027, 1030

(D. Alaska 2020); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1019–22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1002–03 (W.D. Wis. 2018).

As these courts have recognized, it is not necessary that a law use the word "transgender" to facially discriminate against transgender people, just as a law criminalizing same-sex intimacy need not use the words "homosexuality" or "gay" to discriminate based on sexual orientation. Under settled law, a statute that classifies based on conduct or characteristics that either define or are closely correlated with a particular group facially discriminates against that group. *See, e.g.,Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010) (holding that a club's exclusion of people because they engaged in same-sex conduct was discrimination based on sexual orientation); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (stating that a law targeting conduct "closely correlated with being homosexual" is "directed toward gay persons as a class").

By discriminating against transgender people, the Bans also discriminate based on sex. Both the Supreme Court and the Eleventh Circuit have held that discrimination because a person is transgender is discrimination based on sex. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1741 (2020) (holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based  on sex"); *Glenn v. Brumby*,

663 F.3d 1312, 1316 (11th Cir. 2011) (holding that "discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause").

Under this controlling law, the Bans' targeting of transgender adolescents is subject to heightened scrutiny review under the Equal Protection Clause. *Brumby*, 663 F.3d at 1319 (holding that "discrimination on this basis is a form of sex-based discrimination that is subject to heightened scrutiny under the Equal Protection Clause").

In addition, even if considered as an independent classification, discrimination based on transgender status meets the criteria for suspect classification established in *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). As many courts across the country have held, transgender people have suffered a history of discrimination; being transgender is an immutable trait and one that is unrelated to a person's ability to participate in or contribute to society; and people who are transgender lack the political power to achieve full equality through the political process.[5] For these reasons, as well as because discrimination based on

---

[5] *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F. 3d 1034, 1051 (7th Cir. 2017); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004); *Toomey v. Arizona*, No. CV-19-00035-TUC-RM, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019); *Stone v. Trump*, 400 F. Supp. 3d 317, 355 (D. Md. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704 (D. Md. 2018); *Board of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of New York*, 143 F. Supp.3d 134, 139 (S.D.N.Y. 2015).

transgender status is based on sex, policies that single out transgender people warrant heightened review.

Accordingly, Defendants "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 516 (1996) (quotations omitted) (modifications in original). The justification for the classification must be "exceedingly persuasive," the burden of which "is demanding, and . . . rests entirely on the State." *Id*. Neither Defendants' asserted interests nor the alleged relationship between the interests and the discriminatory classification may "rely on overbroad generalizations." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1692 (2017). Nor may Defendants "hypothesiz[e] or inven[t]" its interests "*post hoc* in response to litigation"—they must be the actual goals the policy was intended to advance at the time it was created. *Id.* at 1696–97 (quoting *Virginia*, 518 U.S. at 533).

### b. *Defendants Cannot Establish that their Asserted Justifications Serve Important Governmental Objectives or the that Bans are Substantially Related to the Achievement of those Objectives*

The Bans prohibit parents from obtaining established care for their transgender children. Decades of evidence support the safety and efficacy of medications for treating gender dysphoria in adolescents. (Bruggeman Decl. ¶ 22;

Shumer Decl. ¶¶ 38–53; Janssen Decl. ¶¶ 29–30.) The Bans deprive transgender adolescents of medically necessary care and put them at risk of serious harms, including severe depression, anxiety, suicidality, and self-harm. As another federal district court recently held with respect to a similar ban, banning medical treatment for transgender adolescents fails heightened scrutiny and "would not even withstand rational basis scrutiny" because "[g]ender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and "[e]very major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people"); *Brandt*, 551 F. Supp. 3d at 891–92; *see also Eknes-Tucker,* 603 F. Supp. 3d at 1138 (same); (Bruggeman Decl. ¶¶ 21–23, 50–52; Shumer Decl. ¶ 39; Janssen Decl. ¶ 28).

Defendants' justifications for the Bans have no basis in medical science and undermine, rather than advance, their purported goals of protecting children's health and safety. The Bans cannot survive even a cursory review, much less the demanding scrutiny required by this case.

### i.    *The treatments are effective and well-established*

Defendants are likely to claim that the use of puberty blocking medications and hormone therapy are ineffective to treat this condition, but that is factually inaccurate. In fact, decades of substantial scientific evidence show that these

treatments significantly improve mental health outcomes for transgender adolescents, including reducing rates of suicidal ideation and suicide attempts, which are significantly higher among transgender adolescent children when compared to their non-transgender peers. (Bruggeman Decl. ¶¶ 56, 61, 63; Shumer Decl. ¶¶ 38–53; Janssen Decl. ¶¶ 28–30.)

> ### ii.  The treatments are safe, and parents and patients are capable of assessing risks and benefits and providing informed consent and assent

Defendants cannot demonstrate that treatments for gender dysphoria are unsafe or that transgender adolescents and their parents are unable to assess their risks and benefits.

