# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
## Tallahassee Division

JANE DOE, individually and on behalf of her minor daughter, SUSAN DOE, et al.,

*Plaintiffs*,

v.

JOSEPH A. LADAPO, M.D., *in his official capacity as Florida's Surgeon General of the Florida Department of Health,* et al.,

*Defendants*.

Case No. 4:23-cv-00114-RH-MAF

## DECLARATION OF JANE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Jane Doe,[1] hereby declare and state as follows:

1.  I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to those facts if called to do so.

2.  I am a plaintiff in this Action and I am the parent and next friend of my minor child, Susan Doe, who is also a Plaintiff in this action.

---

[1] Because of concerns about my child's privacy and safety, I have filed a motion with this Court seeking to proceed in this case under a pseudonym. *See ECF 21, Motion to Proceed Pseudonymously*. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. My attorneys have a copy of that separate declaration.

1

3.      I am a Florida resident. I live in St. Johns County with my four children and my husband.

4.      I was born and raised in New York. I am a special education teacher licensed to work in K-12, and I have a Masters of Education in special education, with two highly qualified endorsements in math and language arts (ELA). I have taught both high school and middle school for many years in various states.

5.      My husband is a Senior Officer in the U.S. Military. He is a Lieutenant Commander in the U.S. Navy, in line to become Commander, and is current on assignment at the Pentagon. My family was stationed in Florida due to my husband's job.

6.      My daughter, Susan, who is also a Plaintiff in this action, is an eleven-year-old girl who is transgender.

7.      Susan began stating that she is a girl from an early age and has consistently done so since that time.

8.      Even before Susan could speak, she gravitated toward her sister's dolls and would not play with any of the "traditional boy's toys" we purchased for her. She was always genuinely confused as to why these things were being offered to her. Susan would constantly ask me why I was dressing her in boys' clothes. She repeatedly told me that she was a girl and developed extreme anxiety and distress

2

about wearing "boys' clothes." This finally escalated to the point that she would rip her clothes off on the way to daycare until she was in only a diaper.

9. Around the age of three, after she began expressing significant distress about her clothing, I brought Susan to the pediatrician and explained what was happening, looking for an answer to help my unhappy and anxious child.

10. The pediatrician advised me "not to fight it" and to allow her to dress the way she felt comfortable and play with the toys she naturally gravitated to. He advised me "it will be either pass or it won't, but either way it will be okay."

11. This was difficult at first, as I was fearful about how the world would receive and treat my child. But we could not sit by and allow her to continue suffering based on our notions of what clothes are "normal" or "typical" for little girls and little boys.

12. Once we began allowing Susan to wear dresses, including to school (after discussions with school leadership and her teachers), she was like a different child. She was happy, glowing, secure, and we began to see all of the little things that made Susan exactly who she was. She began to flourish in ways that took my breath away once she was able to live her truth and express herself.

13. I came from a strict Irish Catholic family, so initially it was difficult for my family to understand what was happening. It took a year or two for my family to

understand that this was not a phase, but rather this is who Susan is. She is lucky to have a network of family who support her and love her unconditionally.

14. Because Susan was able to socially transition so early, she has gone through school from pre-K to her current grade, without anyone ever knowing that her sex assigned at birth was male. She has had the privilege that so many trans youth are denied, the privilege of navigating through the world without having to explain who she is, or be subjected to discrimination or hatred because of her mere existence.

15. That will all change, however, if Susan is forced to go through endogenous puberty because of the Florida Medical Boards' new rules. This would not only be physically, emotionally, and psychologically devastating for Susan, but it would also "out" her to others without her consent.

16. Susan has been legally recognized as female by the state and federal government. Her government-issued identification documents, including her birth certificate and official education records, reflect her legal gender marker: female.

17. We have done everything right, following the Standards of Care and the guidance of numerous doctors with clinical expertise in the treatment of gender dysphoria. Susan's gender dysphoria diagnosis has been confirmed by doctors in Nevada, in Virginia, in Florida, and at the Pentagon, including the doctor who is responsible for the transgender health program for the entire United States military. We have always sought out the expertise of the most qualified medical providers we

could find in the country, and we have followed their guidance throughout Susan's transition.

18.     Susan is right on the cusp of puberty. However, well before she was approaching the start of puberty, and prior to discussing puberty blocking medications with a pediatric endocrinologist, we took Susan to see a psychotherapist who specializes in transgender youth. The psychotherapist assessed Susan and concluded there were no mental health issues or any other concerns that would deem puberty blocking medications inappropriate for Susan. She said puberty blocking medications would likely be medically necessary when the time was right, and expressed that Susan should meet with a pediatric endocrinologist to determine next steps.

