IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JANE DOE, individually and on
behalf of her minor daughter,
SUSAN DOE, et al.,

 Plaintiffs,

v.        Case No. 4:23-cv-00114-RH-MAF

JOSEPH A. LADAPO, in his
official capacity as Florida's
Surgeon General of the Florida
Department of Health, et al.,

 Defendants.

_____/

## THE STATE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION

Defendants Surgeon General Ladapo, the Florida Board of Medicine, and the

Florida Board of Osteopathic Medicine (collectively, the "State") oppose Plaintiffs'

preliminary-injunction motion. The reasons for denying the motion are detailed in the

accompanying memorandum.

Dated: May 15, 2023    /s/ Mohammad O. Jazil
           Mohammad O. Jazil (FBN 72556)
           Gary V. Perko (FBN 855898)
           Michael Beato (FBN 1017715)
           HOLTZMAN VOGEL BARAN
           TORCHINSKY & JOSEFIAK
           119 S. Monroe St. Suite 500
           Tallahassee, FL 32301
           (850) 270-5938
           mjazil@holtzmanvogel.com

gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 15, 2023, this response was filed through the Court's

CM/ECF system, which will send a notice of electronic filing to all counsel of record.


<u>/s/ Mohammad O. Jazil</u>
Mohammad O. Jazil (FBN 72556)

2

## INTRODUCTION

Simply put, Plaintiffs aren't entitled to a preliminary injunction. The fact remains that puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria in minors remain experimental and come with potentially negative and permanent health consequences. Plaintiffs' evidence doesn't change this conclusion, and Plaintiffs fail to establish the four preliminary-injunction factors. Their motion should be denied.

## BACKGROUND

In *Dekker v. Weida*, 4:22-cv-325 (N.D. Fla. 2022) ("*Dekker* Doc."), the Florida Agency for Health Care Administration provided its position on gender dysphoria, treatments for gender dysphoria, the federal government's inconsistency on these treatments, and the unreliability of the World Professional Association for Transgender Health's standards of care and Endocrine Society's clinical guidelines. *See Dekker* Doc.120 (AHCA's summary-judgment motion); *Dekker* Doc.49 (AHCA's response in opposition to preliminary-injunction motion). The State incorporates and adopts by reference the arguments made and the evidence provided by AHCA in *Dekker*. But for the purposes of this response, the State briefly notes the following.

## I.    Gender Dysphoria and the State's Choices

Gender dysphoria is the distressing incongruence between an individual's *biological sex* and *gender identity. Dekker* Doc.120-12 ¶ 28 (Levine report); *Dekker* Doc.120-13 ¶ 54 (Hruz report). Biological sex is "determined at conception" at the chromosomal level, and it "structures [an] individual's biological reproductive capabilities." *Dekker*

Doc.120-12 ¶¶ 20-21; *see also Dekker* Doc.120-13 ¶¶ 13-18. While sex is biologically based, gender "is a human phenomenon." *Dekker* Doc.120-12 ¶ 22.

Gender refers to the traits society associates with biological males and biological females. *Id.* ¶¶ 19-27; *Dekker* Doc.120-13 ¶ 19. Gender identity is an individual's subjective sense of his or her gender. *Dekker* Doc.120-12 ¶¶ 24-27; *Dekker* Doc.120-13 ¶ 20. Unlike sex, gender identity is mutable. *See Dekker* Doc.120-13 ¶ 58; *Dekker* Doc.120-14 at 43 (WPATH standards of care) ("[P]eople may spend some time in a gender identity or presentation before they discover it does not feel comfortable and later adapt it or shift to an earlier identity or representation.").

Gender dysphoria is a psychiatric diagnosis. *Dekker* Doc.120-12 ¶ 36. There are no laboratory tests, imaging, or biopsies that can help establish a diagnosis. *Dekker* Doc.120-13 ¶¶ 57-58; *see also Dekker* Doc.120-15 ¶ 24 (Laidlaw redacted report).

For those with gender dysphoria, however, behavioral health services can help. *See, e.g., Dekker* Doc.120-12 ¶¶ 42-49; *Dekker* Doc.120-16 ¶ 136 (Kaliebe report). Florida doesn't prohibit these services. But, unlike behavioral health services, surgeries, puberty blockers, and cross-sex hormones come with risks, and their efficacy is suspect— especially for minors.

