**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

JANE DOE, individually and on behalf
of her minor daughter, SUSAN DOE;
BRENDA BOE, individually and on
behalf of her minor son BENNETT
BOE; CARLA COE, individually and
on behalf of her minor daughter
CHRISTINA COE; FIONA FOE,
individually and on behalf of her minor
daughter FREYA FOE; GLORIA GOE,
individually and on behalf of her
son GAVIN GOE; and LINDA LOE,
individually and on behalf of her minor
daughter LISA LOE; PATRICIA POE,
individually and on behalf of her minor
son PAUL POE,

         Plaintiffs,

           v.

JOSEPH A. LADAPO, *in his official capacity*
*as Florida's Surgeon General*
*of the Florida Department of Health*;
FLORIDA BOARD OF MEDICINE;
SCOT ACKERMAN, NICHOLAS W.
ROMANELLO, WAEL BARSOUM,
MATTHEW R. BENSON, GREGORY
COFFMAN, AMY DERICK, DAVID
DIAMOND, PATRICK HUNTER,
LUZ MARINA PAGES, ELEONOR
PIMENTEL, HECTOR VILA,
MICHAEL WASYLIK, ZACHARIAH P.
ZACHARIAH, MARIA GARCIA,
NICOLE JUSTICE, *in their official*
*capacities as members of the Florida*

Civil No. 4:23-cv-00114-RH-MAF

*Board of Medicine*; FLORIDA BOARD
OF OSTEOPATHIC MEDICINE;
WATSON DUCATEL, TIFFANY
SIZEMORE DI PIETRO, GREGORY
WILLIAMS, MONICA M.
MORTENSEN, VALERIE JACKSON,
CHRIS CREEGAN, WILLIAM D.
KIRSH, *in their official capacities as
members of the Florida Board of
Osteopathic Medicine*; ASHLEY
MOODY, *in her official capacity as
Attorney General for the State of
Florida*; GINGER BOWEN
MADDEN, *in her official capacity
as State Attorney for the First
Judicial Circuit of Florida*; JACK
CAMPBELL, *in his official capacity
as State Attorney for the Second
Judicial Circuit of Florida*; JOHN
DURRETT, *in his official capacity
as State Attorney for the Third
Judicial Circuit of Florida*;
MELISSA NELSON, *in her official
capacity as State Attorney for the
Fourth Judicial Circuit of Florida*;
WILLIAM GLADSON*, in his
official capacity as State Attorney for
the Fifth Judicial Circuit of Florida*;
BRUCE BARTLETT, *in his official
capacity as State Attorney for the
Sixth Judicial Circuit of Florida*; R.J.
LARIZZA, *in his official capacity as
State Attorney for the Seventh
Judicial Circuit of Florida*; BRIAN
S. KRAMER, *in his official capacity
as State Attorney for the Eighth
Judicial Circuit of Florida*;
MONIQUE H. WORRELL, *in her
official capacity as State Attorney for
the Ninth Judicial Circuit of Florida*;
BRIAN HAAS, *in his official*

*capacity as State Attorney for the
Tenth Judicial Circuit of Florida*;
KATHERINE FERNANDEZ
RUNDLE, *in her official capacity as
State Attorney for the Eleventh
Judicial Circuit of Florida*; ED
BRODSKY, *in his official capacity
as State Attorney for the Twelfth
Judicial Circuit of Florida;* SUSAN
S. LOPEZ, *in her official capacity as
State Attorney for the Thirteenth
Judicial Circuit of Florida;* LARRY
BASFORD, *in his official capacity
as State Attorney for the Fourteenth
Judicial Circuit of Florida;* DAVE
ARONBERG, *in his official capacity
as State Attorney for the Fifteenth
Judicial Circuit of Florida*; DENNIS
WARD, *in his official capacity as
State Attorney for the Sixteenth
Judicial Circuit of Florida*;
HAROLD F. PRYOR, *in his official
capacity as State Attorney for the
Seventeenth Judicial Circuit of
Florida*; PHIL ARCHER*, in his
official capacity as State Attorney for
the Eighteenth Judicial Circuit of
Florida*; THOMAS BAKKEDAHL,
*in his official capacity as State
Attorney for the Nineteenth Judicial
Circuit of Florida*; and AMIRA D.
FOX, *in her official capacity as State
Attorney for the Twentieth Judicial
Circuit of Florida*,

      Defendants.

_____/


## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.      This Action is a federal constitutional challenge brought by transgender adolescents and their parents against the bans on medical care for transgender minors adopted by the Florida Boards of Medicine and Osteopathic Medicine ("Medical Boards") and by the Florida Legislature in Senate Bill 254 ("SB 254"), (collectively, the "transgender medical bans"). The bans adopted by the Medical Boards are effective as of March 16, 2023 (Board of Medicine, Rule 64B8-9.019, Fla. Admin. Code) and March 28, 2023 (Board of Osteopathic Medicine, Rule 64B15-14.014, Fla. Admin. Code). The ban created by SB 254 came into effect on May 17, 2023, when it was signed into law.

