**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

JANE DOE, individually and on behalf
of her minor daughter, SUSAN DOE,
et al.,

                                                                                        Civil No. 4:23-cv-00114-RH-MAF

          Plaintiffs,

          v.

JOSEPH A. LADAPO, *in his official capacity*
*as Florida's Surgeon General*
*of the Florida Department of Health*,
et al.,

          Defendants.
_____/

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs reply to Defendants' Response in Opposition to Motion for Preliminary Injunction ("Response"), and state as follows:

**INTRODUCTION**

A preliminary injunction is proper to preserve the status quo and prevent irreparable harm to vulnerable adolescents who urgently need medical care. Absent an injunction, the minor Plaintiffs will suffer long-lasting physical and psychological harm, and the parent Plaintiffs will be forced to watch their children suffer unnecessary and preventable harm due to the denial of time-sensitive,

1

medically needed care. Defendants have offered no valid reason for this Court to permit these drastic and discriminatory Bans to remain in effect pending the resolution of this case.

Plaintiffs incorporate and adopt by reference the evidence presented by the Plaintiffs in *Dekker v. Weida*, 4:22-cv-325 (N.D. Fla. 2022).

## ARGUMENT

**A.     Plaintiffs are Likely to Succeed on Their Equal Protection Claim**

Defendants do not dispute that classifications based on transgender status, and therefore on sex, are subject to heightened scrutiny, as established by *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).

Instead, Defendants contend that the Bans are based on a medical condition, not on transgender status, and thus warrant only rational basis review. Defendants compare this case to *Geduldig v. Aiello*, 417 U.S. 484 (1974) and *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), in which the Supreme Court held that policies about pregnancy or abortion do not discriminate against women, *per se*, and thus do not trigger heightened scrutiny under the Equal Protection Clause. (Dkt. 55, at 14–18.) Defendants' arguments have no merit.

Unlike restrictions based on pregnancy or abortion, which do not prevent women from being or living as women, the banned treatments for gender dysphoria (puberty blockers and hormone therapy) are an essential aspect of transgender

2

identity. They are what allow a transgender person to be transgender—that is, to live consistent with their gender identity rather than be forced to live in accordance with their birth sex. By singling out treatments that target the defining feature of what it means to be transgender—that is, living consistent with a person's gender identity rather than their birth sex—the Bans create a transgender classification on their face.

In *Geduldig*, the Supreme Court held that an exclusion of coverage under California's disability insurance program for "injury or illness caused by or arising out of pregnancy," 417 U.S. at 489, did not trigger heightened scrutiny because there was no evidence that the "selection of the risks insured by the program worked to discriminate against any definable group or class in terms of the aggregate risk protection," *id*. at 496. That is, the exclusion did not discriminate against women as a class because pregnancy is not inherent to the very definition of being a woman. The Supreme Court endorsed the same approach to abortion restrictions in *Dobbs*. 142 S. Ct. at 2245–46; *see also Bray v. Alexandria*, 506 U.S. 263, n.4 (1993) (noting that "the characteristic that formed the basis of the targeting [of the abortion-related law challenged in *Bray*] was not womanhood, but the seeking of abortion").

Here, the situation is just the opposite. The banned treatments *are* integral to transgender identity and to the conduct—gender transition—that defines the class; they are precisely the treatments a transgender person needs to transition and thus

3

to live and thrive as a transgender person. By banning the very treatments that allow transgender people to undergo gender transition and live consistent with their gender identity, the Bans facially discriminate against transgender minors as a "definable group or class." 417 U.S at 496. Simply put, whereas the Supreme Court has held that being pregnant or seeking an abortion is not integral to a woman's identity as such, seeking to transition is integral to a transgender person's identity, as the Supreme Court recognized in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), when it held that an employer discriminated based on transgender status by not permitting a transgender woman to transition on the job. If upheld, the Bans will compel transgender minors to forego treatments essential to their identity— *i.e.*, to their ability to live as who they are, consistent with their gender identity.

