**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE, FLORIDA**

| | |
|---|---|
| JANE DOE, et al., | ) |
| | ) |
| Plaintiffs, | ) Case No:  4:23cv114 |
| | ) |
| vs. | ) Tallahassee, Florida |
| | ) May 19, 2023 |
| JOSEPH A. LADAPO, et al., | ) 8:30 A.M. |
| | ) |
| Defendants. | ) |
| _____ | ) |

**TRANSCRIPT OF PLAINTIFFS' PRELIMINARY INJUNCTION AND**
**TEMPORARY RESTRAINING ORDER HEARING**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES</u>:

For the Plaintiffs,   GLBTQ Legal Advocates & Defenders
                      By: JENNIFER L. LEVI
                          Attorney at Law
                          jlevi@glad.org.com
                      18 Tremont Street
                      Suite 950
                      Boston, Massachusetts 02108

                      Human Rights Campaign Foundation
                      By: CYNTHIA C. WEAVER
                          Attorney at Law
                          cynthia.weaver@hrc.org
                      1640 Rhode Island Avenue NW
                      Washington, DC 20036-3200



***JUDY A. GAGNON, RMR, FCRR***
*Registered Merit Reporter*
*2616 Hemmingwood Place * Tallahassee, Florida  32312*
*jgagnonrmr@gmail.com*

```
APPEARANCES: Cont'd

For the Plaintiffs:   Southern Legal Counsel Inc
                      By:  SIMONE M. CHRISS
                           CHELSEA LEE DUNN
                           Attorneys at Law
                           simone.chriss@southernlegal.org
                           chelsea.dunn@southernlegal.org
                      1229 NW 12th Avenue
                      Gainesville, Florida 32601




For the Defendants:   Holtzman Vogel Baren, et al.
                      By:  MOHAMMAD OMAR JAZIL
                           GARY VERGIL PERKO
                           MICHAEL BEATO
                           Attorneys at Law
                           mjazil@holtzmanvogel.com
                      garyp@holtzmanvogel.com
                      michaelb@holtzmanvogel.com
                      119 South Monroe Street  Suite 500
                      Tallahassee, Florida 32301
```

*1*        P R O C E E D I N G S

*2*        (*Call to order; parties present.*)

*3*            THE COURT:  Good morning.  Please be seated.

*4*            We're here on Doe versus Ladapo, and the plaintiffs'

*5*    motion for temporary restraining order or preliminary

*6*    injunction.  I'll hear from the plaintiffs first.

*7*            MS. LEVI:  Yes, Your Honor.

*8*            Good morning, Your Honor.  I'm Jennifer Levi, and I

*9*    represent the plaintiffs in this case who, as you said, are

*10*   seeking a TRO to prevent SB-254, a law that criminalizes the

*11*   provision of medical treatment that transgender minors need to

*12*   live as transgender minors, that went into effect just two

*13*   days ago.  We're asking the Court to issue an order that

*14*   enjoins the law from remaining in effect.

*15*            As you know we've also filed a preliminary injunction

*16*   seeking to halt the effect of the Board of Medicine's rules

*17*   that prevent doctors from prescribing puberty blockers and

*18*   hormones to transgender adolescents, like SB-254 in a

*19*   different form, barring transgender adolescents from living

*20*   consistent with their gender identity.

*21*            I'll be happy to turn to the argument regarding the

*22*   likelihood of success on the merits, but I wanted to start by

*23*   addressing the irreparable harms that these plaintiffs face in

*24*   the absence of a TRO being issued by this Court.

*25*            The movants in this case are three transgender

1    adolescents, all of whom have been diagnosed with gender

2    dysphoria, all of whom are either on the cusp of puberty or

3    actually have had confirmation that they have entered Tanner

4    Stage 2, pubertal development, and all are not able to

5    initiate puberty blockers because of the bans on treatment.

6          I want to speak just specifically to a couple of

7    their circumstances.

8          Gavin Goe is a transgender boy, lived for years as a

9    boy, and he was referred by his pediatrician in June of 2022

10   to pediatric endocrine specialist for continued assessment to

11   determine whether he has entered into Tanner Stage 2.  He had

12   an appointment scheduled for March, just a couple months ago,

13   that was cancelled because of the Board of Medicine bans.

14         THE COURT:  What's going to happen if I enter the

15   injunction?

16         MS. LEVI:  Your Honor, if you enter the injunction,

17   doctors, we have confirmed this, will continue to provide the

18   treatment that the patients need.  And I will say, we have

19   seen in similar cases in Alabama and in Arkansas where there

20   were immediate orders that were entered by federal district

21   courts enjoining those laws from remaining in effect, that the

22   care the transgender adolescents need was continued.

23         THE COURT:  Those states probably don't have the

24   resent history Florida does of retaliating against individuals

25   who took a position adverse to the State.  But your doctors

1   are willing to go forward.

2          MS. LEVI:  We have confirmation from doctors that the

3   reason they wouldn't provide care is because of SB-254, and

4   that if there was an injunction issued by this Court, that

5   they would go forward in providing that care.

6          And just to say, I do understand your point about the

7   history of retaliation, but in Alabama there also was criminal

8   penalties associated with the law and, you know, a similar

9   response and knowledge from the clinic that the law was

10  coming, and the issuance of a very swift order was essential

11  to the continuation of care.

12         In any case, as I said, Gavin Goe had an appointment

13  cancelled in March.  Lisa Loe, who also was referred to a

14  pediatric endocrine specialist, had an appointment that took

15  place in March that confirmed the fact that she has entered in

16  pubertal development of Tanner Stage 2.  And Susan Doe, who

17  has had ongoing medical monitoring by the U.S. Health Youth

18  Gender Program has submitted documentation from her doctor

19  that she is on the cusp of puberty, could enter puberty any

20  day.

21         So I know Your Honor has been hearing for the last

22  week and a half the serious harms that adolescents with gender

23  dysphoria that's untreated will experience; and, of course,

24  these plaintiffs are experiencing that as well as the

25  disruption of their peer social interactions, the impact on

*1*  their body image, their sense of self that will have long

*2*  lasting repercussions if they can't get the care that they

*3*  need.

*4*        But in addition I want to address, to highlight the

*5*  fact that the plaintiffs are seeking a TRO because of the

*6*  draconian and sweeping punitive measures that are incorporated

*7*  within SB-254, including of course the criminal penalties, the

*8*  potential civil penalties up to 20 years after the completion

*9*  of treatment, as well as the professional discipline threats

*10*  to not just the M.D.s who are regulated by the Board of

*11*  Medicine, but also to the advanced practice registered nurses

*12*  and physician assistants who also can, under Florida law,

*13*  prescribe care.

*14*        And we are asking for a TRO in this case for the very

*15*  classic reasons of preserving the edifice of the health care

*16*  institutions that are currently in place designed to provide

*17*  this care.  It is, you know, likely, it's predictable, without

*18*  a swift order from this Court, doctors will be assigned to

*19*  other areas of practice; these clinics will accept different

*20*  patients; endocrinologists who have specialties to treat

*21*  gender dysphoria, but also other specialized pediatric

*22*  conditions like diabetes, will be transferred, patient rolls

*23*  will change.  And that could happen so swiftly that by the

*24*  time that this Court could rule on the merits, these

*25*  plaintiffs won't have the opportunity and the health care

1  infrastructure won't exist as it does prior to today.

2      THE COURT:  Is that already ongoing?  I mean, my

3  understanding, I guess, is that the clinics aren't taking

4  patients now.

5      MS. LEVI:  Well, my understanding is that, as of two

6  days ago, that clinics were continuing to accept patients to

7  do the monitoring and the assessment.  It's absolutely true

8  that after the Board of Medicine's rule passed, some clinics

9  turned patients away.  We saw that in the case of Gavin Goe.

10  But there are other clinics that are looking to this Court to

11  see what happens, and those are the doctors who have said to

12  us that they would continue to provide care; that if SB-254

13  and, of course, the Board of Medicine rules as well, were

14  enjoined, that they will be able to maintain the practices

15  that they have held.

16      THE COURT:  When I say my understanding, that's what

17  I gather from the evidence in instances like Gavin Goe.

18      MS. LEVI:  Well, that's correct.

19      THE COURT:  Give me some background on what there is.

20  There's the clinic at University of Florida, a clinic at

21  University of Miami.

22      MS. LEVI:  Yes.

23      THE COURT:  A Johns Hopkins clinic in, I guess it's

24  St. Petersburg, somewhere there in the Bay Area.

25      MS. LEVI:  That's correct.  Nicklaus Children's

1    Hospital had been providing care and is no longer providing

2    care.

3             THE COURT:  Where else in the state does one get this

4    care?

5             MS. LEVI:  There are individual endocrinologists,

6    there are individual doctors who -- I know you heard testimony

7    this week who have referred, work in collaboration with the

8    multidisciplinary centers, but also may have specialties to

9    provide practice for adolescents.  The plaintiffs that we

10   represent have been referred to specialty practices by their

11   pediatricians.  Pediatricians have worked in close

12   collaboration with those speciality clinics.  So my

13   understanding, those are the primary centers, but not

14   exclusively the places where people are seeking care.

