**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

JANE DOE et al.,

              Plaintiffs,

     v.

JOSEPH A. LADAPO et al.,

              Defendants.

Civil No. 4:23-cv-00114-RH-MAF

## THIRD AMENDED COMPLAINT FOR
## CLASSWIDE DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.      This Action, brought by the individual Plaintiffs on behalf of themselves and all similarly-situated transgender persons in the State of Florida is a federal constitutional challenge to Senate Bill 254 ("SB 254"), which singles out transgender minors and adults in order to severely limit, and in the case of minors, completely ban their ability to obtain established, medically necessary transition-related care.

2.      SB 254 which took effect on May 17, 2023 (the "Effective Date"), directed the Florida Boards of Medicine and Osteopathic Medicine (the "Boards") to issue rules implementing various provisions of the law, which they have done.  Under SB 254 and its implementing rules, healthcare providers are subject to criminal penalties if they prescribe or administer any transition-related medications to transgender minors or violate restrictions on providing care to transgender adults. These restrictions have no medical purpose and serve only to prevent transgender people from obtaining needed care.

3.      The Boards issued rules banning transition-related care for transgender minors on March 16 and March 28, 2023.[1]  The Boards issued emergency rules and associated informed-consent forms on July 7, 2023, implementing SB 254's restrictions on access to transition-related care for adults and minors.[2]  These rules,

---

[1] Board of Medicine, Rule 64B8-9.019, Fla. Admin. Code, and Board of Osteopathic Medicine, Rule 64B15-14.014, Fla. Admin. Code, respectively.
[2] Board of Medicine, Emergency Rules 64B8ER23-7 and 64B8ER23-8; Board of Osteopathic Medicine, Emergency Rules 64B15ER23-9 and 64B15ER23-10.

including the recently adopted emergency rules, and forms are in effect indefinitely.[3] The restrictions created by SB 254 and the Boards' rules and emergency rules, including the informed-consent forms, are collectively referred to herein as the "Transgender Medical Restrictions."  When referred to separately, the total ban on care for minors is referred to as the "transgender medical ban."

4.      SB 254's prohibition on established medical care for transgender minors violates parents' fundamental right to make medical decisions to protect the health and wellbeing of their adolescent children.

5.      SB 254's restrictions on the ability of transgender minors and transgender adults to obtain established medical care also violate the federal Equal Protection Clause because they discriminate based on transgender status and sex and do not serve even a legitimate governmental interest, much less a compelling or important one.   Instead, these restrictions serve only to prevent transgender adolescents and adults from obtaining safe and effective medically necessary health care.

6.      The Plaintiffs seek declaratory and injunctive relief to enjoin enforcement of the Transgender Medical Restrictions.  Without the relief sought, Plaintiffs will suffer severe, ongoing, and irreparable harm.

---

[3] *See* SB 254, Section 5 (Fla. Stat. § 456.52(6)).

## PARTIES

### I.  *Transgender Minor Plaintiffs and Their Parents*

7.      Plaintiff Jane Doe is and has at all relevant times been a resident of St. Johns County, Florida.  She is the mother of Plaintiff Susan Doe, an eleven-year-old transgender girl for whom she also appears in this case as next friend.  Susan Doe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Jane Doe.

8.      Plaintiff Brenda Boe is and has at all relevant times been a resident of Alachua County, Florida.  She is the mother of Plaintiff Bennett Boe, a fourteen-year-old transgender boy for whom she also appears in this case as next friend.  Bennett Boe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Brenda Boe.

9.      Plaintiff Carla Coe is and has at all relevant times been a resident of Duval County, Florida.  She is the mother of Plaintiff Christina Coe, a nine-year-old transgender girl for whom she also appears in this case as next friend.  Christina Coe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Carla Coe.

10.     Plaintiff Fiona Foe is and has at all relevant times been a resident of Orange County, Florida.  She is the mother of Plaintiff Freya Foe, a ten-year-old transgender girl for whom she also appears in this case as next friend.  Freya Foe sues

pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Fiona Foe.

11.    Plaintiff Gloria Goe is and has at all relevant times been a resident of Lee County, Florida.  She is the mother of Gavin Goe, an eight-year-old transgender boy for whom she also appears in this case as next friend.  Gavin Goe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Gloria Goe.

12.    Plaintiff Linda Loe is and has at all relevant times been a resident of Miami-Dade County, Florida.  She is the mother of Lisa Loe, an eleven-year-old transgender girl for whom she also appears in this case as next friend.  Lisa Loe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through her parent Linda Loe.

13.    Plaintiff Patricia Poe is and has at all relevant times been a resident of Miami-Dade County, Florida.  She is the mother of Paul Poe, a nine-year-old transgender boy for whom she also appears in this case as next friend.  Paul Poe sues pursuant to Federal Rule of Civil Procedure 17(c) by and through his parent Patricia Poe.

## II.    *Transgender Adult Plaintiffs*

14.    Adult Plaintiff Lucien Hamel is and has at all relevant times been a resident of Indian River County, Florida.  He is an adult transgender man.

15.    Adult Plaintiff Olivia Noel[4] is and has at all relevant times been a resident of Florida.  She is an adult transgender woman.

16.    Adult Plaintiff Rebecca Cruz Evia is and has at all relevant times been a resident of Port St. Lucie, Florida.  She is an adult transgender woman.

17.    Adult Plaintiff Kai Pope is and has at all relevant times been a resident of Palm Harbor, Florida.  He is an adult transgender man.

## III.    Defendants

18.    Defendant Joseph Ladapo, M.D., is sued in his official capacity as the Surgeon General of the Florida Department of Health, which is responsible for "protect[ing] and promot[ing] the health" of all Floridians.  Fla. Stat. § 20.43 (2022). The Surgeon General is appointed by the Governor and serves at the pleasure of the Governor.  Fla. Stat. § 20.43(2) (2022).  Defendant Ladapo, in his official capacity as Surgeon General of the Florida Department of Health, initiated the process of the promulgation of the Transgender Medical Restrictions pursuant to the authority granted by Fla. Stat. § 20.43(g) (2022), regarding the regulation of health practitioners. Defendant Ladapo's official place of business is located in Tallahassee, Leon County, Florida.

---

[4] Plaintiff's legal name is Jae Olivia Noel, but she is known by and uses the name Olivia. Accordingly, this Third Amended Complaint refers to Plaintiff as Olivia.

