IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JANE DOE, et al.,

      Plaintiffs,

v.                                   Case No. 4:23-cv-00114-RH-MAF

JOSEPH A. LAPADO, et al.,

      Defendants.

_____/

### THE STATE'S OPPOSITION
### TO THE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
### AND MEMORANDUM OF LAW

      The State Defendants oppose the Plaintiffs' motion for class certification for the reasons set forth in the accompanying memorandum.

Dated: August 14, 2023

**Ashley Moody**
ATTORNEY GENERAL

*/s/ Joseph E. Hart*
**Joseph E. Hart** (FBN 0124720)
COUNSELOR TO THE ATTORNEY
GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Joseph.Hart@myfloridalegal.com

*Counsel for the Surgeon General, the Department of Health, and State Attorney Gladson*

Respectfully submitted by:

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*Counsel for the Surgeon General, the Department of Health, the Boards of Medicine, and the individual Board Members*

## CERTIFICATE OF COMPLIANCE

As required by Local Rule 7.1(F), I certify that this response in opposition to Plaintiffs' motion for class certification contains 33 words.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I certify that, on August 14, 2023, this response in opposition to Plaintiffs' motion for class certification was filed through the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## INTRODUCTION

Rarely will the Court encounter a case *less* appropriate for class treatment than the ones brought by the Plaintiffs here. When Rule 23 was enacted, it was "viewed as a device to be used only in extraordinary circumstances," because "only certain types of cases were amenable to a class action and . . . the vast majority of cases would not be." *Stuart v. Hewlett-Packard Co.*, 66 F.R.D. 73, 77 (E.D. Mich. 1975). It was always intended for use in the rare cases in which resolution of one issue would "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted) (emphasis in original). Cases presenting sprawling issues challenging multiple provisions that could give rise to a wide variety of potential remedies, any of which could depend on the unique circumstances of a particular proposed class member, were never considered amenable to class treatment.

In their Third Amended Complaint, the Plaintiffs have challenged:

- several sets of administrative regulations;

- promulgated by two separate Florida agencies;

- along with roughly a half-dozen Florida statutory provisions,

- that impose no fewer than ten conditions;

- applying to (among others) patients, doctors, nurse practitioners, registered nurses, and mental-health professionals;

- regarding multiple broad categories of treatment, the selection of which "depends on an individualized assessment of a patient's needs";

- for a condition that, according to the Plaintiffs, turns on an "internal sense of one's sex."

ECF No. 118. Indeed, the purported injuries alleged *solely by the dozen or so named Plaintiffs*, by their telling, include "[t]reatments [that] have been discontinued; prescriptions [that have] not be[en] re-filled; previously[]scheduled, essential surgeries [that] have been canceled; and patients [that] are unable to meet the prerequisites for care." ECF No. 121, at 17.

Even assuming numerosity, the Plaintiffs cannot conceivably satisfy the "rigorous analysis" commanded by the ascertainability, commonality, or typicality requirements of Federal Rule of Civil Procedure 23(a). And if they could (which is in itself an impossibility), it defies reality to suggest, given the variety of injuries they allege and the sprawling relief they seek, that the State "has acted or refused to act on grounds that apply generally to the class[es], so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class[es] as a whole." FED. R. CIV. P. 23(b)(2). By virtue of their own pleadings and arguments throughout each progressive stage of this case, the Plaintiffs themselves have demonstrated that class certification is entirely inappropriate. The Court should deny their motion.

