## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JANE DOE et al.,

    Plaintiffs,

    v.

JOSEPH A. LADAPO et al.,

    Defendants.

Civil No. 4:23-cv-00114-RH-MAF

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs respectfully submit this reply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Dkt. 135 ("Opposition")).[1]

### A. The Plaintiff Classes Are Ascertainable

Defendants spill a surprising amount of ink on ascertainability considering this is not a damages case where knowing the specific identities of the class members entitled to recover money from the defendants would be important. Plaintiffs here seek a declaration that the Treatment Bans and other Transgender Medical Restrictions are unconstitutional and an injunction against their enforcement, which

---

[1] Capitalized terms herein have the same meaning as in Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification (Dkt. 121 ("Pl. Mem.")).

presents a classic case for class certification under Rule 23(b)(2). *Colonel Fin. Mgm't Officer v. Austin*, 622 F. Supp. 3d 1187, 1204 (M.D. Fla. 2022) (Rule 23(b)(2) is the "traditional vehicle to vindicate the widespread deprivation of civil rights[.]"). It is an open question in the Eleventh Circuit whether the ascertainability requirement even applies to Rule 23(b)(2) classes. *See Braggs v. Dunn*, 317 F.R.D. 634, 671 (M.D. Ala. 2016). *Cherry* dealt with a Rule 23(b)(3) damages class, *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1300 (11th Cir. 2021), and the Eleventh Circuit otherwise has not addressed the issue.

The majority of the Circuits that have done so hold that no ascertainability requirement exists for Rule 23(b)(2) classes. *See*, *e.g.*, *Shelton v. Bledsoe*, 775 F.3d 554, 561-63 (3d Cir. 2015) (collecting cases). These Courts follow the Advisory Committee's note to Rule 23, which provides that Rule 23(b)(2) classes are appropriate in "'various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration*.'" *Id.* at 561 (quoting Fed.R.Civ.P. 23 advisory committee's note (1966) (emphasis added by Court)). Given this language and Rule 23(b)(2)'s purpose of facilitating litigation in civil rights cases that challenge discriminatory government policies, "a judicially-created implied right of ascertainability – that the members of the class be *capable* of specific enumeration – is inappropriate for (b)(2) classes." *Id.*

Furthermore, in Rule 23(b)(2) cases there is no need to define the members of the class with precision, because the named class representatives are available to enforce the terms of whatever relief the Court grants to the class. *Shelton*, 775 F.3d at 561. By contrast, ascertainability is necessary for Rule 23(b)(3) classes because of the need to provide notice and opt out rights to class members and, of course, to identify which persons are entitled to share in any money judgment obtained by the class. *Id*. at 562. Rule 23(b)(2) classes do not require notice to class members, and there is no opt out right. While all of this counsels in favor of not applying the ascertainability requirement to Rule 23(b)(2) classes at all, at a minimum, these significant differences between 23(b)(2) and 23(b)(3) classes warrant applying a more relaxed standard of ascertainability to (b)(2) classes.

Reduced to its essence, Defendants argue that the proposed Plaintiff Classes are not ascertainable because not all transgender persons will seek medical treatment for gender dysphoria and, in any event, identifying a person as transgender and diagnosing gender dysphoria both require applying subjective criteria. (Opposition at 9-13.) The fundamental problem with this argument is that it ignores the rest of the class definition for all three Plaintiff Classes. As explained in Plaintiffs' moving brief, each of the three Class definitions encompasses transgender persons in Florida who are seeking, have attempted to seek or will in the future attempt to seek medical treatments for gender dysphoria that are banned or restricted under Florida law. (Pl.

Mem. at 19.)  Classes 2 and 3 explicitly cover only those transgender persons who "have attempted, are attempting or will attempt" to obtain access to transition-related care that is subject to the Transgender Medical Restrictions.  (*Id*. at 8-9.)  Class 1, which challenges the outright prohibitions on transition-related care for minors imposed by the Treatment Bans, covers transgender minors "prohibited from initiating treatment with puberty blockers and/or hormone therapy[.]"  (*Id*. at 6.)

The qualifiers in each Class definition constitute objective criteria that resolve Defendants' purported vagueness concerns.  In Defendants' own words, transgender persons who have attempted, are attempting or will attempt to seek transition-related treatment, or who wish to initiate puberty blockers or hormone therapy but are banned from doing so, by definition "want or need the procedures that (according to Plaintiffs) the State has denied them."  (Opposition at 11.)  More to the point, objective evidence and documentation of such attempts to obtain care will usually be available.  When the Class 2 and 3 definitions are thus evaluated in their entirety, their "membership is capable of being determined."  *Cherry*, 986 F.3d at 1303 (cleaned up).

