UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO. 4:23-cv-00114-RH-MAF


JANE DOE, individually and on
behalf of her minor daughter,
SUSAN DOE, et al.,

      Plaintiffs,
vs.

JOSEPH A. LADAPO, in his
official capacity as Florida's
Surgeon General of the Florida
Department of Health, et al.,

      Defendants.
_____


REMOTE DEPOSITION OF

KENNETH W. GOODMAN, Ph.D., FACMI, FACE

Friday, September 15, 2023

8:30 a.m. - 10:43 a.m.

LOCATION OF WITNESS:

Via Zoom

Miami, Florida


STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ
RPR, CM, CRR, CRC, CCR-GA

1    APPEARANCES: (All appearing via Zoom.)

2

3      ON BEHALF OF THE PLAINTIFFS:

4

5      HUMAN RIGHTS CAMPAIGN FOUNDATION
       1640 Rhode Island Ave. NW
       Washington, D.C. 20036
6      202.993.4180
       BY: JASON STARR, ESQUIRE
7      Jason.Starr@hrc.org
       BY:  CYNTHIA CHENG-WUN WEAVER, ESQUIRE
8      Cynthia.Weaver@hrc.org

9

10     SOUTHERN LEGAL COUNSEL, INC.
       1229 NW 12th Avenue
11     Gainesville, FL  32601
       352.271.8890
12     BY: SIMONE CHRISS, ESQUIRE
       simone.chriss@southernlegal.org

13

14

15     ON BEHALF OF THE DEFENDANTS:

16

       HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK
17     119 South Monroe Street, #500
       Tallahassee, FL  32301
18     850.508.7775
       BY: GARY V. PERKO, ESQUIRE
19     gperko@holtzmanvogel.com

20

21

       ALSO PRESENT:
22
       Sharon Minter, Observer
23

24

25

1                         I N D E X

2    WITNESS                                    PAGE

3    KENNETH W. GOODMAN, PhD, FACMI, FACE         4

4        Direct Examination by Mr. Perko        4

5    CERTIFICATE OF OATH                         84

6    CERTIFICATE OF REPORTER                     85

7    READ AND SIGN LETTER                        86

8    ERRATA SHEET                                87

9    (STENOGRAPHER'S NOTE:  All documents were sent to
     Stenographer electronically.  A digital exhibit
10   sticker was placed on the documents which were
     marked during the proceeding.)

11
                      INDEX OF EXHIBITS
12

13   NO.        DESCRIPTION                      ID

14

15   1  Combined Expert Report Kenneth W. Goodman    25
     2  Expert Declaration of Kenneth W. Goodman     25
16   3  Endocrine Society guideline, "Method of      35
        Development of Evidence:  Clinical Practice
17      Guidelines"
     4  Paper entitled "Grade Guidelines"            47
18   5  BMJ Investigation, Gender Dysphoria in Young 47
        People is Rising—And So Is Professional
19      Disagreement
     6  Guyatt, Can We Trust Strong Recommendations  49
20      Based on Low Quality

21

22

23

24

25

1   The following Zoom proceedings began at 8:30 a.m.

2           THE STENOGRAPHER:  Do you swear or affirm

3       that the testimony you are about to give will

4       be the truth, the whole truth, and nothing but

5       the truth?

6           THE WITNESS:  I do.

7           **THE STENOGRAPHER:**  Thank you.

8   Thereupon,

9       KENNETH W. GOODMAN, Ph.D., FACMI, FACE

10  having been first remotely duly sworn or affirmed,

11  as hereinafter certified, testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. PERKO:

14      Q    Can you please state your full name for

15  the record.

16      A    Kenneth Wayne Goodman.

17      Q    Dr. Goodman, my name is Gary Perko.  I

18  represent the medical defendants in this case.

19           Have you ever been deposed before?

20      A    Yes, sir, I have.

21      Q    Okay.  How many times?

22      A    Fewer than half a dozen, three or four.

23      Q    Okay.  So you know the drill.  I'll be

24  asking you questions about -- primarily about your

25  expert report, but possibly other knowledge you

1    might have that's relevant to this lawsuit.

2              If you don't understand my questions at

3    any time, please let me know and I will try to

4    rephrase it.  Otherwise, if you do go ahead and

5    answer, we'll assume that you understood the

6    question.  Is that fair?

7         A    It is.

8         Q    I don't expect this deposition to be too

9    long, but if you ever need a break to get some

10   water, go to the restroom, just let me know, we'll

11   accommodate you.

12        A    Okay.

13        Q    Dr. Goodman, let's just start off with a

14   document on the screen here.

15             **MR. PERKO:**  Excuse me, I'm not technically

16        proficient here.

17             There we go.

18   BY MR. PERKO:

19        Q    And do you see a document on the screen,

20   at the top, it's in blue writing, it says "Case

21   4:23-cv-00114-RH-MAF, document 58-1."

22             Do you see that?

23        A    Yes, sir.

24        Q    This is entitled "Expert Declaration of

25   Kenneth W. Goodman, Ph.D, FACMI, and FACE."

1          And I'll scroll down to the bottom, show

2   you your signature here.  Do you see your signature?

3          There we go.

4       A    Yes, I do.

5       Q    And does this appear to be a true and

6   correct copy of the expert declaration that you

7   submitted in this case?

8       A    It appears to be.

9       Q    Okay.  In paragraph 12 you state that you

10  previously testified as an expert or at trial or by

11  deposition in several cases.  The first one is Adams

12  & Boyle, P.C., et al. versus Herbert H. Slatery.

13          When did that case occur; was it 2015?

14      A    It's been 8, 7 to 10 years, yes.

15      Q    Can you tell me what that case was about?

16      A    That was a case involving termination of

17  pregnancies, and if I'm not mistaken, involving

18  mandatory waiting periods between -- for abortion,

19  unless I am conflating with another similar one.

20      Q    Did you testify as an expert?

21      A    I did.

22      Q    Do you recall what subject matter you

23  testified about?

24      A    Consent and the process for the

25  termination of pregnancies.

7

1      Q      Then the other case that you list here is

2    Gainesville Woman Care, LLC, et al. versus State of

3    Florida, et al. Circuit Court, Leon County.

4             Do you recall when that case occurred?

5      A      It's more recent, and so it's not -- it's

6    not styled -- more recent than that and on the same

7    issue.

8      Q      I'm sorry?

9      A      I say it's more recent than that.

10     Q      Okay.  And what was that case about?

11     A      The same issue, although a different

12   waiting period, but a requirement that patients be

13   required to go away and return to receive medical

14   intervention.

15     Q      And what did you testify about, what were

16   your expert opinions?

17     A      With the role of informed consent in that

18   process and to the point that it was unusual that

19   such a requirement would be made or imposed in that

20   kind of case and not many other medical cases.

21     Q      Are there other medical cases where that

22   type of informed consent is required?

23     A      To the best of my knowledge, no.

24     Q      Now, Dr. Goodman, we're going to talk a

25   little bit about your background, your professional

1    background and education.  Do you recall submitting

2    an expert declaration back in May, May 18th in this

3    case?

4         A    I do.

5         Q    Okay.  And you have a CV attached to that

6    document.  Would you have any additions or

7    corrections to the CV that you submitted at that

8    time?

9         A    I've had some publications since then.

10        Q    Okay.  Can you tell me what those

11   publications were about?

12        A    One of them -- for example, one of them

13   has to do with ethical challenges surrounding

14   wastewater sampling to detect COVID.

15             Another one has to do -- CVs in academia

16   are rather dynamic, but that's an example of two

17   recent papers.  One of them is -- several of them,

18   rather, have to do with scientific projects

19   surrounding the detection of COVID and other

20   diseases in wastewater.

21        Q    And I see from the CV that you received a

22   BS degree with high honors from the University of

23   Florida from the Department of Journalism and

24   Communication.  Can you tell me a little bit more

25   about that degree, what it entailed?

1    A    Are you asking for the content of the

2  curriculum or --

3    Q    Yeah.

4    A    So journalism and communication,

5  well-established at the University of Florida, was

6  what I sought a degree in.  We learned about theory

7  and practice of the news media, with internships

8  with actual newspapers, for example.

9    Q    Okay.  And it says here that you received

10  an MA in 1982 from the University of Essex,

11  Colchester, United Kingdom, from the Department of

12  Language and Linguistics, and your program was in

13  theoretical linguistics.

14        What is theoretical linguistics?

15    A    In brief, it's the study of the structure

16  of human language and similarities between and among

17  different languages, having to do with their

18  evolution, their origin, and what it is that makes

19  utterance -- what -- the reason we're able to

20  understand each other now is actually quite

21  interesting when one comes to think of it.

22        And that has to do with the syntax that we

23  understand, the semantic force of our utterances,

24  what makes an utterance well formed or grammatical,

25  if you will, and how it is the human brain is able

1    to do that.

2        Q    And have you ever practiced in the area of

3    theoretical linguistics?

4        A    No, but some in the area of applied or

5    practical linguistics.  This was a theory-based

6    program that does not -- is not associated with any

7    form of practice.

8        Q    Okay.  And then you received a doctor -- a

9    Ph.D. from the University of Miami from the

10   Department of Philosophy in 1991; is that correct?

11       A    Yes.

12       Q    It says here that your dissertation was

13   entitled, *Progress and Truth in Science*.

14            Can you tell me a little bit more about

15   that?

16       A    About the dissertation and its contents,

17   you mean?

18       Q    Yes, sir.

19       A    There has been a debate probably for

20   several thousand years now about what it is we do

21   when we do science, and whether, for example, we

22   learn truths about the world or, for example, to the

23   contrary, whether we solve -- merely solve problems.

24            This is a great question in epistemology

25   of the study of knowledge.  Are we learning truths

1    about the world, is there a uniquely true

2    description of the world and the way the world

3    works, or do scientists solve problems such that,

4    come a scientific revolution, everything that we

5    believed before needs to be challenged.

6            A good example of that, for instance, is

7    the Copernican revolution.  For most of the history

8    of the world people believed the world -- the earth

9    was at the center of it.  After Copernicus, we

10   realized that the earth was no longer the center.

11   That undermined quite literally ancient beliefs

12   about what was up or down.

13           Newtonian revolution was another

14   revolution in relativity theory and quantum theory.

15   Science is revising itself on a regular basis, and

16   that produces very interesting challenges about what

17   we know, how we come to find it out, and how we can

18   make assertions about the way the world works.

19       Q    When you were getting your Ph.D., did you

20   take any classes in the sciences?

