IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

JANE DOE et al.,

       Plaintiffs,         Civil No. 4:23-cv-00114-RH-MAF

  v.

JOSEPH A. LADAPO et al.,

       Defendants.

**REBUTTAL EXPERT REPORT OF DAN H. KARASIC, M.D.
ON BEHALF OF PLAINTIFFS**

September 5, 2023

Prepared by
Dan H. Karasic, M.D.

PL000939

Doe Pls' Trial Ex. 10

-i-

## TABLE OF CONTENTS

                                                                                    **PAGE**

I. INTRODUCTION ............................................................................................... 1

    A. Qualifications ......................................................................................... 1

    B. Compensation ........................................................................................ 1

    C. Prior Testimony ..................................................................................... 1

    D. Bases for Opinions ................................................................................ 2

II. REBUTTAL EXPERT OPINION ....................................................................... 2

    A. The material cited in Dr. Román's report is unreliable, outdated, and incomplete; his report does not provide an accurate picture of the care provided to transgender adolescents in Sweden or other European countries, which is consistent with the WPATH Standards of Care and the Endocrine Society's Clinical Practice Guidelines for the Treatment of Gender Dysphoria .......................... 2

## I. INTRODUCTION

1. I have been retained by counsel for Plaintiffs in the above-captioned litigation. I submit this report in rebuttal to the expert report submitted on behalf of the Defendants in this case by Dr. Sven Román. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

### A. *Qualifications*

2. I am a Professor Emeritus of Psychiatry at the University of California – San Francisco (UCSF). I have been on faculty at UCSF since 1991. I have also had a telepsychiatry private practice since 2020.

3. My professional background, experiences, publications, and presentations are detailed in my curriculum vitae and in my earlier expert reports submitted in this case and the companion case of *Dekker v. Weida*. I incorporate those materials into this rebuttal report by reference.

### B. *Compensation*

4. I am being compensated for my work on this matter at a rate of $400.00 per hour for preparation of declarations and expert reports. I will be compensated $3,200.00 per day for any deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

### C. *Prior Testimony*

5. Over the past four years, I have given expert testimony at trial or by deposition in the following cases: *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB (W.D. Wash.); *Kadel v. Folwell*, No. 1:19-cv-00272 (M.D.N.C.); *Fain v. Crouch*, 3:20-cv-00740 (S.D.W. Va.); *Brandt v. Rutledge*, No. 4:21-cv-00450 (E.D. Ark.); *K.C. et al. vs Individual Members of the Indiana*

PL000941

*Licensing Board, et al*, and *Dekker, et al. v. Weida, et al.*, No. 4:22-cv-00325-RH-MAF. To the best of my recollection, I have not given expert testimony at a trial or at a deposition in any other case during this period.

### D. *Bases for Opinions*

6. In preparing this report, I have relied on my training and years of research and clinical experience, as set out in my curriculum vitae, my previous declarations and reports in this matter and *Dekker v. Weida*, the materials listed and sources cited in bibliographies attached to those reports, and additional sources cited in this rebuttal report.

7. The materials I have relied upon in preparing this report are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject. I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

8. I may also further supplement these opinions in response to information produced by Defendants in discovery and in response to additional information from Defendants' designated experts.

## II. REBUTTAL EXPERT OPINION

### A. *The material cited in Dr. Román's report is unreliable, outdated, and incomplete; his report does not provide an accurate picture of the care provided to transgender adolescents in Sweden or other European countries, which is consistent with the WPATH Standards of Care and the Endocrine Society's Clinical Practice Guidelines for the Treatment of Gender Dysphoria*

9. Dr. Román's report relies heavily on news articles, television programs, and other media sources. As a general matter, these are not the types of peer-

-2-

PL000942

reviewed research studies and materials upon which an expert in this field would rely to inform opinions on these subjects.

10.   Dr. Roman's report also relies on material that is unavailable in official English translations. For example, Dr. Roman cites to a database maintained by the Swedish National Board of Health and Welfare (Socialstyrelsen), but the link provided is exclusively in Swedish. Similarly, Dr. Roman's report cites to a December 2019 by the Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU),[1] but the full report is available only in Swedish.

11.   The report indicates that Dr. Román's opinions are based, in part, on his "review of the literature both in Sweden and the rest of the world" with a "focus on the Swedish experience and the resulting systematic review of the Swedish National Health Service." (Expert Decl. of Dr. Sven Román, dated Aug. 16, 2023 ("Report"), ¶ 6.)   In fact, however, Dr. Roman's report does not include a comprehensive review of current international or European policies relating to the treatment of gender dysphoria and misstates those policies.

