

**Guaranteeing Florida Families
Access to Ethical Health Care**

EOG_005157

Doe Pls' Trial Ex.

**62**

EOG_005158

Ethical Healthcare

EOG_005159

EOG_005160

**Families Need Access to Medically Ethical Health Care, Especially for Children—And Doctors and Nurses Need Protection to Offer It**

Many national medical associations are more concerned about being "woke" than on fulfilling their oath to "Do No Harm." They support harmful, untested gender transition procedures for children, advocate for abortion up to the moment of birth, and promote assisted suicide being legalized across the country. And we are hearing more and more stories of medical professionals who are afraid to speak against assisted suicide, gender transition for minors, or other unethical medical procedures for fear of losing their jobs or being "cancelled" within the medical community.

More than ever, families need access to ethical, scientifically-sound healthcare. And that means standing with ethical doctors, nurses, and other medical professionals who want to practice medicine consistent with their conscience. Doctors and nurses need protection from retaliation for declining to do harmful procedures or blowing the whistle on unethical behavior.

**Tab 1 – Florida Dept. of Health Guidance on Treatment of Gender Dysphoria for Children and Adolescents**

**Tab 2 – Dr. James Cantor's Rebuttal of the American Academy of Pediatrics**

**Tab 3 – Support from Florida Doctors for Medical Conscience Protections**

**Tab 4 – Medical Organizations in Support of Conscience Protections**

EOG_005161

EOG_005162

1

EOG_005163

EOG_005164



**Mission:**
To protect, promote & improve the health of all people in Florida through integrated state, county & community efforts.

**Vision:** To be the Healthiest State in the Nation

**Ron DeSantis**
Governor

**Joseph A. Ladapo, MD, PhD**
State Surgeon General

### Treatment of Gender Dysphoria for Children and Adolescents
April 20, 2022

The Florida Department of Health wants to clarify evidence recently cited on a fact sheet released by the US Department of Health and Human Services and provide guidance on treating gender dysphoria for children and adolescents.

Systematic reviews on hormonal treatment for young people show a trend of low-quality evidence, small sample sizes, and medium to high risk of bias. A paper published in the International Review of Psychiatry states that 80% of those seeking clinical care will lose their desire to identify with the non-birth sex. One review concludes that "hormonal treatments for transgender adolescents can achieve their intended physical effects, but **evidence regarding their psychosocial and cognitive impact is generally lacking.**"

According to the Merck Manual, "gender dysphoria is characterized by a strong, persistent cross-gender identification associated with anxiety, depression, irritability, and often a wish to live as a gender different from the one associated with the sex assigned at birth."

Due to the lack of conclusive evidence, and the potential for long-term, irreversible effects, the Department's guidelines are as follows:

- Social gender transition should not be a treatment option for children or adolescents.

- Anyone under 18 should not be prescribed puberty blockers or hormone therapy.

- Gender reassignment surgery should not be a treatment option for children or adolescents.

    - Based on the currently available evidence, "encouraging mastectomy, ovariectomy, uterine extirpation, penile disablement, tracheal shave, the prescription of hormones which are out of line with the genetic make-up of the child, or puberty blockers, are all clinical practices which run an **unacceptably high risk of doing harm.**"

- Children and adolescents should be provided social support by peers and family and seek counseling from a licensed provider.

These guidelines do not apply to procedures or treatments for children or adolescents born with a genetically or biochemically verifiable disorder of sex development (DSD). These disorders include, but are not limited to, 46, XX DSD; 46, XY DSD; sex chromosome DSDs; XX or XY sex reversal; and ovotesticular disorder.

The Department's guidelines are consistent with the federal Centers for Medicare and Medicaid Services age requirement for surgical and non-surgical treatment. These guidelines are also in line with the guidance, reviews, and recommendations from Sweden, Finland, the United Kingdom, and France.

Parents are encouraged to reach out to their child's health care provider for more information.



**Florida Department of Health**
**Office of the State Surgeon General**
4052 Bald Cypress Way, Bin A-00 • Tallahassee, FL 32399-1701
PHONE: 850/245-4210 • FAX: 850/922-9453
FloridaHealth.gov

**Accredited Health Department**
Public Health Accreditation Board

EOG_005165

EOG_005166

EOG_005167

EOG_005168

JOURNAL OF SEX & MARITAL THERAPY
2020, VOL. 46, NO. 4, 307–313
https://doi.org/10.1080/0092623X.2019.1698481



Routledge
Taylor & Francis Group

Check for updates

# Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy

James M. Cantor

Toronto Sexuality Centre, Toronto, Canada

**ABSTRACT**

The American Academy of Pediatrics (AAP) recently published a policy statement: *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents.* Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping gender diverse (GD) children, the AAP statement instead rejected that consensus, endorsing *gender affirmation* as the only acceptable approach. Remarkably, not only did the AAP statement fail to include any of the actual outcomes literature on such cases, but it also misrepresented the contents of its citations, which repeatedly said the very opposite of what AAP attributed to them.

The American Academy of Pediatrics (AAP) recently published a policy statement entitled, *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents* (Rafferty, AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness, 2018). These are children who manifest discontent with the sex they were born as and desire to live as the other sex (or as some alternative gender role). The policy was quite a remarkable document: Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping transgender and gender diverse (GD) children, the AAP statement rejected that consensus, endorsing only *gender affirmation.* That is, where the consensus is to delay any transitions after the onset of puberty, AAP instead rejected waiting before transition. With AAP taking such a dramatic departure from other professional associations, I was immediately curious about what evidence led them to that conclusion. As I read the works on which they based their policy, however, I was pretty surprised—rather alarmed, actually: These documents simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead contradicted that policy, repeatedly endorsing *watchful waiting.*

The AAP statement was also remarkable in what it left out—namely, the actual outcomes research on GD children. In total, there have been 11 follow-up studies of GD children, of which AAP cited one (Wallien & Cohen-Kettenis, 2008), doing so without actually mentioning the outcome data it contained. The literature on outcomes was neither reviewed, summarized, nor subjected to meta-analysis to be considered in the aggregate—It was merely disappeared. (The list of all existing studies appears in the appendix.) As they make clear, *every* follow-up study of GD children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition. AAP is, of course, free to establish whatever policy it likes on

CONTACT James Cantor  jamescantorphd@gmail.com  Toronto Sexuality Centre, 2 Carlton Street, suite 1820, Toronto, Ontario M5B 1J3, Canada.
© 2019 Taylor & Francis Group, LLC

EOG_005169

EOG_005170

308   J. M. CANTOR

whatever basis it likes. But any assertion that their policy is based on evidence is demonstrably false, as detailed below.

AAP divided clinical approaches into three types—conversion therapy, watchful waiting, and gender affirmation. It rejected the first two and endorsed *gender affirmation* as the only acceptable alternative. Most readers will likely be familiar already with attempts to use conversion therapy to change sexual orientation. With regard to gender identity, AAP wrote:

> "[C]onversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions.... Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[38,39–42]

The citations were:

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol.* 1994;62(2):221–227.

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957–974.

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health.* 2016;3(2):97–99.

40. Cohen-Kettenis PT, Delemarrevan de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897.

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy.* 2006;3(3):23–39.

42. World Professional Association for Transgender Health. *WPATH De-Psychopathologisation Statement.* Minneapolis, MN: World Professional Association for Transgender Health; 2010.

AAP's claims struck me as odd because *there are no studies of conversion therapy for gender identity.* Studies of conversion therapy have been limited to *sexual orientation,* and, moreover, to the sexual orientation of *adults,* not to gender identity and not of children in any case. The article AAP cited to support their claim (reference number 38) is indeed a classic and well-known review, but it is a review of sexual orientation research *only.* Neither gender identity, nor even children, received a single mention in it. Indeed, the narrower scope of that article should be clear to anyone reading even just its title: "The practice and ethics of *sexual orientation* conversion therapy" [italics added].

