CONFIDENTIAL

## TITLE
Gender Dysphoria/Transgender Health Care Legislation

## SUMMARY
Include elements of Alabama, Arizona, and Arkansas bills to safeguard Florida's children from the irreversible mental, physical, and emotional harm that results for the treatment of gender dysphoria.

## ELEMENTS
The following elements by Department/Agency would be included in the legislation:

**Prohibition of State Expenditures**
- Prohibit the use of public funds for gender dysphoria/transitional related care to both children and adults.
    - Examples: DOC (inmates), DMS (state employee health insurance/state university system employees and their dependents), DCF (state hospitals, child welfare system), APD (ICF/IDDs), DOH (health departments), DFS (Florida Healthy Kids), DJJ (juvenile justice system), Florida College System (Florida College System Risk Management Consortium).

- Could expand to local funds but would trigger preemption discussion, this would include school boards, government sponsored insurance payers (cities, counties, school districts).

- Healthcare subsidy for Florida Retirement System recipients and beneficiaries.

**Limits Services to Children**
**Department of Health**
- Prohibit health care practitioners from providing both surgical and non-surgical care related to gender dysphoria to children and adolescents.

**Surgical (Genital)**
- Male: Penectomy, Orchiectomy, Vaginoplasty, Clitoroplasty, Vulvoplasty.
- Female: Hysterectomy, Oophorectomy, Urethra reconstruction, Genital reconstruction (metodioplasty or phalloplasty/ construction of penile structure), Vaginectomy, Scrotoplasty, Implantation of Erectile/Testicular Prostheses.

**Surgical (Non-Genital)**
- Male: Augmentation mammoplasty, Facial feminization surgery, Liposuction, Lipofilling, Voice surgery, Thyroid cartilage reduction, Gluteal augmentation, Hair reconstruction, and Other aesthetic procedures.
- Female: A subcutaneous mastectomy, Voice surgery, Liposuction, Lipofilling, Pectoral implants, Other aesthetic procedures.

**Non-Surgical**
- Ban prescribing of non-surgical care including pubertal blocking drugs, cross sex hormone therapy, and voice therapy.

**Mental Health/Psychological***
- Determine whether to include allowance of mental health, psychology, and psychiatric services for children.*

**Agency for Health Care Administration**
- Prohibit managed care plans (and fee-for-service) from authorizing care for children under age 21 (EPSDT <21 years of age).

- Direct Florida Medicaid to exclude all gender dysphoria related surgical and certain non-surgical services to children under 21 years of age.

EOG_008128

Doe Pls' Trial Ex.
**59**

**Stricken language would be deleted from and underlined language would be added to present law.**

| | |
|---|---|
| 1 | State of Arkansas | *As Engrossed:  H3/2/21 H3/8/21* |
| 2 | 93rd General Assembly | A Bill |
| 3 | Regular Session, 2021 | HOUSE BILL 1570 |

4

5  By: Representatives Lundstrum, Barker, Bentley, Brown, Bryant, Cavenaugh, Cloud, Coleman, C.

6  Cooper, Cozart, Crawford, Dalby, Dotson, C. Fite, Furman, Gazaway, Gonzales, M. Gray, Haak,

7  Hollowell, Ladyman, Lowery, Lynch, J. Mayberry, McGrew, McNair, S. Meeks, Miller, Payton, Penzo,

8  Pilkington, Ray, Richmond, Slape, B. Smith, Speaks, Tollett, Tosh, Underwood, Vaught, Warren,

9  Watson, Wing, *Bragg, Hillman, Wooten*

10  By: Senators A. Clark, B. Ballinger, Beckham, Bledsoe, B. Davis, J. English, Gilmore, K. Hammer, Hill,

11  Irvin, B. Johnson, M. Johnson, Rapert, Rice, G. Stubblefield, D. Wallace, *D. Sullivan, Hester, T. Garner*

12

13  **For An Act To Be Entitled**

14  AN ACT TO CREATE THE ARKANSAS SAVE ADOLESCENTS FROM

15  EXPERIMENTATION (SAFE) ACT; AND FOR OTHER PURPOSES.

16

17

18  **Subtitle**

19  TO CREATE THE ARKANSAS SAVE ADOLESCENTS

20  FROM EXPERIMENTATION (SAFE) ACT.

21

22

23  BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

24

25  SECTION 1.  Title.

26  This act shall be known and may be cited as the "Arkansas Save

27  Adolescents from Experimentation (SAFE) Act".

28

29  SECTION 2.  Legislative findings.

30  The General Assembly finds that:

31  (1)  Arkansas has a compelling government interest in protecting

32  the health and safety of its citizens, especially vulnerable children;

33  (2)(A)  Only a small percentage of the American population

34  experiences distress at identifying with their biological sex.

