IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JANE DOE, et al.,

     Plaintiffs,

v.                              Case No. 4:23-cv-114-RH-MAF

JOSEPH A. LADAPO, et al.,

     Defendants.

_____/

## THE STATE'S TRIAL BRIEF

Defendants Surgeon General Ladapo, the Florida Board of Medicine, the Florida Board of Osteopathic Medicine, and State Attorney Gladson provide this Court with their trial brief.

Dated: November 6, 2023          Respectfully submitted by:

**Ashley Moody**
ATTORNEY GENERAL

/s/ James H. Percival
**James H. Percival** (FBN 1016188)
CHIEF OF STAFF
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
James.Percival@myfloridalegal.com

*Counsel for the Surgeon General, the Department of Health, and State Attorney Gladson*

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

*Counsel for the Surgeon General, the Department of Health, the Boards of Medicine, and the individual Board Members*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, the foregoing was filed using the

Court's CM/ECF, which will serve a copy to all counsel of record.

/s/ Mohammad O. Jazil<br>Mohammad O. Jazil

## Introduction

Plaintiffs don't have a case after *Eknes-Tucker v. Governor of the State of Alabama*, 80 F.4th 1205 (11th Cir. 2023). So much so that Plaintiffs now adopt new legal theories to challenge State gender-dysphoria laws—pretext and intentional discrimination—that appear nowhere in Plaintiffs' *third* amended complaint. That speaks volumes of their class-action case (or lack thereof).

Plaintiffs' third amended complaint challenges provisions of Senate Bill 254; Florida Board of Medicine Rules 64B8-9.019, 64B8ER23-7, and 64B8ER23-8; and Florida Board of Osteopathic Medicine Rules 64B15-14.014, 64B15ER23-9, and 64B15ER23-10, under Fourteenth Amendment substantive due process and the Equal Protection Clause. Plaintiffs claim that the laws (1) violate a parent's fundamental right to obtain puberty blockers and cross-sex hormones to treat their children's gender dysphoria and (2) discriminate "based on [] sex and transgender status." Doc.118 ¶¶ 192-207 (third amended complaint).

But *Eknes-Tucker* forecloses both claims: the Eleventh Circuit held that there's no fundamental parental right to obtain gender-dysphoria treatments, and that laws that regulate gender-dysphoria treatments are neither sex nor transgender-status discrimination.

Even Plaintiffs' new pretext and intentional discrimination theories fail; the *Arlington Heights* factors don't demonstrate that the Florida House of Representatives *and* the Florida Senate *and* the Governor *and* the Surgeon General *and* the Florida

3

Department of Health *and* the Florida Board of Medicine *and* the Florida Board of Osteopathic Medicine all targeted transgender Floridians. Nothing shows that all these state actors made their decisions "because of," and "not merely in spite of," someone's transgender status. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up).

If anything, this case is about the State's actions to protect children, to protect patients, to safeguard the medical profession, and to ensure a high quality of medical care for Floridians. Those are more than rational reasons—they are compelling governmental interests—and are advanced by the challenged laws. Given the low-quality evidence that supports the gender-dysphoria treatments at issue here—a fact that the *Dekker* and *Doe* experts and their preferred treatment guidelines all admit—the State's actions are reasonable.

This Court should therefore reject Plaintiffs' arguments (including the new ones) and enter judgment in favor of the State.

## Background

This case concerns treatments for gender dysphoria. Gender dysphoria is a psychiatric diagnosis, the distressing incongruence between one's biological sex and one's gender identity. *Dekker* Tr.971:3-7 (Dr. Levine); *see also Dekker* Tr.38:17-20, 114:3-9 (Dr. Karasic). Sex is biologically based, but gender is increasingly used to describe culturally constructed attributes associated with being a biological male or a biological female. *See generally Dekker* Tr.971:15-25, 1099:18-25 (Dr. Levine); *Dekker* DX24 at 7 (Endocrine Society guideline). Gender identity, in turn, is understood as "a person's

deeply felt, inherent sense of being a girl, woman, female, a boy, a man, or male." *Dekker* Tr.120:14-22 (Dr. Karasic). Unlike biological sex, gender identity isn't biologically based. *Dekker* Tr.971:15-972:2 (Dr. Levine). One's gender identity can change throughout one's life. *Dekker* Tr.165:18-23 (Dr. Karasic). So can transgender status; after all, detransitioners exist. *Dekker* Tr.81:23-82:14, 164:2-165:23 (Dr. Karasic); *Dekker* DX16 at 43; *Dekker* P.I. Tr.41:17 (testimony from a detransitioner).

As the *Dekker* Plaintiffs' experts conceded during trial, there isn't any "confirmatory laboratory or radiographic study for the diagnosis of gender dysphoria." *Dekker* Tr.400:7-14 (Dr. Antommaria). No "blood test," "X-ray," "MRI," "CT scan," "imaging of any kind," or "gene" can diagnose or establish the existence of gender dysphoria. *Dekker* Tr.114:15-115:4 (Dr. Karasic), 189:14-16 (Dr. Shumer). And while only transgender individuals suffer from gender dysphoria, not every transgender individual has gender dysphoria; some transgender individuals have no distressing incongruence between their gender identity and biological sex. *Dekker* Tr.115:5-119:22 (Dr. Karasic). In other words, someone can be transgender but not have gender dysphoria. *Id.*

It's hard to diagnose gender dysphoria for other reasons as well. Transgender individuals often suffer from other mental health issues, such as autism, anxiety, depression, and suicidality. *Dekker* Tr.108:11-111:11 (Dr. Karasic), 1053:4-1054:17 (Dr. Levine); *Dekker* DX16 at 173 (WPATH standards of care). Many factors can influence one's gender dysphoria as well, including environmental factors, like social acceptance.

*Dekker* Tr.136:16-137:5 (Dr. Karasic). Other conditions, such as body dysmorphic disorder, can also be confused with gender dysphoria. *Dekker* DX24 at 8.

Some medical professionals and organizations recommend treating gender dysphoria with puberty blockers, cross-sex hormones, and surgeries. Puberty blockers, or GnRH agonists, suppress an adolescent's natural puberty. *Dekker* DX24 at 12-17. Puberty blockers are then followed up with cross-sex hormones—testosterone for biological females and estrogen for biological males—which make an individual undergo the opposite sex's puberty. *Dekker* DX24 at 17-21. Around 98% of gender-dysphoric patients who take puberty blockers go on to receive cross-sex hormones. *Dekker* Tr.578:14-20 (Dr. Olson-Kennedy); *see also Dekker* Tr.262:14-22 (Dr. Shumer). And surgeries remove sex organs from patients, to conform with their gender identity.

