## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JANE DOE et al.,

                Plaintiffs,

    v.

JOSEPH A. LADAPO et al.,

                Defendants.

Civil No. 4:23-cv-00114-RH-MAF

## INTRODUCTION

Plaintiffs submit this trial brief to apprise the Court of the relevant issues of fact and law involved at trial in this case and to explain why Plaintiffs should prevail.

This case involves a constitutional challenge to Florida's (1) *prohibition* of gender transition care for transgender minors, and (2) *restrictions* on such care for all transgender adults and the subset of minors who were already receiving care when the bans on minor care took effect and are permitted to continue receiving care under the law's "grandfather" clause. Because both the law and rules are grounded in discriminatory animus against transgender people, they cannot survive constitutional scrutiny under any standard of review.

## STATEMENT OF FACTS

### I.   THE PARTIES

1

## A.      The Plaintiffs

### i.      *Classes of Plaintiffs*

In response to Plaintiffs' motion for class certification (ECF 137), this Court certified two classes: (1) all transgender adults in Florida who seek gender transition medications, including puberty blockers and hormone therapy, or gender-affirming surgeries; and (2) all transgender minors in Florida who seek gender transition medications, including puberty blockers and hormone therapy, and the parents of those minors. The Court also certified a subclass of the second class that consists of all transgender minors in Florida who seek and are prohibited (as opposed to restricted) by state law from obtaining gender transition medications, including puberty blockers and hormone therapy, and the parents of those minors. (Order on Class Action Certification (ECF 166 at 13–14).) This subclass includes only transgender minors who are totally prohibited from receiving treatments because they seek the prohibited treatments, did not initiate them before the effective dates of the laws and rules (and thus were not "grandfathered"), and are prohibited by state law from ever obtaining them. If the members of the subclass "prevail on their challenge to the prohibition of these treatments," they will still be subject to the "challenged conditions that apply to all minors." (*Id.* at 12).

Class representatives for Class 1 include: Lucien Hamel, Olivia Noel, Kai Pope, and Rebecca Cruz Evia.  Class representatives for Class 2, including for the

Class 2 subclass, include: Jane Doe, individually and on behalf of Susan Doe; Fiona Foe, individually and on behalf of Freya Foe; Gloria Goe, individually and on behalf of Gavin Goe; and Patricia Poe, individually and on behalf of Paul Poe. The Class representatives for the Class 2 subclass are the Does and the Goes.

### ii.    *Adult Plaintiffs*

#### a.    *Plaintiff Kai Pope*

Kai Pope is a 51-year-old transgender man and a representative for the first class. Kai has been a practicing hospice physician for 20 years and has lived and worked in Florida for the past 11 years. (Declaration of Kai Pope, (ECF 115-1) ("Pope Decl.") ¶¶ 2–4.) Kai was diagnosed with gender dysphoria many years ago and is on hormone therapy that helps align his body with his male gender identity. (*Id.* ¶¶ 4, 6.) In December of 2021, he underwent a bilateral mastectomy, often referred to as chest surgery or top surgery. (*Id.* ¶ 7.) In March of 2023, he underwent a hysterectomy. (*Id.* ¶ 8.) The hysterectomy was part of his treatment for gender dysphoria and also in preparation for genital surgery. His genital surgery was scheduled for September 14, 2023. (*Id.* ¶ 10.) However, on July 13, 2023, he was informed by his surgeon during a phone call that his surgery was cancelled because of SB 254. (*Id.* ¶¶ 9–11.)

The cancellation of his surgery has devastating consequences for Kai. He was unable to obtain a procedure that his medical providers, including mental health

providers, determined is essential to his health and well-being. (*Id.* ¶¶ 10–12.) Without getting his surgery, Kai continues to suffer the effects of untreated gender dysphoria. (*Id.* ¶¶ 11–13.)

### b.    *Plaintiff Lucien Hamel*

Lucien Hamel is a 27-year-old transgender man who lives and works in Florida with his wife and child; he is a representative for the first class. (Declaration of Lucien Hamel (ECF 115-2) ("Hamel Decl.") ¶¶ 2–3.) He has known that he is a man since he was very young. (*Id.* ¶¶ 4–5.) He was diagnosed with gender dysphoria and started treatment with hormone therapy 4 years ago. (*Id.* ¶¶ 5–6.) Initiating care with a pediatric endocrinologist, Lucien later transitioned care to an adult provider. (*Id.* ¶¶ 6–7.)

The medical provider from whom he currently gets his hormone therapy is an autonomous-practice certified Advanced Practice Registered Nurse -- Nurse Practitioner (NP-APRN). (*Id.* ¶ 7.) Lucien received his last testosterone shot on June 28 and has been without medication since that time. (*Id.* ¶¶ 9–10.) Because of SB 254, he cannot receive continued care for his gender dysphoria from his current medical provider. (*Id.* ¶¶ 9–14.) Lucien has been searching for a physician to whom he could transfer his care for gender dysphoria but has not yet been able to find one. (*Id.*) And even if at some point he can, he faces disruption to his ongoing medical care with a provider with whom he has a trusted relationship. (*Id.* ¶ 13.) Being forced

to go without testosterone has had, and will continue to have, devastating consequences for Lucien physically, emotionally, and psychologically. (*Id.* ¶¶ 12–14.)

### c. *Plaintiff Olivia Noel*

Olivia Noel is a transgender woman who resides in Florida and is a representative for the first class. (Declaration of Olivia Noel (ECF 115-3) ("Noel Decl.") ¶¶ 2–3.) She began receiving transition-related care in 2016 at the UF Health multi-disciplinary youth gender clinic after a full multidisciplinary evaluation and assessment. (*Id.* ¶¶ 4–5.) Olivia was referred to an adult endocrinologist for continued care when she was 21 years old. (*Id.* ¶ 6.) In 2022, Olivia moved to Seattle for a short period of time and established care with a doctor there. (*Id.* ¶ 7.) She returned to Florida in March 2023 and has had continuous medical support for treatment of gender dysphoria, having been on hormones for over 7 years. (*Id.* ¶ 8.)

She was receiving medical care through a physician's assistant (PA) at Planned Parenthood. (*Id.* ¶¶ 8–9.) The medications prescribed by her PA will run out before trial and Olivia has not been able to find a physician to prescribe her necessary care. (*Id.* ¶¶ 10–14.) She is also harmed by SB 254's provisions that prevent her from receiving care for her gender dysphoria through telehealth which has been a primary way for her to obtain care.

### d. *Plaintiff Rebecca Cruz Evia*

Rebecca Cruz Evia is a transgender woman who resides in St. Lucie County, Florida and is a representative for the first class. (Declaration of Rebecca Cruz Evia (ECF 115-4) ("Cruz Evia Decl.") ¶¶ 2–3.) Rebecca has received transition-related care for the treatment of her gender dysphoria, including hormone therapy and breast augmentation surgery, which have allowed her to align her body with her female gender identity. (*Id.* ¶¶ 5–8.)

Rebecca was scheduled to have surgery at the University of Miami to obtain a vaginoplasty surgery as treatment for her gender dysphoria on August 15, 2023. (*Id.* ¶ 9.) Before surgery day, she received a phone call from her surgeon informing her that because of SB 254, the procedure was cancelled. (*Id.* ¶ 10.) Rebecca was devastated and shocked, as she was weeks away from obtaining this essential surgery. (*Id.* ¶¶ 9–12.) She has not been able to access any other option for getting the surgery done in Florida. (*Id.* ¶ 11.) Without the surgery, Rebecca will continue to suffer harms from the dysphoria she experiences. (*Id.* ¶ 12.)

### iii.   *Minor Plaintiffs and Minor Plaintiffs' Parents*

#### a.   *Jane Doe and her Daughter Susan Doe*

Jane Doe, individually and on behalf of her daughter Susan Doe, is a representative for the second class and the subclass of the second class of Plaintiffs. Susan Doe is an eleven-year-old girl who is transgender and resides with her family in St. Johns County. (*See* Declaration of Jane Doe (ECF 30-1) ("Doe Decl.") ¶¶ 3,

6.) Jane is a special education teacher, and her husband is a Senior Officer in the United States Military. (*Id.* ¶¶ 4–5.) Susan knew she was a girl, and told her mother she was a girl, from a very young age. (*Id.* ¶¶ 7–8.) When Susan was three years old, she began experiencing distress about the inconsistency between her birth sex and her gender identity; this distress manifested particularly when she wore male clothing. (*Id.* ¶ 9.) Jane sought advice from Susan's pediatrician, who advised Jane to support Susan's female gender identity rather than seek to force her to conform to male stereotypes. (*Id.* ¶¶ 9–10.)

Despite Jane's fears and concerns about how Susan would be treated by others, she followed the pediatrician's advice. (*Id.* ¶ 11.) When Susan was allowed to dress as a girl and when those around her, including her family members' peers, interacted with her as a girl, she flourished. (*Id.* ¶ 12.) Because Susan has lived as a girl from a young age, she has gone through her entire school experience without anyone knowing she is transgender. (*Id.* ¶ 14.)

State law prevents Susan from accessing puberty blockers, the recommended medical treatment for her diagnosis of gender dysphoria by her treating providers, thus forcing her to go through male puberty inconsistent with her gender identity and the person she knows herself, and her friends and family know her, to be. (*Id.* ¶ 15.) Without access to recommended medical treatment, Susan will experience the effects of male puberty, causing her to develop physical traits inconsistent with her

female gender identity, bringing back and exacerbating the distress that she experienced before she socially transitioned. (*Id.* ¶¶ 21–22; Declaration of Dr. Roe ¶¶ 9–10.) This harm has been articulated by Susan as her biggest fear and by her parents as their worst nightmare because they know how harmful it will be to her. (Doe Decl. ¶¶ 22, 26–29.)

### b.   *Brenda Boe and her Son Bennett Boe*

Bennett Boe is a fourteen-year-old boy who is transgender and lives with his mother, Brenda Boe, in Alachua County. (Third Am. Compl. (ECF 118) ¶ 119.)

Bennett has known that he was not a girl since third grade. (*Id.* ¶ 120.) After experiencing physical changes that came with beginning puberty, Bennett became increasingly distressed by the mismatch between his body and his sense of himself as a boy. (*Id.*) He then started to experience debilitating depression that culminated in an incident of self-harm. (*Id.*)

Brenda sought help from medical providers who diagnosed Bennett with gender dysphoria and who prescribed menstrual suppression medication as treatment. (*Id.* ¶ 121.) Brenda consented to this care for Bennett. (*Id.*) While Bennett's depression has been considerably alleviated, he continues to experience significant distress. (*Id.* ¶ 122.) His doctors think that it may be medically necessary for him to initiate hormone therapy after he turns sixteen. (*Id.* ¶ 123.) State law bars Bennett from being able to initiate hormone therapy when he needs it. Both Brenda

and Bennett fear that the state law will prevent Bennett from obtaining medically necessary care to treat his ongoing symptoms of gender dysphoria. (*Id.* ¶ 124.)

### c.  Carla and her Daughter Christina Coe

Christina Coe is a nine-year-old girl who is transgender and resides with her mother, Carla, and family in Duval County. (Third Am. Compl. ¶ 125.) From an early age, Christina began to tell her parents that she is a girl. (*Id.* ¶ 126.) When she was around five years old, Christina began expressing a desire to harm herself because of the distress she experienced from the discordance between her gender identity and birth sex. (*Id.* ¶ 127.) Since entering third grade, Christina began living as a girl in all aspects of her life and has not expressed a renewed desire to harm herself. (*Id.* ¶ 128.) Carla and her husband fear that with SB 254 in place, their daughter will not be able to receive the medical care that she needs to thrive. (*Id.* ¶ 129.)

### d.  Fiona Foe and her Daughter Freya Foe

Fiona Foe, individually and on behalf of her daughter Freya Foe, is a representative for the second class. Freya Foe is a ten-year-old girl who is transgender and resides with her mother, Fiona Foe, her father, her grandmother, and her two siblings. (*Id.* ¶ 130.)  As soon as she could walk and talk, Freya was very feminine in her self-expression, including her choices of clothing and toys. (*Id.* ¶

131.)  As she grew older, Freya began to express distress about being seen as a boy. (*Id.* ¶ 132.)

Fiona and her husband took Freya to see a psychologist who diagnosed her with gender dysphoria. (*Id.*) Shortly before her tenth birthday, Freya's doctor examined her and determined that she had reached Tanner Stage 2, meaning puberty is in progress. (*Id.* ¶ 133.) In the months preceding this examination, Freya had begun to express distress about the onset of puberty and her performance in school began to decline. (*Id.*)  In December 2022, Freya's doctors determined that puberty blocking medication was medically necessary for the treatment of her gender dysphoria. (*Id.* ¶ 134.) With the consent of her parents, Freya began taking puberty blocking medication. Following the initiation of treatment, Freya's overall wellbeing and performance in school improved. (*Id.*) In August of 2023, Fiona took Freya to a pediatric endocrinologist in Maryland to assess her readiness for hormone therapy, as SB 254 prevents Freya from accessing this treatment in Florida. Freya was assessed and deemed ready to initiate hormone therapy and was prescribed hormone therapy in August. Fiona and Freya would like for Freya to be able to receive needed care from her trusted and chosen Florida provider, but the current law renders this impossible.

### e.    *Gloria Goe and her Son Gavin Goe*

Gloria Goe, individually and on behalf of her son Gavin Goe, is a

representative for the second class and the subclass of the second class. Gavin Goe, the youngest of four children, is an eight-year-old boy who is transgender and lives with his family in Lee County. (*See* Declaration of Gloria Goe (ECF 30-3) ("Goe Decl.") ¶¶ 3, 7.) Gavin has known that he is a boy from a young age. (*Id.* ¶ 8.) He told his parents that he wanted to grow up to look like his father. (*Id.*) Gloria Goe, Gavin's mother, and her husband thought for some time that Gavin was simply a "tomboy," but over time, due to Gavin's distress from being treated as a girl, they allowed Gavin to wear boys' clothes to school and use male pronouns. (*Id.* ¶¶ 9–11.) Eventually, Gloria and her husband allowed Gavin to use a male name. (*Id.* ¶ 11.)

In 2021, Gavin was diagnosed with gender dysphoria by a pediatrician. (*Id.* ¶ 15.) Gavin's pediatrician recommended that he see a pediatric endocrinologist as puberty is approaching. (*Id.*) Given Gavin's family history around when puberty begins, the pediatrician advised the family to have Gavin assessed regularly for readiness for puberty blockers, as they need to be initiated soon after puberty starts; if not, he will lose the medical benefits they confer. (*Id.* ¶ 16.)

Gavin has positive relationships and development at school. (*Id.* ¶¶ 12–13.) While some school personnel know that he is transgender, Gavin does not want his classmates to know. (*Id.* ¶ 14.) Without puberty blockers, Gavin will begin developing characteristics that will irreversibly identify him by his birth sex and predictably cause him serious psychological distress. (Goe Decl. Ex. A (Letter by

Dr. Nicole M. Bruno).)

### e. *Patricia Poe and her Son Paul Poe*

Patricia Poe, individually and on behalf of her son Paul Poe, is a representative for the second class. Paul Poe is a nine-year-old transgender boy who resides with his family in Miami-Dade County. (Third Am. Compl. ¶ 150.) From a young age, Paul identified as a boy. (*Id.* ¶ 151.) Consistent with his male identity, he began wearing boys' clothing, using a boy's name, and eventually, with the advice and support of a therapist, living as a boy in all aspects of his life. (*Id.* ¶ 152.)

In late 2022, Paul began experiencing physical changes with the onset of puberty. (*Id.* ¶ 153.) Paul's mom, Patricia, took Paul to a pediatric endocrinologist, who determined that Paul was far enough along in puberty that he may need blockers. (*Id.*) Paul was recommended to see a psychologist to confirm his medical need for puberty blockers. (*Id.*) In early 2023, a psychologist evaluated Paul and determined that he needed to begin puberty blockers to alleviate his gender dysphoria. (*Id.* ¶ 154.) Shortly thereafter, Paul's pediatric endocrinologist told Patricia that they would not be able to move forward with prescription and monitoring of Paul's needed treatment because of SB 254. (*Id.* ¶ 155.) In September 2023, Paul received his first treatment with puberty blockers. If Paul cannot receive the medical care he needs because of the law in Florida, Paul and his family will be irreparably harmed. (*Id.*)

## II.    THE DEFENDANTS

Defendant Joseph Ladapo, M.D., is sued in his official capacity as the Surgeon General of the Florida Department of Health, which is responsible for "protect[ing] and promot[ing] the health" of all Floridians. (Pl's Third Am. Compl. ¶ 18, admitted, ECF 131, Ans. ¶ 18.) *See* Fla. Stat. § 20.43 (2022). The Surgeon General is appointed by the Governor and serves at the pleasure of the Governor.  (Third Am. Compl. ¶ 18, admitted, Ans. ¶ 18.) *See* Fla. Stat. § 20.43(2) (2022). Defendant Ladapo, in his official capacity as Surgeon General of the Florida Department of Health, initiated the process of the promulgation of the rules at issue in this case pursuant  to  the authority  granted by Fla. Stat. § 20.43(1)(g) (2022), regarding the regulation of health practitioners.  (Third Am. Compl. ¶ 18.) Defendant Ladapo's official place of business is located in Tallahassee, Leon County, Florida. (Third Am. Compl. ¶ 18, admitted, Ans. ¶ 18.)

The Florida Board of Medicine is made up of fifteen members who are appointed by the Governor. (Third Am. Compl. ¶ 41, admitted, Ans. ¶ 41.) *See* Fla. Stat. § 458.307(1) (2022). Defendant members of the Florida Board of Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B-9.019 pursuant to their rulemaking authority under Fla. Stat. §§ 458.309 and 458.331(1)(v) (2022). (Third Am. Compl. ¶ 41.) Further, Defendant members of the Florida Board of Medicine, in their official

capacities, each has the authority to enforce Fla. Admin. Code 64B-9.019, including taking disciplinary action against any doctor for violating its provisions. (*Id.*) *See* Fla. Stat. § 456.072. The Florida Board of Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Medicine is, Tallahassee, Leon County, Florida.  (*Id.*)

The Defendant members of the Florida Board of Medicine are Scot Ackerman, M.D. (Third Am. Compl. ¶ 19, admitted, Ans. ¶ 19), Nicholas W. Romanello, Esq. (Third Am. Compl. ¶ 20, admitted, Ans. ¶ 20), Wael Barsoum, M.D. (Third Am. Compl. ¶ 21, admitted, Ans.  ¶ 21), Matthew R. Benson, M.D. (Third Am. Compl.¶ 22, admitted, Ans. ¶ 22), Gregory Coffman, M.D.  (Third Am. Compl. ¶ 23, admitted, Ans. ¶ 23), Amy Derick, M.D.  (Third Am. Compl. ¶ 24, admitted, Ans. ¶ 24), David Diamond, M.D.  (Third Am. Compl. ¶ 25, admitted, Ans. ¶ 25), Patrick Hunter, M.D. (Third Am. Compl. ¶ 26, admitted, Ans. ¶ 26), Luz Marina Pages, M.D. (¶ 27, admitted, Ans. ¶ 27), Eleonor Pimentel, M.D.  (Third Am. Compl. ¶ 28, admitted, Ans. ¶ 28), Hector Vila M.D. (Third Am. Compl. ¶ 29, admitted, Ans. ¶ 29), Michael Wasylik, M.D.   (Third Am. Compl. ¶ 30, admitted, Ans.  ¶ 30), Zachariah P. Zachariah, M.D.  (Third Am. Compl. ¶ 31, admitted, Ans. ¶ 31), Nicole Justice (Third Am. Compl. ¶ 33, admitted, Ans. ¶ 33.)