First, Defendants' likely assertion that the treatments are unsafe because they involve off-label use has no merit. "Off-label" refers to use of medication that has been approved by the Food and Drug Administration (FDA), but not for all conditions for which it may be effective.[6] Many established medical treatments involve off-label uses of FDA-approved medications. (Shumer Decl. ¶ 67.) Off-label use of medications for children is common and sometimes necessary, because an "overwhelming number of [FDA-approved] drugs" have no FDA-approved instructions for use in pediatric patients.[7]

---

[6] See Am. Acad. Pediatrics Comm. Drugs, Off-Label Use of Drugs in Children, 133 Pediatrics 563-67 (2014).

[7] Id.

The American Academy of Pediatrics specifically approves the off-label use of drugs:

> The purpose of off-label use is to benefit the individual patient. Practitioners use their professional judgment to determine these uses. As such, the term "off-label" does not imply an improper, illegal, contraindicated, or investigational use. Therapeutic decision-making must always rely on the best available evidence and the importance of the benefit for the individual patient.[8]

There is no legitimate reason, much less an important one as is required under heightened scrutiny review, to adopt a different rule for medications used to treat gender dysphoria in transgender patients.

Second, the medications used to treat gender dysphoria, including puberty blockers and hormones, are routinely used in the treatment of other medical conditions in youth. (Bruggeman Decl. ¶¶ 52, 54; Shumer Decl. ¶¶ 66–67.) Puberty blocking medication has been used for decades to treat a medical condition known as "precocious puberty." (Bruggeman Decl. ¶¶ 52, 54; Shumer Decl. ¶¶ 63, 66.) These medications are also used to treat verified disorder[s] of sexual developments, often referred to as intersex conditions. (Bruggeman Decl. ¶ 58.) Hormone therapy is often used to treat medical conditions experienced by adolescents, including painful menstruation, amenorrhea, and serious acne. (Bruggeman Decl. ¶ 58). While no medication can be shown to have zero risks,

---

[8] *Id.*

puberty blocking medication and hormones are considered very safe and well within acceptable risk factors for approved medication for minors. (Bruggeman Decl. ¶¶ 51–52, 54, 58, 60, 63; Shumer Decl. ¶¶ 74–86; Janssen Decl. ¶¶ 29–33.)

Moreover, contrary to any assertion that parents and patients are unable to provide informed consent to these treatments, any prescribed treatments, including puberty blocking medication and hormone therapy, are undertaken only after thorough assessment and discussion with parents and minor patients, and only after ensuring that all persons involved understand the need for treatment along with any attendant risks, just as in other medical situations where medication may be required to treat a condition. (Bruggeman Decl. ¶¶ 30, 36, 44-46, 54, 59; Shumer Decl. ¶¶ 37, 68, 70; Janssen Decl. ¶¶ 34–48.)

### iii. Rather than protecting transgender adolescents, the Bans deprive Minor Plaintiffs of established medical care and leave them with no effective treatment for their gender dysphoria

In addition to lacking any basis in medical science, the Bans also fail heightened scrutiny because they deprive Minor Plaintiffs of established medical care to treat a serious medical condition. Under the standards of care, puberty blocking medication and hormone therapy are recognized as safe and effective treatments for adolescents with severe gender dysphoria. For many patients, there are no alternative medications or treatments that treat the condition. As a result, the Bans leave Minor Plaintiffs without medical treatment for their gender

27

dysphoria.

The irrationality—and harmfulness—of that result is underscored by the fact that the Bans permit minors who are already receiving these medications to continue doing so. If the banned medications are sufficiently safe and effective to permit youth already receiving them to continue treatment, there is no legitimate reason to bar them for youth with the same medical condition and whose medical need for them will arise in the future. This discrepancy defies logic and strongly suggests that the justifications are a post hoc justification for impermissible discrimination.

In sum, the burden is on Defendants to justify the Bans under heightened scrutiny, and they cannot do so. Defendants' policies lack even a rational justification, much less one that meets the much more demanding test applicable here. Rather than protecting the health of transgender adolescents, Defendants' categorical Bans harm the Minor Plaintiffs by depriving them of the individualized care and treatment to which they are entitled under established medical standards of care.

## IV.    The Bans are Causing Irreparable Harm to Plaintiffs

As an initial matter, it is well settled that the deprivation of constitutional rights, even without more, constitutes irreparable harm. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.

1990). Here, the Bans deprive Plaintiffs of due process and equal protection, which in itself constitutes irreparable harm sufficient to warrant preliminary relief. The Bans violate parental rights. *See Eknes-Tucker*, 603 F. Supp. 3d at 1150 (finding parent plaintiffs demonstrated irreparable harm where act banning transition-related care for minors infringed on their fundamental right to parent their children); *Brandt*, 551 F. Supp. 3d at 892–93 (same). And the Bans deprive transgender adolescents of equal protection. *Eknes-Tucker*, 603 F. Supp. 3d at 1148; *Brandt*, 551 F. Supp. 3d at 892.