19.     We then made an appointment to get established as patients at the University of Florida ("UF") Health Youth Gender Program. Though our appointments require approximately 4 hours of driving round trip, we felt it was so important to establish care with a multidisciplinary treatment team with expertise in the treatment of gender dysphoria in minors. The pediatric endocrinologists at the Youth Gender Program have been monitoring Susan's prepubertal development and Tanner Stage for the past year and a half. Susan's pediatric endocrinologist has explained all the details about beginning puberty blocking medication when the time is right and this medication becomes medically necessary, including significant

5

counseling on the effects, risks, and the science supporting the use of these medications for youth experiencing gender dysphoria.

20. Susan's medical providers, including her pediatrician, pediatric endocrinologist, and medical provider on base, have all concluded that pursuant to the authoritative standards of care, it will be medically necessary for Susan to begin puberty blocking medications as soon as she enters Tanner Stage 2, which could be any day now. But the Board rules prohibit my child from receiving the treatment that has been recommended as medically necessary by her treating providers. The rules rob her of the right to access evidence-based medical care that has been deemed necessary to treat her gender dysphoria by the experts overseeing her medical care.

21. Denying my child medications to treat gender dysphoria would be cruel. Susan is a happy, kind, thoughtful, loving child. She is a straight A student, a girl scout, a talented gymnast, a visual artist, the captain of the safety patrol team at her school, on the principal's honor roll, part of the choir group, and a leader among her friend groups. She is loved by teachers, neighbors, and friends. She is sassy, smart, compassionate, intuitive, and lives her life in a way that gives more than she takes.

22. Forcing her to go through endogenous male puberty would be life changing and devastating for Susan's physical, emotional, and psychological

6

wellbeing. In fact, she has stated to me many times -- and it breaks my heart -- that her biggest fear is having to "turn into a boy."

23. The Board rules substitute the judgment of a group of providers who have never met nor treated my child, for the judgment of my child's actual medical providers who are experts on her medical needs and experts in the treatment of gender dysphoria in minors. They strip me, the parent of Susan, of the right to determine the best course of medical care for my own daughter.

24. The Board rules put me and my husband in an impossible position, as we do not have the luxury of simply moving to another state where our parental rights to determine the medical care for our own child will not be trampled upon, where the rights of parents are truly respected and upheld. I never in my wildest dreams imagined the state would put me and my family in this predicament. As Susan's mother, I know what is best for her and I want only to follow the advice of my child's medical providers. We are not in Florida by choice, we are in Florida because this is where we were stationed by the United States military. This new rule treats military families stationed in Florida differently than those stationed elsewhere. The Board of Medicine's decision to discriminate against transgender children and strip their parents of their rights makes Florida an unsafe state for all military families with transgender children.

25. The Department of Defense has been incredibly supportive of our family and of our transgender daughter throughout this entire process. The military doctors have been huge advocates for her, consistently advocating on her behalf for the best treatment that could be provided to her, and they have treated Susan with dignity and respect on every level. The Department has helped ensure that she has had access to medically necessary gender-affirming healthcare, and the Tri-Care health insurance plan provided by the Department of Defense to military families affirmatively covers all gender-affirming care. However, because of this new rule, members of the United States Military who are stationed in Florida will be subjected to worse treatment and have less rights than military families stationed elsewhere.

26. The Florida Board of Medicine's adoption of the new rule has thrown me, and my entire family, into a massive state of stress, anxiety, uncertainty, and panic. We worry daily about what will happen to our healthy, happy, thriving daughter if she is forced to go through what she has described as her worst nightmare, become something she isn't. We cannot even allow ourselves to think about the toll it would take on her emotionally, mentally, physically, psychologically, socially, academically, and beyond. My husband and I lay awake at night absolutely riddled with fear about how this perfect little girl's life is going to be torn apart. In addition to the impacts on Susan's body and mind, we worry about how she will be treated by friends, neighbors, and strangers once she is

forcibly outed to everyone in her life who have only ever known Susan as female. "Torture" is the only word I've identified to adequately describe the feelings of terror a parent experiences in a situation like this.

27.     From the start of the Board of Medicine's rulemaking process back in June of 2022, I have felt a near constant sense of dread. There isn't a single moment of the day where the thought of not being able to protect my daughter isn't on my mind. It has interfered with my husband's work performance, as he is so worried about our child not receiving the medical care she needs. He has spent hours and hours trying to determine solutions to all the "what if's" about our future and our ability to protect our daughter in this state.