In *Dekker*, Drs. Hruz, Laidlaw, and Van Meter all discussed the concerns associated with puberty blockers and cross-sex hormones. *Dekker* Doc.120-13 ¶¶ 67-87; *Dekker* Doc.120-15 ¶¶ 66-140, ¶¶ 149-58; *Dekker* Doc.120-17 ¶ 20 (Van Meter rebuttal report). Dr. Hruz explained that puberty blockers suppress natural puberty.

4

*Dekker* Doc.120-13 ¶¶ 67-68. But he cautioned that after "an extended period of pubertal suppression," you can't "turn back the clock" and "reverse changes in the normal coordinated pattern of adolescent psychological development and puberty." *Id.* ¶ 75. Evidence to the contrary is "very weak." *Id.* ¶ 78. Puberty blockers and cross-sex hormones also come with a laundry list of potential health consequences, including issues with bone density, fertility, cancer, and brain maturation. *Id.* ¶¶ 67-87.

Dr. Scott provided a neuroscientist's perspective on puberty blockers, which are the first step on the road to physical transition. She explained that the current science doesn't support puberty-blocking treatments for minors with gender dysphoria and that such science is needed, given the "considerable changes" that are happening to brain development during and after puberty. *Dekker* Doc.120-18 ¶¶ 12-13 (Scott report). She stated that "more research" is needed to justify this treatment. *Id.* ¶ 16. Current studies suggest that puberty blockers could lead to negative (and perhaps "irreversible") effects: lower IQ scores, lower heart rates, greater emotional reactivity, higher anxiety, greater avoidance behavior, and more risk-taking behavior. *Id.* ¶ 15.

Dr. Lappert, a plastic surgeon, worried that surgical treatments to cut healthy tissue are firmly in the realm of cosmetic surgeries. *Dekker* Doc.120-19 ¶¶ 47-50 (Lappert report). These treatments introduce the prospect of complications and pose ethical concerns because, unlike other cosmetic procedures, the goal is to induce "functional loss" of the breasts and genitalia. *Id.* ¶¶ 47-50.

There are also mental-health consequences to hormone therapies and surgeries. Dr. Levine, a psychiatrist, commented that "[g]ender transition routinely leads to isolation from at least a significant portion of one's family in adulthood" and can impact future romantic relationships. *Dekker* Doc.120-12 ¶¶ 198-99. That can negatively affect mental health. Dr. Levine also responded to claims of *positive* mental health outcomes and *lower* suicidality after hormone therapies: many of those claims lack quality evidence. *Id.* ¶¶ 134-73. And Dr. Levine noted that those with gender dysphoria likely have mental health comorbidities—anxiety disorders, ADHD, autism spectrum disorder, OCD, for example. *Id.* ¶¶ 43, 134. As such, it remains unclear whether hormone therapies and surgeries will resolve underlying mental-health concerns.

## II.    Florida Joins the International Consensus

Countries that were at the forefront of gender-dysphoria treatments have now backtracked their positions. Finland's National Science Review, for example, concluded that "[i]n light of available evidence, gender reassignment of minors is an experimental practice." *Dekker* Doc.13 ¶ 124. Finland reached this conclusion after noting that "there are no medical treatments (for transitioning) that can be considered evidence-based" and that the "reliability of the existing studies with no control groups is highly uncertain," especially considering the potential "risks" of such treatments, such as bone-growth and neurological issues. *Id.*

Sweden reached a similar conclusion. Its board of health said that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected

benefits of these treatment[s]" in minors, and that such treatments should be provided only in rare cases and ideally as part of experimental trials. *Id.* ¶ 125.

The United Kingdom went further still. Its National Institute of Health and Care Excellence reviewed studies that support hormone therapy for gender-dysphoric minors. *Id.* ¶ 126. The institute concluded that "all small, uncontrolled observational studies" for puberty blockers "are of very low certainty using modified GRADE" and they "reported physical and mental health comorbidities and concomitant treatments very poorly." *Id.* As for cross-sex hormones, the institute stated that evidence of their effectiveness was also of a "very low" quality. *Id.* The United Kingdom's Cass Report, which reviewed gender-identity services in the country, stated that there's a "lack of consensus and open discussion about the nature of gender dysphoria and therefore about the appropriate clinical response." *Id.*

Other countries agree. France's Académie Nationale de Médecine says that "great medical caution" must be taken "given the vulnerability, particularly psychological, of this population [gender-dysphoric minors] and the many undesirable effects, and even serious complications, that some of the available therapies can cause." *Dekker* Doc.53 at 11. The Royal Australian and New Zealand College of Psychiatrists has said that there's a "paucity of quality evidence on the outcomes of those presenting with gender dysphoria." *Id.* And Norway has also found the support for the excluded treatments to be "insufficient," and their "long-term effects" to be "little known." *Dekker* Doc.120-1.