2.      The transgender medical bans violate the rights of parents to make medical decisions to ensure the health and wellbeing of their adolescent children. They prohibit parents from seeking and obtaining effective medical treatment in Florida for their adolescent children by prohibiting doctors from providing medications to adolescents in accordance with the standards of care and clinical practice guidelines for treatment of a rare and serious medical condition, gender dysphoria.

3.      The transgender medical bans also violate the guarantees of equal protection by banning essential medical treatments needed by the adolescent Plaintiffs because they are transgender.

4.      Defendants cannot demonstrate any rational basis, much less an important or compelling one, for the transgender medical bans which prevent

transgender adolescents from obtaining safe and effective medically necessary healthcare.

5.      The plaintiffs seek declaratory and injunctive relief to enjoin enforcement of the transgender medical bans. Without the relief sought, plaintiffs will suffer real and immediate injury.

## PARTIES

### I. Transgender Plaintiffs and Their Parents

6.      Plaintiff Jane Doe is and has at all relevant times been a resident of St. Johns County, Florida. She is the mother of Plaintiff Susan Doe, an eleven-year-old transgender girl for whom she also appears in this case as next friend. Susan Doe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Jane Doe.

7.      Plaintiff Brenda Boe is and has at all relevant times been a resident of Alachua County, Florida. She is the mother of Plaintiff Bennett Boe, a fourteen- year-old transgender boy for whom she also appears in this case as next friend. Bennett Boe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Brenda Boe.

8.      Plaintiff Carla Coe is and has at all relevant times been a resident of Duval County, Florida. She is the mother of Plaintiff Christina Coe, a nine -year-old transgender girl for whom she also appears in this case as next friend. Christina Coe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent

Carla Coe.

9.     Plaintiff Fiona Foe is and has at all relevant times been a resident of Orange County, Florida. She is the mother of Plaintiff Freya Foe, a ten-year-old transgender girl for whom she also appears in this case as next friend. Freya Foe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Fiona Foe.

10.     Plaintiff Gloria Goe is and has at all relevant times been a resident of Lee County, Florida. She is the mother of Gavin Goe, an eight-year-old transgender boy for whom she also appears in this case as next friend. Gavin Goe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Gloria Goe.

11.     Plaintiff Linda Loe is and has at all relevant times been a resident of Miami-Dade County, Florida. She is the mother of Lisa Loe, an eleven-year-old transgender girl for whom she also appears in this case as next friend. Lisa Loe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Linda Loe.

12.     Plaintiff Patricia Poe is and has at all relevant times been a resident of Miami-Dade County, Florida. She is the mother of Paul Poe, a nine-year-old transgender boy for whom she also appears in this case as next friend. Paul Poe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Patricia Poe.

## II.    *Defendants*

13.     Defendant Joseph Ladapo, M.D., is sued in his official capacity as the

Surgeon General of the Florida Department of Health, which is responsible for "protect[ing] and promot[ing] the health" of all Floridians. Fla. Stat. § 20.43 (2022). The Surgeon General is appointed by the Governor and serves at the pleasure of the Governor. Fla. Stat. § 20.43(2) (2022). Defendant Ladapo, in his official capacity as Surgeon General of the Florida Department of Heatlh, initiated the process of the promulgation of the transgender medical bans pursuant to the authority granted by Fla. Stat. § 20.43(g) (2022), regarding the regulation of health practitioners. Defendant Ladapo's official place of business is located in Tallahassee, Leon County, Florida.

14.     Defendant Scot Ackerman, M.D., is a member of the Florida Board of Medicine.

15.     Defendant Nicholas W. Romanello, Esq., is a member of the Florida Board of Medicine.

16.     Defendant Wael Barsoum, M.D., is a member of the Florida Board of Medicine.

17.     Defendant Matthew R. Benson, M.D., is a member of the Florida Board of Medicine.

18.     Defendant Gregory Coffman, M.D., is a member of the Florida Board of Medicine.

19.     Defendant Amy Derick, M.D., is a member of the Florida Board of Medicine.

20.     Defendant David Diamond, M.D., is a member of the Florida Board of

Medicine.

21.     Defendant Patrick Hunter, M.D., is a member of the Florida Board of Medicine.

22.     Defendant Luz Marina Pages, M.D., is a member of the Florida Board of Medicine.

23.     Defendant Eleonor Pimentel, M.D., is a member of the Florida Board of Medicine.

24.     Defendant Hector Vila M.D., is a member of the Florida Board of Medicine.

25.     Defendant Michael Wasylik, M.D., is a member of the Florida Board of Medicine.

26.     Defendant Zachariah P. Zachariah, M.D., is a member of the Florida Board of Medicine.

27.     Defendant Maria Garcia, Esq., is a member of the Florida Board of Medicine.

28.     Defendant Nicole Justice is a member of the Florida Board of Medicine.

29.     Defendant Watson Ducatel, D.O., is a member of the Florida Board of Osteopathic Medicine.

30.     Defendant Tiffany Sizemore Di Pietro, D.O., is a member of the Florida Board of Osteopathic Medicine.

31.     Defendant Gregory Williams, D.O., is a member of the Florida Board of

Osteopathic Medicine.