The fact that some transgender people can transition to live consistently with their gender identity without medications—through social transition alone—does not change that analysis. Bans on marriage by same-sex or interracial couples are no less based on sexual orientation or race because there are some gay people who do not marry or some people who do not marry someone of a different race. Where a restriction, on its face, targets a protected group, there is no need to evaluate whether every person in the group seeks to exercise the right or benefit affected by the law.

That is the situation here. The Bans do not prohibit treatments that happen to

4

be used by transgender minors; they prohibit treatments *because* they are used by transgender minors and because they enable transgender minors to live consistently with their gender identity. As such, the Bans discriminate based on transgender status, regardless of whether every transgender adolescent requires the banned medications. For those who do or who may in the future require them, they are essential to the person's very identity as transgender.

Defendants' reliance on *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) is also unavailing. In *Adams*, the Eleventh Circuit held that a policy requiring all students to use restrooms based on their "biological sex" did not discriminate against transgender students because the rule applied to all students, not just to transgender students, and did "not depend in any way on how students act or identify." *Id*. at 809. Here, in contrast, the Bans apply expressly and exclusively only to transgender minors. The Bans do not prohibit puberty blockers and hormone therapy for all minors, but only for transgender minors and *because* they are transgender—that is, only for "therapies and procedures performed for the treatment of gender dysphoria in minors." Rule No. 64B8-9.019 (1), Fla. Admin. Code; Rule No. 64B15-14.014 (1), Fla. Admin. Code.

For the reasons explained above and as other courts have recognized, gender dysphoria and transgender identity are two sides of the same coin. Because a transgender person who is forced to live in accordance with their birth sex will

5

experience gender dysphoria, banning treatments for gender dysphoria discriminates against transgender people.

In sum, the Bans facially discriminate against transgender minors. As such, they are subject to, and cannot survive, heightened scrutiny. Defendants cannot show that their mere disagreement with the overwhelming medical consensus of experts in the treatment of transgender minors with gender dysphoria constitutes an "exceedingly persuasive justification," as required. *United States v. Virginia*, 518 U.S. 515, 531 (1996). To the contrary, as demonstrated by the expert declarations submitted in support of Plaintiffs' Motion and the additional attached declaration from Dr. Kenneth Goodman, the Generally Accepted Professional Medical Standards on the Treatment of Gender Dysphoria ("GAPMS Report") upon which Defendants relied in promulgating the bans has no scientific merit and disregards basic principles of evidence-based medical practice and science. (Declaration of Kenneth W. Goodman, Ph.D ("Goodman Decl.") ¶ 17-22.) As Dr. Goodman notes: "Much pediatric practice would be utterly undone and out of bounds if the stance revealed in the GAPMS Report were applied to many conditions afflicting children." (Goodman Decl. ¶ 19.)

**B.    Parent Plaintiffs are Likely to Succeed on the Their Due Process Claim**

Defendants cannot credibly dispute that the right to seek medical care for one's child is an established aspect of parents' fundamental interest "in the care,

custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). *See Parham v. J.R.,* 442 U.S. 584, 602, 604 (1979); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990).

In the absence of any precedent supporting their claim that Plaintiffs are asserting a "new" right, Defendants rely on a non-precedential unpublished decision in *Case v. Ivey,* 2022 WL 2441578 (11th Cir. July 5, 2022). *See* 11th Cir. R. 36-2. But even if *Case* were binding precedent, it does not support Defendants' position. *Case* held only that existing case law did not address the scope of parental rights in the context of mask mandates with sufficient clarity to overcome qualified immunity. 2022 WL 2441578, at *4. There is no issue of qualified immunity here. None of the other cases Defendants cite, *see* Opp. at 10-12, involved the established right of parents to make decisions concerning their children's medical care.

Defendants also improperly speculate, based on the oral argument in *Eknes-Tucker*, that the Eleventh Circuit may in the future decide that state laws barring health care for transgender minors do not infringe upon parent's fundamental rights. *See* Opp. at 10. Needless to say, such predictions are not precedent. The district court in *Eknes-Tucker* held that parents "have a fundamental right to direct the medical care of their children," which "includes the more specific right to treat their children with transitioning medications subject to medically accepted standards." *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1146 (M.D. Ala. May 13, 2022),

7

*appeal docketed*, No. 22-11707 (11th Cir. May 18, 2022). This Court should reach the same conclusion.