15            THE COURT:  Part of the defense express concern is --

16   expressed concern is not everybody practices at the level that

17   should be required or should be followed for treatment of

18   this.  Not everybody has a multidisciplinary team.  There's

19   testimony about a 20-minute interview and then straight to

20   these drugs.  I don't know that anybody had instances where it

21   happened.

22            What does the record show about whether, in fact,

23   that goes on?

24            MS. LEVI:  It's not demonstrated in the case of the

25   plaintiffs that I represent who, as I've said, have either had

1  ongoing care and coordination between their pediatrician and

2  multidisciplinary speciality practices.  I haven't seen

3  anything in the record that demonstrates as you said that what

4  the State's fear has been carried out.

5  　　　　But more significantly, to the extent that that's the

6  concern, the sweeping ban, criminalization, civil liability

7  for 20 years is hardly tailored to that specific concern.  I

8  mean, to say there is a recognition that nobody disputes the

9  fact that transgender dysphoria is a real and serious

10  condition, and that without treatment adolescents will suffer,

11  and this ban is far from tailored to the concerns that the

12  Court was raising -- that the defense is raising, I guess.

13  　　　　I'm happy to turn to the merits.

14  　　　　THE COURT:  Please.

15  　　　　MS. LEVI:  Plaintiffs argue that, because the medical

16  rules and SB-254 facially discriminate on the basis of

17  transgender status; and, therefore, because of sex, that they

18  are subject to strict scrutiny or at least heightened review.

19  　　　　The laws, both the Board of Medicine's rule and

20  SB-254, facially target transgender people, transgender

21  adolescents, by prohibiting the treatments that are integral

22  to transgender identity -- that is to the conduct, gender

23  transition that defines the group -- the prohibited treatments

24  are precisely those that a transgender person needs to

25  transition and thus live and thrive as a transgender person.

1   SB-254 couldn't be clearer in the language of the statute by

2   prohibiting -- this is the statutory text -- *treatments that*

3   *affirm a person's perception of his or her sex if that*

4   *perception is inconsistent with the person's birth sex*.  In

5   other words, if a person is transgender.  That's the

6   classification that is baked into it.  And the same treatments

7   are prohibited under the Board of Medicine rules.

8           Defendants argue that the analysis of *Geduldig* or

9   *Dobbs* applies; and rather than being a transgender

10  classification, the laws regulate a medical condition, but as

11  I said, you could look through SB-254, and you won't see a

12  medical condition specifically identified that doesn't refer

13  to the underlying condition of gender dysphoria.

14  Specifically, it refers to a prohibition, as I said, of the

15  treatments that affirm a person's gender identity, or somebody

16  has a gender identity that's inconsistent with their birth

17  sex.

18          And so it couldn't be clearer on the face of the

19  statute itself, and by targeting the specific treatments in

20  the Medical Board's bans, that the laws create a facial

21  classification targeting transgender people; therefore,

22  discriminates both on the basis of transgender status and also

23  sex.

24          I can speak more specifically to the reasons why

25  *Geduldig, Dobbs*, and *Adams*, in those cases the court and other

1    courts explaining those decisions have explained that you

2    don't have to be pregnant or have an abortion to be a woman.

3           Here, the prohibited treatments are precisely those

4    treatments that individuals need to be transgender.  I don't

5    think there is any real argument that you can't, on the face

6    of the statute, determine the class that it's focused on.

7    That's what the courts in Alabama and Arkansas found as well.

8           So it's not that the bans prohibit treatment that

9    happen to be used by transgender minors, they prohibit

10   treatments because they are used by transgender minors.  And

11   so we argue that strict scrutiny, at minimum, heightened

12   review applies to the statute and the medical ban.

13          THE COURT:  What do you do with -- one of the things

14   they argue is, they basically tell me, go listen to the

15   argument.  There was an oral argument in the Alabama case.  I

16   haven't gone to listen to the argument.  But I take it it

17   didn't go well for the plaintiffs, and we live in the world we

18   live in, and the panel will do as it will.

19          Of course, the *Adams* case wound up *en banc*, and it's

20   a -- it will be a long time before this is settled.  But it's

21   likely that whatever the Circuit does in the Alabama case,

22   it's going to control what happens in this case between the

23   time of that decision and the time of any *en banc* decision or

24   Supreme Court review, Supreme Court review in this case or

25   Arkansas or somewhere else.  Tell me how you think this is

1    going to play out over time.

2         I enter an injunction and the doctors provide this

3    treatment, and next week or next month or three months from

4    now, but probably not much more than three months from now,

5    there is a Circuit decision.  What's going to happen?

6         MS. LEVI:  I was at that argument, Your Honor.  I

7    take a very different view than the State in this case.  The

8    bench said to the oralist to please address equal protection

9    argument initially because of the existence of *Glenn v. Brumby*

10   and the recognition that the Eleventh Circuit actually was a

11   forerunner to establishing the law that the Supreme Court

12   later recognized, which is that discrimination against

13   transgender status is sex discrimination, and asked my

14   co-counsel in Alabama, Jeff Doss, to start by addressing the

15   equal protection argument because of the panel's purported

16   view of that being very strong under *Glenn v. Brumby*.

17        Mr. Doss actually said, you know, appreciate the

18   bench's, at least, consideration of the parental rights

19   argument, which we make here as well, explained to the court

20   that it's a parental right to medical decision-making to

21   ensure that a child can get well-established, evidence-based

22   medication and treatment.  That's been endorsed by major

23   medical associations, as you know.  The trial I know has

24   reflected all of that information.  I think Mr. -- Mr. Doss

25   made the argument, and actually my perception, which might

1    have been harder to -- I mean, this is just to answer your

2    question, I don't know how the Eleventh Circuit is going to

3    rule.

4              THE COURT:  I learned a long time ago, you can't

5    watch an argument and know how a case is going to come out.

6              MS. LEVI:  Absolutely.  All I want to say is my

7    perception is that there is a very real possibility that the

8    Eleventh Circuit decides to affirm the District Court's

9    opinion on the basis of equal protection -- it may be on the

10   basis of equal protection or parental rights.  I can't

11   predict, I don't know.

12             But, again, I think that's an important example where

13   at least at the moment the controlling precedent is the

14   District Court's decision, and the care has been ongoing.  Of

15   course, I don't know how the Eleventh Circuit is going to

16   rule.  I do think that *Glenn v. Brumby* is controlling.  I also

17   think that *Adams* is distinguishable.

18             In the *Adams* case the court said that there was a

19   policy that applied to all students, didn't depend on how

20   students looked or acted.  This law is completely distinct

21   from this.  I mean, this law is a law that only applies to

22   transgender minors and denies them the treatment that they

23   need to affirm a gender identity.

24             So I think there is a very strong possibility that

25   the Eleventh Circuit affirms the Alabama decision.  It maybe

1    does so on both equal protection, parental rights.  I can't

2    speak to that.  But given the established law in the Eleventh

3    Circuit, I think it will be really important for this Court to

4    enjoin the law as the District Court did, and then, yes, it

5    will be revolved in the future as it is.

6              I'm happy to address the parental argument, if that

7    would be helpful.

8              THE COURT:  Whatever you wish.  You've got a few

9    minutes left and --

10             MS. LEVI:  I'm happy to.  I also want to make sure I

11   have answered all of your questions, Your Honor.

12             THE COURT:  I think that's what I had on my list to

13   make sure I asked you.

14             MS. LEVI:  Okay.  Well, then with the few minutes

15   remaining, we do argue that -- plaintiffs' also argue that

16   strict scrutiny applies because these bans interfere with

17   well-established parental rights, not in a high level of

18   generality, but a very specific articulation of parents'

19   rights to obtain established medical care for their children

20   where it is well established, recognized, demonstrated to be

21   effective.  It's one of the oldest fundamental rights that's

22   been recognized by the Supreme Court.

23             The State argues that the plaintiffs haven't argued

24   it at the level of generality addressing the very specific

25   medical treatment that would be requested.  To require that

1   kind of demonstration of the right would really eviscerate the

2   right.  It's not the approach that the Eleventh Circuit has

3   taken in *Vendenberg*, which it has not walked away from.  And

4   we do think by sweepingly preventing parents from being able

5   to secure the medical care that their children need, that it

6   sweeps more broadly than the State has authority to do so.

7          I know that the State has also argued that there

8   can't be a right that isn't otherwise secured to adults, but

9   in the foundational cases *Meyer versus Nebraska, Pierce versus*

10  *Society of Sisters*, where the Supreme Court established that

11  right.  It was about parental rights, you know, different

12  aspect of a parental right, but it was about educational --

13  making decisions about educating one's children.  There is no

14  right to education, and yet the interpretation, the disruption

15  of the State on parents being able to exercise that autonomy

16  was recognized as a right.