19.     Defendant Scot Ackerman, M.D., is a member of the Florida Board of Medicine.

20.     Defendant Nicholas W. Romanello, Esq., is a member of the Florida Board of Medicine.

21.     Defendant Wael Barsoum, M.D., is a member of the Florida Board of Medicine.

22.     Defendant Matthew R. Benson, M.D., is a member of the Florida Board of Medicine.

23.     Defendant Gregory Coffman, M.D., is a member of the Florida Board of Medicine.

24.     Defendant Amy Derick, M.D., is a member of the Florida Board of Medicine.

25.     Defendant David Diamond, M.D., is a member of the Florida Board of Medicine.

26.     Defendant Patrick Hunter, M.D., is a member of the Florida Board of Medicine.

27.     Defendant Luz Marina Pages, M.D., is a member of the Florida Board of Medicine.

28.     Defendant Eleonor Pimentel, M.D., is a member of the Florida Board of Medicine.

29.     Defendant Hector Vila M.D., is a member of the Florida Board of Medicine.

30.     Defendant Michael Wasylik, M.D., is a member of the Florida Board of Medicine.

31.     Defendant Zachariah P. Zachariah, M.D., is a member of the Florida Board of Medicine.

32.     Defendant Maria Garcia, Esq., is a member of the Florida Board of Medicine.

33.     Defendant Nicole Justice is a member of the Florida Board of Medicine.

34.     Defendant Watson Ducatel, D.O., is a member of the Florida Board of Osteopathic Medicine.

35.     Defendant Tiffany Sizemore Di Pietro, D.O., is a member of the Florida Board of Osteopathic Medicine.

36.     Defendant Gregory Williams, D.O., is a member of the Florida Board of Osteopathic Medicine.

37.     Defendant Monica M. Mortensen, D.O., is a member of the Florida Board of Osteopathic Medicine.

38.     Defendant Valerie Jackson is a member of the Florida Board of Osteopathic Medicine.

39.     Defendant Chris Creegan is a member of the Florida Board of Osteopathic Medicine.

40.     Defendant William D. Kirsh, D.O., is a member of the Florida Board of Osteopathic Medicine.

41.     The Florida Board of Medicine is made up of fifteen members who are appointed by the Governor.  Fla. Stat. § 458.307(1) (2022).  Defendant members of the Florida Board of Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B-9.019 pursuant to their rulemaking authority under Fla. Stat. §§ 458.309 and 458.331(1)(v) (2022). Further, Defendant members of the Florida Board of Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B-9.019, including taking disciplinary action against any doctor for violating its provisions.  Fla. Stat. § 456.072.  Defendant members of the Florida Board of Medicine, in their official capacities, each separately and independently also took actions to promulgate Emergency Rules 64B8ER23-3, 64B8ER23-7, and 64B8ER23-8, pursuant to their rulemaking authority under Fla. Stat. § 456.52(6) (2023).  The Florida Board of Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Medicine is, Tallahassee, Leon County, Florida.

42.    The Florida Board of Osteopathic Medicine is made up of seven members who are appointed by the Governor.   Fla. Stat. § 459.004(1) (2022). Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B15-14.014 pursuant to their rulemaking authority under Fla. Stat. §§ 459.005 and 459.015(1)(z) (2022).   Further, Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B15-14.014, including taking disciplinary action against any doctor for violating its provisions.   Fla. Stat. § 456.072.   Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each separately and independently also took actions to promulgate Emergency Rules, 64B15ER23-9, and 64B15ER23-10, pursuant to their rulemaking authority under Fla. Stat. § 456.52(6) (2023).   The Florida Board of Osteopathic Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Osteopathic Medicine is, Tallahassee, Leon County, Florida.

43.    Defendant Melissa Nelson is the State Attorney for Florida's Fourth Judicial District.

44.    Defendant William Gladson is the State Attorney for Florida's Fifth Judicial District.

45.    Under Florida's Constitution, State Attorneys serve as prosecutors representing the people in criminal courts.  Fla. Const. art. 5, § 17.  State Attorneys initiate investigations if there is reason to believe a crime has occurred and an investigation is warranted, review criminal investigations and complaints submitted by law enforcement agencies, the Governor, and others, and decide whether or not to file formal charges and present these cases in court.  Accordingly, the Defendant State Attorneys, in their official capacities, have the authority to enforce the criminal sanctions provisions of SB 254, discussed herein.

## JURISDICTION AND VENUE

46.    The Plaintiffs seek redress for the deprivation of their rights secured by the United States Constitution.  This Action is initiated pursuant to 42 U.S.C. § 1983 to enjoin the Defendants from enforcing the Transgender Medical Restrictions and for a declaration that the Transgender Medical Restrictions violate federal law.

47.    This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343.

48.    This Court has personal jurisdiction over the Defendants because the Defendants are domiciled in Florida and the denial of the Plaintiffs' rights guaranteed by federal law arises out of and relates to the Defendants' official duties in Florida.

49.     Each of the Defendants is a resident of the State of Florida and serve in their official capacity for a government office for the State of Florida.  Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

50.     The Transgender Medical Restrictions violate the constitutional rights of the Plaintiffs in this judicial district.  Therefore, venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

51.     Venue is proper in the Tallahassee Division of the Northern District of Florida under N.D. Fla. Loc. R. 3.1(B) because it is the location of the principal place of business for a majority of the Defendants and where a substantial portion of the acts or omissions complained of herein occurred.

52.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 57 and 65, 28 U.S.C. §§ 2201 and 2202, and this Court's inherent equitable powers.

## FACTUAL ALLEGATIONS

### I.     *Gender Identity and Gender Dysphoria*

53.     Gender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity.  It is an essential element of human identity and a well-established concept in medicine.  Everyone has a gender identity.  Most people's gender identity is consistent with their birth sex.  Transgender people, however, have a gender identity that differs from their birth sex.  Being made to live

inconsistently with a person's gender identity causes discomfort and distress and can interfere with a person's ability to function in a productive and healthy way in matters of daily living.

54.    Gender dysphoria is the clinical diagnosis for the distress that arises when a transgender person cannot live in a manner consistent with their gender identity.  To be eligible for a diagnosis of gender dysphoria, a young person or adult must meet the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DSM-5").[5]  If left untreated, gender dysphoria can cause anxiety, depression, and self-harm, including suicidality.

55.    In fact, 56% of transgender youth reported a previous suicide attempt and 86% of them reported suicidality.  *See* Ashley Austin, Shelley L. Craig, Sandra D. Souza, and Lauren B. McInroy (2022), *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, J. of Interpersonal Violence, Vol. 37 (5-6) NP2696-NP2718.

56.    The DSM-5 reports a prevalence of gender dysphoria in natal adult males ranging from 0.005% to 0.014%, and for natal females from 0.002% to 0.003%.

---

[5] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder."  The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*.  Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012).

However, the DSM-5 states that these rates are likely "modest underestimates."  Other studies have measured the proportion of the population that self-identified as transgender or gender incongruent and found that measuring self-identity yields higher numbers.  For example, in 2016, data from the Center for Disease Control's Behavioral Risk Factor Surveillance System suggested that 0.6% of U.S. adults identify as transgender.  Florida is estimated to have the second-largest population of transgender adults in the U.S., with roughly 95,000 adults identifying as transgender. With respect to transgender minors, the Williams Institute estimates 16,200 transgender minors residing in Florida. Herman, et al., Williams Institute.

57.    Research has shown that an individual's gender identity is innate and cannot be changed.  In the past, mental health professionals sought to treat gender dysphoria by attempting to change the person's gender identity to match their birth sex; these efforts were unsuccessful and caused serious harms.  Today, the medical profession recognizes that such efforts put transgender minors and adults at risk of profound harm, including dramatically increased rates of suicidality.

58.    Gender dysphoria is highly treatable.   Health care providers who specialize in the treatment of gender dysphoria follow well-established standards of care and clinical practice guidelines that have been adopted by the major medical and mental health associations in the United States including, but not limited to, the American Medical Association, the American Academy of Pediatrics, the American

Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and the Endocrine Society.

59.    The standards of care for treatment of transgender people, including transgender youth and adults, were initially developed by the World Professional Association for Transgender Health ("WPATH"), an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria.  WPATH published the most recent edition of its standards of care for the treatment of gender dysphoria in minors and adults in 2022, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8.   (Coleman E, Radix AE, Bouman WP et al. Standards of Care for the Health of Transgender and Gender Diverse People, Version 8.  Int. J. Transgend. 2022 Sept. 6;23 (suppl. 1): S1-S259.)

60.    The Endocrine Society has also promulgated a standard of care and clinical practice guidelines for the provision of hormone therapy as a treatment for gender dysphoria in minors and adults.  *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinol. Metab. 3869 (2017).

61.    The American Medical Association, the American Academy of Pediatrics, the American Association of Child and Adolescent Psychiatrists, the Pediatric Endocrine Society, the American Psychiatric Association, the American Psychological Association, and other professional medical organizations also follow the WPATH and Endocrine Society standards of care and clinical practice guidelines.