## STATEMENT OF CASE & FACTS

### I.   THE PLAINTIFFS' ALLEGATIONS REGARDING GENDER DYSPHORIA.

According to the Plaintiffs, "[g]ender identity is an innate, internal sense of one's sex and is an immutable aspect of a person's identity." ECF No. 118 ¶ 53. "To be eligible for a diagnosis of gender dysphoria, a young person or adult must meet the criteria set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition." ECF No. 118 ¶ 54. The DSM-V criteria for gender dysphoria, in turn, are as follows:

A).   A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two or more of the following:

1.   A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2.   A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3.   A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.   A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5.   A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

> 6.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
>
> B).   The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM-V. "The precise treatment of gender dysphoria," by Plaintiffs' telling, "depends on an individualized assessment of a patient's needs." ECF No. 118 ¶ 63. And at the *Dekker* trial, it was established that transgenderism and gender dysphoria are *not* the same thing—the latter requires a diagnosis premised on some distress by the aforementioned incongruence; the former does not, and it remains the case that some transgender individuals neither want nor need sex-modifications procedures. *See, e.g.,* ECF No. 116, at 28; Dekker Trial Tr. 115–19.

In other words, the Plaintiffs have placed beyond all dispute that the only way to determine whether a person is experiencing gender dysphoria is through that person's *subjective*, "internal sense." ECF No. 118 ¶ 53. That gender dysphoria cannot be ascertained objectively is bolstered by the DSM-V definition, which requires a person to experience "a strong desire" or a "strong conviction" regarding his or her "experienced/expressed gender and assigned gender." DSM-V. And the "precise," "individualized treatment" for gender dysphoria can range from social transition, ECF No. 118 ¶ 65, puberty blockers," ECF No. 118 ¶ 66, cross-sex hormones, ECF No. 118 ¶¶ 66, 69, or a variety of sex-modification surgeries, ECF No. 118 ¶ 70.

II.   THE INJURIES ALLEGED AND THE RELIEF SOUGHT BY THE PLAINTIFFS.

The Plaintiffs' Third Amended Complaint challenges a wide range of statutory and regulatory provisions. They take issue with the criminal- and civil-penalty provisions directed at health-care practitioners. ECF No. 118 ¶ 97. They allege that the ban on sex-modification procedures, puberty blockers, and cross-sex hormones (which, as noted above, are necessarily individualized remedies) for minors violates the Constitution. ECF No. 118 ¶ 99. They object to Florida's informed-consent requirements, which change depending on the treatment sought. ECF No. 118 ¶ 100. And they challenge the requirement that a prescription for sex-modification procedures come solely from a licensed physician. ECF No. 118 ¶ 101.

The injuries alleged by the Plaintiffs span a wide spectrum:

- Susan Doe, an eleven-year-old transgender girl diagnosed with gender dysphoria, "has not been prescribed puberty blockers or hormones to treat her gender dysphoria." ECF No. 118 ¶ 117. Jane, Susan's mother, claims that Susan's alleged injuries have also violated her rights as a parent.

- Bennett Boe, a fourteen-year-old transgender boy diagnosed with gender dysphoria, has begun "menstrual suppression medication," and wishes to begin hormone therapy at age sixteen. ECF No. 118 ¶¶ 121, 123. Bennet's mother, Brenda, claims that Bennet's alleged injuries have also violated her rights as a parent.

- Christina Coe, a nine-year-old transgender girl diagnosed with gender dysphoria, has not specified what treatment she seeks. ECF No. 118 ¶¶ 125–129. Carla, Christina's mother, has claimed that Christina's alleged injuries have also violated her rights as a parent.

- Freya Foe, a ten-year-old transgender girl diagnosed with gender dysphoria, has "beg[u]n puberty blocking medication." ECF No. 118 ¶¶ 134. Fiona, Freya's mother, claims that Freya's alleged injuries have also violated her rights as a parent.

- Gavin Goe, an eight-year-old transgender boy diagnosed with gender dysphoria, wants to see a pediatric endocrinologist. ECF No. 118 ¶¶ 141–142. Gloria, Gavin's mother, has claimed that Gavin's alleged injuries have also violated her rights as a parent.

- Lisa Loe, an eleven-year-old transgender girl diagnosed with gender dysphoria, wants puberty blockers. ECF No. 118 ¶¶ 148. Linda, Lisa's mother, has claimed that Lisa' alleged injuries have also violated her rights as a parent.