To the extent Defendants are arguing that the Plaintiff Classes are not ascertainable because different class members might seek different forms of transition-related treatment (Opposition at 12-13), the Middle District of Florida rejected a similar argument from Florida defendants in a case challenging the denial

under Medicaid of coverage for certain incontinence supplies. *Meza v. Marstiller*, Case No. 3:22-cv-783-MMH-LLL, 2023 WL 2648180, at *1-2, 7 (M.D. Fla. Mar. 27, 2023). The defendants there argued that the class was overbroad, and thus unascertainable, because not all class members, as defined, had a medical necessity for such supplies and determining which ones did would require highly individualized determinations. The Court disagreed because the plaintiffs sought "only to require AHCA to end the categorical coverage exclusion [of incontinence supplies], to which all class members are subject." *Id.* at *7. Whether any individual class member could establish a medical need for these supplies was thus irrelevant to the relief sought by the class, and thus not a legitimate criterion for determining class membership. *Id.* The same is true here; because Plaintiffs seek to enjoin the Treatment Bans that apply to all transgender minors in Florida, and the Transgender Treatment Restrictions that apply to all transgender minors and adults in Florida, individualized determinations of which class members seek which treatments are simply not germane to the relief sought by the Plaintiff Classes and, thus, unnecessary to decide class membership.

What Defendants really seem to be complaining about is not that the members of each Plaintiff Class are incapable of being identified, but that it is not easy to do so. That, however, is an administrative feasibility argument foreclosed by *Cherry*. 986 F.3d at 1304; *see also Harris v. Georgia Dep't of Corrections*, No. 5:18-cv-

00365-TES, 2021 WL 6197108, at *10 (M.D. Ga. Dec. 29, 2021) ("Plaintiffs aren't required to limit their proposed class to the one that is the easiest to figure out."). Class membership does not have to be "capable of *convenient* determination[,]" and inconvenience is the most Defendants have shown here. *Cherry*, 986 F.3d at 1303. In any event, tools to address such inconvenience are available. Even in Rule 23(b)(3) damages classes under the now-defunct administrative feasibility standard, courts have allowed class members to self-identify in order to facilitate the determination of class membership. *E.g.*, *Belin v. Health Ins. Innovations, Inc.*, 337 F.R.D. 544, 554 (S.D. Fla. 2021) ("Allowing self-identification here, in proposed classes that Plaintiffs insist are in the hundreds of thousands is not only administratively preferable but protects every interested party's due-process rights."). That option remains available here should the Court deem it necessary (even though it is not). Defendants' ascertainability challenge fails.

## B. Common Questions Exist in Each Plaintiff Class

Commonality is a "low hurdle" for plaintiffs to clear. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009). Yet, Defendants argue there are no common questions for any of the Plaintiff Classes because different members of each Class seek different forms of transition-related treatment and, in the case of Classes 2 and 3, challenge multiple statutory and regulatory provisions comprising

the Transgender Medical Restrictions.    (Opposition at 16-19.)    Defendants'
argument borders on frivolous.

Rule 23(a)(2) requires the existence of only one legal or factual issue that is
common to the class.  *Hernandez v. Medows*, 209 F.R.D. 665,  669 (S.D. Fla. 2002)
("Commonality requires that there is at least one issue affecting all or a significant
number of proposed class members."); *Hoffer v. Jones*, 323 F.R.D. 694, 697 (N.D.
Fla. 2017) ("There is no requirement as to the number of common questions – even
a single common question will do.").  Class 1 contends the Treatment Bans are
unconstitutional under the Due Process and Equal Protection Clauses of the
Fourteenth Amendment because they fail heightened constitutional scrutiny.  That
is a legal issue common to every member of Class 1, and its resolution will determine
in one stroke whether ***all*** class members may obtain relief from the Court
invalidating the bans – regardless of whether any particular class member seeks
access to puberty blockers or hormone therapy.

Likewise, Classes 2 and 3 contend the Transgender Medical Restrictions
(other than the Treatment Bans) are unconstitutional under the Equal Protection and
(in the case of Class 2) Due Process Clauses of the Fourteenth Amendment because
they fail heightened constitutional scrutiny.  Because all members of Classes 2 and
3 are subject to the legal restrictions each Class is challenging (a point Defendants
persistently  overlook),  the  resolution  of  that  constitutional  issue  as  to  the

Transgender Medical Restrictions as a whole – and as to each challenged provision individually – will again determine in one stroke whether all members of Classes 2 and 3 may obtain relief from any of those restrictions.  Whether the Transgender Medical Restrictions are unconstitutional is central to the claims of each Class, and common to all of their respective members, thus easily meeting the standard for commonality under *Dukes*.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (a common issue is one that it is "capable of classwide resolution" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