21       A    No.

22       Q    On your list of publications you have a

23   publication with Birnbach, D.J., entitled, "Ethics

24   and Plastic Surgery" -- I'm sorry, "Plastic -- "and

25   Plastic Surgery Practice," that's in, I guess, a

1    book entitled *The Unfavorable Result in Plastic*

2    *Surgery:  Avoidance and Management*.  Can you tell me

3    a little bit more about that?  I guess it's a book

4    chapter?

5         A    It is.  It's a survey of ethical issues in

6    plastic surgery, so --

7         Q    What -- go ahead.

8         A    And there are many such issues, ranging

9    from patient accommodations to the consent process

10   to what happens when something goes wrong.

11        Q    Can you give me some examples of the

12   ethical issues you're talking about?

13        A    In many areas of medical practice, one can

14   arrange ethical issues under different headings.

15   One of them is going to be privacy.  And I think

16   we're all familiar with that:  Are you adequately

17   protecting your patient's privacy while you're busy

18   doing other things that require the sharing of

19   information?  Is your consent process adequate?

20              So many patients have expectations about

21   plastic surgery that are sometimes shaped or

22   reshaped by the consent process.  Those, as I

23   recall, are -- actually the second one was the major

24   one that the article addressed -- as well as

25   accommodating patient preferences.  In the course of

1   preparing the article, I changed my mind about

2   something.

3       Q    I'm sorry, Doctor.  You're breaking up.

4           **MR. PERKO:**  Sandi, were you able to take

5       that down?

6           **THE STENOGRAPHER:**  Yes.

7           **MR. PERKO:**  You were?  Okay.  Is he

8       breaking up on you?

9           **THE STENOGRAPHER:**  No.

10          **MR. PERKO:**  Okay.

11   BY MR. PERKO:

12      Q    Well, I have an understanding of what you

13   said, Doctor, but you were breaking up there on my

14   system for some reason.

15      A    Should I -- should I try and repeat what I

16   said?

17          **MR. PERKO:**  Sandi -- if -- Sandi, you were

18      able to get that down on the transcript?

19          **THE STENOGRAPHER:**  Correct.  Correct, yes.

20   BY MR. PERKO:

21      Q    Then you don't need to repeat it, Doctor.

22          There is another book chapter attributed

23   to you on your CV entitled, "Ethical and Legal

24   Issues in Decision Support," and that was in a book

25   entitled *Clinical Decision Support Systems:  Theory*

14

1    *and Practice.*

2           Can you tell me a little bit more about

3    that book chapter?

4           A    That chapter addresses challenges that

5    arise when clinicians use computers to help them

6    make decisions.  For example, diagnoses and

7    prognoses is a whole issue, although it's very much

8    of the moment.  Some of us have been writing about

9    it for quite some time.

10          If you are a physician, should you use a

11   computer to help you render a diagnosis for me?  And

12   the literature on that is actually quite extensive.

13          One of the legal issues is obviously our

14   colleagues in the practice of medicine are always

15   concerned about liability, and it's been suggested

16   that failure to use a new technology might itself be

17   blameworthy.

18          Q    Those were the legal issues you addressed

19   in your chapter?

20          A    Yes.

21          Q    And so --

22          A    And others.

23          Q    What were the others?

24          A    If, for example, you were my physician and

25   you used a computer to diagnose my condition, or to

1   help you diagnose one, and it turns out it was a

2   mistake, would that be your fault, would that be the

3   manufacturer's fault, the software writer's fault?

4   It's quite an interesting question, both in terms of

5   moral responsibility and in liability.

6          On the other hand, these programs are

7   improving to the point where if one failed to use

8   one, and no reason to believe that it might have

9   rendered an accurate diagnosis that you missed, then

10  that also would be blameworthy.

11      Q    Okay.  This says that that chapter was

12  fully revised from second edition in 2000.  How was

13  it revised?

14      A    To the best of my memory, Counselor, it

15  would have been about updating references and

16  clarifying arguments as necessary.  That's -- I'd

17  have to -- I'd have to compare the two versions

18  after 20 years.

19      Q    Okay.  Later down in your CV, under your

20  list of publications, you had listed a paper that

21  you did with Rosenfeld, P.J., entitled, "When is

22  Off-label Drug Use in the Patient's Best Interest?"

23          Can you tell me a little bit more about

24  that paper?

25      A    It was a paper about drugs and

1   ophthalmology where -- where one in particular was

2   found by ophthalmologists to be really quite useful

3   and quite helpful and where, for a number of

4   reasons, some of them, financial or legal, they were

5   not able to do some of the studies they wanted to do

6   and therefore this particular drug was really quite

7   helpful in the management of the eye condition.  And

8   so it was essential that ophthalmologists be able to

9   use that drug off label.

10       Q    I'm sorry, Doctor, you broke up on my end.

11  Could you -- could you repeat that?

12       A    The article made clear that there are

13  circumstances in which off-label use of drugs is

14  sometimes essential for proper patient care.

15       Q    Okay.  Thank you.  And how would you

16  determine whether off-label use of a drug is

17  essential for patient care?

18       A    I would not, but people in the practice of

19  ophthalmology who are familiar with the drug and its

20  effects on their patients in communication with

21  others would be able to do that.

22       Q    Do you know how they would go about doing

23  that?

24       A    How physicians communicate with each

25  other, is that what you're asking?

1      Q      How they determine when off-label drug use

2    is appropriate?

3      A      When the -- well, there's several ways.

4    It's appropriate, this is a function of its safety

5    and efficacy and so people with extensive experience

6    with it will be able to make a judgment based on

7    that.  When people who are familiar with each

8    other's practice communicate, they will be able to

9    communicate with each other the literature about

10   off-label use.  So you have publications, you have

11   scientific conferences, and so forth.

12     Q      Doctor, you are currently -- sorry.

13            What's your current position at the

14   University of Miami?

15     A      I'm a faculty member, I'm a professor of

16   medicine, and I direct the Institute for Bioethics

17   and Health Policy.

18     Q      And what do you teach in the School of

19   Medicine?

20     A      I teach ethics, professional ethics,

21   biomedical ethics, related topics.  We're struggling

22   now with the appropriate use of computers in

23   medicine.

24     Q      Can you describe for me some of the

25   ethical issues that you address in your classes?

1          A    The ethics curriculum for medical students

2    tends to have -- I beg your pardon -- tends to have

3    several key components.

4               One of them is privacy and how protecting

5    and ensuring that the patients are able to trust

6    their physicians who need to know sometimes very

7    intimate things about their patients, privacy is

8    crucially important.

9               Another component is valid consent,

10   circumstances under which a patient can

11   appropriately be treated or participate in a

12   research project.

13              Third component, we spend some time on

14   end-of-life care, which is related to valid consent

15   in many ways.

16              Fourth component has to do with social

17   medicine or access to care, where we teach

18   physicians that once they've learned how to help

19   people, they have an obligation to continue to do

20   so.

21              It is, in some fields -- I'm sorry -- is

22   uncontroversial to some of us that people have a

23   right to healthcare and therefore up to physicians

24   and nurses to help them enjoy that right.

25          Q    Can you tell me a little bit more about

1   what you teach in the area of valid consent?

2       A    I can.

3           **MR. PERKO:**  I'm sorry, Doctor, you're

4       breaking up.  You might want to get closer to

5       the microphone.

6           **THE WITNESS:**  Or -- how's that?  Seem to

7       help?

8           **MR. PERKO:**  Much better.  Thank you.

9           **THE WITNESS:**  Now you understand why

10      professors need elbow patches for their --

11      A    As a result of work by people in ethics,

12  and for that matter also the law, we are clear now

13  about the components of valid consent.

14          So if I'm going to be your patient -- I

15  beg your pardon -- if I'm going to be a patient,

16  then my physician or my nurse is going to be

17  duty-bound to make sure that three things are the

18  case.

19          One of them is that I'm adequately

20  informed.  That's where the phrase "informed

21  consent" originates from; adequately informed about

22  risks, benefits, and alternatives.

23          There may be other kinds of information

24  and how that information is communicated and how

25  it's made accessible based on everything from an

1  educational level to language, that's the informed

2  part.

3         It's also important that if I'm going to

4  be a patient, that I have capacity, namely that I

5  can understand and appreciate all that information

6  in coming to a decision; or that my guardian,

7  surrogate, or proxy is thus informed and

8  capacitated.

9         And then, thirdly, that my choice is a

10  free one, that it is -- that I'm not coerced into

11  agreeing to go forward with a treatment or a

12  procedure or risk.

13     Q    Is there a specific valid consent process

14  for adolescents?

15     A    In general, you mean?

16     Q    Yes, sir.  Is there a difference between

17  obtaining informed or valid consent from adolescents

18  as compared to adults?

19     A    Well, if they're under the age of

20  majority, then the consent process includes their

21  parents or guardians.  In other words, under --

22  under -- under -- under well-agreed standards, I

23  guess, if you were 17 or younger, then you are

24  officially regarded as unable to consent to your own

25  medical treatment.

1          There are a number of debates about that,

2    one might note, and in which case the valid consent

3    process includes the legally authorized

4    representative of the patient, and that would be a

5    guardian or a parent.

6          Q    Doctor, going back to your education, can

7    you -- did you take any courses in scientific

8    fields?

9          A    In -- since when?

10         Q    Well, let's just say when you were

11   obtaining your Ph.D. at the University of Miami.

12         A    So my duty at the University of Miami

13   was -- it didn't involve science courses, although I

14   have over the years attended a number of science

15   courses.  But as an undergraduate, linguistics is a

16   science and so in some respects, some of those

17   courses were science courses.

18         Q    You mentioned that you had over the years

19   taken other science courses.  Was that in your

20   undergraduate degree, or have you since -- since you

21   obtained your Ph.D., have you taken scientific

22   courses?

23         A    Could I ask you to clarify, by a "course,"

24   are you -- well, what exactly are you referring to?

25   Because many people are exposed to scientific

1   education without taking a course at a university.

2        Q    Okay.  Well, what type of scientific

3   education have you obtained outside the university?

4        A    Well, that would take a while to go

5   through.

6             I attend a lot of scientific conferences,

7   where either I'm asked to participate in one way or

8   another; so in the practice of medicine, the

9   practice of nursing, public policy; I've enjoyed

10  collaborating with the Florida Bar over the years.

11       Q    How have you collaborated with the Florida

12  Bar?

13       A    By giving presentations at Bar conferences

14  and supporting projects related to trying to improve

15  statute as it relates to end-of-life care, for

16  instance.

17       Q    How did you improve that statute?  What

18  was your work related to?

19       A    Oh, I -- please do not infer that I have

20  implied that I improved any statute.

21       Q    Maybe I misunderstood you.  What was your

22  involvement with that statute?

23       A    So that statute in Florida is Chapter 765,

24  which addresses -- it's entitled "Advanced

25  Directives," but it addresses many issues besides

1   advanced directives.