12.   Dr. Roman cites to an April 2021 policy change at Astrid Lindgren's Children's Hospital which is described in a document on a webpage of the Society for Evidence Based Gender Medicine (SEGM). (Report, ¶ 23, footnote 10.)  The SEGM is an advocacy organization that does not appear the be affiliated with the Children's Hospital or the Karolinska University Hospital[2] where the Children's Hospital is housed. Dr. Roman is affiliated with SEGM but has no work experience or affiliation with any of the six Swedish gender clinics. (Report, ¶ 24.)

---

[1] The link to this systematic inventory included in Dr. Roman's report resulted in a 404 error when I attempted to access the page on August 31, 2023. The page does include three suggested links, at least one of which appears to be the review to which Dr. Roman is referring.

[2] Society for Evidence Based Gender Medicine, About Us.  Available at https://segm.org/about_us. Accessed on August 31, 2023.

PL000943

13. The Astrid Lundgren Children's Hospital paused new intakes for adolescents for gender affirming care from April 2021 until December 2022. During that time, it continued to provide ongoing treatment with puberty blockers and hormones for those on whom medications had been initiated. In December 2022, after new national guidelines were published by the Swedish National Board of Health and Welfare, Astrid Lundgren Children's Hospital resumed initiation of care with puberty blockers and hormones for adolescents, and care continues to be available at the other five gender clinics in Sweden.

14. The National Guidelines state that "young people suffering from gender dysphoria need to be promptly assessed and offered appropriate treatment measures…" and "[g]ender affirming treatments need to be offered when these are deemed indicated.[3]" The guidelines further state that individual treatment decisions should be made using criteria that include "the existence of the incongruence since childhood, the stability of gender identity over time, clear distress caused by the onset of puberty, and the absence of factors that complicate the diagnosis."

15. The report also mischaracterizes and incompletely reports policy changes in gender transition care in Finland, the Netherlands, and the United Kingdom.

16. Dr. Roman references June 2020 guidelines issued by the Finnish Ministry of Health but fails to note that they provide for both pubertal suppression and hormonal intervention on a case-by-case basis "after careful consideration and appropriate diagnostic examinations if the medical indications for the treatment are

---

[3] The National Board of Health and Welfare, Care of children and adolescents with gender dysphoria: Summary of National Guidelines (December 2022). Available at https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf. Accessed August 31, 2023.

PL000944

present and there are no contraindications.[4]" This approach is consistent with the WPATH Standards of Care Version 8 and the Endocrine Society guidelines. [5]

17.   Dr. Roman's descriptions of care in the United Kingdom are similarly inaccurate and incomplete. Dr. Roman's report indicates that a petitioner, Keira Bell, "won a Supreme Court case against Tavistock Clinic in London [and] as a result, no children under 16 can receive gender reassignment treatment at that clinic without judicial approval." (Report, ¶ 21.). This is inaccurate.  That preliminary decision was overturned on appeal.  Adolescents remain able to receive gender transition medications in the United Kingdom.

18.   Dr. Roman further asserts that the Tavistock clinic has "subsequently been closed as a result of an interim review by Dr. Hilary Cass." (Report, ¶ 22). In fact, the UK is moving from a single specialist provider model to regional centers in part to expand the number of providers and reduce the significantly long waiting periods and other barriers to accessing care[6].  The Tavistock clinic remains open until the new regional centers are in operation.

19.   In sum, the current guidelines for gender transition care in adolescents in Sweden provide for the treatment of gender dysphoria in adolescents with gender transition medications on a case-by-case basis in accordance with criteria that are consistent with the WPATH Standards of Care and Endocrine Society Clinical Practice Guidelines.

---

[4] Medical treatment methods for dysphoria associated with variations in gender identity in minors: summary of recommendations by COHERE (Council for Choices in Healthcare in Finland). Available at https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474.  Accessed on September 5, 2023.
[5] Notably Dr. Roman's report does not include a citation to the Finnish guidelines themselves, but rather a 2015 article published in an online, open access medical journal which examines the adolescent applicants for legal and medical sex reassignment at two Finnish gender identity services clinics over the period of 2013-2015.
[6] The Cass Review. Independent review of gender identity services for children and young people: Interim report at p. 20. February 2022. Available at https://cass.independent-review.uk/publications/interim-report/. Accessed August 31, 2023.

PL000945

20. I reserve the right to supplement, amend, or modify my opinions upon review of further information, including, but not limited to, testimony, documents, and reports I receive after the date of this report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of September 2023.

_____
Dan H. Karasic, M.D.

PL000946