AAP continued, saying that conversion approaches for GD children have already been rejected by medical consensus, citing five sources. This claim struck me as just as odd, however—I recalled associations banning conversion therapy for sexual orientation, but not for gender identity, exactly because there is no evidence for generalizing from adult sexual orientation to childhood gender identity. So, I started checking AAP's citations for that, and these sources too pertained only to sexual orientation, not gender identity (specifics below). What AAP's sources *did* repeatedly emphasize was that:

A.  Sexual orientation of adults is unaffected by conversion therapy and any other [known] intervention;

B.  Gender dysphoria in childhood before puberty desists in the majority of cases, becoming (cis-gendered) homosexuality in adulthood, again regardless of any [known] intervention; and

C.  Gender dysphoria in childhood persisting after puberty tends to persist entirely.

That is, in the context of GD children, it simply makes no sense to refer to externally induced "conversion": The majority of children "convert" to cisgender or "desist" from transgender

EOG_005172

*regardless* of any attempt to change them. "Conversion" only makes sense with regard to adult sexual orientation because (unlike childhood gender identity), adult homosexuality never or nearly never spontaneously changes to heterosexuality. Although gender identity and sexual orientation may often be analogous and discussed together with regard to social or political values and to civil rights, they are nonetheless distinct—with distinct origins, needs, and responses to medical and mental health care choices. Although AAP emphasized to the reader that "gender identity is not synonymous with 'sexual orientation'" (Rafferty et al., 2018, p. 3), they went ahead to treat them as such nonetheless.

To return to checking AAP's fidelity to its sources: Reference 29 was a practice guideline from the Committee on Quality Issues of the American Academy of Child and Adolescent Psychiatry (AACAP). Despite AAP applying this source to *gender identity*, AACAP was quite unambiguous regarding their intent to speak to sexual orientation and *only* to sexual orientation: "Principle 6. Clinicians should be aware that there is no evidence that *sexual orientation* can be altered through therapy, and that attempts to do so may be harmful. There is no established evidence that change in a predominant, enduring *homosexual* pattern of development is possible. Although sexual fantasies can, to some degree, be suppressed or repressed by those who are ashamed of or in conflict about them, sexual desire is not a choice. However, behavior, social role, and—to a degree—identity and self-acceptance are. Although operant conditioning modifies sexual fetishes, it does not alter *homosexuality*. Psychiatric efforts to alter *sexual orientation* through 'reparative therapy' *in adults* have found little or no change in *sexual orientation*, while causing significant risk of harm to self-esteem" (AACAP, 2012, p. 967, italics added).

Whereas AAP cites AACAP to support gender affirmation as the only alternative for treating GD children, AACAP's actual view was decidedly neutral, noting the lack of evidence: "Given the lack of empirical evidence from randomized, controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment, and longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood, further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed" (AACAP, 2012, p. 969). Moreover, whereas AAP rejected watchful waiting, what AACAP recommended was: "In general, it is desirable to help adolescents who may be experiencing gender distress and dysphoria to defer sex reassignment until adulthood" (AACAP, 2012, p. 969). So, not only did AAP attribute to AACAP something AACAP never said, but also AAP withheld from readers AACAP's actual view.

Next, in reference 39, Byne (2016) also addressed only sexual orientation, doing so very clearly: "Reparative therapy is a subset of conversion therapies based on the premise that *same-sex attraction* are reparations for childhood trauma. Thus, practitioners of reparative therapy believe that exploring, isolating, and repairing these childhood emotional wounds will often result in reducing *same-sex attractions*" (Byne, 2016, p. 97). Byne does not say this of gender identity, as the AAP statement misrepresents.

In AAP reference 40, Cohen-Kettenis et al. (2008) did finally pertain to gender identity; however, this article never mentions conversion therapy. (!) Rather, in this study, the authors presented that clinic's lowering of their minimum age for cross-sex hormone treatment from age 18 to 16, which they did on the basis of a series of studies showing the high rates of success with this age group. Although it did strike me as odd that AAP picked as support against conversion therapy an article that did not mention conversion therapy, I could imagine AAP cited the article as an example of what the "mainstream of traditional medical practice" consists of (the logic being that conversion therapy falls outside what an 'ideal' clinic like this one provides). However, what this clinic provides is the very *watchful waiting* approach that AAP rejected. The approach

EOG_005173

EOG_005174

310 ⓒ J. M. CANTOR

espoused by Cohen-Kettenis (and the other clinics mentioned in the source—Gent, Boston, Oslo, and now formerly, Toronto) is to make puberty-halting interventions available at age 12 because: "[P]ubertal suppression may give adolescents, together with the attending health professional, more time to explore their gender identity, without the distress of the developing secondary sex characteristics. The precision of the diagnosis may thus be improved" (Cohen-Kettenis et al., 2008, p. 1894).

Reference 41 presented a very interesting history spanning the 1960s–1990s about how feminine boys and tomboyish girls came to be recognized as mostly pre-homosexual, and how that status came to be entered into the DSM at the same time as homosexuality was being *removed* from the DSM. Conversion therapy is never mentioned. Indeed, to the extent that Bryant mentions treatment at all, it is to say that treatment is entirely irrelevant to his analysis: "An important omission from the *DSM* is a discussion of the kinds of treatment that GIDC children should receive. (This omission is a general orientation of the DSM and not unique to GIDC)" (Bryant, 2006, p. 35). How this article supports AAP's claim is a mystery. Moreover, how AAP could cite a 2006 history discussing events of the 1990s and earlier to support a claim about the *current* consensus in this quickly evolving discussion remains all the more unfathomable.

Cited last in this section was a one-paragraph press release from the World Professional Association for Transgender Health. Written during the early stages of the American Psychiatric Association's (APA's) update of the DSM, the statement asserted simply that "The WPATH Board of Directors strongly urges the de-psychopathologisation of gender variance worldwide." Very reasonable debate can (and should) be had regarding whether gender dysphoria should be removed from the DSM as homosexuality was, and WPATH was well within its purview to assert that it should. Now that the DSM revision process is years completed however, history has seen that APA ultimately retained the diagnostic categories, rejecting WPATH's urging. This makes AAP's logic entirely backwards: That WPATH's request to depathologize gender dysphoria was *rejected* suggests that it is WPATH's view—and therefore the AAP policy—which fall "outside the mainstream of traditional medical practice." (!)

AAP based this entire line of reasoning on their belief that conversion therapy is being used "to prevent children and adolescents from identifying as transgender" (Rafferty et al., 2018, p. 4). That claim is left without citation or support. In contrast, what is said by AAP's sources is "delaying affirmation should *not* be construed as conversion therapy or an attempt to change gender identity" in the first place (Byne, 2016, p. 2). Nonetheless, AAP seems to be doing exactly that: simply relabeling any alternative approach as equivalent to conversion therapy.

Although AAP (and anyone else) may reject (what they label to be) conversion therapy purely on the basis of political or personal values, there is no evidence to back the AAP's stated claim about the existing science on gender identity at all, never mind gender identity of children.

AAP also dismissed the watchful waiting approach out of hand, not citing any evidence, but repeatedly calling it "outdated." The criticisms AAP provided, however, again defied the existing evidence, with even its own sources repeatedly calling watchful waiting the current standard. According to AAP:

> [G]ender affirmation is in contrast to the outdated approach in which a child's gender-diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow-up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47]

The citations from AAP's reference list are:

EOG_005175

EOG_005176

45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo-Meier C. Prepubertal social gender transitions: what we know; what we can learn—a view from a gender affirmative lens. *Int J Transgend.* 2018;19(2):251–268

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry.* 2016;55(3):155–156.e3

I was surprised first by the AAP's claim that watchful waiting's delay to puberty was somehow "arbitrary." The literature, including AAP's sources, repeatedly indicated the pivotal importance of puberty, noting that outcomes strongly diverge at that point. According to AAP reference 29, in "*prepubertal* boys with gender discordance—including many without any mental health treatment—the cross gender wishes usually fade over time and do not persist into adulthood, with only 2.2% to 11.9% continuing to experience gender discordance" (Adelson & AACAP, 2012, p. 963, italics added), whereas "when gender variance with the desire to be the other sex is present *in adolescence*, this desire usually does persist through adulthood" (Adelson & AACAP, 2012, p. 964, italics added). Similarly, according to AAP reference 40, "Symptoms of GID *at prepubertal ages* decrease or even disappear in a considerable percentage of children (estimates range from 80–95%). Therefore, any intervention in childhood would seem premature and inappropriate. However, GID persisting *into early puberty* appears to be highly persistent" (Cohen-Kettenis et al., 2008, p. 1895, italics added). That follow-up studies of prepubertal transition differ from postpubertal transition is the very meaning of non-arbitrary. AAP gave readers exactly the reverse of what was contained in its own sources. If AAP were correct in saying that puberty is an arbitrarily selected age, then AAP will be able to offer another point to wait for with as much empirical backing as puberty has.