35  (B)  According to the American Psychiatric Association,

36  "For natal adult males, prevalence ranges from 0.005% to 0.014%, and for

As Engrossed:  H3/2/21 H3/8/21                                    HB1570

1  natal females, from 0.002% to 0.003%.";

2              (3)  For the small percentage of children who are gender

3  nonconforming or experience distress at identifying with their biological

4  sex, studies consistently demonstrate that the majority come to identify with

5  their biological sex in adolescence or adulthood, thereby rendering most

6  physiological interventions unnecessary;

7              (4)  Furthermore, scientific studies show that individuals

8  struggling with distress at identifying with their biological sex often have

9  already experienced psychopathology, which indicates these individuals should

10  be encouraged to seek mental health services to address comorbidities and

11  underlying causes of their distress before undertaking any hormonal or

12  surgical intervention;

13              (5)  Even among people who have undergone inpatient gender

14  reassignment procedures, suicide rates, psychiatric morbidities, and

15  mortality rates remain markedly elevated above the background population;

16              (6)(A)  Some healthcare providers are prescribing puberty-

17  blocking drugs, such as gonadotropin-releasing hormone analogues, in order to

18  delay the onset or progression of puberty in children who experience distress

19  at identifying with their biological sex.

20                  (B)  The prescribing of puberty-blocking drugs is being

21  done despite the lack of any long-term longitudinal studies evaluating the

22  risks and benefits of using these drugs for the treatment of such distress or

23  gender transition;

24              (7)  Healthcare providers are also prescribing cross-sex hormones

25  for children who experience distress at identifying with their biological

26  sex, despite the fact that no randomized clinical trials have been conducted

27  on the efficacy or safety of the use of cross-sex hormones in adults or

28  children for the purpose of treating such distress or gender transition;

29              (8)  The use of cross-sex hormones comes with serious known

30  risks, such as:

31                  (A)  For biological females:

32                      (i)  Erythrocytosis, which is an increase in red

33  blood cells;

34                      (ii)  Severe liver dysfunction;

35                      (iii)  Coronary artery disease, including heart

36  attacks;

EOG_008130

As Engrossed:  H3/2/21 H3/8/21                                    HB1570

1                              (iv)  Cerebrovascular disease, including strokes;
2                              (v)  Hypertension;
3                              (vi)  Increased risk of breast and uterine cancers;
4    and
5                              (vii)  Irreversible infertility; and
6                         (B)  For biological males:
7                              (i)  Thromboembolic disease, including blood clots;
8                              (ii)  Cholelithiasis, including gallstones;
9                              (iii)  Coronary artery disease, including heart
10   attacks;
11                             (iv)  Macroprolactinoma, which is a tumor of the
12   pituitary gland;
13                             (v)  Cerebrovascular disease, including strokes;
14                             (vi)  Hypertriglyceridemia, which is an elevated
15   level of tryglycerides in the blood;
16                             (vii)  Breast cancer; and
17                             (viii)  Irreversible infertility;
18        (9)  Genital and nongenital gender reassignment surgeries are
19   generally not recommended for children, although evidence indicates referrals
20   for children to have such surgeries are becoming more frequent;
21        (10)(A)  Genital gender reassignment surgery includes several
22   irreversible invasive procedures for males and females and involves the
23   alteration of biologically healthy and functional body parts.
24                    (B)  For biological males, surgery may involve:
25                              (i)  Genital reconstruction including penectomy,
26   which is the removal of the penis;
27                              (ii)  Orchiectomy, which is the removal of the
28   testicles;
29                              (iii)  Vaginoplasty, which is the construction of a
30   vagina-like structure, typically through a penile inversion procedure;
31                              (iv)  Clitoroplasty, which is the construction of a
32   clitoris-like structure; and
33                              (v)  Vulvoplasty, which is the construction of a
34   vulva-like structure.
35                    (C)  For biological females, surgery may involve:
36                              (i)  A hysterectomy or oophorectomy;

                                3               03-08-2021 11:23:08 JMB259

EOG_008131

As Engrossed:  H3/2/21 H3/8/21                                      HB1570

1          (ii)  Reconstruction of the urethra;
2          (iii)  Genital reconstruction including
3  metoidioplasty or phalloplasty, which is the construction of a penis-like
4  structure;
5          (iv)  Vaginectomy, which is the removal of the
6  vagina;
7          (v)  Scrotoplasty, which is the construction of a
8  penis-like and scrotum-like structure; and
9          (vi)  Implantation of erection or testicular
10  prostheses;
11          (11)  The complications, risks, and long-term care concerns
12  associated with genital gender reassignment surgery for both males and
13  females are numerous and complex;
14          (12)(A)  Nongenital gender reassignment surgery includes various
15  invasive procedures for males and females and also involves the alteration or
16  removal of biologically normal and functional body parts.
17          (B)  For biological males, this surgery may involve:
18          (i)  Augmentation mammoplasty;
19          (ii)  Facial feminization surgery;
20          (iii)  Liposuction;
21          (iv)  Lipofilling;
22          (v)  Voice surgery;
23          (vi)  Thyroid cartilage reduction;
24          (vii)  Gluteal augmentation;
25          (viii)  Hair reconstruction; and
26          (ix)  Other aesthetic procedures.
27          (C)  For biological females, this surgery may involve:
28          (i)  A subcutaneous mastectomy;
29          (ii)  Voice surgery;
30          (iii)  Liposuction;
31          (iv)  Lipofilling;
32          (v)  Pectoral implants; and
33          (vi)  Other aesthetic procedures;
34          (13)(A)  It is an accepted principle of economics and public
35  policy that when a service or product is subsidized or reimbursed, demand for
36  that service or product is increased.