These treatments come with significant health risks. Puberty blockers can cause bone-mineralization issues, compromise fertility (if puberty blockers are followed with cross-sex hormones), and have unknown effects on brain development. *Dekker* DX24 at 14. Cross-sex hormones could cause infertility. *Dekker* DX24 at 18. "Surgery that affects fertility is irreversible." DX24 at 25.

To be sure, these treatments aren't unique to gender dysphoria. Puberty blockers, for example, have been used to treat precocious puberty in minors, though the goal there is to restore endocrine levels to a normal range, not to stop a natural and age-appropriate release of hormones. Doc.90 at 10 (preliminary-injunction order).

Two advocacy organizations are the primary proponents for these gender-dysphoria treatments. The first is the World Professional Association for Transgender Health. It publishes what it calls "standards of care" on treatments for gender dysphoria. *Dekker* DX16. The drafters of these so-called standards of care must be WPATH full members with a marked commitment to furthering transgender rights, *Dekker* Tr.100:18-101:5 (Dr. Karasic); *Dekker* DX17 (WPATH webpage), and they need not be medical professionals; being a parent of a transgender child suffices. *Dekker* Tr.*100:16-21 (Dr. Janssen)[1]; *Dekker* DX16 at 250.

WPATH is candid about the shortcomings of the evidence that supports its treatment recommendations. Consider the following admissions:

- In the adolescent-treatment chapter: "[g]ender-diverse youth should fully understand the reversible, partially reversible, and irreversible aspects of a treatment, *as well as the limits of what is known about certain treatments (e.g., the impact of pubertal suppression on brain development[)]*." *Dekker* DX16 at 63 (emphasis added).
- In the adolescent-treatment chapter: "[t]here is, however, limited data on the optimal timing of gender-affirming interventions as well as the long-term physical, psychological, and neurodevelopmental outcomes in youth." *Dekker* DX16 at 67.
- In the adolescent-treatment chapter: "[t]he potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study." *Dekker* DX16 at 67.
- In the adult-assessment chapter: the "empirical evidence base for the assessment of" transgender and gender diverse adults "is limited." *Dekker* DX16 at 34-35.

---

[1] "*Dekker* Tr.*" refers to the transcript of the fourth day of the *Dekker* trial.

7

- In the adult-assessment chapter: the "intervention-specific risks associated with the presence of specific physical conditions have not been well researched." *Dekker* DX16 at 40.
- In the hormone-therapy chapter: "[t]here are also major gaps in knowledge regarding the potential effects of testosterone on oocytes and subsequent fertility of" "patients." *Dekker* DX16 at 120.

The second organization is the Endocrine Society. It publishes clinical practice guidelines on gender-dysphoria treatments, which WPATH co-sponsors, with several WPATH members serving as contributors to the guidelines. *Dekker* DX24 at 1, *Dekker* Tr.124:11-125:8 (Dr. Karasic). The guidelines themselves use the Grading of Recommendations Assessment, Development, and Evaluation or GRADE evidence-rating system. *Dekker* DX24 at 1, 4-5. GRADE rates the evidence quality for a treatment recommendation: evidence is either high, moderate, low, or very-low quality. *Dekker* DX24 at 4-5. With higher-quality evidence comes more confidence that treatments will produce the intended result. *Dekker* Tr.346:4-14 (Dr. Antommaria); *Dekker* DX24 at 4-5. With low-quality evidence, or even very-low-quality evidence, such confidence is either limited or little. *Dekker* Tr.396:21-397:10 (Dr. Antommaria); *Dekker* DX24 at 4-5.

The Endocrine Society's clinical practice guidelines put forth twenty-eight recommendations on gender-dysphoria treatments. *Dekker* DX24 at 2-4. Three are backed by moderate-quality evidence, fourteen are backed by low-quality evidence, five are backed by very-low-quality evidence, and six are backed by no evidence at all. *Dekker* DX24 at 2-5. For example:

- Low-quality evidence backs the following: "[w]e suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty." *Dekker* DX24 at 3.

- Very-low-quality evidence backs the recommendation that "there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years," "*even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years.*" *Dekker* DX24 at 3 (emphasis added).

- The recommendation that "clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment" is backed by no evidence at all. *Dekker* DX24 at 4.

Even beyond WPATH's standards of care and the Endocrine Society's clinical practice guidelines, gender-dysphoria treatments are backed by limited data and studies. The *Dekker* Plaintiffs' experts concede as much:

- "Limited prospective outcome data exist regarding transgender and nonbinary youth receiving gender-affirming hormones." *Dekker* Tr.586:18-23 (Dr. Olson-Kennedy).

- "Evidence has been lacking from longitudinal studies that explore potential mechanisms by which gender-affirming medical care affects gender dysphoria and subsequent well-being." *Dekker* Tr.586:24-587:5 (Dr. Olson-Kennedy).

- "There are no large-scale studies examining mental health among transgender and nonbinary youth who receive gender-affirming hormone therapy." *Dekker* Tr.588:14-589:4 (Dr. Olson-Kennedy).

- "Knowledge about the effects of puberty suppression on the developing brain of transgender youth is limited." *Dekker* Tr.*38:16-19 (Dr. Edmiston).

The studies relied on by Plaintiffs are also exceedingly weak, often backed by online-survey data, *Dekker* Tr.589:8-19 (Dr. Olson-Kennedy), small sample sizes, *Dekker* Tr.*37:11-39:7 (Dr. Edmiston), a lack of long-term data, *Dekker* Tr.*37:11-39:7 (Dr. Edmiston), and a lack of randomized-sampling data, *Dekker* Tr.143:13-15, 146:3-

9

147:18 (Dr. Karasic) (discussing whether high-quality, randomized gender-dysphoria studies are feasible).

States aren't alone in worrying about gender-dysphoria treatments. Other countries share their concern:

**Sweden:** Sweden's National Board of Health and Welfare determined that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments," and determined that "[t]reatment with GnRH analogues, gender-affirming hormones, and mastectomy can be administered" only "*in exceptional cases.*" *Dekker* DX8 at 3 (emphasis added).