The Florida Board of Osteopathic Medicine is made up of seven members who are appointed by the Governor. (ECF 118 at ¶41); Fla. Stat. § 459.004(1) (2022).

14

Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each separately and independently took actions to promulgate Fla. Admin. Code 64B15-14.014 pursuant to their rulemaking authority under Fla. Stat. §§ 459.005 and 459.015(1)(z) (2022).  (*Id.*)  Further, Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each has the authority to enforce Fla. Admin. Code 64B15-14.014, including taking disciplinary action against any doctor for violating its provisions. (*Id.*)  Fla. Stat. § 456.072.  Defendant members of the Florida Board of Osteopathic Medicine, in their official capacities, each separately and independently also took actions to promulgate Emergency Rules, 64B15ER23-9, and 64B15ER23-10, pursuant to their rulemaking authority under Fla. Stat. § 456.52(6) (2023).  (*Id.*)  The Florida Board of Osteopathic Medicine is based and headquartered in, and the official place of business for the Defendant members of the Florida Board of Osteopathic Medicine is, Tallahassee, Leon County, Florida.  (*Id.*).

The Defendant members of the Florida Board of Osteopathic Medicine are Watson Ducatel, D.O. (Third Am. Compl. ¶ 34, admitted, Ans. ¶ 34), Tiffany Sizemore Di Pietro, D.O. (Third Am. Compl. ¶ 35, admitted, Ans. ¶ 35), Gregory Williams, D.O.  (Third Am. Compl. ¶ 36, admitted, Ans. ¶ 36), Monica M. Mortensen, D.O.  (Third Am. Compl. ¶ 37, admitted, Ans. ¶ 37), Chris Creegan (Third Am. Compl. ¶ 39, admitted, Ans. ¶ 39), William D. Kirsh, D.O.  (Third Am.

Compl. ¶ 40, admitted, Ans. ¶ 40.)

Under Florida's Constitution, State Attorneys serve as prosecutors representing the people in criminal courts. (Third Am. Compl. ¶45, admitted, Ans. at ¶ 45.) *See* Fla. Const. art. 5, § 17. State Attorneys initiate investigations if there is reason to believe a crime has occurred and an investigation is warranted, review criminal investigations and complaints submitted by law enforcement agencies, the Governor, and others, and decide whether or not to file formal charges and present these cases in court. (*Id.*) Accordingly, the Defendant State Attorney, in his official capacities, has the authority to enforce the criminal sanctions provisions of SB 254. (*Id.*) Defendant William Gladson is the State Attorney for Florida's Fifth Judicial District. (Third Am. Compl. ¶ 44, admitted, Ans. ¶ 44).

## III.    MEDICAL TREATMENT FOR GENDER DYSPHORIA

### A.    Gender Dysphoria

Gender dysphoria is a serious medical condition experienced by many transgender people. It is characterized by the distress due to the incongruence between a person's birth sex and their gender identity. (Ex. 3, Bruggeman Report ¶ 24; Ex. 5, Shumer Report ¶ 36; Ex. 2, Janssen Report ¶ 23-24.) The diagnosis is contained in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, 5th Edition* ("DSM-5"). (Ex. 3, Bruggeman Report ¶ 24; Ex.5, Shumer Report ¶ 36; Ex. 2, Janssen Report ¶ 24; *see also* DSM 5 Gender

16

Dysphoria (*Dekker,* ECF 175-33).)  Gender dysphoria is characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning and often manifests as intense and persistent discomfort with the primary or secondary characteristics of a person's sex birth sex. (Ex. 3, Bruggeman Report ¶ 24; Ex. 5, Shumer Report ¶ 36; Ex. 2, Janssen Report ¶ 23.)

Without appropriate treatment, gender dysphoria may cause debilitating anxiety, severe depression, self-harm, and even suicidality. (Ex. 3, Bruggeman Report ¶ 24; Ex. 5, Shumer Report ¶ 40; Ex. 2, Janssen Report ¶ 48.) With treatment, gender dysphoria can be alleviated, enabling transgender people to thrive. (Ex. 3, Bruggeman Report ¶¶ 65, 67; Ex. 5. Shumer Report ¶ 41; Ex. 2, Janssen Report ¶ 49, Ex. 4, Karasic Report ¶ 27.)

### B.    Medical Treatment of Gender Dysphoria

The medical treatment for gender dysphoria is well-established. (Ex. 3, Bruggeman Report ¶ 25; Ex. 5, Shumer ¶¶ 46-47; Ex. 2, Janssen Report ¶ 49, Ex. 4, Karasic Report ¶ 26, 29-31.) It involves a process known as gender transition which enables a transgender person to access medications and treatments to align their body with their gender identity. (Ex. 3 Bruggeman Report ¶ 28; Ex. 5, Shumer Report ¶¶ 57-60, 69; Ex. 2, Janssen Report ¶ 26.) As this Court has already recognized, gender identity is real. (*Doe v. Ladapo*, 2023 U.S. Dist. LEXIS 996602, *7 (N.D. Fla. June 6, 2023).) A person's gender identity is deep-seated, established at an early age, and

impervious to external influences. (*Id.*; *see also*, Ex. 5, Shumer Report ¶¶ 26-33; Ex. 2, Janssen Report ¶¶ 18-22.) Substantial evidence shows that gender transition treatments are effective in treating gender dysphoria. (Ex. 3, Bruggeman Report ¶¶ 26-27, 60; Ex. 5, Shumer Report ¶¶ 35, 85, Ex. 4, Karasic Report ¶ 27.) Medical treatment for gender transition has been studied for over half a century, and there is substantial evidence that it alleviates gender dysphoria and improves quality of life and measures of mental health for transgender people. (Ex. 4, Karasic Report ¶ 29; Ex. 2, Janssen Report ¶¶ 33-34, 50.) The medical treatments to support gender transition include, for minors, puberty blockers and hormone therapy. (Ex. 3, Bruggeman Report ¶¶ 31, 35; Ex. 5. Shumer Report ¶ 60; Ex. 2, Janssen Report ¶ 49.) For adults, the treatments include hormone therapy and a range of surgeries.

### i.   *Puberty Blockers*

For adolescents with gender dysphoria who experience severe distress with the onset of puberty, puberty-delaying medications, also known as gonadotropin-releasing hormone agonists ("GnRHa") or "puberty blockers," may be indicated. (Ex. 3, Bruggeman Report ¶¶ 31–32; Ex. 5, Shumer Report ¶¶.) Puberty blockers work by pausing endogenous puberty when the treatment begins, thus limiting the influence of a person's endogenous hormones on their body. (Ex. 3, Bruggeman Report ¶¶ 31–32, 56; Ex. 5, Shumer Report ¶ 62.) Such interventions afford the adolescent time to better understand their gender identity while delaying the

development of secondary sex characteristics, which can cause severe distress when incompatible with an adolescent's gender identity. (Ex. 5, Shumer Report ¶¶ 60-61.)

Puberty blockers may be indicated after an adolescent begins puberty, at what is called Tanner Stage 2. (Ex. 3, Bruggeman Report ¶ 52; Ex. 5, Shumer Report ¶ 62.) Tanner Stage 2 refers to the stage in pubertal development when the physical effects of testosterone or estrogen are apparent upon physical exam and usually occurs between age 9–14 for individuals assigned male at birth and between age 8–12 for individuals assigned female at birth. (Ex. 3, Bruggeman Report ¶ 57; Ex. 5, Shumer Report ¶ 62.) The treatment is reversible, meaning that if an adolescent discontinues the treatment, puberty will resume. (Ex. 3, Bruggeman Report ¶ 32; Ex. 5, Shumer Report ¶ 64.)

Puberty blockers are safe and effective and have long been used to treat many conditions other than gender dysphoria, including precocious puberty. (Ex 3, Bruggeman Report ¶ 56; Ex. 5, Shumer Report ¶ 67; Ex. 2, Janssen Report ¶¶ 29-33.) No Florida law or rule prohibits or restricts the use of puberty blockers when used for reasons other than gender transition.

### ii.  *Hormone Therapy*

For some older adolescents and for adults with gender dysphoria, hormone therapy (testosterone for transgender males and testosterone suppression and

estrogen for transgender females) may be medically necessary. (Ex. 3, Bruggeman Report ¶ 31; Ex. 5, Shumer Report ¶¶ 69-71.) Hormones are administered to attain the appropriate masculinization or feminization to align with the patient's gender identity and helps to alleviate gender dysphoria. (Ex. 3, Bruggeman Report ¶ 33; Ex. 5, Shumer Report ¶ 60.) Laboratory testing ensures proper dosing and hormone levels. (Ex. 5, Shumer Report ¶ 72.)

Hormone therapy is safe and effective at treating gender dysphoria. These same medications are also used to treat a wide range of other health conditions. (Ex 3, Bruggeman Report ¶¶ 62, 64-65; Ex. 5, Shumer Report ¶ 83; Ex. 2, Janssen Report ¶¶ 31-35.) They have all been in use for decades. (Ex. 3, Bruggeman Report ¶ 63.) Florida does not prohibit or restrict the use of hormone therapy other than when they are used for gender transition.

### iii.   Gender Confirming Surgeries

Gender confirming surgery may be medically indicated for some transgender adults to align their primary and secondary sex characteristics with their gender identity. (Ex. 5, Shumer Report ¶ 74; *Dekker* Trial Tr. vol. I, 36:18-20, 38:5-9.) Surgical care can include, but is not limited to, mastectomy, breast augmentation, hysterectomy, oophorectomy, orchiectomy, vaginoplasty, and phalloplasty. (Dekker Trial Tr., vol II, 296:17-297:7.) Surgeries for gender transition are safe and effective in treating gender dysphoria. Surgeons regularly

20

perform these procedures to treat conditions other than gender dysphoria and for reasons other than gender transition. (Dekker Trial Tr., vol II, 297:8-298.12.)  No Florida law targets these surgeries for restrictions or prohibitions when needed for reasons other than gender transition.

## IV.   GENDER TRANSITION TREATMENTS ARE MEDICALLY NECESSARY, SAFE, AND EFFECTIVE

Decades of medical authority support the safety and efficacy of gender transition treatments that are medically necessary for treating gender dysphoria in transgender adolescents and adults. (Ex. 3, Bruggeman Report ¶¶ 26–27, 49; Ex. 4, Karasic Report ¶¶ 2, 26, 28; Ex. 2, Janssen Report ¶¶ 9, 29–30; Ex. 5, Shumer Report ¶¶ 35, 38, 48–55.) The specific aspects of a patient's treatment plan are individualized, based on a comprehensive evaluation done and managed by qualified professionals. (Ex. 3, Bruggeman Report ¶¶ 34-35, 43; Ex. 5, Shumer Report ¶ 38, 42.) The American Academy of Pediatrics has adopted this treatment protocol as safe and effective for the health and well-being of transgender adolescents, (Ex. 3, Bruggeman Report ¶ 55; Ex. 5, Shumer Report ¶ 53), while organizations such as the American Academy of Family Physicians, American College of Obstetricians and Gynecologists, and the American Medical Association have formally recognized the safety and efficacy of this treatment for transgender adults.[1]

---

[1] *See Dekker v. Weida*, No. 4:22-cv-00325 (N.D. Fla.), ECF Nos. 193-16, 193-24 (*Dekker*, Trial Tr.); ECF 238 at 72, 74–75; *see also* Trial Tr., ECF 228 at 14; Trial Tr., ECF 226 at 36, 176; Pls.'

Treatment with puberty blockers for adolescents is reversible as endogenous puberty resumes if this medication is no longer administered. (Ex. 3, Bruggeman Report ¶ 37, 56; Ex. 5, Shumer Report ¶¶ 64–65, 73.) Puberty blockers may eliminate the need for surgical treatments that otherwise would be necessary to treat ongoing gender dysphoria as an adult, such as chest surgery, facial and body hair electrolysis, and feminizing facial surgeries. (Ex. 3, Bruggeman Report ¶ 57, 59; Ex. 5, Shumer Report ¶ 66.) And before hormone therapy begins for a transgender young person who may require it later in adolescence, a mental health professional and medical doctor must confirm the persistence of gender dysphoria, assess whether any coexisting issues could interfere with treatment, and verify that the adolescent understands the consequences of the treatment, before getting the adolescent to have the same typical levels of testosterone or estrogen as their non-transgender peer. (Ex. 3, Bruggeman Report ¶¶ 61-66; Ex. 5, Shumer Report ¶¶ 71, 80.)

Puberty blockers and hormones are routinely used in the treatment of other medical conditions in non-transgender youth and adults, with such use being approved by the Food and Drug Administration.[2] (Ex. 3, Bruggeman Report ¶¶ 56, 58, 62; Ex. 5, Shumer Report ¶¶ 64, 67-68, 76, 78, 83.) While no medication can be shown to have zero risks, puberty blockers and hormones are considered safe and

Exs. 36–43, 45–48, ECF Nos. 175-36 through 176-8 (omitting ECF 176-4); *see also* Amicus Brief of American Academies and Health Organizations, ECF 192-1.

[2] *Id.*, Trial Tr., ECF 226 at 216.

well within acceptable risk factors for approved medication for minors, and hormones are considered safe and well within acceptable risk factors for approved medication for adolescents and adults. (Ex. 3, Bruggeman Report ¶¶ 55-58, 62, 67; Ex. 5, Shumer Report ¶¶ 45, 52, 75–87; Ex. 2, Janssen Report ¶¶ 31–35.)

Much like the provision of other types of medical treatments, health care providers undertake a rigorous informed consent process before a transgender patient, an adolescent or an adult, begins any treatment for gender dysphoria. (Ex. 3, Bruggeman Report ¶¶ 2, 15, 34, 37-38; Ex. 5, Shumer Report ¶ 71; Ex. 2, Janssen Report ¶¶ 36–38, 42.)

Substantial scientific evidence shows that medications and surgical treatments for gender transition improve gender dysphoria, psychological function, comorbidities, and overall quality of life. (Ex. 3, Bruggeman Report ¶¶ 36, 65, 67, 69, 71-72; Ex. 2, Janssen Report ¶¶ 29–31; Ex. 4, Karasic Report ¶¶ 27, 29–31, 34; Ex. 6, Schecter Report ¶¶ 20; Ex. 5, Shumer Report ¶¶ 35, 39–41, 60.) These treatments are effective for treating gender dysphoria in both transgender adolescents and adults.

Gender dysphoria is a serious medical condition, and for many patients who experience it, there is no effective treatment other than gender transition.[3] Though psychological therapy can benefit many individuals, no evidence supports that it can

---

[3] Trial Tr., ECF 226 at 218–29.

alleviate gender dysphoria in those for whom gender transition care is indicated. (Ex. 4, Karasic Report ¶ 33.) Providing access to this medical care is vital and can improve both short-term and long-term health outcomes, whereas withholding the care worsens a patient's mental health outcomes. (Ex. 3, Bruggeman Report ¶¶ 65, 67).

## V.      THE BOARDS OF MEDICINE RULES.

Effective on March 16, 2023 and March 28, 2023, respectively, the Florida Board of Medicine and the Florida Board of Osteopathic Medicine implemented identical rules prohibiting doctors in Florida from providing certain medical treatments for transgender adolescents. (Trial Ex. 11, Fla. Admin. Code R. 64B8-9.019 (2023); Trial Ex. 12, Fla. Admin. Code R. 64B15-14.014 (2023)). These rules prohibit "[p]uberty blocking, hormone, and hormone antagonist therapies" for all minors. *Id.* at 64B8-9.019(1); 64B15-14.014(1). Each rule includes an exception for continuing care, allowing an adolescent who had initiated treatment with puberty blockers prior to the effective date of the rules to continue puberty blockers, and allowing an adolescent who had initiated treatment with hormone therapy prior to the effective date of the rules to continue hormone therapy. *Id.* at 64B8-9.019(2); 64B15-14.014(2).

## VI.     Senate Bill 254 ("SB 254").

On May 4, 2023, the Florida Legislature voted to pass SB 254. On May 17, 2023, Florida Governor Ron DeSantis signed SB 254 into law. Ch. 2023-90, at 6, Laws of Fla. It became effective that same day. (*See* Trial Ex. 17, Fla. SB 254, § 10, line 271 (2023) (Second Engrossed)). SB 254 created, among other sections, Florida Statute Sections 456.001(8) and (9) (defining "sex" and "sex-reassignment prescriptions and procedures") and Florida Statute Section 456.52 ("[s]ex-reassignment prescriptions and procedures; prohibitions; informed consent"). (Trial Exs. 19, 20.)

## A.  SB 254 Bans Medical Treatment for Transgender Minors with Limited Exceptions

SB 254 prohibits health care providers from providing established medical care, including puberty blockers and hormones, to transgender minors, subject to a narrow continued-use exception (alternately referred to as a "grandfather" clause). Sections 4 and 5 of SB 254 effectuate this outcome by providing: "[s]ex-reassignment prescriptions and procedures are prohibited for patients younger than 18 years of age" where sex-reassignment prescriptions and procedures are defined as puberty blockers and hormone therapy when prescribed "in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex[.]" (Trial Ex. 17, Fla. SB 254, § 4, lines 107-117; § 5, lines 149-170 (2023).) The only exception to the bar on treatments for transgender minors is for

cases in which treatment was "commenced before, and is still active on, the effective date" of the Act. (*Id*. at § 5, lines 159-161.)

These same medical procedures and prescriptions barred for treatments used by transgender minors are expressly *not* prohibited if being used for purposes other than "to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" at birth. (*See id.* at § 4, lines 109-146) (specifying the prohibition "does not include . . . " treatment prescribed for a "genetic disorder of sexual development" and "a physical disorder, physical injury, or physical illness that would . . . place the individual in imminent danger of death or impairment of bodily function without the prescription or procedure").) In other words, these treatments are not restricted by SB 254 for anyone who is not transgender. SB 254 also does not specifically reference the medical condition of gender dysphoria.

SB 254 directs that the Boards of Medicine and Osteopathic Medicine "shall, within 60 days after the effective date of this act, adopt emergency rules pertaining to standards of practice under which a patient younger than 18 years of age" - pursuant to the continued use exception - may continue treatment. (*Id.* at § 5, lines 154-161.) The Boards were to consider informed consent requirements and the provision of professional counseling services in developing these rules. (*Id.* at § 5, lines 161-170.)