In addition, the Bans inflict other severe and irreparable harms. First, the Bans prevent the Parent Plaintiffs from obtaining established and time-sensitive medical care for their children. Like other parents, these Parent Plaintiffs want to be able to care for their children—to get their children the medical care that their treating physicians have recommended, and that they have witnessed for themselves, is essential to their children's ability to thrive. The Bans inflict serious, irreparable harm by barring the Parent Plaintiffs from acting in the best interests of their children, forcing them to sit by while their children suffer preventable harms.

Second, the Bans inflict irreparable harm by depriving the Minor Plaintiffs of necessary medical care for a serious medical condition. (Roe Decl. ¶¶ 9–10; Goe Decl. Ex. A). This denial will cause irreversible and harmful physical changes and

irreparable psychological harm, which may include anxiety, depression, severe psychological distress, and suicidality. Denial of medically necessary medical care is sufficient to show immediate and irreparable harm. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483–84 (1986) (finding denial of benefits caused irreparable injury by exposing plaintiffs to "severe medical setback[s]" or hospitalization); *Eknes-Tucker*, 603 F. Supp. 3d at 1150; *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1206-07 (S.D. Fla. June 6, 2020) (holding that increased likelihood of serious illness constitutes an irreparable injury); *Flack v. Wis. Dep't of Health Servs.*, 331 F.R.D. 361, 373 (W.D. Wis. 2019) (denying coverage for medical treatment for gender dysphoria is irreparable harm).

Due to the nature of gender dysphoria and its time-sensitive treatments, every day that goes by in which Minor Plaintiffs are unable to obtain the medical care they need has a detrimental effect on both their immediate and long-term health and well-being.

As the district court found in *Brandt* when enjoining a similar Arkansas law, barring transgender youth from established medical care forces them to "undergo endogenous puberty," causing them to "live with physical characteristics that do not conform to their gender identity, putting them at high risk of gender dysphoria and lifelong physical and emotional pain." 551 F. Supp. 3d at 892; *see also Campbell v. Kallas*, No. 16-CV-261-JDP, 2020 WL 7230235, at *8 (W.D. Wis.

Dec. 8, 2020) (slip op.) (finding plaintiff demonstrated "irreparable injury" required for an injunction where plaintiff "continues to suffer from gender dysphoria, which causes her anguish and puts her at risk of self-harm or suicide").

Without the essential treatment Susan Doe needs, she will undergo a male puberty that conflicts with her female gender identity, causing her to suffer devastating and irreversible physical and psychological consequences. (Doe Decl. ¶¶ 21–22.) Susan Doe has expressed that this scenario is her "worst nightmare," and her mother, Jane Doe, can think of nothing more painful than watching her daughter go through the avoidable harms that will accrue due to the denial of this medically necessary treatment. (*Id.* ¶¶ 22, 26–29.)

The Bans are likewise harming Gavin Goe; they are preventing him from being assessed for medical care while approaching the age at which puberty will begin. (Goe Decl. Ex. A). Similarly, Lisa's doctor has determined that she needs puberty blocking medications, but her endocrinologist can no longer treat her in Florida because the Bans prohibit him from doing so. (Loe Decl. ¶ 11). For both Gavin and Lisa, going through a puberty that aligns with their birth sex rather than their gender identities will result in unwanted physical changes and psychological distress. These changes may cause Gavin and Lisa lifelong suffering and distress, in addition to putting them immediately at risk for the serous harms associated with untreated gender dysphoria. (Goe Decl. Ex. A; Loe Decl. ¶¶ 14–15.)

These harms are serious, irreparable, and potentially life-threatening. (Bruggeman Decl. ¶¶ 26, 50, 56, 61, 64–69; Shumer Decl. ¶ 39; Janssen Decl. ¶¶ 28; Roe Decl. ¶¶ 9–10; Goe Decl. Ex. A.)

## V.   The Imminent Threat of Harm to Plaintiffs Outweigh Any Damage to Defendants, Who Lack an Interest in Enforcing Unconstitutional Rules

The serious irreparable harms that Plaintiffs will experience if the Bans remain in effect outweigh any countervailing government interest. When "the nonmovant is the government, . . . the third and fourth requirements [for an injunction]—'damage to the opposing party' and 'public interest'—can be consolidated." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (internal citations omitted); *Eknes-Tucker*, 603 F. Supp. 3d at 1150–51. In addition, there is no "legitimate interest in enforcing an unconstitutional [regulation]." *Otto*, 981 F.3d at 870.