28.     After the final rule was filed with the Department of State, removing all doubt that Florida doctors would soon be prohibited from providing evidence-based medical treatment for children in Florida like Susan, we flew Susan to Washington D.C. to meet with the chief pediatric endocrinologist at the Walter Reed medical facility. The doctor confirmed that Susan had not entered Tanner Stage 2 and, pursuant to the WPATH Standards of Care was not yet ready to start puberty blocking treatment. We spent over a thousand dollars on the trip, Susan had to miss school, my husband had to make special arrangements to get the time off, and the outcome was not what we were hoping for, but we had to be sure that our daughter wasn't ready to start puberty blocking treatment before the rule went into effect.

29. The actions by the Florida Board of Medicine threaten the health, safety, and wellbeing of my daughter and many other transgender children in the state of Florida. No parent should be forced to sit by, powerless, stripped of their parental rights to care for their child, while they watch their child experience unnecessary trauma and distress, and undergo changes that will profoundly harm them.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of April 2023.

Respectfully Submitted,

*Jane Doe*
DocuSigned by:
B68AE8FBFEFD4D8...

Jane Doe

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# Tallahassee Division

| | |
|---|---|
| JANE DOE, individually and on behalf of her minor daughter, SUSAN DOE, et al., <br><br> *Plaintiffs*, <br> v. <br><br> JOSEPH A. LADAPO, M.D., *in his official capacity as Florida's Surgeon General of the Florida Department of Health,* et al., <br><br> *Defendants*. | Civil No. 4:23-cv-00114-RH-MAF |

## DECLARATION OF DR. RACHEL ROE, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Rachel Roe, M.D.[1], hereby declare and state as follows:

1.  I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to those facts if called to do so.

---

[1] I have filed a motion with this Court seeking to proceed in this case under a pseudonym. In addition, contemporaneous with signing this declaration, I have signed with my legal name a separate copy of this declaration. Counsel for Plaintiffs have a copy of that separate declaration.

1

2.     I am a pediatrician and I am licensed to practice medicine in Florida by the Florida Board of Medicine.

3.     Plaintiff known as Susan Doe in this matter (the "patient"), has been a patient under the care of my practice since November, 2021. She is eleven years old.

4.     In my professional opinion, the patient meets the clinical criteria for a diagnosis of gender dysphoria. The patient was diagnosed with gender dysphoria by her pediatrician, and the diagnosis has been confirmed by myself and another physician in my practice.

5.     For patients with gender dysphoria, the onset of puberty can cause or exacerbate distress arising from the incongruence between their sex assigned at birth and their gender identity. For some adolescent patients, their gender dysphoria can cause them to experience depression, anxiety, and suicidal ideation when left untreated.

6.     When an adolescent reaches puberty, they may require puberty blocking medication (commonly referred to as puberty blockers) to treat their gender dysphoria, depending on the individualized and unique needs of the patient. Puberty blockers can delay the onset of puberty and prevent the development of secondary sex characteristics that are not aligned with the patient's gender identity if the intervention is timely. Puberty blockers should not be initiated before puberty has

begun, but the treatment must be initiated promptly after the patient enters Tanner stage 2 or the treatment may be ineffective.

7. Physicians with expertise in pediatric endocrinology and the treatment of gender dysphoria in adolescents, in close coordination with the parents of the adolescent patient, are best situated to assess an individual patient's need for puberty blockers. When timely administered, puberty blockers can alleviate the symptoms of gender dysphoria.

8. During her appointment with me in November of 2022, after examining the patient and considering her family history, it was my opinion that the onset of puberty was likely imminent. In my professional opinion, the patient has an imminent need for treatment because she has a limited window of time to get the medical benefit of puberty blockers.

9. In my professional opinion, the patient is at serious risk of irreparable harm if she cannot be prescribed puberty blockers by her treating physicians upon the onset of puberty, which could be any day now. My understanding is that the new rules adopted by the Florida Board of Medicine and the Florida Board of Osteopathic Medicine prohibit me and the patient's other treating physicians from prescribing puberty blockers to any transgender adolescent, regardless of medical necessity or harms of withholding such treatment.

4

10. The patient may have already begun puberty based on my last medical assessment, and every day the patient is prevented from receiving treatment after having a physician determine her readiness for puberty blockers, subjects her to potential irreparable physical, mental, and emotional harm.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of April 2023.

>Respectfully Submitted,
>
>*Rachel Roe, MD*
>Dr. Rachel Roe, M.D.