### III.   The State's Medical Boards Pass Reasonable Rules

In 2022, the Florida Board of Medicine and the Florida Board of Osteopathic Medicine initiated rulemaking processes to create standards of practice for treating gender dysphoria in minors. Throughout the rulemaking process, the boards made sure to hear testimony and evidence from both sides of the medical debate. For example, during an August 2022 meeting, the Board of Medicine invited and heard from Dr. Michael Haller, a University of Florida pediatric endocrinologist and proponent of gender-transition treatments.[1] Two months later, at a joint meeting, the Board of Medicine and the Board of Osteopathic Medicine invited and heard testimony from Dr. Kristin Dayton, Dr. Meredithe McNamara, and Dr. Aron Janssen, who support such treatments as well[2]; Dr. Janssen, in fact, submitted expert reports for Plaintiffs in this case and the *Dekker* case. Doc.30-5; *Dekker* Doc.120-28.

After conducting several hearings, the boards promulgated rules that contain the same language:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>
>> (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>>
>> (b) Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

---

[1] The meeting minutes can be assessed here: https://bit.ly/3BqyUtS.
[2] The meeting minutes can be assessed here: https://bit.ly/3W0LARP.

Rule 64B8-9.019, Fla. Admin. Code; Rule 64B15-14.014, Fla. Admin. Code.

The Board of Medicine's rule went into effect on March 16, 2023, and the Board of Osteopathic Medicine's rule went into effect on March 28, 2023.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy," a "powerful exercise of judicial authority in advance of trial." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1284-85 (11th Cir. 1990) (cleaned up). Accordingly, the moving party bears the heavy burden of establishing four factors: (1) a substantial likelihood of success on the merits, (2) irreparable harm absent a preliminary injunction, (3) that the threatened harm outweighs any harm to the nonmoving party, and (4) that the public interest favors a preliminary injunction. *Id.* The first two factors are the most important, and when the State is the nonmoving party, the last two factors merge. *Swain v. Junior*, 958 F.3d 1081, 1088, 1091 (11th Cir. 2020).

## ARGUMENT

Plaintiffs fail to establish all four preliminary-injunction factors. In fact, their motion omits more than it includes. For substantial likelihood of success on the merits, Plaintiffs disregard the operative substantive-due-process-analytical framework, and they completely omit *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2281 (2022), and *Adams v. School Board of St. Johns County*, 57 F.4th 7911 (11th Cir. 2022) (en banc), in their equal-protection arguments. For irreparable harm, Plaintiffs don't include any

9

medical records. And for the remaining factors, Plaintiffs fail to appreciate that the State is harmed when it can't enforce its laws and that the State has a compelling interest in protecting minors against experimental treatments.

## I.     Plaintiffs Are Unlikely to Succeed on the Merits

Plaintiffs are unlikely to succeed on their substantive-due-process and equal-protection challenges to the two State rules. The *Eknes-Tucker* Eleventh Circuit panel has suggested as much when reviewing similar challenges to Alabama's gender-dysphoria legislation. *See generally* Oral Argument, *Eknes-Tucker v. Gov. of the State of Ala.*, 22-11707 (Nov. 18, 2022). That take makes sense: binding Supreme Court and Eleventh Circuit precedent clearly foreclose both claims.

### A.     Plaintiffs Don't Have a Fundamental Right to Gender-Dysphoria Treatments

Plaintiffs contend that the State rules "violate the fundamental right of the Parent Plaintiffs to obtain established medical care for their children." Doc.30 at 18. The *Eknes-Tucker* Eleventh Circuit panel suggested that this isn't a strong argument. *See* Oral Argument at 18:00-13, *Eknes-Tucker v. Gov. of the State of Ala.*, 22-11707 (Nov. 18, 2022). Plaintiffs' arguments here aren't made any stronger by the absence of the operative substantive-due-process legal framework in their motion. The State thus provides the operative framework for them.