32.     Defendant Monica M. Mortensen, D.O., is a member of the Florida Board of Osteopathic Medicine.

33.     Defendant Valerie Jackson is a member of the Florida Board of Osteopathic Medicine.

34.     Defendant Chris Creegan is a member of the Florida Board of Osteopathic Medicine.

35.     Defendant William D. Kirsh, D.O., is a member of the Florida Board of Osteopathic Medicine.

36.     The Florida Board of Medicine is made up of fifteen members who are appointed by the Governor. Fla. Stat. § 458.307(1) (2022). Defendant members of the Florida Board of Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B-9.019 pursuant to their rulemaking authority under Fla. Stat. §§ 458.309 and 458.331(1)(v) (2022). Further, Defendant members of the Florida Board of Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B-9.019, including taking disciplinary action against any doctor for violating its provisions. Fla. Stat. § 456.072. The Florida Board of Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Medicine is, Tallahassee, Leon County, Florida.

37.     The Florida Board of Osteopathic Medicine is made up of seven members

who are appointed by the Governor. Fla. Stat. § 459.004(1) (2022). Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B15-14.014 pursuant to their rulemaking authority under Fla. Stat.

§§ 459.005 and 459.015(1)(z) (2022). Further, Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B15-14.014, including taking disciplinary action against any doctor for violating its provisions. Fla. Stat. § 456.072. The Florida Board of Osteopathic Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Osteopathic Medicine is, Tallahassee, Leon County, Florida.

38.     Defendant Ashley Moody is the Attorney General for the State of Florida. Defendant Moody, in her official capacity as Attorney General, is the "chief state legal officer." Fla. Const. Art. IV, § 4(b). Pursuant to Fla. Stat. § 16.08, Defendant Moody exercises general superintendence and direction over the state attorneys as to the manner of discharging their respective duties.

39.     Defendant Ginger Bowen Madden is the State Attorney for Florida's First Judicial District.

40.     Defendant Jack Campbell is the State Attorney for Florida's Second Judicial District.

41.     Defendant John Durrett is the State Attorney for Florida's Third Judicial

District.

42.     Defendant Melissa Nelson is the State Attorney for Florida's Fourth Judicial District.

43.     Defendant William Gladson is the State Attorney for Florida's Fifth Judicial District.

44.     Defendant Bruce Bartlett is the State Attorney for Florida's Sixth Judicial District.

45.     Defendant R.J. Larizza is the State Attorney for Florida's Seventh Judicial District.

46.     Defendant Brian S. Kramer is the State Attorney for Florida's Eighth Judicial District.

47.     Defendant Monique H. Worrell is the State Attorney for Florida's Ninth Judicial District.

48.     Defendant Brian Haas is the State Attorney for Florida's Tenth Judicial District.

49.     Defendant Katherine Fernandez Rundle is the State Attorney for Florida's Eleventh Judicial District.

50.     Defendant Ed Brodsky is the State Attorney for Florida's Twelfth Judicial District.

51.     Defendant Susan S. Lopez is the State Attorney for Florida's Thirteenth Judicial District.

52.     Defendant Larry Basford is the State Attorney for Florida's Fourteenth Judicial District.

53.     Defendant Dave Aronberg is the State Attorney for Florida's Fifteenth Judicial District.

54.     Defendant Dennis Ward is the State Attorney for Florida's Sixteenth Judicial District.

55.     Defendant Harold F. Pryor is the State Attorney for Florida's Seventeenth Judicial District.

56.     Defendant Phil Archer is the State Attorney for Florida's Eighteenth Judicial District.

57.     Defendant Thomas Bakkedahl is the State Attorney for Florida's Nineteenth Judicial District.

58.     Defendant Amira D. Fox is the State Attorney for Florida's Twentieth Judicial District.

## JURISDICTION AND VENUE

59.     The Plaintiffs seek redress for the deprivation of their rights secured by the United States Constitution. This Action is initiated pursuant to 42 U.S.C. § 1983 to enjoin the Defendants from enforcing the transgender medical bans and for a declaration that the transgender medical bans violate federal law.

60.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343.

61.     This Court has personal jurisdiction over the Defendants because the Defendants are domiciled in Florida and the denial of the Plaintiffs' rights guaranteed by federal law arises out of and relates to the Defendants' official duties in Florida.

62.     Each of the Defendants is a resident of the State of Florida and serve in their official capacity for a government office for the State of Florida. Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

63.     If enforced, the transgender medical bans would violate the constitutional rights of the Plaintiffs in this judicial district. Therefore, venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

64.     Venue is proper in the Tallahassee Division of the Northern District of Florida under N.D. Fla. Loc. R. 3.1(B) because it is the location of the principal place of business for a majority of the Defendants and where a substantial portion of the acts or omissions complained of herein occurred.

65.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 57 and 65, 28 U.S.C. §§ 2201 and 2202, and this Court's inherent equitable powers.