Defendants also contend that Parent Plaintiffs' due process claim is "derivative from" a minor's right to access medical treatment. Opp. at 13–14. But this is not a case about whether patients have a right to seek new or untested treatments. It is about whether the state may completely bar parents from obtaining established treatments for their children that are the recognized standard of care endorsed by every relevant major medical association in the country, including the American Medical Association and the American Academy of Pediatrics.

A parent's fundamental right to obtain established medical care for a child stands on its own. For example, parents have a fundamental right to determine whether their child attends a public or private school, *Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), even though children do not have a fundamental constitutional right to a public education, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973). Similarly, parents' fundamental right to obtain established care for their children exists irrespective of whether the child has an underlying right to that medical care.[1]

---

[1] *Doe ex rel. Doe v. Public Health Trust*, 696 F.2d 901, 903 (11th Cir. 1983) (per curiam) does not support Defendants' position that the parental rights at issue here are "derivative." In *Doe*, the court acknowledged that "parents have the right to decide what medical attention should or should not be provided for their children"

8

Defendants also fail to show that the Bans are narrowly tailored to advance a compelling interest. Although states have an interest in protecting health, they must do so within constitutional limits and based on credible evidence. *See, e.g., Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam) (enjoining public health order where the government "has not shown that public health would be imperiled" and the measure infringed upon religious liberty); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1316 (11th Cir. 2017) (holding that the mere assertion of "the need to regulate the medical profession in order to protect the public" was not sufficient to justify an otherwise unconstitutional law).

Defendants acknowledge that transgender children exist. (Dkt. No. 55 at 18.) They acknowledge that gender dysphoria is a serious medical condition that can cause severe suffering and harm. *Id.* at 3. The Bans nevertheless prohibit transgender adolescents in Florida from initiating transition-related care, regardless of their individual circumstances and medical needs. Such an approach—which prohibits an individualized approach to care and the best interests of the adolescents—belies any assertion that the Bans are narrowly tailored to achieve the goal of protecting minors' health.

---

but held that the parents' rights were not violated because they decided voluntarily to admit their daughter to a public hospital and were free to withdraw their consent. *Id*. Here, by contrast, the Bans categorically bars parents from exercising their right to obtain medical care for their children's gender dysphoria.

9

## C. Other Factors Weigh in Favor of a Preliminary Injunction

Plaintiffs have proffered uncontroverted evidence that if the Minor Plaintiffs do not begin time-sensitive medical treatments soon, they may lose any benefit that treatment would confer, which would constitute irreparable injury.

Defendants claim that Plaintiffs must produce medical records to demonstrate irreparable harm yet have not and cannot identify any case law that states such a requirement. Plaintiffs have submitted sworn testimony that is corroborated by statements from their physicians, and other evidence, which is sufficient evidence to show irreparable injury. (Dkt. No. 30-1, Declaration of Jane Doe; Dkt. No. 30-2, Declaration of Linda Loe; Dkt. No. 30-3, Declaration of Gloria Goe; Dkt. No. 30-4, Declaration of Daniel Shumer, M.D.; Dkt. No. 30-5, Declaration of Aron Janssen, M.D.; Dkt. No. 30-6, Declaration of Brittany Bruggeman, M.D.) For each of these plaintiffs, the inability to initiate puberty blockers creates irreparable harm including:

**Psychological distress**: Without blockers, each is experiencing heightened gender dysphoria and distress because of the incongruence between their gender identity and the physical changes being caused by puberty, which can lead to other severe mental health issues, including anxiety, depression, suicidality, and self-harm. *See* Doe Declaration ¶ 15, 22, 26, 29 Exh. A ¶ 10; Goe Declaration ¶ 18; Loe Declaration ¶ 12; Shumer Declaration ¶¶ 59–60; Janssen Declaration ¶¶ 46–48;

Bruggerman Declaration ¶¶ 26–27, 65.

**Negative body image**: Puberty predictably causes increased distress caused by bodily changes that conflict with a minor's gender identity. This dissonance can cause long-lasting and irreparable effects on body image, self-esteem, and well-being. *See* Doe Declaration ¶ 15, 18, 22, 29; Loe Declaration ¶ 15; Shumer Declaration ¶ 59; Bruggerman Declaration ¶¶ 26–27.