17         We think that also triggers heightened scrutiny as

18  did the Alabama and the Arkansas courts as well.  And then

19  looking at the statute and the medical bans and applying

20  heightened scrutiny, we think it's crystal clear.  Going to

21  your earlier question that, where you have no dispute over the

22  existence of the underlying medical condition, the seriousness

23  of that medical condition when it's untreated, the only

24  established treatment is that which is being enjoined, no

25  alternative treatment has been demonstrated to be effective in

1    care, that the State hasn't demonstrated that the treatment is

2    experimental and can't demonstrate that it's experimental.

3    But even if that were to be the case, it doesn't justify a

4    categorical ban on the treatment for all adolescents for whom

5    we know it to be an effective treatment.

6          And just to kind of return to where I started, we do

7    ask this Court to issue a TRO because people have been

8    looking, including the health care providers, looking at the

9    potentiality of this law getting passed, which just happened

10   two days ago, and a swift order from this Court will preserve

11   the health care institutions and the edifice that exists to

12   provide care so that it's still there once the Court has the

13   opportunity to resolve the case on the merits.

14         THE COURT:  I do have a couple of questions.  One

15   goes to the TRO aspect of this.

16         Where do you stand on letting the other defendants

17   know that we are here, and what do you want to do about it?

18         MS. LEVI:  So we have the summonses ready to go and

19   to be served.  We are moving as expeditiously as possible to

20   notify all of the defendants.  We would ask you to issue the

21   TRO ex parte while we can make that happen as quickly as

22   possible.  And we are prepared to move to the merits phase as

23   quickly as possible.  We believe and appreciate the full

24   record that the Court has been developing over the course of

25   the week and a half.

1          THE COURT:  When can you try the case?

2          MS. LEVI:  We can try the case as quickly as the

3     defendants would agree to it.  We have very few additional

4     witnesses that we would want to put on.  It would include a

5     couple of our plaintiffs.  We have an additional medical

6     provider from the University of Florida, Health Care System.

7     We have a bioethicist from the University of Miami who we

8     think can provide an important perspective to this Court,

9     but --

10         THE COURT:  But you can do that, if I set a trial in

11    June, you say you would be there.

12         MS. LEVI:  Yes, we would, Your Honor.

13         THE COURT:  I had a specific question about

14    Dr. Bruggeman -- I'm not sure I said the name correctly.

15         MS. LEVI:  Yes, that's right.

16         THE COURT:  Is Dr. Bruggeman doing research at UF or

17    treating -- I know doing research, but doing research on this

18    or just treating these patients?

19         MS. LEVI:  She's treating these patients, yes.  She's

20    a clinician, yes.

21         THE COURT:  All right.  You said you have summonses

22    ready to go, but you haven't had any contact with the Attorney

23    General's Office or the State Attorneys' Offices or --

24         MS. LEVI:  We haven't yet.  We honestly have been

25    doing all we could to get the TRO on file and are moving -- I

1  mean, we have the summonses ready to go.

2        THE COURT:  And if I entered a preliminary injunction

3  against the Secretary, do you know whether that's enough for

4  your doctors?  I mean, if I did that, it would be a clear

5  indication of my view of the merits and, frankly, it would

6  make it pretty clear what's going to happen next; although, as

7  always, the new party comes in, I give the new party a chance

8  to be heard, and then it sometimes happens that a new party

9  has something new to say and persuades me of its position.  So

10 it wouldn't be a guarantee that the same result would follow

11 against the Attorney General or against the State Attorney,

12 but there would be some indication.

13        I would think that that would be enough to keep a

14 university from dismantling its program, but whether that

15 would be enough to lead a doctor to say, I'm going to provide

16 this care, even though there's a threat of criminal

17 prosecution out there, I don't know.

18        MS. LEVI:  I believe it would be a powerfully

19 important decision that, as you said, would indicate the

20 likely outcome, that would be the standard in the assessment.

21 I can't, without confirming, represent what the doctors will

22 do.  There's obviously a tremendous concern about the criminal

23 prosecution.  That's why we had to bring in the State

24 Attorneys, but I think that would be powerfully important, but

25 I can't represent, you know.

1           THE COURT:  All right.

2           Let me hear from the other side.  Mr. Jazil?

3           Before you get into the merits, tell me where you are

4    on representation.  Who do you represent and what do you know

5    about the co-defendants?

6           MR. JAZIL:  Good morning, Your Honor.  I represent

7    the Boards of Medicine and the individual board members.  I do

8    not represent the State Attorneys.

9           And, Your Honor, because of that, the Boards of

10   Medicine don't have jurisdiction over the criminal liability

11   provision that's being challenged.  I'm happy to answer the

12   Court's questions regarding those provisions; however, I don't

13   have authority to --

14          THE COURT:  Is the Attorney General a defendant?  Do

15   you represent the Attorney General?

16          MR. JAZIL:  I do not, Your Honor.

17          THE COURT:  And I guess, while we are still dealing

18   with things that really aren't in your bailiwick, is this a

19   statewide prosecutor issue?

20          I know they passed a law recently to give the

21   statewide prosecutor additional jurisdiction.  And we may be

22   beyond what is in your bailiwick or what you want to speak to.

23   I know they expanded the jurisdiction of the statewide

24   prosecutor.  I don't know whether anybody has challenged that

25   under the Florida Constitution.  State Attorneys are elected

1    constitutional officers.  I'm not sure the legislature can

2    just take their jurisdiction away, but maybe so.  That's a

3    Florida issue I certainly don't know the answer to.

4         Some of this probably does involve more than one

5    county.  Some of these individual plaintiffs are crossing

6    county lines to get to their providers.

7         Do you know whether it's a statewide prosecutor issue

8    or just a State Attorney issue?

9         MR. JAZIL:  Your Honor, I believe it can become a

10   statewide prosecutor issue as you described it, if they are

11   crossing jurisdictional boundaries from circuit to circuit.  I

12   do not believe that this issue would be subsumed within the

13   changes that have been made to the statewide prosecutor

14   jurisdiction.  I think those deal with election-related

15   issues, under the theory that elections have a statewide

16   impact beyond one circuit.

17        THE COURT:  All right.  Back to the real issues.

18        MR. JAZIL:  Your Honor, I'm happy to begin with

19   whichever issue you would like for me to address first.  I

20   know my friend talked about the irreparable harm issues, the

21   equal protection issues, and the due process issues.  I can

22   address those in any order that Your Honor would prefer or

23   comment on --

24        THE COURT:  Probably do briefly on irreparable harm.

25   These plaintiffs' doctors certainly think they're going to

1 suffer irreparable harm.

2      MR. JAZIL:  Yes, Your Honor.  I know my friend

3 provided the Court some information about what the doctors may

4 or may not do, but just looking at the record and the

5 affidavits that have been provided, we've got an affidavit

6 from Dr. Rachel Roe, who is Susan Doe's physician.  She last

7 saw Susan Doe in November of 2022 and said that the onset of

8 puberty was imminent.  She then provided a declaration --

9 pardon me -- a letter or declaration in April of 2023 saying

10 that *She may have already begun puberty based on my last*

11 *assessment,* which again was in November of 2022.

12      I don't think it tells us whether or not the patient

13 has started Tanner Stage 2 puberty.  So I make that note, Your

14 Honor.

15      The other physician's note that is in the record is

16 from Nicole Bruno.  She is the physician for Gavin Goe.  She

17 last saw Gavin Goe in 2022, it's unclear when, and says that

18 puberty may begin now or within the next few years.

19      Those are the two physicians who provided letters.

20 We don't have the medical records for these patients in the

21 record.

22      So, Your Honor, I would simply note that irreparable

23 harm is a high standard.  Irreparable harm based on doctors'

24 notes alone, which are a little unclear about whether or not

25 Tanner Stage 2 puberty has begun and treatments must be

1    administered, is a little vague.  All we are left with then

2    are the affidavits from the parents who are then speculating

3    about whether or not Tanner Stage 2 has or has not begun.

4         So I would submit to the Court that that in and of

5    itself is not enough for irreparable harm.

6         And if we look at the Dekker case by analog, when we

7    got the medical records for these individuals in the Dekker

8    case, the medical records cut both ways.  The medical records

9    include material that supports the prescription of puberty

10   blockers, cross-sex hormones, and surgeries, but then it also

11   supports the perspective of the State, where you have someone

12   who has seen a patient once, that someone is a mental health

13   intern with ten hours of training, and diagnosed someone.  You

14   have testimony where someone with lots of both mental and

15   physical comorbidities had a 20-minute consultation about

16   whether or not to use puberty blockers and cross-sex hormones.

17        And, Your Honor, I note that that experience that we

18   are seeing from the Dekker case is inconsistent with even what

19   the WPATH and Endocrine Society folks suggested the

20   appropriate way to treat these issues.  It's broad

21   multidisciplinary teams who take a thorough examination of a

22   person, sometimes over time, weeks, months, years, and then

23   prescribe these treatments.

24        So, Your Honor, I would submit on the irreparable

25   harm prong, my friends for the plaintiffs have not satisfied

1    their burden.