62.    The treatment of gender dysphoria is designed to reduce a transgender person's clinically significant distress by permitting them to live in alignment with their gender identity.  Undergoing treatment for gender dysphoria is commonly referred to as "transition," "gender transition," or "gender-affirming care."  There are several components to the gender transition process.

63.    The precise treatment of gender dysphoria depends on an individualized assessment of a patient's needs.

64.    Treatment of gender dysphoria in adults and adolescents is well-established.  The WPATH "Standards of Care" set forth the range of ways in which gender dysphoria can be treated, including by social transition, hormone therapy, and a range of surgeries.

65.    Social transition involves a transgender person taking measures to live in accordance with their gender identity in all aspects of life.  For transgender boys or men, it means living fully as a boy or man; for transgender girls or women, it means living fully as a girl or woman.  Social transition can include adopting a name,

pronouns, hairstyle, and clothing consistent with that person's gender identity. The steps a transgender person takes as part of their social transition help align their gender identity with all aspects of everyday life.

66.    For adolescents, gender transition may also involve taking prescribed medications, puberty blockers and hormones, to bring a person's body into alignment with their gender identity.

67.    There are no medications prescribed to transgender children before they have begun puberty.

68.    For a transgender adolescent who has begun puberty, puberty-blocking medication prevents the patient from going through the physical developments associated with puberty that exacerbate the distress experienced by the incongruence between the patient's gender identity and their body. As such, under the Standards of Care and clinical practice guidelines, puberty-blocking medication may become medically necessary and appropriate after a transgender adolescent reaches puberty to minimize or prevent the exacerbation of gender dysphoria and the permanent physical changes that puberty would cause. In providing medical treatments to adolescents, pediatric physicians and endocrinologists work in close consultation with qualified mental health professionals experienced in the diagnosis and treatment of gender dysphoria.

69.    For older transgender adolescents and adults, hormone therapy may also be medically necessary to bring their body into alignment with their gender identity and further treat the gender dysphoria they may experience without treatment.

70.    For transgender adults, transition-related surgeries may be required to treat symptoms of gender dysphoria by better aligning their primary or secondary sex characteristics with their gender identity and thus alleviate gender dysphoria.

71.    Treatments for gender dysphoria are highly effective for people of all ages.  Longitudinal studies have shown that transgender children with gender dysphoria who receive essential medical care, including puberty blockers and hormones, show levels of mental health and stability consistent with those of non-transgender children.  Lily Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. Am. Acad. Child & Adolescent Psychiatry 116 (2017); Kristina Olson et al., *Mental Health of Transgender Children Who are Supported in Their Identities*, 137 Pediatrics 1 (2016).  In contrast, transgender children with gender dysphoria who do not receive appropriate medical care are at risk of serious harm, including dramatically increased rates of suicidality and serious depression.

72.    Studies demonstrate that transition-related care contributes to improved well-being in adults as well.  *See* Tim C. van de Grift et al., *Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study*, 79(7)

Psychosom. Med. 815 (2017); Anthony N. Almazan et al., *Association Between Gender-Affirming Surgeries and Mental Health Outcomes*, 156 JAMA Surgery 611, 611 (2021); Friedemann Pfäfflin & Astrid Junge, *Sex Reassignment. Thirty Years of International Follow-up Studies After Sex Reassignment Surgery: A Comprehensive Review, 1961-1991* (1998).

73.     Every leading medical organization in the U.S. has recognized that transition-related care is a medically necessary, safe, and effective treatment for gender dysphoria, and that access to such treatment improves the health and well-being of transgender people.  Many of these groups have voiced strong opposition to restrictions on care like those imposed by SB 254.

74.     Advanced practice registered nurses ("APRNs") in Florida are advanced practice nurses who may be certified to practice autonomously in the field of primary care practice, which is defined by administrative regulation as "physical or mental health promotion, assessment, evaluation, disease prevention, health maintenance, counseling, patient education, diagnosis and treatment of acute and chronic illnesses, inclusive of behavioral and mental health conditions."  Fla. Admin. Code Ann. 64B9-4.001(12) (2021).

75.     Certified nurse practitioners ("NPs") are a type of APRN that are qualified to diagnose gender dysphoria and recommend and prescribe appropriate medical treatment, such as puberty blockers and hormones.  NPs have completed

advanced education and training that includes years of higher medical education beyond the required registered nurse degree and at least 1000 hours of clinical practice.   Florida law provides that autonomous practice APRN NPs may practice medicine independently, including prescribing medication, and without the direct supervision of a physician.   Fla. Stat. § 464.0123.   Non-autonomous practice NPs can prescribe with a collaborative practice agreement and protocol with a physician.   Fla. Stat. § 464.012(3).   The range of tasks NPs may perform in autonomous practice includes diagnosing illness, ordering and interpreting diagnostic tests, prescribing medications, and managing patient care.   To the extent there are limits on their ability to prescribe medications, they are the same limitations imposed on physicians.

76.     Numerous studies demonstrate that NPs administer medical services safely, achieve high quality results, and that patient satisfaction with NPs and their willingness to be seen by NPs is high.   Hilary Barnes, et al., *Physician Practices Increasingly Rely On Nurse Practitioners*, 37(6) Health Aff. 908 (2018).

77.     NPs can offer high quality and safe care for transgender patients comparable to that provided by physicians, as they have been doing for decades before passage of SB 254.   There is no legitimate medical reason to bar NPs from prescribing or administering hormone therapy to transgender patients, and doing so will serve only to harm transgender people by preventing them from receiving medically needed care.

78.     As a result of SB 254's arbitrary prohibition on any qualified medical provider other than a physician, including NPs, from prescribing, administering or performing transition-related health care, many transgender adults are unable to obtain needed medical care because they are transgender. This is true both because there are not enough physicians to provide the care necessary throughout the state and because many patients do not have access to physicians in proximity to where they live. This restriction also results in transgender patients being unable to obtain care in a timely manner, resulting in long delays that cause harm to their health.

79.     Throughout Florida, many transgender patients receive transition-related health care from an NP. SB 254 prevents patients from receiving medical care from qualified medical providers because the patients are transgender and for no legitimate reasons, causing serious harms.

80.     These harms will increase over time given the number of transgender patients who need medical care and the dearth of available physicians. The number of practicing NPs in the state of Florida is approximately 33,231. The number of practicing APRNs in the state of Florida is approximately 50,805. The number of autonomous practice NPs licensed in the state of Florida is approximately 9,181. The number of practicing MDs in the state of Florida is approximately 83,350 and the number of practicing DOs is approximately 11,381. Studies commissioned by the Florida Safety Net Hospital Alliance and the Florida Hospital Association estimate

that Florida will have a shortfall of approximately 18,000 practicing physicians by 2035.  In fact, this predicted shortage was a key reason Florida's autonomous practice APRN law (Fla. Stat. § 464.0123) was passed.

## II.    *The Boards' Pre-SB 254 Bans on Care for Transgender Minors*

81.    On June 2, 2022, Defendant Ladapo sent a letter to the Boards asking them to "establish a standard of care" for the treatment of gender dysphoria, notwithstanding the widely accepted standards of care and clinical practice guidelines established by WPATH and the Endocrine Society.

82.    On July 28, 2022, the Florida Department of Health sent the Boards a "Petition to Initiate Rulemaking," asking the Board, among other things, to adopt a categorical ban on all treatment of gender dysphoria for people under eighteen years of age.

83.    On August 5, 2022, the Boards discussed the June 2, 2022 letter from Dr. Ladapo and the July 28, 2022 Petition to Initiate Rulemaking.  The Boards voted to accept the Petition to Initiate Rulemaking.