- Paul Poe, a nine-year-old transgender boy diagnosed with gender dysphoria, has started, and was forced to discontinue, puberty blockers. ECF No. 118 ¶¶ 154–155. Patricia, Paul's mother, has claimed that Paul's alleged injuries have also violated her rights as a parent.

- Lucien Hamel, a twenty-seven-year-old transgender man diagnosed with gender dysphoria, can no longer received prescription hormones from a nurse practitioner. ECF No. 118 ¶¶ 159.

- Olivia Noel, a twenty-six-year-old transgender woman diagnosed with gender dysphoria, can no longer receive prescription hormones from nurse practitioners via telehealth. ECF No. 118 ¶¶ 162.

- Rebecca Cruz Evia, a forty-year-old transgender woman diagnosed with gender dysphoria, has not been able to schedule a vaginoplasty. ECF No. 118 ¶¶ 168.

- Kai Pope, a fifty-one-year-old transgender man diagnosed with gender dysphoria, has not been able to schedule a phalloplasty. ECF No. 118 ¶¶ 171.

The Plaintiffs have argued that this profusion of alleged injuries is caused by the catch-all phrase "Transgender Medical Restrictions," which, as noted above, cover a variety

6

statutory and regulatory provisions (the latter of which have been issued by multiple State agencies). The parent Plaintiffs have alleged substantive due process violations, while the transgender plaintiffs have claimed equal-protection violations.

## III.   THE PLAINTIFFS THREE PROPOSED CLASSES.

Based on these allegations, the Plaintiffs have asked the Court to certify three separate classes:

*Class 1:*

All transgender minors in the State of Florida who are prohibited from initiating treatment with puberty blockers and/or hormone therapy as a result of the Treatment Bans, and the parents of all such minors.

*Class 2.*

All transgender minors in the State of Florida who were being actively treated with puberty blockers and/or hormone therapies as of May 17, 2023, and since that date have attempted, are attempting or will attempt to obtain access to such treatments that are subject to the Transgender Medical Restrictions applicable to minors, and the parents of all such minors.

*Class 3.*

All transgender adults in the State of Florida who have attempted, are attempting or will attempt to obtain access to transition-related medications or surgeries that are subject to the Transgender Medical Restrictions applicable to transgender adults.

7

## ARGUMENT

Federal Rule of Civil Procedure 23 governs class-action practice. Rule 23(a) sets out the "[p]rerequisites" for certifying a class. Specifically, "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members *only if*":

    (1)    the class is so numerous that joinder of all members is impracticable;

    (2)    there are questions of law or fact common to the class;

    (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4)    the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(A) (emphasis added). In addition, the Eleventh Circuit recently clarified that "[a]scertainability is an implied prerequisite of Rule 23" that "must [be] satisf[ied] . . . *before* the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (citing *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (emphasis added)). And based on their pleadings, the Plaintiffs must also comply with Rule 23(b)(2), which requires them to demonstrate that the State "has acted or refused to act on grounds that apply generally to the class[es], so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class[es] as a whole." FED. R. CIV. P. 23(B).

These strictures are not pleading requirements. Instead, "[t]he factual record, as opposed to 'sheer speculation,' must demonstrate that each Rule 23 requirement has been met." *G.H. v. Tamayo*, 339 F.R.D. 584, 588 (N.D. Fla. 2021) (Hinkle, J.) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009)). In other words, the Plaintiffs "'must affirmatively demonstrate [their] compliance' with Rule 23 by proving that the requirements are '*in fact*' satisfied." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (citation omitted) (emphasis in original). Accordingly, the Court "has a duty to actually decide" any factual dispute, rather than "accept[ing] it as true or constru[ing] it in anyone's favor." *Id.*

Of all the hurdles the Plaintiffs must clear, the only one they *might* be able to address is numerosity—i.e., that there are more than forty individuals who fit each of their classes. The others, which are tested via "rigorous analysis," doom the Plaintiffs' attempt to certify any of their proposed classes. We discuss each prong in turn.