Defendants fixate on the Supreme Court's statement in *Dukes* that commonality requires more than merely showing that class members "have all suffered a violation of the same provision of law."  (Opposition at 18 (quoting 564 U.S. at 350).)  But Defendants rip that statement from its context.  The Court's point was that alleging that all class members were injured by a violation of Title VII of the Civil Rights Act of 1964 does not establish the existence of a common issue unless the claims "depend upon a common contention – for example, the assertion of discriminatory bias on the part of the same supervisor."  *Dukes*, 564 U.S. at 350. That is because Title VII can be violated in different ways by different supervisors within the same company.  *Id*.  Here, however, the members of each respective Class challenge the same Florida legal provisions, to which all of them are subject, on the

grounds that each of those provisions violates the Constitution in the same way for each class member – by discriminating against transgender persons without the heightened justifications required by the Equal Protection Clause and (in the case of Classes 1 and 2) by interfering with the Due Process rights of parents to direct their children's medical care.  In other words, each Class has asserted the "common contention" *Dukes* requires.

Furthermore, in Rule 23(b)(2) cases like this one that challenge general State policies, courts across the Eleventh Circuit have ***repeatedly*** rejected efforts by defendants – especially Florida government defendants – to defeat commonality by emphasizing factual differences among class members' individual circumstances. *Hernandez*, 209 F.R.D. at 670-71 (common issue was whether Florida was legally-required to provide notice when prescription drug claims are denied under Medicaid; "The underlying individual issues that caused each plaintiff to need prescription drugs through the Medicaid program and the differences in how they ultimately left the pharmacy empty handed are not grounds for denying certification[.]"); *Hoffer*, 323 F.R.D. at 697-98 (common issue was whether Florida violated the Eighth Amendment through its policies on treatment of prisoners with Hepatitis C; "[T]he relief that Plaintiffs seek with respect to the class as a whole is limited to changing Defendant's policies and practices.  Defendant has not shown why differences in symptoms and treatment considerations should preclude awarding such class-wide

relief."); *Marstiller*, 2023 WL 2648180, at *10 (common issue was whether Florida violated the Medicaid statute by denying coverage for incontinence supplies; "While the ramifications resulting from the lack of coverage for incontinence supplies may differ among class members, given that Plaintiffs do not seek damages in this action, these factual differences do not preclude certification of the class."); *see also G.H. v. Tamayo*, 339 F.R.D. 584, 589 (N.D. Fla. 2021) (Hinkle, J.) ("It is undoubtedly true, as the Department asserts, that children are placed in solitary confinement for different reasons and, if properly placed there at all, can properly be kept there for different periods.  But, the plaintiffs challenge the Department's standard for placing children in solitary … This is a contention that raises common issues and can be answered one way or the other for the class as a whole."); *Harris*, 2021 WL 6197108, at *12 (holding that the "particular circumstances" of each class member do not defeat commonality where the plaintiffs challenge an illegal general policy).  In short, "factual differences between class members do not preclude a finding of commonality, as long as common questions of law exist."  *Hernandez*, 209 F.R.D. at 669.  Such common questions exist here.

### C. The Typicality and Adequacy Requirements Are Satisfied

Defendants' argument on typicality is merely a slight variation on the theme of its challenge to commonality.  Because their individual circumstances and treatment needs vary, Defendants contend that the named Plaintiffs' "stories, their

allegations, and their claims have nothing in common with each other or any other unique individual experiencing gender dysphoria." (Opposition at 22.)

This argument runs headlong into contrary black-letter law. "Substantial factual differences" between the class representatives' claims and those of absent class members do not defeat a finding of typicality "where there is a strong similarity of legal theories." *Hoffer*, 323 F.R.D. at 699 (cleaned up); *Hernandez*, 209 F.R.D. at 671 (typicality is established "if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory"); *Marstiller*, 2023 WL 2648180, at *10 ("'The typicality requirement is generally met if the class representative and the class members received the same unlawful conduct irrespective of whether the fact patterns that underlie each claim vary.'" (quoting *Mesa v. Ag-Mart Produce, Inc*., No. 2:07-cv-47-FtM-34DNF, 2008 WL 2790224, at *6 (M.D. Fla. July 18, 2008)). For each Plaintiff Class, the representatives and members are subject to the same bans and restrictions on transition-related treatment and seek to invalidate those bans and restrictions using the same legal theories. And, far from having nothing in common with the stories of other class members, the named Plaintiffs' stories follow a depressingly-similar pattern in which a transgender person finds hope for a better life through treatment for gender dysphoria only to have those hopes dashed by the obstacles to that treatment imposed by Florida law. In that respect, the named

Plaintiffs' circumstances are highly typical of the experiences of transgender persons all over the State of Florida in the wake of the enactment of the Transgender Medical Restrictions. Their injuries are the same. Each of the Plaintiff Classes complies with Rule 23(a)(3).