2          So many years ago there was a statewide

3   initiative to update, and so we had to revise that

4   statute to make it more apt, if you will.  And in

5   the process -- so, for example, in the process you

6   are learning a great deal about the science of --

7   well, of biomedical science, including neurology,

8   which sometimes bears on capacity, about pulmonology

9   and cardiology, which are -- along with urology --

10  among the ways that we can die, and so forth.

11          The challenge in many jurisdictions is one

12  between -- is about how best to protect people while

13  at the same time not infringing on their rights.

14          And so, for instance, our discussion about

15  valid consent has as its adverse valid refusal.

16  Those are basically attributed to that, so a

17  competent, informed adult can refuse any treatment

18  she wants.

19      Q    And how does the statute deal with valid

20  consent?

21      A    To the best of my recollection, it had --

22  it is implied throughout.  I mean, it's -- the

23  patient's rights to consent or refuse treatment,

24  it's more valid refusal than consent.

25          I am not prepared to discuss 765 today.

1    This -- this work -- working group by the Florida

2    legislature is much earlier in the century.

3         Q    Fair enough.  Have you had any other

4    involvement with the Florida Bar?

5         A    I've given a number of presentations at

6    Bar programs over the years.  The community of

7    lawyers who deal in health law, sometimes elder law,

8    overlaps in many ways.  But people who do what I do

9    is healthcare organizations, namely trying to manage

10   the consent and refusal process for people who are

11   dying.

12        Q    You list your professional affiliations in

13   your CV, but I was curious, are you a member of the

14   World Professional Association for Transgender

15   Health, or WPATH?

16        A    I am not.

17        Q    I'm sorry?

18        A    No.

19        Q    I'm going to go back to your expert report

20   here, if I can bring it up.

21             Do you see your expert declaration on the

22   screen, Doctor?

23        A    Yes.

24        **MR. PERKO:**  Sandi, can we mark this as

25        Exhibit Number 1, please?

1        (Exhibit 1 was marked for identification.)

2        (Exhibit 2 was marked for identification.)

3        (Discussion off record.)

4    BY MR. PERKO:

5        Q    And, Dr. Goodman, in paragraph 8 of your

6    expert declaration, you state that in addition to

7    your research and publication as outlined in your

8    curriculum vitae, you are "responsible for providing

9    clinical" consultive serv- -- "consultative services

10   to providers across the Jackson and UH Health

11   Systems and on a consulting basis to other

12   institutions.  The purpose of these consultations is

13   to help clinicians make decisions concerning patient

14   care in cases that present unique or challenging

15   ethical issues."

16         Can you tell me, give me some examples of

17   the consultations you have undertaken that you're

18   referring to here?

19       A    Sure.  They're -- they're -- most of them

20   are in the hospital, at least, and it will be

21   similar to what my colleagues do elsewhere.

22         The most common source of consult requests

23   will be from, for example, colleagues and

24   institutions -- in a hospital where a patient has

25   lost capacity, an elderly, sick patient lacks

1    capacity and spouses or children or siblings are

2    insisting on a level of treatment that the team in

3    its professional judgment believes is inappropriate.

4            It's a very common phenomenon in U.S.

5    hospitals, the idea that it's a hospital and that's

6    where you stop people from dying.  Unfortunately,

7    some people die no matter what, and the challenge

8    then is to what extent should a physician and/or a

9    nurse be compelled to render treatment against their

10   clinical judgment or to withhold treatment based on

11   their clinical judgment.

12        Q    Have any of these consultations involved

13   gender dysphoria?

14        A    No.

15        Q    Do you have any experience with patients

16   or physicians regarding treatment of gender

17   dysphoria?

18        A    I am aware of cases and have communicated

19   with my colleagues who used to do this, although

20   those cases were largely shaped by the fact that

21   their practice had been altered by -- by -- by

22   regulation.  Their concerns were continuity of care,

23   for example.

24        Q    In the context of gender dysphoria?

25        A    Yes.

1      Q    Approximately how many of those

2  consultations involved gender dysphoria?

3      A    How many --

4      Q    I'm sorry, you answered that question.

5  None of your consultations have involved --

6      A    No formal consultations have been about

7  gender dysphoria.

8      Q    Thank you.  And in paragraph, beginning in

9  paragraph 13, you talked about "clinical practice

10  guidelines established" --

11          Sorry, something's beeping in here.

12          You talk about "clinical practice

13  guidelines established by the Endocrine Society that

14  were developed using the Grading of Recommendations,

15  Assessment, Development, and Evaluations or GRADE

16  guidelines."

17          Tell me about your experience with use of

18  those GRADE guidelines.

19      A    I do not use the GRADE guidelines.  The

20  GRADE guidelines are intended obviously to try and

21  support clinicians who are grappling with a great

22  deal of evidence in biomedicine and the

23  evidence-based medicine movement over the past half

24  century has tried to support physicians and nurses

25  and other clinicians in trying to capture, to

1   understand, to incorporate, to metabolize, if you

2   will, evidence that -- that can be used to guide

3   their practice.  But I, for example, don't use them

4   because I don't practice medicine or nursing.

5       Q    Okay.  Have you ever undertaken a

6   systematic review using the GRADE guidelines?

7       A    No, but --

8       Q    The next sentence -- I'm sorry.

9       A    Strictly speaking, no.  No, I have not.

10      Q    In the next sentence, you talk about "In

11  this process," and I believe you're talking about

12  the Endocrine Society's development of clinical

13  practice guidelines; is that correct?

14      A    Yes.

15      Q    You say, "The guidelines and

16  recommendations are subjected to rigorous internal

17  and external review, including public comment, and

18  undergo peer review prior to publication."

19           Can you tell me about the "rigorous

20  internal review" that the Endocrine Society

21  conducts?

22      A    I don't have -- I don't have direct

23  acquaintance with what the Endocrine Society did,

24  other than what I've read and what's available at

25  public sources.

1    Q    So you don't know what internal review the

2    Endocrine Society undertook?

3    A    I've read some of the reports that I see

4    are admitted as documents in the case, but I don't

5    have direct acquaintance of -- with -- I'm not a

6    member of it and I wasn't involved in the

7    guidelines, so I do not know with detail that would

8    be adequate to the task how they -- how they did

9    that.

10    Q    So how --

11    A    It's not my practice to try and do it that

12    way, though.

13    Q    How do you know that the Endocrine Society

14    undertook -- or the internal review process was

15    rigorous?

16    A    Because it is suggested in the literature,

17    and absent any -- I can't believe that they --

18    because it has been reported publicly as such.

19    Q    Okay.

20    A    As, for example, are many guidelines, the

21    GRADE system itself, while it's an attempt to help

22    physicians and nurses and others guide policy,

23    itself, for example, has not been reviewed or

24    externally evaluated.  The debate about

25    evidence-based practice basically is really quite

1   far reaching and it would be -- it would be inapt

2   for anybody to say of any particular guideline --

3   parenthetically, there are now guidelines for

4   guidelines -- or any particular requirements for

5   reporting of clinical trials.

6           The GRADE is about trying to synthesize

7   recommendations, but there now -- there are

8   guidelines for how the trials that they use should

9   have been reported in the first place.

10          So the idea that there is an easy or a

11  straightforward mapping between GRADE guidelines and

12  any professional organization's practice guidelines

13  is going to be very, very difficult to draw.  It's

14  not that simple.

15     Q    Well, getting back to my original

16  question, what's your basis for saying that the

17  Endocrine Society's internal review was rigorous?

18     A    That it is reported trustworthily to be a

19  bit rigorous.

20          One second, Counselor.  May I read this?

21     Q    Sure.

22     A    (Examining document.)

23          I think -- I think one of us has

24  misunderstood something.  If -- what I intended to

25  be communicating here is not the Endocrine Society

1  guidelines, although they are reported to be

2  rigorous.

3          What I'm saying is in this process,

4  guidelines and recommendations are subject to

5  rigorous external -- that's the appropriate

6  application of the GRADE guidelines for anybody

7  who's coming up with practice guidelines, not the

8  Endocrine Society.

9      Q    But you said also including public comment

10 is when the GRADE guidelines are implemented and

11 recommendations are subject to it.  Is there always

12 rigorous internal review, external review, and

13 public comment?

14     A    For all the guidelines in the world?  I

15 would not know.

16     Q    But here you were talking generally and

17 not with regard to the Endocrine Society guidelines?

18     A    I'm talking about the GRADE guidelines,

19 describing the GRADE process whereby guidelines and

20 recommendations are subject to -- the intent of

21 GRADE is to provide that support.  In fact -- I --

22 I -- because of the nature of our discussion, the

23 Endocrine Society guidelines have been publicly

24 reported to have been rigorous.

25          I'm not competent to judge whether that

1  was the case or not.  My comments here are about how

2  these guidelines are -- how it should be used by

3  anybody seeking to develop practice guidelines.

4      Q    In paragraph 14, you state that "the

5  framework," and I believe you're talking about the

6  GRADE guidelines, is that correct, when you refer to

7  framework?

8      A    Yes, the GRADE -- the GRADE framework for

9  summarizing medical evidence.

10     Q    Okay.  You say "The GRADE framework

11 considers the population in question, here

12 transgender adolescents experiencing gender

13 dysphoria and the outcomes of the desired" clinical

14 -- "from clinical intervention and the alleviation

15 of clinically significant distress associated with

16 gender dysphoria."

17          I'd like to go to another document here,

18 if you'll give me a --

19          I'll represent for the record that this

20 was an exhibit that was submitted in the trial in

21 the Dekker case.  It was Exhibit DX24.

22          Doctor, if you could take a look at this.

23 Are these the Endocrine Society guidelines that you

24 referred to in your expert report?

25     A    They appear to be.

1      Q      On page 3872 of this paper, under the

2  heading "Method of Development of Evidence:

3  Clinical Practice Guidelines," it states that -- it

4  states that "In terms of the strength of

5  recommendations, strong recommendations use the

6  phrase 'we recommend' in number 1, and weak

7  recommendations use the phrase 'we suggest' in the

8  number 2.  Cross-filed circles indicate the quality

9  of evidence, such that one out of four circles

10  indicates" -- or "denotes very low-quality evidence;

11  two out of four, low-quality; three out of four,

12  moderate-quality; and four out of four,

13  high-quality."

14           Do you see that?

15      A      I do.

16      Q      Now, going back up to the prior page,

17  there are some recommendations and suggestions for

18  the treatment of adolescents.  Do you see that?

19      A      Yes.

20      Q      And it's Section 2.0.  Now, there appears

21  to be -- there are six recommendations and

22  suggestions here in Section 2.0.  And would you

23  agree with me that three of them are suggestions

24  based on low-quality evidence?