Next, it was not clear on what basis AAP could say that watchful waiting withholds support—AAP cited no support for its claim. The people in such programs often receive substantial support during this period. Also unclear is on what basis AAP could already know exactly which treatments are "critical" and which are not—Answering that question is the very purpose of this entire endeavor. Indeed, the logic of AAP's claim appears entirely circular: It is only if one were already pre-convinced that gender affirmation is the only acceptable alternative that would make watchful waiting seem to withhold critical support—What it delays is gender affirmation, the method one has already decided to be critical.

Although AAP's next claim did not have a citation appearing at the end of its sentence, binary notions of gender were mentioned both in references 45 and 47. Specifically, both pointed out that existing outcome studies have been about people transitioning from one sex to the other, rather than from one sex to an in-between status or a combination of masculine/feminine features. Neither reference presented this as a reason to reject the results from the existing studies of complete transition however (which is how AAP cast it). Although it is indeed true that the outcome data have been about complete transition, some future study showing that partial transition shows a different outcome would not invalidate what is known about complete transition. Indeed, data showing that partial transition gives better outcomes than complete transition would, once again, support the watchful waiting approach which AAP rejected.

Next was a vague reference alleging concerns and criticisms about early studies. Had AAP indicated what those alleged concerns and flaws were (or which studies they were), then it would be possible to evaluate or address them. Nonetheless, the argument is a red herring: Because all of the later studies showed the same result as did the early studies, any such allegation is necessarily moot.

Reference 47 was a one-and-a-half page commentary in which the author off-handedly mentions criticisms previously made of three of the eleven outcome studies of GD children, but does not provide any analysis or discussion. The only specific claim was that studies (whether early or late) had limited follow-up periods—the logic being that had outcome researchers lengthened the follow-up period, then people who seemed to have desisted might have returned to the clinic as

EOG_005177

EOG_005178

312   J. M. CANTOR

cases of "persistence-after-interruption." Although one could debate the merits of that prediction, AAP instead simply withheld from the reader the result from the original researchers having tested that very prediction directly: Steensma and Cohen-Kettenis (2015) conducted another analysis of their cohort, by then ages 19–28 (mean age 25.9 years), and found that 3.3% (5 people of the sample of 150) later returned. That is, in long-term follow-up, the childhood sample showed 66.7% desistance instead of 70.0% desistance.

Reference 45 did not support the claim that watchful-waiting is "outdated" either. Indeed, that source said the very opposite, explicitly referring to watchful waiting as the *current* approach: "Put another way, if clinicians are straying from SOC 7 guidelines for social transitions, not abiding by the watchful waiting model *favored by the standards*, we will have adolescents who have been consistently living in their affirmed *gender* since age 3, 4, or 5" (Ehrensaft et al., 2018, p. 255). Moreover, Ehrensaft et al. said there are cases in which they too would still use watchful waiting: "When a child's gender identity is unclear, the watchful waiting approach can give the child and their family time to develop a clearer understanding and is not necessarily in contrast to the needs of the child" (p. 259). Ehrensaft et al. are indeed critical of the watchful waiting model (which they feel is applied too conservatively), but they do not come close to the position the AAP policy espouses. Where Ehrensaft summaries the potential benefits and potential risks both to transitioning and not transitioning, the AAP presents an ironically binary narrative.

In its policy statement, AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified by anyone caring to do any fact-checking at all. AAP claimed, "This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population"; however, much of that evidence was about sexual orientation, not gender identity. AAP claimed, "Current available research and expert opinion from clinical and research leaders … will serve as the basis for recommendations" (pp. 1–2); however, they provided recommendations entirely unsupported and even in direct opposition to that research and opinion.

AAP is advocating for something far in excess of mainstream practice and medical consensus. In the presence of compelling evidence, that is just what is called for. The problems with Rafferty, however, do not constitute merely a misquote, a misinterpretation of an ambiguous statement, or a missing reference or two. Rather, AAP's statement is a systematic exclusion and misrepresentation of entire literatures. Not only did AAP fail to provide compelling evidence, it failed to provide the evidence at all. Indeed, AAP's recommendations are *despite* the existing evidence.

## Disclosure statement

No potential conflict of interest was reported by the author.

## References

Rafferty, J., AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162. doi:10.1542/peds.2018-2162

Steensma, T. D., & Cohen-Kettenis, P. T. (2015). More than two developmental pathways in children with gender dysphoria? *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 147–148. doi:10.1016/j.jaac.2014.10.016

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. doi:10.1097/CHI.0b013e31818956b9

EOG_005179

EOG_005180



## Appendix

| Count | Group | Study |
|---|---|---|
| 2/16 | gay* | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its outcome. |
| 4/16 | trans-/crossdress | *American Journal of Psychiatry, 128,* 1283–1289. |
| 10/16 | straight*/uncertain | |
| 2/16 | trans- | Zuger, B. (1978). Effeminate behavior present in boys from childhood: |
| 2/16 | uncertain | Ten additional years of follow-up. *Comprehensive Psychiatry, 19,* 363–369. |
| 12/16 | gay | |
| 0/9 | trans- | Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant |
| 9/9 | gay | gender identity/role: Longitudinal follow-up. *Journal of Pediatric Psychology, 4,* 29–41. |
| 2/45 | trans-/crossdress | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and |
| 10/45 | uncertain | significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97. |
| 33/45 | gay | |
| 1/10 | trans- | Davenport, C. W. (1986). A follow-up study of 10 feminine boys. *Archives of* |
| 2/10 | gay | *Sexual Behavior, 15,* 511–517. |
| 3/10 | uncertain | |
| 4/10 | straight | |
| 1/44 | trans- | Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* |
| 43/44 | cis- | New Haven, CT: Yale University Press. |
| 0/8 | trans- | Kosky, R. J. (1987). Gender-disordered children: Does inpatient treatment help? |
| 8/8 | cis- | *Medical Journal of Australia, 146,* 565–569. |
| 21/54 | trans- | Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric |
| 33/54 | cis- | children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. |
| 3/25 | trans- | Drummond, K. D., Bradley, S. J., Badali-Peterson, M., & Zucker, K. J. (2008). A follow-up study |
| 6/25 | lesbian/bi | of girls with gender identity disorder. *Developmental Psychology, 44,* 34–45. |
| 16/25 | straight | |
| 17/139 | trans- | Singh, D. (2012). *A follow-up study of boys with gender identity disorder.* Unpublished doctoral |
| 122/139 | cis- | dissertation, University of Toronto. |
| 47/127 | trans- | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). |
| 80/127 | cis- | Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590. |

*For brevity, the list uses "gay" for "gay and cis-", "straight" for "straight and cis-", etc.

EOG_005181

EOG_005182

3

EOG_005183

EOG_005184

# Florida's Doctors Support Medical Professionals' Right to Protect Our Children

"Today, these issues of conscience rights have now moved beyond the abortion debate. Today, some are advocating for the more widespread use of gender altering hormonal and permanent surgical treatments for individuals with gender confusion or dysphoria. More disturbingly, some are calling for these procedures and interventions to be done on children without their parent's knowledge or consent and that insurance companies should be forced to pay for it. Parental rights are a centuries old fundamental right recognized by all cultures. Today there are some who not only seek to discard this right, but force all who object or refuse to participate to endure sanctions or loss of employment. The parents of the child are not only the parents, but are also paying for the insurance. Should the insurer be required to pay for a procedure the parents don't want their child to have, and keep that information from them? Rights of conscience takes us beyond the religious and political. Rights of conscience touch on our own humanity and our ability to live in peace within ourselves."

**-Honorable Dave Weldon, MD, Member of Congress 1995-2008**

"Furthermore, in the future, I know that I will likely attract patients to my medical practice who have a similar belief system to myself. The HELP Act will allow for a wide diversity of physicians to practice in confidence in the State of Florida. This will increase access to care for everyone in the state, including those who would seek a practice with values opposite the ones I hold. It will allow for a wider diversity of students to enter our medical schools, and encourage them to remain in-state. For myself, passage of a rights of conscience bill, such as the Help Act, is an important factor I am considering for where I will eventually settle and practice medicine."