EOG_008132

As Engrossed:  H3/2/21 H3/8/21                                          HB1570

1        (B)  Between 2015 and 2016, gender reassignment surgeries
2   increased by nearly twenty percent (20%) in the United States;
3        (14)  It is of grave concern to the General Assembly that the
4   medical community is allowing individuals who experience distress at
5   identifying with their biological sex to be subjects of irreversible and
6   drastic nongenital gender reassignment surgery and irreversible, permanently
7   sterilizing genital gender reassignment surgery, despite the lack of studies
8   showing that the benefits of such extreme interventions outweigh the risks;
9   and
10       (15)  The risks of gender transition procedures far outweigh any
11  benefit at this stage of clinical study on these procedures.
12
13       SECTION 3.  Arkansas Code Title 20, Chapter 9, is amended to add an
14  additional subchapter to read as follows:
15
16  Subchapter 15 — Arkansas Save Adolescents from Experimentation (SAFE) Act
17
18       20-9-1501.  Definitions.
19       As used in this subchapter:
20       (1)  "Biological sex" means the biological indication of male and
21  female in the context of reproductive potential or capacity, such as sex
22  chromosomes, naturally occurring sex hormones, gonads, and nonambiguous
23  internal and external genitalia present at birth, without regard to an
24  individual's psychological, chosen, or subjective experience of gender;
25       (2)  "Cross-sex hormones" means:
26       (A)  Testosterone or other androgens given to biological
27  females in amounts that are larger or more potent than would normally occur
28  naturally in healthy biological sex females; and
29       (B)  Estrogen given to biological males in amounts that are
30  larger or more potent than would normally occur naturally in healthy
31  biological sex males;
32       (3)  "Gender" means the psychological, behavioral, social, and
33  cultural aspects of being male or female;
34       (4)  "Gender reassignment surgery" means any medical or surgical
35  service that seeks to surgically alter or remove healthy physical or
36  anatomical characteristics or features that are typical for the individual's

EOG_008133

1   biological sex, in order to instill or create physiological or anatomical
2   characteristics that resemble a sex different from the individual's
3   biological sex, including without limitation, genital or nongenital gender
4   reassignment surgery performed for the purpose of assisting an individual
5   with a gender transition;
6           (5)  "Gender transition" means the process in which a person goes
7   from identifying with and living as a gender that corresponds to his or her
8   biological sex to identifying with and living as a gender different from his
9   or her biological sex, and may involve social, legal, or physical changes;
10          (6)(A)  "Gender transition procedures" means any medical or
11  surgical service, including without limitation physician's services,
12  inpatient and outpatient hospital services, or prescribed drugs related to
13  gender transition that seeks to:
14              (i)  Alter or remove physical or anatomical
15  characteristics or features that are typical for the individual's biological
16  sex; or
17              (ii)  Instill or create physiological or anatomical
18  characteristics that resemble a sex different from the individual's
19  biological sex, including without limitation medical services that provide
20  puberty-blocking drugs, cross-sex hormones, or other mechanisms to promote
21  the development of feminizing or masculinizing features in the opposite
22  biological sex, or genital or nongenital gender reassignment surgery
23  performed for the purpose of assisting an individual with a gender
24  transition.
25          (B)  "Gender transition procedures" do not include:
26              (i)  Services to persons born with a medically
27  verifiable disorder of sex development, including a person with external
28  biological sex characteristics that are irresolvably ambiguous, such as those
29  born with 46 XX chromosomes with virilization, 46 XY chromosomes with
30  undervirilization, or having both ovarian and testicular tissue;
31              (ii)  Services provided when a physician has
32  otherwise diagnosed a disorder of sexual development that the physician has
33  determined through genetic or biochemical testing that the person does not
34  have normal sex chromosome structure, sex steroid hormone production, or sex
35  steroid hormone action;
36              (iii)  The treatment of any infection, injury,