**Finland:** Finland's Council for Choices in Healthcare urged extreme caution when providing gender transitioning services to children. It says that "[t]he reliability of the existing studies with no control groups is highly uncertain, and because of this uncertainty, no decisions should be made that can permanently alter a still-maturing minor's mental and physical development." *Dekker* DX9 at 7.

**United Kingdom:** The U.K. National Institute of Health and Care Excellence reviewed studies that purport to support hormone therapy for gender-dysphoric minors. *Dekker* DX11, *Dekker* DX12. The institute concluded that "all small, uncontrolled observational studies" for puberty blockers "are of very low certainty using modified GRADE" and the studies "reported physical and mental health comorbidities and concomitant treatments very poorly." *Dekker* DX11 at 13. As for cross-sex hormones, the institute stated that evidence of their effectiveness was also of

10

a "very low" quality. *Dekker* DX12 at 4. The U.K.'s Cass Report, which reviewed gender-identity services in the country, stated that there's a "lack of consensus" and open discussion about the nature of gender dysphoria and therefore about the appropriate clinical response. *Dekker* DX10 at 16.

**France:** France's Académie Nationale de Médecine concludes that "great medical caution" must be taken "given the vulnerability, particularly psychological, of this population [of younger people presenting with gender dysphoria] and the many undesirable effects, and even serious complications, that some of the available therapies can cause." *Dekker* DX13 at 1.

**Australia & New Zealand:** The Royal Australian and New Zealand College of Psychiatrists has said that there's a "paucity of evidence" on the outcomes of those presenting with gender dysphoria. *Dekker* DX14 at 1.

### Factual History

This case begins in mid-2022. In June 2022, Surgeon General Ladapo asked the Florida Board of Medicine and the Florida Board of Osteopathic Medicine to promulgate standard-of-care rules for gender-dysphoria treatments for minors. PX15 (Ladapo letter). The boards are authorized to adopt standard-of-care rules, and have promulgated rules on a wide range of medical practice areas.[2]

---

[2] See Chapter 64B8-9, Florida Administrative Code (Board of Medicine), and Chapter 64B15-14, Florida Administrative Code (Board of Osteopathic Medicine). To provide examples, the Board of Medicine "created registries and standards for [] practice areas [such] as prescription drugs to treat obesity, office surgery standards,

Noting the "lack of conclusive evidence and the high risk for long-term, irreversible harms," the Surgeon General recommended that the boards prohibit the "pharmaceutical, non-pharmaceutical, and surgical treatments for gender dysphoria" for minors. PX15. The Surgeon General "spent a lot of time" on this issue, and his opinions evolved based on his "review of the evidence" and "evaluation of data presented by individuals of all different perspectives." PX23 10:12-20 (August 5, 2022, Board of Medicine Meeting). He concluded that "the effectiveness" of these treatments "is completely uncertain," and that the treatments—which carry a significant "level of risk"—are backed   "entirely" by "observational studies" that have many "issues," making it "impossible to conclude that there is a benefit from the scientific studies that have been published." PX23 10:12 – 11:21; *see also* PX23 11:22 – 12:5 (Surgeon General discussing risks for hormone therapies); PX23 12:6-10 (Surgeon General discussing risks for surgeries).

The Surgeon General's letter was followed by a Florida Department of Health petition to the boards to initiate rulemaking, to set the standard of care for certain gender-dysphoria treatments. PX16 (petition); *see also* PX14 (Florida Department of

---

opioid dispensing and prescription, electrolysis, use of laser and light-based devices, medical marijuana, including a consent form. And by extension, th[e] board regulates the standard of care of a physician when they are supervising a PA or an anesthesia assistant. And most recently, [it] took up the issue of the Brazilian butt lifts." PX24 103:12 – 104:9 (October 28, 2022, Joint Rule Workshop).

Health guidance); PX23 14:1 – 15:13 (department attorney explaining the department's position).

To determine whether they should promulgate standard-of-care rules (and if so, to determine the substance of those rules), the boards wanted a robust expert debate. The boards made it their business to invite medical professionals with differing opinions—those who support puberty blockers, cross-sex hormones, and surgeries as treatments for gender dysphoria, and those who oppose those treatments. PX23 19:16-19, 57:8-17 (Board of Medicine Chairman Diamond).

The invite list was long, particularly for the experts and groups who have provided the at-issue treatments. The boards invited, for example:

- Dr. Caroline Davidge-Pitts, Co-Chair of the Endocrine Society Special Interest Group for Transgender Research and Medicine.
- Dr. Sean Iwamoto, Co-Chair of the Endocrine Society Special Interest Group for Transgender Research and Medicine.
- Dr. Jonathan Poquiz, Clinical Director of the Gender Affirming Care Clinic at Johns Hopkins All Children's Hospital.
- Dr. Suzanne Jackman, Interim Medical Director at John Hopkins All Children's Hospital.
- Dr. Alejandro Diaz, Chief of the Division of Pediatric Endocrinology at Nicklaus Children's Pediatric Specialists.
- Dr. Bethel Steindel-Spargo, Joe DiMaggio Children's Hospital.
- The Endocrine Society.
- WPATH.

PX75 (invitation list). These professionals and groups declined, PX25 13:3-22 (November 4, 2022, Joint Board Meeting) (Board of Medicine Chairman Diamond), but many accepted.[3] The following experts testified before the boards:

- Dr. Michael Haller, Chief of Pediatric Endocrinology at the University of Florida. PX23 19:22.
- Dr. Kristen Dayton, University of Florida's Shands Children's Hospital Youth Transgender Clinic. PX24 18:4 (October 28, 2022, Joint Rule Workshop).
- Dr. Aron Janssen, a WPATH member and *Dekker* and *Doe* expert. PX24 33:12.
- Dr. Riittakerttu Kaltiala, Chief of the Department of Adolescent Psychiatry at Finland's Tampere University Hospital, "one of the two nationally centralized gender identity teams for minors" in that country. PX24 47:7.
- Dr. Meredithe McNamara, Yale School of Medicine. PX24 73:14.