The penalties that may be imposed on physicians who provide care for transgender adolescents not eligible for receiving treatment include being charged with a felony, *id*. at § 5, lines 210–13 ("Any health care practitioner who willfully or actively participates in a violation of subsection (1) commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084"), and the imposition of "disciplinary action" by the governing Medical Boards. (*Id*. at § 5, lines 207–09.) SB 254 also provides for increased civil liability for physicians providing medical care to transgender adolescents. (*Id.* at § 7.) A new section of the Florida Statutes, § 766.318, Fla. Stat. (2023), creates a cause of action "to recover damages for personal injury or death" resulting from the provision of prohibited medical care to transgender adolescents. (*Id.* at § 7, lines 243-261). Section 7 also removes the general limitations on punitive damages provided for in Florida tort law[4] and allows an action under this section to be commenced within 20 years after the cessation or completion of the sex-reassignment prescription or procedure.[5] (*Id.* at § 7, lines 248-252.)

  **B.** **SB 254 Creates Restrictions on Access to Medical Care for Transgender Adults and for Minors Who Are Not Barred from Treatment Due to the Continued Use Exception**

---

[4] Generally, under Florida law, punitive damages are limited to three times the amount of compensatory damages per claimant or $500,000, whichever is greater. Fla. Stat. § 768.73 (2023).

[5] The statute of limitations on medical malpractice actions in Florida is otherwise "within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered" but no more than "4 years from the date of the incident occurrence out of which the cause of action accrued[.]" Fla. Stat. § 95.11 (2023).

SB 254 creates barriers to gender transition treatments for all transgender individuals, including adults as well as those minors allowed to obtain care under the continued-use exception. These restrictions include that no transgender patient can receive gender transition treatments prescribed by any health care provider other than a physician. (*Id.* at § 5, lines 194-199.) Nor can a transgender patient initiate or change treatment regimens through telehealth visits. (*Id.* at § 5, lines 179-183.) As this Court explained, "no telehealth, even by a physician, and no treatment, even in person, only by a different kind of healthcare professional without a physician." (ECF 166 at 1). Finally, all transgender patients can only demonstrate consent to care by the execution of unique forms adopted by the Boards of Medicine. (Trial Ex. 17, SB 254 at § 5, lines 175-179 (adults); 161-170 (minors); *see also id.* at lines 171-173 (continued use treatment of minors must be by a physician); *id.* at lines 175-193 (informed consent requirements for adult transgender patients can only be met by physical presence in the same room with physician); and *id.* at lines 194-199 (prohibiting "[s]ex-reassignment prescriptions or procedures" from being "prescribed, administered, or performed" for any transgender patients – adults or minors – except by a physician).)

### i.    *Physician Limitations*

SB 254 restricts the types of health care providers who may provide medical care to transgender individuals, limiting the provision of this care exclusively to

physicians licensed under Fla. Stat. Chapters 458 and 459, or a physician practicing in the employment of the federal government. (*Id.* at § 5, lines 194-199.) Prior to SB 254, many other qualified healthcare providers, including autonomous practice certified advanced practice registered nurses ("AP-APRNs"), could prescribe medical care to transgender individuals under certain circumstances. SB 254 creates a limitation on AP-ARPRNs' scope of practice. APRNs licensed in Florida have had full authority to prescribe treatment and medications to transgender individuals for years. (Trial Ex. 109, § 464.012(3)-(4), Fla. Stat. (2023); Trial Ex. 7, Expert Report of Langford ("Langford Rep.") ¶¶ 25-27.)

In addition, in 2020, Florida created a separate category of APRNs who are permitted to engage in autonomous primary care practice. (Trial Ex. 108, § 464.0123(3), Fla. Stat. (2023); Trial Ex. 7, Langford Rep. ¶¶ 25-27.) AP-APRNs must complete additional educational requirements and have completed at least 3,000 clinical practice hours under the supervision of a physician to be eligible for autonomous practice certification. (Trial Ex. 7, Langford Rep. ¶¶ 33-34.). Since 2020, AP-APRNs have been able to provide any medical treatments within the scope of a primary care practice to transgender individuals without the supervision of a physician. (*Id.* at ¶ 28.)

WPATH Standards of Care 8 ("SOC 8") permits the provision of medical care to transgender individuals by any licensed and qualified health care provider and

provides that transgender healthcare can be delivered in the course of primary care, including by "nurse practitioners, advanced practice nurses, [and] physician associates/assistants" as long as the qualified provider has the necessary competency to care for transgender patients. (Trial Ex. 7, Langford Rep. ¶¶ 40-41; *Dekker*, Dx. Trial Ex. 16, WPATH SOC 8, at S33, S143.)

SB 254's limitation on the delivery of the restricted medical care to transgender individuals by non-physician healthcare providers prevents qualified health care providers from offering this medical care. (Trial Ex. 17, Fla. SB 254, at § 5, lines 194-199.) No Florida law prohibits AP-APRNs from prescribing the same medications needed by transgender patients for gender transition to non-transgender patients for the treatment of any condition. The penalty for licensed and qualified non-physician healthcare providers who provide this medical care to transgender patients includes a misdemeanor of the first degree and other disciplinary action by the Boards. (*Id.* at § 5, lines 207-209, 214-17.)

### ii.    *In-Person Requirements*

WPATH Standards of Care 8 ("SOC 8") allow for the provision of medical care to transgender individuals via telehealth. (*Dekker*, Dx. Trial Ex. 16, WPATH SOC 8, at S31.) No Florida law restricts the use of telehealth for any other medical treatments or as a mode of establishing informed consent in other circumstances. It is unusual and unnecessary for a regulatory board to require that informed consent

be obtained in person, specifically by the physician prescribing the medication or performing the procedure, and in the presence of a third-party witness. (*See* Trial Ex. 2, Expert Report of Janssen ("Janssen Rep.") ¶¶ 60-61; Trial Ex. 4, Expert Report of Karasic ("Karasic Rep.") ¶ 47; Trial Ex. 8, Expert Report of Goodman ("Goodman Rep.") ¶ 27.) The penalties for physicians who do not comply with the in-person requirements include a misdemeanor of the first degree and other disciplinary action by the Boards. (Trial Ex. 17, Fla. SB 254 at § 5, lines 207-209, 214-17.)

### *iii.   Informed Consent Requirements*

SB 254 requires the Boards to adopt informed consent forms. (*Id.* at § 5, lines 175-183.) Consent for the restricted medical care is considered voluntary and informed only if the physician providing that medical care has, "while physically present in the same room" as the patient, "[i]nformed the patient of the nature and risks of the prescription or procedure[,]" "[p]rovided the informed consent form" adopted by the Boards, and received written acknowledgement from the patient. (*Id.* at § 5, lines 179-193.)  The penalties for physicians who do not comply with these informed consent requirements include a misdemeanor of the first degree and other disciplinary action by the Boards. (*Id.* at § 5, 207-09, 214-17.)

## VII.   BOARDS OF MEDICINE RULES IMPLEMENTING SB 254

On June 8, 2023, the Board of Medicine issued Emergency Rule 64B8ER23-3, which would allow a patient's prescribing physician to renew a "prior lawfully

issued" prescription for the treatments restricted by SB 254 so long as it "was prescribed prior to May 17, 2023." (Trial Ex. 21, at 169-70, Fla. Admin. Code R. 64B8ER23-3 (effective June 8, 2023)). This rule would allow these prescriptions to be renewed for up to "six months from the date of the Board's emergency rule formally adopting a consent form." *Id.* On June 20, 2023, the Board of Osteopathic Medicine issued an identical emergency rule. (*Id.* at 171-72, Fla. Admin. Code R. 64B15ER23-4 (effective June 20, 2023)).

Shortly thereafter, on June 23, 2023, the Boards held a Joint Rules/Legislative Committee meeting ("Joint Meeting") to discuss the draft consent forms that were under consideration; the Committee approved the forms. (Trial Ex. 21, at 173-182.) (Fla. Admin. Code. R. 64B8ER23-7 and 64B8ER23-8 (Board of Medicine) and 64B15ER23-9 and 64B15ER23-10 (Board of Osteopathic Medicine).) On June 30, 2023, the Boards held a Joint Meeting, and each Board voted separately to approve the draft consent forms via emergency rule. (*Id.* at 111-116). These rules became effective on July 5, 2023. (*Id.* at 173-182) (*See* Fla. Admin. Code R. 64B8ER23-7 (Board of Medicine emergency rule setting forth the consent form requirements for minors); R. 64B8ER23-8 (Board of Medicine emergency rule setting forth the consent form requirements in adults); R. 64B151523-9 (Board of Osteopathic Medicine emergency rule setting forth consent form requirements in minors) and R. 64B15ER23-10 (Board of Osteopathic Medicine emergency rule setting forth

consent form requirements in adults).)

On July 21, 2023, the Boards received correspondence from the Joint Administrative Procedures Committee ("JAPC") questioning the Boards' "authority to require that adult patients 'undergo a thorough psychological and social evaluation performed by a Florida licensed board-certified psychiatrist or a Florida licensed psychologist' before beginning hormone replacement therapy and every two years thereafter," a requirement included in the adult informed consent forms. (*Id.* at 476-479.) In response, the Board removed this provision and replaced the emergency rules for adults and the two corresponding consent forms for hormone therapy, effective August 18, 2023.  (*Id.* at 183-188) (Fla. Admin. Code. R. 64B8ER23-11 (Board of Medicine) and R. 64B15ER23-12 (Board of Osteopathic Medicine).)

For minors, three informed consent forms were created and published by the Joint Boards: (1) DH5079-MQA (eff. 06/23) ("Puberty Suppression Treatment for Patients with Gender Dysphoria, Patient Information and Informed Parental Consent and Assent for Minors") (Dx. Ex. 4); (2) DH5080-MQA (eff. 06/23) ("Feminizing Medications for Patients with Gender Dysphoria, Patient Information and Informed Parental Consent and Assent for Minors") (Dx. Ex. 7); and (3) DH5081-MQA (eff. 06/23) ("Masculinizing Medications for Patients with Gender Dysphoria, Patient Information and Informed Parental Consent and Assent for Minors") (Dx. Ex. 3). (Fla. Admin. Code. R. 64B8ER23-7 and R. 64B15ER23-9 (July 5, 2023).) There are

also three informed consent forms for adults: (1) DH5082-MQA (eff. 06/23) ("Feminizing Medications for Patients with Gender Dysphoria, Patient Information and Informed Consent"), (2) DH5083-MQA (eff. 06/23) ("Masculinizing Medications for Patients with Gender Dysphoria, Patient Information and Informed Consent"); and (3) DH5084-MQA (eff. 06/23) ("Surgical Treatment for Adults with Gender Dysphoria, Patient Information and Informed Consent") (Dx. Ex. 5). (Fla. Admin. Code. R. 64B8ER23-8 and R. 64B15ER23-10 (July, 2023)). The two hormone therapy informed consent forms for adults were revised in response to the JAPC letter and re-published on August 18, 2023: (1) DH5082-MQA (rev. 08/23) ("Feminizing Medications for Patients with Gender Dysphoria, Patient Information and Informed Consent") (Dx. Ex. 6), and (2) DH5083-MQA (rev. 08/23) ("Masculinizing Medications for Patients with Gender Dysphoria, Patient Information and Informed Consent") (Dx. Ex. 20). (Fla. Admin. Code R. 64B8ER23-11 (Board of Medicine) and R. 64B15ER23-12 (Board of Osteopathic Medicine).)

### A.    Informed Consent Forms

The forms[6] all contain false and misleading information, as explained by

---

[6] This section will cite to the forms included as Defendant's Exs. 2-7 (Dx. Ex. #). The most recent versions of each informed consent form are available on the Florida Board of Medicine's website. *See* Masculinizing Medications for Patients with Gender Dysphoria, DH5083-MQA (Rev. 08/23); Masculinizing Medications for Patients with Gender Dysphoria (Minors), DH5081-MQS (Rev. 06/23); Puberty Suppression Treatment for Patients with Gender Dysphoria, DH5079-MQA (Rev. 06/23); Surgical Treatment for Adults with Gender Dysphoria, DH5084-MQA (Rev. 06/23);

Plaintiffs' experts. All forms contain the following statement:

> Medical treatment of people with gender dysphoria is based on very limited, poor-quality research with only subtle improvements seen in some patients' psychological functioning in some, but not all, research studies. This practice is purely speculative, and the possible psychological benefits may not outweigh the substantial risks of medical treatments and, in many cases, the need for lifelong medical treatments.

*See* Dx. Ex. 2, at 1; Dx. Ex. 3, at 1; Dx. Ex. 4, at 1; Dx. Ex. 5, at 1; Dx. Ex. 6, at 1; Dx. Ex. 7, at 1; *see also* Trial Ex. 2, Janssen Rep. ¶ 52; Trial Ex. 3, Expert Report of Bruggeman ("Bruggeman Rep.") ¶ 81; Trial Ex. 4, Karasic Rep. ¶¶ 24-25; Trial Ex. 5, Expert Report of Shumer ("Shumer Rep.") ¶ 98; Trial Ex. 6, Expert Report of Schechter ("Schechter Rep.") ¶ 20; Trial Ex. 8, Goodman Rep. ¶ 29. All the forms also state that mental health treatment is an alternative treatment for individuals with gender dysphoria for whom hormone therapy or surgical procedures are medically indicated. Dx. Ex. 2, at 2; Dx. Ex. 3, at 2; Dx. Ex. 4, at 1; Dx. Ex. 5, at 2; Dx. Ex. 6, at 3; Dx. Ex. 7, at 2; *see* Trial Ex. 2, Janssen Rep. ¶ 153; Trial Ex. 4, Karasic Rep. ¶ 33. The forms further state that the restricted medical treatments "will not prevent serious psychiatric events, including suicide." Dx. Ex. 2, at 6; Dx. Ex. 3, at ; 7Dx. Ex. 4, at 4; Dx. Ex. 5, at 5; Dx. Ex. 6, at 6; Dx. Ex. 7, at 6 ; *see* Trial Ex. 2,

---

Feminizing Medications for Patients with Gender Dysphoria, DH5082-MQA (Rev. 08/23); Feminizing Medications for Patients with Gender Dysphoria (Minors), DH5080-MQA (Rev. 06/23). *See also* Florida Board of Medicine, "Links and Resources" (last visited Nov. 3, 2023), https://flboardofmedicine.gov/resources/.

Janssen Rep. ¶ 154; Trial Ex. 3, Bruggeman Rep. ¶ 91; Trial Ex. 4, Karasic Rep. ¶ 34; Trial Ex. 5, Shumer Rep. ¶ 111. These statements are false.

The puberty blocking medication forms twice state that the use of "these medications for gender dysphoria is considered 'off label' use because they are not being used for their intended purpose."Dx. Ex. 4, at 2, 4; *see* Trial Ex. 3, Bruggeman Rep. ¶ 82; Trial Ex. 4, Karasic Rep. ¶ 45; Trial Ex. 5, Shumer Rep. ¶ 96. The forms make reference to treatments and procedures that are not related to puberty blockers. Dx. Ex. 4, at 2 (describing treatment with Provera), 3 (requiring knowledge and understanding of treatment with hormones and surgery) ; *see* Trial Ex. 3, Bruggeman Rep. ¶ 84; Trial Ex. 5, Shumer Rep. ¶¶ 99-100. The puberty blocking medication form also state that the effects of these medications "could be permanent" and that the effects when used to treat gender dysphoria are not well known. Dx. Ex. 4, at 4 ; *see* Trial Ex. 3, Bruggeman Rep. ¶ 95-96, 98; Trial Ex. 5, Shumer Rep. ¶¶ 107-108. They further suggest that puberty blockers interfere with fertility or may impact cognitive or brain development.  Dx. Ex. 4, at 4, 6; *see* Trial Ex. 3, Bruggeman Rep. ¶ 97; Trial Ex. 5, Shumer Rep. ¶¶ 109, 114. These statements are false and misleading. Lastly, the forms appear to create certain requirements about frequency of mental health screenings and in person screenings by the prescribing physician that are not supported by clinical practice guidelines. Dx. Ex. 4, at 3; *see* Trial Ex. 2, Janssen Rep. ¶ 57-58; Trial Ex. 3, Bruggeman Rep. ¶ 85-90; Trial Ex. 4, Karasic

Rep. ¶¶ 36-41; Trial Ex. 5, Shumer Rep. ¶ 129, 131, 141.

The forms for hormone therapy suffer from similar defects. They also twice state that the use of "these medications for gender dysphoria is considered 'off label' use because they are not being used for their intended purpose."Dx. Ex. 2, at 1, 6; Dx. Ex. 3, at 1, 6; Dx. Ex. 6, at 1, 6; Dx. Ex. 7, at 1, 5; *see* Trial Ex. 3, Bruggeman Rep. ¶ 82; Trial Ex. 4, Karasic Rep. ¶ 45; Trial Ex. 5, Shumer Rep. ¶¶ 117. These forms suggest that there are no established published guidelines and protocols to determine the timing, dosing, and types of medications used in hormone replacement therapy.Dx. Ex. 2, at 5; Dx. Ex. 3, at 6; Dx. Ex. 6, at 6; Dx. Ex. 7, at 6; *see* Trial Ex. 5, Shumer Rep. ¶ 130. The hormone forms include references to medications risks, which may not even be a medication or risk relevant to the patient from whom informed consent is sought is being prescribed. Dx. Ex. 2, at 2 (Finasteride), 4 (Warfarin and Coumadin), 6 (coronary artery disease), 7 (Finasteride); Dx. Ex. 3, at 4 (Warfarin and Coumadin), 6 (coronary artery disease); Dx. Ex. 6, at 2 (Cyproterone Acetate, Finasteride, and Provera), 6 estrogen-dependent cancers); Dx. Ex. 7, at 6 (estrogen-dependent cancers); *see also* Trial Ex. 3, Bruggeman Rep. ¶ 92; Trial Ex. 5, Shumer Rep. ¶ 126, 128, 133, 138-139; Trial Ex. 8, Goodman Rep. ¶ 31.  The hormone therapy forms also provide information about certain risks for which there is no data to support those statements. Dx. Ex. 2, at 7 ("treatment with testosterone increases the risk of cancer to the uterus, ovaries, or breasts"; "taking testosterone

causes or worsens migraines"); Dx. Ex. 3, at 7 (same); Dx. Ex. 6, at 5  ("My risk of breast cancer may significantly increase"; (referencing cholesterol, diabetes, heart disease, high blood pressure); Dx. Ex. 7, at 4, 7 (same); *see* Trial Ex. 3, Bruggeman Rep. ¶ 101, 104-106; Trial Ex. 5, Shumer Rep. ¶ 136, 142. The forms also state that certain non-permanent effects of testosterone or estrogen could be permanent. Dx. Ex. 2, at 5-6; Dx. Ex. 3, at 5-6; Dx. Ex. 6, at 5, 6; Dx. Ex. 7, at 4-5;  *see* Trial  Ex. 3, Bruggeman Rep. ¶ 100, 103; Trial Ex. 5, Shumer Rep. ¶ 134. Lastly, the forms appear to create certain requirements about visit frequency, frequency of mental health screening, and laboratory and radiology testing. Dx. Ex. 2, at 3; Dx. Ex. 3, at 3; Dx. Ex. 6, at 4; Dx. Ex. 7, at 3; *see* Trial Ex. 2, Janssen Rep. ¶ 57-58; Trial Ex. 4, Karasic Rep. ¶¶  36-42; Trial Ex. 5, Shumer Rep. ¶ 129, 131, 141.