Here, the balance of equities strongly favors an injunction. The medical care provided to transgender adolescents has been available for many years, and Defendants implicitly acknowledge that it is safe by permitting youth who were already receiving it to continue to do so. Under these circumstances, it is difficult to see any injury to Defendants or others that would be caused by delaying enforcement of the Bans while the case proceeds. Doing so would merely maintain the status quo before the Bans took effect.

In sharp contrast, the immediate harms to Plaintiffs if the bans are enforced are severe. The Parent Plaintiffs would be deprived of the "enduring American tradition" of "nurturing and caring for their children." *Eknes-Tucker*, 603 F. Supp. 3d at 1151 (citation omitted). The Minor Plaintiffs would experience a cascade of physical and psychological harms. Because these harms are so great, other courts have preliminarily enjoined similar bans. *Eknes-Tucker*, 603 F. Supp. 3d at 1150–51; *Brandt*, 551 F. Supp. 3d at 894.

## VI.  The Court Should Enjoin Enforcement of the Bans

"[I]n the case of a constitutional violation, injunctive relief must be tailored to fit the nature and extent" of the violation. *Georgia Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021), *vacated as moot*, 33 F.4th 1325 (11th Cir. 2022). "Once invoked, the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (internal citations omitted). Unconstitutional agency regulations, like the transgender medical Bans, "are ordinarily vacated universally, not simply enjoined in application solely to the individual plaintiffs." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 64 (D.D.C. 2020).

An order enjoining the Bans on their face is necessary and proper. The Bans prohibit all doctors throughout Florida from prescribing the medications the Minor Plaintiffs need to remain healthy and thrive. The only remedy that will redress that

injury is an injunction that prevents Defendants from enforcing the Bans. Each of the movants needs to be able to find and secure medical treatment from doctors and healthcare providers to get the care they need.  The Minor Plaintiffs cannot know with certainty the identity of all providers they may need to consult, nor is it feasible to issue an injunction that would apply only to specific patients or providers. In addition, the Bans are causing cascading effects including clinic closures and diminishment of available providers. All of those effects will continue and expand without a facial injunction against the Bans. As other courts considering similar bans have done, this Court should preliminarily enjoin Defendants from enforcing the Bans.

## VII.   Request for Relief from Requirement to Post Bond

Plaintiffs request an exemption from the requirements of Fed. R. Civ. P. 65(c). "[T]he amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court . . . [and] the court may elect to require no security at all." *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Srvs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005).  Waiving the bond requirement is particularly appropriate in public interest litigation, where Plaintiffs allege the infringement of their constitutional rights. *See id*; *Washington v. DeBeaugrine*, 658 F. Supp. 2d 1332, 1339 (N.D. Fla. 2009); *Eknes-Tucker*, 2022 WL 1521889, at *13.

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin enforcement of the Bans while this lawsuit is pending.

Respectfully submitted this 24th day of April, 2023.

**SOUTHERN LEGAL COUNSEL**

*By: /s/ Simone Chriss*
**Simone Chriss**
Florida Bar No. 124062
**Chelsea Dunn**
Florida Bar No. 1013541
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**HUMAN RIGHTS CAMPAIGN FOUNDATION**

**Ami Patel**\* (CA No. 325647)
**Jason Starr**\* (NY No. 5005194)
Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 993-4180
Facsimile: (202) 628-0517
Ami.Patel@hrc.org
Jason.Starr@hrc.org

**NATIONAL CENTER FOR LESBIAN RIGHTS**

**Christopher F. Stoll**
(CA Bar No. 179046)
**Kelly Jo Popkin**
(NY Bar No. 5698220)\*
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel. 415-365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

**GLBTQ LEGAL ADVOCATES & DEFENDERS**

**Jennifer Levi**\*
**Chris Erchull**\*
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
cerchull@glad.org

*\* Admitted pro hac vice*

***Counsel for Plaintiffs***

## <u>CERTIFICATION OF WORD LIMIT</u>

Pursuant to Local Rule 7.1(F), undersigned counsel certifies that, according to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there are 668 total words contained within the Motion, and there are 7,209 words contained within the Memorandum of Law.

*/s/ Simone Chriss*

Simone Chriss

## **CERTIFICATE OF SATISFACTION OF ATTORNEY-CONFERENCE REQUIREMENT**

Pursuant to Local Rule 7.1(B), Counsel for Plaintiffs requested to meet and confer with Defendants' Counsel on April 20, 2023. On April 24, 2023, Counsel for Defendants indicated that Defendants oppose the relief sought.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 24, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Counsel for Defendants stated that they would accept service via email. I certify that I served by email the foregoing on the following non-CM/ECF participant:

Mohammad O. Jazil
Counsel for Defendants
Holtzman Vogel
(850) 391-0503
mjazil@holtzmanvogel.com

*/s/ Simone Chriss*
Simone Chriss