**A.** A "substantive-due-process analysis has two primary features." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). The first feature is a careful and precise

description of the asserted fundamental right. *See Reno v. Flores*, 507 U.S. 292, 302 (1993)

(Courts must craft a "careful description of the asserted right"). The asserted right must

be "narrowly frame[d]" to "the specific facts" of the case. *Doe v. Moore*, 410 F.3d 1337,

1344 & n.4 (11th Cir. 2005). It shouldn't be abstracted. *Morrisey v. United States*, 871

F.3d 1260, 1269 (11th Cir. 2017). When a party abstracts a right, courts intervene and

properly prescribe the asserted right:

- In *Reno v. Flores*, an immigration case, the asserted right *wasn't* a right to be free from bodily restraint *or* a right of a "child to be released from all other custody into the custody of its parents, legal guardians, or even close relatives." Instead, the asserted right was a "right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government selected child-care institution." 507 U.S. at 302.

- In *Morrisey v. United States*, the asserted right *wasn't* the right to procreate. Instead, the asserted right was "whether a man has a fundamental right to procreate via an [in-vitro-fertilization] process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate." 871 F.3d at 1269.

- In *Doe v. Moore*, the asserted right *wasn't* a right to family association, a right to be free from threats, a right to be free of interference with religious practices, *or* a right to find or keep employment. Instead, the asserted right was a "right of a person, convicted of 'sexual offenses,' to refuse subsequent registration of his or her personal information with Florida law enforcement and prevent publication of this information on Florida's Sexual Offender/Predator website." 410 F.3d at 1343-44.

- In *Case v. Ivey*, the asserted right *wasn't* a right to "direct the upbringing of" "children." Instead, the asserted right was a right of parents "to dress their children and what kind of medical care to provide them in the specific context of a [COVID] mask mandate." 2022 WL 2441578, at *8 (11th Cir. July 5, 2022) (per curiam).

**B.** The second feature is that the asserted right must be "'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720-21 (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 502 (plurality op.)). Courts look to whether common law, early state legislatures, and historical court cases recognized the right. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248-56 (2021) (demonstrating that a right to abortion isn't deeply rooted in the nation's history and traditions); *Glucksberg*, 521 U.S. at 710 (same for a right to physician-assisted suicide). That way, courts don't "deduce[]" rights "from abstract concepts," like "personal autonomy" or privacy. *Glucksberg*, 521 U.S. at 725; *see also id.* at 727 ("That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected.").

**C.** Here, Plaintiffs' asserted fundamental right—a parental right to direct their children's upbringing—is far too abstract. *See Case*, 2022 WL 2441578, at *8 (stating that the asserted "right to direct the upbringing of" children under *Troxel v. Granville* was too abstract). Instead, the claimed right should be "narrow[ed]" to "the specific facts" of this case. *Moore*, 410 F.3d at 1344. The properly prescribed asserted right is a right for parents to obtain puberty blockers, cross-sex hormones, and surgeries for their minor children to treat the minor children's gender dysphoria. Of course, Plaintiffs haven't pleaded or argued that right as such.

Nor have they produced any facts that this right is deeply rooted in our nation's history and tradition. *See, e.g., Dobbs*, 142 S. Ct. at 2248-56 (demonstrating that a right to abortion isn't deeply rooted in the nation's history and traditions); *Glucksberg*, 521 U.S. at 710 (same for a right to physician-assisted suicide). Plaintiffs can't allege such facts because these facts don't exist. There simply isn't a deeply rooted right for parents to obtain gender-transition treatments for their minor children. As a result, such a "novel[]" right can't "be considered 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Flores*, 507 U.S. at 303 (quoting *United States v. Salerno*, 481 U.S. 739, 751 (1987)).

**D.** Even if such a right existed, the State would overcome any form of constitutional review: it's "indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.'" *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (quoting *New York v. Ferber*, 458 U.S. 747, 756-57 (1982)). That interest can only be strengthened when the State is safeguarding minors from experimental treatments with either unknown or potentially negative and permanent health consequences. *See supra.*

**E.** Before continuing to Plaintiffs' equal-protection challenge, a final word on their asserted substantive-due-process right—a *parental* right to gender-transition treatments for their minor children. It bears noting that a parent's parental-rights claim is "derivative from, and therefore no stronger than," a minor's claim. *Whalen v. Roe*, 429 U.S. 589, 604 (1977). A parent's "right[] to make decisions for his daughter can be no

greater than his right[] to make medical decisions for himself." *Doe By & Through Doe v. Pub. Health Tr. of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983). Because parents don't have a constitutional right to seek gender-transition treatments—which, again, are experimental—their minor children don't have such a right, either.