## FACTUAL ALLEGATIONS

### I. Gender Identity and Gender Dysphoria

66.     Gender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity. It is an essential element of human identity and a well-established concept in medicine. Everyone has a gender identity. Most

13

people's gender identity is consistent with their birth sex. Transgender people, however, have a gender identity that differs from their birth sex. Being made to live inconsistent with a person's gender identity causes discomfort and distress and can interfere with a person's ability to function in a productive and healthy way in matters of daily living.

67.     Gender dysphoria is the clinical diagnosis for the distress that arises when a transgender person cannot live consistent with their gender identity. To be eligible for a diagnosis of gender dysphoria, a young person must meet the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DSM-5").[1] If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

68.     In fact, 56% of transgender youth reported a previous suicide attempt and 86% of them reported suicidality. *See* Ashley Austin, Shelley L. Craig, Sandra D. Souza, and Lauren B. McInroy (2022), *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, J. of Interpersonal Violence, Vol. 37 (5-6) NP2696-NP2718.

69.     Research has shown that an individual's gender identity is hard-wired

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*. Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012).

and cannot be changed. In the past, mental health professionals sought to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms. Today, the medical profession recognizes that such efforts put transgender minors at risk of profound harm, including dramatically increased rates of suicidality.

70.     Gender dysphoria is highly treatable. Healthcare providers who specialize in the treatment of gender dysphoria follow well-established standards of care and clinical practice guidelines that have been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

71.     The standards of care for treatment of transgender people, including transgender youth, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the most recent edition of its standards of care for the treatment of gender dysphoria in minors and adults in 2022, Standards of Care for the Health of Transgender and Gender Diverse

People, Version 8. (Coleman E, Radix AE, Bouman WP et al. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int J Transgend 2022 Sep 6;23 (suppl 1): S1-S259.)

72.     The Endocrine Society has also promulgated a standard of care and clinical practice guidelines for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults. *See* Wylie C. Hembree, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinol. Metab. 3869 (2017).

73.     The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations also follow the WPATH and Endocrine Society standards of care and clinical practice guidelines.

74.     The treatment of gender dysphoria is designed to reduce a transgender person's clinically significant distress by permitting them to live in alignment with their gender identity. Undergoing treatment for gender dysphoria is commonly referred to as "transition," "gender transition," or "gender affirming care." There are several components to the gender transition process.

75.     The precise treatment of gender dysphoria depends on an individualized assessment of a patient's needs.

76.     Social transition involves a transgender person taking measures to live

in accordance with their gender identity in all aspects of life. For transgender boys, it means living fully as a boy; for transgender girls, it means living fully as a girl. Social transition can include adopting a name, pronouns, hairstyle, and clothing consistent with that person's gender identity. The steps a transgender person takes as part of their social transition help align their gender identity with all aspects of everyday life.

77.     Gender transition may also involve taking prescribed medications, puberty blockers and hormones, to bring a person's body into alignment with their gender identity.

78.     There are no medications prescribed to transgender children before they have begun puberty.

79.     For a transgender adolescent who has begun puberty, puberty-blocking medication prevents the patient from going through the physical developments associated with puberty that exacerbate the distress experienced by the incongruence between the patient's gender identity and their body. As such, under the WPATH Standards of Care and clinical practice guidelines, puberty-blocking medication may become medically necessary and appropriate after a transgender adolescent reaches puberty to minimize or prevent the exacerbation of gender dysphoria and the permanent physical changes that puberty would cause. In providing medical treatments to adolescents, pediatric physicians and endocrinologists work in close consultation with qualified mental health professionals experienced in the diagnosis and treatment of gender dysphoria.

80.     For older transgender adolescents, hormone therapy may also be medically necessary to bring their body into alignment with their gender identity and further treat the gender dysphoria they may experience without treatment.

81.     The treatment for gender dysphoria is highly effective. Longitudinal studies have shown that transgender children with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with those of non-transgender children. Lily Durwood, et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson, et al., *Mental Health of Transgender Children Who are Supported in Their Identities*, 137 Pediatrics 1 (2016). In contrast, transgender children with gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

## II. The Bans Adopted by the Boards

82.     On June 2, 2022, Defendant Ladapo sent a letter to the Florida Board of Medicine and the Florida Board of Osteopathic Medicine (collectively, the "Boards") asking the Boards to "establish a standard of care" for the treatment of gender dysphoria, notwithstanding the widely accepted standards of care and clinical practice guidelines established by WPATH and the Endocrine Society.

83.     On July 28, 2022, the Florida Department of Health sent the Boards a "Petition to Initiate Rulemaking," asking the Board, among other things, to adopt a

categorical ban on all treatment of gender dysphoria for people under eighteen years of age.

84.     On August 5, 2022, the Boards discussed the June 2, 2022 letter from Dr. Lapado and the July 28, 2022 Petition to Initiate Rulemaking. The Boards voted to accept the Petition to Initiate Rulemaking.