**Social difficulties**: Adolescence is a crucial period for social development. Susan and Lisa have lived as girls for years, and Gavin has lived as a boy for years. Knowing that their bodies are developing in ways inconsistent with who they are and who their friends know them to be makes it extremely difficult to fit into their peer groups, which also can have long-lasting negative impacts on their social and personal development. *See* Doe Declaration ¶ 21; Goe Declaration ¶¶ 14, 18; Loe Declaration ¶ 15; Shumer Declaration ¶ 59; Bruggerman Declaration ¶¶ 26–27.

**Physical harm**. There is a limited window of time to get the benefit of puberty blocking medications. Once pubertal changes such as breast development, musculature, and facial hair begin, they can only be reversed with more invasive medical interventions. Delay in receiving this time-sensitive care will needlessly cause the minor plaintiffs to suffer preventable irreparable physical harms. *See* Doe Declaration, ¶ 29, Exh. A ¶ 8, 10; Goe Declaration, Exh. A; Shumer Declaration ¶ 62; Bruggerman Declaration ¶¶ 26–27, 53.

11

The balance of equities weighs strongly in favor of issuing a preliminary injunction. A preliminary injunction preserves the status quo by allowing transgender adolescents and their families to pursue essential medical care, which was not prohibited prior to March of this year. The irreversible harm to transgender adolescents who imminently may be forced to undergo endogenous puberty clearly outweighs any potential state interest in immediate enforcement of the Bans.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court enjoin enforcement of the Bans while this lawsuit is pending.

Respectfully submitted this 18th day of May, 2023.

| | |
|---|---|
| **SOUTHERN LEGAL COUNSEL** | **NATIONAL CENTER FOR LESBIAN RIGHTS** |
| *By: /s/ Simone Chriss* | *By: /s/ Christopher F. Stoll* |
| **Simone Chriss** | **Christopher F. Stoll \*** |
| Florida Bar No. 124062 | CA Bar No. 179046 |
| **Chelsea Dunn** | **Kelly Jo Popkin\*** |
| Florida Bar No. 1013541 | NY Bar No. 5698220 |
| 1229 NW 12th Avenue | National Center for Lesbian Rights |
| Gainesville, FL 32601 | 870 Market Street, Suite 370 |
| (352) 271-8890 | San Francisco, CA 94102 |
| Simone.Chriss@southernlegal.org | Tel. 415-365-1320 |
| Chelsea.Dunn@southernlegal.org | cstoll@nclrights.org |
| | kpopkin@nclrights.org |

| | |
|---|---|
| **HUMAN RIGHTS CAMPAIGN FOUNDATION** | **GLBTQ LEGAL ADVOCATES & DEFENDERS** |
| By: */s/ Cynthia Cheng-Wun Weaver*<br>**Cynthia Cheng-Wun Weaver***<br>NY No. 5091848<br>**Jason Starr***<br>NY No. 5005194<br>**Ami Patel***<br>CA No. 325647<br>1640 Rhode Island Avenue NW<br>Washington, D.C. 20036<br>(202) 993-4180<br>Cynthia.Weaver@hrc.org<br>Jason.Starr@hrc.org<br>Ami.Patel@hrc.org | By: */s/ Jennifer Levi*<br>**Jennifer Levi***<br>**Chris Erchull***<br>18 Tremont, Suite 950<br>Boston, MA 02108<br>(617) 426-1350<br>jlevi@glad.org<br>cerchull@glad.org<br><br>* Admitted by *pro hac vice*<br><br>***Counsel for Plaintiffs*** |

### CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), the undersigned counsel certifies that, according to Microsoft Word, the word-processing system used to prepare this Reply Memorandum, there are 2,600 total words contained within this Motion and Memorandum of Law.

                                                  */s/ Jason E. Starr*
                                                    **Jason E. Starr**

# **CERTIFICATE OF SERVICE**

I hereby certify that, on May 18, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

*/s/ Jason E. Starr*
**Jason E. Starr**