2          Moving on -- well, Your Honor, I would also like to

3    touch briefly on the physician issue.  We're speculating at

4    this point that physicians with a PI would or would not issue

5    treatments.  I don't know what in the records support that

6    contention.  So I would leave it there.

7          Your Honor, moving on --

8          THE COURT:  Of course, it's clear the only reason

9    they wouldn't provide treatment is because of the State

10   action.  Surely, the State can't hold off otherwise

11   appropriate injunctive relief by saying, we're going to

12   prosecute you, and we don't care whether a district judge

13   enters an injunction.  It's not quite standing in the

14   schoolhouse door, but it's the same idea, isn't it?

15         I mean, you really, the State -- I'm right that the

16   State has -- well, you can understand how a doctor would be

17   concerned about the approach the State of Florida has taken to

18   those who oppose the State's position including on gay rights

19   or transgender issues.  You got a State Attorney that was

20   fired in an Executive Order that said in so many terms that

21   his position on transgender issues was a reason for the

22   firing.  This morning's news -- yesterday's just full of the

23   ongoing spat between the Governor and Disney.  There's a

24   lawsuit pending in this court where Disney says, look at all

25   of the changes because we took a position on gay rights or

1    transgender issues.  Just took a position.  And the governance

2    of Disney has changed dramatically.

3            So you can see how a doctor would be concerned and

4    might not think that just a district judge's injunction would

5    be enough to alleviate the concern; isn't that right?

6            MR. JAZIL:  That's true, Your Honor.  I think there's

7    a slight little complication in that analysis.

8            One, Your Honor, "the State" is too broad a phrase as

9    the recent League of Women Voters' case from the Eleventh

10   Circuit pointed out.  One can say that the legislature is

11   doing what the governor would like them to do, but the

12   legislature is a separate entity with separate authorities.

13   The constitutional officers who would be charged with

14   implementing the criminal provisions are also separate

15   constitutional officers and as --

16           THE COURT:  Colleagues of the one that got fired.

17           MR. JAZIL:  Yes, Your Honor.

18           THE COURT:  Held the same constitutional position as

19   the one that got fired.

20           MR. JAZIL:  Yes, Your Honor.  And the Attorney

21   General is also a separate officer who's separately elected,

22   has separate powers and authorities.  The fact that I can't

23   speak for all three of them is indicative of that as well,

24   Your Honor.

25           THE COURT:  Fair enough.  But, look, if the problem

1    is that -- I raise the question, are the doctors really going

2    to do this, we can deal with that.  If the conclusion is, on

3    the merits, the plaintiffs are entitled to win; and if they

4    don't get care, they are going to suffer irreparable harm,

5    then we can deal with the so what after that.

6           I mean, one thing the State has sought to do is to

7    make sure that, even if there is not a doctor in Florida that

8    will provide care, these people can't go anywhere else in the

9    country to get care, right?  The State of Florida is trying to

10   make sure that they can't go to Boston and get care.

11          MR. JAZIL:  Your Honor, I will confess, I don't

12   recall reading that in the bill, but --

13          THE COURT:  Well, here's what the bill says, if they

14   just threaten, and I think that means talk about, getting

15   care, we'll take the children away from the parents.  Tell me

16   what's the reason for that other than animus.  These kids who

17   probably need parental support as much as any kid in the

18   state, and the State of Florida passes a law that says, if the

19   parents even seek out good medical advice, we'll take them

20   away from their parent.  What would support that other than

21   just flat animus?

22          MR. JAZIL:  Your Honor, two points there:

23          One, I am getting up to speed on some of the language

24   in this bill.

25          Two, that is in Section 1 of the bill which isn't

1   being challenged here, which deals with child custody issues.

2         THE COURT:  Because these parents aren't going to be

3   intimidated, apparently, and so they haven't come forward and

4   said, oh, we're scared to do what's in the best interest of

5   our children because of this.  So it's not challenged here,

6   but it's part of the statute that can certainly be analyzed on

7   the question of animus.  And part of what you do to analyze

8   animus is look at this statute and what could support it and

9   what could the State have been thinking.  So that's my

10  question:

11        What could the State have been thinking to say that,

12  if a parent -- it's kind of written in the passive voice

13  backwards and it has the word "threat," but I don't know what

14  that quite means, but it seems to me that, if the parent talks

15  with a doctor, maybe one of these doctors who's testified who

16  provides gender care and is considering thinking about,

17  proposes -- threatens, proposes, in context, I'm not sure what

18  the difference is -- proposes to get care, we can take the

19  child away from the parents.  I'm not sure that the statute

20  doesn't say, you can take the kids away just because they

21  brought the lawsuit.

22        What would be the reason for that?

23        By the way, the State already has a whole dependency

24  system set up.  They've got separate sections in the state

25  court system.  Any parent that's not doing what the parent

1    needs to do, that child can be taken away already.

2         So with all that dependency background already there,

3    the State passes a statute specifically addressing trans kids

4    that says, if you seek care, we can take the children away

5    from the parents.  As I say, it seems to me, animus is an

6    explanation.  I'm at a loss to understand what the additional

7    explanation for that provision could be.

8         MR. JAZIL:  Your Honor, a couple of points.  As

9    you're going through your animus analysis, yes, in

10   consideration of the whole bill language in its entirety is an

11   appropriate thing for the Court to do.

12        Second, Your Honor, and I'm happy to file an errata

13   on this, but to the extent that Chapter 61 deals with child

14   custody disputes, and it's a dispute between one parent and

15   another about whether or not to provide these services, and

16   that's the trigger for a child being taken into the custody of

17   the State, if there is a dispute between the two, one

18   explanation could be, well, it's dealing with a minor child,

19   you're dealing with informed consent issues, which are

20   difficult for minor children, and if you have a dispute

21   between two parents, the way to preserve the status quo in

22   that instance, arguably, is to keep the kid from getting

23   the --

24        THE COURT:  So the parents --

25        MR. JAZIL:  -- puberty blockers --

1    THE COURT:  -- are in dispute about whether the kid

2    should go to public school or to a private school, and the

3    State, with its infinite wisdom and better assessment of

4    what's good for a child, thinks, well, we will just take the

5    child away and we'll make the decision.  Surely not.

6    MR. JAZIL:  Your Honor, it's different than the

7    public school/private school example.  This is at its core

8    whether or not we should have certain treatments for a certain

9    diagnosis; and if that certain treatment --

10   THE COURT:  Parents don't agree about whether to give

11   a COVID vaccine, what we need to do is just have the State

12   take the child away.

13   MR. JAZIL:  Your Honor, if the point is -- I

14   understand the Court is making an example to point out the

15   situation, but, Your Honor, I would posit that if it's a

16   health, safety, welfare issue, and the State says, we are

17   going to take the child away and do a certain treatment on the

18   child because we believe it's in the best interest of the

19   child, there are some instances where that's appropriate.

20   The due process case from the Eleventh Circuit my

21   friend mentioned.  It was a case where a father opposed the

22   use of a catheter, and the State took the kid in custody, did

23   the operation, and then the father sued saying I have

24   substantive due process rights on the care of my child.  And

25   part of the discussion from the Eleventh Circuit was, well,

1    look, if in an emergency, the State needs to take the kid and

2    do a surgery and can't get you on the horn to get your

3    consent, we should be able to do that.

4         Some of the other Eleventh Circuit cases dealing with

5    mask mandates, the Alabama case that dealt with the mask

6    mandate.  Parents are saying we don't want masks, the State

7    saying you should have masks.  It was allowed.  A 1905 case,

8    shots for influenza, same point, Your Honor, that when it

9    comes to health, safety, welfare, it's a little different than

10   the school-choice example.

11        THE COURT:  It is.  And the State of Florida -- I get

12   it, the State thinks, by golly, even though your own expert

13   said, no, no, the State shouldn't be making this decision, the

14   parents should, they ought to get good medical advice, and

15   then the parents and child ought to make the decision, that's

16   what your own expert said, that this care is sometimes the

17   proper care, and that it ought to be up to the parent.  But

18   the State says, oh, no, no, we know so much better than the

19   parents and the doctors, we're going to make this decision,

20   and if we have to, we're going to take the kids away.  I get

21   it, it's a remarkable position.

22        I do understand the question is who gets to make the

23   decision.  Does the legislature get to make the decision?  Do

24   the parents get to make the decision?  And then if the

25   legislature decides it really does know better than the

1   parents, and that the legislature is going to make the

2   decision one size fits all, we've already decided we are going

3   to make the decision, then the question becomes, is that a

4   decision that the legislature is entitled to make?  I'm not

5   the medical person, but I am the one that makes the initial

6   decision on the constitutional law question.

7            MR. JAZIL:  Yes, Your Honor.  I would like to address

8   some of Dr. Levine's testimony.