84.    On September 1, 2022, the Boards each published a Notice of Development of Rulemaking in the Florida Administrative Register (F.A.R.), proposing "rule development to clarify the practice standards for treatment of gender dysphoria in minors."

85.    On October 14, 2022, the Boards each published a Notice of Rule Workshop, which would take place on October 28, 2022.

86.    On October 28, 2022, the Boards held a Joint Workshop regarding the development of a rule related to "Practice Standards for the Treatment of Gender Dysphoria."   At the conclusion of the meeting, the Boards voted in support of proposed rules that would ban puberty blockers and hormones, with an exception for treatment performed as clinical trials under the auspices of the Institutional Review Board.  The proposed rules were as follows:

> (1)    The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>
>> (a)    Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>>
>> (b)    Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2)    Nonsurgical treatments for the treatment of gender dysphoria in minors may continue to be performed under the auspices of Institutional Review Board (IRB) approved, investigator-initiated clinical trials conducted at any of the Florida medical schools set forth in Section 458.3145(1)(i), Florida Statutes.  Such clinical trials must include long term longitudinal assessments of the patients' physiologic and psychologic outcomes.
>
> (3)    Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

87.    On November 4, 2022, the Florida Board of Medicine voted to remove the exception from its proposed transgender medical ban.

88.    On January 9, 2023, the Boards published Notices of Public Hearing in the Florida Administrative Register, regarding a joint hearing of the Boards scheduled to take place on February 10, 2023.

89.    On February 10, 2023, during the Public Hearing, the Florida Board of Osteopathic Medicine voted to remove the exception from its proposed transgender medical bans.

90.    The Florida Board of Medicine filed the following rule with the Florida Department of State on February 24, 2023, with an effective date of March 16, 2023:

> (1)    The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>
>> (a)    Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
>>
>> (b)    Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2)    Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

91.    The Florida Board of Osteopathic Medicine filed the following rule with the Florida Department of State on March 8, 2023, with an effective date of March 28, 2023:

> (1)    The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.

(a)    Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.

(b)    Puberty blocking, hormone, and hormone antagonist therapies.

(2)    Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

92.    The transgender medical bans include a clause that permits minors being treated with puberty blockers or hormones prior to the effective date of the transgender medical bans to continue to receive those treatments.

93.    Transgender minors who were not yet receiving puberty blockers or hormones when the transgender medical bans took effect are barred from obtaining such treatment from a Florida doctor regardless of medical necessity.

94.    The transgender medical bans ignore the established medical and scientific consensus that these treatments are medically necessary, safe, and effective for the treatment of gender dysphoria.

95.    The transgender medical bans undermine the public policy of this state, which provides that parents have the right to make medical decisions for their adolescent children. *See* Fla. Stat. § 1014.02 (which provides that "it is a fundamental right of parents to direct the upbringing, education, and care of their minor children"); Fla. Stat. § 1014.03 ("The state, any of its political subdivisions, any other governmental entity, or any other institution *may not infringe on the fundamental*

*rights of a parent to direct* the upbringing, education, *health care*, and mental health of his or her minor child[.]") (emphasis added).

### III.   The Restrictions Created by SB 254

96.   On May 4, 2023, the Florida Legislature voted to pass SB 254.

97.   On May 17, 2023, Florida Governor Ron DeSantis signed into law SB 254, which imposes criminal and civil penalties, as well as professional discipline, on any health care practitioner who, in violation of SB 254, prescribes or administers puberty blocking medications or hormone therapy, or performs a medical procedure, in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's birth sex.  *See* SB 254, § 4 (Fla. Stat. § 456.001) (definitions); § 5 (Fla. Stat. § 456.52) (prohibitions, restrictions, and criminal and civil penalties); § 6 (Fla. Stat. § 456.074) (professional discipline); § 7 (Fla. Stat. § 766.318) (civil liability).

98.   Section 4 defines "sex-reassignment prescriptions" as the "prescription or administration of puberty blockers for the purpose of attempting to stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" at birth and the "prescription or administration of hormones or hormone antagonists to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" at birth.  SB 254, § 4 (Fla. Stat. § 456.001(9)(a)(1)-(2)).   Section 4 defines sex-reassignment

"procedures" as "[a]ny medical procedure, including a surgical procedure, to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" at birth. *Id.* at § 4 (Fla. Stat. § 456.001(9)(a)(3)). "Sex" is defined under Section 4 as "the classification of a person as either male or female based on the organization of the human body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth." *Id.* at § 4 (Fla. Stat. § 456.001(8)).

99.     Section 5 bars the provision of transition-related care to minors. SB 254, § 5 (Fla. Stat. § 456.52(1) ("Sex-reassignment prescriptions and procedures are prohibited for patients younger than 18 years of age[.]")). Minors who were receiving transition-related prescriptions (not procedures) prior to and through the passage of SB 254 on May 17, 2023, may continue to receive such medication. *Id.* at § 5 (Fla. Stat. § 456.52(1)(a) ("[A] patient younger than 18 years of age may continue to be treated with [sex-reassignment prescriptions] if such treatment for sex reassignment was commenced before, and is still active on, the effective date of this act.")). However, minors eligible to continue prescription transition-related treatment must comply with the restrictions developed by the Boards (discussed below). *Id.* at § 5 (Fla. Stat. § 456.52(1)(a)-(b)).

100.    Section 5 permits adults to obtain transition-related prescriptions and procedures only if they comply with restrictions imposed by the Boards, including

meeting requirements set forth on "forms adopted in rule by the [Boards]" (discussed below).  SB 254, § 5 (Fla. Stat. § 456.52(2)).  The requirement of completing these forms does not apply to renewals of prescriptions "if a physician and his or her patient have met the requirements for consent for the initial prescription or renewal." *Id.* at § 5 (Fla. Stat. § 456.52(4)).  However, "separate consent is required for any new prescription for a pharmaceutical product not previously prescribed to the patient." *Id.*

101.   Further, Section 5 limits who can provide transition-related care – for both adults and minors – to Florida-licensed allopathic and osteopathic physicians or a physician practicing medicine or osteopathic medicine in the employment of the United States federal government.  *Id.* at § 5 (Fla. Stat. § 456.52(3) ("Sex-reassignment prescriptions or procedures may not be prescribed, administered, or performed except by a physician.")).  Under this provision, NPs are no longer permitted to prescribe or administer transition-related medications for treatment of gender dysphoria.

102.   Section 5 provides that the Boards shall adopt, by emergency rule, requirements that eligible transgender minors and transgender adults must meet to receive transition-related treatment.  SB 254, § 5 (Fla. Stat. § 456.52(1)(a) ("The [Boards] shall . . . adopt emergency rules pertaining to the standards of practice under which a [minor patient] may continue to be treated with a prescription[.]"); Fla. Stat.

§ 456.52(2) (requiring transgender adults to provide consent "in writing on forms adopted in rule by the [Boards]"); Fla. Stat. § 456.52(6)(a) ("The Board[s] shall adopt emergency rules to implement this section.")).  The Boards issued these emergency rules on July 7, 2023.[6]

103.   These emergency rules prohibit health care providers from providing transition-related care to transgender patients unless they (i) see a physician in person and are treated only by a physician (also a requirement in SB 254 itself), (ii) comply with the extensive, medically unnecessary requirements in the consent forms; and (iii) have a competent third-party witness observe this process and sign the consent form as well.[7]

104.   Section 5 provides that violation of its provision "constitutes grounds for disciplinary action under this chapter and chapter 458 or chapter 459, as applicable." SB 254, § 5 (Fla. Stat. § 456.52(5)(a)).  Section 5 further provides that violation of the prohibition or limitations on providing transition-related care to eligible transgender minors results in felony criminal liability; violations of the provisions pertaining to transgender adults results in misdemeanor criminal liability.  *Id.* at § 5 (Fla. Stat. § 456.52(5)(b)-(c)).