### A.    Ascertainability.

Contrary to the Plaintiffs' assertion, ECF No. 121, at 18, the Eleventh Circuit has confirmed that "[a]scertainability is" indeed "an implied prerequisite of Rule 23" that "must [be] satisf[ied] . . . before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." *Cherry*, 986 F.3d at 1302 (citing *Little*, 691 F.3d at 1304). Would-be class plaintiffs fail at this step if their "class is inadequately defined," which means that it "is defined through vague or subjective criteria." *Cherry*, 986 F.3d at 1302 (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th

Cir. 1970)). In other words, "[a] class is not ascertainable unless the class definition contains objective criteria . . . .'" *Colonel Fin. Mgmt. Officer v. Austin*, 622 F. Supp. 3d 1187, 1206 (M.D. Fla. 2022) (citing *Karhu v. Vital Pharms., Inc.*, 621 F. App'x. 945, 946 (11th Cir. 2015) (citing, in turn, *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x. 782, 787 (11th Cir. 2014)).

One initial (and insurmountable) problem for the Plaintiffs is that each of their proposed classes are defined as including all "transgender" individuals rather than all persons suffering from gender dysphoria. The Plaintiffs have stressed that not all "transgender" individuals suffer from gender dysphoria, and that being transgender "is a normal variation of human identity and not a mental illness or disorder." ECF No. 116, at 28. So have their experts:

> Q:   And, Doctor, just so the record is clear, not all transgender individuals suffer from gender dysphoria; right?
>
> A:   Yes. (*Dekker* Trial Tr. 115).
>
> ***
>
> Q:   Do all transgender people have the clinical diagnosis of gender dysphoria?
>
> A:   No. . . . you can be transgender but not have any distress associated with that. (*Dekker* Trial Tr. 186).

So has this Court: "*some* [transgender individuals] suffer gender dysphoria." *Dekker v. Weida*, 4:22-cv-00325-RH-MAF, 2023 WL 4102243, *6 (N.D. Fla. Jun. 21, 2023) (emphasis added), *see also id.* at *10 (finding that plaintiffs' motivation was "the desire to achieve the best possible treatment for their *gender dysphoria*") (emphasis added); *id.* at

10

*20 (declaring challenged statute and regulations invalid "to the extent they categorically ban Medicaid payment for puberty blockers and cross-sex hormones for the *treatment of gender dysphoria*") (emphasis added).

This means that some transgender individuals do not want or need the procedures that (according to the Plaintiffs) the State has denied them. *See Dekker* Trial Tr. 117. Nor is it a foregone conclusion that individuals diagnosed with gender dysphoria want or need those procedures either; some might be content with social transitioning. The upshot, however, is that defining their classes to include "all transgender" individuals means that the Plaintiffs have swept into their class definition individuals who have no purported injury, and there is no objective way to tell which transgender individuals are suffering an alleged injury-in-fact, which is necessary to have an ascertainable class.

If, as the Plaintiffs contend, transgender individuals are a "normal variation of human identity," what is the medical treatment they need? And if some transgender individuals do not need medical treatment, how do they face the same questions of law or fact as do those persons suffering from gender dysphoria, a condition that the Plaintiffs have admitted is a diagnosable psychiatric malady for which medical treatment is necessary? Indeed, none of the transgender Plaintiffs in this case are merely "transgender." They all claim to suffer from gender dysphoria. ECF No. 121, at 7–13 Thus, to the extent that the Plaintiffs have conflated the two categories, they have not adequately defined their three classes.