In addition, although they attack adequacy in a single, conclusory sentence (Opposition at 22), Defendants do not even attempt to identify a disabling conflict of interest between the class representatives and the other members of the Plaintiff Classes or to articulate a reason why the named Plaintiffs will fail to vigorously prosecute the case. *See G.H.*, 339 F.R.D. at 590.

### D. Rule 23(b)(2) Is Satisfied

The parties agree that the "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (cleaned up). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id*. (Opposition at 22-23.) Defendants contend this standard cannot be met here because the Court might ultimately enter relief that permits some forms of transition-related treatment (and not others) or strikes down only some of the Transgender Medical Restrictions while leaving others in place. Defendants construe this possibility as the equivalent of the Court

-12-

granting different injunctions to particular members of each Class. (Opposition at 23.)

That is just not so. Plaintiffs do not seek individualized injunctions tailored to the unique circumstances of each class member. Rather, each Class seeks an injunction striking down the Treatment Bans and the other Transgender Medical Restrictions, respectively, as unconstitutional in their entirety. The injunction applicable to each Class will be the same for all members of that Class. Take Class 1 as an example. If the Court determines the Treatment Bans are unconstitutional and enjoins them, then the Treatment Bans cannot be enforced against *any* member of Class 1 – irrespective of whether that member seeks puberty blockers or cross-sex hormones. Such an injunction would provide relief to each member of the Class. *Dukes*, 564 U.S. at 360. On the other hand, if the Court holds the Treatment Bans pass constitutional muster, then Defendants may enforce them against *all* members of Class 1. And, if the Court only grants partial relief by (for the sake of argument) finding that puberty blockers cannot be banned but hormone treatments can be, that holding and the partial injunction accompanying it will *still* apply to *all* members of Class 1; all such members will be legally able to access puberty blockers but not hormones, regardless of their individual circumstances.

The same is true of Classes 2 and 3. Any injunction Plaintiffs obtain for either of these Classes will apply equally to all members of that Class, and the decision as

to the constitutionality of each component of the Transgender Medical Restrictions will be binding on the entire Class.  If the Court enjoins the Transgender Medical Restrictions in their entirety, that single injunction would provide complete relief to each Class.  Even if the Court only enjoins some of these restrictions, that would still provide partial relief to all members of Classes 2 and 3.  That is sufficient to satisfy Rule 23(b)(2).  *Hoffer*, 323 F.R.D. 699 (certification appropriate under Rule 23(b)(2) because, "if this Court enters an injunction forcing Defendant to change FDC's policies and practices with respect to HCV treatment, then each member of the proposed class will be able to enjoy those changes"); *Florida Educ. Ass'n v. Dep't of Educ.*, No. 4:17cv414-RH-CAS, 2019 WL 8219403, at *6 (N.D. Fla. Jan. 3, 2019) (Hinkle, J.) (Rule 23(b)(2)'s "standard is easily met for the plaintiff's claims for injunctive and declaratory relief.").

### E. Conclusion

Plaintiffs respectfully request that the Court grant their motion for class certification in its entirety.

Respectfully submitted this 21st day of August, 2023.

**LOWENSTEIN SANDLER LLP**

*By: /s/ Thomas Redburn, Jr.*
**Thomas E. Redburn, Jr.\***
New York Bar No. 5822036
**Maya Ginsburg\***
New York Bar No. 5128152
1251 Avenue of the Americas
New York, NY 10020
(212) 262-6700
tredburn@lowenstein.com
mginsburg@lowenstein.com

**NATIONAL CENTER FOR LESBIAN RIGHTS**

**Christopher F. Stoll\***
CA Bar No. 179046
**Kelly Jo Popkin\***
NY Bar No. 5698220
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel. 415-365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

**SOUTHERN LEGAL COUNSEL**

**Simone Chriss**
Florida Bar No. 124062
**Chelsea Dunn**
Florida Bar No. 1013541
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**GLBTQ LEGAL ADVOCATES & DEFENDERS**

**Jennifer Levi\***
MA Bar No. 562298
**Chris Erchull\***
MA Bar No. 690555
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
cerchull@glad.org

\* Admitted by *pro hac vice*

**HUMAN RIGHTS CAMPAIGN
FOUNDATION**

**Cynthia Cheng-Wun Weaver\***
NY No. 5091848
**Jason Starr\*** NY No. 5005194
**Ami Patel\*** CA No. 325647
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180
Cynthia.Weaver@hrc.org
Jason.Starr@hrc.org
Ami.Patel@hrc.org

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), the undersigned counsel certifies that, according to Microsoft Word, the word-processing system used to prepare this Reply, there are 3169 total words contained within the Memorandum.

*/s/ Thomas Redburn, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 21, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

*/s/ Thomas Redburn, Jr.*