25      A      I would need to read them.  You're talking

1   about 2.1 through 2.6?

2        Q     Yes, sir.

3        A     Yes, apparently so.

4        Q     Okay.  And the recommendations here, 2.3,

5   2.4, are based on low-quality evidence as well; is

6   that correct?

7        A     Given those labels, apparently so.

8        Q     And then there's 2.5.  At the last

9   sentence, it says, "As with the care of adolescents,

10  greater or equal to 16 years of age, we recommend

11  that an expert" admissible -- "multidisciplinary

12  team of medical and MHPs manage this treatment."

13           And that's a recommendation, correct?

14  A     Apparently, yes.

15           **THE WITNESS:**  I beg your pardon.

16           **MR. PERKO:**  No problem.  Would you like to

17  take a break, Doctor?

18           **THE WITNESS:**  No, I'm good.  I'm just

19  getting over a cold, and so thank you all for

20  your indulgence.

21           **MR. PERKO:**  All right.

22           **THE WITNESS:**  We're coming up on the hour,

23  so maybe at 9:30 you'll let me refresh my tea.

24           **MR. PERKO:**  Sure.

25           I'm sorry, Sandi, can we mark this as

1        Exhibit Number 2 (sic), please.

2                THE STENOGRAPHER:  Yes.

3                (Exhibit 3 was marked for identification.)

4    BY MR. PERKO:

5        Q    And, Doctor -- well, first of all, let me

6    go back.   I apologize, getting ahead of myself here.

7                Going back to your expert report, or

8    expert declaration, there's a sentence here that

9    these rankings -- and you're talking about quality

10   of evidence:  High, moderate, low, and very low --

11   "these rankings reflect the extent of confidence

12   that the estimates of an effect are adequate to

13   support a particular clinical decision or

14   recommendation."

15               Then you have a footnote 5 after that

16   sentence and you cite to a paper by Balshem,

17   Helfand, Schunemann, et al., entitled, "GRADE

18   Guidelines: 3. Rating the Quality of Evidence."  It

19   was in the *Journal of Clinical Epidemiology*.

20               Are you familiar -- and this is one of the

21   series of papers discussing the GRADE guidelines; is

22   that correct, this number 3?

23       A    It's the ... there's many papers about the

24   GRADE guidelines.  This is among them, yes.

25       Q    And they're developed by what's called the

1    "GRADE working group"; is that correct?

2        A    To the best of my recollection, yes.

3        Q    And you would consider these to be

4    reputable and scientific papers that could be --

5    should be or can be relied upon?

6        A    There's several questions there.  Are they

7    reputable?  To the best of my ability to judge that,

8    yes.

9             Whether any particular paper or scientific

10   report can be relied on is actually another and a

11   very large question, and I don't think -- in fact,

12   it goes to the nature of our case here:  What can be

13   relied on to guide practice?

14            So -- but the idea that there's a

15   particular publication and it alone is dispositive

16   is -- is rarely the case in science, especially

17   biomedical science.

18       Q    Fair enough.  I'm going to pull up another

19   paper here.  It's entitled, "GRADE Guidelines:"

20   Number "15.  Going from Evidence to Recommendation"

21   slash, "Determinants of a Recommendation's Direction

22   and Strength."

23            Are you familiar with this paper?

24       A    Yes, I am.

25       Q    Okay.  Going down to page 731 of this

1 paper, under the heading 2.3.1, "Low Confidence in

2 Effect Estimates May Rarely be Tied to Strong

3 Recommendations."

4     Do you see that?

5 A   I do.

6 Q   And right after that, it states, "In

7 general, we discourage guideline panels from making

8 strong recommendations when their confidence in

9 estimates of effect for critical outcomes is" very

10 low -- "is low or very low."

11     Is that your understanding, that the GRADE

12 working group discourages guideline panels from

13 making strong recommendations when their confidence

14 and estimates of effect for critical outcomes is low

15 or very low?

16 A   That seems to be the case.

17 Q   Now, going back to your expert report, at

18 the bottom of page 6, paragraph 16, you state, "Put

19 another way, technically, low-quality evidence can

20 and often does support strong clinical

21 recommendations."

22     What's your basis for saying that

23 low-quality evidence often does support strong

24 clinical recommendations?

25 A   In the case especially of pediatrics and

 1  especially the case of rare diseases, there's not

 2  going to be a very easy mapping between the body of

 3  research that's available and a recommendation that

 4  a clinician is going to value to guide her practice.

 5          And so the challenge is -- and it's not

 6  just with the interventions we're talking about

 7  here, but across the medical spectrum -- you'd need

 8  to be able to, if you will, play with the cards

 9  you're dealt.

10          And so sometimes it's not so much that we

11  wish -- we wish we had better evidence for all

12  medical interventions, but for those that for

13  various reasons are not as extensive, not as large,

14  or not as good as we want it, that's not a license

15  to not proceed.

16          And so you -- sometimes you find yourself

17  in a situation -- I beg your pardon -- in a

18  situation where you'd need to act as a matter of

19  your professional duty to take care of your patients

20  with imperfect evidence.  And so in circumstances

21  like that, conceptually one could argue it would be

22  irresponsible to say I'm not going to go something

23  because the last randomized trial wasn't good enough

24  or the cohort wasn't large enough.

25          The challenges here have to do with how to

1  make clinical decisions under some measure of

2  uncertainty.  And therefore you can get a strong

3  guideline or strong practice guideline in other

4  contexts, obviously, even though the GRADE system,

5  which is not to say the only possible one, in itself

6  is open to criticism, says would be low.

7          That's the basis of my -- of my statement

8  that you can make a strong clinical recom- -- one

9  could make a credible, strong recommendation even

10  though under the GRADE scale, the evidence was

11  regarded as moderate or low, because there was no

12  alternative and you had patients who needed

13  treatment.

14      Q    Now, you don't make clinical

15  recommendations for patients, correct?  You're not a

16  physician?

17      A    Correct.

18      Q    So when you're talking about "you," you're

19  talking about physicians generally or the medical

20  health professionals?

21      A    Correct.  I'm talking about people with

22  prescribing authority who have patients, yes.  That

23  might include nurses in some jurisdictions.

24      Q    Fair enough.  My question really relates

25  to your statement that low-quality evidence often

1   does support strong clinical recommendations.

2           Given that the GRADE working group

3   discourages using low-quality evidence to support

4   strong recommendations, what's your basis for saying

5   that low-quality evidence often does support strong

6   clinical recommendations?

7           **MR. STARR:**  Objection.

8   BY MR. PERKO:

9       Q    You can answer the question, Doctor.

10      A    I'm trying -- I'm trying to -- if you look

11  at the spectrum of rare diseases, in oncology, for

12  example, or transplant science or neurology or

13  cardiology, especially in pediatrics, you will see

14  that there's -- there's either inadequate or

15  low-quality evidence in a situation where physicians

16  need to act, and that's what I'm trying to say

17  there.

18           Strong clinical recommendations, by the

19  way, is ambiguous about who's making them, right?

20  The fact of the matter is, different professional

21  organizations, including the American Academy of

22  Pediatrics, have different ways of recommend- --

23  making recommendations.  Some make strong

24  recommendations, some make recommendations.

25           And that's the distinction that the

1  American Academy of Pediatrics uses.  So we've

2  got -- we need to, like, maybe -- so we'll have to

3  be careful about whose recommendation, what

4  recommendations are made, by whom, in what context,

5  or what audience against what it would -- with what

6  evidence.

7          So I'm speaking generally here, not about

8  the GRADE guidelines, or -- but about -- about

9  evidence that's regarded as low or weak being the

10  best that's available, but which could still

11  conceptually and without controversy -- otherwise we

12  wouldn't be able to treat kids for cancer -- be able

13  to guide a clinician in her practice.

14      Q    But in this paragraph 16 you're talking in

15  the context of the GRADE framework, are you not?

16      A    I'm -- well, I'm not -- I'm talking

17  about -- could you scroll to the next page, please?

18      Q    Sure.

19      A    The GRADE recommend- -- the GRADE

20  estimation of evidence quality could be used by any

21  number of professional organizations.  So while,

22  yes, I'm talking about the GRADE criteria, those

23  GRADE criteria could be used in many different

24  science -- in various specialties, rather, to guide

25  clinical practice and to produce a recommendation

1  that -- that could be regarded as.

2       Strong.  What you've shared and what I've

3  tried to give examples of is how different

4  professional organizations try and convey their --

5  the confidence that they have in their

6  recommendation.

7       And so, for example, you have strong, not

8  so strong, sort of strong, strongly recommend, or

9  just recommend.

10      By the way, a physician will be forgiven

11 for not knowing how to make that distinction when

12 you have a patient in front of you who needs medical

13 treatment.

14      So the point is I'm talking about the

15 GRADE guidelines as they could be applied to any

16 recommendation by any organization.

17      Q    So are you saying that the GRADE

18 guidelines are not uniformly applied in determining

19 clinical guidelines?

20      A    Oh, I think that they're not uni- --

21 that's a question I'm not sure if I know the answer

22 to.  I hypothesize they're not.

23      Q    Why did you discuss the GRADE guidelines

24 in your expert declaration?

25      A    Because they were used.  Because, for

1   example, the Endocrine Society used them, and it

2   seemed to be salient.

3        Q    Seemed to be what, I'm sorry?

4        A    Salient.

5        Q    Thank you.  Now, at the beginning of

6   paragraph 17, you talk about the GAPMS report.  I

7   believe that's referring to the Generally Accepted

8   Professional Medical Standards report that was

9   prepared by the Florida Agency for Health Care

10  Manage- -- or Agency for Health Care Administration;

11  is that correct?

12       A    I believe so, yes.

13       Q    You say that the report "mysteriously

14  departs from the GRADE framework."

15            Are you familiar with an attachment to

16  that report that's a review of the evidence prepared

17  by Doctors Brignardello-Petersen and Wiercioch?

18       A    I would ask you to help refresh my memory

19  by showing it to me, if that's not impermissible.

20       Q    I'll have to come back to that.

21            **MR. PERKO:**  Did you want to take a break

22       now, Doctor?

23            **THE WITNESS:**  Yes, could we do that for

24       just a hundred seconds or so?

25            **MR. PERKO:**  We could do five minutes or

1      10 minutes, whatever is good for you.

2            **THE WITNESS:**  Five minutes would be

3      lovely, 9:35.

4            **MR. PERKO:**  I'll see you in five minutes?

5            **THE WITNESS:**  Yes, please.

6            **MR. PERKO:**  Thank you.

7            **THE WITNESS:**  Thank you.