**-Dr. Brianna Best**

"If we ever lose the right decline to be involved in a procedure that we ethically oppose, that'll be the day that I end my practice here in Florida. Physicians and their medical personnel should always have the right to refuse being involved in procedures they deem inappropriate or unethical according to their individual conscience. "

**-Dr. Carlos Lamoutte**



**religious doctors, nurses, and other medical professionals say they would rather stop practicing medicine than violate their ethical, moral, or religious beliefs.**

"As a healthcare professional, I believe strongly in healthcare right of conscience and wish to preserve it for future generations of healthcare professionals. Without the protection of conscience rights, many ethical healthcare professionals would leave their practices or choose to practice out of state. This legislation will preserve our conscience protections and allow Florida to keep some of our best healthcare professionals."

**-Dr. Daniel Joyce**

1 / 3

EOG_005185

EOG_005186

"One afternoon a group of us went to the abortion room to get the requirement out of the way. I still vividly remember the scene. The young woman moaning on the table. The baby sucked out into the vacuum bottle. And the nurse examining the body parts to make sure that the entire baby had been removed. I can still see the perfectly formed leg, foot and toes of the now-deceased baby. It was wrong for me to have been there, to stand by while a life was taken and a young woman harmed. I felt that I had no choice. One of my classmates, Brian, had the courage to say that he would not go. He had to appeal to the Dean of the medical school and after a protracted battle was able to abstain from the requirement. He paid a price for his courage. He was ostracized for the rest of his medical school education. As members of the House and of this Subcommittee you have before you the ability to protect a medical student like me from having to participate in a procedure that they object to. You have the ability to protect a medical student like Brian from repercussions for sticking to his beliefs. You can protect nurses, doctors, and technologists from being forced to participate in procedures that violate their religion and their ethical standards."

**-Eugenio Erquiaga, MD**

---

**36%**

**of Christian medical students say they have experienced discrimination or pressure during medical school.**

"In my work with medical students as an Associate Professor and clinic supervisor, the issue of conscience protection is also of great consequence. These students are concerned about pursuing careers in which they will be pressured to compromise their consciences. No one should be forced to choose between their faith and their profession and yet this is what we now see occurring more and more in medicine. I urge you to pass this vital legislation."

**-Dr. Peter Morrow**

---

"The doctor patient relationship is based on trust. The vulnerable, ailing person must trust that the physician will deliver the best care possible. If rules and regulations limit the physician's delivery of care, the patient may not receive the best care. The relationship of trust would be seriously damaged. Physicians must not be coerced to act against their moral principles."

**-Felipe E Vizcarrondo MD, MA**
**State Director American Academy of Medical Ethics**
**Christian Medical and Dental Association**
**President, Miami Guild, Catholic Medical Association**

---

"Protection of healthcare rights of conscience is vital. Physicians and other medical professionals need to be protected from intimidation or coercion in their faith-based practice of medicine. We need to be allowed to decline to participate in any healthcare service that violates our conscience."

**-Dr. William Whibbs, MD**
**President of the NW Florida Guild of CMA**

"There are increasingly severe demands on physicians to choose between corporate and patient best interests. And what stands in the way? The conscience of the medical provider. Stick up for us, so we can stick up for you and your loved ones!"

**-Dr. Richard H. Sandler, MD**



EOG_005187

EOG_005188

"When my wife was pregnant with our third child, almost 50 years ago, I had sought a vasectomy, but the military doctor said I was too young and refused to do the procedure. Initially, both my wife and I were upset, but little did we know that three months later, a terrible car accident would claim the life of our oldest child Adam. She went on to having three more beautiful children. The accident itself lead us both to our deep Catholic faith and it's teaching on moral decision making. I knew without a doubt that I must obey what my heart and soul was telling me. I approached the medical director and co-founder of the OB group who hired me as their first doctor. I explained that my conscience, would no longer allow me to do tubal ligations or prescribe any form of birth control. He said that he too was Catholic but disagreed with the churches and my views, but if my conscience said otherwise, that he would keep me employed without prejudice. Unfortunately, several years later the Medical Director retired, and two days later, I was informed, by telephone, that my services were immediately no longer needed. I received no severance pay or any benefits from the company that I helped establish over the course of more than a decade. I was terminated on 2 Jan 2018 and did not work again that year until September."

**-Dr. Lance Maki, Certified OBGYN physician**

"As a Board certified Ob/Gyn in Florida for 30 years, in private practice for 28 years and now doing pro-bono work as Medical director for a free pregnancy clinic, I implore you to support the Rights of Conscience bill. The field of medicine has been increasingly treacherous for those of us who have a strong belief in the dignity of all human life, even to the point that providers have to choose between one's conscience and a profession which is a difficult but treasured calling."

**-Dr. Karen F. Liebert**

> **81%**
> of Americans say it is important that their medical providers share their moral beliefs.

"I urge you not to force physicians to render care or perform procedures that are against our judgment and that violate our medical, ethical, moral, or religious convictions. Conscience protection legislation is essential for healthcare practice today. It allows physicians and other healthcare practitioners to give our best care in managing the health of your spouses, your children, and your parents with medical practice that is not encumbered by obstacles to our patient care. There is a growing physician shortage; let us not further decrease the physician workforce by instituting regulations that inhibit our liberty to practice medicine in accordance with our conscience."

**-Dr. Nadine Khouzam, MD**

---

**No American should be forced to violate their conscience.
Doctors, nurses, and other medical providers are no different.**

---



EOG_005189

EOG_005190

EOG_005191

EOG_005192

## Medical Organizations _Support_ Protecting Conscience Rights



**Association of American Physicians and Surgeons**
"Medical professionals should not fear the loss of their ability to practice their profession if they decline to participate in procedures or treatment that they believe to be harmful or unethical, and hence not in the best interest of their patients."[1]



**American College of Pediatricians**
"Health professionals, parents or patients, should not be required to provide, or participate in, any medical service that violates their conscience or causes moral distress."[2]



**American Academy of Fertility Care Professionals**
Physicians should not be forced "to give up the right and duty to refuse to participate in medical interventions that their upright conscience commands them to shun."[3]



**Christian Medical & Dental Association**
"Issues of conscience arise when some aspect of medical care is in conflict with the personal beliefs and values of the patient or the healthcare professional...[I]n such circumstances the Rights of Conscience have priority."[4]



**Catholic Medical Association**
"The right of religious liberty, the first freedom guaranteed by our Constitution, includes a right to provide and receive health care without being required to violate our most fundamental beliefs."[5]



**American Association of Pro-Life OB/GYNS**
Physician conscience rights in medical decision making has become a core issue in medical ethics. AAPLOG is committed to the individual right of conscience for each physician, especially in decisions involving moral values.[6]



**National Association of Pro-Life Nurses**
Supports "defending nursing and para-medical personnel from discrimination and/or job loss for refusal to participate in practices which violate [their] values."[7]

---

[1] https://www.aapsonline.org/testimony/provider-conscience-regulation-comments.php.
[2] https://www.acpeds.org/the-college-speaks/position-statements/societal-issues/freedom-of-conscience-in-healthcare.
[3] https://aafcp.net/wp-content/uploads/2014/07/Protecting-the-Right-of-Informed-Conscience-in-Reproductive-Medicine.pdf.
[4] https://cmda.org/wp-content/uploads/2018/04/healthcare-right-of-conscience.pdf.
[5] https://www.cathmed.org/wp-content/uploads/2016/10/ThePulse_Fall2016.pdf.
[6] https://aaplog.org/physician-conscience-rights/.
[7] https://nursesforlife.org/.

EOG_005193

EOG_005194

Biden's Assault
on Conscience

EOG_005195

EOG_005196

**The Biden Administration is Poised to Revoke Existing Federal
Conscience Protections for Medical Professionals**

    The Biden Administration's Department of Health and Human Services
recently announced its plan to rescind existing federal conscience protections, a move
that will crush the ability of doctors, nurses, and other medical professionals to
provide compassionate care for patients in accordance with their religious and ethical
beliefs. As the federal government continues to push policies that threaten religious
freedom and the right of conscience, Florida must lead the effort to protect those
rights.

**Tab 5 – Biden's Assault on Ethical Medical Care for Families**

**Tab 6 – FoxNews.com: "Biden HHS set to roll back health care conscience
protections"**

EOG_005197

EOG_005198

5

EOG_005199

EOG_005200

# Biden's Assault on Ethical Medical Care for Families

The Biden Administration's Department of Health and Human Services recently announced its plan to rescind existing federal conscience protections, a move that will crush the ability of doctors, nurses, and other medical professionals to provide compassionate care for patients in accordance with their religious and ethical beliefs. As the federal government pushes policies that threaten religious freedom and the right of conscience, **Florida must lead the effort to protect these vital rights for doctors and nurses, ensuring they can continue caring for all patients in a compassionate, ethical manner.**

## Biden's Assault on Medical Conscience Rights

- In 2019, the Trump Administration issued a comprehensive federal regulation that protects medical professionals from discrimination for declining to participate in actions that violate their ethical or moral convictions, such as gender transition procedures for children or abortion.