EOG_008134

As Engrossed:  H3/2/21 H3/8/21                              HB1570

1    disease, or disorder that has been caused by or exacerbated by the
2    performance of gender transition procedures, whether or not the gender
3    transition procedure was performed in accordance with state and federal law
4    or whether not funding for the gender transition procedure is permissible
5    under this subchapter; or
6                          (iv)  Any procedure undertaken because the individual
7    suffers from a physical disorder, physical injury, or physical illness that
8    would, as certified by a physician, place the individual in imminent danger
9    of death or impairment of major bodily function unless surgery is performed;
10          (7)  "Genital gender reassignment surgery" means a medical
11   procedure performed for the purpose of assisting an individual with a gender
12   transition, including without limitation:
13                 (A)  Surgical procedures such as penectomy, orchiectomy,
14   vaginoplasty, clitoroplasty, or vulvoplasty for biologically male patients or
15   hysterectomy or ovariectomy for biologically female patients;
16                 (B)  Reconstruction of the fixed part of the urethra with
17   or without a metoidioplasty; or
18                 (C)  Phalloplasty, vaginectomy, scrotoplasty, or
19   implantation of erection or testicular prostheses for biologically female
20   patients;
21          (8)  "Healthcare professional" a person who is licensed,
22   certified, or otherwise authorized by the laws of this state to administer
23   health care in the ordinary course of the practice of his or her profession;
24          (9)  "Nongenital gender reassignment surgery" means medical
25   procedures performed for the purpose of assisting an individual with a gender
26   transition including without limitation:
27                 (A)  Surgical procedures for biologically male patients,
28   such as augmentation mammoplasty, facial feminization surgery, liposuction,
29   lipofilling, voice surgery, thyroid cartilage reduction, gluteal
30   augmentation, hair reconstruction, or various aesthetic procedures; or
31                 (B)  Surgical procedures for biologically female patients,
32   such as subcutaneous mastectomy, voice surgery, liposuction, lipofilling,
33   pectoral implants, or various aesthetic procedures;
34          (10)  "Physician" means a person who is licensed to practice
35   medicine in this state;
36          (11)  "Puberty-blocking drugs" means gonadotropin-releasing

EOG_008135

As Engrossed:  H3/2/21 H3/8/21                                    HB1570

1   hormone analogues or other synthetic drugs used in biological males to stop
2   luteinizing hormone secretion and therefore testosterone secretion, or
3   synthetic drugs used in biological females which stop the production of
4   estrogens and progesterone, when used to delay or suppress pubertal
5   development in children for the purpose of assisting an individual with a
6   gender transition; and
7            (12)  "Public funds" means state, county, or local government
8   monies, in addition to any department, agency, or instrumentality authorized
9   or appropriated under state law or derived from any fund in which such moneys
10  are deposited.
11
12      20-9-1502.  Prohibition of gender transition procedures for minors.
13      (a)  A physician or other healthcare professional shall not provide
14  gender transition procedures to any individual under eighteen (18) years of
15  age.
16      (b)  A physician, or other healthcare professional shall not refer any
17  individual under eighteen (18) years of age to any healthcare professional
18  for gender transition procedures.
19      (c)  A physician or other healthcare professional is not prohibited
20  from providing any of the following procedures which are not gender
21  transition procedures to an individual under eighteen (18) years of age:
22            (1)  Services to persons born with a medically verifiable
23  disorder of sex development, including a person with external biological sex
24  characteristics that are irresolvably ambiguous, such as those born with 46
25  XX chromosomes with virilization, 46 XY chromosomes with undervirilization,
26  or having both ovarian and testicular tissue;
27            (2)  Services provided when a physician has otherwise diagnosed a
28  disorder of sexual development that the physician has determined through
29  genetic or biochemical testing that the person does not have normal sex
30  chromosome structure, sex steroid hormone production, or sex steroid hormone
31  action;
32            (3)  The treatment of any infection, injury, disease, or disorder
33  that has been caused by or exacerbated by the performance of gender
34  transition procedures, whether or not the gender transition procedure was
35  performed in accordance with state and federal law or whether not funding for
36  the gender transition procedure is permissible under this subchapter; or

EOG_008136

As Engrossed:  H3/2/21 H3/8/21                                      HB1570

1            (4)  Any procedure undertaken because the individual suffers from
2    a physical disorder, physical injury, or physical illness that would, as
3    certified by a physician, place the individual in imminent danger of death or
4    impairment of major bodily function unless surgery is performed.
5
6         20-9-1503.  Prohibition on use of public funds for gender transition
7    procedures.
8         (a)  Public funds shall not be directly or indirectly used, granted,
9    paid, or distributed to any entity, organization, or individual that provides
10   gender transition procedures to an individual under eighteen (18) years of
11   age.
12        (b)  Healthcare services furnished in the following situations shall
13   not include gender transition procedures to an individual under eighteen (18)
14   years of age:
15            (1)  By or in a healthcare facility owned by the state or a
16   county or local government; or
17            (2)  By a physician or other healthcare professional employed by
18   state or a county or local government.
19        (c)  Any amount paid by an individual or an entity during a taxable
20   year for provision of gender transition procedures or as premiums for health
21   care coverage that includes coverage for gender transition procedures is not
22   tax-deductible.
23        (d)  The Arkansas Medicaid Program shall not reimburse or provide
24   *coverage for gender transition procedures to an individual under eighteen*
25   *(18) years of age.*
26
27        20-9-1504.  Enforcement.
28        (a)  Any referral for or provision of gender transition procedures to
29   an individual under eighteen (18) year of age is unprofessional conduct and
30   is subject to discipline by the appropriate licensing entity or disciplinary
31   review board with competent jurisdiction in this state.
32        (b)  A person may assert an actual or threatened violation of this
33   subchapter as a claim or defense in a judicial or administrative proceeding
34   and obtain compensatory damages, injunctive relief, declaratory relief, or
35   any other appropriate relief.
36            (c)(1)  A person shall bring a claim for a violation of this subchapter

EOG_008137

1    no later than two (2) years after the day the cause of action accrues.