These experts weren't shrinking violets. Some expressed disagreement with Florida's gender-dysphoria actions, including criticizing the Florida Agency for Health Care Administration's GAPMS report on gender-dysphoria treatments. *E.g.*, PX23 22:2 – 23:9 (Dr. Haller testifying); PX24 75:3-22 (Dr. McNamara testifying). And they provided insight about how they provide gender-dysphoria treatments. For Dr. McNamara, as an example, "[i]t's all about what the patients want, how that fits into

---

[3] It's also worth noting that the boards tried to contact "several accomplished pediatric endocrinologists practicing here in Florida, who stated their discomfort with the guidelines espoused by the Endocrine Society, WPATH and the American Academy of Pediatrics. These physicians, of course, were invited to speak . . . but each declined. They cited a concern that their positions in various medical societies and indeed their actual employment would be jeopardized should they speak." PX25 13:3-22 (Board of Medicine Chairman Diamond).

the informed consent model, and how that is—and how that goes along with clinical

practice guidelines." PX24 92:18-25.

Even so, these experts conceded the limitations of their positions:

- "There is no literature about what is the natural cause of adolescent onset gender dysphoria." PX24 60:17-19 (Dr. Kaltiala).
- Age guidelines for gender-dysphoria treatments are based on "capacity," not "anatomic physiology." PX23 41:21 – 42:9 (Dr. Dayton).
- Gender dysphoria is "not as common as many other medical diagnoses, so there are limited data. And it forces us to develop guidelines without often having core randomized control trials like we'd all like." PX23 49:18-23 (Dr. Haller).
- European countries "have a limited data set as everybody does, because this is the cutting edge of medicine, the data are the data." PX23 45:13-21 (Dr. Haller).

Even the University of Florida didn't have published data at the time:

We don't have an active registry of our [gender-dysphoric] patients currently. . . .

We don't have ongoing trials with our patients, but we are working, like, on things like registries of our patients. But no specific, like, investigational trials. . . . I do think something like a larger database throughout the country is not only important to have, but actually is something that our pediatric endocrine society has been working toward doing with all the clinics in the country. So it's not yet fully operational, but it is something that a lot of physicians are going to do. . . . [W]e're not necessarily, you know, systematically collecting like surveys from our patients and things like that to do a more prospective. But I do agree that that would be a really great next step that we need to pursue.

PX24 27:9-13; PX23 50:19-22, 51:6-13, 58:16-21.

Dr. Janssen's and Dr. Kaltiala's testimonies were particularly noteworthy; they

showcased the difference between American gender-dysphoria treatments and

European gender-dysphoria treatments. For example, Dr. Janssen opined that gender-dysphoria treatments are used to help patients' mental health comorbidities:

> Research and clinical experience repeatedly affirm that transition significantly improves the mental and physical health of transgender young people. This is true of each stage of a young person's transition and transition can and often does alleviate co-occurring mental health issues that transgender young person experience prior to transition. Following transition, transgender young people are often able to see significant improvements in functioning and quality of life.

PX24 39:20 – 40:4. But Dr. Kaltiala testified that patients' mental health comorbidities should be treated *before* obtaining gender-dysphoria treatments:

> I consider it of utmost importance [that] severe psychiatric disorders first be treated into remission.

> Very seldom we see patients where you could think that the mental health comorbidities would only be secondary and mild. It is often stated in the literature. . . .

> I have also myself reviewed the literature and the evidence for—because it is often stated that the gender reassignment will also help in the mental health difficulties and the functional impairments. This is not the case. There is no evidence base for such claims.

> Literature and the research on the impact of gender reassignment of mental health is lousy at best and I cannot conclude based on my own reviews and the reviews by COHERE Finland, and also the Cass review and some other experts, that there is evidence to say that mental health difficulties, psychiatric disorders (indiscernible) if an adolescent experiencing gender dysphoria is given gender reassignment, for instance. These are separate problems and if the psychiatric problems seem to be more fundamental, they have to be treated first.

PX24 56:5 – 57:11. Again, Dr. Kaltiala works at "one of the two nationally centralized gender identity teams for minors" in Finland. PX24 47:7. In her experience, gender-

16

dysphoria treatments should come from a multi-disciplinary team, PX24 51:12 – 54:13, where health assessments "comprise multiple meetings over a period of 6 to 12 months," "rarely" "in 6 months." PX24 52:1-16. Even she was aware that:

> [Y]ou may be wondering why I seem to have a different evidence from the American speakers. Yes, this is an interesting question, but I have myself reviewed the evidence for the impact of medical gender reassignment on the mental health in children and adolescents. . . . And this is really my sincere understanding that the evidence is lousy.

> Research on the impact of child and adolescent gender reassignment—medical reassignment in children and adolescents is mainly comprising the one Dutch study which can be criticized because they didn't have a comparable comparison group and it only included some 70 patients and we are now treating tens of thousands of patients all around the world. So 70 patients as the model for treatment for tens of thousands of patients, I find it really lousy. And it is not in the same level as is usually expected for evidence-based medicine in any field of medicine nowadays.

> And the other treatment studies after the Dutch study have been even worse. They only have a handful of patients; the follow up times is up to one or two years only; they have been using a variety of instruments; and they mainly have not been able to demonstrate any improvement of mental health or functional capacity—functional abilities; and they have also not reported who were the patients who were not included in the study. So there is no basis for critical (indiscernible) what kind of group is the treatment group representative of.

> So evidence is lousy in general regarding mental health and adolescent progress and adolescent development in particular. . . . There as almost all of the other claims of their effectiveness is questionable, based on questionable quality studies. . . .

> [T]herefore, I personally think that actually hormonal treatments on gender dysphoria indication for children and adolescents should preferably be limited into the context of formal research studies at the moment.

PX24 57:17 – 59:13, 61:1-5.

The boards didn't solely hear from expert proponents and opponents; they also heard from detransitioners—some of whom didn't receive the best care[4]—as well as Democratic state officials, *e.g.*, PX23 66:16 (Rep. Eskamani); PX23 85:21 (Nathan Bruemmer), and the public. The boards did so over, at times, jeers, disruptions, and threats.[5] But the boards received quality expert debate. In taking in the expert opinions, Board of Medicine Chairman Diamond summarized both sides of the issue:

> We have the State that contends that the standard of care as espoused by these professional societies has serious flaws; that the number of minors receiving these treatments is substantively increasing; that they may be causing harm, potentially even irreversible harm, and there are issues related to the capacity they contend for these young children to make these important decisions. And for these reasons, we are being asked, as the body charged with such responsibilities, to enter rulemaking. . . .

> [T]he opposition position [is that the] standard of care is developed by the professional societies as a result of vigorous scientific debate. This is how science works. We yell and we argue in a respectful, scientific way. The numbers of individuals being treated in the state is actually relatively small,

---

[4] *E.g.*, PX24 131:6-10 ("[M]y therapist lied on documentation to say I had been her patient for far longer than I had been and that I had no preexisting conditions that might affect my gender identity disorder diagnosis."); PX24 143:25 – 144:2 ("I obtained testosterone by calling Planned Parenthood and was prescribed after just a 30-minute phone conversation.").