The surgical treatment forms are also misleading and inaccurate. The forms address a wide range of surgeries, many of which would be inapplicable to the patient providing informed consent. Dx. Ex. 5, at 1; *see* Trial Ex. 6, Schechter Rep. ¶ 19. The forms suggest that gender confirming surgeries will result in a need for lifelong treatment. Dx. Ex. 5, at 1; *see* Trial Ex. 6, Schechter Rep. ¶ 21. The forms inaccurately describe many of the surgical procedures covered. Dx. Ex. 5, at 1 (Orchiectomy), at 2 (Vaginoplasty, Phalloplasty, Metoidioplasty, Hysterectomy); *see* Trial Ex. 6, Schechter Rep. ¶ 22-27. Lastly, the surgical treatment form lists many risks that patients will not face because of the nature of their surgery. Dx. Ex. 5, at

3; *see* Trial Ex. 6, Schechter Rep. ¶ 30.

Providing a patient with a list of medications and risks, including those that the patient is not being prescribed, is likely to cause confusion, to overwhelm a patient with irrelevant information, prevent a patient from understanding the individualized risks and benefits of the particular medication that is being recommended or prescribed, and make it more difficult to focus on information that is relevant to their health. *See* Trial Ex. 5, Shumer Rep. ¶ 133; Trial Ex. 4, Karasic Rep. ¶ 35; Trial Ex. 8, Goodman Rep. ¶¶ 31, 35.

## VIII.    EVIDENCE OF ANIMUS

The State of Florida, through executive and legislative action, bans medical care for transgender adolescents and restricts such care for all transgender adults and for the "grandfathered" subset of transgender minors. The purpose of these measures is to discourage transgender Floridians from living consistent with their gender identity—in other words, to discourage people from being transgender. This constitutes purposeful discrimination against a vulnerable group. The facts and evidence leading up to SB 254 and the Boards of Medicine rules all support that conclusion and show that these measures were adopted for an improper discriminatory purpose.

### A.    The State of Florida's Plan to Restrict Healthcare for Transgender People

Between April 20, 2022 and May 17, 2023, the state of Florida took steps that banned Medicaid from covering medical care needed by transgender Medicaid beneficiaries both by rule (Fla. Admin. Code Rule 59G-1.050(7)) and by statute (Fla. Stat. § 286.31(2)); banned medical providers from prescribing established medical care for transgender minors both by rule (Fla. Admin. Code Rules 64B8-9.019 and 64B15-14.014) and by statute (Fla. Stat. § 456.52(1)); made the provision of these services to minors a crime punishable by felony conviction (Fla. Stat. § 456.52(5)(b)); and took the unprecedented step of establishing restrictions on accessing established medical care for transgender adults, whose providers are now subject to misdemeanor criminal penalties (Fla. Stat. § 456.52(5)(c)) for the provision of this care.

On March 2, 2022, the U.S. Department of Health and Human Services' (HHS) Office of Civil Rights issued guidance stating that HHS "stands with . . . the significant majority of expert medical associations" in "unequivocally stating that gender affirming care for minors, when medically appropriate and necessary, improves their physical and mental health" (*Dekker*, ECF 193-1, HHS Notice and Guidance on Gender Affirming Care) and later released a Fact Sheet demonstrating that gender transition care can "yield lower rates of adverse mental health outcomes, build self-esteem, and improve overall quality of life for transgender and gender diverse youth" (*Dekker*, ECF No. 193-2, HHS Fact Sheet: Gender Affirming Care

and Young People.). In response, the Governor's office convened a meeting of staff from the Governor's office, the Florida Department of Health ("FDOH"), and the Agency on Health Care Administration ("AHCA") to formulate a plan for adopting a contrary policy for the state of Florida and to, more broadly, prohibit and restrict medical treatment for transgender Floridians. (*Dekker,* ECF 120-6, Brackett Feb. 8 Dep. at 88:12-89:19).

As an initial step, on April 20, 2022, Defendants FDOH and Surgeon General Ladapo issued a set of guidelines titled "Treatment of Gender Dysphoria for Children and Adolescents" ("FDOH Guidelines"). (Trial Ex. 14). The FDOH Guidelines, which recommend against puberty-blocking medication, hormone treatments, surgery, and social transition[7] for adolescents, were issued directly to contradict the 'HHS' recent guidance supporting the established medical guidelines for the treatment of gender dysphoria.[8] (*Dekker*, ECF 193-1 and 193-2.) In response to the federal government's position on this issue, the state of Florida embarked upon a strategic and coordinated effort to bring Florida's policies into alignment with the FDOH Guidance. (*See Dekker*, ECF 199, at 69-80; *Dekker,* ECF 182-35 (Gender

---

[7] *Dekker,* ECF 246 at 37 ("In a 'fact sheet,' the Florida Department of Health asserted social transitioning, which involves no medical intervention at all, should not be a treatment option for children or adolescents. Nothing could have motivated this remarkable intrusion into parental prerogatives other than opposition to transgender status itself.")

[8] (https://ahca.myflorida.com/let-kids-be-kids/setting-the-record-straight) ("Setting the Record Straight" with fact-check of HHS Fact Sheet, including what FDOH has labeled as "Truths" - such as "[m]ost children identifying as transgender will detransition following the onset of puberty.")

Dysphoria/Transgender Health Care Non-Legislative Pathway); *Dekker,* ECF 182-36 (Gender Dysphoria/Transgender Health Care Policy Pathway)).

Subsequently, the Executive Office of the Governor directed AHCA to initiate the process to develop a Generally Accepted Professional Medical Standards report ("GAPMS Report"), relating to gender transition treatments, which is something AHCA had never before done for a type of medical treatment that was already approved and covered by Florida Medicaid. (*Dekker,* ECF 246, at 8-9.) In another diversion from typical process, AHCA sought out and hired paid consultants to assist with the GAPMS Report, "retain[ing] only consultants known in advance for their staunch opposition to gender-affirming care." (*Id.* at 9.)[9] The flawed GAPMS Report concluded that treatments for gender dysphoria are experimental, a conclusion that this Court found, "was, from the outset, a biased effort to justify a predetermined outcome, not a fair analysis of the evidence." (*Dekker,* ECF 246 at 9.) The goal was to develop an official report to conclude, incorrectly and without evidentiary support, that the use of puberty blockers, hormone therapy, and surgeries for gender transition was experimental. As envisioned by the Executive Office, that report was then used

---

[9] Dr. Patrick Hunter, who would soon after be appointed by Governor DeSantis to the Florida Board of Medicine, was involved in "organizing testimony" to support the AHCA rule banning Medicaid coverage for the treatment of gender dysphoria. (Trial Ex. 52) (an email from Dr. Van Mol, paid consultant for the state during the GAPMS process, to AHCA Secretary Jason Weida, states that a friend of his wishes to testify at the AHCA rule hearing, and asks "[d]o I put him in contact with you, or this Patrick Hunter gentleman who contacted me that he is organizing testimony?"). This email was dated June 14, 2022, and Patrick Hunter was appointed to the Board on June 17, 2022.

to justify a Medicaid exclusion, rulemaking by the relevant Boards, and throughout the legislative process as a justification for SB 254. (*Dekker,* ECF 182-35, ECF 182-36). The GAPMS report focused in part on treatments for adolescents consistent with the Governor's goal of ending gender transition treatment for transgender minors.[10] The report, however, was broader, drawing conclusions generally about treatments for both transgender adolescents and adults. Based on the GAPMS Report, AHCA promulgated a rule that would ban Florida Medicaid from paying for puberty blockers, hormones, and surgery when used for gender transition, whether by minors or adults. (Fla. Admin. Code Rule 59G-1.050(7); *Dekker,* ECF 246, at 10).[11]

On July 8, 2022, AHCA held a Public Hearing on the Rule, during which time speakers who were in support of the ban and spoke "on the preordained side" were permitted to speak, but those who opposed the ban or who had "some expertise" on the issue were rebutted by the state's retained "consultants," including Drs. Van Meter, Van Mol, and Grossman. (*Dekker,* ECF 62, Tr. of Prel. Inj. Hrg. 10.12.22, at

---

[10] Throughout the process of developing the GAPMS Report and the Medicaid Rule, the Governor's Office, FDOH, and AHCA engaged in a campaign called "Let Kids Be Kids," which included an entire website, https://ahca.myflorida.com/let-kids-be-kids, dedicated to this slogan and the state's position against the federal government on this issue. This has remained a staple in the Governor's speeches and the agency's public statements their accomplishments. *See, e.g.*, Ron DeSantis, "Let Kids Be Kids," https://www.flgov.com/wp-content/uploads/2023/05/Kids-v8.pdf (using the same slogan to announce DeSantis' May 17, 2023 signing of 5 bills, including "Outlawing permanent mutilation of minors (SB254)".

[11] After a seven-day bench trial in *Dekker v. Weida,* including 13 expert witnesses, 7 fact witnesses, and approximately 200 exhibits, this Court determined that "the State's determination that these treatments are experimental" was not reasonable (*Dekker,* ECF 124, at 15), and that the statute and rule promulgated based upon the GAPMS report "were an exercise in politics, not good medicine" (*id.* at 43).

90:11-91:2.)[12] As demonstrated by the Hearing Brief put together by AHCA (*Dekker*, ECF 183-7, AHCA Hearing Brief), there were speakers lined up to tell their stories, including "detransitioners" (and parents of alleged "detransitioners") who would soon become witnesses for the state and would be part of an orchestrated endeavor to ensure that their testimony was presented to the Boards of Medicine and the Florida Legislature, including Chloe Cole, Sophia Galvin, Katie Canterbury, Janette Cooper, Robert Roper, and January Littlejohn. (*Id.*) Only these "detransitioners" - whose testimony was orchestrated by the state throughout these processes - had descriptions of their testimony provided in the AHCA Hearing Brief. (*Dekker*, ECF 183-7; *see also Dekker*, ECF 183-8, AHCA Hearing Transcript). Also appearing on the AHCA Hearing Brief and Hearing Transcript[13] as an individual providing public comment in support of the ban was Dr. Matthew Benson,[14] who would later be appointed by Governor DeSantis to the Florida Board of Medicine (Trial Ex. 103, DeSantis Appoints Two to Board of Medicine). On the same day, July 8, 2022,

---

[12] "THE COURT: So tell me, how do you support a process that goes out and finds five experts…they go out and get five people who are decidedly out of the mainstream, nobody in the mainstream. They have a hearing and they line up all the lay speakers who are opposed, one after the next. So somebody has organized this…And when anybody speaks with some expertise on the other side of the issue, they've got somebody there at the hearing to rebut it instantly. So if you speak on the preordained side, you get to just speak, but if you speak against the preordained view – or the allegedly preordained view, you've got somebody right there harking back at your immediately."

[13] ECF 183-8, AHCA Hearing Transcript at 18:7-19:13 (including a reference to the detransitioners – "And we've already seen two individuals, Chloe and Sophia, testify here today about how they were harmed by these procedures.")

[14] *Id.* at 18:7-19:13 (Matthew Benson provides public comment in support of AHCA's Medicaid Ban).

Defendant Surgeon General Ladapo held an event where these same out-of-state "guests" were invited to share their views opposing gender transition medical treatment, in order to be able to later share that perspective with the Boards; Dr. Benson[15] was also invited to and participated in this event. (Trial Ex. 44, Gender Dysphoria Talking Points).

### B.    The State's Request for the Boards to Ban Care.

On June 2, 2022, the same day that the GAPMS Report was published, Defendant Surgeon General Ladapo sent a letter to the Medical Defendants encouraging them to review the "Agency's findings" (the GAPMS Report) and the "Department's guidance" (Trial Ex. 14) to "establish a standard of care for these complex and irreversible procedures." (Trial Ex. 15, Letter from Surgeon General Ladapo).

On July 28, 2022, FDOH relied on the GAPMS report and FDOH Guidance to petition the Florida Board of Medicine to initiate rulemaking to ban gender transition care for transgender minors and to restrict such care for transgender adults. (Trial Ex. 16, Florida Department of Health's Petition to Initiate Rulemaking). On August

---

[15] Trial Ex. 44, Gender Dysphoria Roundtable Talking Points, refers to Dr. Benson as an "expert" despite the fact that he does not provide this treatment. Dr. Benson, who works with Dr. Mortensen at Nemours, and with whom he co-authored a letter in support of the Boards' bans on treatment of gender dysphoria in minors, is not an expert on gender dysphoria. (*See* Mortensen Deposition Tr. at 130:22-25 ("Q: You mentioned earlier to the best of your knowledge, Dr. Benson has not provided treatment for gender dysphoria, correct? A: Correct."); 102:10-12 ("Q: Does Dr. Benson provide treatment for gender dysphoria? A: Not to my knowledge."); *see also* 123:8-10.

4, 2022, FDOH did the same in petitioning the Florida Board of Osteopathic Medicine to initiate rulemaking.[16] Both petitions relied upon the flawed conclusions reached by AHCA in the GAPMS Report, which is attached as Exhibit B to the Petitions, and its findings are summarized on pages 4-5. (*Id.*).

The FDOH Petition to Initiate Rulemaking set forth a "Proposed Standard of Care" which requested the Board to adopt a rule categorically banning all gender transition treatments for patients under 18 years old and requiring "informed consent…in writing through forms approved by Board at least 24 hours before treatment is provided" for all adults. (*Id.* at ¶¶ 23(a)-(c), and Exhibits C and D). The Board of Medicine met on August 5, 2022 to discuss the Petition to Initiate Rulemaking (Trial Ex. 22, Public Book, at p. 4955-4974; Trial Ex. 23, Transcript of Florida Board of Medicine August 5, 2022 Meeting; Ex. 21, Rulemaking Record, at p. 24-25), and the Board of Osteopathic Medicine met on August 12, 2022 to discuss the Petition to Initiate Rulemaking (Trial Ex. 21, Rulemaking Record, at p. 31-40).

At both Boards' meetings, Defendant Surgeon General Ladapo was invited to speak and urged the Boards to initiate rulemaking to ban this care (Trial Ex. 23, at 8:12-13:16; Trial Ex. 21, at 32-33.), noting that "the Department of Health, our Governor, DeSantis, and the Agency for Healthcare Administration, have been

---

[16] https://ahca.myflorida.com/let-kids-be-kids/additional-resources (Florida Board of Medicine and Florida Board of Osteopathic Medicine Materials, (2) Board of Osteopathic medicine Petition to Initiate Rulemaking)

focused on this issue" (Trial Ex. 23, at 10:1-5). Defendant Ladapo stated that "it is *impossible* to conclude that there is a benefit" associated with these treatments (*id.* at 11:1-8), and suggested that neither minors nor adults can "competently provide consent" for this treatment (*id.* at 12:22-25).

At both Boards' meetings, FDOH General Counsel John Wilson, who signed the Petition to Initiate Rulemaking, was also invited to speak and also urged the Boards to initiate rulemaking to ban this care (*id.* at 13:17-18:24; Trial Ex. 21, at 25, 33), relying upon the FDOH Guidance and the GAPMS Report by AHCA as the bases for the Petition to Initiate Rulemaking (Trial Ex. 23, at 14:6-20). The process the Boards undertook to promulgate the Rules marked a deviation from its ordinary process. (*Id.* at 16:12-17:2) (explaining the Boards' "usual rulemaking process is responsive…to a set of disciplinary cases, an ongoing dialogue with a trade association or professional association, or after the legislature's mandated you to engage in rulemaking.") Mr. Wilson acknowledged that no issues or concerns with the provision or receipt of gender transition care prompted the state's actions on this issue, but rather the state was "not willing to wait" for an actual controversy to occur. (*Id.* at 17:11-15); *see also* Defendant Dr. Mortensen Dep. Tr. at 236:4-237:7) *Id.* at 149:6-8 ("Q: Are you aware of any complaints filed against providers for providing this care inappropriately? A: Not yet.").

Some Board members raised concerns about the novelty and irregularity of the

petition process. One Board member, for example, noted that in prior instances of similar regulation of treatment by the Boards, the catalyst was "the large number of deaths" resulting from those treatments, and the "very large number of disciplinary cases brought before us, and we had deaths." (Trial Ex. 23, at 35:5-20). Mr. Wilson responded "as your chief prosecutor, there have not been any recent public cases that have made it to the board on this issue in recent history." (*Id.* at 35:21-36:4).

Dr. Quentin Van Meter was also invited to speak to the Board of Medicine on August 5, 2022 to urge them to initiate the rulemaking process to ban this care. (*Id.* at 26:22- 33:15.) Dr. Van Meter was retained by AHCA as a paid consultant during the GAPMS process and as an author of a GAPMS Report Attachment (*see* GAPMS Attachment E),[17] and was paid $4,395.02 by AHCA to attend the August 5, 2023 Board of Medicine. (Trial Ex. 58, AHCA Invoice for Dr. Van Meter attendance at Board meeting). Dr. Van Meter has never provided treatment for gender dysphoria nor conducted any original, peer-reviewed research on gender identity, transgender people, or gender dysphoria (*Dekker,* ECF 144-3, Van Meter Dep. at 28:6-23; 37:13-25); he  is the past president of the American College of Pediatricians (a well-known anti-LGBTQ group founded to oppose "the AAP's view on gay parenting"),  believes that being transgender is a choice and "is not normal" (*id.* at 107:24-198:2, 191:25-

---

[17] *Dekker,* ECF 246, at 9 ("AHCA retained only consultants known in advance for their staunch opposition to gender-affirming care"); *see generally Dekker,* ECF 144, Memo in Support of Mot. to Exclude Testimony of Dr. Van Meter.

192:2), and considers gender affirmation to be "medical abuse" (*id.* at 186:12-15). Dr. Van Meter shared with the Board that "there is no biological basis for one's gender identity[,] it is purely a social construct" (Trial Ex. 23, at 27:12-13), he suggested that the internet and COVID restrictions have caused people to identify as transgender (*id.* at 30:18-25),[18] and inaccurately stated that "the government of Sweden, the government of Finland, and most recently in the last week, the UK, have closed down all such treatments and banned them by government edict" (*id.* at 31:8-16).

On August 5, 2022, the Board of Medicine voted to accept the FDOH's Petition and to proceed with the rulemaking process. (Trial Ex. 21, Meeting Minutes from August 5, 2022 Meeting, at 25). On August 12, 2022, the Board of Osteopathic Medicine also voted to accept the FDOH Petition and to proceed with the rulemaking process. (*Id.* at 32-33).[19]

### C.    The Boards Convened a Workshop with the Joint Rules Committee.

---

[18] A member of the Board of Medicine later acknowledged in his questions that "it almost seemed like [Dr. Van Meter was] insinuating that's like a social contagion" when he said "one of the contributing factors or main factors" leading to increases in reported gender dysphoria "was COVID that kids were staying at home on the internet" (*id.* at 52:18-24).