Plaintiffs cite *Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990), for the proposition that parents have a right to make child-rearing decisions. Doc.30 at 19. But *Bendiburg* made clear that "[p]arental autonomy may be limited when parental decisions jeopardize the health or safety of a child, and the state can intercede on the child's behalf." *Id.* at 470. As established above, the at-issue treatments for gender dysphoria could jeopardize the health and safety of children. Therefore, the State properly promulged its rules and interceded on Florida children's behalf.

*        *        *

All told, Plaintiffs' substantive-due-process challenge fails.

## B.    The Equal Protection Clause Doesn't Apply

Plaintiffs' equal-protection challenge fares no better. Just as Plaintiffs omit the operative substantive-due-process framework, Plaintiffs omit any discussion of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), or even *Adams v. School Board of St. Johns County*, 54 F.4th 791 (11th Cir. 2022) (en banc). These cases defeat their equal-protection claim.

**A.** State health, safety, and welfare regulations are subject to a "strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284 (cleaned up). They "must be

sustained if there is a rational basis on which" the State "could have thought that it would serve legitimate state interests." *Id.*

Here, the two State rules are health, safety, and welfare regulations that make a distinction based on a medical diagnosis: the excluded treatments are generally unavailable to those with gender dysphoria but are available to those with other diagnoses (like breast cancer or precocious puberty). The distinction furthers the State's interest in protecting its citizens from unnecessary and experimental treatments that lack quality evidence and that threaten to cause permanent harm like sterilization and infertility. Rational-basis review is easily met. *Dobbs*, 142 S. Ct. at 2268; *Otto*, 981 F.3d at 868.

**B.** Plaintiffs ask for some heightened level of scrutiny to apply because, in their estimation, the State rules make a discriminatory distinction based on sex or transgender status. That isn't so. The challenged rules classify on the basis of a medical condition, not on the basis of sex or transgender status.  The problems with Plaintiffs' argument are threefold.

*First*, the en banc Eleventh Circuit in *Adams v. School Board of St. Johns County* forecloses the sex-based discrimination argument. In that case, the court held that a school board's sex-based bathroom-assignment policy doesn't violate the Equal Protection Clause. 57 F.4th at 796. The court elaborated that sex-based discrimination is discrimination based on biological sex. *Id.* at 807-08. After all, the Equal Protection Clause protects immutable characteristics, like biological sex. *Id.* (citing *Frontiero v.*

*Richardson*, 411 U.S. 677, 686 (1973)). That stands in strong contrast to gender identity, which is mutable and isn't afforded heightened constitutional protection. *Id.* at 807-08.

The *Adams* school-board policy made a distinction on the basis of biological sex: mainly, biologically male students use one bathroom, biologically female students use another bathroom, or a sex-neutral bathroom is available. *Id.* at 802. "This is a sex-based classification," the Eleventh Circuit held. *Id.* at 801.

That's different from the two State rules at issue here. The rules don't make a distinction based on biological sex. The rules make a distinction based on a medical diagnosis—gender dysphoria—which applies to biological males and biological females. *See Lange v. Houston County*, 608 F. Supp. 3d 1340, 1354 (M.D. Ga. 2022); *see also Geduldig v. Aiello*, 417 U.S. 484, 497 n.20 (1974).

Regardless of biological sex, the State prohibits certain gender-dysphoria treatments for minors. Therefore, rational basis—and not heightened scrutiny—applies, and rational basis is still satisfied.

*Second*, the *Adams* decision forecloses Plaintiffs' transgender discrimination argument as well. Notably, the court didn't hold that transgender status is a quasi-suspect class. It said that "we have grave 'doubt' that transgender persons constitute a quasi-suspect class" and that "the Supreme Court has rarely deemed a group a quasi-suspect class." 57 F.4th at 803 n.5 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985)). Transgender individuals thus aren't entitled to heightened constitutional review per se. *Id.*

16

Whether to apply heightened review then turns on a *Geduldig v. Aiello* "identity" analysis. In *Adams*, the Eleventh Circuit asked if there was either an "identity" or "lack of identity" between the school-board bathroom policy and transgender status; an "identity" between the two would potentially demonstrate unconstitutional discrimination, but a "lack of identity" would demonstrate a lack of unconstitutional discrimination. *Id.* at 809 (quoting 417 U.S. at 497).