85.     On September 1, 2022, the Boards each published a Notice of Development of Rulemaking in the Florida Administrative Register (F.A.R.), proposing "rule development to clarify the practice standards for treatment of gender dysphoria in minors."

86.     On October 14, 2022, the Boards each published a Notice of Rule Workshop, which would take place on October 28, 2022.

87.     On October 28, 2022, the Boards held a Joint Workshop regarding the development of a rule related to "Practice Standards for the Treatment of Gender Dysphoria." At the conclusion of the meeting, the Boards voted in support of proposed rules that would ban puberty blockers and hormones, with an exception for treatment performed as clinical trials under the auspices of the Institutional Review Board. The proposed rules were as follows:

> (1)  The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>> (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>> (b)  Puberty blocking, hormone, and hormone antagonist therapies.
> (2)  Nonsurgical treatments for the treatment of gender dysphoria in

minors may continue to be performed under the auspices of Institutional Review Board (IRB) approved, investigator-initiated clinical trials conducted at any of the Florida medical schools set forth in Section 458.3145(1)(i), Florida Statutes. Such clinical trials must include long term longitudinal assessments of the patients' physiologic and psychologic outcomes.

(3) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

88.    On November 4, 2022 the Florida Board of Medicine voted to remove the exception from its proposed transgender medical ban.

89.    On January 9, 2023, the Boards published Notices of Public Hearing in the Florida Administrative Register, regarding a joint hearing of the Boards scheduled to take place on February 10, 2023.

90.    On February 10, 2023, during the Public Hearing, the Florida Board of Osteopathic Medicine voted to remove the exception from its proposed transgender medical bans.

91.    The Florida Board of Medicine filed the following rule with the Florida Department of State on February 24, 2023, with an effective date of March 16, 2023:

(1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
(a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
(b) Puberty blocking, hormone, and hormone antagonist therapies.
(2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

20

92.     The Florida Board of Osteopathic Medicine filed the following rule with the Florida Department of State on March 8, 2023, with an effective date of March 28, 2023:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>     (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>     (b) Puberty blocking, hormone, and hormone antagonist therapies.
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

93.     The transgender medical bans include a clause that permits minors being treated with puberty blockers or hormones prior to the effective date of the transgender medical bans to continue to receive those treatments.

94.     Transgender minors who were not yet receiving puberty blockers or hormones when the transgender medical bans took effect are barred from obtaining such treatment from a Florida doctor regardless of medical necessity.

95.     The transgender medical bans ignore the established medical and scientific consensus that these treatments are medically necessary, safe, and effective for the treatment of gender dysphoria.

96.     The transgender medical bans are in direct conflict with state laws ensuring that parents have the right to make medical decisions for their adolescent children. *See* Florida Statutes 1014.02 (which provides that "it is a fundamental right of

parents to direct the upbringing, education, and care of their minor children."); Florida Statutes 1014.03 ("The state, any of its political subdivisions, any other governmental entity, or any other institution *may not infringe on the fundamental rights of a parent to direct* the upbringing, education, *health care*, and mental health of his or her minor child[.]") (emphasis added).

### III. The Ban Created by SB 254

97.     On May 4, 2023, the Florida Legislature voted to pass SB 254.

98.     On May 17, 2023, Florida Governor Ron DeSantis signed into law SB 254, which imposes felony criminal penalties, as well as professional discipline and civil liability, on any health care practitioner who prescribes or administers puberty blocking medications or hormone therapy to a minor "in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [birth] sex." Fla. SB 254, § 4, lines 109–16 (2023) (Second Engrossed).

99.     Section 4 defines "sex" as the "classification of a person as either male or female based on the organization of the human body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." *Id*. at § 4, lines 102–06.

100.    Section 4 bars the provision of transition-related care to minors: "Sex-reassignment prescriptions and procedures are prohibited for patients younger than 18 years of age[.]" *Id*. at § 4, line 107.

101.     Section 4 defines the prohibited care as the "prescription or administration of puberty blockers for the purpose of attempting to stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" at birth and the "prescription or administration of hormones or hormone antagonists to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" at birth. *Id*. at § 4, lines 109–13; 114–16.

102.     Section 5 directs the Boards of Medicine and Osteopathic Medicine to create rules permitting the continued treatment of minors receiving transition-related care before the new law takes effect: "The Board of Medicine and the Board of Osteopathic Medicine shall, within 60 days after the effective date of this act, adopt emergency rules pertaining to standards of practice under which a patient younger than 18 years of age may continue to be treated with a prescription consistent with those referenced under s. 456.001(9)(a)1. or 2. if such treatment for sex reassignment was commenced before, and is still active on, the effective date of this act." *Id*. at § 5, lines 154–61.

103.     Section 5 provides: "A patient meeting the criteria of paragraph (a) may continue to be treated by a physician with such prescriptions according to rules adopted under paragraph (a) or nonemergency rules adopted under paragraph (6)(b)." *Id*. at § 5, line 171–74.

104.     Section 5 provides that violation of the prohibition on providing sex-

reassignment prescriptions and procedures "constitutes grounds for disciplinary action under this chapter and chapter 458 or chapter 459, as applicable." *Id.* at § 5, lines 207–09.