9            As I understood his testimony, there are three major

10  frameworks for treatment here.  There's the reparative model,

11  which is sometimes called "conversion therapy," on one end of

12  the continuum.  On the other end you have the gender-affirming

13  model that says, we're going to support the kid in the chosen

14  gender, and eventually if the kid needs it, puberty blockers,

15  cross-sex hormones, surgery.  And Dr. Levine was advocating

16  sort of the middle ground.  This may not be his phrase, but

17  I'll call it the ambivalence model, where you're not trying to

18  get the kid back into the natal sex and you're not trying to

19  affirm the kid in their chosen gender.

20           So the middle ground, the ambivalence model, is what

21  I thought he was advocating for, Your Honor.  And he's laying

22  out choices, and at the end of the day, yes, parents have a

23  role in how those choices are selected, but so do the

24  policymakers in the State, Your Honor, is the position I take.

25  And if at the end of the day, the State is choosing among

*1* those points on the continuum, it can draw a line and say that

*2* this is the perspective of the State, and the State in its

*3* efforts to manage the health, welfare, safety of its citizens

*4* is drawing a line in a certain place.  And that is what I

*5* would argue the State has done, Your Honor.

*6*     THE COURT:  What is inconsistent with what the State

*7* has done with this view of its action:  What the State has

*8* decided is that people should not be trans?

*9*     MR. JAZIL:  Your Honor, I do not think that that is

*10* what the State has decided.  If we take a look at --

*11*     THE COURT:  What's inconsistent -- what would the

*12* State do differently if what it decided was, being trans is

*13* immoral or contrary to our religion, just not to be done, we

*14* are flat against trans; these people, in the words of the

*15* legislator, are mutants and basically shouldn't exist, so we

*16* want to see to it that there are no trans individuals.  What

*17* would the State have done differently from what it has done?

*18*     MR. JAZIL:  Your Honor, if we begin with the

*19* supposition that every transgender person has gender dysphoria

*20* and, therefore, needs these treatments --

*21*     THE COURT:  That's not true, and your own doctors say

*22* that is not true.

*23*     MR. JAZIL:  That is not true, Your Honor, I agree

*24* that is not true.  And, again, for purposes of your question,

*25* I am assuming that is true to make the point that, if every

1   transgender person has gender dysphoria and, therefore, needs

2   these treatments, then what the State would do is say, okay,

3   we're going to prohibit these treatments for everyone, not

4   just minors, everyone.  Also what the State could do, which is

5   what the testimony is in the Dekker case, not every

6   transgender person has gender dysphoria, what the State could

7   do is say, okay, look, we're going to do the reparative model.

8   All of these psychotherapies that are available for all three

9   models -- reparative, affirmation, and the ambivalence

10  model -- forget all that, we're going to do just the

11  reparative model; that is the only therapy that could be

12  allowed in the State for folks who have transgender health

13  issues.

14          THE COURT:  That would plainly be unconstitutional

15  under the current law of the Circuit, right?

16          MR. JAZIL:  That would, Your Honor, but that is what

17  the State could do if it were trying to suggest that

18  transgenderism itself is the issue.

19          THE COURT:  The State could do that if it wanted to

20  overtly violate the constitution as currently interpreted in

21  the Eleventh Circuit in a case that the anti-trans community

22  won.

23          MR. JAZIL:  Your Honor, states often lay out statutes

24  to set up test cases to take them up on appeal.  That seems to

25  be a trend.  So, if the question the Court is asking is what

1   the State could have done --

2          THE COURT:  Fair enough.

3          MR. JAZIL:  So, Your Honor, just sticking to the

4   equal protection issue, the sex-based discrimination argument,

5   the argument is on its face discriminates based on sex.  I

6   point out the language in *Adams* talks about sex-based

7   discrimination being discrimination based on biological sex.

8   That is what *Adams* said.  Then the analysis becomes, well,

9   okay, why is it that we should have heightened scrutiny when

10  it's not sex-based discrimination or discrimination based on

11  an immunocal characteristic; again, *Adams* talked about

12  immunocal characteristics being the trigger for heightened

13  scrutiny --

14          THE COURT:  *Adams* didn't overrule *Glenn versus*

15  *Brumby*.

16          MR. JAZIL:  *Adams* did not overrule *Glenn versus*

17  *Brumby*, nor did it overrule *Bostock*.  Both cases, however,

18  talk about sex stereotypes in a workplace environment.  In a

19  workplace environment, a man, a woman, a transgender man or

20  transgender woman in employment context, usually no

21  difference, and that would be appropriate.  But if we're

22  talking about, again, the health-related aspects, we also had

23  testimony in Dekker, at the chromosomal level, people aren't

24  changing.  So, Your Honor, I note that --

25          THE COURT:  Let's use sex to mean sex assigned at

*1*  birth or sex determined at the chromosomal level.  So here's

*2*  my question:

*3*       A doctor determines that two 15-year-olds need to be

*4*  treated with testosterone.  The doctor prescribes testosterone

*5*  for each of the two 15-year-olds.  It's legal for one; it's

*6*  illegal for the other.  How do we know which one it's legal

*7*  for and which one it's illegal for?  And the answer is, one is

*8*  a boy and one is a girl assigned at birth, they have different

*9*  sex.  That's the only difference that determines under the

*10*  Florida statute whether it's legal or illegal; isn't that

*11*  right?

*12*       MR. JAZIL:  No, Your Honor.  I think under the

*13*  Florida statute the question becomes:  Is it being given to

*14*  affirm a perception of his or her sex that is inconsistent

*15*  with the sex that's defined prenatally?

*16*       THE COURT:  But the only way to answer that question

*17*  is to know whether it's a boy or a girl.  If it's a boy --

*18*  using these terms to mean natal sex -- if it's a boy, it's

*19*  legal; if it's a girl, it's illegal under the statute a

*20*  hundred percent of the time.

*21*       MR. JAZIL:  True.

*22*       THE COURT:  You can't say that in *Adams*, you can't

*23*  say that in *Geduldig*.  And the same thing about nine-year-olds

*24*  treated with GnRHa.  Whether it's legal or not depends on

*25*  whether it's a natal boy or a natal girl a hundred percent of

1   the time.

2        MR. JAZIL:  So I take it Your Honor's point that

3   based on the *Geduldig* test and the *Adams* test what we are

4   talking about is sex-based distinctions.

5        THE COURT:  Absolutely.  I don't think you'll be able

6   to give me any case where the only difference in the two

7   classes we're talking about for equal protection purposes

8   correspond 100 percent with sex, and the scrutiny applied is

9   not strict.  I shouldn't say "strict."  Intermediate.

10        MR. JAZIL:  Intermediate.  Your Honor, that's fair.

11   A couple of points about that.

12        One, if we do that analysis and we look at the

13   diagnosis of gender dysphoria rather than sex, and we're doing

14   the analysis to see, okay, if one group includes -- and the

15   point has been made that this is targeted to transsexuals.  So

16   if one group includes both gender dysphoria, one group

17   includes both -- includes trans, and the second category is

18   not gender dysphoria, it includes both trans and natal males

19   and natal females, so if it --

20        THE COURT:  But it doesn't, and that's the point.

21   Your doctors said it, and you agreed with it just a minute

22   ago.  This doesn't apply just to people with dysphoria.  This

23   applies to all trans individuals.  So you can be a trans

24   person without dysphoria, but a trans person still in need of

25   puberty blockers and cross-sex hormones to support your trans

1   identity, and this statute prohibits that.  This statute does

2   not allow treatment of people who are trans but not -- but do

3   not have dysphoria.

4          MR. JAZIL:  Understood, Your Honor.  And I was making

5   the distinction between gender dysphoria and the sex point

6   that Your Honor made, because the preliminary injunction is

7   seeking to enjoin two different things here.  It is seeking to

8   enjoin the statutes, which do not mention gender dysphoria,

9   and the rules, which do mention gender dysphoria.

10         So if we're doing the analysis for the statute, what

11  Your Honor said, biologic-based sex, intermediate scrutiny, if

12  we're doing the analysis for the Board of Medicine rules --

13  pardon me, Your Honor, I'm a little under the weather -- they

14  talk about gender dysphoria.  So, if we're doing the *Geduldig*

15  and *Adams* analysis for the rule, it would be gender dysphoria

16  is a --

17         THE COURT:  You think under the rule it's okay for a

18  doctor to prescribe puberty blockers and cross-sex hormones

19  for a trans child if the trans child does not have dysphoria.

20  And kind of a follow-up, what planet do you live on?  I mean,

21  really?  And, look, if all the plaintiffs really needed was a

22  doctor to say this child doesn't have gender dysphoria, and

23  you told these clinics, look, you can treat these kids as long

24  as they don't technically have gender dysphoria, I just don't

25  think that's what the Board of Medicine would say is fine, do

1  you?

2      MR. JAZIL:  Your Honor, I'm looking at their

3  language:

4      *The following therapies and procedures performed for*

5  *the treatment of gender dysphoria in minors are prohibited.*

6      If the minor is identifying as trans and the minor --

7  and, again, trans is a strongly felt sense of self.  If the

8  minor has, for example, Klinefelter's disease, an extra

9  chromosome, that would be perfectly appropriate to prescribe

10 them puberty blockers, cross-sex hormones, right?  If a child

11 is in the process of detransitioning from one gender to the

12 other, and there could be a tapering off period, a withdrawal

13 period, that would be perfectly appropriate under the rule.