---

[6] Board of Medicine, Emergency Rules 64B8ER23-7 and 64B8ER23-8; Board of Osteopathic Medicine, Emergency Rules 64B15ER23-9 and 64B15ER23-10.
[7] *See id.*

105.   Section 6 provides for "immediate suspension" of the license of any health care practitioner who is "arrested for committing or attempting, soliciting, or conspiring to commit" violations of the prohibitions and restrictions on providing transition-related care to minors.  SB 254, § 6 (Fla. Stat. § 456.074(5)(c)).

106.   Section 7 creates civil liability for the provision of sex-reassignment prescriptions or procedures to minors.  It provides as follows:

(1)   A cause of action exists to recover damages for personal injury or death resulting from the provision of sex reassignment prescriptions or procedures, as defined in s. 456.001, to a person younger than 18 years of age which are prohibited by s. 456.52(1).

(2)   The limitations on punitive damages in s. 768.73(1) do not apply to actions brought under this section.

(3)   An action brought under this section:

(a)   May be commenced within 20 years after the cessation or completion of the sex-reassignment prescription or procedure.

(b)   Is in addition to any other remedy authorized by law.

(4)   The cause of action created by this section does not apply to:

(a)   Treatment with sex-reassignment prescriptions if such treatment is consistent with s. 456.001(9)(a)1. or 2. and was commenced on or before, and is still active on, the effective date of this act.

(b)   Sex-reassignment prescriptions or procedures that were ceased or completed on or before the effective date of this act.

SB 254, § 7 (Fla. Stat. § 766.318(1)-(4)).

107.   The medical bans on transition-related care for minors in SB 254 ignore the established medical and scientific consensus that these treatments are medically necessary, safe, and effective for the treatment of gender dysphoria.  Further, SB 254 puts multiple substantial, harmful, and medically unnecessary obstacles in the path of transgender patients seeking treatments who are not otherwise completely barred under SB 254 from getting care.  These restrictions serve no legitimate medical purpose and do not apply to similarly-situated persons who are not transgender seeking comparable forms of medical care.  Instead, they are uniquely targeted against transgender persons receiving or desiring to receive transition-related care and serve no purpose other than to make it extremely difficult or impossible for them to obtain the treatment they need.

108.   The first restriction is a requirement that each patient provide informed consent "in writing on forms adopted in rule by the [Boards]."[8]  The Boards have issued three consent forms for eligible transgender minors – one form for puberty blockers, one form for feminizing hormones, and one form for masculinizing hormones; and three consent forms for transgender adults – one form for feminizing hormones, one form for masculinizing hormones, and one form for transition-related surgical treatment.  These forms were adopted by the Boards through emergency rules

---

[8] Fla. Stat. § 456.52(2) and Emergency Rules 64B8ER23-8 and 64B15ER23-10 (applicable to adults); Fla. Stat. § 456.52(1)(a), Emergency Rules 64B8ER23-7 and 64B15ER23-9 (applicable to minors).

and became effective on July 7, 2023.[9]  They remain in effect indefinitely pursuant to SB 254, Section 5 (Fla. Stat. § 456.52(6)).   These forms impose substantive requirements that serve no medical purpose, that are harmful to transgender patients, that undermine rather than serve informed consent, and that prevent transgender patients from receiving the care they need. These forms also require providers to convey false information and to misrepresent the risks and benefits of transition-related care.

109.   A second restriction is a requirement that a physician be "physically present in the same room" to establish informed consent.[10]  This requirement prevents the use of telehealth, even when a patient has a well-established therapy for treatment and is transferring care to a new provider because of restrictions under the new law. This requirement can be an absolute barrier to care for a patient who does not live in proximity to their doctor and does not have access to transportation.  This requirement also prevents NPs from obtaining informed consent, although they are fully qualified to do so.

110.   A third barrier is the total prohibition on transition-related medications prescribed by NPs.  SB 254, § 5 (Fla. Stat. § 456.52(3) (restricting transition-related

---

[9] *See* Board of Medicine, Emergency Rules 64B8ER23-7 and 64B8ER23-8; Board of Osteopathic Medicine, Emergency Rules 64B15ER23-9 and 64B15ER23-10.
[10] Fla. Stat. § 456.52(2), Emergency Rules 64B8ER23-8(2)(a) and 64B15ER23-10(2)(a) (applicable to adults); Fla. Stat. § 456.52(1)(a), Emergency Rules 64B8ER23-7(3)(a) and 64B15ER23-9(3)(a) (applicable to minors).

medication prescribers to licensed physicians)).  Under Florida law, qualified NPs are authorized to "[p]rescribe, dispense, administer, or order any drug."  Fla. Stat. § 464.012(3)(a) (noting additional education requirements for prescribing controlled substances).  The effect is that the number of authorized providers of transition-related medications has been severely reduced and patients are unable to continue receiving care from the providers who know their treatment history and with whom they have established a rapport.  As set forth above, this restriction works in concert with the in-person requirement, causing many patients, including Plaintiffs, to be unable to obtain medications because they can no longer receive hormone therapy from their NP and cannot either get an appointment with a physician before their medication runs out or are unable to travel to initiate treatment with a physician under the in-person requirement.

111.  For example, Spektrum's entire clinic is staffed by NPs, and these practitioners serve about 2,500 transgender patients whose access to care is now in jeopardy.   A predicted shortfall of nearly 18,000 physicians in Florida by 2035 will further exacerbate transgender persons' ability to obtain care.

112.  A fourth restriction  created by SB 254 is that a "competent witness is also required to sign the informed consent form[s]" in order for them to be

"executed[.]"[11]  This is yet another obstacle to care for transgender persons that serves no recognized medical purpose and does not apply to comparable forms of medical care sought by similarly-situated persons who are not transgender.

113.   In addition to preventing transgender patients from receiving medical care, SB 254 has caused numerous practitioners to stop providing care to transgender patients, either in whole or in part.   For example, since the enactment of SB 254, the University of Miami has repeatedly canceled scheduled transition-related surgeries without rescheduling them, leaving the affected patients in the lurch and without available alternatives for obtaining surgical treatment.  In addition, because of SB 254 and the accompanying rules, some physicians in Florida who treat gender dysphoria have stopped seeing new patients.

114.   One overall effect of the Transgender Medical Restrictions has been to create a crisis of availability for transition-related care in Florida, with demand for that care vastly outstripping the supply of physicians authorized and willing to supply it.   This has created extremely long wait times for treatment that leaves patients without their medications or access to other forms of care for prolonged periods, risking significant harm to their physical and mental health while they remain untreated.

---

[11] Fla. Stat. § 456.52(1)(a), Emergency Rules 64B8ER23-7(3)(d) and 64B15ER23-9(3)(d) (applicable to minors); Fla. Stat. § 456.52(2), Emergency Rules 64B8ER23-8(2)(c) and 64B15ER23-10(2)(c) (applicable to adults).

## IV.    *The Transgender Medical Restrictions Will Irreparably Harm the Plaintiffs*

<u>Jane Doe and her daughter Susan Doe</u>

115.    Susan Doe is an eleven-year-old transgender girl who resides with her mother, Jane Doe, her father, and her three siblings in St. Johns County, Florida.

116.    From an early age, Susan began telling her parents that she is a girl.  She began living fully as a girl, with the support of her family and upon advice of her pediatrician by the time she started kindergarten.

117.    Susan has been diagnosed with gender dysphoria and that diagnosis has been confirmed by many doctors, including her doctor at the Pentagon.  Susan has not been prescribed puberty blockers or hormones to treat her gender dysphoria.