11

Even if the Court were to limit the class-definitions to individuals experiencing gender dysphoria, there is similarly no objective way for ascertaining who is in fact experiencing gender dysphoria. Objective is defined as "perceptible to persons other than the affected individual," whereas subjective is defined as "arising from conditions within the brain or sense organs and not directly caused by external stimuli." *Compare Objective, Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/objective (last visited Aug. 14, 2023), *with Subjective, Merriam-Webster Online Dictionary* https://www.merriam-webster.com/dictionary/subjective (last visited Aug. 14, 2023). And according to both the Plaintiffs' allegations and the DSM-V criteria they cite, ascertaining who has gender dysphoria (i.e., "a strong desire" to harmonize the "innate, internal sense of one's sex" with that person's "assigned gender") is fundamentally a subjective exercise. Indeed, in the *Dekker* Trial, this Court heard testimony establishing that "[g]ender dysphoria is a psychiatric diagnosis," and "[n]o laboratory tests, imaging, biopsies, or other objective tests exist to diagnose someone with gender dysphoria." *Dekker* Trial Tr. 114-15.

The problem with defining a class premised on a psychiatric diagnosis is that there exists no way for the Court to determine the metes and bounds of the proposed class. By Plaintiffs' own lights, sometimes gender dysphoria arises when a person is young, sometimes after reaching adulthood. Some individuals seem to experience it as adolescents, and then they age out of it. Sometimes individuals suffering from other psychiatric ailments are misdiagnosed as gender dysphoric. Some individuals with

12

gender dysphoria find solace in dressing like members of a different gender, some desire cross-sex hormones, some want mastectomies, some want breast augmentation, and some want "bottom surgery."

With this much variety and subjectivity, it cannot be said that any of the three classes offered by the Plaintiffs have the requisite ascertainability to allow this Court even to consider the Rule 23(a) prerequisites. For this reason, the Plaintiffs' motion for class certification fails immediately out of the gate.

### B.   Commonality.

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). Critically, "[t]his does not mean merely that they have all suffered a violation of the same provision of law." *Id.*

Although "[a]ny competently crafted class complaint literally raises common 'questions,'" *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (citation omitted), the Rule requires more; i.e., the class claims "must depend upon a common contention," which "must be of such a nature that it is capable of classwide resolution," *id.* at 350. This, in turn, "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to

13

drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009) (alteration and emphasis in original)). Critically, "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.*

Plaintiffs have asked the court to certify three separate classes, and they have offered the court several "common questions" that, in their view, show that their proposed classes satisfy Rule 23's commonality requirement:

*Class 1 proposed definition*:

> All transgender minors in the State of Florida who are prohibited from initiating treatment with puberty blockers and/or hormone therapy as a result of the Treatment Bans, and the parents of all such minors.

*Class 1 proposed common questions*:

> (1)   whether the ban on transition-related medical care for transgender minors violates the Equal Protection Clause;
>
> (2)   whether Class 1 Plaintiffs and other members of Class 1 are injured by the bans on transition-related medical care for transgender minors;
>
> (3)   whether Class 1 Plaintiffs and other members of Class 1 are entitled to, among other things, a declaratory judgment that the bans on transition-related medical care for transgender minors violate the Equal Protection Clause, and injunctive relief prohibiting enforcement of Fla. Stat. § 456.52(1); and
>
> (4)   whether Defendants are liable to Class 1 Plaintiffs and other class members for reasonable attorneys' fees.

*Class 2 proposed definition*:

All transgender minors in the State of Florida who were being actively treated with puberty blockers and/or hormone therapies as of May 17, 2023, and since that date have attempted, are attempting or will attempt to obtain access to such treatments that are subject to the Transgender Medical Restrictions applicable to minors, and the parents of all such minors.

*Class 2 proposed common questions*:

(1)   whether the informed consent requirements and/or bans on receiving transition-related prescriptions from qualified health professionals, other than physicians, for eligible transgender minors violate the Equal Protection Clause;

(2)   whether Class 2 Plaintiffs and other members of Class 2 are injured by the informed consent requirements and/or bans on receiving transition-related prescriptions from qualified health professionals, other than physicians;

(3)   whether Class 2 Plaintiffs and other members of Class 2 are entitled to, among other things, a declaratory judgment that the informed consent requirements and/or bans on receiving transition-related prescriptions from qualified health professionals, other than physicians, for eligible transgender minors violate the Equal Protection Clause, and injunctive relief prohibiting enforcement of Fla. Stat. §§ 456.52(1) and 456.52(3); and

(4)   whether Defendants are liable to Class 2 Plaintiffs and other class members for reasonable attorneys' fees.