8            (A recess took place from 9:30 a.m. to

9      9:35 a.m.)

10    BY MR. PERKO:

11         Q    Dr. Goodman, I'm going to try to bring up

12    that document that I was referring to.  Do you see a

13    document on the screen that's labeled Attachment C?

14         A    I see a page, I see Attachment C, the

15    document --

16            (Overlapping speech.)

17    BY MR. PERKO:

18         Q    I'm sorry.

19            The next page starts a paper entitled,

20    "Effects of Gender-affirming Therapies in People

21    with Gender Dysphoria: Evaluation of the Best

22    Available Evidence," by Romina

23    Brignardello-Petersen, DDS, MSc, Ph.D., and Wojtek

24    Wiercioch, MSc, Ph.D.

25            And I'll state for the record this is

1    Attachment C to the GAPMS report.  My question is:

2    Did you review this document as part of your

3    analysis for this case?

4        A    Yes.

5        Q    Okay.  And this presents review of the

6    evidence using the GRADE guidelines; is that

7    correct?

8        A    Yes.

9        Q    Did you take this into account when you

10   prepared your expert report?

11       A    Yes.

12       Q    How so?

13       A    In the context of the evolution of

14   evidence-based practice, and -- and the -- and

15   the -- and the -- how shall I say -- some of the

16   controversies surrounding it.

17            There are precious few guidelines that are

18   immune from criticism, so I -- and in fact, I think

19   criticism of -- from the study design through

20   practice guidelines based on concatenation of many

21   different studies is itself a field in ferment.  And

22   so I took it into an account as an example of a

23   review of a review of a review that comes to a

24   different conclusion than the review did.

25       Q    I'm trying to understand what you mean by

1    "a review of a review of a review."  What are you

2    saying there?

3         A    So this is a document that is commenting

4    on practice guidelines, that's one review.

5              The practice guidelines are a review of

6    other reviews, namely the biomedical research that

7    led to the practice guidelines.  So it's three --

8    it's three levels out, if you will, from the actual

9    studies, which themselves are open to criticism, if

10   you will.

11        Q    Can you tell me where this document refers

12   to "guidelines" and is a review of guidelines?

13        A    It in itself is an -- so for example, it

14   says right there under Methods, "an overview of

15   systematic reviews."

16             So basically what they're saying is that

17   they used -- whether it's reproducible or not, I'm

18   not able to assess -- "to serve, select, prioritize,

19   appraise, and synthesize available evidence."

20             But a systematic review is itself a review

21   of the evidence.  And what we've learned is

22   systematic reviews and meta-analyses sometimes

23   contradict each other, which is why it is actually

24   not incoherent to -- for some people who call for

25   guidelines for guidelines.  None of these documents

1     is dispositive, is what -- is -- is what I'm trying

2     to say.

3          Q    Fair enough.

4          **MR. PERKO:**  Sandi, can mark that as the

5     next exhibit, please?

6          **THE STENOGRAPHER:**  That'll be number 3.

7          **MR. PERKO:**  Okay.  Did we get the paper

8     that I referenced?  Did we get that marked?

9          **THE STENOGRAPHER:**  No, you didn't, the

10    last one.  So that -- you want to mark that one

11    as 4 and this one as 5?

12         **MR. PERKO:**  Yes, please.

13         **THE STENOGRAPHER:**  Okay.  Will do.

14         **MR. PERKO:**  Thank you.

15         (Exhibit 4 was marked for identification.)

16         (Exhibit 5 was marked for identification.)

17    BY MR. PERKO:

18         Q    Doctor, paragraph 17 of your expert

19    declaration you say that "The GAPMS report

20    mysteriously departs from the GRADE framework by

21    excluding available evidence as of low quality.

22    This appears to be a calumny more than a reason to

23    critique."

24              What are you suggesting when you say "this

25    appears to be a calumny"?

1        A       In this and many other cases, especially

2   those of high public interest and controversy, there

3   is a great deal of -- of -- of effort to try and

4   ensure that -- that the -- that a conclusion

5   comports with a position independent of other

6   considerations.  We -- I suppose it's part of the

7   human condition, Counselor, but what's happening, on

8   would -- would make the observation that here and

9   elsewhere, there are -- there are -- there are --

10  how shall we say it? -- conflicting advocates on

11  different positions, and that sometimes what

12  conclusions are drawn are drawn in part from the

13  evidence or the available evidence as selected that

14  supports a particular position.

15            As I say, this is not a criticism of any

16  particular group.  I think this is very common,

17  unfortunately, in the sciences.  We see it in many

18  sciences.  In fact, we see it -- we see it here, we

19  see it -- sometimes see it in climate change.  We

20  sometimes see it in gun violence.  We sometimes see

21  it in other areas of great public controversy and

22  interest that -- that -- that -- that reasoned

23  critique is hard to come by, and that's why it

24  appears to be an insult more than that; that we

25  are -- that there is partisans trying to move

1    forward a position and that sometimes leaves science

2    as -- as less -- as less -- on the side of a

3    contentious debate.  That's all.

4         Q    Would you agree with me that there are

5    partisans on both sides of the issue in this case?

6              **MR. STARR:**  Objection.

7         A    I think there are many sides to these

8    issues and that there are partisans at all in this

9    case is unusual in medicine.

10             Well, you sometimes will see quote/unquote

11   partisans in cardiology or of hepatology.

12             What seems to be occurring here is

13   somewhat different in kind.  In cardiology,

14   different scientists might have different approaches

15   or theories or beliefs based on their work about

16   what works and what doesn't work.

17             In this case, we have the evolving

18   practice, which unusually has led to efforts to

19   regulate it, which you do not see elsewhere in

20   medicine.

21             (Exhibit 6 was marked for identification.)

22   BY MR. PERKO:

23        Q    And here, Doctor, can you see a document

24   entitled, "Can We Trust Strong Recommendations Based

25   on Low Quality"?

1      A    Yes.

2      Q    And one of the authors is Gordon H.

3  Guyatt.  Are you familiar with Dr. Guyatt?

4      A    I'm familiar with his work.

5      Q    I'm sorry?

6      A    Yes, I am.

7      Q    Okay.  If you could read the first two

8  paragraphs, I'd like to ask you some questions about

9  them.

10     A    Yes.

11     Q    And then the third paragraph states that

12 "Basing treatment decisions or clinical guidelines

13 on low-quality evidence means that the true effects

14 of treatment or clinical decision might differ

15 considerably from best estimates.  This discrepancy

16 could result in launching campaigns such as those

17 designed to persuade women to use hormone

18 replacement therapy, that are based on unjustified

19 faith in net benefit instead of transparently

20 sharing the uncertainties in the quality of evidence

21 on which the recommendations were based."

22          Do you agree with that statement?

23     A    I might point out that in key places,

24 treatment or clinical decisions might differ

25 considerably from best estimates, that and also they

1   might not.  This represents it could result, which

2   means that it could -- it also might not.  It's

3   framed as -- this is by a scientist who's made great

4   contributions in the world of evidenced-based

5   practice who is trying to -- who appears to be

6   trying in this article -- I do not know more, I

7   don't know anything about the background of this

8   article other than it's a very brief article.

9          And what it's saying is that there's --

10   he's alleging that there's a gap between -- basing

11   guidelines on low-quality evidence produces a

12   tension.  And as a general proposition, one could

13   say, as is rough and ready advice, that would seem

14   to be okay; that we have a history of biomedical

15   science, we -- and this would be editorial and

16   empirical "we" -- I'm not a scientist, but as a

17   citizen who understands a fair bit of it, I'm keen

18   that more and better science will lead to more and

19   better healthcare.

20          And there are, as a matter of fact,

21   especially in the context of rare diseases --

22   osteoporosis is not a rare disease, by the way, for

23   which one might receive hormone replacement

24   therapy -- that is really quite difficult to draw

25   mapping rules between evidence which may be -- which

1   is not nearly as voluminous as in other fields, but

2   for which there's a patient population that is

3   expecting, requiring, hoping ardently for treatment.

4           So it's not so much that one would agree

5   or disagree with this, as you need to frame it in

6   the context of a much larger debate, a debate we've

7   been having for a half a century about what evidence

8   ought we to have and how ought it to guide clinical

9   practice.

10          That is an extraordinary large, and

11  complex problem, which I think is, as obviously in

12  the page and a half here, not being comprehensively

13  reviewed; not that it was the intent to do so, mind

14  you.  But this is basically making a garden-variety

15  observation that the better the evidence, the better

16  the recommendations, which I think is

17  uncontroversial.

18          **MR. PERKO:**  Sandi, were you able to get

19      that down?  It broke up for me at parts.

20          **THE STENOGRAPHER:**  Yes.

21          **MR. PERKO:**  Doctor, if I could get you to

22      get closer to the microphone.  You're breaking

23      up on me.

24  BY MR. PERKO

25      Q    Well, let's talk about the sentence that

1    says "This discrepancy."  And I believe they're

2    talking about basing clinical guidelines on

3    low-quality evidence, right, when they refer to

4    "this discrepancy"?

5         A    Yes.

6         Q    And it says that "This discrepancy could

7    result in launching campaigns such as those designed

8    to persuade women to use hormone replacement therapy

9    that are based on an unjustified faith in net

10   benefit instead of transparently sharing the

11   uncertainties in the quality of evidence on which

12   the recommendations were based."

13        Do you disagree with that statement?

14        A    This discrepancy could also not result in

15   launching campaigns.  This discrepancy could result

16   in launching campaigns that actually are

17   transparently sharing uncertainties.

18        This is -- this is -- this is an -- this

19   is well-argued advocacy, but I think that I would

20   want to parse it with far finer granularity than we

21   likely are going to be able to today.

22        The history, for example, of hormone

23   replacement therapy and other -- or for that matter,

24   it doesn't matter, there are many examples of people

25   advocating for patients based on the best available

1  evidence.  Whether or not, as it is implied here,

2  they're being intellectually dishonest, which I'd be

3  disappointed if that's what Professor Guyatt is

4  doing -- is an entirely different question, when --

5  when you -- if you care about the health of patient

6  populations, it is possible to be too -- too -- too

7  quick to judge or too slow to judge.  We just don't

8  know until we've done it for a while.

9          And as I say, in the case where there are

10  patients in front of you who have a malady that's

11  been identified and they are demanding treatment for

12  it, then the advocacy is not for any particular form

13  of treatment necessarily, but simply that there

14  needs to be some treatment in the best available,

15  however imperfect it might be, is an opportunity for

16  physicians and nurses to discharge their duty to

17  their patients and provide it.