- But the Biden administration recently announced it will rescind the 2019 regulation, harming both medical professionals and the patients they serve by driving nurses, doctors, and other medical professionals out of healthcare.

- Rescinding conscience protections will exacerbate lack of access to care, especially after the pandemic has reduced medical staffing leading to dire shortages.

- The Biden Administration's actions will virtually destroy religious freedom and medical conscience in healthcare by coercing doctors, nurses, medical professionals, and faith-based hospitals to perform abortions, harmful and experimental gender transition procedures on children, and other unethical procedures that undermine the sanctity of life and subject kids to dangerous, sterilizing surgeries.

## Florida's Response: Protect Conscience Rights for Medical Workers

- Although the Biden Administration's actions violate the First Amendment and other existing federal laws, it could take years to get a final court ruling.

- **Unless Florida acts immediately to protect medical rights of conscience, nurses, doctors, and other medical professionals in Florida will be stripped of their right to serve their communities consistent with their moral, ethical, and religious beliefs.**

- Florida must stand with patients and their families and **by providing vital protections for medical professionals, religious hospitals, and medical entities** that simply want to love and care for patients consistent with their moral, ethical, and religious convictions.

- Florida has the authority to provide greater protections for constitutional rights—including medical rights of conscience—than are provided under federal law. As the U.S. Supreme Court explained, "State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution." *Mills v. Rogers*, 457 U.S. 291, 300 (1982).

EOG_005201

EOG_005202

6

EOG_005203

EOG_005204

## Biden HHS set to roll back health care conscience protections

foxnews.com/politics/biden-hhs-health-care-conscience-protections

The Biden administration is moving to rescind a Trump-era religious conscience rule that allows medical workers to object to providing services that conflict with their faith.

The Department of Health and Human Services confirmed to Fox News Digital on Wednesday that it is in the "rulemaking process" of proposing an end to the conscience rule. The policy change is currently under review at the Office of Management and Budget and could become public as soon as next week, Politico first reported Tuesday.

Former President Donald Trump announced the rule in 2018, which would have made it easier for medical providers to refuse to perform abortions, gender reassignment surgeries, and other medical services on religious or moral grounds. The rule never took effect, however, after being blocked by a federal court in 2019.

At the time of its passing, HHS said the regulation would protect health care workers who object to procedures such as abortion, administering vaccines derived from fetal tissue or referring patients for end-of-life care decisions on religious or moral grounds.

Federal law already protects moral and religious rights of health care providers who work for recipients of federal funding, but the regulation would have increased enforcement and oversight.

News of the coming rescission sparked criticism from conservatives.

"No American should be forced to violate their ethical and religious beliefs," Alliance Defending Freedom senior counsel Matt Bowman said in a statement shared with Fox News Digital. "Doctors, nurses, and other medical providers should enjoy this same constitutional protection, free to live and work in a manner consistent with their faith. Yet the Biden administration's proposed rule would abandon health care professionals to being forced to perform medical procedures that directly violate their religious beliefs or risk losing their jobs.

"This is an illegal and gross overreach of executive power, and we urge the administration to withdraw this harmful proposal immediately," he said.

LifeNews.com quipped that "nothing says 'faithful Catholic' like forcing Christian doctors to do abortions," referring to President Biden's Catholic faith.

*Fox News' Morgan Phillips and Kelly Laco contributed to this report.*

1/2

EOG_005205

EOG_005206

Critical Shortages
in Healthcare

EOG_005207

EOG_005208

**Florida is Facing Urgent Shortages of Healthcare Workers,
and Protecting Conscience Will Entice More Students
to Enter the Medical Profession**

A recent study from The Safety Net Hospital Alliance of Florida and the Florida
Hospital Association projects a shortage of nearly 18,000 physicians in Florida by
2035. In order to entice more students to enter the medical profession, Florida needs
to guarantee that they will not be forced to participate in abortion, gender transitions,
assisted suicide, or other procedures that violate their moral or ethical beliefs.

**Tab 7 – Summary of Looming Florida Healthcare Shortages**

**Tab 8 – Safety Net Hospital Alliance of Florida and the Florida Hospital
Association—Florida Statewide and Regional Physician Workforce Analysis:
2019 to 2035**

**Tab 9 – Robert Graham Center's Projections of Florida Physician Shortages**

EOG_005209

EOG_005210

7

EOG_005211

EOG_005212

THE NEED FOR THE

# Family MED Act

EOG_005213

## Symptoms

**1** **A Looming Healthcare Shortage**

Florida will need **74,700+** doctors and physicians by **2035**

But **SHORTAGES** are expected for...

Primary Care Doctors    -7,782

Other Specialty Doctors    -10,052

**2** **Attacks on Ethics & Personal Beliefs in Medicine**

In a survey of religious doctors, nurses, and other medical providers:

 **9 out of 10** would stop practicing medicine rather than violate their ethical, moral, or religious beliefs.

 **23%** ...experienced discrimination during the medical school or residency application/ interview process because of their ethical beliefs.

 **32%** ...experienced discrimination or pressure from their medical school faculty because of their ethical beliefs.

 **33%** ...considered not pursuing a career in a particular medical specialty because of hostility towards their beliefs in that area of practice.

## Diagnosis

**DRIVING OUT** doctors, nurses, and other providers because of their **MORALS & ETHICS**

 **CAUSES** **FEWER HEALTHCARE OPTIONS** for families when our healthcare system faces a dire shortage of providers

## Remedy

Enact the Family and Medical Ethics Defense Act. The law:

 Protects medical providers from being forced to participate in a procedure that violates their ethical or religious beliefs.

 Protects medical providers from losing their jobs or facing criminal charges for exercising their conscience rights.

 Enhances patient care by protecting those who report violations of medical ethics or standards of care.

EOG_005214

8

EOG_005215

EOG_005216



# Florida Statewide and Regional Physician Workforce Analysis: 2019 to 2035

**2021 Update to Projections of Supply and Demand**

**Prepared for the Safety Net Hospital Alliance of Florida and the Florida Hospital Association**

December 2021

**Will Iacobucci**
Senior Consultant

**Tim Dall**
Executive Director

**Ritashree Chakrabarti, PhD**
Senior Consultant

**Ryan Reynolds**
Senior Consultant

**Kari Jones, PhD**
Associate Director

EOG_005217

EOG_005218

## Executive Summary

To support workforce planning efforts and help ensure an adequate supply of healthcare providers in the future, The Safety Net Hospital Alliance of Florida and the Florida Hospital Association engaged IHS Markit to develop projections of future supply and demand for physicians, advanced practice registered nurses (APRNs), registered nurses (RNs), and licensed practical nurses (LPNs) in Florida. This report focuses on the physician workforce and projects supply and demand for physicians from 2019 through 2035. A companion report presents findings on the RN and LPN workforces. Less information is available on APRN supply and demand, but workforce projections for APRNs also are presented. This report updates a previous report (the "2015 Report") on the physician workforce prepared by IHS Markit. That study projected physician supply and demand starting in 2013, using the most current data available at that time. For this report, the baseline for data and modeling assumptions has been updated to 2019. The base year workforce adequacy can serve as a benchmark for Florida's progress towards addressing the workforce needs identified in the 2015 Report, while projected future adequacy provides insight into what resources may be needed in the future.

Using 2019 as a base year for modeling implies that the data sources used to derive physician workforce decisions and patient healthcare use patterns are pre-COVID-19. While the pandemic has had a large short-term impact on the population, demand for physician services, and the physician workforce, the ongoing nature of the pandemic and lags in data becoming available to researchers limits the degree to which long-term impacts on the physician workforce can be identified. This will likely be an area of ongoing research over the next several years. The pandemic has also increased awareness of the disparities that members of certain communities face in accessing high-quality care within the healthcare system. Given the heightened emphasis on this issue, a Reduced Barriers demand scenario was included in this report to provide an understanding of potential implications for the provider workforce demand assuming certain barriers to accessing healthcare services are removed for members of historically underserved populations.