2          (2)  An individual under eighteen (18) years of age may bring an

3    action throughout their minority through a parent or next friend, and may

4    bring an action in their own name upon reaching majority at any time from

5    that point until twenty (20) years after reaching the age of majority.

6        (d)  Notwithstanding any other provision of law, an action under this

7    subchapter may be commenced, and relief may be granted, in a judicial

8    proceeding without regard to whether the person commencing the action has

9    sought or exhausted available administrative remedies.

10       (e)  In any action or proceeding to enforce a provision of this

11    subchapter, a prevailing party who establishes a violation of this subchapter

12    shall recover reasonable attorneys' fees.

13       (f)(1)  The Attorney General may bring an action to enforce compliance

14    with this subchapter.

15         (2)  This subchapter does not deny, impair, or otherwise affect

16    any right or authority of the Attorney General, the State of Arkansas, or any

17    agency, officer, or employee of the state, acting under any law other than

18    this subchapter, to institute or intervene in any proceeding.

19

20      SECTION 4.  Arkansas Code Title 23, Chapter 79, Subchapter 1, is

21    amended to add an additional section to read as follows:

22    23-79-164.  Insurance coverage of gender transition procedures for

23    minors prohibited.

24       (a)  As used in this section, "gender transition procedures" means the

25    same as defined in § 20-9-1501.

26       (b)  A health benefit plan under an insurance policy or other plan

27    providing healthcare coverage in this state shall not include reimbursement

28    for gender transition procedures for a person under eighteen (18) years of

29    age.

30       (c)  A health benefit plan under an insurance policy or other plan

31    providing healthcare coverage in this state is not required to provide

32    coverage for gender transition procedures.

33

34                      /s/Lundstrum

35

36

EOG_008138

Senate Engrossed

~~gender transition; prohibitions; public monies~~
(now: irreversible gender reassignment surgery; minors)

State of Arizona
Senate
Fifty-fifth Legislature
Second Regular Session
2022

# SENATE BILL 1138

AN ACT

AMENDING TITLE 32, CHAPTER 32, ARTICLE 1, ARIZONA REVISED STATUTES, BY
ADDING SECTION 32-3230; RELATING TO HEALTH CARE.

(TEXT OF BILL BEGINS ON NEXT PAGE)