[5] *E.g.*, PX25 77:22 – 78:3 ("Everyone in this room, and I promise you, your names, your emails, your phones, your emails, your phones, everything will be published, and you will not live the moment down. Every person that kills themselves because of this that I know, I will make sure their family contacts you. The blood is on your hands."); PX25 82:15-17 (disruption); PX25 86:11-13 (The rules are "dangerous, regressive, purposefully hateful, and another strong step towards fascism for the state of Florida.").

and it's not the purview of the State to get involved in these actions. I think that's the bottom line [of the opposition position].

PX23 33:16 – 34:13. It was important for the boards to consider these perspectives; after all, medicine isn't perfect, and imperfect medicine can cause horrible consequences, as Chairman Diamond explained:

> In the example we always use in oncology is back in the 1990s, thousands and thousands of women with locally advanced breast cancer were undergoing bone marrow transplant and a very, very toxic, very difficult procedure. And everyone thought it ought to work. The data from South Africa purported that it did work. And guess what? It didn't work. And it was a terrible experience.

PX23 51:23 – 52:6.

In the end, the boards decided to initiate rulemaking and promulgate rules that contained the same language:

> (1) The following therapies and procedures performed for the treatment of gender dysphoria in minors are prohibited.
>
> > (a) Sex reassignment surgeries, or any other surgical procedures, that alter primary or secondary sexual characteristics.
> >
> > (b) Puberty blocking, hormone, and hormone antagonist therapies.
>
> (2) Minors being treated with puberty blocking, hormone, or hormone antagonist therapies prior to the effective date of this rule may continue with such therapies.

Rule 64B8-9.019, Fla. Admin. Code; Rule 64B15-14.014, Fla. Admin. Code. Both rules went into effect in March 2023.

Around this time, the Florida Legislature was also considering gender-dysphoria treatments. Two bills were working their ways through the legislature: House Bill 1421

19

and Senate Bill 254. The bills had some similarities and some important differences. Some of those differences were:

- HB1421 contained provisions that prevented individuals from changing the biological sex on their birth certificates. SB254 didn't have birth-certificate provisions. PX32 6:8-10 (March 27, 2023, House Health & Human Services Committee).
- HB1421 prevented public *and private* health insurance policies from covering certain gender-dysphoria treatments. SB254 didn't affect private health insurance. PX32 10:7-10.
- Both bills had a grandfather provision for individuals receiving certain gender-dysphoria treatments before the legislation would go into effect. HB1421's grandfather provision would end on December 31, 2023. SB254's grandfather provision didn't have a sunset provision.

Like the boards, the Florida Legislature heard testimony from proponents and opponents of the at-issue treatments. Detransitioners shared their stories with lawmakers. One detransitioner stated that she can no longer "trust my doctors to help me." PX27 40:1 – 52:11 (February 21, 2023, House Health & Human Services Committee). Her doctors didn't provide her with "any other option[s]" than "medical transition" and didn't conduct "a proper psychological evaluation," which prevented her from being "informed fully of the potential consequences of medical transition." PX27 40:1 – 52:11. Pointedly, she stated that:

> I had several comorbidities that the doctors failed to rule out or address. I was previously diagnosed with ADHD, but it actually turned out later that I'm actually on the spectrum. And it was actually the gender specialist, the same one who referred me to surgery, who about a year afterward told me that I had some pretty key symptoms of autism, that I should be screened for it. And even if I was diagnosed with autism, my doctors still would have transitioned me.

PX27 47:8-17.

Dr. Stephen Levine also spoke to lawmakers. He explained the lack of long-term quality studies that support certain treatments for gender dysphoria. PX27 36:21 – 37:5. And he noted the tension between two positions that treatment proponents often state: that "gender dysphoria is a serious medical condition, and" that "it requires medical intervention only if the patient wants it. So there is some inherent paradox in that idea, right? It's a serious medical condition. That implies that we should treat it, but we should only treat it if the patient wants it." PX27 35:22 – 36:3. Recall Dr. McNamara's statement before the Board of Medicine and Board of Osteopathic Medicine that "[i]t's all about what the patients want." PX24 92:18-25.

After several hearings and amendments, the Florida Legislature coalesced around SB254. Relevant to this case, it:

- Prevents patients younger than 18 years old from obtaining puberty blockers, cross-sex hormones, and surgeries to treat their gender dysphoria.
- Contains an exception for patients younger than 18 years old, who obtained puberty blockers or cross-sex hormones before SB254 became effective. The bill tasked the Board of Medicine and Board of Osteopathic Medicine with adopting emergency rules to establish standards of care and informed-consent forms.
- Allows patients 18 years of age and older to continue obtaining puberty blockers, cross-sex hormones, and surgeries to treat their gender dysphoria—if they receive informed consent, as established by the Board of Medicine and Board of Osteopathic Medicine. Informed consent requires, in part, the patient and physician to be "physically present in the same room." "[R]enewals of prescriptions" don't require separate informed consent.
- Limits prescribing and performing these treatments.

21

- Contains civil, criminal, and professional consequences for performing unauthorized treatments.

Under SB254, emergency board rules "remain in effect until replaced by rules adopted under the nonemergency rulemaking procedures" of the Florida Administrative Procedure Act.

Lawmakers explained their support for this kind of legislation. The support was based on, for instance:

- Protecting patients. *E.g.*, PX30 88:8-9 (March 22, 2023, House Healthcare Regulation Subcommittee) ("because I do care deeply for these patients, I'm up on your bill"); PX30 92:25 – 93:2 ("our primary role as legislators, as lawmakers of Florida, or any state, is to protect our citizens").
- The need for the Florida Legislature to "draw the line when drastic life-altering gender dysphoria therapies and surgeries are being prescribed for our children." PX29 5:11-14 (March 13, 2023, Senate Health Policy Committee); PX29 117:20-24 (same).
- A concern that "given the seriousness of the" at-issue "procedure[s]," consultations and informed-consent discussions "should be done with a doctor in person." PX30 31:17-19; *see also* PX31 10:22 – 11:2 (March 23, 2023, Florida Senate Fiscal Policy Committee) ("The treatments have the potential for life-altering effects and should be provided by our most highly educated and trained health care practitioners, as well as being regulated in a heightened manner and differently than most other medical treatments.").
- A worry that the medical profession was not doing right by their patients. PX36 20:17-24 (April, 19, 2023, House Session) ("[A]s we learned from the situation up at Vanderbilt, we now know there are plenty of doctors who are not guided by conscience but by the fact that these surgeries pay a lot of money. . . . The art of medicine is not for sale.").