[19] At the Board of Osteopathic Medicine meeting on August 12, 2022, the only invited guest speakers were Surgeon General Ladapo, FDOH Counsel Mr. Wilson, and physician Dr. Tom Benton, founder of anti-trans organization ACPeds (https://acpeds.org/about/meet-our-board/tom-benton-md;Trial Ex. 21, at 33 ("Only one person spoke, Dr. Tom Benton who supports the motion.") On Wednesday, August 10, 2022, two days prior to the meeting, AHCA Secretary Jason Weida received the following text message: "From Quentin [Van Meter]: Tom Benton of Gainesville has agreed to speak at the Friday meeting. He should be calling you. His email address is notneb@bellsouth.com" (Trial Ex. 96). The remainder of the text exchange was redacted by the Executive Office of the Governor prior to being produced to Plaintiffs in *Dekker*.

Following the Boards of Medicine and Osteopathic Medicines' decisions to accept the Petition to Initiate Rulemaking, on September 1, 2022, the Boards each published Notices of Development of Rulemaking in the Florida Administrative Register ("F.A.R.") as required by Florida Statute 120.54(2)(c). (Trial Ex. 21, Rulemaking Record, at 160, 163, Rule 64B8-9.019, Board of Medicine; Rule 64B15-14.014, Board of Osteopathic Medicine, F.A.R. Vol. 48/71). On September 7, 2022, the Florida Boards of Medicine and Osteopathic Medicine Joint Rules/Legislative Committee ("Joint Boards") published a Notice of Rule Workshop to be held on September 30, 2022.

The Agenda for the September 30, 2022 Rule Workshop listed the following "Subject Matter Experts" who were invited by the Boards to speak about the development of the rules at issue: Michael Biggs, PhD, James Cantor, PhD, Kristin Dayton, M.D., and Michael Laidlaw, M.D. (Trial Ex. 73). Three of the four invited speakers served as expert witnesses for the state in defending AHCA's rule banning Medicaid coverage for gender-affirming care (*Dekker*, ECF 128 and 130 (Pls' Mot. to Exclude Testimony of Michael Biggs); ECF 53-21 (Laidlaw Decl.); ECF 133 (Pls' Mot. to Exclude Testimony of Michael Laidlaw); ECF 53-13 (Cantor Decl.)); and Dr. Cantor also served as a hired consultant for the state as an author of one of the GAPMS Report Attachments (*Dekker*, ECF 199, at 74-80, 104; ECF 53-7 (Attachment E to GAPMS Report)).

The September 30, 2022 Rule Workshop was cancelled due to Hurricane Ian, and on October 14, 2022, the Joint Boards published a Notice of Rule Workshop to be held on October 28, 2022. (Trial Ex. 22, at 41-42). As required by Florida Statute 120.54(8)(d), public comments were accepted from October 14, 2022 through October 29, 2022. The comments were overwhelmingly in opposition to the proposed rules. (Trial Ex. 22, Public Book for Boards' Original Rulemaking Process). The original Agenda for the October 28, 2022 Rule Workshop included the following "Subject Matter Experts" that were removed prior to the publication of the Agenda: "James Cantor, PhD" and "Detransitioner Testimony." (Trial Ex. 74; *compare with* Trial Ex. 21, at p. 43, Published Agenda for Oct. 28 Rule Workshop). (*See also* Trial Ex. 79).

At the joint workshop on October 28, 2022, the Boards invited people to speak about treatments for gender transition. The solicitation of the invited speakers opposed to gender transition care was largely conducted by Defendant Dr. Hunter, similar to his "organization" of experts to support the AHCA Rule banning coverage for the same treatments. (*See, supra* FN 10[20]; Trial Ex. 52). Dr. Hunter is an

---

[20] Prior to his appointment to the Boards of Medicine, Dr. Patrick Hunter was involved in "organizing testimony" to support the AHCA rule banning Medicaid coverage for the treatment of gender dysphoria. (Trial Ex. 52) (an email from Dr. Van Mol, paid consultant for the state during the GAPMS process, to AHCA Secretary Jason Weida, states that a friend of his wishes to testify at the AHCA rule hearing, and asks "[d]o I put him in contact with you, or this Patrick Hunter gentleman who contacted me that he is organizing testimony?"). This email was dated June 14, 2022, and Patrick Hunter was appointed to the Board on June 17, 2022.

outspoken opponent of medical care for transgender minors, whose positions and affiliation with anti-transgender groups are publicly documented. (Trial Ex. 92, Patrick Hunter, *Political Issues Surrounding Gender-Affirming Care for Transgender Youth* (Dec. 20, 2021); Trial Ex. 123, Hunter Letter to the Editor; Trial Ex. 93, at p. 279-331, Decl. of Patrick Hunter in *Eknes-Tucker v. Ivey*; Trial Ex. 97, AAP Resolution # 27, Co-authored by Patrick Hunter).

Dr. Hunter was appointed by Governor Ron DeSantis to the Florida Board of Medicine on June 17, 2022 (Trial Ex. 91), mere weeks after the release of the GAPMS Report and Defendant Ladapo's request to the Boards to adopt a standard of care banning treatment for gender dysphoria for minors. (TrialEx. 15). Dr. Hunter was, and continues to be, a member of an organization that has adopted resolutions stating that its members "reject all policies" that allow *anyone* to obtain gender transition care. (Trial Ex. 94, CMA Resolutions)[21].  Dr. Hunter is also a leading member of the organization Society for Evidence Based Medicine (SEGM), which opposes standard medical care for transgender people. (Trial Ex. 99; Trial Ex. 100;

---

[21] Catholic Medical Association Resolution 8-12: "Resolution on Transgender Treatments: BE IT RESOLVED, that the Catholic Medical Association **does not support the use of any hormones, hormone blocking agents or surgery in all human persons for the treatment of Gender Dysphoria**."
CMA Resolution 8-13: "Resolution on Gender Dysphoria: BE IT RESOLVED, that the Catholic Medical Association and its members **reject all policies that condition all persons with gender dysphoria to accept as normal** a life of chemical and surgical **impersonation of the opposite sex**; further, that the use of puberty blocking hormones and cross-sex hormones and surgical reassignment surgery be rejected."

Depo Tr. of Dr. Roman, at 68:21-69:14) ("Q: What us Dr. Hunter's role in SEGM? A: I think that he is one of the leading persons in SEGM.").

Dr. Hunter solicited Dr. Ritta Kaltiala to testify before the Board of Medicine at the Rule Workshop. (Trial Ex. 51 (email from Hunter to Board of Medicine Executive Director Vazquez stating "I met with Ritta Kaltiala this morning" and "we meet regularly," and sharing that Dr. Kaltiala wants to discuss harms of transition to the Boards "but would like it to be formally requested" due to "cultural and political issues in her country surrounding this issue."); *see also* Trial Ex. 87 (Hunter forwarding Vazquez emails between him and Kaltiala, and stating "I forgot to mention that they were very interested in the Florida evidence review, especially the report from McMaster University.")). Dr. Hunter also solicited Dr. Biggs to testify before the Board of Medicine at the Rule Workshop. (Trial Ex. 90) (sending Vazquez the CV of Michael Biggs and stating that he "wants to be present to express his concerns to the board" and "before he purchases tickets and flies in from England, he wants to assure that he will have an opportunity to talk to the board."); *see also* Trial Ex. 89 (email from Vazquez to Dr. Biggs, "Your name was given to me by Dr. Patrick Hunter."); *see also* Trial Ex. 100, at p. 3, listing Michael Biggs as a "Clinical and Academic Advisor" for SEGM, an organization Hunter is a leader within.) Dr. Hunter emailed Vazquez about potential "subject matter expert" Dr. Kaliebe, including his CV and publications, though the response from Vazquez was redacted

by FDOH (Trial Ex. 88). Dr. Kaliebe was a witness retained by the state to defend its Medicaid ban on treatment for gender dysphoria (*Dekker,* ECF 53-21, Decl. of Kaliebe; ECF 120-16, Expert Report Kaliebe; ECF 138-139, Mot. to Exclude Testimony of Dr. Kaliebe).

When Vazquez asked Hunter if he was able to recruit any Florida doctors who practice in this state and provide treatment to transgender adolescents, Dr. Hunter responded that the only providers he is aware of who actually provide treatment for transgender adolescents in Florida follow the standards of care and thus were not aligned with the Boards' position on banning the care. (Trial Ex. 54). In this email, Hunter went on to ask Vazquez if he saw the video that he sent from a detransitioner, which he later asked to be added to the rulemaking record for these bans. (*Id.*; *see also* Trial Ex. 55) The final "subject matter expert" who spoke in opposition to gender transition care was Dr. Laidlaw, who was recruited by Vernadette Broyles, an advocate with a national anti-transgender organization. (*See infra* at p. 56-58; *see also,* Pls' Trial Ex. 42).

Dr. Kaltiala, Dr. Biggs, and Dr. Laidlaw participated as "subject matter experts" at a workshop for the Board, repeating to the Boards the same flawed reasoning that formed the underpinnings of the GAPMS report. (Trial Ex. 22, at 2721-2786; 2798-2943); *see also* Trial Ex. 24, 8-16, 47-73; Trial Ex. 65.) These invited speakers claimed that medical treatments for transgender people are not

supported by sufficient evidence. ("Dr. Kaltiala: I have also myself reviewed the literature and the evidence for -- because it is often stated that the gender reassignment will also help in the mental health difficulties and the functional impairments. This is not the case. There is no evidence base for such claims.") (Trial Ex. 24, at 56-57.)

At the meeting, board members raised questions about whether the medical treatments at issue (puberty blockers and hormones) would be barred for all minors or only barred when used for gender transition. (Trial Ex. 24, at 105-07). Dr. Ackerman made a motion to "make it clear" that the prohibitions discussed by the Boards were only applicable for treatment of gender dysphoria and that "these drugs remain available for those that need it that have other disorders." (*Id.* at 105-07; *See also* Trial Ex. 23, at 34-35 (Dr. Diamond's questions from the August 5 meeting of the Boards: "I want to be very, very clear that this petition does not include individuals with disorders of sex development, does not include congenital adrenal hyperplasia, Leydig cell hypoplasia, Klinefelter, Turner syndrome, Ovo testicular disorder. Is that correct?" Dr. Van Meter reponded, "That's correct." And Chair Diamond asked "Just gender dysphoria, correct?" to which Van Meter confirmed, "That's correct.").)

With the time remaining after expert testimony, the workshop was open to public comment. In traditional Rule Workshops held pursuant to Fla. Stat. 120.54(2),

such as that held by the Medical Defendants on October 28, 2022, the following is

the standard protocol:

> "Public comments presented at the workshop will be limited to no more
> than two hours in total. Any person who wants to make public
> comments must notify board staff in writing. Speaker cards will be
> available at the workshop for this purpose. Public comments will be
> limited to three minutes per person. This time will not include time
> spent by the public commenter responding to questions imposed by
> Committee members, staff, or board counsel. If a group or faction of
> persons consisting of five or more persons wishes to address the
> Committee, please identify one individual who will speak on behalf of
> the group." (Trial Ex. 21, at p. 41; *see also* Trial Ex. 24, at 4:10-5:25[22].

For the October 28, 2022 Workshop, however, Board of Osteopathic Medicine

Executive Director Danielle Terrell deviated from that process by coordinating with

an anti-transgender organization to orchestrate a pre-selected and pre-approved line-

up of "detransitioner testimony." On October 25, 2022, Terrell spoke with Vernadette

Broyles,[23] President and General Counsel of the Child & Parental Rights

Campaign,[24] who followed up afterwards by sending Terrell "the list of testifiers"

---

[22] Transcript of October 28, 2022 Rule Workshop. Paul Vazquez, Executive Director of the Florida
Board of Medicine, explained the public comment process on the record, including that "[t]he
following guidelines will apply to public comments: interested parties will be given an opportunity
to provide comment on matters before the board after an agenda item is introduced…" and
"[a]ppearance forms have been provided to facilitate this process." (Trial Ex. 24, at 5:5-25); *see
also* Trial Ex. 66, Appearance Request Form.
[23] This Court was informed by Defendant AHCA's detransitioner witness Zoe Hawes, during the
*Dekker v. Weida* Evidentiary Hearing on the Preliminary Injunction, that she was recruited to
participate in the litigation by "Vernadette." (*Dekker,* ECF 62, Tr. of Prel. Inj. Hrg. 10.12.22, at
46:12-25). Hawes was one of the nine "detransitioner" testifiers listed on Vernadette Broyles' list.
[24] Child and Parental Rights Campaign's mission is to "defend parents' rights to shield their
children from the impacts of gender identity ideology" and it ""was founded to respond to a radical
new ideology overtaking families and threatening the well-being of children and the fundamental
right of parents." (http://childparentrights.org/)

for the Rule Workshop. (Trial Ex. 42, at 40-41). Terrell confirmed to Broyles that the individuals named on the list "will be first to speak during the public comments portion of the workshop" and that the subject matter expert named on the list, Dr. Laidlaw, "would be heard first and given 10 minutes" to speak, along with the other experts. (*Id.* at 39.)  On October 27, 2023, the Child & Parental Rights Campaign sent an email to Terrell stating "[a]fter talking with the detransitioners I'd like to please just change the order of the DETRANSITIONERS to as follows" – providing a final list of nine detransitioners, one expert, five parents, and four readers of detransitioners' testimony. (*Id.* at 30). Terrell acknowledged that the list of detransitioners and Dr. Laidlaw "would total one hour of our public comment time" out of the two hours allotted for public comments. (*Id.* at 25). Terrell relayed to Vazquez that the list of detransitioners "will be the first to make public comment" and "we need to ensure that cards are filled out for all detransitioners and the parent." (*Id.* at 22). Bettye Strickland confirmed "we will pre-fill out speaker cards for the detransitioners and parent on the list and have them waiting." (*Id.*)

Just like the AHCA Rule Hearing on the Medicaid ban,[25] the emails between Terrell and Broyles demonstrate the state's orchestration of arriving at a predetermined outcome. (Trial Ex. 42; Trial Ex. 24). A Board member confirmed the

---

[25] *See supra* footnote 13 (*Dekker,* ECF 62, Tr. of Prel. Inj. Hrg. 10.12.22, at 90:11-91:2) (COURT: "They have a hearing and they line up all the lay speakers who are opposed, one after the next. So somebody has organized this…")

Boards' departure from the practice of having speakers randomly drawn from those who had filled-out speaker cards. (Mortenson Depo. Tr. at 153:9-13.)

The substance of the meeting was determined by the steps taken by Danielle Terrell and other staff to ensure the focus of discussion was around banning medical care for transgender adolescents. Almost all who spoke in support of the ban were from the pre-selected list of speakers offered pre-filled speaker cards. (*Id.* at 127:16-130:12 (Zoe Hawes testimony); 130:14-132:24 (Rachel Foster testimony); 132:25-135:12 (Chloe Cole testimony); 135:13-137:15 (Camille Kiefel testimony); 137:16-140:4 (Shape Shifter testimony); 140:5-142:11 (Billy Burleigh testimony); 143:12-145:3 (Cat Cattinson testimony); 145:4-148:1 (Helena Kerschner testimony); 148:2-150:6 (Ted Halley testimony); 150:7-152:23 (Yaacov Sheinfeld testimony); 160:9-162:22 (Edward Drass testimony), 165:9-167:25 (Robert Roper testimony), 169:4-5 (Amy Atterbury called), 169:6-171:21 (January Littlejohn testimony); 174:17-176:19 (Bob Framingham testimony); and 179:20-183:23 (Patti Sullivan testimony).

**D.   The Board of Medicine adopted a rule eliminating a provision  for clinical trials.**

The rule drafted by the Joint Boards' Rules Committee after the Joint Rule Workshop on October 28, 2022 included a provision allowing minors to receive

medical treatment for gender dysphoria if enrolled in a clinical trial.[26] (Trial Ex. 22, at 1664-1665; *see also* Trial Ex. 21.).

During the next Joint Board meeting on November 4, 2022, the Board of Medicine members Dr. Hector Vila and Dr. Patrick Hunter moved and seconded to remove the clinical trial exemption, against the objection of Board Chair Dr. David Diamond. (Trial Ex. 25, at 20:17-21:10; *see also* Trial Ex. 21, at 51 ("Dr. Vila stated he is not in support of item two in the proposed draft rule. Dr. Vila made a motion to strike item two from the proposed draft rule, Dr. Hunter seconded" and "Dr. Vila indicated after hearing extensive testimony, and detransition experiences, given these facts, he does not feel they are safe.")). The Board of Medicine voted in favor of the motion to amend. (Trial Ex. 25, at 28:14-30:25). The Board of Medicine also voted not to include a sunset provision for the rule, diverting from typical procedure for non-mandatory, discretionary rules such as this. (*Id.* at 44:24-45:19). This decision, too, was driven by Dr. Villa. (*Id.* at 45:15-19).

The same motion was introduced to the Board of Osteopathic Medicine, which unanimously voted against the amendment to remove the clinical trial exception. (Trial Ex. 25, at 40:1-41:3; *see also* Trial Ex. 21, at 52.)

---

[26] Trial Ex. 21, at 51 ("Nonsurgical treatments for the treatment of gender dysphoria in minors may continue to be performed under the auspices of Institutional Review Board (IRB) approved, investigator-initiated trials conducted at any of the Florida medical schools set forth in Section 458.3 145(1)(i), Florida Statutes. Such clinical trials must include long term longitudinal assessments of the patients' physiologic and psychologic outcomes.").

E.     **The Board of Osteopathic Medicine, after a change in its composition, also voted to eliminate the clinical trials provision.**

In December of 2022, during the pendency of the rulemaking procedures initiated by the FDOH petition, the Governor appointed new members who had publicly stated their opposition to medical care for transgender minors to both Boards, appointing Dr. Monica Mortenson to the Florida Board of Osteopathic Medicine, and Dr. Gregory Coffman and Dr. Matthew Benson to the Florida Board of Medicine. (Tr. Ex. 102; Trial Ex. 103; *see also* Mortensen Tr. at 33:25-24:2; 123:24-124:1; 165:7-12.)    Prior to being appointed to the Boards, Doctors Mortenson and Benson had previously written an open letter to the Florida Boards of Medicine supporting the bans and opposing medical care for transgender youth. (Trial Ex. 22, at 4025-4030;[27] *see also* Mortensen Tr. at 120:15-124:1).[28] Benson had also been an invited guest of Surgeon General Ladapo's "Gender Dysphoria Roundtable" in July of 2022 (Trial Ex. 44, Gender Dysphoria Roundtable Talking

---

[27] The Open Letter argues that "hundreds of clinics in the USA implementing these treatment pathways carte blanche outside of well-regulated and well-designed research protocols" and that they "have witnessed children being prescribed cross-sex hormones after a single brief visit to clinics, at times by physician and non-physician providers with limited expertise and minimal to no involvement by well-trained psychologists." (*Id.* at 4028). However, when asked about these statements and others during her deposition, Dr. Mortensen was unable to identify a single clinic that provided care inappropriately or a single patient in the state of Florida who received inappropriate care. (Mortensen Dep. Tr. at 236:4-237:7). In their Open Letter, Benson and Mortensen discuss and rely upon the GAPMS report. (Trial Ex. 22, at 4028, "To understand the state of evidence, the Florida Department of Health commissioned two researchers from McMaster University where the term 'evidence-based medicine' was coined, for a systematic review of available evidence (https://ahca.mvflorida'com/Ietkidsbekids/).")
[28] None of the signatories to the Open Letter, including Defendants Dr. Mortensen and Dr. Benson, had any experience providing the gender transition medical care at issue in their letter.