In conducting the analysis, the *Adams* court observed what groups the bathroom policy created. The court concluded that the policy "divide[d] students into biological male and biological female groups." *Id.* Because both groups "can inherently contain transgender students," there was a lack of identity between the policy and transgender status.

The same analysis and conclusion bore out in *Geduldig*. That case concerned a state insurance program that excluded coverage for certain pregnancy-related disabilities. 417 U.S. at 486, 496-97. To determine whether there was an "identity" between the program and sex, the Supreme Court observed what groups the program created. *Id.* at 496 at n.20. According to the Court, the "program divide[d] potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes." *Id.* As a result, there was a lack of identity between the program and sex, and the Court concluded that the constitution wasn't violated.

17

The same analysis applies here. The State rules create two groups—a group affected by the rules, and a group unaffected by the rules. The group affected by the rules include transgender individuals who suffer from gender dysphoria. The group unaffected by the rules includes non-transgender individuals and transgender individuals *who don't* suffer from gender dysphoria. Under *Adams* and *Geduldig*, there's a "lack of identity" between the rules and transgender status. Like the policy in *Adams* and the program in *Geduldig*, the constitution isn't violated.

*Third*, Plaintiffs can't rely on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011). In *Adams*, the Eleventh Circuit disavowed reliance on *Bostock* on the equal-protection issue, 57 F.4th at 808-09, and the court ostensibly relegated both cases to workplace-discrimination disputes, *id.* at 808-09, 813-14.

\*     \*     \*

In sum, rational basis applies. That test is easily met. Plaintiffs' equal-protection challenge fails.

## II.   Plaintiffs Haven't Shown Irreparable Harm

Plaintiffs haven't shown that they would suffer irreparable harm absent a preliminary injunction. As with the previous preliminary-injunction factor, they omit more than they include.

Plaintiffs omit medical records from their preliminary-injunction motion. In *Dekker*, the absence of medical records contributed to the denial of the *Dekker* plaintiffs'

preliminary-injunction motion: the "other reason for denying a preliminary injunction is that the record does not include medical records for these plaintiffs." *Dekker* P.I. Trans. 113:12-22. Here, instead of medical records, Plaintiffs provided conclusory declarations. To be sure, unlike the *Dekker* case, Plaintiffs provided one declaration from Dr. Rachel Roe (who saw Susan Doe in November 2022) and a letter from Dr. Nicole Bruno (who saw Gavin Doe back in 2022). But these declarations are just as conclusory as the *Dekker* declarations. Like the *Dekker* declarations, the declarations and letter here fail to conclusively demonstrate that gender-transition treatments are necessary for each minor Plaintiff and that such care would do more good than harm. *Compare Dekker* Docs.11-6, 11-7, 11-8, 11-9 (affidavits from *Dekker* plaintiffs), *with Dekker* Doc.49 at 27-30 (Dr. Laidlaw's evaluation of the *Dekker* plaintiffs' medical records, explaining that their preferred treatments would do more harm than good). In other words, the declarations and letter fail to establish that Plaintiffs would suffer irreparable harm absent a preliminary injunction.

In sum, Plaintiffs fail to show irreparable harm.

## III.   Plaintiffs Fail to Establish the Remaining Factors

The remaining preliminary-injunction factors weigh against granting a preliminary injunction. The public benefits from the State guarding against experimental and potentially harmful treatments, especially ones directed at minors. *See Otto*, 981 F.3d at 868 (quoting *Ferber*, 458 U.S. at 756-57); *see also Dobbs*, 142 S. Ct. at 2282 (noting the State's strong role in making health, safety, and welfare decisions).

19

The public is also served when the State gets to enforce its laws, and the State is harmed when it's prevented from doing so. *See Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (The State is "harmed" when it can't "apply its own laws."); *see also Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating" its laws, "it suffers a form of irreparable harm." (cleaned up)).

Because Plaintiffs haven't established a constitutional violation, haven't shown irreparable harm, and haven't shown that their preferred treatments would do more harm than good, these factors tilt decidedly in the State's favor.

## CONCLUSION

For the reasons expressed above, this Court should deny Plaintiffs' preliminary-injunction motion.

Dated: May 15, 2023

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*Counsel for Defendants*

## **LOCAL RULE CERTIFICATIONS**

I certify that this memorandum contains 4,312 words, excluding the case style and certifications, and I certify that this memorandum complies with this Court's formatting requirements.

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)


## **CERTIFICATE OF SERVICE**

I certify that, on May 15, 2023, this notice was filed through the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)