105.    Section 5 provides that violation of the prohibition on providing sex-reassignment prescriptions and procedures also results in criminal liability: "Any health care practitioner who willfully or actively participates in a violation of subsection (1) commits a felony of the third degree, punishable as provided in s. 775.082, s. 213 775.083, or s. 775.084." *Id.* at § 5, lines 210–13.

106.    Section 7 creates civil liability for the provision of sex-reassignment prescriptions or procedures to minors. It provides as follows:

(1) A cause of action exists to recover damages for personal injury or death resulting from the provision of sex reassignment prescriptions or procedures, as defined in s. 246 456.001, to a person younger than 18 years of age which are prohibited by s. 456.52(1).

(2) The limitations on punitive damages in s. 768.73(1) do not apply to actions brought under this section.

(3) An action brought under this section:
        (a) May be commenced within 20 years after the cessation or completion of the sex-reassignment prescription or procedure.
        (b) Is in addition to any other remedy authorized by law.

(4) The cause of action created by this section does not apply to:
        (a) Treatment with sex-reassignment prescriptions if such treatment is consistent with s. 456.001(9)(a)1. or 2. and was commenced on or before, and is still active on, the effective date of this act.
        (b) Sex-reassignment prescriptions or procedures that were ceased or completed on or before the effective date of this act.

*Id.* at § 7, lines 241–61.

24

### IV. The Transgender Medical Bans Will Irreparably Harm the Plaintiffs

<u>Jane Doe and her daughter Susan Doe</u>

107.   Susan Doe is an eleven-year-old transgender girl who resides with her mother, Jane Doe, her father, and her three siblings in St. Johns County, Florida.

108.   From an early age, Susan began telling her parents that she is a girl. She began living fully as a girl, with the support of her family and upon advice of her pediatrician by the time she started kindergarten.

109.   Susan has been diagnosed with gender dysphoria and that diagnosis has been confirmed by many doctors, including her doctor at the Pentagon. Susan has not been prescribed puberty blockers or hormones to treat her gender dysphoria.

110.   Susan's medical providers, including her pediatrician, pediatric endocrinologist, and medical provider on base, continue to monitor her treatment and concluded that it likely will be medically necessary for her to begin puberty blocking medications after she begins puberty, which is imminent. The transgender medical bans, however, will prevent her from obtaining treatment.

<u>Brenda Boe and her son Bennett Boe</u>

111.   Bennett Boe is a fourteen-year-old transgender boy who resides in Alachua County, Florida, with his mother, Brenda Boe.

112.   Bennett has known that he was not a girl since the third grade. After he began puberty and started experiencing the accompanying physical changes, Bennett

grew increasingly distressed by the mismatch between his body and his sense of himself as a boy. Around that time, Bennett experienced debilitating depression, culminating in an incident of self-harm resulting in hospitalization.

113.   Bennett's mother Brenda took Bennett to see medical professionals who diagnosed Bennett with gender dysphoria and recommended treatment, including menstrual suppression medication. With Brenda's consent, Bennett began treatment which has considerably alleviated his depression.

114.   Even with that treatment, Bennett continues to experience gender dysphoria as a result of continued pubertal development inconsistent with his sense of himself as a boy.

115.   Bennett's doctors believe it may be medically necessary for him to begin hormone therapy after he turns sixteen.

116.   Brenda and Bennett fear that the transgender medical bans will prevent him from being able to treat his ongoing symptoms of gender dysphoria with hormone therapy.

Carla Coe and her daughter Christina Coe

117.   Christina Coe is a nine-year-old transgender girl, and one of three triplets, who resides in Duval County, Florida with her mother, Carla Coe, her father, and her siblings.

118.   From an early age, Christina began to say to her parents that she is a girl.

119.   At age five Christina began to express distress including suicidal ideation and a desire to harm herself.

120.   Since entering the third grade, Christina has been living as a girl in all aspects of her life. She has not expressed a renewed desire to harm herself.

121.   Carla and her husband fear that Christina will not be able to get the medical care she needs after she begins puberty because of the transgender medical bans.

<u>Fiona Foe and her daughter Freya Foe</u>

122.   Freya Foe is a ten-year-old transgender girl who resides with her mother, Fiona Foe, her father, her grandmother, and her two siblings in Orange County, Florida.

123.   As soon as she could walk and talk, Freya was very feminine in her self-expression, including her choices of clothing and toys.

124.   As she grew older, Freya began to express distress about being seen as a boy. Fiona and her husband took Freya to see a psychologist who diagnosed her with gender dysphoria.

125.   Shortly before her tenth birthday, Freya's doctor examined her and determined that she had reached Tanner Stage 2, meaning puberty is in progress. In the months preceding this examination, Freya had begun to express distress about the onset of puberty and her performance in school began to decline.

126.   In December 2022, Freya's doctors determined that puberty blocking

medication was medically necessary for the treatment of her gender dysphoria. With the consent of her parents, Freya began puberty blocking medication. Since then, Freya's overall wellbeing and performance in school have improved.