14 So I can think of some samples, but I --

15     THE COURT:  Yeah.  I think it goes back to what

16 planet do you live on.  I think the idea that the Board of

17 Medicine thought that would be okay is just not it.  I think

18 more likely -- I think all of this is consistent with the view

19 that trans without more is just not acceptable.  There should

20 not be trans people.  They should not be treated.  We went

21 through that discussion.

22     MR. JAZIL:  I understand, Your Honor.  I would like

23 to pull the equal protection --

24     THE COURT:  Your own expert, I mean, this is some

25 consistent -- you have an expert on that signs on to an *amicus*

1   brief that says this is a false identity, they are

2   masquerading as the other sex, that kind of language.

3           MR. JAZIL:  I understand, Your Honor.  And just to --

4           THE COURT:  I have to say, a lawyer of your caliber,

5   as good as you are, has all of the resources the State has,

6   that's the expert you can find?

7           Dr. Levine, very helpful I thought.  And his

8   testimony in his view would support substantial restrictions

9   on how this kind of medical care is provided.  And so, if the

10  concern is, there are people prescribing this stuff after a

11  20-minute interview, then, by golly, make it illegal to do

12  that.  Nobody is saying you can't require good quality medical

13  care as a condition to providing this kind of treatment.

14          MR. JAZIL:  I understand, Your Honor.  And another

15  way to take a look at Dr. Levine's testimony, as I'm trying to

16  articulate it as best I can, is, if we agree that there is

17  room for some restrictions to provide this care in a safe,

18  effective manner, then who gets to make that choice?  Right?

19          That choice at the end of the day should be given to

20  the policymakers at the Florida legislature.  The Florida

21  legislature decides to draw lines on how to make those

22  choices.  Do these lines need to be perfect?  No.  What is it

23  that those lines need to do?  Do those lines need to satisfy

24  the floor set by the constitution?  The floor set by the

25  constitution, depending on the treatment -- let's take

1    abortion for one.  It's a highly-charged issue, it's one that

2    spurs passions.  Abortions have been around forever.

3    Abortions some have said, and a lot of the medical

4    associations did say in *Dobbs*, is safe, effective, et cetera.

5    But a State can completely bar abortion as its appropriate

6    line-drawing exercise.

7           THE COURT:  They can.  And *Dobbs* is not a case -- and

8    I don't think there are any cases -- well, we went through the

9    can you treat the 12-year-old, and *Dobbs* is not an exception

10   to the analysis there.  Look, *Dobbs* is an enormously --

11   abortion is an enormously difficult subject.  There is a fetus

12   involved, a potential child involved in the *Dobbs* analysis,

13   and that's not true here.

14          So I get it.  *Dobbs* is the law of the land, and it

15   talks about substantive due process, and on and on, and it

16   talks about equal protection.  But it doesn't compel the

17   result here where the facts and the two classes in the equal

18   protection analysis are different.

19          MR. JAZIL:  Your Honor, I bring up abortion in part

20   because the *Geduldig* analysis is also an abortion analysis,

21   right?  This is whole class concept we come up with from

22   *Geduldig* to *Dobbs* to *Adams* is based in abortion.  And Your

23   Honor made the point, you know, what planet am I living on if

24   I think this is going to affect someone other than trans

25   people, but, again, the argument was made in all three of

1   those cases -- well, in *Geduldig* and *Dobbs*, look, at the end

2   of the day, abortion only affects women.  So it's an

3   intermediate scrutiny --

4         THE COURT:  Yeah, I get it.  I should not have asked

5   what planet, that was probably a little too glib.  All of this

6   stuff is very serious, and every now and then something glib

7   is a pleasant break in an otherwise way serious discussion.

8         But I don't think I said -- I used the phrase in the

9   way that -- on the issue that you just said.  I used it with

10  respect to the question of whether the rule is different from

11  the statute in its scope, whether the rule would allow a

12  doctor to prescribe a puberty blocker or a cross-sex hormone

13  to a trans child just because the child did not have gender

14  dysphoria.  I just don't think anybody would construe the rule

15  that way, and I suspect that the explanation for the reference

16  to gender dysphoria in the rule is because nobody had studied

17  this issue carefully enough or looked at the actual facts and

18  medical situation with enough care to understand that there

19  are trans people who do not have dysphoria.  But all of the

20  evidence in the case is that there are indeed trans people who

21  do not have gender dysphoria.

22        MR. JAZIL:  Yes, Your Honor.  I think Your Honor

23  understands my position.  At the end of the day health,

24  welfare, safety regulations defer to the State.

25        If Your Honor has additional questions, I'm happy to

 1   answer them.

 2           THE COURT:  I did want to ask this:

 3           *Carolene Products* was decided decades ago.  I haven't

 4   gone back to look at the date, but it was old when I was in

 5   law school, and that was decades ago.  But *Carolene Products*

 6   footnote four is there, it refers to discrete and insular

 7   minorities.  The phrase has continued to be referred to, and I

 8   don't think anybody has suggested that it's not a construct

 9   that is useful in equal protection analysis.  So I guess the

10   two-part question is:

11           First, am I correct that whether a challenged

12   distinction works on a discrete and insular minority is still

13   an appropriate part of the analysis; and, second, aren't trans

14   individuals a discrete and insular minority?

15           MR. JAZIL:  Your Honor, if I could -- you used the

16   phrase "discrete and insular minority," the argument that's

17   made in the papers is that they are a quasi-suspect class.  I

18   think functionally the argument is the same.

19           And there, I pivot to *City of Cleburne* case where

20   Justice Marshall was talking about mentally-handicapped

21   individuals and whether or not they should be treated as a

22   quasi-suspect class and given heightened protections under the

23   constitution; and the Supreme Court said, no.  Justice

24   Marshall in his opinion talks about how, for the mentally

25   handicapped, they suffered through Jim-Crow-like issues, long

1   history of forced sterilizations, all sorts of abuse,

2   et cetera.  Even with that history, they weren't given

3   heightened status in an equal protection analysis context.

4           So I would suggest that, you know, I understand the

5   perspective, but from constitutional tradition, I don't think

6   it crosses the bar to getting heightened protections.

7           And, Your Honor, I would also point to footnote five

8   in the *Adams* decision where this issue is -- it's dicta.  It

9   wasn't decided, but it was touched upon.

10          THE COURT:  Fair enough.  And now that you mentioned

11  it, I do recall that, and I will go back and visit it again.

12          Let me say this about the *City of Cleburne*.  First, I

13  think it is a relevant case.  I suggest to you, it's very

14  helpful to the plaintiffs, not to the defense.  You're right

15  about part of the discussion.  There's a lot more to the

16  discussion.  The plaintiffs won that case.  That is a good

17  example of a case where the Supreme Court said rational basis,

18  but it really has to be rational.  Part of the analysis of

19  whether mentally disabled -- that's probably as good a term as

20  any.

21          MR. JAZIL:  I was trying to clean it up, Your Honor.

22          THE COURT:  I understand.  At the time they probably

23  used the language "retarded," and we don't use that so much

24  anymore.

25          Part of the discussion was that class of people has

 1  been able to garner substantial political support.  You would

 2  be hard-pressed at least lately to point out any substantial

 3  political support that the trans community has gotten at least

 4  in this State.  It also pointed out, which is an important

 5  part of the suspect class analysis, that it often is true that

 6  treating that class differently makes sense, and so people do

 7  get hired based on how smart they are.  There are many things

 8  that mentally-disabled people can do, many things they cannot.

 9        And so it's not true as it is, for example, for the

10  classic suspect class, race, that the characteristic often is

11  a legitimate basis for different treatment.

12        You turn to trans individuals, it's a lot more like

13  race.  What is the instance where it would be legitimate to

14  treat a trans individual differently?  Maybe choosing a

15  bathroom, and that's what *Adams* says.  There's privacy

16  concerns of others, and although we don't allow customer

17  preference to support racial discrimination, for example,

18  there are privacy concerns, they are legitimate.  There was

19  intermediate scrutiny in the case.  But the court held this

20  survived it.

21        But it's hard to understand why the trans community

22  wouldn't get intermediate scrutiny if there is hardly ever any

23  legitimate basis for treating the trans community differently.

24  What's wrong with that analysis, other than footnote five cuts

25  against it?

1            MR. JAZIL:  Footnote five cuts against it.  There's

2       also discussion in the *en banc* opinion in *Adams*.  It talks

3       about when heightened scrutiny should apply, and the court --

4       I don't have the pin citation, Your Honor, but -- the court

5       talks about immutable characteristics.  It lays out certain

6       ones that are immutable, such as sex -- biological sex, race,

7       national origin.  And, again, Your Honor, I simply point out

8       that the testimony in this case has been, when we're talking

9       about the transgender identity, the deeply held sense of self,

10      and it can change over time.  And so, Your Honor, I point out

11      that that discussion would cut against it.