118.    Susan's medical providers, including her pediatrician, pediatric endocrinologist, and medical provider on base, continue to monitor her treatment and concluded that it likely will be medically necessary for her to begin puberty blocking medications after she begins puberty, which is imminent.  The Transgender Medical Restrictions applicable to minors, however, will prevent her from obtaining treatment.

<u>Brenda Boe and her son Bennett Boe</u>

119.    Bennett Boe is a fourteen-year-old transgender boy who resides in Alachua County, Florida, with his mother, Brenda Boe.

120.    Bennett has known that he was not a girl since the third grade.  After he began puberty and started experiencing the accompanying physical changes, Bennett grew increasingly distressed by the mismatch between his body and his sense of

-34-

himself as a boy.   Around that time, Bennett experienced debilitating depression, culminating in an incident of self-harm resulting in hospitalization.

121.   Bennett's mother Brenda took Bennett to see medical professionals who diagnosed Bennett with gender dysphoria and recommended treatment, including menstrual suppression medication.   With Brenda's consent, Bennett began treatment which has considerably alleviated his depression.

122.   Even with that treatment, Bennett continues to experience gender dysphoria as a result of continued pubertal development inconsistent with his sense of himself as a boy.

123.   Bennett's doctors believe it may be medically necessary for him to begin hormone therapy after he turns sixteen.

124.   Brenda and Bennett fear that the Transgender Medical Restrictions applicable to minors will prevent him from being able to treat his ongoing symptoms of gender dysphoria with hormone therapy.

Carla Coe and her daughter Christina Coe

125.   Christina Coe is a nine-year-old transgender girl, and one of three triplets, who resides in Duval County, Florida with her mother, Carla Coe, her father, and her siblings.

126.   From an early age, Christina began to say to her parents that she is a girl.

127.   At age five Christina began to express distress including suicidal ideation and a desire to harm herself.

128.   Since entering the third grade, Christina has been living as a girl in all aspects of her life.  She has not expressed a renewed desire to harm herself.

129.   Carla and her husband fear that Christina will not be able to get the medical care she needs after she begins puberty because of the Transgender Medical Restrictions applicable to minors.

Fiona Foe and her daughter Freya Foe

130.   Freya Foe is a ten-year-old transgender girl who resides with her mother, Fiona Foe, her father, her grandmother, and her two siblings in Orange County, Florida.

131.   As soon as she could walk and talk, Freya was very feminine in her self-expression, including her choices of clothing and toys.

132.   As she grew older, Freya began to express distress about being seen as a boy.  Fiona and her husband took Freya to see a psychologist who diagnosed her with gender dysphoria.

133.   Shortly before her tenth birthday, Freya's doctor examined her and determined that she had reached Tanner Stage 2, meaning puberty is in progress.  In the months preceding this examination, Freya had begun to express distress about the onset of puberty and her performance in school began to decline.

134.   In December 2022, Freya's doctors determined that puberty blocking medication was medically necessary for the treatment of her gender dysphoria.  With the consent of her parents, Freya began puberty blocking medication.  Since then, Freya's overall wellbeing and performance in school have improved.

135.   The Transgender Medical Restrictions applicable to minors will prevent Freya's medical providers from prescribing hormones to allow her to go through female puberty, medication she may need as her peers continue to develop through puberty.

<u>Gloria Goe and her son Gavin Goe</u>

136.   Gavin Goe is an eight-year-old transgender boy who resides with his mother, Gloria Goe, his father, and his siblings in Lee County, Florida.

137.   Gavin identified as a boy at a very young age, pointing to photographs of boys to let others around him know how he felt.  Eventually, he asked his parents why he could not have a boy's name and why people did not believe he was a boy.

138.   Gradually over time, Gavin's parents supported him in taking steps to live more fully as a boy.

139.   By the time Gavin entered first grade, he was living as a boy in all aspects of his life.

140.   Gavin was assessed for gender dysphoria by his pediatrician in 2022, who referred Gavin to a pediatric endocrinologist for further assessment and treatment because of Gavin's age, development, and family history.

141.   Gloria made an appointment for Gavin with the pediatric endocrinologist at a clinic for March of 2023.  She learned, just before the appointment, that it was cancelled because the clinic is no longer seeing new patients due to the Transgender Medical Restrictions applicable to minors.

142.   Gloria and Gavin know that irreversible changes can happen in Gavin's body at any time due to the onset of puberty and that he needs to be assessed regularly by a pediatric endocrinologist to determine if and when he needs puberty blockers to effectively treat his gender dysphoria.

<u>Linda Loe and her daughter Lisa Loe</u>

143.   Lisa Loe is an eleven-year-old transgender girl who resides with her mother, Linda Loe, her father, and her sibling in Miami-Dade County, Florida.

144.   As a child, Lisa identified closely with her female friends and strongly preferred toys and activities more commonly associated with girls.

145.   At age nine, Lisa said that she knew she was a girl.

146.   Lisa's parents took her to see a psychologist who assisted them in supporting Lisa to live consistently with her gender identity.

147.   Lisa was evaluated in fall of 2022 by a pediatric endocrinologist who confirmed her diagnosis of gender dysphoria and recommended that she return for another appointment in six months because she was likely to start puberty soon.

148.   Lisa was evaluated again in March of 2023 and her doctor confirmed that she has reached puberty and advised that it would be necessary to begin puberty blockers within approximately three months.   The doctor also advised that the Transgender Medical Restrictions applicable to minors made it impossible for the doctor to prescribe puberty blockers to Lisa.

149.   Irreversible changes are occurring in Lisa's body at this time, which are causing her significant distress.  Lisa and her family cannot meet her urgent medical needs because of the barriers they are facing in Florida finding the medical care she needs.

<u>Patricia Poe and her son Paul Poe</u>

150.   Paul Poe is a nine-year-old transgender boy who resides with his mother, Patricia Poe, and his sister in Miami-Dade County, Florida.

151.   From a young age, Paul began asking consistently to use the boys' bathroom and to be referred to as a boy and a brother.

152.   Paul began wearing boys' clothing, using a boy's name when away from home, and, with the advice and support of a therapist, living as a boy at school and in all other aspects of his life.

153.   In late 2022, Paul's body began changing with the onset of puberty. Patricia took him to see a pediatric endocrinologist who determined that Paul was far enough along in puberty that he may need puberty blockers.   The pediatric endocrinologist recommended that Paul see a psychologist to confirm his medical need for puberty blockers.

154.   In February 2023, a psychologist evaluated Paul and determined that he needs to begin treatment with puberty blockers to alleviate his gender dysphoria.  Paul began treatment at that time.

155.   Shortly thereafter, Paul's pediatric endocrinologist told Patricia that the endocrinologist was unable to continue prescribing or monitoring the treatment in light of the transgender medical bans.   Paul's family must find medical providers outside of Florida to secure the care he needs which presents a hardship to the family and potential harms because of disruption to the continuity of his care, as long as the Transgender Medical Restrictions applicable to minors are in effect.

<u>Lucien Hamel</u>

156.   Lucien Hamel is a 27-year-old transgender man who resides in Indian River County, Florida with his wife and child.

157.   Lucien has known he was a man since the age of six.  Because he lacked the vocabulary to describe his experience when he was young, and fearing the danger

and discrimination that transgender persons experience, Lucien did not begin receiving transition-related care until 2019.

158.   After Lucien's psychiatrist diagnosed him with gender dysphoria, he began receiving transition-related medication initially from a pediatric endocrinologist.  Thereafter, he was referred to an NP at Spektrum Health, who continued to prescribe him hormones for treatment of his gender dysphoria.