*Class 3 proposed definition*:

All transgender adults in the State of Florida who have attempted, are attempting or will attempt to obtain access to transition-related medications or surgeries that are subject to the Transgender Medical Restrictions applicable to transgender adults.

*Class 3 proposed common questions*:

(1)     whether the informed consent requirements and/or bans on receiving transition-related medical care from qualified health professionals, other than physicians, for transgender adults violate the Equal Protection Clause;

(2)     whether Class 3 Plaintiffs and other members of Class 3 are injured by the informed consent requirements and/or bans on receiving transition-related medical care from qualified health professionals, other than physicians;

(3)     whether Class 3 Plaintiffs and other members of Class 3 are entitled to, among other things, a declaratory judgment that the informed consent requirements and/or bans on receiving transition-related medical care from qualified health professionals, other than physicians, for transgender adults violate the Equal Protection Clause, and injunctive relief prohibiting enforcement of §§ 456.52(2) and 456.52(3); and

(4)     whether Defendants are liable to Class 3 Plaintiffs and other class members for reasonable attorneys' fees.

A quick perusal of the Plaintiffs' proposed class definitions and suggested common questions demonstrates the hopelessness of the Plaintiffs' task. Regarding the common questions that the Plaintiffs propose, each can be boiled down to: (1) Do we win on our constitutional challenge? (2) Do we have standing? (3) Do we get the relief we want? (4) Do our lawyers get paid? Simply regurgitating at a risibly high level of generality the basic elements of their claims does not satisfy Rule 23(a)'s commonality requirement.

Even had the Plaintiffs put in *some* effort to identify *some* common question that might advance the ultimate resolution of their claims on a class wide level, they would not be able to satisfy this task. Regarding their proposed first class, dissimilarities

16

abound. "Transition-related care" covers a wide variety of medical interventions, none of which will apply to each member of the Plaintiffs' proposed class. Some minors might seek puberty blockers, some cross-sex hormones, and some sex-modification surgery, any of which "depends on an individualized assessment of a patient's needs." ECF No. 118 ¶ 63. Resolution of one factual issue (e.g., puberty blockers are appropriate for this class, anabolic steroids are not) will not provide an answer that will advance the claims of the entire proposed class. And it bears noting that the medical intervention will differ for each member of the class depending on whether the individual was born a biological male or female, and these medical interventions prompt different risks that could affect the propriety of the applying them to an individual under the age of eighteen. Taken together, these facts obliterate any argument that the Plaintiffs' first proposed class satisfies Rule 23's commonality requirement.

Plaintiffs' second and third proposed classes are even further afield. Both challenge Florida's "informed consent" provisions, which, among other things, include (1) an in-person consultation, (2) with a medical doctor (rather than a registered nurse or physician assistant), to (3) complete informed-consent forms, which differ depending on the procedures sought (i.e., masculinizing hormones, feminizing hormones, or sex-modification surgery). Resolution of one question raised by the Plaintiffs (e.g., the constitutionality of the in-person consultation requirement) will not advance class-wide resolution because in-person consultation requirements will not be an issue for every (or perhaps even most) members of the Plaintiffs' proposed classes.

17

The same is true for the doctor-as-prescriber requirement; not all members of the purported classes secure prescriptions from health-care providers who are not physicians. And should the Court agree with the Plaintiffs regarding the sex-modification-surgery informed-consent form, it will do nothing to advance the claims brought by individuals seeking masculinizing or feminizing hormones. Indeed, lumping together challenges to masculinizing and feminizing hormone informed-consent forms is fatal to the Plaintiffs' class allegations, since each form differs and no member of the second or third proposed classes will have to complete both of them.