18          That we -- that any individual criticism

19  of individual studies or practice guidelines are

20  important for future fine-tuning of them and

21  improvement of them.  So I would need more research

22  for all of this.  But I -- but this is not a

23  dispositive criticism of, for example, the Endocrine

24  Society's guidelines, which I'm sure are open to

25  criticism by people more competent to criticize them

1    than I am.

2            But in the absence of anything else with a

3    patient population that one could argue deserves

4    treatment, it puts clinicians in a tight spot if

5    there are no guidelines.  If the guidelines are

6    imperfect, it's not a justification for them not

7    treating their patient.

8        Q    Do you see a document on the screen

9    entitled "BMJ Investigation:  Gender dysphoria in

10   young people is rising, slash, and so is

11   professional disagreement."

12           Do you see that?

13       A    Yes.

14       Q    I'm going to go down to the second page of

15   this document at the very end, actually the third

16   page -- yeah, second page.

17           At the very end it states that Guyatt --

18   and I believe they're talking about Dr. Gordon

19   Guyatt -- Guyatt, who co-developed the GRADE, found,

20   "serious problems with the Endocrine Society

21   guidelines, noting that the systematic reviews

22   didn't look at the effect of intervention on gender

23   dysphoria itself, arguably the most important

24   outcome.  He also noted that the Endocrine Society

25   had at times paired strong recommendations --

1    phrased as 'we recommend' -- 'we recommend' with

2    weak evidence."

3           If you -- if Dr. Guyatt actually made

4    those observations, would that give you pause for

5    concern for relying on the Endocrine Society

6    guidelines?

7      A    On themselves -- on itself, I told you,

8    I'm not in a position to rely on any kind of

9    practice guidelines, given what I do.  But I have

10   been studying for many years the way in which the

11   literature around this has evolved, and how

12   controversies ebb and flow and go back and forth.

13          Such criticism I think is important as we

14   get clearer about how best to take care of patients.

15          That a particular scholar has found fault

16   with a particular document is good and it's

17   something that we all need to scrutinize, but I

18   don't know what the counterarguments by an expert

19   who disagrees with them consist in, for example.

20   And I -- and I can tell you this is also parallel to

21   that -- disputes in areas that are not quite as

22   contentious, where there's not a social or an

23   advocacy component as much as there is a scientific

24   one.  And people -- scientists are famous for

25   disagreeing.

The previous document used the word "reproducible." Reproducibility is one of the greatest challenges we face now in biomedical research. When one team does a study, the other team can't reproduce it for one reason or another. And yet at the end of the day, in all of these cases, there are doctors and nurses saying we've got patients in our waiting room and we need to take care of them.

And I'm not in a position, any individual clinician could say, to become a philosopher of evidence. I need my society to give me guidelines.

Are they going to be perfect? Of course not.

But are they going to be the best available evidence, given that my patients -- that there is treatment available and my patients are -- are asking for it, then I'm going to have to play with the cards that I've been dealt.

Dr. Guyatt is a well-established scientist and I take his criticisms to be important data, if you will, in the assessment of all of these guidelines. But no particular quote in what basically The BMJ publishes -- this is journalism, you'll notice, and The BMJ is not a scientific

1    article.  And I don't know what someone might say to

2    disagree with him.

3        Due diligence on all our parts would

4    require that we seek that out.

5        Q    Well, you disagree -- assuming Dr. Guyatt

6    said that, do you disagree with him, with regard to

7    the Endocrine Society guidelines?

8        A    With regard to what -- you said several

9    things here.

10       Q    I'm sorry, assuming that Dr. Guyatt had

11   these criticisms of the Endocrine Society

12   guidelines, do you disagree with him?

13       A    For example, bottom of page 2, found,

14   quote, serious problems, quote.

15       Do I agree that there are serious

16   problems?  I don't think that I am competent to

17   assess that as much as somebody who is Dr. Guyatt's

18   counterpart.

19       Is it true that, that gender dysphoria

20   itself, arguably the most important outcome?  Well,

21   it is arguable, right?  And so I -- I -- I find

22   myself saying:  I would really like to learn a whole

23   lot more about all of this before I would agree.

24       "Pairing strong recommendations -- phrased

25   as 'we recommend' -- with weak evidence."

1          Well, that's what -- we've been discussing

2     that for a while.  Sometimes when -- when you have a

3     patient population that has a malady that is

4     identified, where a professional society has

5     provided guidelines, however flawed they might be,

6     then the option is not, well, we're going to not

7     treat our patients and wait for the wheels to turn

8     to produce more and better biomedical evidence.

9          Dr. Guyatt's reasoned criticism is not

10    something that I'm prepared to agree with or

11    disagree with.  I don't -- I would have to spend a

12    lot more time reviewing the literature and the

13    foundational literature and all of that.  And even

14    then, it's possible that I'd be incompetent to agree

15    or disagree with him.

16         The point is that agreeing with him or

17    disagreeing with him is not something that I think

18    any individual clinician needs to be prepared to do

19    either.

20    Q    Going back to your expert declaration,

21    Dr. Goodman, on page 9, you state, carrying over to

22    page 10, "Similarly in Florida, minors frequently

23    receive cosmetic procedures, including breast

24    augmentation, ear surgery, liposuction, and

25    rhinoplasty with less than optimal evidence."

1          What's your basis for saying that minors

2     frequently receive those treatments?

3          A     That in my experience, and you may recall

4     the article about plastic surgery, I have spent some

5     time looking at cosmetic surgery in minors to be

6     able to communicate with residents and others in my

7     department.  And it is according to my learned

8     colleagues on whom I rely that, in fact, minors

9     receive cosmetic surgery with some frequency,

10    especially in Florida.

11         Q     And these procedures are intended to treat

12    no malady or they cure no disease; is that correct?

13         A     Generally speaking, yes.  It does raise

14    the difficult question between trait and malady,

15    which is a very large and important and difficult

16    question in medical histomology that need not delay

17    us.  But if someone -- but somebody who's seeking,

18    for example, breast augmentation, I think would not

19    be regarded as having a malady or a disease,

20    especially as a minor; it is a trait.

21              **MR. PERKO:**  I apologize.  I'm having

22         technical difficulties here.

23              **THE WITNESS:**  No worries.

24    BY MR. PERKO:

25         Q     Do you see your expert report on the

1    screen?

2         A    I see my report, yes.

3         Q    Beginning on page 11, you talk about "The

4    board's informed consent requirements depart from

5    well-established principles of medical ethics."

6              What experience do you have with

7    developing informed consent requirements?

8         A    Over the years I have participated, for

9    example, in the context of human subjects research

10   on institutional review boards.  And so I have been

11   in a position of reviewing and approving consent

12   documents.  Otherwise, I -- that's my best

13   experience.

14        Q    When you say "consent documents," what are

15   you referring to?

16        A    It is very often important that not only

17   do our colleagues in medicine and nursing need to

18   obtain consent, they need to document that they have

19   obtained consent.  And that has led to the

20   preparation of documents.  And there are many -- for

21   example, every study that's being conducted will

22   have a distinctive consent document based on the

23   goals and the risks of the study.

24              And so I've contributed to that process.

25        Q    I guess I'm a little bit confused about

1   your answer.  You say that there are consent

2   documents for studies?

3       A    My experience, which you asked about, with

4   consent documents consists in serving on an

5   institutional review board, which duties include,

6   among other things, reviewing the adequacy of the

7   consent documents.

8       Q    Okay.  So you're -- if you can get closer

9   to the microphone, Doctor.  I apologize.

10          So I understand it, you're talking about

11  consent documents for patients who intend to

12  participate in a study?

13      A    Who are -- who are -- whether they intend

14  to or not, who are -- these documents will be

15  available, will be made available to people who are

16  recruiting subjects in the study to participate in

17  the study, or the research project, if you prefer.

18      Q    Are you familiar with instances where,

19  let's say, the UHealth, University of Miami Hospital

20  or Jackson Memorial Health System use informed

21  consent documents for specific -- for patients

22  undergoing specific procedures?

23      A    Well, any hospital, depending on the

24  proced- -- so we're moving from research to clinical

25  practice; is that your intent?

1      Q     Yes, sir.

2      A     So it's not unique to my institutions,

3   from which I like to -- my -- my -- my service here

4   is -- my identification with those institutions is

5   for identification only, and nothing I say should be

6   taken to bear on any process or practice at my

7   institutions, which doesn't matter for our purposes

8   because it's pretty standard across all hospitals;

9   namely, that there's usually a standard consent

10  form.

11          And then certain other procedures will

12  sometimes have additional consent documents, which

13  will describe sometimes in more detail as

14  appropriate the risks that arise, given the

15  procedures.

16          So, for example, the general consent form

17  might be adequate for hospital admission, but if

18  you're going to be getting a liver transplant,

19  there's going to be a separate set of documents that

20  will describe the liver transplant.

21     Q     Have you been involved in developing those

22  types of consent documents?

23     A     Episodically.  I mean, not so much to

24  develop them as to review them, I think would be

25  more appropriate.

1        Q    What do you mean by "review them"?

2        A    Well, so, for example, all forms in all

3   hospitals are -- you don't simply write it and start

4   giving it to patients.  There's a process by which

5   forms are vetted.  And sometimes I find myself being

6   asked:  What's your opinion about this form or this

7   document?  And then I will share my opinion about

8   it.

9        Q    At the end of paragraph 21 of your report,

10  or your expert declaration, you state, "Permitting

11  these boards to bar healthcare providers from

12  following clinical practice guidelines or standard

13  of care that are based on less than high-quality

14  evidence would subject many pediatric patients to

15  serious harm."

16            Now, to be clear, you're not a physician,

17  correct?

18       A    No.  I mean, correct.  It is correct, I'm

19  not a physician.

20       Q    What's your basis for saying that the

21  Florida boards' "bar of healthcare providers from

22  following clinical practice guidelines or standards

23  of care that are based on" high-quality -- "less

24  than high-quality evidence"?

25            Is it your understanding that the Florida

1    boards have barred treatments based on less than

2    high-quality evidence?

3              That's inartfully stated.  Let's strike

4    that.

5              What's your basis for saying that barring

6    such treatments would subject many pediatric

7    patients to serious harm?

8         A    The point is made in a plenary way about

9    the nature of pediatric evidence, which in many

10   cases would not enjoy a high -- a high mark under

11   the GRADE standards.  That's because the patient

12   populations are few, the studies are hard to design,

13   the statistical significance is not as good as they

14   would want it, as, for example, is the case in

15   oncology or in neurology, or any other areas of

16   pediatric practice.

17             The pediatricians have traditionally

18   enjoyed both great responsibility and great

19   privilege in being able to use their clinical

20   judgment to take care of their patients even though

21   they do not have perfect or dispositive evidence.