Physician supply and demand are expressed as full-time equivalents (FTEs), with an FTE defined as the estimated average hours worked by physicians working at least 8 hours per week. Hours worked per week varies by specialty, thus FTE definitions are slightly different across the specialties modeled. The Status Quo supply scenario models the continuation of base year numbers of new physicians trained and labor force participation patterns accounting for changing demographics of the physician workforce. The Status Quo demand scenario extrapolates national patterns of care use and delivery to Florida's current and projected future population accounting for demographics and prevalence of disease prevalence, health risk factors such as obesity and smoking, medical insurance coverage, household income levels, and metropolitan/nonmetropolitan residence location. Physician specialties were categorized into three specialty groupings: 1) traditional primary care, which includes family practice, general internal medicine, geriatric medicine, and pediatric medicine; 2) total primary care, which includes the four traditional primary care specialties plus emergency medicine, general surgery, and obstetrics & gynecology; and 3) non-primary care specialties, which includes the remaining 29 specialties modeled.

Key findings from the study include:

- Physician supply in 2019 was 55,083 FTEs and is projected to grow 3% (1,776 FTEs) and reach 56,859 FTEs by 2035. Supply growth varies by specialty, with supply for total primary care and traditional primary care physicians projected to increase by 3% and 4%, respectively, while non-primary care physician supply is projected to grow by 6%.

- Physician demand in 2019 is estimated at 58,918 FTEs, with demand projected to increase by 27% (15,866 FTEs), reaching 74,784 FTE physicians by 2035. This rapid increase in demand is driven largely

EOG_005219

EOG_005220

by population growth of 21%. The remaining 6% growth in demand is attributed to changing demographics, particularly population aging, under this modeled Status Quo scenario. The population age 65-74 is projected to increase by 32% and the population ages 75 and older is projected to increase by 74% over the projection period. This projected increase results in the population age 65 and above, which represents 20% of the state population in 2019, making up 26% of the state population by 2035. Consequently, demand growth is particularly high for specialties that predominately treat older patients.

- Estimated 2019 physician supply was approximately 3,835 FTEs lower than estimated demand, suggesting that supply in Florida was adequate to meet 93% of estimated demand relative to national averages. Supply adequacy varies by physician specialty. If current trends continue, projected 2035 supply and demand suggest a shortfall of about 17,924 FTE physicians (Exhibit ES-1) with supply sufficient to meet 77% of projected demand. Like with base year estimates, the projected shortfall varies by specialty and Florida Medicaid region.

  - **Primary Care Specialties:** Estimated demand for traditional primary care physicians in 2019 exceeded supply by 1,977 FTEs (an 88% estimated adequacy), driven by an estimated shortfall of 2,412 FTEs in family medicine with Florida having more general internists and pediatricians and fewer geriatricians relative to levels expected based on national averages. Total primary care had an estimate shortfall of 2,185 FTEs in 2019, a 91% estimated adequacy. Projected into the future, adequacy is expected to worsen across primary care specialties, with projected 2035 shortfalls totaling 7,872 FTEs (74% adequacy) for total primary care specialties, and 5,974 FTEs (72% adequacy) for traditional primary care specialties.

  - **Non-Primary Care Specialties:** Estimates for 2019 suggest that demand for non-primary care physicians exceeded supply by 1,650 FTEs, which translates to an adequacy of 95%. Supply appears more than adequate relative to the national average for radiology (134% adequacy; +869 FTEs), pathology (132% adequacy; +388 FTEs), and neurology (121% adequacy; +218 FTEs). Higher than national average supply of dermatologists (135% adequacy; +293 FTEs) could be due to higher levels of sun exposure in Florida which is not captured in the workforce model. Specialties where supply was substantially below levels based on estimated demand for services include: vascular surgery (69% adequacy, -113 FTEs), physical medicine and rehabilitation (70% adequacy; -316 FTEs), hematology and oncology (75% adequacy; -409 FTEs), and psychiatry (75% adequacy, -728 FTEs). Hospital medicine (69% adequacy; -794 FTEs) is also lower than expected, but this disparity might simply reflect data challenges with identifying hospitalists in licensure files. Projected to 2035, adequacy for the non-primary care specialty category is expected to decline to an overall 77% adequacy.

EOG_005221

EOG_005222

IHS Markit | Florida Statewide and Regional Physician Workforce Analysis: 2019 to 2035

**ES-1. Projected Total Supply and Demand for Physicians, 2019-2035**



- Adequacy of Florida's physician supply varies across the state's 11 Medicaid Regions. Demand is calculated based on where the population resides. In Regions 10 and 11, for example, 2019 supply exceeds projected demand by 448 FTEs (109% adequacy) and 2,123 FTEs (137% adequacy) respectively. On a total FTE basis, Region 3 (-1,558 FTEs, 73% adequacy) and Region 8 (-1,412 FTEs, 76% adequacy) face the largest base year shortfall. Region 2 faces the largest shortage on a relative basis (-603 FTEs, 69% adequacy). Projected demand exceeds supply in 2035 in all but Region 11, suggesting that many people in Florida might need to travel substantial distances to receive care.

- Alternative supply scenarios were modeled to provide sensitivity analysis for estimates and assumptions regarding physician workforce participation (more or fewer hours worked per week, early or delayed retirement, increased and decreased numbers of annual new entrants). These modeled supply scenarios did not materially change the projected 2035 physician shortfall.

- A hypothetical demand scenario addressing healthcare utilization equity modeled the implications if barriers to accessing care were reduced for populations that traditionally have faced such barriers (i.e., people who are uninsured, residing in non-metropolitan areas, and racial and ethnic minority populations). If barriers to accessing healthcare services could be reduced, demand for physicians would rise and by 2035 there would be a shortfall of approximately 26,026 FTE physicians, which includes a shortfall of 10,594 FTEs in total primary care specialties and 15,432 FTEs in non-primary care specialties.

- Estimated 2019 supply of APRNs in Florida was 29,311 FTEs. This number is projected to nearly double over the projection period, reaching 57,780 FTEs (28,469 FTE or 97% growth) by 2035. While the 31% 2019-2035 projected APRN demand growth is well above the 21% rate of projected population growth, it

EOG_005223

EOG_005224

is significantly below the projected supply growth. ==In 2019 the supply of APRNs was an estimated 6,446 FTEs below the level that would be expected based on national average levels of care use and delivery. Due to the rapid growth in APRN supply, by 2035 there will be an estimated 10,765 FTEs beyond what is needed to maintain current national average physician-to-APRN staffing ratios.==

This study updates key components of the workforce models compared to the 2015 Report. Key differences in model inputs and projections include the following:

- The 2015 Report projected that, starting from a 2013 supply of 42,610 FTEs, if the current (as of 2013) number of physicians entering Florida's workforce each year (2,230) remained unchanged, FTE physician supply would reach nearly 47,000 by 2019. This updated study found that the number of new entrants to Florida's workforce has been increasing over time, with about 2,324 now entering the workforce each year, and actual FTE supply in 2019 was 55,083. Thus, while 2013-2019 supply in the 2015 Report was projected to grow by about 4,400 FTEs absent policy intervention, actual supply growth over the time period was about 12,473 FTEs.

- Florida's population grew faster than the population projections used for the 2015 Report. Extrapolating a 2013 national average level of care (care use and delivery) to Florida's *projected* population in 2019 (20.9 million), the 2015 Report projected demand for 53,710 FTE physicians in 2019. Extrapolating a 2019 national average level of care to the *actual* population in 2019 (21.5 million), this updated study estimates demand for 58,918 FTEs. The higher population counts and updated national average level of care each contributed to the 5,208 FTE increase in estimated 2019 demand between the 2015 Report and this updated report. Another contributing factor is that the *actual* 2013-2019 projected growth in the population age 65-74 and 75 and older (31% and 27%, respectively) was larger than the *projected* 2013-2019 growth for the age cohorts (25% and 15%, respectively) used in the 2015 Report.

- Although the 2015 Report and this updated study use different benchmarks to estimate demand for physicians in Florida (i.e., 2013 national average versus 2019 national average level of care), the updated estimate of a shortfall of physicians in Florida (3,835 FTEs) is smaller than what was projected for 2019 in the 2015 Report (5,933 FTEs). The supply adequacy updates vary by Medicaid region.