- i -

EOG_008139

S.B. 1138

1  Be it enacted by the Legislature of the State of Arizona:
2      Section 1. Title 32, chapter 32, article 1, Arizona Revised
3  Statutes, is amended by adding section 32-3230, to read:
4      32-3230. Prohibition of irreversible gender reassignment
5              surgery for minors; definitions
6      A. A PHYSICIAN MAY NOT PROVIDE IRREVERSIBLE GENDER REASSIGNMENT
7  SURGERY TO ANY INDIVIDUAL WHO IS UNDER EIGHTEEN YEARS OF AGE.
8      B. A PHYSICIAN MAY PROVIDE ANY OF THE FOLLOWING TO AN INDIVIDUAL
9  WHO IS UNDER EIGHTEEN YEARS OF AGE:
10     1. SERVICES TO AN INDIVIDUAL BORN WITH A MEDICALLY VERIFIABLE
11 DISORDER OF SEX DEVELOPMENT, INCLUDING AN INDIVIDUAL WITH EXTERNAL
12 BIOLOGICAL SEX CHARACTERISTICS THAT ARE IRRESOLVABLY AMBIGUOUS, SUCH AS
13 BEING BORN WITH FORTY-SIX XX CHROMOSOMES WITH VIRILIZATION OR FORTY-SIX
14 XY CHROMOSOMES WITH UNDERVIRILIZATION OR HAVING BOTH OVARIAN AND
15 TESTICULAR TISSUE.
16     2. SERVICES PROVIDED WHEN A PHYSICIAN HAS OTHERWISE DIAGNOSED A
17 DISORDER OF SEXUAL DEVELOPMENT AND HAS DETERMINED THROUGH GENETIC OR
18 BIOCHEMICAL TESTING THAT THE INDIVIDUAL DOES NOT HAVE NORMAL SEX
19 CHROMOSOME STRUCTURE, SEX STEROID HORMONE PRODUCTION OR SEX STEROID
20 HORMONE ACTION.
21     3. THE TREATMENT OF ANY INFECTION, INJURY, DISEASE OR DISORDER THAT
22 HAS BEEN CAUSED BY OR EXACERBATED BY THE PERFORMANCE OF GENDER TRANSITION
23 PROCEDURES, WHETHER OR NOT THE GENDER TRANSITION PROCEDURE WAS PERFORMED
24 IN ACCORDANCE WITH STATE AND FEDERAL LAW.
25     4. ANY PROCEDURE UNDERTAKEN BECAUSE THE INDIVIDUAL SUFFERS FROM A
26 PHYSICAL DISORDER, PHYSICAL INJURY OR PHYSICAL ILLNESS THAT WOULD, AS
27 CERTIFIED BY A PHYSICIAN, PLACE THE INDIVIDUAL IN IMMINENT DANGER OF DEATH
28 OR IMPAIRMENT OF MAJOR BODILY FUNCTION UNLESS SURGERY IS PERFORMED.
29     C. FOR THE PURPOSES OF THIS SECTION:
30     1. "BIOLOGICAL SEX" MEANS THE BIOLOGICAL INDICATION OF MALE AND
31 FEMALE IN THE CONTEXT OF REPRODUCTIVE POTENTIAL OR CAPACITY, SUCH AS SEX
32 CHROMOSOMES, NATURALLY OCCURRING SEX HORMONES, GONADS AND NONAMBIGUOUS
33 INTERNAL AND EXTERNAL GENITALIA PRESENT AT BIRTH, WITHOUT REGARD TO AN
34 INDIVIDUAL'S PSYCHOLOGICAL, CHOSEN OR SUBJECTIVE EXPERIENCE OF GENDER.
35     2. "GENDER" MEANS THE PSYCHOLOGICAL, BEHAVIORAL, SOCIAL AND
36 CULTURAL ASPECTS OF BEING MALE OR FEMALE.
37     3. "GENDER TRANSITION" MEANS THE PROCESS IN WHICH A PERSON GOES
38 FROM IDENTIFYING WITH AND LIVING AS A GENDER THAT CORRESPONDS TO THE
39 PERSON'S BIOLOGICAL SEX TO IDENTIFYING WITH AND LIVING AS A GENDER
40 DIFFERENT FROM THE PERSON'S BIOLOGICAL SEX AND MAY INVOLVE SOCIAL, LEGAL
41 OR PHYSICAL CHANGES.
42     4. "IRREVERSIBLE GENDER REASSIGNMENT SURGERY" MEANS A MEDICAL
43 PROCEDURE PERFORMED FOR THE PURPOSE OF ASSISTING AN INDIVIDUAL WITH A
44 GENDER TRANSITION, INCLUDING ANY OF THE FOLLOWING:

EOG_008140

S.B. 1138

1       (a) PENECTOMY, ORCHIECTOMY, VAGINOPLASTY, CLITOROPLASTY OR
2   VULVOPLASTY FOR BIOLOGICALLY MALE PATIENTS OR HYSTERECTOMY OR OVARIECTOMY
3   FOR BIOLOGICALLY FEMALE PATIENTS.
4       (b) METOIDIOPLASTY, PHALLOPLASTY, VAGINECTOMY, SCROTOPLASTY OR
5   IMPLANTATION OF ERECTION OR TESTICULAR PROSTHESES FOR BIOLOGICALLY FEMALE
6   PATIENTS.
7       (c) AUGMENTATION MAMMOPLASTY FOR BIOLOGICALLY MALE PATIENTS AND
8   SUBCUTANEOUS MASTECTOMY FOR FEMALE PATIENTS.
9       5. "PHYSICIAN" MEANS A PERSON WHO IS LICENSED PURSUANT TO CHAPTER
10  13 OR 17 OF THIS TITLE.
11      Sec. 2.  <u>Effective date</u>
12      This act is effective from and after March 31, 2023.

- 2 -

1     SB184

2     216600-4

3     By Senators Shelnutt and Allen

4     RFD: Healthcare

5     First Read: 03-FEB-22

EOG_008142

SB184

1    SB184

2

3

4    <u>ENROLLED</u>, An Act,

5          Relating to public health; to prohibit the

6    performance of a medical procedure or the prescription of

7    medication, upon or to a minor child, that is intended to

8    alter the minor child's gender or delay puberty; to provide

9    for exceptions; to provide for disclosure of certain

10   information concerning students to parents by schools; and to

11   establish criminal penalties for violations; and in connection

12   therewith would have as its purpose or effect the requirement

13   of a new or increased expenditure of local funds within the

14   meaning of Amendment 621 of the Constitution of Alabama of

15   1901, as amended by Amendment 890, now appearing as Section

16   111.05 of the Official Recompilation of the Constitution of

17   Alabama of 1901, as amended.

18   BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

19         Section 1. This act shall be known and may be cited

20   as the Alabama Vulnerable Child Compassion and Protection Act

21   (V-CAP).