The Governor signed SB254 into law, and it went into effect on May 17, 2023. The Board of Medicine and the Board of Osteopathic Medicine then began their emergency-rulemaking procedures. The process to create informed-consent forms was

particularly complicated. Many entities provided input. PX39 15:35 – 16:2 (June 23, 2023, Joint Rules/Legislation Committee Meeting).

And, at base, the informed-consent-drafting process involved several lawyers and doctors on governmental boards discussing medical studies, syntax, and grammar, at some length, as the following vignette reflects:

> Attorney McNulty: Thank you. And then the second item on that same page is . . . where it requires the DEXA scan. But the other forms say annual. Is there a length of time you want that DEXA scan, like what period of time? Or just—the other forms say like annual bone scan but I'm not sure—
>
> Dr. Ackerman: Other forms said a bone scan. It's a DEXA scan, not a bone scan.
>
> Attorney McNulty: It says, "Bone DEXA scan."
>
> Dr. Ackerman: No, no. It's a DEXA scan, it's not a bone scan.
>
> Dr. Benson: It's a bone density scan.
>
> Attorney McNulty: So what should the right—
>
> Dr. Ackerman: A bone scan is a nuclear study that looks at osteoblastic changes in the bones. A DEXA scan is basically a low dose x-ray of the bone to look at the bone density. So it should be—it's a DEXA scan, it's not a bone scan.
>
> Dr. Benson: You could put a bone density scan or something.
>
> Dr. Ackerman: Yeah. Bone density scan, yeah. Bone density scan. Don't use—so I move that we change all of that terminology to say, "Bone density scan (DEXA)."
>
> Attorney Dierlman: Do you want it to say annual across all—
>
> Dr. Ackerman: No, no. I didn't get there yet.

23

Attorney Dierlman: Okay.

Dr. Ackerman: We'll go with that in a second. Let's clarify what it is. "Bone density scan (DEXA scan)."

Unidentified Speaker: Yeah, yeah.

Dr. Ackerman: Because I get this—it happens to me all the time that a patient needs a DEXA scan, and they get a bone scan. No, no. Because—all the time.

PX39 66:11 – 67:25. Also consider the following:

Dr. Ackerman: Box six, "I understand my surgery—risk factors." Those are breast cancer, right, the breast cancer risk factors one?

Chairman Romanello: Yes.

Dr. Ackerman: So it says, "I.e." bracket one, bracket to [sic]. Technically, it should be "E.g."

Chairman Romanello: Okay.

Dr. Ackerman: For example, not that is. I.e. is that is, meaning those are the only two. E.g. is for example. There's more than just those two.

PX39 128:1-11. To be sure, there's lots of information on the informed-consent forms. But that's also the case for the medical marijuana informed-consent forms, DX8, as well as the informed-consent forms for cataracts (which are available on the boards' websites under "resources"). As one board member stated, the gender-dysphoria informed-consent forms:

[R]emind[] me of a lot of the consent forms that I use in my practice when I have patients that are involved in cancer treatment, especially ones that are involved with getting multiple different drugs and radiation. In that it's not just a general consent form where you're signing away—you're signing not waiver. You're signing saying, "I accept puberty blockers." But it's

> going through each of the benefits, and risks of those puberty blockers, and what one could accept over time."

PX39 16:14-24. All of this is to say that the informed-consent-drafting process is an inherently dense, complicated process.

The boards passed informed-consent forms, and they have been updating these emergency rules since. Oct. 16, 2023 Status Conference Tr.8:14-21 (Plaintiffs' counsel noting that the forms have "been modified twice"). That said, the boards stated that they intend to pass permanent rules. *E.g.*, PX41 61:7-12 (September 3, 2023, Joint Board Meeting).

**Procedural History**

Plaintiffs filed their original complaint on March 23, 2023, Doc.1, and their first amended complaint on April 24, 2023, Doc.29. They moved to preliminarily enjoin the two original, minor-focused board rules—Rules 64B8-9.019 and 64B15-14.014—also on April 24. Doc.30. Plaintiffs filed their second amended complaint on May 18, 2023. Docs.56, 59. This Court eventually granted their preliminary-injunction motion on June 6, 2023. Doc.90.

Plaintiffs then filed a second preliminary-motion on July 24, 2023, to enjoin adult-focused aspects of SB254 and board actions. Doc.115. They also filed a third amended complaint on July 27, 2023, Docs.114, 117, and a motion for class certification on July 31, 2023,  Doc.120. This Court denied the second preliminary-injunction

motion, Doc.151, and granted the class-certification motion, Doc.166. Two classes and

a subclass were certified:

- "The first class consists of all transgender adults in Florida who seek gender-affirming treatment with puberty blockers, cross-sex hormones, or surgery."
- "The second class consists of all transgender minors in Florida who seek gender-affirming treatment with puberty blockers or cross-sex hormones and their parents."
- "The subclass—a subset of the second class—consists of all transgender minors in Florida who seek but are prohibited by state law from obtaining gender-affirming treatment with puberty blockers or cross-sex hormones and their parents."

Doc.166 at 14.

**Argument**

Plaintiffs' substantive-due-process, equal-protection, and (new) pretext and

intentional discrimination challenges fail.

**Substantive Due Process.** Plaintiffs contend that parents have a fundamental

right to obtain puberty blockers and cross-sex hormones to treat their children's gender

dysphoria, which, according to Plaintiffs, the State laws infringe. To make this claim,

Plaintiffs must establish that this purported right is deeply rooted in the nation's history

and traditions. *Timbs v. Indiana*, 139 S. Ct. 682, 686-87 (2019). Plaintiffs can't do it—for

several reasons.

*First*, of course, in *Eknes-Tucker*, the Eleventh Circuit held that this fundamental

right doesn't exist: the court made clear that there's no "right to treat one's children

26

with transitioning medications subject to medically accepted standards." 80 F.4th at 1224 (cleaned up).