Points), he spoke on the record at the July 8, 2022 Public Hearing on the Medicaid

Ban (*Dekker* ECF 183-8, Transcript of July 8, 2022 Hearing, at 18:6-19:13), and he

was quoted in the New York Times in a 2022 article questioning the appropriateness

of prescribing puberty blocking medications to transgender youth (Trial Ex. 104.).

Dr. Gregory Coffman had submitted a public comment to the Board of Medicine in

support of the Proposed Rules, expressing that he was "gravely concerned" about

medical care for transgender people. (Trial Ex. 22, at 3235.)

On February 10, 2023, the Joint Boards held a Public Hearing on the final

rules, as required by Florida Statute 120.54. At the conclusion of the hearing, Board

of Osteopathic Medicine unanimously voted to amend the rule by striking the

clinical trial exception. Nothing had changed other than a change in Board

composition.[29] Additionally, the basis for the change was FDOH General Counsel

John Wilson, who submitted a petition for rule hearing, and explicitly requested that

the Board of Osteopathic Medicine remove the clinical trial exception.

### F.    SB 254

On February 21, 2023, the Florida House Health & Human Services

Committee held a meeting at which several speakers were invited to speak to the

---

[29] In December 2022, Governor DeSantis replaced three members of the Board of Osteopathic Medicine who had voted in support of the clinical trials exception (Dr. Schwemmer, Dr. Gadea, and Dr. Mendez) with three new members (Dr. Monica Mortenson, Christopher Creegan, and Dr. Gregory Coffman). (Trial Ex. 25, at 4; Trial Ex. 26, at 4.)

Committee. (Trial Ex. 27, at 5:4-15). The meeting was led by State Representative Randy Fine, and the invited speakers included Dr. Ackerman (Chair of the Board of Medicine), Dr. Laidlaw, Dr. Stephen Levine, Michael Biggs, Chloe Cole, and David Leatherwood (leader of the local chapter of Gays Against Groomers). (*Id.*). Each spoke in support of a ban on medical care for transgender minors. The committee did not hear from any practitioners who provide this care or from any transgender minors or adults, or from any parents of transgender adolescents. Rep. Fine stated that this presentation was a prelude to introducing legislation that would ban medical care for transgender adolescents, consistent with the bans recently promulgated by the Boards. (Trial Ex. 27, at 92:24-94:2-94). Rep. Fine compared providers of gender transition medical care to medical experimentation by Nazis: "When I hear these comments—so you all know I'm Jewish, and I study the Holocaust. And it's been an impactful part of my life, and I will tell you that when I hear this discussion, . . . when I hear this, I think of Dr. Mengele, who was another doctor." *Id*. He went on: "And so I will tell you this. I say these panels are oftentimes a predicate for what's to come. That's exactly what today was. And I promise you, you will like the bill that is coming." (*Id*.)

On March 3, 2023, weeks after the Medical Boards had adopted their bans, Florida State Senator Clay Yarborough filed Senate Bill 254 to ban medical care for transgender adolescents and to restrict it for adults. (Trial Ex. 17

https://www.flsenate.gov/Session/Bill/2023/254). This bill was amended and voted favorably through the Senate on April 4 and crossed over to the House. (https://www.flsenate.gov/Session/Bill/2023/254). A companion bill, House Bill 1421, was introduced on the same day, March 3, by Florida State Reps. Fine and Ralph Massullo. (Trial Ex. 18 https://www.flsenate.gov/Session/Bill/2023/1421). The House version of the bill merged with the Senate version on April 18 and was variously amended until being adopted by both the House and the Senate on May 4. (https://www.flsenate.gov/Session/Bill/2023/254). The bill was signed into law by the Governor on May 17. (https://www.flsenate.gov/Session/Bill/2023/254).

Throughout the hearings on the bill, legislators relied heavily on the GAPMS report this Court has found to be biased and unfounded.

## H.    Reliance on GAPMS.

Immediately prior to SB 254's introduction in the legislature, Surgeon General Ladapo testified to its findings as justification for legislative action.[30] Senator Yarborough relied on the GAPMS report throughout the legislative process to justify both the bill's general prohibition on insurance coverage for gender transition care and its specific complete prohibition for minors.[31] Many of the Fiscal Policy

---

[30] Trial Ex. 29, at 2:9-4:17.

[31] Trial Exs. 33, 53, and 78.

Committee and Health Policy Committee bill analyses associated with SB 254 reference and rely explicitly upon the GAPMS report.[32]

## I.   The Legislature permitted testimony only from speakers supporting a ban.

On February 21, 2023 led by Rep. Fine, the House heard testimony on medical care for transgender people in Florida. Despite Rep. Fine's claim that the purpose of the hearing was to hear from experts "on both sides,"[33] only doctors opposed to medical care for transgender adolescents testified.[34] In addition, the legislature invited testimony from one of the "detransitioner" witnesses – Chloe Cole[35] - who had previously testified before the Boards, and a person from "Gays Against Groomers."[36] The legislature did not hear testimony from any transgender people, nor from any parents of transgender adolescents, nor from any provider of medical care to transgender adolescents or adults.

---

[32] See Bill Analysis and Fiscal Impact Statement, Committee on Fiscal Policy, at 17 (Mar. 22, 2023),   https://www.flsenate.gov/Session/Bill/2023/254/Analyses/2023s00254.fp.PDF;   Bill Analysis and Fiscal Impact Statement, Committee on Health Policy, at 17 (Mar. 14, 2023), https://www.flsenate.gov/Session/Bill/2023/254/Analyses/2023s00254.hp.PDF; Bill Analysis and Fisacl Impact Statement, Committee on Health Policy, at 17 (Mar. 10, 2023), https://www.flsenate.gov/Session/Bill/2023/254/Analyses/2023s00254-pcs112830.hp.PDF;   Bill Analysis and Fiscal Impact Statement (Pre-Hearing), Committee on Health Policy, at 20 (Mar. 10, 2023), https://www.flsenate.gov/Session/Bill/2023/254/Analyses/2023s00254.pre.hp.PDF.

[33] Trial Ex. 27, at 4:10-13.

[34] The speakers were Dr. Scot Ackerman, Dr. Michael Laidlaw, Dr. Michael Biggs, and Dr. Stephen Levine. Trial Ex. 27, at 5:4-39:25; 40:1-56:19. All had previously testified in opposition of gender transition care for the state (either for the Board of Medicine or AHCA.)

[35] Trial Ex. 27, Tr. of 2.21.23 Hrg, at 40:1-52:13.

[36] *Id.* at 52:12-56:19.

### J.   Recurring refrain that medications must remain available to treat other conditions.

Throughout the legislative process, bill sponsors were confronted with the fact that puberty blockers, hormone therapy, and surgery are also medical treatments used outside of the context of medical care for transgender people. And each time, the sponsors had one response: as long as the procedure is not being used for gender transition, it would not be banned for adolescents. For instance, Sen. Yarborough acknowledged that puberty blockers are safely used in other contexts and would remain legal for all purposes other than gender transition care.[37] When confronted with concerns that other hormone therapies would be banned, both Sen. Yarborough and Rep. Fine made clear that the purpose of their bills was to only ban the use of hormones in gender transition care and no other contexts.[38]

### K.   Gross misstatements of fact by legislators about medical care.

Legislators made numerous untrue comments that grossly misrepresent treatment for gender dysphoria. One representative cited a story that a parent had put a six-*month*-old child on hormone therapy and that toddler was "changed into a man."[39] Despite the blatant incredulity of the statement—and the complete lack of evidence that such an event ever occurred—Rep. Fine approvingly cited to the

---

[37] Trial Ex. 29, Tr. of 3.29.23 Hrg, at  14:20-16:21; Trial Ex. 31, Tr. of 3.23.23 Hrg., at 27:11-24.

[38] Trial Ex. 33, Tr. of 4.3.23 Hrg, at 65:10-66:25; Trial Ex. 30, Tr. of 3.22.23 Hrg, at 11:17-13:9; Trial Ex. 35, Tr. of 4.18.23 Hrg, at 18:13-20:23.

[39] Trial Ex. 30, Tr. of 3.22.23 Hrg, at 91:11-19.

statement later in the session and falsely suggested that such an event was consistent with WPATH's standards of care.[40] Another representative, Rep. Black, falsely asserted that surgeries are routinely performed on minors, stating on the record that a nebulous "they" take "little children," "cut of their breasts," "sever their genitalia" and then  " they throw them in the trash."[41]

### L.    Comments showing disapproval of transgender people.

The sponsors of the bill in the House, Rep. Fine and Rep. Masullo repeatably referred to gender transition care as child abuse.[42] Rep. Fine referred to medical care for transgender adolescents as "mutilation,"[43] "castration,"[44] an "abomination,"[45] and "butchery."[46] Another representative referred to gender transition care as "gruesome" and "diabolical," and that it leaves those that undergo it "disfigured" and "crippled."[47] Advocates of such care were referred to by Rep. Fine and others as "evil,"[48] "a cult that is focused on the abuse of children," and doctors that perform such care were referred to as "bloodsuckers."[49]

---

[40]  *Id.* at 96:15-20.

[41] Trial Ex. 36, at 21:16-22:6.

[42] Trial Ex. 30, Tr. of 3.22.23 Hrg, at 18:15-21:3; Trial Ex. 32, Tr. of 3.27.23 Hrg, at 113:16-16:24; 120:1-71.

[43] Ex. 30, at 3:13-15; *id.* at 33:4-5.

[44] Trial Ex. 30, Tr. of 3.22.23 Hrg, at 3:13-15.

[45] *Id.* at 98:19-21.

[46] Trial Ex. 36, Tr. of 4.19.23 Hrg, at 45:23-46:20.

[47]  *Id.* at 21:16-22:6.

[48] Trial Ex. 35, Tr. of 4.18.23 Hrg, at 3:6-12; Trial Ex. 36, 45:23-46:19; Trial Ex. 36, 21:16-22:6.

[49] Trial Ex. 36, at 21:20-23.

Representatives made clear that they disapprove of medical care for transgender people because they disapprove of people being transgender.[50] Rep. Fine referred to gender transition as a "cosmetic" attempt to "defy [] biology."[51] Rep. Massullo spoke of the "truth" that there is "no such thing" as being able to change sex.[52] Rep. Massullo also expressly stated "[o]ur bill doesn't address the existence of trans people."[53] Representatives rejected the concept of gender transition in any situation. One, Rep. Borreo, asserted that gender transition "actually kills" because the person "changes their gender and is no more," and that therefore laws banning transition—in any context—would "save lives."[54] Another, Rep. Tramont, proclaimed that "[i[n the image of God, he created them[,] Male and female, he created them."[55] Echoing those comments later in the same hearing, Rep. Fine stated that the "ultimate gender-affirming care" is to "affirm they are creature of God," "made the way they are," and that "God doesn't make mistakes."[56] Rep. Fine called for a return to where children know "there are boys and there are girls."[57]

**M.    Comments from outside of hearings show an intent to harm transgender people.**

---

[50] Trial Ex. 35, at 76.

[51] Trial Ex. 30, Tr. of 3.22.23 Hrg, at 29:2-23.

[52] *Id.* at 92:15-94:16.

[53] Trial Ex. 35, at 19:5-20:23.

[54] Trial Ex. 30, Tr. of 3.22.23 Hrg, at 86:8-87:2 (adding that the bill "saves lives" and "recognizes who they are in the eyes of God.".)

[55] Trial Ex. 36, Tr. of 4.19.23 Hrg, at 13:3-:10.

[56] *Id.* at 45-46.

[57] *Id.* at 45-46.

On March 31, 2022, before the bill banning healthcare was introduced, Rep. Fine declared on Twitter that "[w]okeism is evil, and we will destroy it in FLA. Why? #BecauseWeCan #WeAreJustGettingStarted."[58] In response to being questioned on his comments, Rep. Fine discussed the indecency of "five-year olds" being "lectured on the normality of self-mutilation."[59]

A few days later Rep. Fine declared that he "had enough" and would introduce legislation—which ultimately became SB 254—barring medical care for transgender minors.[60] In his statement, he referred to such care as "child abuse" that should be punished by prison time.[61] He also mocked the concept of transgender identity, stating that "I can say I'm a porcupine, but that doesn't make it so,"[62] and calling adult gender-affirming care "self-mutilat[ion] in pursuit of the fiction that [a transgender adult] can defy G-d [sic] and science."[63]

Just as he did in legislative hearings, Rep. Fine continuously referred to gender transition procedures as "child mutilation" and "doctor-driven child abuse."[64] He further accused the Florida Psychiatric Society and the Florida Chapter of the

---

[58] Trial Ex. 116, Composite at 1.

[59] *Id.* at 1.

[60] *Id.* at 2.

[61] *Id.* at 2.

[62] *Id.* at 2; *id.* at 12 (Rep. Massullo has also publicly questioned the legitimacy of trans identity, writing that "[o]ne cannot decide their sex, it is decided at birth by their creator.")

[63] *Id.* at 3.

[64] *Id.* at 4-6.

American Academy of Pediatricians of recommending the "castration and mutilation" of children.[65]

Also as he did in legislative hearings, Rep. Fine has publicly framed his policies as a fight against "evil."[66] In response to being questioned about families leaving Florida in the wake of laws banning trans healthcare, Rep. Fine had a simple response: "Good riddance. Take your evil elsewhere."[67] He has called protestors against banning transgender healthcare "child-abusers" who are a part of a "pro-mutilation cult."[68] And following the preliminary judgement being entered in this case barring Florida Medicaid from denying coverage for gender transition care, Rep. Fine called the Court a "science-denying wokeist" and pledged to fight against "those like [the Court] who support child castration and mutilation."[69]

---

[65] *Id.* at 6-7.

[66] *Id.* 116, at 8.
[67] *Id.* 116, at 9.
[68] *Id.* 116, at 9-10.
[69] *Id.* 116, at 10.

## LEGAL ARGUMENT AND AUTHORITIES

### I.   SB254 AND THE BOARDS OF MEDICINE RULES VIOLATE EQUAL PROTECTION

As this Court has already explained, equal protection analysis typically starts with attention to the appropriate level of scrutiny: strict, intermediate, or rational-basis. *Dekker* v. *Weida*, No. 4:22CV325-RH-MAF, 2023 WL 4102243, at *11 (N.D. Fla. June 21, 2023). While Plaintiffs maintain the Challenged Provisions[70] are subject to heightened scrutiny because they facially discriminate based on sex and transgender status, in this case the level of scrutiny is not essential to demonstrating the unconstitutionality of the laws because the Challenged Provisions are rooted in animus, which is never a permissible justification.[71]

As the Eleventh Circuit has explained, there are two prongs to an equal protection analysis. *Greater Birmingham Ministries* v. *Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). Plaintiffs must first establish both discriminatory purpose and

---

[70] Plaintiffs refer collectively to the bans and restrictions under SB 254 and the Boards of Medicine rules prohibiting treatments for transgender minors and requiring the execution of informed consents as "Challenged Provisions."

[71] Plaintiffs who are parents with minor children also assert that the ban on adolescents receiving established medical treatment violates the right of parents to direct the upbringing of their children protected by the Due Process Clause of the Fourteenth Amendment. Plaintiffs acknowledge that an Eleventh Circuit panel rejected that claim in a case challenging an Alabama law that criminalizes the provision of gender transition treatments to adolescents. *Eknes-Tucker* v. *Governor of the State of Ala.*, 80 F.4th 1205 (11th Cir. August 21, 2023). Because that panel opinion is pending *en banc* rehearing consideration, and because the Florida law is different both in scope and history, Plaintiffs maintain the Florida laws at issue here violate parental autonomy rights. Because the laws reflect invidious discrimination, they cannot survive under both Equal Protection and Due Process.

discriminatory effect. *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir. 1999). Second, once discriminatory intent and effect are established, the burden shifts to the Defendants to demonstrate that the law would have been enacted without the discriminatory factor. *Id.* (quoting *Hunter* v. *Underwood*, 471 U.S. 222, 228 (1985)).

Where government policy facially targets a group on the basis of sex, heightened scrutiny applies. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Even an otherwise facially neutral policy that has a "disparate impact on a group offends the Constitution" when it is "motivated by purposeful discrimination." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 810 (11th Cir. 2022) (cleaned up). Where a law is facially neutral, plaintiffs must separately show discriminatory effect and purpose before the burden shifts to Defendants to show the law would have been passed even absent the discriminatory motive. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,* 66 F.4th 905, 922 (11th Cir. 2023); *Greater Birmingham Ministries*, 992 F.3d at 1321.

Here, Plaintiffs maintain that the Challenged Provisions are facially discriminatory based on sex and transgender status. While the recent *Eknes-Tucker* decision calls that argument into question, it remains viable pending the en banc consideration for rehearing of that case. Accordingly, Plaintiffs maintains that the Challenged Provisions are facially discriminatory but incorporate by reference their

earlier legal argument set forth in their earlier motions for preliminary injunctive relief on those points rather than restating them here. (*See* ECF 30, 57, 115.) Plaintiffs further maintain that the ban on treatments for minors violate constitutionally protected rights of parents to make medical decisions to obtain established care for their children. Regardless of the ultimate resolution of that legal issue, *Eknes-Tucker* held that "the regulation of a course of treatment that, by the nature of things, only transgender individuals would want to undergo" triggers heightened scrutiny if the "regulation is a pretext for invidious discrimination against such individuals." *Eknes-Tucker* v. *Governor of the State of Ala.*, 80 F. 4th 1205, 1230 (11th Cir. Aug. 21, 2023). In *Eknes-Tucker*, the Eleventh Circuit said there was no such finding in that case made by the District Court below. *Id.* Here, there is voluminous evidence of invidious discrimination.

**A.    SB 254 and the Board Rules Fail Because the Motivation for Their Passage was to Discourage Transgender People from Living Consistent with Their Gender Identities and to Manifest the State's Disapproval of Transgender Status**

Whether or not this Court finds the Challenged Provisions to be facially discriminatory, they fail constitutional scrutiny because they are discriminatory in purpose and effect, and Defendants cannot demonstrate they would have been enacted absent the discriminatory factor.