127.   The transgender medical bans will prevent Freya's medical providers from prescribing hormones to allow her to go through female puberty, medication she may need as her peers continue to develop through puberty.

Gloria Goe and her son Gavin Goe

128.   Gavin Goe is an eight-year-old transgender boy who resides with his mother, Gloria Goe, his father, and his siblings in Lee County, Florida.

129.   Gavin identified as a boy a very young age, pointing to photographs of boys to let others around him know how he felt. Eventually, he asked his parents why he could not have a boy's name and why people did not believe he was a boy.

130.   Gradually over time, Gavin's parents supported him in taking steps to live more fully as a boy.

131.   By the time Gavin entered first grade, he was living as a boy in all aspects of his life.

132.   Gavin was assessed for gender dysphoria by his pediatrician in 2022, who referred Gavin to a pediatric endocrinologist for further assessment and treatment because of Gavin's age, development, and family history.

133.   Gloria made an appointment for Gavin with the pediatric endocrinologist at a clinic for March of 2023. She learned, just before the appointment, that it was

cancelled because the clinic is no longer seeing new patients due to the transgender medical bans.

134.   Gloria and Gavin know that irreversible changes can happen in Gavin's body at any time due to the onset of puberty and that he needs to be assessed regularly by a pediatric endocrinologist to determine if and when he needs puberty blockers to effectively treat his gender dysphoria.

Linda Loe and her daughter Lisa Loe

135.   Lisa Loe is an eleven-year-old transgender girl who resides with her mother, Linda Loe, her father, and her sibling in Miami-Dade County, Florida.

136.   As a child, Lisa identified closely with her female friends and strongly preferred toys and activities more commonly associated with girls.

137.   At age nine, Lisa said that she knew she was a girl.

138.   Lisa's parents took her to see a psychologist who assisted them in supporting Lisa to live consistently with her gender identity.

139.   Lisa was evaluated in Fall of 2022 by a pediatric endocrinologist who confirmed her diagnosis of gender dysphoria and recommended that she return for another appointment in six months because she was likely to start puberty soon.

140.   Lisa was evaluated again in March of 2023 and her doctor confirmed that she has reached puberty and advised that it would be necessary to begin puberty blockers within approximately three months. The doctor also advised that the transgender medical bans made it impossible for the doctor to prescribe puberty

blockers to Lisa.

141.   Irreversible changes are occurring in Lisa's body at this time, which are causing her significant distress. Lisa and her family cannot meet her urgent medical needs because of the barriers they are facing in Florida finding the medical care she needs.

Patricia Poe and her son Paul Poe

142.   Paul Poe is a nine-year-old transgender boy who resides with his mother, Patricia Poe, and his sister in Miami-Dade County, Florida.

143.   From a young age, Paul began asking consistently to use the boys' bathroom and to be referred to as a boy and a brother.

144.   Paul began wearing boys' clothing, using a boy's name when away from home, and, with the advice and support of a therapist, living as a boy at school and in all other aspects of his life.

145.   In late 2022, Paul's body began changing with the onset of puberty. Patricia took him to see a pediatric endocrinologist who determined that Paul was far enough along in puberty that he may need puberty blockers. The pediatric endocrinologist recommended that Paul see a psychologist to confirm his medical need for puberty blockers.

146.   In February 2023, a psychologist evaluated Paul and determined that he needs to begin treatment with puberty blockers to alleviate his gender dysphoria. Paul began treatment at that time.

147.    Shortly thereafter, Paul's pediatric endocrinologist told Patricia that the endocrinologist was unable to continue prescribing or monitoring the treatment in light of the transgender medical bans. Paul's family must find medical providers outside of Florida to secure the care he needs which presents a hardship to the family and potential harms because of disruption to the continuity of his care, as long as the transgender medical bans are in effect.

## CLAIMS FOR RELIEF

### COUNT I
Deprivation of Substantive Due Process
Parent Plaintiffs Against All Defendants in Their Official Capacities
Violation of Parent Plaintiffs' Right to Direct the Upbringing of Their
Adolescent Children
U.S. Const. Amend. XIV

148.    The Plaintiffs incorporate paragraphs 1–147 of the Second Amended Complaint as if set forth fully herein.

149.    The Parent Plaintiffs bring this Count against all Defendants.

150.    The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality). That fundamental right includes the liberty to make medical decisions for their minor adolescent children, including the right to obtain medical treatments that are recognized to be safe, effective, and medically necessary to protect their adolescent children's health and well-being.

31

151.   The transgender medical bans violate this fundamental right by preventing the Parent Plaintiffs from obtaining medically necessary care for their minor adolescent children.

152.   By intruding upon parents' fundamental right to direct the upbringing of their adolescent children, the transgender medical bans are subject to strict scrutiny.

153.   The Defendants have no compelling justification for preventing parents from ensuring their adolescent children can receive essential medical care. The transgender medical bans do not advance any legitimate interest, much less a compelling one.