12            THE COURT:  The idea that it's not immutable is a

13      complicated question.  It's an easy question if you believe,

14      as some of the people on your side seem to believe, that it's

15      just made up and it's not really a thing; that these people

16      are just masquerading as somebody of the other sex, that it's

17      a false identity, and that theme runs through some of this.

18            MR. JAZIL:  I understand, Your Honor.

19            THE COURT:  It's been a good discussion.  I think I'm

20      out of questions, and it's the kind of thing we could talk

21      about for hours.

22            MR. JAZIL:  Your Honor, I would just like to

23      highlight the second part of your question about treating the

24      trans people differently and when would that be appropriate.

25            And, Your Honor, again, I would posit that it would

1  be appropriate in the medical context.  In an employment

2  context like *Bostock* and *Brumby*, it would not, and that's been

3  settled.

4       Your Honor, I know you're referring to Dr. Hruz's

5  testimony and some of his *amicus* briefs.  Again, the point of

6  his testimony was to talk about the fact that at the

7  chromosomal level things don't change and he critiqued the

8  study.  So the chromosomal stuff, I would simply urge the

9  Court to separate from his personal views.

10      Thank you, Your Honor.

11      THE COURT:  Fair enough.  Thank you.

12      Rebuttal?  I think you need to talk to me about the

13  medical records for the particular plaintiffs.

14      MS. LEVI:  Well, I mean, we have, as Mr. Jazil

15  represented, there are letters from the doctors who referred

16  them to endocrine specialists.  They weren't able to get

17  appointments, at least the two that had more

18  longstanding referrals.

19      THE COURT:  Here's the concern.  I do think that the

20  record suggests that this treatment ought to be provided with

21  great care, with a multidisciplinary approach.  I don't think

22  there is anything in the record suggesting that anybody in

23  Florida has been treated any other way.  I don't think -- I

24  could be wrong -- I don't think the record has any indication

25  of any actual individual in Florida who has not been

1    appropriately treated or who has come to regret it.  At the

2    earlier administrative stage they had some people from out of

3    state that had some dramatic testimony about how they

4    regretted the treatment they got.

5          But the record does suggest that this care ought to

6    be provided with care, with a multidisciplinary team.  And I

7    do think that, before you get an injunction saying you're

8    entitled to this care, you probably need to establish that

9    indeed this has been through that kind of multidisciplinary

10   approach, and this is not something that was made haphazardly,

11   but a decision that was made appropriately.  And I haven't

12   gone back and focused on the actual record on this.  What do

13   we have?

14         MS. LEVI:  We have one plaintiff who is under the

15   supervision of the University of Florida, Health Gender

16   Program; we have one client who was referred to Johns Hopkins'

17   Child Adolescence Program; and we have one child who was

18   referred to Nicklaus.

19         So all of these are patients whose parents are doing

20   what they have been recommended by their pediatricians to do.

21   And what you have are the letters from the doctors showing the

22   referrals to those gender health specialty programs and/or

23   testimony from the parents about the approach that they are

24   taking.

25         THE COURT:  And so when I go back through and

1   flyspeck the record, I'm going to find that there's a record

2   of long-term care, evaluation?  One of the things that

3   Dr. Levine said, some of it certainly rang true, parents know

4   more than the doctors, but parents don't always tell the

5   doctors everything they know.  And he was concerned that, if

6   you didn't see the patient over a substantial period of time,

7   you wouldn't necessarily develop the level of trust that you

8   need to make sure you got all of the information, to make sure

9   you are doing this right.

10          I know the University of Florida because I'm in the

11  State and I know the reputation the institution has.  But

12  what's in the record that shows that the gender clinic is

13  providing care at that level, other than just my assumption

14  that the University of Florida surely is doing this right?

15          MS. LEVI:  What you will find in the record is

16  testimony from the parents about the persistent identification

17  of the children.  You will see in the record the parents'

18  testimony that they sought care from doctors, that they got an

19  appropriate diagnosis of gender dysphoria, and they are trying

20  to take this next step to ensure that comprehensive evaluation

21  of care.  As I said, for one of the plaintiffs, she was able

22  to actually get the blood work to make a determination that

23  she's initiated Tanner 2 stage puberty.  We have a child who

24  was turned away, not able to get the blood work done.  And so

25  what the injunction we are asking you to issue would do would

1    not be necessarily an order that's going to, you know, in any

2    way require the next medical step.  That's for the judgment of

3    the doctors that these plaintiffs are working with.  They

4    can't even get the comprehensive health assessment that would

5    make the determination of readiness.

6           I mean, what you will see in the record, as I said,

7    for Gavin Goe, he was referred in June of 2022.  He had to

8    wait that long period of time, nine months.  It's not that

9    atypical to get into the gender specialty health centers in

10   order to get the assessment and then the determination of

11   care.  I mean, as you are well aware, this is absolutely not

12   for these parents about just getting an order that then gets

13   this medication.  That's exactly what they want, is to be able

14   to move into a facility that has the kind of assessment that

15   would make an appropriate determination for the timeframe for

16   the initiation of puberty blockers.

17          And so what's in the record is the testimony from the

18   parents of their continued work with medical professionals and

19   doctors, the inability to get into a facility, as I said,

20   except for one who did get the blood work who had the

21   determination that she had initiated puberty.

22          So it seems to me that would be exactly the kind of

23   careful ongoing assessment we would want these parents to be

24   able to get for their children, not a bar from the State

25   that's going to potentially -- and these parents won't do it

1    but others might -- turn to alternative less.  I mean, I think

2    really what the law does is going to unsettle the ability of

3    parents to get comprehensive multidisciplinary care.

4           THE COURT:  Is there a reason why the defense doesn't

5    have the medical records?  I take it, you have the medical

6    records.

7           MS. LEVI:  We don't actually have the comprehensive

8    medical records.  I mean, the law was passed -- the law was

9    passed, I understand that we have already challenged the Board

10   of Medicine rules, but what we have, what we are able to get

11   within the time that the law passed and filing the case are

12   the letters from doctors -- two, in this case -- to support

13   the request for the injunction.

14          But there's evidence to support that the parents

15   have, as I said, been taking cautious careful steps to get to

16   appropriate doctors and get the full comprehensive evaluation.

17   I mean, again, what the law is doing is shutting down the care

18   that is essential to evaluate the appropriateness for

19   initiating treatment.

20          THE COURT:  Oh, I get it.  But what we're dealing

21   with here is three specific individuals.  Shouldn't it be

22   required as a prerequisite to a preliminary injunction that

23   they have received the kind of full analysis, the

24   multidisciplinary analysis, that the standard of care would

25   require?

1          MS. LEVI:  They can't get the full multidisciplinary

2     analysis.  I mean, that's --

3          THE COURT:  Well, I mean, up to this point.  I don't

4     know how much of that analysis needs to be done.  But I take

5     it that what you want is you would like an order today, and

6     you could see the doctor next week, and a week from today you

7     could have the medicine.  Now, maybe that's too fast, maybe

8     it's not.  But what you're asking for essentially is for me to

9     clear the roadblock so that you can have the medicine

10    immediately, as soon as you can see the doctor and get

11    approved.

12         Do you think that, as part of that, there should be a

13    condition -- or, as part of that, I should evaluate whether

14    you have actually had the multidisciplinary workup that you

15    need?

16         MS. LEVI:  I don't, Your Honor.  We're asking you to

17    enjoin SB-254 because of the impact that it has on impeding

18    patients' ability to get ongoing care and because of the

19    erosion it's going to have on the entire health

20    infrastructure.  If this Court doesn't enjoin the law's

21    application to doctors, there's not going to be a way for

22    these plaintiffs to even get into a facility.

23         THE COURT:  You understand that any injunction is

24    going to be in favor of these three individuals, right?  I

25    mean, that's the -- leave out for a minute the general law

*1*  that applies to federal judges across the board and how one

*2*  would analyze this; and, frankly, that's how I have been

*3*  analyzing this my whole time here, but there's Eleventh

*4*  Circuit law specifically on this.  One of these cases was

*5*  vacated and remanded.  I think it was the Medicaid case, *Rush*

*6*  *versus Parham*.  I think the injunction in that case -- I think

*7*  I'm thinking of the right case -- was vacated and remanded to

*8*  limit the injunction to the specific plaintiffs in the case.

*9*          MS. LEVI:  Well, I have a couple of things to say.  I

*10* mean, one is, the relief that the plaintiffs are seeking can

*11* really only be gotten with a broad facial injunction, again,

*12* because of the impact that the law has on the entire health

*13* system.  In the *Otto* case the order was a facial injunction

*14* upon remand from the Eleventh Circuit enjoin the law, not just

*15* an exception from the provision for the doctors that brought

*16* the particular challenge to the law.

*17*         THE COURT:  Let me tell you how I have dealt with

*18* this, and I'll hear your input on how I ought to deal with it,

*19* but this goes not just for the preliminary injunction but the

*20* long-term.