159.   Because of SB 254, Lucien's NP at Spektrum can no longer refill his transition-related medication.  Lucien's former pediatric endocrinologist will also not refill his medication because that doctor's practice will no longer permit him to treat adults.  Lucien has tried to obtain refills from a physician but has been unable to get an appointment with one.  Lucien has also contacted out-of-state providers, but he cannot obtain transition-related care from these practitioners because such treatment would require him to travel out of state, which he cannot afford.

160.   Lucien took his last testosterone shot on June 28, 2023, and has been without transition-related medication since that time.  Being forced to go without testosterone has caused, and will continue to cause, severe and irreparable physical, emotional, and psychological consequences for Lucien.  He is also harmed because he cannot continue to receive care from the medical provider with whom he has built a relationship of trust and who knows about his medical history and needs.

Olivia Noel

161.   Olivia Noel is a 26-year-old transgender woman who resides in Florida.

162.   Olivia started taking transition-related medication in May 2016 after being diagnosed with gender dysphoria.  Before receiving transition-related treatment, Olivia was assessed by and met several times with an endocrinologist.  She has been receiving transition-related care via telehealth from NPs at Planned Parenthood in Florida.

163.   The current prescription Olivia has for hormones will run out within 30 days.

164.   Planned Parenthood informed Olivia it can no longer provide her medical care because of SB 254.  Olivia has not been able to get an appointment with a physician to get continued care as SB 254 requires, and cannot meet the burdensome prerequisites to medical treatment set forth in the informed consent forms for financial and logistical reasons even if she could.

165.   As a result of SB 254, Olivia will be unable to get the medical care she needs for treatment of gender dysphoria.

Rebecca Cruz Evia

166.   Rebecca Cruz Evia is a 40-year-old transgender woman who resides in Port St. Lucie, Florida.

167.   Rebecca began her transition in February 2019, at which time she started receiving transition-related medication.  She currently receives hormones from a physician at the University of Miami Health System and also sees a mental health provider.

168.   Rebecca has undergone one transition-related surgery already which was completed in 2020, and was scheduled to undergo another transition-related surgery in August with surgeons at the University of Miami Health System.  However, the surgeons who were scheduled to do the surgery called Rebecca and told her that they were required to cancel all inpatient transition-related surgeries because of SB 254.

169.   Rebecca has inquired about receiving her needed transition-related operation from the only other provider in Florida that performs such operations, but this provider does not take her health insurance and she cannot afford to pay out of pocket.  Her current health insurance plan will not cover out-of-state operations.

Kai Pope

170.   Kai Pope is a 51-year-old transgender man who resides in Florida.  Kai is a physician.

171.   Kai was scheduled to receive a transition-related surgery in September with a surgeon at the University of Miami Health System.  However, this surgeon called Kai and told him that she was required to cancel all inpatient transition-related surgeries because of SB 254.

172.   Kai is not able to get his surgery scheduled with another surgeon.  He also has an established doctor-patient relationship with the surgeon who had to cancel the surgery and will be harmed if he has to find another surgeon to complete this procedure.

173.   The crises in access to transition-related care created by SB 254 has caused serious negative physical, emotional, and psychological effects on Kai because he has not been able to get the surgery he needs.

## CLASS ACTION ALLEGATIONS

**Class 1**

174.   Class 1 Plaintiffs Jane Doe on behalf of Susan Doe, Carla Coe on behalf of Christina Coe, Brenda Boe on behalf of Bennett Boe, Gloria Goe on behalf of Gavin Goe, and Linda Loe on behalf of Lisa Loe, bring this action through the Parent Plaintiffs and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

175.   Class 1 is defined as:

> **All transgender minors in the State of Florida who are prohibited from initiating treatment with puberty blockers and/or hormone therapy as a result of the Transgender Medical Restrictions applicable to minors, and the parents of all such minors.**

176.   Plaintiffs reserve the right to modify or amend the definition of Class 1, as appropriate, during the course of this litigation.

177.   Class 1 satisfies the requirements of Rule 23(a).  The members of Class 1 are so numerous that joinder of all members is impracticable.  While the exact number of Class 1 members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, upon information and belief, there are thousands of Class 1 members dispersed throughout Florida.

178.   Common questions of law and fact exist as to all Class 1 members and predominate over any questions solely affecting individual Class 1 members.  Among the questions of law and fact common to Class 1 are:

> (1)   whether the ban on transition-related medical care for transgender minors violates the Equal Protection Clause;

> (2)   whether Class 1 Plaintiffs and other members of Class 1 are injured by the bans on transition-related medical care for transgender minors;

> (3)   whether Class 1 Plaintiffs and other members of Class 1 are entitled to, among other things, a declaratory judgment that the bans on transition-related medical care for transgender minors violate the Equal Protection Clause, and injunctive relief prohibiting enforcement of Fla. Stat. § 456.52(1); and

> (4)   whether Defendants are liable to Class 1 Plaintiffs and other class members for reasonable attorneys' fees.

179.   Class 1 Plaintiffs' claims are typical of the claims of the class, as all Class 1 members were and are similarly affected by Defendants' wrongful conduct, and the relief sought herein is common to all members of Class 1.  Class 1 Plaintiffs will fairly and adequately represent and protect the interests of the members of Class 1.  There

are no conflicts between Class 1 Plaintiffs and Class 1 members.  Class 1 Plaintiffs

have retained counsel competent and experienced in complex class action litigation.

### Class 2

180.   Class 2 Plaintiffs Fiona Foe on behalf of Freya Foe, and Patricia Poe on

behalf of Paul Poe, bring this action through the Parent Plaintiffs and on behalf of a

class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the

Federal Rules of Civil Procedure.

181.   Class 2 is defined as:

> **All transgender minors in the State of Florida who were being
> actively treated with puberty blockers and/or hormone therapies as
> of May 17, 2023, and since that date have attempted, are attempting
> or will attempt to obtain access to such treatments that are subject
> to the Transgender Medical Restrictions applicable to minors, and
> the parents of all such minors.**

182.   Plaintiffs reserve the right to modify or amend the definition of Class 2

as appropriate, during the course of this litigation.

183.   Class 2 satisfies the requirements of Rule 23(a).  The members of Class

2 are so numerous that joinder of all members is impracticable.  While the exact

number of Class 2 members is unknown to Plaintiffs at this time and can only be

ascertained through appropriate discovery, upon information and belief, there are

thousands of Class 2 members dispersed throughout Florida.

184.   Common questions of law and fact exist as to all Class 2 members and predominate over any questions solely affecting individual Class 2 members.  Among the questions of law and fact common to Class 2 are:

(1)   whether the informed consent requirements and/or bans on receiving transition-related prescriptions from qualified health professionals, other than physicians, for eligible transgender minors violate the Equal Protection Clause;

(2)   whether Class 2 Plaintiffs and other members of Class 2 are injured by the informed consent requirements and/or bans on receiving transition-related prescriptions from qualified health professionals, other than physicians;

(3)   whether Class 2 Plaintiffs and other members of Class 2 are entitled to, among other things, a declaratory judgment that the informed consent requirements and/or bans on receiving transition-related prescriptions from qualified health professionals, other than physicians, for eligible transgender minors violate the Equal Protection Clause, and injunctive relief prohibiting enforcement of Fla. Stat. §§ 456.52(1) and 456.52(3); and

(4)   whether Defendants are liable to Class 2 Plaintiffs and other class members for reasonable attorneys' fees.

185.   Class 2 Plaintiffs' claims are typical of the claims of the class, as all Class 2 members were and are similarly affected by Defendants' wrongful conduct, and the relief sought herein is common to all members of Class 2.  Class 2 Plaintiffs will fairly and adequately represent and protect the interests of the members of Class 2.  There are no conflicts between Class 2 Plaintiffs and Class 2 members.  Class 2 Plaintiffs have retained counsel competent and experienced in complex class action litigation.