There are *no* common legal or factual questions in any of the Plaintiffs' three proposed classes that could conceivably counsel in favor of class-certification. They have raised no question that "determination of its truth or falsity will resolve an issue that is central to the validity of [their] claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 349. For that reason, the Court should deny the pending motion.

In the Plaintiffs' view, however, their allegation of "a common discriminatory device"—such as an unconstitutionally-discriminatory statute or regulation—"suffices to establish the commonality requirement." ECF No. 121, at 22. By their telling, "the class members all share the same injury in the form of a violation of their constitutional rights through the operation." ECF No. 121, at 22–23. The problem for the Plaintiffs, however, is the Supreme Court's admonition that "merely" showing "that [class members] have all suffered a violation of the same provision of law" does not satisfy Rule 23(a)'s commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011). In *Wal-Mart*, the Court held that, "[q]uite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once." *Id.* at 350. So long as the "mandatory elements of each class members' claim depend on . . . individualized facts and circumstances," commonality remains absent. *Vega*, 564 F.3d at 1272.

It is manifestly not enough to suggest that "the common question of the application of heightened constitutional scrutiny" is enough to satisfy the commonality requirement. Were it enough, class-actions would become the rule rather than the exception, lumping together as a matter of course allegations of gender discrimination, *Craig v. Boren*, 429 U.S. 190 (1976), highway-sign restrictions, *Rappa v. New Caste Cnty.*, 18 F. 3d 1043 (3d Cir. 1994), mass-media regulation, *US West, Inc. v. United States*, 48 F.3d 1092 (9th Cir. 1994), and zoning of adult-entertainment establishments, *MD II Entertainment, Inc. v. Dallas*, 28 F.3d 492 n. 21 (5th Cir. 1994). Plainly, that is not the law, but the Plaintiffs offer no more than that.

Finally, it bears reiterating that by defining their proposed classes to include all "transgender" individuals, rather than individuals suffering from gender dysphoria, the Court is further stymied in its ability to assess whether the class has common questions of law or fact. *See Cherry*, 986 F.3d at 1303. For all of these reasons, class treatment is inappropriate.

### C.     Typicality.

Although commonality and typicality overlap, Rule 23(a)'s typicality requirement imposes on the Plaintiffs a burden to show that they "'possess the same interest and suffer the same injury as the class members.'" *G.H.*, 339 F.R.D. at 590 (quoting *Wal-Mart*, 564 U.S. at 348-49 (quoting, in turn, *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). In other words, "The central inquiry in determining . . . typicality [is] the relationship between the named Plaintiffs and the members of the purported class." *Hernandez*, 209 F.R.D. at 671. On this prong, the Plaintiffs fare no better than they did on the commonality prong.

For class one, the Plaintiffs offer Susan Doe, Gavin Goe, Lisa Loe, and their respective mothers. All have submitted declarations stating that they wish to start puberty-blocking medication. Not one has testified that he or she has been prescribed, desires, or has been denied cross-sex hormones. For that reason, the Doe, Goe, and Loe's claims are not typical of the Plaintiffs' proposed class one.

For class two, the Plaintiffs offer Freya Foe and Paul Poe, as well as their respective mothers. Freya has alleged that she is on puberty-blocking medication, but that "[t]he Transgender Medical Restrictions applicable to minors will prevent Foe's medical providers from prescribing hormones to allow her to go through female puberty, medication she may need as her peers continue to develop through puberty." ECF No. 118 ¶¶ 134, 135. Poe has similarly begun puberty-blocking medication, but he alleges that his "pediatric endocrinologist told [his mother] that the endocrinologist was

20

unable to continue prescribing or monitoring the treatment in light of the transgender medical bans." ECF No. 118 ¶¶ 154, 155. Because they have both started puberty-blocking medication, Florida law allows them to continue, *see* Fla. Stat. § 456.52(1)(a), so long as they comply with the informed-consent requirements, and neither Foe nor Poe have alleged any facts whatsoever regarding their experience with Florida's informed-consent rules. Their claims are plainly not typical of those in the Plaintiffs' proposed class two.