22             And so -- and because of their excellence

23   and their knowledge of medicine, and responses to

24   medicine and interventions, they have done a good

25   job in taking care of children and preventing them

1   from harm.

2          The overarching remark is if the Board of

3   Medicine were to basically say:  In ophthalmology or

4   in neurology or in cardiology or oncology, we are

5   going to take the same stance with those that we

6   have taken with managing gender dysphoria, then a

7   lot of children would come to grief.

8      Q    So are you saying that what the boards of

9   medicine have done here would subject many pediatric

10  patients to serious harm?

11     A    I'm -- well, that's not clear yet.  All

12  I'm saying is in a broader sense, any -- any -- any

13  legislatively imposed restriction of a physician's

14  ability to use her clinical judgment to take care of

15  her patients would, if broadly applied, undermine a

16  great deal of pediatric practice; because the nature

17  of the population, the nature of the research, the

18  nature of the small number of subjects that you get

19  in the studies are rarely going to lead to the kind

20  of high-quality evidence that we would prefer.

21         But to say that because you don't have

22  high-quality evidence, therefore you should not

23  treat your cancer patient would, I think, strike

24  most people as wholly inappropriate.

25     Q    What other -- what pediatric clinical

1    guidelines have you reviewed in connection with this

2    report?

3         A    In one way or another I have looked at a

4    number of them.  I'm quite interested, for example,

5    in otitis media, very, very common pediatric malady,

6    and if -- the American Academy of Pediatrics, they

7    list two kinds of recommendations.

8              This is basically -- sorry, that's a fancy

9    word for ear infection.  And when you have an ear

10   infection, there are a number of things you can do.

11             One is you can do nothing.  Another is you

12   can treat it with an antibiotic.  And another, if

13   you can -- if you're familiar with the tubes they

14   sometimes put in kids' ears, that's actually a

15   source of great -- it's a really quite common

16   pediatric malady, for which there is a lot more

17   evidence, still does not have a standard treatment

18   that you would impose on every patient.

19             And the American Academy of Pediatrics

20   has -- the recommend- -- if I recall correctly,

21   Counselor, I was -- but we could perhaps get that in

22   front of us.  If I'm not mistaken, they make both

23   what they call a "strong recommendation" and a

24   "recommendation."

25             I don't know the quality of the evidence;

1    I haven't reviewed it.  I don't know how -- what I'm

2    saying is there are a lot of practice guidelines in

3    pediatrics and, so one is ear infections, obesity,

4    forms of injury, I can't remember all of them.

5    There are a fair number of them.

6        Q    But you haven't evaluated the evidence in

7    association with those clinical guidelines?

8        A    Evaluate the evidence in association

9    with --

10       Q    Those clinical guidelines that you were

11   talking about?

12       A    No, I have not evaluated the evidence.

13   You asked me if I was familiar with the guidelines.

14   And I am familiar with the guidelines and the -- and

15   the -- and the number -- and that there are many of

16   them, and they are varied.

17           **MR. PERKO:**  I'm sorry, Doctor, could you

18       get closer to the microphone?

19           (Discussion off record.)

20   BY MR. PERKO:

21       A    So in the context of this report, I have

22   not reviewed the evidence basis for other pediatric

23   guidelines.

24       Q    And beginning on page 11 you talk about

25   the boards' informed consent requirements and their

1  forms.  The bottom of -- the last sentence in

2  paragraph 26, you state, "There are critical reasons

3  why the informed consent requirements run afoul of

4  these standards."

5         And in 27 you say, "First, valid consent

6  is context-specific."

7         Are the consent forms that you're familiar

8  with, that patients sign before they can undergo

9  certain treatments, are they individualized?

10  A    The documentation of consent, recall there

11  are two components to this.  One of them is ethical;

12  the other is medical legal.

13         In a physician or nurse's communication

14  with her patient, it will be enough for me to answer

15  questions, and one might or might not document that

16  somebody asked a question and it was answered.

17         But consent process, properly speaking, is

18  an ongoing -- well -- process.

19         The document is a way of making clear for

20  a number of reasons, some of which are medical

21  legal, that that process or at least a component of

22  that process has occurred.  And so you thereby have

23  a signature on a consent form which documents that,

24  in fact, some element of that process has been

25  successfully completed.

1          And so rarely do you have hyper-granular

2    consent forms because you have to change every one

3    for every patient.  And so, therefore, there's some

4    reliance on communication between team members and

5    patients to be sure that patients or their legally

6    authorized representatives have had adequate time to

7    ask questions and have them answered to their

8    satisfaction.

9          There's no way a document can do that.

10   Q    Are there standard consent forms for

11   various treatments?

12   A    There are in many cases standard consent

13   forms where the risks are well-known and agreed to

14   and -- standards is not the right word because

15   obviously every institution is going to be

16   responsible for its own consent process and its

17   documentation.  But there's a lot of overlap among

18   institutions who tend to rely on each other to try

19   to frame this in a way which is shaped at least --

20   is shaped at least as much by a desire to get it

21   right and ensure a good consent process as to be --

22   as well as to be mindful of the fact that that

23   documentation serves important medical legal goals.

24          So the context-specific component of the

25   consent process is crucial.  Whether that's in a

1    form or not may be immaterial.  When it's in a form,

2    and it's very fine-grained, then it might be there's

3    something in the form that applies for one patient

4    but not another.  And so framing that carefully will

5    be a great challenge.

6           Q    In paragraph 28 you state, "To be sure,

7    many specialized procedures and surgeries do employ

8    procedure-specific consent forms, but these are

9    crafted by experts in the procedure or surgery who

10   are not trying to discourage their patients."

11          When you -- you're talking about

12   "procedure-specific consent forms," are you talking

13   about consent forms that are given -- the same

14   consent forms are given to patients undergoing the

15   specialized procedures and surgeries?

16          A    I'm sorry, make sure I understand.  Could

17   you reframe that, please?

18          Q    Sure.

19          When you talk about these

20   procedure-specific consent forms in paragraph 28,

21   I'm trying to understand whether those consent forms

22   differ for each patient or are they the same for

23   each patient?

24          A    The forms are generally, to the best of my

25   understanding, the same for each patient.  But

1    that's why it's very important that the other

2    components of the consent process be completed,

3    namely that there be questions that can be answered.

4        Q    Where you state there, "but these are

5    crafted by experts in the procedure or surgery who

6    are not trying to discourage their patients," do you

7    know who develops the consent forms for the Boards

8    of Medicine?

9        A    The Board of Medicine and people who it

10   turns to to develop the consent forms.  I don't know

11   who -- the authors are not --no, I -- just what I

12   read in the lay media, they're the forms that were

13   developed.

14            What you were asking about originally was

15   so, for example, if someone's going to get a kidney

16   transplant, then the forms are going to be crafted

17   in part by people who are familiar with

18   transplanting kidneys.  And therefore they have

19   great experience doing this, or more or less

20   experience, depending on how early we are in the

21   days of kidney transplantation.

22            I don't know the case here, but I

23   hypothesize that the Board of Medicine forms were

24   not written by people who provide gender-affirming

25   therapy, rather those that oppose the very idea of

1    it.

2         Q     So in order to develop an appropriate

3    consent form, you say that the author must be

4    someone who provides gender-affirming care?

5         A     No, I wouldn't say that, Counselor.

6    What -- the knowledge of a procedure, not --

7    basically how to frame risks, benefits, and

8    alternatives, I think would -- the proper

9    development of a consent form is really quite a

10   diverse process, and a number of people with

11   different kinds of expertise should be involved.

12        But I think it would be uncontroversial to

13   observe that if you're going to have a consent form

14   for a kidney transplant, that somebody who does

15   kidney transplants is involved in that process

16   somewhere along the line.

17        Q     But you don't provide any consultations to

18   patients with gender dysphoria; is that correct?

19        A     Correct.

20        Q     You say here, "these are crafted by

21   experts in the procedure or surgery who are not

22   trying to discourage their patients."

23        Are you suggesting here that the forms at

24   issue in this case are intended to discourage

25   patients?

1    A    They struck me very much to be trying to

2    do so.  To somebody who is familiar with different

3    kinds of consent forms, I know -- and I'd love to be

4    corrected on this, but I know of no antecedent or

5    precedent of regulatory consent forms in this

6    granularity for something -- for any other malady or

7    treatment.

8         And so I've inferred that the intent of

9    the forms is to dissuade people from receiving

10   therapy.  There may be another explanation.  I'd

11   be -- I'd like to know what it is.

12   Q    I'm sorry, you broke up at the end there,

13   Doctor.  Could you repeat that?

14   A    If there's another explanation, I would

15   be -- devoutly love to hear it.  If you read the

16   forms, it is clear that these are forms that are

17   negative, that frame the procedures as -- in ways

18   that are not agreed to by the people who provide

19   this treatment.

20   Q    Are you familiar with the consent forms

21   required for medical marijuana in Florida?

22   A    I'm not.

23   Q    Have you done -- when you say that there

24   are no other consent forms like these, what research

25   have you done to see what consent forms are used in

1   the medical field?

2        A    Actually, I -- I believe -- at least I

3   hope I said to the best of my knowledge.  And having

4   spent more than 30 years working in academic medical

5   centers, I and my colleagues tend not to see consent

6   forms issued by regulatory agencies that are this

7   numerous, this detailed, and framed in this way.

8             I have not conducted any research at all

9   on the topic.  These leap out as unusual.

10       Q    You talked about "legislative interference

11  with the consent process."

12            Are you suggesting that the legislature

13  has no role in regulating the informed consent

14  process at all?

15       A    In fact, statute requires that patients

16  provide valid consent for treatment.  So no, one

17  couldn't suggest that there's no legislative role.

18  But it is not -- but the role is that -- follow --

19  you need to follow your professional standards in

20  obtaining consent.  This is the case for -- well,

21  for most things that happen in the hospital.

22            So the legislature clearly has a role in

23  requiring consent, but rarely does the legislature

24  say what the consent process should contain for

25  heart transplants or neurosurgery or hip

1   replacement, for instance.  That -- it would be

2   highly unusual for the legislature or any regulatory

3   agency to specify with this granularity what the

4   consent process ought to consist of.

5       Q    Are you suggesting that the legislature

6   prescribe what the consent forms should say in terms

7   of granularity?

8       A    No, on the contrary, I was suggesting that

9   it shouldn't.

10      Q    I'm asking in this case, are you saying

11  that the legislature prescribed too much granularity

12  in developing the consent forms?

13      A    That it prescribes any granularity at all

14  is -- is -- is putting physicians and nurses in a

15  real tight spot, because they need to be able to

16  manage, to titrate their communication to their

17  patients based on their individual patients.  And

18  risks and benefits and alternatives are going to be

19  quite diverse.  And that applies to any particular

20  drug.