EOG_005225

EOG_005226

9

EOG_005227

EOG_005228



**ROBERT
GRAHAM
CENTER**

**Florida:
Projecting Primary Care Physician Workforce**

### Background

Primary care physicians (PCP) workforce shortages challenge the long term viability of U.S. primary care, a foundation of the Triple Aim for U.S. health care. The Triple Aim envisions primary care as an integrating component working across its three goals of improving the quality of care, improving health of populations, and reducing per capita health care costs.[1] Studies of the future need for primary care providers indicate that demographic and policy trends will only strain a workforce already struggling to meet national needs.[2] Other analyses document geographic maldistribution of PCPs, within states as well as across states.[3] Addressing both physician shortages and maldistribution requires analysis and action on the state level.

**Methods.** The Robert Graham Center projected the Florida PCP workforce necessary to maintain current primary care utilization rates, accounting for increased demand due to aging, population growth, and an increasingly insured population due to the Affordable Care Act (ACA). Primary care use was estimated with 2010 Medical Expenditure Panel Survey (MEPS) data. Current active PCPs within Florida were identified using the 2010 American Medical Association (AMA) Masterfile, adjusting for retirees and physicians with a primary care specialty but not practicing in primary care settings. Florida population projections are from those produced by the state based on the 2010 Census.[4]

### Workforce Projections 2010-2030

To maintain current rates of utilization, **Florida will need an additional 4,671 primary care physicians by 2030**, a 38% increase compared to the state's current (as of 2010)  12,228 PCP  workforce.



**Florida Projected Primary Care Physicians Need**

Suggested citation: Petterson, Stephen M; Cai, Angela; Moore, Miranda; Bazemore, Andrew.  State-level projections of primary care workforce, 2010-2030.  September 2013, Robert Graham Center, Washington, D.C.

[1] Berwick, D. M., Nolan, T. W., & Whittington, J. (2008). The triple aim: care, health, and cost. *Health Affairs, 27*(3), 759–69. doi:10.1377/hlthaff.27.3.759
[2] Petterson, S. M., Liaw, W. R., Phillips, R. L., Rabin, D. L., Meyers, D. S., & Bazemore, A. W. (2012). Projecting US Primary Care Physician Workforce Needs: physician supply meet demands of an increasing and aging population? *Health Affairs, 27*(3), w232–w241.  Also see Colwill, J., Cultice, J., & Kruse, R. (2008). Will generalist physician supply meet demands of an increasing and aging population? *Health Affairs, 27*(3), w232–w241.
[3] Council on Graduate Medical Education Tenth Report: Physician Distribution and Health Care Challenges in Rural and Inner-city Areas. (1998). Washington, D.C.
[4] http://edr.state.fl.us/Content/population-demographics/data/index.cfm.  For full description of the methodology, see http://www.graham-center.org/tools-resources/state-projections.htm.

EOG_005229

EOG_005230



**Physician Demand Comparison – State, Region, Nation**

### Implications for Florida

    To maintain the status quo, Florida will require an additional 4,671 primary care physicians by 2030, a 38% increase of the state's current (as of 2010) 12,228 practicing PCPs. The current population to PCP ratio of 1537:1 is greater than the national average of 1463:1. The 2030 projection stands above the South overall and above the nation overall. Components of Florida's increased need for PCPs include 19% (894 PCPs) from increased utilization due to aging, 66% (3,100 PCPs) due to population growth, and 14% (677 PCPs) due to a greater insured population following the Affordable Care Act (ACA).

    Pressures from a growing, aging, increasingly insured population call on Florida to address current and growing demand for PCPs to adequately meet health care needs. Policymakers in Florida should consider strategies to bolster the primary care pipeline including reimbursement reform, dedicated funding for primary care Graduate Medical Education (GME), increased funding for primary care training and medical school debt relief.

| Highlights: Florida's Projected Primary Care Physician Demand | |
|---|---|
| **Additional PCPs Required by 2030**<br>**4,671**<br><br>Or, **38%** of current workforce, due to an aging, growing and increasingly insured population. | **Potential Solutions —**<br>**Bolster the Primary Care Pipeline**<br><br>❖ Physician reimbursement reform<br>❖ Dedicated funding for primary care Graduate Medical Education (GME)<br>❖ Increased funding for primary care training (Title VII, Section 747)<br>❖ Medical school student debt relief |
| **Current Primary Care Physician Workforce**<br>**12,228** | **The state's PCP ratio of 1537:1 is greater than the national average of 1463:1.** |

**The Robert Graham Center:**
**Policy Studies in Family Medicine and Primary Care**
1133 Connecticut Avenue, NW,  Suite 1100
Washington, DC  20036

TELEPHONE: 202.331.3360
FAX: 202.331.3374
E-MAIL: policy@aafp.org
Web: www.graham-center.org

The information and opinions contained in research from the Graham Center do not necessarily reflect the views or policy of the AAFP.

EOG_005231

EOG_005232

EOG_005233

EOG_005234

## FAMILY AND MEDICAL ETHICS DEFENSE ACT

**Section 1.  Definitions.**

A.      "*Disclosure*" means a formal or informal communication or transmission, but does not include a communication or transmission concerning policy decisions that lawfully exercise discretionary authority unless the medical practitioner providing the disclosure or transmission reasonably believes that the disclosure or transmission evinces:

 1.  Any violation of any law, rule, or regulation;

 2.  Any violation of any ethical guidelines for the provision of any healthcare service; or

 3.  Gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

B.      "*Healthcare service*" means medical research or medical care provided to any patient at any time over the entire course of treatment. This includes, but is not limited to, testing; diagnosis; referral; dispensing and/or administering any drug, medication, or device; psychological therapy or counseling; research; prognosis; therapy; record making procedures; notes related to treatment; set up or performance of a surgery or procedure; or any other care or services performed or provided by any medical practitioner including, but not limited to, physicians, nurses, allied health professionals, paraprofessionals, contractors, or employee of healthcare institutions.

C.      "*Healthcare institution*" means any organization, corporation, partnership, association, agency, network, sole proprietorship, joint venture, or other entity that provides healthcare services. The term includes, but is not limited to, any public or private hospital, clinic, medical center, physician organization, professional association, ambulatory surgical center, private physician's office, pharmacy, nursing home, medical school, nursing school, medical training facility, or any other entity or location in which healthcare services are performed.

D.      "*Healthcare payer*" means any employer, health plan, health maintenance organization, insurance company, management services organization, or any other entity that pays for—or arranges for the payment of—any healthcare service provided to any patient, whether that payment is made in whole or in part.

E.      "*Medical practitioner*" means any person or individual who may be or is asked to participate in any way in any healthcare service. This includes, but is not limited to, doctors, nurse practitioners, physician's assistants, nurses, nurses' aides, allied health professionals, medical assistants, hospital employees, clinic employees, nursing home employees, pharmacists, pharmacy technicians and employees, medical school faculty and students, nursing school faculty and students, psychology and counseling faculty and students, medical researchers, laboratory technicians, psychologists, psychiatrists, counselors, mental health professionals, social workers, or any other person who facilitates or participates in the provision of healthcare services to any person.

F.      "*Participate*" in a healthcare service means to provide, perform, assist with, facilitate, refer for, counsel for, advise with regard to, admit for the purposes of providing, or take part in any way in providing, any health care service or any form of such service.

**Section 2.  Rights of Conscience.**

A.      **Freedom of Conscience.** A medical practitioner, healthcare institution, or healthcare payer has the freedom not to participate in or pay for any healthcare service which violates his, her, or its

EOG_005235

EOG_005236

conscience as informed by ethical, moral, or religious beliefs or principles.

B.    **Limitations.** The exercise of the right of conscience is limited to conscience-based objections to a particular healthcare service. This section may not be construed to waive or modify any duty a health care practitioner, health care institution, or health care payer may have to provide other medical services that do not violate the practitioner's, institution's, or payer's conscience.

C.    **Discrimination Prohibited.** No medical practitioner, healthcare institution, or healthcare payer shall be discriminated against or suffer any adverse action as a result of declining to participate in or pay for a healthcare service on the basis of conscience. No medical practitioner, healthcare institution, or healthcare payer shall be civilly, criminally, or administratively liable for exercising the right of conscience by declining to participate in or pay for a healthcare service. No healthcare institution shall be civilly, criminally, or administratively liable because a medical practitioner employed, contracted, or granted admitting privileges by the healthcare institution exercise the conscience rights by declining to participate in a healthcare service.

D.    **Emergency Medical Treatments.** Nothing herein shall be construed to override the requirement to provide emergency medical treatment to all patients set forth in 42 U.S.C. § 1395dd or any other federal law governing emergency medical treatments.