22         Section 2. The Legislature finds and declares the

23   following:

24         (1) The sex of a person is the biological state of

25   being female or male, based on sex organs, chromosomes, and

EOG_008143

SB184

1    endogenous hormone profiles, and is genetically encoded into a

2    person at the moment of conception, and it cannot be changed.

3        (2) Some individuals, including minors, may

4    experience discordance between their sex and their internal

5    sense of identity, and individuals who experience severe

6    psychological distress as a result of this discordance may be

7    diagnosed with gender dysphoria.

8        (3) The cause of the individual's impression of

9    discordance between sex and identity is unknown, and the

10   diagnosis is based exclusively on the individual's self-report

11   of feelings and beliefs.

12       (4) This internal sense of discordance is not

13   permanent or fixed, but to the contrary, numerous studies have

14   shown that a substantial majority of children who experience

15   discordance between their sex and identity will outgrow the

16   discordance once they go through puberty and will eventually

17   have an identity that aligns with their sex.

18       (5) As a result, taking a wait-and-see approach to

19   children who reveal signs of gender nonconformity results in a

20   large majority of those children resolving to an identity

21   congruent with their sex by late adolescence.

22       (6) Some in the medical community are aggressively

23   pushing for interventions on minors that medically alter the

24   child's hormonal balance and remove healthy external and

EOG_008144

SB184

1   internal sex organs when the child expresses a desire to

2   appear as a sex different from his or her own.

3          (7) This course of treatment for minors commonly

4   begins with encouraging and assisting the child to socially

5   transition to dressing and presenting as the opposite sex. In

6   the case of prepubertal children, as puberty begins, doctors

7   then administer long-acting GnRH agonist (puberty blockers)

8   that suppress the pubertal development of the child. This use

9   of puberty blockers for gender nonconforming children is

10  experimental and not FDA-approved.

11         (8) After puberty blockade, the child is later

12  administered "cross-sex" hormonal treatments that induce the

13  development of secondary sex characteristics of the other sex,

14  such as causing the development of breasts and wider hips in

15  male children taking estrogen and greater muscle mass, bone

16  density, body hair, and a deeper voice in female children

17  taking testosterone. Some children are administered these

18  hormones independent of any prior pubertal blockade.

19         (9) The final phase of treatment is for the

20  individual to undergo cosmetic and other surgical procedures,

21  often to create an appearance similar to that of the opposite

22  sex. These surgical procedures may include a mastectomy to

23  remove a female adolescent's breasts and "bottom surgery" that

24  removes a minor's health reproductive organs and creates an

EOG_008145

SB184

1  artificial form aiming to approximate the appearance of the

2  genitals of the opposite sex.

3       (10) For minors who are placed on puberty blockers

4  that inhibit their bodies from experiencing the natural

5  process of sexual development, the overwhelming majority will

6  continue down a path toward cross-sex hormones and cosmetic

7  surgery.

8       (11) This unproven, poorly studied series of

9  interventions results in numerous harmful effects for minors,

10  as well as risks of effects simply unknown due to the new and

11  experimental nature of these interventions.

12       (12) Among the known harms from puberty blockers is

13  diminished bone density; the full effect of puberty blockers

14  on brain development and cognition are yet unknown, though

15  reason for concern is now present. There is no research on the

16  long-term risks to minors of persistent exposure to puberty

17  blockers. With the administration of cross-sex hormones comes

18  increased risks of cardiovascular disease, thromboembolic

19  stroke, asthma, COPD, and cancer.

20       (13) Puberty blockers prevent gonadal maturation and

21  thus render patients taking these drugs infertile. Introducing

22  cross-sex hormones to children with immature gonads as a

23  direct result of pubertal blockade is expected to cause

24  irreversible sterility. Sterilization is also permanent for

25  those who undergo surgery to remove reproductive organs, and

EOG_008146

SB184

1  such persons are likely to suffer through a lifetime of

2  complications from the surgery, infections, and other

3  difficulties requiring yet more medical intervention.

4       (14) Several studies demonstrate that hormonal and

5  surgical interventions often do not resolve the underlying

6  psychological issues affecting the individual. For example,

7  individuals who undergo cross-sex cosmetic surgical procedures

8  have been found to suffer from elevated mortality rates higher

9  than the general population. They experience significantly

10  higher rates of substance abuse, depression, and psychiatric

11  hospitalizations.

12       (15) Minors, and often their parents, are unable to

13  comprehend and fully appreciate the risk and life

14  implications, including permanent sterility, that result from

15  the use of puberty blockers, cross-sex hormones, and surgical

16  procedures.

17       (16) For these reasons, the decision to pursue a

18  course of hormonal and surgical interventions to address a

19  discordance between the individual's sex and sense of identity

20  should not be presented to or determined for minors who are

21  incapable of comprehending the negative implications and

22  life-course difficulties attending to these interventions.