*Second*, even if *Eknes-Tucker* hadn't come out, Plaintiffs must still "perform a[] historical inquiry" to establish a fundamental right's deep-rootedness. *Id.* at 1221. But Plaintiffs aren't calling any expert historians at trial. At most, Plaintiffs are calling expert doctors. Yet doctors aren't historians. And Plaintiffs can't rely on the *Dekker* record, because that case didn't feature any expert historians, either.

Even so, little good an expert historian would do: obtaining access to "decidedly modern" treatments can't be and aren't deeply rooted in our nation's history and traditions. *Morrissey v. United States*, 871 F.3d 1260, 1269-70 (11th Cir. 2017) (holding that there's no right to obtain in vitro fertilization, a treatment that came out in the 1970s). Puberty blockers "first began being used in the 1980s," and cross-sex hormones came out in "the second half of the 20th century." *Eknes-Tucker*, 80 F.4th at 1221 n.11 &12. These new treatments aren't deeply rooted.

*Finally*, and again, assuming *Eknes-Tucker* didn't come out, Plaintiffs can point to no U.S. Supreme Court or Eleventh Circuit case that has held that there's a fundamental right for parents to obtain puberty blockers and cross-sex hormones to treat their children's gender dysphoria. At most, they can only rely on cases that "recognize, at a high level of generality, that there is a fundamental right to make decisions concerning the 'upbringing' and 'care, custody, and control' of one's children." *Id.* at 1224 (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925); *Troxel v. Granville*, 530 U.S. 57, 66

(2000)). But placed in "the context of medical decision-making," those cases don't "establish that parents have a derivative fundamental right to obtain a particular medical treatment for their children." *Id.*

In fact, case law cuts in the opposite direction—it's well recognized that States can limit parental authority when "parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Wisconsin v. Yoder*, 406 U.S. 205, 233-34 (1972); *see also Prince v. Massachusetts*, 321 U.S. 158, 168-69 (1944); *Parham v. J.R.*, 442 U.S. 584, 604 (1979); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990).

Thus, the challenged State laws sail under rational-basis review. It's a deferential standard that's easily met. *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004). A justification for a challenged law need only be backed by rational speculation, and the challenging party must negate *every* possible justification—including justifications based on rational speculation. *FCC v. Beach Comm'ns*, 508 U.S. 307, 315 (1993).

Here, rational-basis review is easily satisfied. States, after all, have a compelling governmental interest to protect minors. *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756-57 (1982)). "In the same vein, states have a compelling interest in protecting children from drugs, particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects." *Eknes-Tucker*, 80 F.4th at 1225. Plaintiffs' experts, the *Dekker*

experts, Plaintiffs' preferred treatment guidelines, and European countries all agree on these points. *Id.* (noting actions of European countries).

The challenged State laws are also justified by the fact that "some families will not fully appreciate those risks and that some minors experiencing gender dysphoria ultimately will desist and identify with their biological sex." *Id.* There's record evidence here that shows that families and patients haven't been fully informed of the risks of these easily accessible gender-dysphoria treatments.

Members of the public told State policymakers that treating doctors didn't provide informed consent, and just gave them access to the treatments. One member of the public stated that my "therapist lied on documentation to say I had been her patient for far longer than I had been and that I had no preexisting conditions that might affect my gender identity disorder diagnosis." PX24 131:6-10. Another stated that her doctors didn't recommend "any" treatment "option[s]" other than "medical transition" and didn't conduct "a proper psychological evaluation"; she therefore wasn't "informed fully of the potential consequences of medical transition." PX27 40:1 – 52:11. And another member of the public stated that "I obtained testosterone by calling Planned Parenthood and was prescribed after just a 30-minute phone conversation." PX24 143:25 – 144:2.

All told, there isn't a fundamental parental right to obtain puberty blockers and cross-sex hormones to treat their children's gender dysphoria, and the challenged laws easily withstand rational-basis review.

29

**Equal Protection**. Next, Plaintiffs argue that the challenged laws—for both minors and adults—violate the Equal Protection Clause. They contend that the laws are sex and transgender-status discrimination, which subject the laws to heightened scrutiny.

*Eknes-Tucker* held otherwise. To be sure, the Alabama gender-dysphoria legislation in *Eknes-Tucker* applied to only minors, but the analysis would apply to legislation that affects adult treatment.

The Alabama legislation wasn't sex discrimination: it didn't "establish an unequal regime for males and females," and it "refer[red] to sex only because the medical procedures that it regulate[d]" were "themselves sex-based." 80 F.4th at 1228. So too here.

Nor was the Alabama law transgender-status discrimination: it didn't "further any particular gender stereotype," and it didn't matter that the law was a "regulation of a medical procedure that only one" group (transgender individuals) "can undergo." *Id.* at 1229-30. So too here.

For that matter, the Eleventh Circuit has rejected the argument that transgender individuals are part of a discrete and insular minority. *Id.* at 1230; *see also Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n.5 (11th Cir. 2022) (en banc). Transgender individuals aren't a politically powerless group. "The President of the United States," the Department of Health and Human Services, and "the Department of Justice support the Plaintiffs." *L.W. v. Skrmetti*, 2023 U.S. App. LEXIS 25697, at *60 (6th Cir.

Sept. 28, 2023); *see also E.g.*, *Dekker* DX1, DX2, DX3 (Biden Administration's policies on gender-dysphoria treatments). "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting." *L.W.*, 2023 U.S. App. LEXIS 25697, at *60. "The major medical organizations support the Plaintiffs." *Id.* at *60. And "the only large law firms to make an appearance in the case all entered the controversy in support of the Plaintiffs. *These are not the hallmarks of a skewed or unfair political process.*" *Id.* (emphasis added).

Again, the challenged laws sail under and survive rational-basis review—and then some. States, after all, can "protect[] the integrity and ethics of the medical profession," *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997), and protect vulnerable patients— especially in areas of "medical and scientific uncertainty," *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

**Pretext.** Plaintiffs are now left with pretext and intentional discrimination. Those claims fail, too. To determine whether a law was passed with discriminatory animus, *Arlington Heights* factors are considered. *Vill. of Arlington Heights v. Metro. Hous. Auth.*, 429 U.S. 252 (1977). As is the presumption of good faith.

*Presumption of Good Faith.* This Court must apply the presumption of good faith. *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023) ("*LWVFL*"); *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021) ("*GBM*").

It's a mandatory presumption. *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (The "good faith" "*must* be presumed." (emphasis added)); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018) (discussing presumption of good faith); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (stay panel) (same); *NAACP v. City of Jacksonville*, 2023 WL 119425, at *11-24 (11th Cir. Jan. 6, 2023) (stay panel) (Newsom, J., dissenting) (same).