> ***i.    The Challenged Provisions have a disparate impact on transgender people.***

Any prohibition or restriction on medical treatments for gender transition has a disparate impact on transgender individuals. Gender transition is the process through which a transgender person brings their body into alignment with their gender identity. (Tr. Ex. 2, Janssen Report ¶ 26). The description of a person as "transgender" refers to one whose gender identity does not align with their birth sex. (*Id.* ¶ 18). The purpose for the treatments regulated by the Challenged Exclusions is to enable transgender people to undergo a gender transition. (*Id.* ¶ 23). The Challenged Restrictions apply only when the restricted treatments are used for the purpose of gender transition—i.e., only when they are used to "affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex." (*See* Trial Ex. 17, SB 254, at § 4, lines 107-21 (2023).) Restricting medications and treatments that could be needed by any person for a range of medical reasons only when they are used for the purpose of gender transition obviously affects transgender people specifically and disproportionately relative to the general population. *See Eknes-Tucker*, 80 F.4th at 1229 (a ban on transition medications "restricts a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive."). In sum, the Challenged Provisions unquestionably have a disparate impact on transgender people.

> ### ii.    *The Challenged Provisions reflect purposeful discrimination.*

The Eleventh Circuit has articulated eight factors to apply in determining whether government action reflects purposeful discrimination. *League of Women Voters of Fla.,* 66 F.4th at 922. These factors include: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading to its passage; (4) procedural and substantive departures from past or typical practices; (5) contemporary statements of key decisionmakers; (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives. *Id.* (citing *Greater Birmingham Ministries*, 992 F.3d at 1321-22 (summarizing and elaborating on the factors in *Vill. of Arlington Heights v. Metropo. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). Each of those factors supports the conclusion that the Challenged Provisions reflect purposeful discrimination.

The evidence demonstrates that Challenged Provisions were motivated by an intent to discriminate against transgender people. This Court has already said as much, at least with respect to SB 254, in its ruling in *Dekker* that:

> the State's disapproval of transgender status—of a person's gender identity when it does not match the person's natal sex—was a substantial motivating factor in enactment of the challenged [Medicaid] rule *and statute*. Discouraging individuals from pursuing their gender identities, when different from their natal sex, was also a substantial motivating factor…. The rule *and statute* at issue were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities. This was purposeful discrimination against transgenders.

*Dekker*, 2023 WL 4102243, at *14 (emphasis added). The same is true with respect to the Challenged Restrictions.

Under the Eleventh Circuit's multifactor test, the "discriminatory intent and effect" of the challenged medical care restrictions in both SB 254 and the Boards of Medicine rules are patent. *See League of Women Voters of Florida*, 66 F.4th at 922. The first factor, pertaining to the impact of SB 254 and the Board Rules on transgender people, has already been discussed. The discussion of the foreseeability and knowledge of the impact has been combined below.

> ### a. The Challenged Restrictions are part of a broader context in which the Florida government has discriminated against transgender people.

SB 254 and the Board Rules were enacted as part of an unprecedented number of bills, laws, and regulations targeting transgender Floridians. This contextual background "reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. As Florida and national media outlets have reported, transgender people were "the subject of intense focus for state lawmakers" in the past two years, with lawmakers in 2023 filing "at least 18 bills that directly or indirectly target transgender Floridians."[72] This Court has already addressed one of

---

[72] Kathryn Varn, *A rundown of Florida bills causing 'massive panic' in transgender, LGBTQ communities*, Tallahassee Democrat (Mar. 15, 2023, 10:04 AM), https://www.tallahassee.com/story/news/politics/2023/03/15/florida-legislature-18-bills-targeting-transgender-lgbtq-community/70002777007/; Brett Wilkins, *DeSantis Signs 'Most Extreme Slate of Anti-Trans Laws in Modern History*, Common Dreams (May 17, 2023),

those laws, the elimination of Medicaid funding for transition-related care. *Dekker*,

2023 WL 4102243, at \*14. In addition to restricting access to health care, Florida

has enacted multiple laws and administrative policies that single out transgender

people for many other types of adverse treatment. The first of these laws was Senate

Bill 1028, signed into law on May 28, 2021, banning transgender girls and women

from playing on female sports teams. The following year, on March 28, 2022, the

Legislature enacted House Bill 1557, banning instruction about LGBTQ+ people or

issues from Kindergarten to third grade. On May 17, 2023, House Bill 1069 was

signed into law, expanding the scope of House Bill 1557 to include instruction up to

---

https://www.commondreams.org/news/desantis-transgender; Brandon Girod, *Four new Florida laws target transgender, broader LGBTQ community. Here's what they do*, Pensacola News J., (May 17, 2023, 9:46 PM), https://www.pnj.com/story/news/politics/2023/05/17/desantis-signs-3-bills-targeting-transgender-gender-affirming-care-bathrooms-drag-shows/70227878007/; Steve Contorno, *Florida bills that will alter the lives of transgender people await DeSantis' signature*, CNN (May 4, 2023, 4:27 PM), https://www.cnn.com/2023/05/04/politics/ron-desantis-transgender-bills-florida/; Brendan Farrington, *Florida Gov. DeSantis signs bills targeting drag shows, trans rights, and care for transgender children*, PBS (May 17, 2023, 2:09 PM), https://www.pbs.org/newshour/politics/florida-gov-desantis-signs-bills-targeting-drag-shows-trans-rights-and-care-for-transgender-children; Carlos Suarez and Denise Royal, *Florida's private colleges and universities must comply with rule requiring people to use bathrooms aligning with their sex assigned at birth*, CNN (Oct. 19, 2023, 11:46 PM), https://www.cnn.com/2023/10/19/us/florida-private-college-trans-bathroom-restriction; Thalia Beaty, Brendan Farrington, and Hannah Schoenbaum, *Transgender adults in Florida `blindsided' that new law also limits their access to health care*, ABC News, (June 4, 2023, 11:23 AM), https://abcnews.go.com/US/wireStory/transgender-adults-florida-blindsided-new-law-limits-access-99824193; Tori Otten, Florida Passes Bill Allowing Trans Kids to Be Taken From Their Families, The New Republic, (May 4, 2023, 1:39 PM), https://newrepublic.com/post/172444/florida-passes-bill-allowing-trans-kids-taken-families.

eighth grade, authorizing removal of books from school libraries, prohibiting transgender teachers and staff from using pronouns consistent with their gender identity, and singling out transgender persons in the school by authorizing others to refer to them without regard for their gender identity. That bill declares that it must be the policy of all schools that "a person's sex is an immutable biological trait" and "it is false" to use a pronoun other than that aligned with the person's birth sex.

Another bill signed into law on May 17, 2023, House Bill 1521, excludes transgender people from public restrooms, including in K-12 schools. On August 23, 2023, the Florida Board of Education voted to expand the rule from K-12 public schools, prisons, and some state colleges to private colleges and universities. See Rule 6A-14.00612; Rule 6A-6.0963. House Bill 1438, also signed into law on May 17, 2023, criminalizes drag shows.

Finally, SB 254, in addition to banning gender transition medical treatments for transgender adolescents and restricting access to them for transgender adults, the law also addresses family law related matters. For example, it authorizes temporary emergency jurisdiction in Florida family courts in interstate custody disputes involving transgender children. (Ex. 17, Section (1), subsection (1)(c); *see also* Section 2 (changing standard for issuance of a warrant to take physical custody in limited circumstances involving interstate custody disputes.).

Taken together, these measures constitute a clear expression of governmental

hostility toward transgender Floridians. Collectively, they establish an official public policy of disapproval of transgender people, with the goal of preventing transgender Floridians from participating openly or equally in civil society. No other state in the country has enacted as many anti-transgender measures as Florida, nor has any other state enacted measures as extreme as some of Florida's new laws, including its imposition of restrictions even on medical care for transgender adults.[73]

SB 254 and the Board Rules must be seen in this historical context, which strongly supports the conclusion that they reflect purposeful discrimination.

> **b.     The specific events leading to SB 254 and the Board's policies demonstrate discriminatory intent**

The specific events leading to SB 254 and the Boards' restrictions also strongly suggest an intent to discriminate against transgender people. *Arlington Heights*, 429 U.S. at 267. On March 2, 2022, the HHS issued notice to state child welfare agencies of their obligation under federal law to promote the health and wellbeing of transgender youth, including by providing them with nondiscriminatory access to medical care for gender dysphoria. The HHS Secretary issued a statement "reaffirming HHS's commitment to supporting and protecting transgender youth and their parents, caretakers and families" and condemning attempts by Texas to prosecute parents who obtained medical care for transgender

---

[73] Florida's trans people, parents of trans kids see options steadily banned (tallahassee.com)

youth for alleged child abuse.[74] In response, the Governor's office in early April directed the FDOH and AHCA to adopt a contrary policy for Florida.

On April 20, 2022, the FDOH issued guidance stating that transgender minors "should not be prescribed puberty blockers or hormone therapy," that gender "reassignment surgery should not be a treatment option for children or adolescents," and that "social gender transition should not be a treatment option for children or adolescents."[75] A press release called "into question the motives of the federal HHS" in supporting this care. *See* Statement of Facts § VIII, *supra.*

Shortly thereafter, AHCA commissioned the GAPMS report, which was published on June 2, 2022, with the predetermined goal of opposing and setting down what could be pointed to as a factual predicate for denying medical care to transgender people – both adolescents and adults. *See* Statement of Facts § VIII, *supra.*

A day later, on June 3, 2022, AHCA proposed eliminating Medicaid coverage for transgender medical care. Within two months, on July 28, 2022, the Florida Department of Health and the Florida Surgeon General petitioned the Boards to prohibit medical treatment for transgender adolescents. By November, both Boards

---

[74] Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth | HHS.gov

[75] This Court has already noted that "[n]othing could have motivated this remarkable intrusion into parental prerogatives other than opposition to transgender status itself." *Dekker v. Weida*, No. 4:22-CV-325-RH-MAF, 2023 WL 4102243, at *14 (N.D. Fla. June 21, 2023).

were considering rules banning healthcare for transgender adolescents. In December, the Governor appointed several new Board members who opposed transgender health care. Following those appointments, both Boards voted to adopt rules banning medical care for transgender minors which were finalized on February 10, 2023. Based on the GAPMS report, legislation to ban medical care for transgender minors and to restrict it for adults was introduced less than two weeks later, on February 21, 2023, and SB 254 was signed into law on May 17, 2023. *See* Statement of Facts § VIII, *supra.*

As this rapid succession of events makes plain, SB 254 and the Boards' Rules were driven by a predetermined, invidiously discriminatory and politically driven opposition to medical care for transgender people. At each step, the goal was to reach a predetermined goal of restricting care, not to undertake a neutral or good faith inquiry. *See* Statement of Facts § VIII, *supra.*

### c.   The enactment of SB 254 and the adoption of the Board's Rules were surrounded by departures from normal process

The State's many departures from normal process strongly indicate the State's intent to harm transgender people. *Arlington Heights*, 429 U.S. at 267. As this Court has already found, AHCA adopted a process for the GAPMS report that was unlike any it had ever used before. *Dekker*, 2023 WL 4102243, at *14. From start to finish, the GAPMS process was manipulated to dictate a predetermined outcome. It was "a

biased effort to justify a predetermined outcome, not a fair analysis of the evidence."
(*Id.*)

Just as the GAPMS report resulted from a highly unusual and distorted process, so too did the Boards' Rules. *See* Statement of Facts § VIII, *supra.* As an initial matter, the Boards typically initiate rulemaking in response to serious discipline issues with doctors that have resulted in deaths; examples include back-alley gluteal fat transfer surgery and the opioid epidemic. Trial Ex. 23, Tr. of 8.5.22 Mtg, at 34–36. In this case, however, despite *having no complaints* from Floridians about gender-transition care, the FDOH directly petitioned the Board of Medicine to initiate a ban, and the Board decided, apparently without precedent, to initiate and ultimately ban gender-transition care in minors. In presenting its petition to the Boards, the FDOH again departed from normal process by paying an out-of-state consultant affiliated with a conservative advocacy group known for its opposition to marriage and parenting by same-sex couples and to medical care for gender transition, Dr. Quentin Van Meter, to attend, with the goal of seeking to persuade members that medical care for transgender minors should be banned. Many things about this were unusual: paying a consultant to make a presentation to the Boards of Medicine; selecting a consultant associated with an advocacy group; selecting a consultant with no significant background or expertise in the subject matter; and

selecting a consultant with no knowledge of, or connection to, Florida or the delivery of healthcare in Florida.  *See* Statement of Facts § VIII, *supra.*

In October 2022, the Boards again departed dramatically from their usual process by permitting an attorney for an advocacy organization that opposes medical care for transgender minors to select a group of outside speakers who were given priority to speak, using the majority of the public comment period. Ordinarily, the public comment process is designed to give speakers from the public who attend the meeting an equal chance to share their views, with no pre-selection of those speakers. Here, in contrast, the Board relied on an outside advocate to pre-select public comment speakers and then went to extraordinary lengths (such as pre-filling speaker cards) to accommodate them and allow them to monopolize the public comment period. *See* Statement of Facts § VIII, *supra.*

In a further departure from normal process, the Governor stacked the Boards with members who would vote for a complete ban and also ultimately were responsible for the process of developing the problematic informed consent forms following the passage of SB 254. First, the appointment of Dr. Patrick Hunter to the Board of Medicine on June 14, 2022 enabled him to take on a crucial role in shepherding the Boards through the rulemaking process. (Trial Ex. 87). Thereafter, in December of 2022, Governor DeSantis appointed two new members of the Board of Medicine, including Dr. Benson and Dr. Coffman, who previously submitted

public comments to the Boards in support of the adolescent treatment bans. (Trial Ex. 103). On the same day, Governor DeSantis replaced three members of the Board of Osteopathic Medicine (more than half the composition of the board) (Trial Ex. 102), ensuring that the Board of Osteopathic Medicine would reverse course and eliminate the clinical trials exception and bring the two Boards into alignment, as it did. *See* Statement of Facts § VIII, *supra.*

From its introduction to its enactment, SB 254 was also unusual. Even before any legislation was introduced, Rep. Fine hosted a special hearing to lay a foundation for a legislative ban on February 21, 2023, in the House HHS Committee. *See* Statement of Facts § VIII, *supra.* Ostensibly, the purpose of the hearing was to examine issues relating to medical care for transgender adolescents and to hear from experts "on both sides."  In fact, however, the hearing included only presenters who oppose such care, including the same out-of-state experts chosen to speak previously to the Boards. Fine also invited David Leatherwood, a representative of the Florida chapter of an organization known as Gays Against Groomers, who has no medical background or expertise and who described medical care for transgender adolescents in extremely inflammatory terms, as a "radical agenda of mutilation, sterilization, and indoctrination of minors." (Trial Ex. 27, Tr. of 2.21.23 Hrg, at 52:12-56:19.) The legislative process was also unusual in relying heavily on the GAPMS report, notwithstanding its lack of objectivity, and—as described more fully below—on

openly negative views about transgender people. *See* Statement of Facts § VIII, *supra.*

The enactment of SB 254 was unusual in two other respects as well. First, to Plaintiffs' knowledge, it marked the first time the Legislature banned an established medical treatment. And second, SB 254 is also highly unusual in combining regulation of a medical treatment with provisions addressing topics that are unrelated except insofar as they impose negative treatment on transgender people (for example, transferring physical custody of a transgender adolescent in certain circumstances).

After SB 254 was enacted and the Boards were required by the law to develop informed consent forms, unusual departures from practice continued. Though the forms, according to Defendants, are intended to apprise patients of benefits and risks of treatments, no person involved in the drafting of the forms actually performs the treatments the forms are intended to address. *See* Statement of Facts § VIII, *supra.*

In addition, the Boards initially created forms for adults that had substantive requirements, not in line with any accepted medical standards of care, that were prerequisites to eligibility for gender transition medical care, like mandatory psychotherapy. Tellingly, some of these substantive requirements were later removed from the informed consent forms after inquiry by a legislative committee about the basis for the Boards' authority to include them. *See* Statement of Facts § VIII, *supra.*

84

These many departures from normal process throughout the rulemaking and legislative process indicate that the true motivation behind the challenged restrictions was purposeful discrimination.

> ### d. Contemporaneous statements of Board members and legislators demonstrate that animus motivated the bans and restrictions on medical care for transgender people.

As detailed in the Statement of Facts, parts VIII (K), (L), and (M), *supra,* a host of comments from legislators show that their support for SB 254 was rooted in disapproval of or hostility toward transgender people. Claims about gender transition medical care that no reasonable person would believe were put forward by legislators and accepted as facts, demonstrating that the Legislature was not interested in understanding the truth or in regulating medical care. Their goal was to keep transgender people from being able to live as transgender people. *Id.*

Other comments by legislators were shockingly inflammatory, like referring to medical care providers as "evil" and "bloodsuckers," reaching far beyond what any reasonable person would consider appropriate for a policy debate. The extreme hostility of these comments reflects their goals. These comments went even further, denying individuals can have a gender identity that is not aligned with their birth sex or, in other words, denying that transgender people exist. Legislators exercised even less restraint in their comments outside of hearings, cruelly mocking transgender Floridians and declaring a desire that Florida be free of transgender people. The

actual statements of several legislators prove that SB 254 was not motivated by legitimate concerns about health or safety of transgender people or anyone else, but instead by a total disregard for their well-being.

> ### e. Legislators and Board members were aware that the impact of the SB 254 and the Board Rules falls exclusively on people who are transgender because they only restrict treatments when medically indicated for transgender people.

As the Eleventh Circuit recently explained, gender transition medical care, "by the nature of things," only restricts medical treatment that "gender nonconforming individuals may receive." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229-30 (11th Cir. 2023).

Board members and legislators throughout the rulemaking and legislative process repeatedly inquired about whether the challenged restrictions would implicate people who need medical care for reasons other than to "affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex" as defined under the law. Trial Ex. 17, SB 254, Section 4. The unequivocal response was always that the restrictions were intended to impact transgender people exclusively. By their terms, SB 254 and the Board Rules do not prohibit or restrict the same treatments when needed to treat a "minor born with a medically verifiable genetic disorder of sexual development." *Id*.

> ### f. The challenged restrictions are far from the least discriminatory means to achieve the State's proffered justifications.

As this Court concluded in granting the preliminary injunction against the ban on treatment for transgender minors, the State had many less discriminatory alternatives available to achieve each of the governmental objectives purportedly advanced by the ban on medical care for transgender youth. The same is true for the restrictions on care for adults.

If, for example, Florida believed that it was necessary to protect adolescent patients from medical risks associated with puberty blockers and hormone therapy, it could have banned those medications for all purposes. Transgender adolescents reflect a small minority of patients who use these medications. The vast majority of patients who use them are either non-transgender patients with precocious puberty (puberty blockers) or non-transgender adolescents with conditions such as painful menstruation, amenorrhea and acne. A less discriminatory alternative, and one that would be more directly tied to the Defendants' purported interests, would have been to bar use of the medications for all adolescents. Instead, it banned them only when needed by transgender adolescents. So too with the restrictions on who can provide care (physicians only), how informed consents must be executed (only in person), and even who must sign informed consents (only transgender people accessing the medications and procedures).