### COUNT II
Deprivation of Equal Protection
All Plaintiffs Against All Defendants in Their Official
Capacities
U.S. Const. Amend. XIV

154.   The Plaintiffs incorporate Paragraphs 1–147 of the Second Amended Complaint as if set forth fully herein.

155.   Plaintiffs bring this Count against all Defendants.

156.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

157.   The transgender medical bans single out transgender minors and prohibit them from obtaining medically necessary treatment based on their sex and transgender status.

158.   Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

159.   Transgender-based government classifications are subject to heightened scrutiny because they are sex-based classifications.

160.   Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different from their birth sex, they comprise a discrete group. This defining characteristic bears no relation to a transgender person's ability to contribute to society. Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.

161.   As such, transgender classifications are subject at least to intermediate scrutiny.

162.   The transgender medical bans do nothing to protect the health or well-being of minors. To the contrary, the transgender medical bans undermine the health and well-being of transgender minors by denying them essential medical care.

163.   The transgender medical bans are not narrowly tailored to further a compelling government interest, substantially related to any important governmental interest, or even rationally related to a governmental interest. Accordingly, the transgender medical bans violate the Equal Protection Clause of the Fourteenth Amendment.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

(1) issue a judgment, pursuant to 28 U.S.C. §§ 2201–2202, declaring that the transgender medical bans violate the United States Constitution for the reasons and on the Counts set forth above;

(2) temporarily, preliminarily, and permanently enjoin the Defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the transgender medical bans;

(3) declare that the transgender medical bans violate the Fourteenth Amendment to the United States Constitution;

(4) award the Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(5) grant such other relief as the Court finds just and proper.

Respectfully submitted this 17th day of May, 2023.

/s/ Simone Chriss
Counsel for Plaintiffs

**SOUTHERN LEGAL COUNSEL**

*By: /s/ Simone Chriss*
**Simone Chriss**
Florida Bar No. 124062
**Chelsea Dunn**
Florida Bar No. 1013541
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**HUMAN RIGHTS CAMPAIGN FOUNDATION**

**Cynthia Cheng-Wun Weaver\***
NY No. 5091848
**Jason Starr\***
NY No. 5005194
**Ami Patel\***
CA No. 325647
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180
Cynthia.Weaver@hrc.org
Jason.Starr@hrc.org
 Ami.Patel@hrc.org

**NATIONAL CENTER FOR LESBIAN RIGHTS**

**Christopher F. Stoll\***
CA Bar No. 179046
**Kelly Jo Popkin\***
NY Bar No. 5698220
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel. 415-365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

**GLBTQ LEGAL ADVOCATES & DEFENDERS**

**Jennifer Levi\***
**Chris Erchull\***
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
cerchull@glad.org

\* Admitted by *pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 17, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I served by process server the foregoing on the following non-CM/ECF participants:

Ashley Moody
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050

Ginger Bowden Madden
Office of the State Attorney, 1st Judicial Circuit
190 W. Government Street
Pensacola, FL 32501

Jack Campbell
State Attorney's Office
Leon County Courthouse
301 S. Monroe St, Suite 475
Tallahassee, FL 32301

John Durrett
310 Pine Ave. SW,
Live Oak, FL 32064

Melissa W. Nelson
Ed Austin Building
311 West Monroe Street
Jacksonville, Florida 32202

William Gladson
Office of the State Attorney
Citrus County Courthouse
110 North Apopka Ave.
3rd Floor RM 2-372
Inverness, FL 34450-4293

Bruce Bartlett
PO Box 17500
Clearwater, FL 33762-0500

R.J. Larizza
251 N Ridgewood Avenue
Daytona Beach, FL 32114

Brian S. Kramer
120 West University Avenue
Gainesville, Florida 32601

Monique H. Worrell
415 North Orange Avenue
Orlando, FL 32801

Brian Haas
930 E Parker St.
Lakeland, FL, 33801

Katherine Fernandez Rundle
E.R. Graham Building
1350 N.W. 12 Avenue
Miami, FL 33136

Ed Brodsky
Criminal Justice Building
2071 Ringling Blvd.
Suite 400
Sarasota, FL 34237

Susan S. Lopez
419 N. Pierce Street
Tampa, Florida 33602

Larry Basford
421 Magnolia Avenue
PO Box 1040 – 32402
Panama City, FL 32401

David A. Aronberg

401 North Dixie Highway
West Palm Beach, FL 33401

Dennis W. Ward
530 Whitehead Street
Suite 301
Key West FL, 33040

Harold F. Pryor
Broward County Judicial Complex
201 Southeast 6th Street, Suite 07150
Fort Lauderdale, Florida 33301

Philip G. Archer
2725 Judge Fran Jamieson Way
Building D
Viera, Florida 32940-6605

Thomas Bakkedahl
411 S. 2nd Street
Fort Pierce, FL 34950

Amira D. Fox
Lee County Justice Complex Center
2000 Main Street, 6th Floor
Fort Myers, Florida 33901

*/s/ Simone Chriss*
**Simone Chriss**
Counsel for Plaintiffs