*21*         Let me tell you, for example, I had the same sex

*22* case, so I was the first federal judge with the challenge to

*23* same sex marriage in Florida.  I entered a preliminary

*24* injunction.  I entered the preliminary injunction in favor of

*25* the specific plaintiffs in the case.  I think that was the

1   appropriate way to enter the injunction.

2          The Association of Court Clerks -- one of the

3   defendants was a clerk of court who had to issue the marriage

4   license -- they had a lawyer that told them, look, it's still

5   a crime in Florida to issue a marriage license.  If you issue

6   these marriage licenses, we don't really care what Hinkle

7   said, if you issue these marriage licenses, it's going to be a

8   crime, you could be prosecuted.

9          Well, the court clerk filed a motion for

10  clarification that said, I know I have to issue a license to

11  this couple that wants to get married in Washington County --

12  a little tiny county out west here in the Panhandle -- do I

13  have to issue the injunction to the others?  And I entered an

14  order, which I think correctly set out the law.  It was just

15  about a page long, it wasn't much, but I think it correctly

16  set out the law, and you can go find it if you're interested

17  in my view on how this ought to work.  And I said, look, my

18  injunction just applies to these plaintiffs, and so you have

19  to comply with the injunction.  But the constitution applies

20  to everybody, and the class action rule is in the book, and if

21  we need a defense class, that can be done, too, and there are

22  attorneys' fees provided in the statute.  So do what you want.

23  And within 24 hours, I think, the lawyers for the Clerks'

24  Association kind of rethought their position.  There's

25  probably more explanations than that than my persuasive order,

1    but they thought better of it, and everybody complied, and

2    there was not another problem.  From that point forward, I

3    thing the same sex marriages have gone forward in the State.

4         I stayed the order, by the way, until the Supreme

5    Court refused to stay the other Circuit decisions around the

6    country.  It was pretty clear to me at that point that the

7    Supreme Court, which way the wind was blowing, and so it

8    wasn't stayed beyond that.

9         That's different from here.  You can put a marriage

10   off.  You can't put puberty blockers off.  So I understand,

11   the State issue is completely different.

12        But that's what I think the law is in terms of how

13   the injunction can be framed.  So I suspect that, if you get a

14   preliminary injunction, and you might well, it's going to be

15   an injunction just in favor of the three plaintiffs.  And part

16   of that is going to be, they need to be able to establish that

17   they are indeed -- they have indeed done what they need to do

18   up to the point of going to clinic that can provide this.

19        So, I'll give some thought to how that would need to

20   be framed, but you should too, and you might want to consider

21   getting those medical records.  The defense is going to get

22   them, right?  There's not any question that they can subpoena

23   all of those medical records and get them.  You can get them a

24   whole lot faster, and you're the one that's asking to go fast.

25   You probably ought to get those records and turn them over.

1    You can seal them.  They can all be filed under seal.  I'll

2    try to put that in my order.

3              MS. LEVI:  I want to correct that we do have the

4    medical records for Gavin Goe.  I apologize.  I just learned

5    from co-counsel that we do have the medical records now.

6              THE COURT:  I understand.  You're not the one that

7    got them, but somebody did.

8              MS. LEVI:  Absolutely.  And I want to clarify that

9    for the Court.  We have them for Gavin Goe, we have them for

10   Susan Doe, and we will quickly get them for Lisa Loe as well.

11   There is also a document affirming that treatment that's been

12   provided to Susan Doe, the one person that we don't have the

13   medical records for, is provided in a multidisciplinary

14   setting, and that's provided by the clinical doctor,

15   Dr. Bruggeman, at the UF Gender Health Program.

16              But I do want to go back to the issue about the scope

17   of the injunction.  I absolutely understand Your Honor's

18   concern in this context, but I also want to say, there are

19   some very significant differences between access to health

20   care and getting a marriage license.  As we talked about, the

21   law is so sweeping in its scope in terms of the threats not

22   just to doctors, but all of the health care providers that are

23   involved in this as well, the APRNs, nurse practitioners, and

24   then -- you know, I appreciate your reference to Section 1,

25   which we are not challenging at this time, but which I suspect

1    we may challenge in the future, that is so draconian in terms

2    of the risks that anyone takes in terms of accessing this

3    care, that I have great concerns that a narrow preliminary

4    injunction is not going to necessarily effectuate the outcome,

5    because, as I said --

6           THE COURT:  I get it.  You don't want the clinic shut

7    down.

8           MS. LEVI:  Or if not shut down, dramatically

9    transformed.  I mean, as you know, they're specialty health

10   clinics, it's a small population, there's a degree of high

11   level expertise among the health providers in them.  As you

12   know, as we all know, getting a medical appointment is not,

13   unfortunately, as easy as picking up the phone and getting it

14   scheduled, and these are appointments that people waited for

15   for many months that got cancelled.

16          I feel confident that if we have an injunction, you

17   know, we can work very closely with these families to ensure

18   these kids, adolescents, who are in really dire circumstances

19   that at the moment will provide care, but I don't have the

20   same confidence about the breadth of the understanding of the

21   likely outcome in the case when you have a statute that has

22   20-year criminal penalties, up to 20-year civil liability for

23   the treatment.  And I do think it's more like the outcome in

24   *Otto* where you have a facially unconstitutional statute that's

25   going to dramatically impact the provision of the health care

1  system, and I'm happy to forward to the Court the follow-on

2  order that was issued after the remand from the Eleventh

3  Circuit in the *Otto* case.  And just to say --

4          THE COURT:  I can get it.

5          MS. LEVI:  I know.

6          THE COURT:  I assume it's on the electronic filing

7  system.

8          MS. LEVI:  Yeah.  What I want to say is that, the

9  State has no interest in enforcing an unconstitutional law,

10  and given the fact that the statute itself anticipates ongoing

11  continued care even for patients who are receiving care at the

12  time that the law was passed, pending the 60-day adoption of

13  the Board of Medicine rules, the difference here is having an

14  additional small group of adolescents having undisrupted care

15  while this Court resolves the question of the case on the

16  merits.

17          And I would suggest, particularly looking at the

18  balance of equities here, that a broad facial ruling, given

19  the animus that you focused on, given the language of the

20  statute, given the impact broadly on the health care

21  institutions that are responding to the statute, that the

22  balance of the equities absolutely tips in favor of a broad

23  facial injunction, and that's what we ask the Court for.

24          THE COURT:  All right.  Thank you.

25          The motions are submitted.  I take them under

1  advisement.

2  I suppose procedurally I should set a deadline for

3  the other defendants to respond.  You think you can get them

4  served today, I take it.

5  MS. LEVI:  We can get them served today.  I'm told

6  that six have already been executed by the clerk.  We are

7  waiting on the other 14.  And as soon as that happens, we'll

8  get them served as quickly as we possibly can.  We have no

9  interest in delay.

10  THE COURT:  You are waiting on the clerk's office to

11  finish 14 of them.  I'm sure they are working on that as

12  quickly as it can be done, but I can assure that they are.

13  You'll want to get them also some kind of scheduling order

14  that I will get done pretty quickly.  Just make sure they know

15  that this is pending, so we can get all that done as soon as

16  they can work out their representation and so forth.  That

17  won't be immediate.  If you have 67 State Attorneys, but maybe

18  not.  How many State Attorneys?

19  MS. LEVI:  I think there are 20.

20  THE COURT:  Oh, I'm sorry.  There is not one in each

21  county, there is one in each circuit, of course.  We had that

22  discussion yesterday.

23  But you have 20 State Attorneys.  The ones you care

24  most about are the three or four or maybe five or six that are

25  actually involved with these three plaintiffs.  So it seems to

1   me what you want is the State Attorney in the circuit where

2   the care would be provided, and the State Attorney probably

3   where the plaintiffs live.  So, if you're prioritizing these,

4   get notice to those quickest.

5           MS. LEVI:  Okay.  For the record, Your Honor, I can

6   also answer the question you asked me earlier about the

7   multidisciplinary centers where care is provided just so that

8   we have that, given that we are focused on the locations.

9           So, they include the University of South Florida,

10  Endocrinology Clinic; Orlando Health; Joe DiMaggio in Broward

11  County; Spectrum in Orange County; Nemours in Orange County;

12  Carruthers in Duval County; University of Florida; and

13  University of Miami.  So there are extensive number of

14  specialty clinics around the state that are providing the

15  care, and we will hustle to get all of those State Attorneys.

16          THE COURT:  All right.  Very good.

17          Those motions are under advisement.  Let's take a

18  15-minute break.  We will start back into the trial in Dekker

19  at 10:20.

20      (*The proceedings concluded at 10:06 a.m.*)

21              *   *   *   *   *   *   *   *

22

23

24

25

1         I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.
2    Any redaction of personal data identifiers pursuant to the
Judicial Conference Policy on Privacy are noted within the
3    transcript.

4

5

6    *Judy A. Gagnon*                   *5/21/2023*
Judy A. Gagnon, RMR, FCRR        Date
7    Registered Merit Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25