**Class 3**

186.   Class 3 Plaintiffs Lucien Hamel, Olivia Noel, Rebecca Cruz, and Kai Pope bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

187.   Class 3 is defined as follows:

> **All transgender adults in the State of Florida who have attempted, are attempting or will attempt to obtain access to transition-related medications or surgeries that are subject to the Transgender Medical Restrictions applicable to transgender adults.**

188.   Plaintiffs reserve the right to modify or amend the definition of Class 3 as appropriate, during the course of this litigation.

189.   Class 3 satisfies the requirements of Rule 23(a).  The members of Class 3 are so numerous that joinder of all members is impracticable.  While the exact number of Class 3 members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, upon information and belief, there are thousands of Class 3 members dispersed throughout Florida.

190.   Common questions of law and fact exist as to all Class 3 members and predominate over any questions solely affecting individual Class 3 members.  Among the questions of law and fact common to Class 3 are:

> (1)   whether the informed consent requirements and/or bans on receiving transition-related medical care from qualified health

professionals, other than physicians, for transgender adults violate the Equal Protection Clause;

(2)     whether Class 3 Plaintiffs and other members of Class 3 are injured by the informed consent requirements and/or bans on receiving transition-related medical care from qualified health professionals, other than physicians;

(3)     whether Class 3 Plaintiffs and other members of Class 3 are entitled to, among other things, a declaratory judgment that the informed consent requirements and/or bans on receiving transition-related medical care from qualified health professionals, other than physicians, for transgender adults violate the Equal Protection Clause, and injunctive relief prohibiting enforcement of §§ 456.52(2) and Section 456.52(3); and

(4)     whether Defendants are liable to Class 3 Plaintiffs and other class members for reasonable attorneys' fees.

191.   Class 3 Plaintiffs' claims are typical of the claims of the class, as all Class 3 members were and are similarly affected by Defendants' wrongful conduct, and the relief sought herein is common to all members of Class 3.  Class 3 Plaintiffs will fairly and adequately represent and protect the interests of the members of Class 3.  There are no conflicts between Class 3 Plaintiffs and Class 3 members.  Class 3 Plaintiffs have retained counsel competent and experienced in complex class action litigation.

## **CLAIMS FOR RELIEF**

### **COUNT I**
Deprivation of Substantive Due Process
U.S. Const. Amend. XIV
Parent Plaintiffs Against All Defendants in Their Official Capacities
Violation of Parent Plaintiffs' Right to Direct the Upbringing of Their Adolescent
Children

192.   The Plaintiffs incorporate paragraphs 1-191 of the Third Amended Complaint as if set forth fully herein.

193.   The Parent Plaintiffs bring this Count against all Defendants.

194.   The Fourteenth Amendment to the United States Constitution protects the rights of parents to make decisions "concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality).   That fundamental right includes the liberty to make medical decisions for their minor adolescent children, including the right to obtain medical treatments that are recognized to be safe, effective, and medically necessary to protect their adolescent children's health and well-being.

195.   The Transgender Medical Restrictions applicable to minors violate this fundamental right by preventing the Parent Plaintiffs from obtaining established, medically necessary care for their minor adolescent children.

196.   By intruding upon parents' fundamental right to direct the upbringing of their adolescent children, the Transgender Medical Restrictions are subject to strict scrutiny.

197.   The Defendants have no compelling justification for preventing parents from ensuring their adolescent children can receive essential medical care.   The Transgender Medical Restrictions do not advance any legitimate interest, much less a compelling one.

## COUNT II
Deprivation of Equal Protection
U.S. Const. Amend. XIV
All Plaintiffs Against All Defendants in Their Official Capacities

198.   The Plaintiffs incorporate Paragraphs 1-191 of the Third Amended Complaint as if set forth fully herein.

199.   Plaintiffs bring this Count against all Defendants.

200.   The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

201.   The Transgender Medical Restrictions set forth herein single out transgender minors and adults and prohibit and restrict them from obtaining medically necessary treatment based on their sex and transgender status.

202.   Under the Equal Protection Clause, government classifications based on sex are subject to heightened scrutiny and are presumptively unconstitutional.

203.   Transgender-based government classifications are subject to heightened scrutiny because they are sex-based classifications.

204. Because transgender people have obvious, immutable, and distinguishing characteristics, including having a gender identity that is different from their birth sex, they comprise a discrete group. This defining characteristic bears no relation to a transgender person's ability to contribute to society. Nevertheless, transgender people have faced historical discrimination and have been unable to secure equality through the political process.

205. As such, transgender classifications are subject at least to intermediate scrutiny.

206. The Transgender Medical Restrictions have no medical justification and do nothing to protect the health or well-being of minors or adults. To the contrary, these restrictions undermine the health and well-being of transgender minors and adults by denying them and standing in the way of essential medical care.

207. The Transgender Medical Restrictions are not narrowly tailored to further a compelling government interest, substantially related to any important governmental interest, or even rationally related to a governmental interest. Accordingly, the Transgender Medical Restrictions violate the Equal Protection Clause of the Fourteenth Amendment.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

(1)     certify this case as a class action brought on behalf of Class 1, Class 2 and Class 3 pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(2)     issue a judgment, pursuant to 28 U.S.C. §§ 2201–2202, declaring that the Transgender Medical Restrictions set forth herein violate the United States Constitution for the reasons and on the Counts set forth above;

(3)     temporarily, preliminarily, and permanently enjoin the Defendants and their officers, employees, servants, agents, appointees, or successors from enforcing the Transgender Medical Restrictions set forth herein;

(4)     declare that the Transgender Medical Restrictions set forth herein violate the Fourteenth Amendment to the United States Constitution;

(5)     award the Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(6)     grant such other relief as the Court finds just and proper.


Respectfully submitted this 21st day of July, 2023.

/s/ Simone Chriss
Counsel for Plaintiffs

**SOUTHERN LEGAL COUNSEL**

*By: /s/ Simone Chriss*
**Simone Chriss**
Florida Bar No. 124062
**Chelsea Dunn**
Florida Bar No. 1013541
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**HUMAN RIGHTS CAMPAIGN FOUNDATION**

**Cynthia Cheng-Wun Weaver***
NY No. 5091848
**Jason Starr*** NY No. 5005194
**Ami Patel*** CA No. 325647
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180
Cynthia.Weaver@hrc.org
Jason.Starr@hrc.org
Ami.Patel@hrc.org

**LOWENSTEIN SANDLER LLP**
**Thomas E. Redburn, Jr.**
  (*pro hac vice*)
New York Bar No. 5822036
**Maya Ginsburg**
  (*pro hac vice*)
New York Bar No. 5128152
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700
tredburn@lowenstein.com
mginsburg@lowenstein.com

**NATIONAL CENTER FOR LESBIAN RIGHTS**

**Christopher F. Stoll***
CA Bar No. 179046
**Kelly Jo Popkin***
NY Bar No. 5698220
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel. 415-365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

**GLBTQ LEGAL ADVOCATES & DEFENDERS**

**Jennifer Levi* Chris Erchull***
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org cerchull@glad.org

* Admitted by *pro hac vice*

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 21, 2023, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system.  I further certify that I served

by process server the foregoing on the following non-CM/ECF participants:

      Melissa W. Nelson
      Ed Austin Building
      311 West Monroe Street
      Jacksonville, Florida 32202

      William Gladson
      Office of the State Attorney
      Citrus County Courthouse
      110 North Apopka Ave.
      3rd Floor RM 2-372
      Inverness, FL 34450-4293

                                          */s/ Simone Chriss*
                                          **Simone Chriss**
                                          Counsel for Plaintiffs