And for class three, the Plaintiffs offer Lucien Hamel, who alleges that he can no longer receive masculinizing hormones from a nurse practitioner, ECF No. 118 ¶¶ 159; Olivia Noel, who alleges she can no longer receive feminizing hormones from nurse practitioners via telehealth, ECF No. 118 ¶¶ 162; Rebecca Cruz Evia, who has not been able to schedule a vaginoplasty, ECF No. 118 ¶¶ 168; and Kai Pope, who has not been able to schedule a phalloplasty, ECF No. 118 ¶¶ 171. Each individual, in other words, is alleging harm based on a different informed-consent provisions, many of which *cannot* operate on the same individual at the same time (e.g., a person cannot receive both masculinizing and feminizing hormones, nor can a person get both a vaginoplasty and a phalloplasty). Not one of them has expressed any confusion over the informed-consent forms, which is the basis for the Plaintiffs' allegation that the informed-consent requirements are dissuading individuals from seeking sex-modification procedures. For the individuals whose surgeries were cancelled, the Plaintiffs make no attempt to demonstrate how the informed-consent provisions

caused that to occur. Their stories, their allegations, and their claims have nothing in common with each other or any other unique individual experiencing gender dysphoria.

Finally, each transgender Plaintiff in all three classes has asserted that a multi-disciplinary team diagnosed them and prescribed the treatment they desire. There is nothing in the record to suggest that the absent members of their proposed classes are going to receive the same attention from multiple providers operating across the same (undefined) various disciplines. Nor is there any evidence in the records that all the absent class members are even going to suffer from gender dysphoria as do the named Plaintiffs. Because it is the Plaintiffs burden to show that their claims are typical of their proposed classes, typicality is manifestly *not* satisfied.

## D.   Adequacy.

Largely for the reasons regarding typicality, the Plaintiffs themselves are not adequate class representatives.

## E.   Appropriateness under Rule 23(b)(2).

Finally, the Court must determine whether the Plaintiffs have satisfied Rule 23(b)(2), which requires a showing that the State "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart Stores, Inc.*, 564 U.S. at 360. "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"

22

*Id.* (quoting *Nagareda*, 84 N. Y. U. L. REV. at 132). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* Conversely "[i]t does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.* (emphasis in original).

The Plaintiffs cannot make this showing, and they are patently mistaken to suggest that "the Court's ultimate decision on the merits of the claims will result in the relief sought being granted either as to all members or to none of them." ECF No. 121, at 28. If the Plaintiffs succeed on the merits of their claims, a member of class one might be entitled to an injunction regarding cross-sex hormones *or* puberty blockers. A class two or class three member might be entitled to, among other things, an injunction that allows prescription by telehealth, abrogates the requirement to sign a consent form, or permits a nurse practitioner to write a prescription for testosterone, or estrogen, or something else related to sex-modification. No single injunction to remedy the purported injury of any one class member will give *every* class member relief. *See* ECF No. 90, at 41–42 (noting that the challenged statutes prohibit "medically appropriate" treatment of *gender dysphoria*). For that reason, the Plaintiffs cannot satisfy Rule 23(b)(2), and the Court should decline to certify any of their three proposed classes.

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' motion for class certification.

Dated: August 14, 2023

Respectfully submitted by:

**Ashley Moody**
ATTORNEY GENERAL

*/s/ Joseph E. Hart*
**Joseph E. Hart** (FBN 0124720)
COUNSELOR TO THE ATTORNEY
GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Joseph.Hart@myfloridalegal.com

*Counsel for the Surgeon General, the Department of Health, and State Attorney Gladson*

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*Counsel for the Surgeon General, the Department of Health, the Boards of Medicine, and the individual Board Members*

24

## CERTIFICATE OF COMPLIANCE

As required by Local Rule 7.1(F), I certify that this memorandum contains 5,667 words.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I certify that, on August 14, 2023, this memorandum was filed through the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mohammad O. Jazil
Mohammad O. Jazil