21           If you take ear infections, for example,

22  you can agree, okay, there are three things to do.

23  Antibiotics are recommended; now the further

24  question is which antibiotic.  There are many

25  antibiotics available, but -- I'm possibly mistaken

1    here, but the idea that the Florida -- or any

2    legislature, Board of Medicine would say we want --

3    that the consent form for treating otitis media

4    needs to include the variable risks of every

5    antibiotic you might choose to use would be -- would

6    be really quite peculiar.

7           There -- there'd be -- the idea that of

8    all the drugs that are prescribed, that there needs

9    to be a legislative or regulatory description of

10   that drug and its risks in this population would --

11   would -- medicine would grind to a halt by noon.

12      Q    I'm sorry, what was that last statement?

13      A    Medicine -- the practice of medicine would

14   grind to a halt; that there are thousands of drugs,

15   thousands of interventions, and heretofore

16   legislators and regulatory boards have not seen it

17   necessary to compel physicians to in stat- -- in

18   language they must use to describe drug risks, for

19   example, in a certain way.  I -- there may be some

20   precedent.  I don't know of it.

21      Q    Okay.  What if a procedure or treatment is

22   experimental?  Would that necessitate some degree of

23   granularity in the consent forms?

24      A    The word "experimental" is -- is relative

25   in our context.  So if you're referring to an

1  experiment in which someone is studying the

2  comparative utility of two drugs, or of one drug

3  against a placebo, then in that experiment, yes, you

4  would -- you would -- that would be the consent form

5  for the patients to sign.

6        And some of these are very high-risk

7  studies, you understand.  But I know of no case in

8  which the government has required language for those

9  forms.  That's based on learned scholars and

10 colleagues who basically are trying to do due

11 diligence to make sure their patients understand

12 risks, benefits, and alternatives.

13       If you were studying, for example a --

14 well, take a drug, an antibiotic that was being

15 studied, you're comparing -- there's no antibiotic

16 being compared to a previous one.  It would be

17 highly unusual for the Florida legislature or Boards

18 of Medicine to say:  Here in your experiment are the

19 ways in which you must describe the risks of these

20 two drugs.

21    Q    Switching gears a little bit, Doctor.

22 When did you become involved in this lawsuit?

23    A    When I was approached by plaintiffs'

24 counsel.

25    Q    Do you know when that was?

1       A    I beg your pardon?

2           I -- in the last year.  I'd have to check

3    my calendar.  A year ago.

4       Q    Okay.  A year ago?

5           You submitted your -- I'm sorry.

6       A    Go ahead.  I don't recall exactly.  I'd

7    have to look.

8       Q    Okay.  You submitted your expert

9    declaration in May of 2023.  How much time did you

10   spend in preparing that expert declaration?

11      A    Several -- several hours.  You know, when

12   you're not billing, you don't keep track of it.

13   I -- oh, you asked me the number of hours, number of

14   days I worked on it.  I worked on it for more than a

15   week, at least.

16      Q    So 40 --

17      A    I did not keep track of the amount of time

18   I spent on individual documents, I'm afraid.

19          **MR. PERKO:**  So if we could just take a

20       five-minute break, I'm close to being finished

21       here.  I just want to read my notes.

22          (A recess took place from 10:31 a.m. to

23       10:37 a.m.)

24   BY MR. PERKO:

25      Q    Just a few more questions, Dr. Goodman.

1          In paragraph 8, at the bottom of

2    paragraph 8 of your expert declaration, you talked

3    about your consultations that you make with

4    clinicians concerning patient care in cases that

5    present unique or challenging ethical issues.

6          I may have asked you this previously, but

7    those consultations that you're referring to there,

8    have you done any that have involved gender

9    dysphoria?

10        A    No.

11        Q    You talk a little in your expert report

12   about the GAPMS report.  In page 9 you state that

13   "The GAPMS report would similarly enjoin the use of

14   most, if not all off-label medical prescriptions."

15        What do you mean by that statement?

16        A    That off-label use of medications is very

17   common and has evolved as part of the standard of

18   care for many maladies.  And -- and -- if you were

19   to require certain levels of evidence for use of a

20   medication in a particular case, then you would say

21   well, we're not allowed to use it for this because

22   there's inadequate published evidence of this sort

23   that you get from a randomized trial or a

24   meta-analysis or a systematic review or a

25   case-control study or an observational study because

1   they -- because it's been used off label.  In other

2   words, it's being used without FDA approval.

3          And yet, such approval is customary and

4   permissible.  We all wish we had more of that, but

5   you would not want to constrain a physician and say

6   you may not use this drug off label because it

7   doesn't enjoy that high-quality evidence.

8      Q    Would you agree that the appropriateness

9   of using off-label medication prescriptions is an

10  individualized consideration that should take into

11  account the risks and benefits of the off-label use?

12     A    All medications, all prescriptions,

13  whether off label or not, ought to take that into

14  account, yes.

15     Q    Dr. Goodman, do you intend to provide any

16  testimony or opinions beyond what you stated in your

17  expert report, Exhibit Number 1?

18     A    I don't know that I have any intentions as

19  regards to my future contributions.  If I'm asked to

20  provide an opinion, I will be honored to do so.

21         Do I understand your question correctly?

22     Q    Yes, sir.  I was just wondering at this

23  time -- or do you know if there are any opinions

24  that you would provide beyond what's stated in your

25  expert report?

1     A     If I am asked and it's appropriate in the

2   context, then I will.  I don't -- I understand there

3   may be additional components to this process where I

4   might be asked to contribute and I will be -- I will

5   be privileged to do so.

6     Q     What additional -- sorry.  What phrase did

7   you use there:  There may be some additional --

8     A     Components to the process that we're --

9   taking place that we are engaged in now, that there

10   may be other hearings or trial settings that

11   might -- that might entail an opportunity for me to

12   contribute again.

13     Q     Outside of this case?

14     A     In this or any case.  If I were asked

15   again in a future context to share and to answer

16   more questions, I would be -- I would be willing to

17   do so.

18           I'm not sure I understand really.  I don't

19   intend to, but I am prepared to.

20     Q     Okay.  At this time you don't intend to?

21     A     I don't have any intentions beyond our --

22   our -- our session here this morning.  I believe

23   that there may be a need in the future for

24   additional components to this process, and if that's

25   realized, then I will participate if I am asked.

1    Q    I'm still just trying to understand what
2  you mean by "additional components of this process."
3  Are you talking about this lawsuit or something
4  outside of this lawsuit?
5    A    No, this -- this -- no, this lawsuit.  I'm
6  talking about this lawsuit.  If this lawsuit were to
7  go to trial and I were asked to testify at the
8  trial, then I would testify at the trial.
9         **MR. PERKO:**  Okay.  I have nothing further,
10      Counsel.
11        **MR. STARR:**  Nothing from my end.
12        **MR. PERKO:**  Okay.  Are you going to read,
13      Jason?
14        **MR. STARR:**  Yeah.  Read and sign.
15        **THE STENOGRAPHER:**  Okay.
16        **MR. PERKO:**  And, Sandi, we'd like a
17      copy -- a copy of the transcript.
18        **THE STENOGRAPHER:**  Okay.  And you need a
19      copy, Mr. Starr?
20        **MR. STARR:**  Yes.
21        **THE STENOGRAPHER:**  Okay.  Very good.
22        (Proceedings concluded at 10:43 a.m.)
23
24
25

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA              )

4    COUNTY OF LEON                )

5            I, the undersigned authority, certify that

6    KENNETH W. GOODMAN, Ph.D., FACMI, FACE remotely

7    appeared before me on September 15, 2023, and was

8    duly sworn.

9

10

11           SIGNED AND SEALED on September 19, 2023.

12   IDENTIFICATION: Driver's license.

13

14

15

16               SANDRA L. NARGIZ
                 RPR, RMR, CRR, CRC, CCR-GA
17               snargiz@comcast.net
                 Commission #HH239213
18               EXPIRES: APRIL 18TH, 2026

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2     STATE OF FLORIDA      )

3     COUNTY OF LEON        )

4                I, SANDRA L. NARGIZ, Registered

5     Professional Reporter, certify that I was authorized

6     to and did stenographically report the remote

7     deposition of KENNETH W. GOODMAN, Ph.D., FACMI,

8     FACE; that a review of the transcript was requested,

9     and that the foregoing transcript, pages 1 through

10    83, is a true record of my stenographic notes.

11               I further certify that I am not a

12    relative, employee, attorney or counsel of any of

13    the parties, nor am I a relative or employee of any

14    of the parties' attorney or counsel connected with

15    the action, nor am I financially interested in the

16    action.

17               DATED on September 19, 2023.

18

19

20

21               SANDRA L. NARGIZ
                 RPR, RMR, CRR, CRC, CCR-GA
22               Notary Public in Florida
                 snargiz@comcast.net
23

24

25

September 19, 2023

JASON STARR, ESQUIRE
Jason.Starr@hrc.org


RE:  Doe, et al. vs. Joseph A. Lapado, et al.
     Case No.  4:23-cv-00114-RH-MAF
     Deposition of KENNETH W. GOODMAN, PhD, FACMI,
     on September 15, 2023

Dear Counsel:

The transcript of the above proceeding is now
available and requires signature by the witness.
Please have your witness read your copy of the
transcript, noting any corrections/changes on the
Errata sheet. Once completed, please print, sign,
and return to the email address listed below for
distribution to all parties.

If the witness does not read and sign the transcript
within a reasonable amount of time (or 30 days if
Federal), the original transcript may be
filed with the Clerk of the court.  If the witness
wishes to waive his/her signature now, please have
the witness sign in the blank at the bottom of this
letter and return to the email address listed below.

Very truly yours,


Sandra L. Nargiz, RPR, RMR, CRR, CRC, CCR-GA
snargiz@comcast.net
I do hereby waive my signature.


KENNETH W. GOODMAN, PhD, FACMI, FACE

1      ERRATA SHEET

2      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3      In Re:  Doe, et al. vs. Joseph A. Lapado, et al.
              Case No.: 4:23-cv-00114-RH-MAF
4              KENNETH W. GOODMAN, PhD, FACMI, FACE
                      September 15, 2023
5
       PAGE   LINE        CHANGE                REASON
6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     Under penalties of perjury, I declare that I have
       read the foregoing transcript of the above
19     proceeding and I hereby swear that my testimony
       therein was true at the time it was given and is now
20     true and correct, including any corrections and/or
       amendments listed above.
21
       Signature of Witness:_____
22     Dated this    day of _____, 2023.
       email to: snargiz@comcast.net
23

24

25