**Section 3.  Speech and Whistleblower Protection.**

A.    No medical practitioner shall be discriminated against in any manner because the medical practitioner:

    **1.**  Provided, caused to be provided, or is about to provide or cause to be provided to his or her employer, the Attorney General of Florida, Florida Department of Health, any other state agency charged with protecting health care rights of conscience, the U.S. Department of Health and Human Services, Office of Civil Rights, or any other federal agency charged with protecting health care rights of conscience information relating to any violation of, or any act or omission the medical practitioner reasonably believes to be a violation of, any provision of this Act;

    **2.**  Testified or is about to testify in a proceeding concerning such violation; or

    **3.**  Assisted or participated, or is about to assist or participate, in such a proceeding.

B.    Unless the disclosure is specifically prohibited by law, no medical practitioner shall be discriminated against in any manner because the medical practitioner disclosed any information that the medical practitioner reasonably believes evinces

    **1.**  Any violation of any law, rule, or regulation;

    **2.**  Any violation of any ethical guidelines for the provision of any healthcare service; or

    **3.**  Gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

C.    A board, or the Department of Health if there is no board, may not reprimand, sanction, or revoke or threaten to revoke a license, certificate, or registration of a health care practitioner for engaging in speech or expressive activity protected under the First Amendment to the U.S. Constitution, unless the board or the Department of Health, as applicable, demonstrates beyond a reasonable doubt that the practitioner's speech was the direct cause of physical harm to a person with whom the health care practitioner had a practitioner-patient relationship within the 3 years

1

EOG_005237

EOG_005238

immediately preceding the incident of physical harm.

(3) The board, or the Department of Health if there is no board, must provide a medical practitioner with any complaints it has received which may result in the revocation of the medical practitioner's license, certification, or registration, within 7 days after receipt of the complaint. The board, or the department if there is no board, must pay the medical practitioner an administrative penalty of $500 for each day the complaint is not provided to the medical practitioner after the specified 7 days.

**Section 4.   Civil Action for Violation of Right of Conscience**.   A civil action for damages, injunctive relief, or any other appropriate relief, including attorneys' fees, may be brought by any medical practitioner, health care institution, or health care payer for any violation of this Act.

2

EOG_005239

EOG_005240

10

EOG_005241

10

EOG_005242



FREQUENTLY ASKED QUESTIONS

## Medical Ethics & Diversity Act

ALLIANCE DEFENDING
FREEDOM
FOR FAITH · FOR JUSTICE

**QUESTION 1**

Why is this bill needed?

It protects diversity of belief within the medical profession and benefits patients by protecting the supply of physicians and other medical providers within the healthcare system. In a 2019 survey of 1732 members of faith-based medical associations:

- 23% of respondents reported personally experiencing discrimination.
- 36% of respondents reported having faced pressure or discrimination from med school administrators or faculty based on their beliefs.
- 20% of respondents said they decided not to pursue a career in certain fields due to a lack of tolerance for their moral, ethical, or religious beliefs. (80% of these respondents had chosen not to pursue a specialty in OB-GYN).
- 91% of respondents reported that they "would rather stop practicing medicine altogether than be forced to violate [their] conscience."[1]

Medical practitioners should not be forced to choose between their ethical, moral, or religious values and their life's calling. Diversity among medical providers is important—81 percent of Americans surveyed said it was important that their medical providers shared their moral beliefs.[2]

**QUESTION 2**

Does this bill allow providers to refuse to provide general care to a patient or kick a patient out of their practice?

No. This bill simply protects providers who gladly serve everyone in their particular field of medicine from being required to perform a specific medical procedure if doing so would violate their conscience. It is not legal permission to refuse to provide general medical care. In fact, federal law already prohibits providers who participate in Medicaid, Medicare, or other federal programs from discriminating on the basis of race, color, or national origin. This bill would not supersede those protections or provide any other legal justification for a provider to dismiss a patient from his or her practice.

[1] Christian Medical Association survey (2019), available at: freedom2care.org/polling.
[2] United States Conference of Catholic Bishops survey (2019), available at: https://24168d49-d5cc-4260-ae1a-a97a91740a06.filesusr.com/ugd/7d505d_e08215f9d7e19431d99ebc7cb03548cx7.pdf.

1

**ADFLegal.org**

EOG_005243

EOG_005244

 **Medical Ethics & Diversity Act – Frequently Asked Questions**

**QUESTION 3**

Will this bill impede the ability of patients to receive proper emergency care?

No. The best avenue for emergency care is usually a patient visit to a hospital. Under a federal law known as the Emergency Medical Treatment and Active Labor Act (EMTALA), hospitals and hospital-affiliated stand-alone emergency departments are required to provide examinations and treatments to anyone with an emergency medical condition. This bill would not conflict with or supersede the EMTALA.

**QUESTION 4**

Are there any limits on what can be included under "conscience"?

Yes. Federal law, including the Emergency Medical Treatment and Active Labor Act, mandates treatment or appropriate transfers of emergency conditions. In addition, there have been no cases involving medical providers seeking the right to refuse emergency treatments required to prevent death or imminent and severe physical harm. Rather, the current conscience issues involve objections concerning lifestyle and elective procedures and treatments, including assisted suicide, dispensing marijuana and mind-altering drugs, gene-editing and other genetic manipulation on children in-utero, prescription or provision of abortifacients, abortion procedures, and surgeries that remove otherwise healthy body parts or that result in permanent sterilization as part of gender identity procedures.

**QUESTION 5**

Does this bill require providers or institutions to offer certain services?

No. This bill simply protects providers or institutions from being compelled to perform specific procedures to which they have a conscientious objection.

**QUESTION 6**

Does this bill establish a right for providers or institutions to offer any services they wish?

No. This bill does not create an affirmative right to perform a medical procedure or offer medical services that are unethical or prohibited under state or federal law. Rather, it protects the right NOT to perform a specific procedure that is unethical or to which a conscientious objection applies.

**QUESTION 7**

Can a medical provider or institution decline to serve a patient due to race or other protected characteristic?

No. This bill does not permit providers, institutions, or payers to decline to serve a person based upon their race, color, sex, or any other protected characteristic. This bill simply protects providers from being required to perform specific procedures.

2

**ADFLegal.org**

EOG_005245

EOG_005246



**Medical Ethics & Diversity Act – Frequently Asked Questions**

**QUESTION 8**

Does the whistleblower section mean that an employer can't fire someone who is a habitual complainer or who files false complaints?

No. Whistleblowers are only safeguarded when making specific, legally protected reports that are necessary to disclose unethical practices or violations of the law. Employees who are filing false reports or merely harassing their employer are not protected under this bill. In addition, the bill includes specific language indicating that reports "concerning policy decisions that lawfully exercise discretionary authority" are generally not protected under this bill.

**QUESTION 9**

Why is it important to protect healthcare payers?

Some organizations, especially non-profits and religious organizations, self-insure and are healthcare payers themselves rather than relying on an insurance company. In addition, all employers who help provide healthcare for their employees are payers. Institutions do not act alone, but rather through people—as the U.S. Supreme Court noted in *Burwell v. Hobby Lobby Stores, Inc*. In the case's majority opinion, Justice Alito recognized that "protecting the free-exercise rights of closely held corporations thus protects the religious liberty of the humans who own and control them." In the same way that we don't require taxpayers to fund abortions, we should not require these organizations and closely held family businesses to pay for specific medical procedures that they find objectionable. Their values and beliefs must be respected when accommodating medical conscience.

**QUESTION 10**

Could insurance companies use this to avoid paying for costly medical treatments by claiming that some treatment costs are unconscionable?

No. This bill only allows an assertion that certain procedures are unconscionable in themselves based upon the nature of the procedure itself. Nothing in this bill allows the cost of the procedure to factor into the consideration of conscience. In addition, neither federal law nor case law support finding a right to medical conscience based upon the cost of a procedure. This premise is unsupported in American law.



ALLIANCE DEFENDING
FREEDOM
FOR FAITH. FOR JUSTICE

 Facebook.com/AllianceDefendingFreedom
 Twitter: @AllianceDefends
 Instagram.com/AllianceDefendingFreedom
 YouTube.com/AllianceDefends

15100 N. 90th Street
Scottsdale, AZ  85260

**ADFlegal.org**
**800-835-5233**

EOG_005247

EOG_005248



EOG_005249



EOG_005250