23       Section 3. For the purposes of this act, the

24  following terms shall have the following meanings:

EOG_008147

SB184

1          (1) MINOR. The same meaning as in Section 43-8-1,
2     Code of Alabama 1975.
3          (2) PERSON. Includes any of the following:
4          a. Any individual.
5          b. Any agent, employee, official, or contractor of
6     any legal entity.
7          c. Any agent, employee, official, or contractor of a
8     school district or the state or any of its political
9     subdivisions or agencies.
10          (3) SEX. The biological state of being male or
11     female, based on the individual's sex organs, chromosomes, and
12     endogenous hormone profiles.
13          Section 4. (a) Except as provided in subsection (b),
14     no person shall engage in or cause any of the following
15     practices to be performed upon a minor if the practice is
16     performed for the purpose of attempting to alter the
17     appearance of or affirm the minor's perception of his or her
18     gender or sex, if that appearance or perception is
19     inconsistent with the minor's sex as defined in this act:
20          (1) Prescribing or administering puberty blocking
21     medication to stop or delay normal puberty.
22          (2) Prescribing or administering supraphysiologic
23     doses of testosterone or other androgens to females.
24          (3) Prescribing or administering supraphysiologic
25     doses of estrogen to males.

EOG_008148

SB184

1          (4) Performing surgeries that sterilize, including

2     castration, vasectomy, hysterectomy, oophorectomy,

3     orchiectomy, and penectomy.

4          (5) Performing surgeries that artificially construct

5     tissue with the appearance of genitalia that differs from the

6     individual's sex, including metoidioplasty, phalloplasty, and

7     vaginoplasty.

8          (6) Removing any healthy or non-diseased body part

9     or tissue, except for a male circumcision.

10         (b) Subsection (a) does not apply to a procedure

11    undertaken to treat a minor born with a medically verifiable

12    disorder of sex development, including either of the

13    following:

14         (1) An individual born with external biological sex

15    characteristics that are irresolvably ambiguous, including an

16    individual born with 46 XX chromosomes with virilization, 46

17    XY chromosomes with under virilization, or having both ovarian

18    and testicular tissue.

19         (2) An individual whom a physician has otherwise

20    diagnosed with a disorder of sexual development, in which the

21    physician has determined through genetic or biochemical

22    testing that the person does not have normal sex chromosome

23    structure, sex steroid hormone production, or sex steroid

24    hormone action for a male or female.

25         (c) A violation of this section is a Class C felony.

EOG_008149

SB184

1       Section 5. No nurse, counselor, teacher, principal,

2    or other administrative official at a public or private school

3    attended by a minor shall do either of the following:

4       (1) Encourage or coerce a minor to withhold from the

5    minor's parent or legal guardian the fact that the minor's

6    perception of his or her gender or sex is inconsistent with

7    the minor's sex.

8       (2) Withhold from a minor's parent or legal guardian

9    information related to a minor's perception that his or her

10    gender or sex is inconsistent with his or her sex.

11       Section 6. Except as provided for in Section 4,

12    nothing in this act shall be construed as limiting or

13    preventing psychologists, psychological technicians, and

14    master's level licensed mental health professionals from

15    rendering the services for which they are qualified by

16    training or experience involving the application of recognized

17    principles, methods, and procedures of the science and

18    profession of psychology and counseling.

19       Section 7. Nothing in this section shall be

20    construed to establish a new or separate standard of care for

21    hospitals or physicians and their patients or otherwise

22    modify, amend, or supersede any provision of the Alabama

23    Medical Liability Act of 1987 or the Alabama Medical Liability

24    Act of 1996, or any amendment or judicial interpretation of

25    either act.

EOG_008150

SB184

1        Section 8. If any part, section, or subsection of
2    this act or the application thereof to any person or
3    circumstances is held invalid, the invalidity shall not affect
4    parts, sections, subsections, or applications of this act that
5    can be given effect without the invalid part, section,
6    subsection, or application.
7        Section 9. This act does not affect a right or duty
8    afforded to a licensed pharmacist by state law.
9        Section 10. Although this bill would have as its
10    purpose or effect the requirement of a new or increased
11    expenditure of local funds, the bill is excluded from further
12    requirements and application under Amendment 621, as amended
13    by Amendment 890, now appearing as Section 111.05 of the
14    Official Recompilation of the Constitution of Alabama of 1901,
15    as amended, because the bill defines a new crime or amends the
16    definition of an existing crime.
17        Section 11. This act shall become effective 30 days
18    following its passage and approval by the Governor, or its
19    otherwise becoming law.

Page 9

**EOG_008151**

SB184

```
 1

 2


 3    _____

 4         President and Presiding Officer of the Senate



 5    _____

 6              Speaker of the House of Representatives



 7    SB184
 8    Senate 23-FEB-22
 9    I hereby certify that the within Act originated in and passed
10    the Senate, as amended.
11
12                              Patrick Harris,
13                              Secretary.
14

15              _____


16
17    House of Representatives
18    Passed: 07-APR-22

19              _____


20
21    By: Senator Shelnutt
```

Page 10

EOG_008152