The presumption of good faith means that the parties don't start out with scales in equipoise. Elected officials should be presumed to be acting in public confidence for constitutional results. To overcome the presumption, "only the clearest proof will suffice." *Smith v. Doe*, 538 U.S. 84, 92 (2003); *see also United States v. Armstrong*, 517 U.S. 456, 464-65 (1996) (demanding clear evidence to overcome presumption of regularity). Indeed, the U.S. Supreme Court has reversed discriminatory intent findings even when they were supported by "a modicum of evidence." *Easley v. Cromartie*, 532 U.S. 234, 257 (2001).

Chief Justice Marshall put it best: holding that a governmental official had improper intent is "a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810). This isn't a doubtful case: Plaintiffs nowhere approach the evidence needed to overcome that presumption.

*Direct Evidence.* The record establishes that policymakers care for individuals with gender dysphoria and that policymakers want to ensure that individuals with gender

dysphoria receive quality healthcare. *See, e.g.*, PX25 27:25 – 28:2 ("Children and youth with gender dysphoria are suffering. They need care, the best possible care, excellent care."); PX30 92:2-3 ("we're not trying to hurt them; we're trying to help them"); PX30 88:8-9 ("And because I do care deeply for these patients, I'm up on your bill.").

Plaintiffs may try to quote (or take out of context) a handful of policymakers' comments. But one or two policymakers can't speak for the entire policymaking body—even if that policymaker is the policy's primary sponsor. *LWVFL*, 66 F.4th at 932 (holding that a bill sponsor's comments "add[] little" to the *Arlington Heights* analysis).

*Impact.* To be sure, the State laws concern gender-dysphoria treatments, and only transgender individuals can be diagnosed with gender dysphoria. It still bears noting that not all transgender individuals have gender dysphoria. Even so, "impact alone is not determinative" of discriminatory animus. *Arlington Heights*, 429 U.S. at 266.

*Historical Background.* This factor doesn't permit an "unlimited look-back to past discrimination." *GBM*, 992 F.3d at 1325 (citing *Arlington Heights*, 429 U.S. at 267). "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality). Here, Plaintiffs can't rely on an expert historian at trial. So it's doubtful that they can establish any specific record evidence to assist them with this factor.

*Substantive and Procedural Departures, Legislative History.* SB254's and the challenged rules' histories are part of garden-variety legislative and administrative processes. The

subject matter may be controversial, but the evidence will show that the legislative and administrative procedures weren't.

*Contemporary Statements.* This factor considers statements from *proponents* of the State laws—not "political opponents." *LWVFL*, 66 F.4th at 940 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 n.24 (1976)). As discussed above, the record contains statements from legislators that reveal a concern for patients, a need to maintain the integrity of the medical profession, and a desire to protect children. Again, one or two policymakers don't speak for the entire policymaking body. *Id.* at 932. "What motivates one" policymaker "to make a speech" or statement "about a" policy "is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968).

*Foreseeability and Knowledge of Disparate Impact.* A review of the legislative and administrative records will show that the State policymakers weren't aware of the exact number of adults and minors people who may have been affected by the laws. That said, they were aware of the number of Florida minor Medicaid recipients who sought the at-issue treatments for their gender dysphoria, *e.g.*, PX33 81:6-15 (April 3, 2023, Senate Session), and figures of minor patients from gender clinics, PX23 36:24 – 38:1.

*Less Discriminatory Alternatives.* Ironically, SB254 is a less discriminatory legislative option. Compare it to HB1421. Plaintiffs *must* concede that they would prefer SB254 over HB1421: SB254 doesn't touch birth certificates, it doesn't sunset its grandfather provision, and it doesn't touch private insurance. As such, SB254 couldn't be the most

discriminatory legislative option. And it also bears noting that SB254 *doesn't* ban gender-dysphoria treatments for adults—it requires informed consent. That fact shouldn't be overlooked in this case.

Plaintiffs may identify other legislative or rule provisions they wish the State would have adopted, but the State needn't adopt Plaintiffs' preferred alternatives. *LWVFL*, 66 F.4th at 940 (quoting *GBM*, 992 F.3d at 1327).

*State Justifications.* At base, the evidence will show that the challenged laws make sense, as the legislative and administrative records confirm, and as Dr. Levine, Dr. Jonathan Clemens, and Dr. Monica Mortensen (who's also on the Board of Osteopathic Medicine and helped draft the informed-consent forms) will testify at trial.[6] Taking everything together, the challenged laws would have been passed by the Florida Legislature and boards, regardless of any purported malintent.

## Conclusion

For these reasons, the evidence will show that judgment in favor of the State is appropriate.

---

[6] Note that Plaintiffs stated that the informed-consent forms are "irrelevant" to minor-patient challenges. Oct.16, 2023 Status Conference Tr.9:24 – 10:3. (Court: "Well, I'm stunned.").

Dated: November 6, 2023                    Respectfully submitted by:

**Ashley Moody**                           /s/ Mohammad O. Jazil
ATTORNEY GENERAL                           Mohammad O. Jazil (FBN 72556)
                                           Gary V. Perko (FBN 855898)
/s/ James H. Percival                      Michael Beato (FBN 1017715)
**James H. Percival** (FBN 1016188)        HOLTZMAN VOGEL BARAN
CHIEF OF STAFF                             TORCHINSKY & JOSEFIAK PLLC
Office of the Attorney General             119 S. Monroe St., Suite 500
The Capitol, Pl-01                         Tallahassee, FL 32301
Tallahassee, Florida 32399-1050            (850) 270-5938
(850) 414-3300                             mjazil@holtzmanvogel.com
(850) 410-2672 (fax)                       gperko@holtzmanvogel.com
James.Percival@myfloridalegal.com          mbeato@holtzmanvogel.com

*Counsel for the Surgeon General, the*     *Counsel for the Surgeon General, the Department*
*Department of Health, and State*          *of Health, the Boards of Medicine, and the*
*Attorney Gladson*                         *individual Board Members*

## LOCAL RULES CERTIFICATION

I certify that this brief complies with this Court's word count, spacing, and

formatting requirements.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I certify that on November 6, 2023, the foregoing was filed using the Court's

CM/ECF, which will serve a copy to all counsel of record.

/s/ Mohammad O. Jazil
Mohammad O. Jazil