Defendants could have adopted rules that require anyone, minors or adults, receiving puberty blockers or hormones, for gender transition or for other reasons,

to receive them from a physician. They could have required everyone receiving these treatments to meet with a physician in person (and not by telehealth) to execute informed consents. And they could have adopted specialized consent forms designed to be executed whenever any patient was to be prescribed the identified treatments and procedures. That approach would have been less discriminatory – and it would have been more closely targeted to the Defendants' purported concerns about safety, health, and patients' knowledge of risk. Instead, Defendants adopted rules singling out transgender people for these unusual requirements despite the fact that transgender people reflect a vast minority of the total population of people prescribed these medications and treatments.

In addition, to the extent the restrictions are claimed to advance an interest in ensuring that individuals receive competent and appropriate care that complies with established medical standards for treatment of gender dysphoria, the State could simply require compliance with those standards. The established guidelines for treatment of gender dysphoria include standards for prescribing medication or performing surgery, ensuring that patients understand the risks and benefits of treatment, and obtaining informed consent. Enforcement of those standards could be conducted in the same manner as with any other type of medical care that falls short of established standards of care, including through disciplinary proceedings before the relevant regulatory boards or through traditional remedies for medical

malpractice. Instead, the State has singled out this particular type of care, imposing prescribing and informed consent requirements that are not applied to other treatments and medications that carry the same or greater risks. This disparity is further evidence of its discriminatory purpose.

The Florida Legislature indeed considered a number of amendments that would have lessened the discriminatory impact of SB 254. On March 22, 2023, the Committee on Fiscal Policy recommended an amendment that would have removed treatment provided to minors from the definition of "sex reassignment prescriptions and procedures" if the minor (1) had been diagnosed as suffering from severe gender dysphoria by two medical or mental health care providers, (2) the diagnosing providers offer written opinions that treatment is medically necessary to limit the possibility of self-harm, (3) the minor's health care decisionmaker and primary physician agree with the treatment, and (4) the prescription or procedure is "limited to the lowest titratable dosage necessary." Trial Exs. 117, 118. The same committee offered a second amendment that would have removed the "in person" requirement to obtain informed consent, but otherwise left the informed consent requirements the same. Trial Ex. 119. Another amendment offered would have removed "puberty blocking, hormone, and hormone antagonistic therapies" from the definition of prohibited medical care. Trial Exs. 120, 121. A fourth amendment would have permitted nonsurgical treatments for gender dysphoria to continue under an

institutional review board approved clinical trial at a Florida medical school, provided the trial included "long-term, longitudinal assessments of the patients' physiologic and psychologic outcomes." Trial Ex. 122. All of these amendments failed. Fla. Legis., History of SB 254, 223 Reg. Sess. (May 18, 2023), https://www.flsenate.gov/Session/Bill/2023/254/?Tab=BillHistory (providing legislative history of SB 254). Each of these failed efforts demonstrates that there were less discriminatory ways to advance the State's objectives.

There were many less discriminatory ways to effectuate the State's purported justifications—but all were rejected—supporting Plaintiffs' argument that the motivating factor was purposeful discrimination.

### iii. *Defendants cannot prove the Challenged Exclusions would have been passed absent the discriminatory factor.*

Once Plaintiffs demonstrate, as they can, that the Challenged Provisions are discriminatory in effect and purpose, the burden shifts to Defendants to prove that they would have adopted the Challenged Provisions absent the discriminatory purpose. Defendants cannot show any independent non-discriminatory reasons for the Challenged Provisions because none of their justifications are supported by the evidence. This Court has already considered and rejected the vast majority of justifications upon which Defendants' defense of SB 254 and the Board Rules rest.

### a. *Treatments for Gender Dysphoria are effective, well-established and safe.*

90

Treatments provided to transgender people, including both adults and adolescents, are effective and based on a well-established and accepted standard of care. *Dekker*, 2023 WL 4102243, at *7-8. This Court has already heard voluminous testimony of "well-qualified doctors who have treated thousands of transgender patients" and concluded the "record includes no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients." (ECF 90, at 12-13.) This Court has also already concluded that "evidence suggesting these treatments are ineffective is nonexistent" and that while there are risks to the treatments, as there are for any medical treatments, the benefits of their use in appropriate cases outweighs any of the risks. (*Id.* at 28, 30-31.) Defendants' continued protestation against the use of medications off-label has no more merit here than it has in Florida's defense to its exclusion of coverage for treatment under the Medicaid rules. *See Dekker*, 2023 WL 4102243, at *19.

Defendants also cannot show that there are any countries in the world where the restrictions on access to treatment are as draconian as they are in Florida. As this Court has explained, "Defendants have asserted time and again" that the Challenged Exclusions bring Florida in line with European countries. No matter how many international experts Defendants bring in to testify, the assertion remains false. "And no matter how many times the defendants say it, it will still be false." *Dekker*, 2023 WL 4102243, at *17.

No evidence shows that any country in Europe (or anywhere else in the world, for that matter) "entirely bans these treatments" for minors, or anyone else. *Id.* It is also worth mentioning that none of the international evidence to which Defendants point to suggest the need for guardrails in the prescribing of care relate to adult care.

Nor can Defendants' point to any evidence that shows any other country limits which qualified health care providers may prescribe treatments or whether medical visits to execute consents must take place in person. Defendants proffer no evidence to support the creation of state-prescribed consent forms.

> **b.     Defendants Cannot Justify Arbitrarily Preventing Qualified NP-APRNs from Providing Medical Treatment, Requiring Transgender People to Execute Informed Consents in Person, and Prescribe Burdensome and Factually Inaccurate Consents be Executed Before Treatment or When Changing Treatments**

Given the extensive findings this Court has already made both in *Dekker* and in its earlier preliminary ruling in this case (ECF 90), the only real factual dispute which remains to be addressed regarding the purported justifications is whether Defendants can demonstrate that they have any non-pretextual reasons to (1) prevent qualified non-physicians, specifically NP-APRNs, from providing medical treatment for transgender patients; (2) require that a doctor be "physically present in the same room" to establish informed consent; and (3) prescribe that burdensome and factually inaccurate informed consents be signed before initiating or changing

treatments. This Court will find no more record support for these requirements than it found to support the ban on treatment for minors.

NP-APRNs have completed advanced education and training that includes years of higher medical education beyond the required registered nurse degree and at least 1000 hours of clinical practice. (Trial Ex. 7, Langford Report ¶ 33). Florida law provides that NP-APRN may practice medicine independently and without the direct supervision of a physician. § 464.0123, Fla. Stat. (2023). The range of tasks they may perform in autonomous practice includes diagnosing illness, ordering and interpreting diagnostic tests, prescribing medications, and managing patient care. (Trial Ex. 7, Langford Report ¶ 24). To the extent there are limits on their ability to prescribe medications, they are the same limitations imposed on physicians. (*Id.* ¶ 27).

Throughout Florida, many transgender patients receive transition-related healthcare from an NP-APRN. NP-APRNs add much needed capacity to Florida's medical care infrastructure. (*Id.* at ¶ 28.) The provision in SB 254 that prohibits healthcare practitioners who are not physicians—including NP-APRNs—from providing transition-related medical care to transgender adult patients has left many transgender patients without access to care. (*Id.* ¶ 35). NP-APRNs can offer high quality, safe and effective medical care for transgender patients comparable to that provided by physicians. There is no

medically valid basis or rationale for preventing them from doing so, and no evidence supports limiting NP-APRNs' ability to prescribe the use of puberty blockers and hormones only when they are used for gender transition. (*Id.* ¶ 48).

To the extent care is provided in a multidisciplinary setting, as it is for transgender adolescents, there is no justification for limiting the role of NP-APRNs from filling their responsibilities in that multidisciplinary setting. The point of the multidisciplinary model is to ensure comprehensive evaluation and monitoring across disciplines – psychological, adolescent medicine, and endocrinology. NP-APRNs, like physicians, are trained across disciplines. If they are not qualified to serve in any particular role in a multidisciplinary setting, they can refer to someone with the appropriate experience and training, just as a physician would. There is nothing unique about being an NP-APRN that makes them less qualified to either develop a specialty or refer to a specialist when needed.

And to the extent the treatment is for adults, where transgender patients typically receive care in a primary care setting, there is also no justification for limiting the role of NP-APRNs. As set forth above, Florida's autonomous practice certification for NP-APRNs authorizes them to prescribe the same medications in any context other than in their use by transgender patients. To the extent Defendants argue that there is anything uniquely challenging about prescribing or monitoring hormones to adult patients that justify limiting the practice of NP-APRNs, they can

provide no explanation for limiting their practice only when prescribing and monitoring treatments for transgender patients. Defendants should also not be heard to argue that the physician-only restriction limits any purported (and unfounded) risk of overdiagnosis since SB 254 limits only NP-APRNs ability to prescribe, not to diagnose. The only effect of the physician-only requirement is to create restrictions on transgender patients' ability to find health care in an already challenging health care environment.

The requirement that a physician must be "physically present in the same room" when obtaining a transgender patient's informed consent also has no medical justification and serves only to deter transgender patients from obtaining the information and care they need. As explained by Plaintiffs' experts there is no medical basis for this requirement. (Trial Ex. 4, Karasic Report ¶ 47). It contradicts the standards of care, which expressly state that "assessments may be in person or through telehealth." (*Dekker*, Dx. Trial Ex. 16, WPATH SOC at S31.) Requiring a physician to be physically present in the same room does nothing to enhance a patient's understanding of the information presented or to facilitate informed consent. Instead, its sole impact is to prevent or delay care. (Trial Ex. 4, Karasic Report ¶ 47).

Notably, SB 254 does not require that a person be in-person when they are diagnosed or even when they are prescribed care. Rather, the in-person requirement

kicks in only to demonstrate that that the executed consents to treatment are "voluntary and informed." SB 254 Section 5(2). Thus, purported justification for the in-person requirement related to ensuring careful or effective treatment is not related to the requirement imposed, further demonstrating the pretextual nature of the explanation.

There is also no evidentiary support for requiring providers to use the informed consent forms developed by the Boards. Promoting informed consent is a legitimate goal; however, it is undermined by mandating that all providers use a one-size-fits-all approach that impedes, rather than enhances, a patient's ability to understand the information presented. (Trial Ex. 8, Goodman Report ¶¶ 24, 27). And it is particularly ineffective when no one with experience treating the relevant patient population was involved in drafting the forms.

To be effective, informed consent must be consent to the treatment a patient is being prescribed. (Trial Ex. 5, Shumer Report ¶¶ 91–94; Trial Ex. 4, Karasic Report ¶ 35). Instead, these forms force providers to give patients a laundry list of treatments they are *not* being prescribed, including medications that are never prescribed for transgender patients in the U.S. or that are not even treatments for gender dysphoria. The forms for minors initiating puberty blockers and hormone therapy include statements about risks of surgeries that the minor will never undergo. This approach is inherently confusing and ineffective, making it much

more difficult for patients to absorb the information they need to receive. (Trial Ex. 4, Karasic Report ¶ 35; Trial Ex. 5, Shumer Report ¶ 133; Trial Ex. 8, Goodman Report ¶¶ 31, 35.).

In addition, the forms developed by the Boards are rife with false, misleading, and biased information that prevents transgender patients from accurately understanding the transition-related treatment they seek. Contrary to the false statements in the form, there are decades of research on the safety and efficacy of transition-related care; there are well-established written protocols for the timing, dosage, and type of medications prescribed; and the prescription of these FDA-approved medications for an off-label use is fully consistent with medical ethics and standards. (Trial Ex. 5, Shumer Report ¶¶ 68, 96, 98, 117-118, 130; Trial Ex. 4, Karasic Report ¶¶ 27, 32, 45, 49; Ex. 3, Bruggeman Report, ¶¶ 26, 64, 81-82, 93). These false statements prevent transgender patients from having the accurate information they need to make informed medical decisions and are designed to deter them from seeking care. Trial Ex. 5, Shumer Report ¶ 90; Trial Ex. 3, Bruggeman Report ¶¶ 78-79.

The forms also harm transgender patients by providing false information about specific medications and their effects. For example, the forms falsely state that transgender women who take feminizing hormones are at heightened risk for breast cancer, whereas, in fact, there is no evidence that this is the case. (Trial Ex. 5,

Shumer Report ¶ 142). Mandating that transgender patients receive inaccurate information about treatments defeats, rather than fosters, the purpose of informed consent.

The process for adopting these consents also supports Plaintiffs' position that the consents reflect discriminatory animus behind the Challenged Provisions rather than helping to show Defendants would have adopted them absent that animus. When SB 254 went into effect, requiring informed consents to be executed before treatment could be initiated, the Board had not yet adopted any consents. As a result, Plaintiffs Kai Pope and Rebecca Cruz Evia had long-scheduled surgeries cancelled. Even though the consents have since issued by the Boards, neither Mr. Pope nor Ms. Cruz Evia have been able to get those surgeries rescheduled. In June 2023, the first versions of the consents were issued by the Boards. *See* Fla. Admin. Code R. 64B8ER23-7, 64B8ER23-8; *supra* at Section __. Those versions required burdensome and unnecessary requirements for treatment that contradict the Standards of Care. Specifically, the forms required transgender adult patients to undergo repeated and unnecessary and invasive mental health evaluations before obtaining treatments, even though the WPATH Standards of Care specifically disclaim the need for such evaluations. Trial Ex. 4, Karasic Report ¶ 41. The forms also required transgender adult patients to undergo ongoing, lifelong psychotherapy regardless of whether they have any individualized need for such therapy. *Id;* Trial

Ex. 5, Shumer Report ¶ 122. Those provisions were removed by the Boards after the Boards received an inquiry from the joint legislative rules committee about what authority the Boards had to include those requirements. Trial Ex. 70, Public Book, 8.3.23 at 46-49. Although removed, the fact of their inclusion in the first place, with no medical support, provides further evidence that Defendants' justifications for the informed consents cannot pass muster.

Simply stated, Defendants cannot demonstrate that the Challenged Provisions would have been enacted without the discriminatory purpose underlying them.

### B.    Defendant's asserted justifications fail under any level of review.

Defendants have not identified any legitimate reason to single out transgender people for the arbitrary restrictions imposed on them—including banning gender transition treatments for minors and putting obstacles in the way of transgender adults receiving care (as well as the few transgender minors who may be able to access care despite the ban).

Even under rational basis review, a law "must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 320 (1993). No such footing is evident here. The "rational-basis standard is 'not a toothless one.'" *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). A law fails rational basis review when "the varying

treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979). In addition, when a law's "sheer breadth is so discontinuous with the reasons offered for it that [the law] seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996). SB 254 and the Board Rules are underinclusive with respect to the State's purported justifications because, as discussed, they do not prohibit or restrict treatments they deem unsafe or experimental except when treating transgender people. The challenged provisions are vastly overly broad because they categorically ban medical care while claiming there is insufficient evidence of safety and efficacy instead of promoting practices that would ensure safety and efficacy. Finally, the State has put forth no evidence that suggests the ban and restrictions will actually promote the health of any individuals in Florida. The evidence demonstrates the Challenged Provisions undermine health and safety and serve only to prevent or dramatically curtail transgender people's ability to get needed medical care.

The record before this Court demonstrates that SB 254 and the Board Rules do not rationally advance any legitimate interest related to safety, efficacy, or the advancement of informed consent. To the contrary, the evidence demonstrates that the Challenged Provisions were enacted for the improper purpose of expressing

disapproval of transgender people and discouraging them from being transgender. Because the Challenged Provisions of SB 254 and the Board Rules are based in animus, they fail under any level of scrutiny.

## II.    SB 254 IRREPARABLY HARMS PLAINTIFFS

To obtain a permanent injunction, a plaintiff must meet a four-factor test by demonstrating that: (1) she has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *State of West Virginia v. United States Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023).

Plaintiffs satisfy all factors in this case. Denial of medically necessary care constitutes immediate and irreparable harm warranting a preliminary injunction. *See, e.g.*, *Bowen v. City of New York*, 476 U.S. 467, 483–84 (1986) (finding denial of benefits caused irreparable injury by exposing plaintiffs to "severe medical setback[s]" or hospitalization). Each of the Minor Plaintiffs has a history of gender dysphoria, diagnoses and recommendations from their treating medical providers, and imminent need for treatment at the onset of puberty; these plaintiffs will suffer severe and irreparable harm if they are unable to receive timely medical treatment, causing or exacerbating symptoms such as depression, anxiety, and ideations of self-

harm. (*See* Doe Decl. ¶¶ 14, 16, 22; Goe Decl. ¶ 14; Pope Decl. ¶¶ 11–13.) Experts have testified that, in the absence of timely medical treatment, adolescents with gender dysphoria will suffer harms that are serious, irreparable, and potentially life-threatening. (*See* Doc. 30-4 at 14; Doc. 30-5 at 10; Doc. 30-6 at 10, 19, 22–23, 24–28.) Similarly, the Adult Plaintiffs will suffer severe and irreparable harm if they continue to be unable to access medical treatment. (*See* Hamel Decl. ¶¶ 12–14; Evia Decl. ¶¶ 9–12.) A permanent injunction is necessary because monetary damages will not make Plaintiffs whole as what they require are the treatments themselves.

The prohibition of such necessary treatments places greater, immediate hardships on Plaintiffs than Defendants. A permanent injunction will ensure that transgender patients get medical care they need. And the public will experience no harm by an order enjoining an unconstitutional law.

## CONCLUSION

For the reasons set forth in this Trial Brief, the Plaintiffs' requests for declaratory and injunctive relief should be granted.

Dated:  November 6, 2023

**SOUTHERN LEGAL COUNSEL**

*By: /s/ Simone Chriss*
**Simone Chriss**
Florida Bar No. 124062
**Chelsea Dunn**
Florida Bar No. 1013541
1229 NW 12th Avenue

**LOWENSTEIN SANDLER LLP**

*By: /s/ Thomas Redburn, Jr.*
**Thomas E. Redburn, Jr.\***
New York Bar No. 5822036
**Maya Ginsburg\***
New York Bar No. 5128152
1251 Avenue of the Americas

102

Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**HUMAN RIGHTS CAMPAIGN FOUNDATION**

**Cynthia Cheng-Wun Weaver\***
NY No. 5091848
**Jason Starr\*** NY No. 5005194
**Ami Patel\*** CA No. 325647
1640 Rhode Island Avenue NW
Washington, D.C. 20036
(202) 993-4180
Cynthia.Weaver@hrc.org
Jason.Starr@hrc.org
Ami.Patel@hrc.org

**NATIONAL CENTER FOR LESBIAN RIGHTS**

**Christopher F. Stoll\***
CA Bar No. 179046
**Kelly Jo Popkin\***
NY Bar No. 5698220
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Tel. 415-365-1320
cstoll@nclrights.org
kpopkin@nclrights.org

New York, NY 10020
(212) 262-6700
tredburn@lowenstein.com
mginsburg@lowenstein.com

**GLBTQ LEGAL ADVOCATES & DEFENDERS**

**Jennifer Levi\***
MA Bar No. 562298
**Chris Erchull\***
MA Bar No. 690555
18 Tremont, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@glad.org
cerchull@glad.org

\* Admitted by *pro hac vice*

***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Simone Chriss*
Counsel for Plaintiffs