## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JANE DOE et al.,

       Plaintiffs,

v.                             CASE NO. 4:23cv114-RH-MAF

JOSEPH A. LADAPO et al.,

       Defendants.

_____/

## ORDER ON THE MERITS

       This class action presents a constitutional challenge to a Florida statute and rules that (1) prohibit transgender minors from receiving specific kinds of widely accepted gender-affirming medical care and (2) impose restrictions on how such care can be provided to adults or to minors who are grandfathered—who are allowed to continue receiving care they were receiving before the statute and rules took effect. The case has been tried to the court. This order sets out the court's findings of fact and conclusions of law.

### I. Background: the parties, claims, and proceedings

       The operative pleading is the third amended complaint.[1] It names eleven

_____

[1] ECF No. 118.

plaintiffs—four transgender adults and seven parents of transgender minors. Two classes have been certified, one for adults and one for minors.[2] The trial record addresses the individual circumstances of only one adult and two minors, so this order dismisses the claims of the others and removes them as class representatives. The order makes a corresponding change in the definition of one class.

The defendants are the Florida Surgeon General, the Florida Board of Medicine and its members, the Florida Board of Osteopathic Medicine and its members, and the State Attorney for the Fifth Judicial Circuit. The individual defendants have been sued only in their official capacities.

The plaintiffs originally named as additional defendants Florida's other 19 state attorneys, but the claims against them were dropped after the parties entered into a stipulation providing, among other things, that the state attorneys would be bound by any judgment in this action. The plaintiffs also originally named the Attorney General of Florida as a defendant, but the plaintiffs dropped their claims against her. Federal Rule of Civil Procedure 54(b) judgments were not entered on the claims against the state attorneys and Attorney General.

By stipulation of all parties, the record consists not only of the evidence presented during the trial of this case but also the evidence presented during the trial of a separate case in this court with overlapping issues, *Dekker v. Weida*, No.

---

[2] ECF No. 166.

4:22cv325-RH-MAF.[3] *Dekker* addressed Florida's denial of Medicaid coverage for the same kinds of transgender services at issue in this case. Full and fair bench trials have been conducted in both cases.

In this case, the plaintiffs assert an equal-protection claim (count II), and the parents assert a substantive-due-process claim based on the right to direct the upbringing of their children (count I). The defendants explicitly acknowledged in *Dekker* that preventing or impeding an individual from pursuing a transgender identity is not a legitimate state interest,[4] and they have never receded from that concession.[5] They assert instead that the statute and rules are a legitimate regulation of medical care and thus are constitutional in all respects.[6]

Three plaintiffs—each the parent of a transgender minor—moved for and obtained a preliminary injunction. The defendants' appeal is pending. The preliminary injunction will expire by its terms upon entry of a judgment as directed by this order.

---

[3] *See* Rule 26(f) Report, ECF No. 113 at 7; *see also* Joint Pretrial Stipulation, ECF No. 189 at 11. Citations including "*Dekker*" refer to the docket in that case.

[4] Trial Tr. in *Dekker*, ECF No. 242 at 97.

[5] *See, e.g.*, ECF No. 66 at 31.

[6] *See id*.; *see also* Defs.' Trial Br., ECF No. 190 at 32–33 (stating lawmakers' intent was "to ensure that individuals with gender dysphoria receive quality healthcare."); Joint Pretrial Stipulation, ECF No. 189 at 10–11 (defendants' statement that the laws simply regulate healthcare); Trial Tr., ECF No. 206 at 23–24 (defendants' position in opening that the state was motivated by concern over the quality of medical care).

## II. The challenged provisions

The kinds of care at issue are puberty blockers and cross-sex hormones. *See* Fla. Stat. § 456.001(9)(a). This order uses the term "gender-affirming care" to refer only to these two kinds of treatment, *not* to gender-affirming surgery. Puberty blockers are more formally known as gonadotropin releasing hormone or "GnRH" agonists or antagonists. Cross-sex hormones typically include estrogen for natal men and testosterone for natal women.

For many years, the State of Florida allowed use of these medications to treat gender dysphoria.[7] A report prepared by the Florida Agency for Health Care Administration supported the use.[8] But then the political winds changed.

### A. The statute

The challenged statute prohibits gender-affirming care for minors—for patients under age 18—subject to a grandfather provision allowing minors who were already receiving this care to continue do so. *Id.* § 456.52(1). The statute does not prohibit but instead only imposes restrictions on care for adults. *Id.* § 456.52(2) & (3).

---

[7] *See, e.g.*, *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1280–81 (N.D. Fla. 2023); *see also* Trial Tr., ECF No. 207 at 131.
[8] *See* Pls.' Ex. 240 in *Dekker*, ECF No. 181-4 at 9; *see also* Pls.' Ex. 243 in *Dekker*, ECF No. 181-7 at 1.

More specifically, for minors, the statute prohibits use of "puberty blockers" to "stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." Fla. Stat. § 456.001(9)(a)1.; *see id*. § 456.52(1). Again for minors, the statute prohibits use of "hormones or hormone antagonists to affirm a person's perception of his or her sex if that perception is inconsistent with the person's [natal] sex." *Id*. § 456.001(9)(a)2.; *id*. § 456.52(1). The grandfather provision allows a patient to "continue to be treated by a physician" with puberty blockers or cross-sex hormones if the treatment was "commenced before, and is still active on, May 17, 2023," subject to rules adopted by the Boards of Medicine and Osteopathic Medicine. *Id*. § 456.52(1)(b) & (a).

The statute restricts the manner in which gender-affirming care can be provided to adults and to grandfathered minors. Care can be "prescribed, administered, or performed" only by a physician—and thus not by an advanced practice registered nurse ("APRN") or other provider. *Id*. § 456.52(3). And the patient must sign a written consent form while in the same room with the physician, thus banning telehealth as a means of initiating treatment. *Id*. § 456.52(2). The statute directs the Boards to specify by rule the terms of the consent forms. *Id*.

Violation of these provisions is a crime and grounds for terminating a healthcare practitioner's license. *See id.* § 456.52(5).

The statute also prohibits gender-affirming surgery for minors and imposes restrictions on surgery for adults. But the plaintiffs have not challenged, as part of this litigation, the prohibition on surgery for minors. The adult plaintiff for whom evidence was presented at trial does not seek surgery at this time, so he lacks standing to challenge the surgery restrictions. This order does not address surgery issues on the merits.

### B. The rules

The challenged rules were adopted by the Boards of Medicine and Osteopathic Medicine. In identical language, the rules prohibit the Boards' licensed practitioners from treating "gender dysphoria in minors" with "[p]uberty blocking, hormone, or hormone antagonist therapies." Fla. Admin. Code r. 64B8-9.019(1)(b); Fla. Admin Code r. 64B15-14.014(1)(b).

For grandfathered minors, the rules mandate the scope and frequency of specific procedures. The requirements include x-rays, DEXA scans, follow-up visits, and laboratory testing more often than medically indicated.[9] The rules allow only psychologists or psychiatrists to provide some required services, while

---

[9] Fla. Admin. Code r. 64B8ER23-7(4) (minors, Board of Medicine), r. 64B15ER2-9(4) (minors, Board of Osteopathic Medicine).

allowing all licensed mental-health professionals to provide others. The rules

require all patients and, for minors, their parents to sign—and initial dozens of

times—long consent forms in exactly the form specified by the Boards.[10]

## III. Gender identity is real

With extraordinarily rare exceptions not at issue here, every person is born

with external sex characteristics, male or female, and chromosomes that match. As

the person goes through life, the person also has a gender identity—a deeply felt

internal sense of being male or female.[11] For more than 99% of people, the external

sex characteristics and chromosomes—the determinants of what this order calls the

person's natal sex—match the person's gender identity.[12]

---

[10] Fla. Admin. Code r. 64B8ER23-7(2) (Board of Medicine adopting forms "DH5079-MQA," "DH5080-MQA," and "DH5081-MQA" and providing website links to the forms for minors), r. 64B15ER23-9(2) (same for Board of Osteopathic Medicine), r. 64B8ER23-11 (Board of Medicine adopting forms "DH5082-MQA," "DH5083-MQA," and "DH5084-MQA" and providing website links to the forms for adults), r. 64B15ER23-12 (same for Board of Osteopathic Medicine). The third amended complaint and the parties' briefs cite Florida Administrative Code rules 64B8ER23-8 and 64B15ER23-10 as the challenged rules that adopted the forms for adults. Those rules initially adopted the forms. But in response to a letter from the Joint Administrative Procedures Committee regarding the Boards' authority to impose substantive requirements on the adults, the forms were amended. *See* 49 Fla. Admin. Reg. 163, 3086–90 (Aug. 22, 2023). The current forms were introduced at trial and cite the correct rules: 64B8ER23-11 and 64B15ER23-12. *See* Defs.' Ex. 2, ECF No. 175-2 (bottom left corner); Defs.' Ex. 5, ECF No. 175-5 (same); Defs.' Ex. 6, ECF No. 175-6 (same). These are the forms still available on the Boards' websites.
[11] Trial Tr. in *Dekker*, ECF No. 226 at 23–24; Trial Tr. in *Dekker*, ECF No. 238 at 72–73.
[12] Trial Tr. in *Dekker*, ECF No. 227 at 222.

For less than 1%, the natal sex and gender identity are opposites: a natal male's gender identity is female, or vice versa.[13] This order refers to such a person who identifies as female as a transgender female and to such a person who identifies as male as a transgender male. This order refers to individuals whose gender identity matches their natal sex as cisgender.

The elephant in the room should be noted at the outset. Gender identity is real. The record makes this clear. The defendants, speaking through their attorneys, have admitted it.[14] At least one defense expert also has admitted it.[15] That expert is Dr. Stephen B. Levine, the only defense expert who has actually treated a significant number of transgender patients. At least in his first appearance as a witness—in the *Dekker* trial—he addressed the issues conscientiously, on the merits, rather than as a biased advocate. He was not as forthcoming in his second appearance—in the trial of this case—but he explicitly stood by his prior testimony,[16] and he again acknowledged that gender-affirming care is sometimes appropriate.[17] He said ending a patient's cross-gender identity should not be a goal

---

[13] *Id.*; *see also* Trial Tr. in *Dekker*, ECF No. 226 at 23–24; Trial Tr. in *Dekker*, ECF No. 228 at 29–31.

[14] *See, e.g.*, Defs.' Trial Br., ECF No. 190 at 4–5.

[15] *See* Trial Tr. in *Dekker*, ECF No. 239 at 10–11, 31–32, 80–81.

[16] Trial Tr., ECF No. 212 at 125.

[17] *Id.* at 172; *see also* Trial Tr. in *Dekker*, ECF No. 239 at 40–42, 44, 81–83, 88–94.

of treatment—that that kind of treatment is ill-informed and unrealistic.[18]

Despite the defense admissions, there are those who believe that cisgender individuals properly adhere to their natal sex and that transgender individuals have inappropriately *chosen* a contrary gender identity, male or female, just as one might choose whether to read Shakespeare or Grisham. Many people with this view tend to disapprove all things transgender and so oppose medical care that supports a person's transgender existence.[19] The defendants have explicitly admitted that prohibiting or impeding individuals from pursuing their transgender identities is not a legitimate state interest.[20] But the record shows beyond any doubt that a significant number of legislators and others involved in the adoption of the

---

[18] Trial Tr., ECF No. 212 at 163.

[19] *See, e.g.*, Trial Tr. in *Dekker*, ECF No. 239 at 129–31 (statement of a defense expert who opposes gender-affirming care that "changing a person's sex is a lie and also a moral violation," "a huge evil," and "diabolical in every sense of the word"); *see also* Trial Tr. In *Dekker*, ECF No. 238 at 193–95 (statement of a different defense expert who opposes gender-affirming care acknowledging he joined amicus briefs asserting that gender-affirming care allows an individual to "adhere to his or her false belief that he or she is the opposite sex" and that the treatments only maintain a "delusion" and perpetuate a "charade."); *see also* Preliminary Inj. Hr'g Tr. in *Dekker*, ECF No. 62 at 40 (statement of yet another defense expert who opposes gender-affirming care responding no to a question from the court: whether in his opinion it is "ever appropriate for a medical professional in any specialty to support a person's decision to live in that person's gender identity instead of the person's natal identity"). These experts testified not based on their professional expertise but based on their ideology. They have little or no experience treating transgender patients and no specialized training in the field. I do not credit the disputed portions of their testimony.

[20] *See supra* notes 4–6.

statute and rules at issue pursued this admittedly illegitimate interest.[21]

For some, the denial that transgender identity is real—the opposition to transgender individuals and to their freedom to live their lives—is not different in kind or intensity from the animus that has attended racism and misogyny, less as time has passed but still today. And some transgender opponents invoke religion to support their position, just as some once invoked religion to support their racism or misogyny. Transgender opponents are of course free to hold their beliefs. But they are not free to discriminate against transgender individuals just for being transgender. In time, discrimination against transgender individuals will diminish, just as racism and misogyny have diminished. To paraphrase a civil-rights advocate from an earlier time, the arc of the moral universe is long, but it bends toward justice.

In the meantime, the federal courts have a role to play in upholding the Constitution and laws. The State of Florida can regulate as needed but cannot flatly deny transgender individuals safe and effective medical treatment—treatment with medications routinely provided to others with the state's full approval so long as the purpose is not to support the patient's transgender identity.

## IV. The standards of care

Transgender individuals suffer higher rates of anxiety, depression, suicidal

---

[21] *See infra* § VIII.G.

ideation, and suicide than the population at large.[22] Some suffer gender dysphoria,

a mental-health condition recognized in the Diagnostic and Statistical Manual of

Mental Disorders, Fifth Edition ("DSM-5"). The diagnosis applies when specific

criteria are met. Among other things, there must be a marked incongruence

between one's experienced gender identity and natal sex for at least six months,

manifested in specified ways, and clinically significant distress or impairment.[23]

There are well-established standards of care for treatment of gender

dysphoria. These are set out in two publications: first, the Endocrine Society

Clinical Practice Guidelines for the Treatment of Gender Dysphoria; and second,

the World Professional Association for Transgender Health ("WPATH") Standards

of Care, version 8.[24] I credit the abundant testimony in this record that these

standards are widely followed by well-trained clinicians.[25] The standards are used

by insurers[26] and have been endorsed by the United States Department of Health

---

[22] Trial Tr. in *Dekker*, ECF No. 226 at 108.

[23] Pls.' Ex. 33 in *Dekker*, ECF No. 175-33 at 2–3; *see also* Trial Tr. in *Dekker*, ECF No. 226 at 25–26; Trial Tr. in *Dekker*, ECF No. 238 at 71.

[24] Defs.' Exs. 16 & 24 in *Dekker*, ECF Nos. 193-16 & 193-24.

[25] Trial Tr. in *Dekker*, ECF No. 226 at 31 (psychiatrist); *id.* at 198 (pediatric endocrinologist); Trial Tr. in *Dekker*, ECF No. 227 at 50–52 (surgeon); *id.* at 106, 112–14 (pediatrician, bioethicist, medical researcher); Trial Tr. in *Dekker*, ECF No. 228 at 15 (physician specializing in pediatrics and adolescent medicine); *see also* Trial Tr., ECF No. 206 at 114 (pediatric psychiatrist); Trial Tr., ECF No. 207 at 133 (pediatric endocrinologist in Florida)

[26] Trial Tr. in *Dekker*, ECF No. 227 at 243–44.

and Human Services.[27]

Under the standards, gender-dysphoria treatment begins with a comprehensive biopsychosocial assessment.[28] In addition to any appropriate mental-health therapy, there are three types of possible medical intervention, all available only to adolescents or adults, never younger children.[29]

First, for patients at or near the onset of puberty, medications known as GnRH agonists can delay the onset or continuation of puberty and thus can reduce the development of secondary sex characteristics inconsistent with the patient's gender identity—breasts for transgender males, whiskers for transgender females, changes in body shape, and other physical effects.[30]

Second, cross-sex hormones—testosterone for transgender males, estrogen for transgender females—can promote the development and maintenance of characteristics consistent with the patient's gender identity and can limit the development and maintenance of characteristics consistent with the patient's natal sex.[31] For patients treated with GnRH agonists, use of cross-sex hormones

---

[27] See Defs.' Ex. 2 in *Dekker*, ECF No. 193-2.
[28] See Trial Tr. in *Dekker*, ECF No. 226 at 42–43.
[29] Trial Tr. in *Dekker*, ECF No. 238 at 72 & 74–75; *see also* Trial Tr. in *Dekker*, ECF No. 228 at 14; Trial Tr. in *Dekker*, ECF No. 226 at 36 & 176.
[30] See Trial Tr. in *Dekker*, ECF No. 226 at 194–97; Trial Tr. in *Dekker*, ECF No. 228 at 27–28.
[31] Trial Tr. in *Dekker*, ECF No. 226 at 217–26, 228.

typically begins when use of GnRH agonists ends.[32] Cross-sex hormones also can be used later in life, regardless of whether a patient was treated with GnRH agonists.

Third, for some patients, surgery can align physical characteristics with gender identity, to some extent.[33] The most common example: mastectomy can remove a transgender male's breasts. Perhaps 98% of all such surgeries are performed on adults, not minors.[34] The ban on surgery for minors has never been at issue in this litigation, and the restrictions on surgery for adults are no longer at issue.

## V. General acceptance of the standards of care

The overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists and cross-sex hormones in appropriate circumstances. Organizations who have formally recognized this include the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists,  American College of Physicians, American Medical Association, American Psychiatric Association, and at least a dozen

---

[32] *See* Trial Tr. in *Dekker*, ECF No. 228 at 87–90.
[33] *See* Trial Tr. in *Dekker*, ECF No. 227 at 42.
[34] *See* Trial Tr. in *Dekker*, ECF No. 227 at 43.

more.[35] The record also includes statements from hundreds of professionals supporting this care.[36] At least as shown by this record, not a single reputable medical association has taken a contrary position.

These medications—GnRH agonists, testosterone, and estrogen—have been used for decades to treat other conditions. Their safety records and overall effects are well known. The Food and Drug Administration has approved their use, though not specifically to treat gender dysphoria.[37]

GnRH agonists are routinely used to treat patients with central precocious puberty—children who have begun puberty prematurely—as well as, in some circumstances, endometriosis and prostate cancer.[38] Central precocious puberty presents substantial health risks and ordinarily should be treated. GnRH agonists are an appropriate treatment, even though GnRH agonists have attendant risks.[39] So, too, gender dysphoria presents substantial health risks and ordinarily should be treated.[40] For some patients, GnRH agonists are an appropriate treatment, even

---

[35] *See* Pls.' Exs. 36–43, 45–48 in *Dekker*, ECF Nos. 175-36 through 176-8 (omitting ECF No. 176-4).

[36] *See* Amicus Brief of American Academies and Health Organizations, ECF No. 36-1; Bruggeman et al., *We 300 Florida health care professionals say the state gets transgender guidance wrong* (Apr. 27, 2022), *Dekker* ECF No. 11-1 at 11–32.

[37] *See* Trial Tr. in *Dekker*, ECF No. 226 at 183; *see also* Trial Tr. in *Dekker*, ECF No. 239 at 54–56.

[38] Trial Tr. in *Dekker*, ECF No. 226 at 183–84, 200–02.

[39] *Id.*

[40] *Id.*

though, just as with their use to treat central precocious puberty and other conditions, GnRH agonists have attendant risks.[41]

The defendants say the risks attendant to use of GnRH agonists to treat central precocious puberty or to treat gender dysphoria are not identical, and that may be so. But it is still true that for gender dysphoria, just as for central precocious puberty, GnRH agonists are an effective treatment whose benefits can outweigh the risks.

The same is true for cross-sex hormones. Testosterone and estrogen are routinely used to treat cisgender patients in appropriate circumstances.[42] The medications are an effective treatment for conditions that should be treated, even though the medications have attendant risks.[43] That is so for cisgender and transgender patients alike. For some transgender patients, cross-sex hormones are an appropriate treatment.

Even the defendants' expert Dr. Levine testified that treatment with GnRH agonists and cross-sex hormones is sometimes appropriate.[44] He would demand appropriate safeguards, as discussed below, but he would not ban the treatments.[45] The patients for whom testimony was presented at trial would qualify for treatment

---

[41] *Id.* at 201–16.
[42] *Id.* at 216.
[43] *Id.* at 218–29.
[44] Trial Tr. in *Dekker*, ECF No. 239 at 81–83.
[45] *Id.* at 91–94.

under Dr. Levine's proposed safeguards.

## VI. Clinical evidence supporting the standards of care

The record includes testimony of well-qualified doctors who have treated thousands of transgender patients with GnRH agonists and cross-sex hormones over their careers and have achieved excellent results. I credit the testimony of Dr. Dan Karasic (psychiatrist), Dr. Daniel Shumer (pediatric endocrinologist), Dr. Aron Janssen (child and adolescent psychiatrist), Dr. Brittany Bruggeman (pediatric endocrinologist), Dr. Johanna Olson-Kennedy (specialist in pediatrics and adolescent medicine), and Dr. Armand Antommaria (pediatrician and bioethicist). I credit their testimony that denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide.[46]

The clinical evidence would support, though certainly not mandate, a decision by a reasonable patient or parent, in consultation with properly trained practitioners, to use GnRH agonists at or near the onset of puberty or to use cross-sex hormones later, even when fully apprised of the current state of medical knowledge and all attendant risks.

---

[46] *See, e.g.*, Trial Tr. in *Dekker*, ECF No. 226 at 64, 158, 215–16, 228–29; Trial Tr. in *Dekker*, ECF No. 228 at 35–36, 40–41, 45–47, 66; Trial Tr. in *Dekker*, ECF No. 238 at 97–98; Trial Tr., ECF No. 207 at 147–48, 150–53.

The record includes no evidence that these treatments have caused substantial adverse clinical results in properly screened and treated patients—patients who were screened and treated with appropriate caution in compliance with the Endocrine Society and WPATH standards of care.

## VII.  The plaintiffs

The third amended complaint names eleven plaintiffs—four transgender adults and seven parents on behalf of transgender minors. The parents and minors are proceeding under pseudonyms.

The plaintiffs introduced evidence at trial supporting the individual claims of only three of the plaintiffs—one transgender adult and two parents of transgender minors. This order dismisses the individual claims of the others, leaving them as class members. The order retains as class representatives only the three remaining plaintiffs.

To be sure, the plaintiffs submitted declarations of other plaintiffs in support of their motion for a preliminary injunction.[47] But those declarations are not part of the trial record. The preliminary-injunction hearing was not consolidated with the trial on the merits. "Even when consolidation is not ordered, evidence that is received on the [preliminary-injunction] motion and that *would be admissible at*

---

[47] *See* Loe Decl., ECF No. 30-2; Pope Decl., ECF No. 115-1; Noel Decl., ECF No. 115-3; & Evia Decl., ECF No. 115-4.

*trial* becomes part of the trial record and need not be repeated at trial." Fed. R. Civ. P. 65(a)(2) (emphasis added). The declarations were hearsay and would not have been admissible if offered by the plaintiffs at trial. Perhaps recognizing this, the plaintiffs did not list the declarations as exhibits or offer them at trial.

The plaintiffs also introduced medical records for some of the others.[48] But those records, without more, are insufficient to establish those plaintiffs' standing, the appropriateness of gender-affirming care or surgery in their individual circumstances, or their entitlement to relief.

### A. Susan Doe

Susan Doe is a 12-year-old transgender girl. Susan's mother, Jane Doe, is a plaintiff. She testified at trial.[49] I credit her testimony.

From a young age, Susan consistently told her mother she was a girl.[50] She experienced extreme anxiety and confusion about wearing boys' clothing.[51]  Her mother sought help from a pediatrician, who said Susan should be allowed to dress and play as made her comfortable.[52] Despite fears, her mother allowed her to wear girls' clothes and socially transition.[53] This took Susan from an anxious, isolated

---

[48] *See* Pls.' Ex. 83-84, ECF No. 208-4 (Noel), 208-5 (Loe), 208-6 (Pope), & 208-7 (Evia).
[49] Trial Tr., ECF No. 206 at 28–50.
[50] *See id.* at 27–30 & 38.
[51] *Id.* at 29–30.
[52] *Id.* at 30.
[53] *Id.*

child to a "happy, bouncing, involved child."[54]

Upon the recommendation of her pediatrician, Susan also saw a family therapist. Based on Susan's adjustment to the social transition, the therapist did not have concerns about Susan but said Susan should be seen for milestone events and as needed for support.[55]

Susan also has been treated for more than two years by a pediatric endocrinologist at the University of Florida Youth Gender Program.[56] Susan's family lives in Jacksonville because her father—who is on active duty in the United States military—is stationed there. Her parents make the drive to the UF Youth Gender Program in Gainesville because they believe, based on their research and Susan's therapist's recommendation, that the program offers excellent care.[57]

Susan is being monitored by her providers for the onset of puberty. Her providers recommend, and her parents agree, that she should begin puberty blockers at that time. After the challenged rules banned gender-affirming care in Florida, Susan's parents sought and received a second opinion from the head of

---

[54] *Id.* at 31.
[55] *Id.* at 32.
[56] *See* Pls.' Ex. 80, ECF No. 208-1 at 1–20; *see also* Trial Tr., ECF No. 206 at 33.
[57] Trial Tr., ECF No. 206 at 33.

endocrinology at Walter Reed Hospital.[58] That physician, too, said puberty

blockers are necessary and appropriate for Susan.[59] The providers at the UF Youth

Gender Program have discussed with Susan's mother the various risks presented

by puberty blockers and cross-sex hormones.[60]

　　For Susan, the benefits outweigh the risks. Susan's biggest fear is "what she

calls turning into a boy."[61] Susan is fully socially transitioned and known at school

as a girl. Denying Susan gender-affirming treatment would be severely detrimental

to her mental health. Susan's parents are committed to ensuring Susan receives

necessary care so that she can continue "flourishing and living her life like a

normal kid."[62]

### B. Gavin Goe

　　Gavin Goe is an eight-year-old transgender boy. Gavin's mother, Gloria

Goe, is a plaintiff. She testified at trial.[63] I credit her testimony.

　　From a very young age, Gavin wanted short hair, masculine clothing, and a

boy's name.[64] He told his mother he wanted to look like a boy because he *was* a

---

[58] *See* Pls.' Ex. 80, ECF No. 208-1 at 21–27; *see also* Trial Tr., ECF No. 206 at 36–38.
[59] Trial Tr., ECF No. 206 at 36–37.
[60] *Id.* at 33–36.
[61] Trial Tr., ECF No. 206 at 35.
[62] *Id.*
[63] *Id.* at 50–69.
[64] *Id.* at 53.

boy.[65] Gavin experienced significant distress over having a feminine haircut and girls' clothing. His mother came to understand Gavin was transgender, and she sought to learn how best to support and love her child. Despite her fear and grief, Gavin's mother allowed him to socially transition, including by using a boy's name and wearing boy's clothing.[66]

Gavin's pediatrician referred him to a psychologist for treatment of gender dysphoria, anxiety, and depression.[67] The pediatrician referred Gavin to a pediatric endocrinologist at the Johns Hopkins All Children's Hospital gender clinic in St. Petersburg, Florida, to assess possible gender-affirming care.[68] Gavin had an appointment, but the clinic canceled it when the Board of Medicine adopted the rule prohibiting doctors from providing this kind of care.[69]

Gavin is terrified of puberty because he does not want to develop female characteristics.[70] If Gavin is unable to receive treatment, his mental health will deteriorate. His mother fears she "will lose the essence" of her child.[71]

---

[65] *Id.* at 54.
[66] *Id.* at 55–56.
[67] *See* Pls.' Ex. 81, ECF No. 208-2 at 3.
[68] Trial Tr., ECF No. 206 at 60.
[69] *Id.*
[70] *Id.* at 61.
[71] *Id.* at 62.

### C.  Lucien Hamel

The plaintiff Lucien Hamel is a 27-year-old transgender man.[72] He testified at trial.[73] I credit his testimony.

From a young age, he regarded himself as male. He experienced anxiety and distress when he was referred to and treated as female. The distress was alleviated only when he was able to conduct himself as a male and was treated by others that way. In adolescence, he tried to have a masculine haircut and clothing but was met with backlash and pressure to present himself as female. He "always hoped that one day [he] would wake up and feel right and feel normal and be a girl, but it just never happened."[74] Mr. Hamel continued to live as a woman—his natal sex—and had a child, but the depression and anxiety persisted.

Mr. Hamel saw a therapist. After long discussions of his history and life experience, Mr. Hamel came to understand he was transgender. A psychiatrist later diagnosed him with gender dysphoria.[75] Mr. Hamel began to socially transition. He presented himself more masculinely and chose a different name. Socially transitioning was, at first, an "incredibly nerve wracking" experience as he faced rejection from friends and family.[76] But he says that when he accepted himself as a

---

[72] *Id.* at 71.
[73] *Id.* at 70–103.
[74] *Id.* at 72.
[75] *Id.* at 73.
[76] *Id.* at 74.

transgender man, he felt inner peace and knew that even if not accepted by others, he could be happy.[77]

After a full psychiatric evaluation—and while still under the care of his therapist—he began to seek medical treatment.[78] He first saw a pediatric endocrinologist. The endocrinologist obtained a medical history and informed Mr. Hamel of available treatments. After repeated visits, laboratory tests, and in-depth discussions of options, risks, and side effects, Mr. Hamel began taking testosterone. He saw dramatic improvement in his happiness. He felt like an "authentic" version of himself, his relationships improved, and he was able to overcome depression and anxiety.[79]

Mr. Hamel continued to see the endocrinologist for several years. The endocrinologist diligently oversaw Mr. Hamel's treatment, including with regular labs and checkups. Mr. Hamel eventually had a mastectomy. In mid-2022, Mr. Hamel was too old to be treated by the pediatric endocrinologist, and he became a patient of a clinic that specializes in transgender care. There, after another full discussion of risks and benefits, he continued testosterone treatment, now with an APRN.[80] He was seen and had labs every three months.

---

[77] *See id.* at 74–75.
[78] *Id.* at 75.
[79] *Id.* at 78.
[80] *Id.* at 81.

After the challenged statute took effect, the APRN could no longer prescribe testosterone.[81] At the time of trial, Mr. Hamel had been unable to establish care with a physician trained in this field. The discontinuation of testosterone caused significant distress, the return of anxiety and depression, and physical changes including lost muscle mass and feminization.[82] In his job and elsewhere, while on testosterone, Mr. Hamel was known and recognized as a man. But when his prescription lapsed and some features feminized, he was sometimes identified as either a transgender man or a woman. This benefited nobody.

### D. Findings on appropriate treatment

Susan Doe, Gavin Goe, and Mr. Hamel have obtained appropriate medical care. Qualified professionals have properly evaluated their medical conditions and needs in accordance with the well-established standards of care. The minors, to the extent of their limited ability, and their parents, and Mr. Hamel, all in consultation with the treating professionals, have determined that the benefits of their gender-affirming care will outweigh the risks. The parents' and Mr. Hamel's ability to evaluate the benefits and risks of this treatment in their individual circumstances far exceeds the ability of the State of Florida to do so. The patients' motivation is the desire to achieve the best possible medical treatment. The parents' motivation

---

[81] *Id.* at 84.
[82] *Id.* at 87–88.

is love for their children and the desire to achieve the best possible medical treatment for them. This was not the motivation of many of those involved in adoption of this statute and these rules.

The same is true for the four individual plaintiffs in *Dekker*. They are class members.

## VIII.  Equal protection

The plaintiffs assert the challenged statute and rules violate the Fourteenth Amendment's Equal Protection Clause.

### A.  *Prior decisions*

Neither the Supreme Court nor any circuit has addressed the constitutionality of banning or restricting gender-affirming care on a full record after a trial on the merits. At least four circuits have addressed preliminary injunctions precluding states from enforcing bans on such care for minors. Two have upheld injunctions; two have reversed. *Compare Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023) (reversing preliminary injunction) *and L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (same on 2–1 vote) *with Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) (affirming preliminary injunction) and *Poe ex rel. Poe v. Labrador*, No. 1:23-cv-269, 2024 WL 170678 (9th Cir. Jan. 16, 2024) (refusing to stay preliminary injunction). The Supreme Court granted a stay in *Poe*, thus disapproving the Ninth Circuit's refusal

to do so, but the issue in the Supreme Court was only the application of the injunction to nonparties; the injunction remained in place for the plaintiffs themselves. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024).

There are also circuit decisions addressing payment for gender-affirming care. *See, e.g.*, *Lange v. Houston Cnty.*, 101 F.4th 793 (11th Cir. 2024) (holding that excluding gender-affirming care from a county's health insurance plan violates Title VII); *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (holding that excluding gender-affirming care from a state's Medicaid coverage and employee insurance plan violates the Equal Protection Clause).

The most important of these decisions, for present purposes, is *Eknes-Tucker*. As an Eleventh Circuit decision, it is binding in this court. *Eknes-Tucker* reversed a preliminary injunction against enforcing Alabama's ban on gender-affirming care for minors—a ban not meaningfully distinguishable from Florida's. The *holding* was only that the district court abused its discretion by applying intermediate rather than rational-basis scrutiny. *See Eknes-Tucker*, 80 F.4th at 1210–11. But the discussion made clear the court's view that a state legislature can rationally ban this treatment. If this was dictum, it "is not binding on anyone for any purpose." *United States v. Garcia*, 405 F.3d 1260, 1274 (11th Cir. 2005) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring)). But if this was dictum, it was recent Eleventh Circuit

dictum that a district court in this circuit could properly follow without further discussion.

For four reasons, this order does not stop with a citation to *Eknes-Tucker* but instead analyzes even the scrutiny issue more completely.

First, a petition for rehearing en banc is pending—and has been pending for months—in *Eknes-Tucker*. Because the plaintiffs in this Florida case need a ruling now, including on issues not addressed in *Eknes-Tucker*, this order has not been further delayed awaiting a ruling on the *Eknes-Tucker* petition. Addressing the issues both ways—both as will be proper if *Eknes-Tucker* remains the law of the circuit and as will be proper if the opinion is vacated—may allow the circuit to address this case when it gets there without a remand and the attendant further delay.

Second, *Eknes-Tucker* was presented to the circuit on limited claims and an abbreviated record. There was no claim in that appeal of actual bias—of anti-transgender animus—as there is here. *See Eknes-Tucker*, 80 F.4th at 1229–30 (stating the district court did not find that Alabama's law was based on invidious discrimination). And the circuit did not address other arguments the plaintiffs have presented here, including some that were a significant part of the analysis in this court's order granting a preliminary injunction. Thus, for example, the circuit did not cite *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938).

Third, circuit decisions are binding on issues of law, not on issues of fact. *Eknes-Tucker* sets out the law of the circuit, at least as of now, but to the extent the result there turned only on the facts established by that incomplete record, the decision does not control factual findings properly made on the complete record in the case at bar. Distinguishing legal from factual issues is not always easy. Addressing all the issues here will help ensure nothing is missed.

Fourth, *Eknes-Tucker* is only one of four recent Eleventh Circuit decisions addressing transgender issues. The others are *Glenn v. Brumby*, 663 F.3d 1313 (11th Cir. 2011), *Adams v. St. Johns County*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc), and *Lange v. Houston County*, 101 F.4th 793 (11th Cir. 2024). The transgender plaintiffs prevailed in the first and last of these, *Glenn* and *Lange*, but lost in the two in the middle, *Adams* and *Eknes-Tucker*. To the extent the holdings are inconsistent, *Glenn*, as the oldest, is binding. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020) ("Our adherence to the prior-panel rule is strict, but when there are conflicting prior panel decisions, the oldest one controls"). *Eknes-Tucker* distinguished *Glenn*, but *Lange* apparently found the distinction unavailing, albeit without citing *Eknes-Tucker*. Perhaps *Lange* is different because it arose under Title VII. But *Glenn*, like *Adams* and *Eknes-Tucker*, arose under the Equal Protection Clause.

One need not question the binding effect of *Eknes-Tucker* to recognize it might not be the circuit's last word on this subject. And if it is the circuit's last word, it still might not be the federal judiciary's last word. *See L.W. v. Skremetti*, 83 F.4th 460 (6th Cir. 2023), *petition for cert. filed*, No. 23-466 (U.S. Nov. 1, 2023).

In sum, this order follows *Eknes-Tucker* as the currently binding law of the circuit. But the order includes the analysis that would apply both based on, and without regard to, *Eknes-Tucker*.

### B.  Introduction to levels of scrutiny

Equal-protection analysis often starts with attention to the appropriate level of scrutiny: strict, intermediate, or rational-basis.

There was a time when the Supreme Court seemed to treat strict scrutiny and rational basis as exhaustive categories of equal-protection review. A leading commentator said that in some situations the first category was "'strict' in theory and fatal in fact" while the second called for "minimal scrutiny in theory and virtually none in fact." Gerald Gunther, *The Supreme Court, 1971 Term— Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1972).

But in the decades since, the Supreme Court has applied *intermediate* scrutiny in many circumstances. And rational-basis review no longer means

virtually no review. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 632 (1996) (striking

down, for lack of a legitimate rational basis, a state law restricting local ordinances

protecting gays: "[E]ven in the ordinary equal protection case calling for the most

deferential of standards, we insist on knowing the relation between the

classification adopted and the object to be attained."); *City of Cleburne v. Cleburne

Living Ctr.*, 473 U.S. 432, 447–50 (1985) (striking down, for lack of a legitimate

rational basis, an ordinance requiring group-care facilities for the mentally

handicapped, but not other facilities with multiple occupants, to obtain land-use

permits); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (striking

down, for lack of a legitimate rational basis, a tax exemption for Vietnam War

veterans limited to those who resided in the state on May 8, 1976); *United States

Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) (striking down, for lack of a

legitimate rational basis, a statute denying food stamps to members of a household

with unrelated members).

Lower courts have sometimes treated the categories of scrutiny as more rigid

and the analysis as more constrained than is proper. Regardless of the level of

scrutiny, there is no substitute for careful, unbiased, intellectually honest analysis.

Still, the level of scrutiny matters, so this order addresses it.

There are four sometimes-overlapping grounds on which heightened

scrutiny might be applicable here: line-drawing based on sex; line-drawing based

on transgender status or gender nonconformity; *Carolene Products*; and actual

animus against transgenders. The defendants say none of these apply—that only

rational-basis scrutiny is appropriate.

The order granting a preliminary injunction concluded the plaintiffs had the

better of it based in large part on the analysis recounted in the remainder of this

section of this order. ECF No. 90 at 19–26. *Eknes-Tucker* ruled to the contrary on

the first two grounds—line-drawing based on sex or gender non-conformity—so

the law of the circuit is that intermediate scrutiny does not apply on those grounds.

*Eknes-Tucker* did not explicitly address *Carolene Products*, but *Eknes-Tucker*

could reasonably be viewed as inconsistent with application of heightened scrutiny

based on *Carolene Products*, too.

On the other hand, *Eknes-Tucker* explicitly did *not* address animus—no

claim of animus was presented on the appeal in that case—so the animus issue is

open here. *See Eknes-Tucker*, 80 F.4th at 1230 (saying transgender status does not

trigger heightened scrutiny "unless the regulation is a pretext for invidious

discrimination against such individuals, and, here, the district court made no

findings of such a pretext").

### C. *Intermediate scrutiny based on sex*

It is well established that drawing lines based on sex triggers intermediate

scrutiny. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Adams v.*

*St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc). If one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020); *Adams*, 57 F.4th at 801. The defendants do not deny this; instead, they say the challenged statute does not draw a line based on sex.

But it does. Consider an adolescent, perhaps age 16, that a physician wishes to treat with testosterone. Under the challenged statute, is the treatment legal or illegal? To know the answer, one must know the adolescent's sex. If the adolescent is a natal male, the treatment is legal. If the adolescent is a natal female, the treatment is illegal. This is a line drawn on the basis of sex, plain and simple. *See Brandt*, 47 F.4th at 669 ("Because the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law, [the law] discriminates on the basis of sex."); *Adams*, 57 F.4th at 801 (applying intermediate scrutiny to a policy under which entry into a designated bathroom was legal or not depending on the entrant's natal sex).

In asserting the contrary, the defendants note that the reason for the treatment—the diagnosis—is different for the natal male and natal female. Indeed it is. But this does not change the fact that this is differential treatment based on sex. The *reason* for sex-based differential treatment is the purported *justification* for treating the natal male and natal female differently—the justification that must

survive intermediate scrutiny. One can survive—but cannot avoid—intermediate scrutiny by saying there is a good reason for treating males and females differently.

Or so this order would hold absent *Eknes-Tucker*.

### D. Intermediate scrutiny based on gender nonconformity

Drawing a line based on gender nonconformity—this includes transgender status—also triggers intermediate scrutiny. In *Glenn v. Brumby*, 663 F.3d 1313 (11th Cir. 2011), the transgender plaintiff, like the plaintiffs in the case at bar, asserted an equal-protection claim. The Eleventh Circuit upheld a judgment for the plaintiff. After citing Supreme Court cases applying intermediate scrutiny to cases alleging discrimination based on sex, the Eleventh Circuit said this: "The question here is whether discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause. For the reasons discussed below, we hold that it does." *Id.* at 1316.

The statute and rules at issue here treat the plaintiffs and class members differently because of their gender identity—because they do not conform to their natal sex. In *Eknes-Tucker*, the court said *Glenn* was different because it dealt with employment, not medical care, but the court did not explain why that affected the level of scrutiny, rather than the separate question of whether the treatment at issue survived the appropriate scrutiny. Saying the differential treatment is appropriate, so no heightened scrutiny, has the cart before the horse.

The defendants say this is differential treatment based on diagnosis, not based on transgender status, but that is just semantics. *See, e.g.*, *Lange*, 101 F.4th at 799 (stating that a health plan's blanket denial of coverage for gender-affirming surgery—surgery sought only by plan participants who are transgender—"denies health care coverage based on transgender status"); *Kadel*, 100 F.4th at 144–49 (noting that in this context, the diagnosis of gender dysphoria is a proxy for transgender status). Here, as in *Lange* and *Kadel*, the prohibition of gender-affirming care is based on transgender status.

To confirm this, consider a child that a physician wishes to treat with GnRH agonists to delay the onset of puberty. Is the treatment legal or illegal? To know the answer, one must know whether the child is cisgender or transgender. The treatment is legal if the child is cisgender but illegal if the child is transgender, because the statute prohibits GnRH agonists only for transgender children, not for anyone else. The theoretical but remote-to-the-point-of-nonexistent possibility that a child will be identified as transgender before needing GnRH agonists for the treatment of central precocious puberty does not change the essential nature of the distinction—the distinction, that is, between cisgender and transgender patients.

Or so this order would hold absent *Eknes-Tucker*.

### E.  Heightened scrutiny under Carolene Products

Adverse treatment of transgender individuals also triggers heightened

scrutiny under *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4

(1938). There the Court said heightened scrutiny might be appropriate for statutes

showing "prejudice against discrete and insular minorities." Courts have continued

to apply the discrete-and-insular-minority construct. *See, e.g.*, *Foley v. Connelie*,

435 U.S. 291, 294–95 (1978) (citing *Carolene Products* and noting that "close

scrutiny" applies to equal-protection claims of resident aliens, who lack access to

the political process); *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019)

(citing *Carolene Products*; recognizing that, under *Foley*, heightened scrutiny

applies to resident aliens; but declining to afford the same treatment to illegal

immigrants). Transgender individuals are a discrete and insular minority.

The Supreme Court further explained this basis for heightened scrutiny in

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447–50 (1985). There

the Court declined to extend strict or even intermediate scrutiny to intellectually

disabled individuals—those with very limited mental ability. But the Court gave

two explanations that support a different result for transgender individuals.

First, *City of Cleburne* noted that strict scrutiny applies when the

characteristic at issue is almost never a legitimate reason for governmental action.

Race is the paradigm—leaving aside affirmative action as a remedy for prior

discrimination, it is almost never appropriate to parcel out government benefits or burdens based on race. Transgender status is much the same. Transgender status is rarely an appropriate basis on which to parcel out government benefits or burdens.

Second, *Carolene Products* and *Foley* both referred to a minority's lack of political voice as a basis for heightened scrutiny. *City of Cleburne* noted that the class of intellectually disabled individuals had garnered considerable public and political support—that this was not a class lacking political access. The same is not true of transgender individuals, who continue to suffer widespread private opprobrium and governmental discrimination, notably in the statute and rules now under review. This is precisely the kind of government action, targeted at a discrete and insular minority, for which heightened scrutiny is appropriate. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020) (holding transgenders are a quasi-suspect class); *Karnoski v. Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (same). *But see Eknes-Tucker*, 80 F.4th at 1230 (expressing grave doubt that transgenders are a quasi-suspect class); *Adams*, 57 F.4th at 803 n.5 (same).

In any event, *City of Cleburne* is important for another reason, too. The Court applied rational-basis scrutiny, but it was *meaningful* rational-basis scrutiny. The Court did not blindly accept a proffered reason for the city's action that did not withstand meaningful analysis. The defendants' proffered reasons here, like those in *City of Cleburne*, do not withstand meaningful analysis.

The *Carolene Products* construct calls for heightened scrutiny here. Or so this order would hold absent *Eknes-Tucker*.

### F.  Cases involving identical, not different, treatment of classes

In opposing heightened scrutiny on these grounds, the defendants cite *Geduldig v. Aiello*, 417 U.S. 484 (1974), for the proposition that heightened scrutiny does not apply when there are members of the allegedly disfavored class on both sides of the challenged classification. *Geduldig* held that exclusion of pregnancy from state employees' health coverage was not sex discrimination. Some women become pregnant, some do not. The defendants say this is why the challenged provision did not discriminate based on sex—there were women on both sides. Note, though, that men and women were treated the same: nobody had health coverage for pregnancy. When men and women are treated the same, the Court reasoned, it is not intentional sex discrimination, even if the challenged provision has a disparate impact.

The situation is different here. Transgender and cisgender individuals are not treated the same. Cisgender individuals can be and routinely are treated with GnRH agonists, testosterone, or estrogen, when they and their doctors deem it appropriate. Not so for transgender individuals—the challenged statute and rules prohibit it. To know whether treatment with any of these medications is legal, one

must know whether the patient is transgender. And to know whether treatment with testosterone or estrogen is legal, one must know the patient's natal sex.

This is differential treatment based on sex and transgender status. *Geduldig* is not to the contrary. *See Kadel v. Folwell*, 100 F.4th 122, 145–47 (4th Cir. 2024). Intermediate scrutiny applies on this basis, or so this order would hold absent *Eknes-Tucker*.

## G. Heightened scrutiny based on animus

Separate and apart from the analysis to this point, invidious discriminatory purpose—actual animus against a disfavored group—can also trigger heightened scrutiny. Recent Eleventh Circuit transgender decisions recognize this. *See Eknes-Tucker*, 80 F.4th at 1230; *Adams*, 57 F.4th at 810 (recognizing that an otherwise neutral law with a disparate impact violates the Equal Protection Clause when it is "motivated by 'purposeful discrimination'") (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)); *see also Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321–22 (11th Cir. 2021).

There was no showing of animus in *Eknes-Tucker* or *Adams*. But there is substantial evidence of animus in the adoption of the statute and rules at issue here.

### 1. Framing the issue

Statutes come to federal court with a "presumption of legislative good faith." *League of Women Voters of Fla., Inc. v. Florida*, 66 F.4th 905, 923 (11th Cir.

2023) (quoting *Abbott v. Perez*, 585 U.S. 579, 603 (2018)). Proper respect for the legislative role requires courts to give broad deference to legislative decision-making. But "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

In *Arlington Heights*, the plaintiffs challenged a zoning decision under the Equal Protection Clause based on the decision's racially disparate impact. The Court held that disparate impact alone is not enough—that to prevail on an equal-protection challenge to a facially neutral, otherwise-rational decision, a plaintiff must show that invidious discriminatory purpose was at least "a" motivating factor in the decision. *Id*. at 266. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*.

The Court mentioned several circumstances that could be considered. The Court explicitly said this was not an "exhaustive" list, *id*. at 268, but through the years the circumstances that were mentioned have come to be known as the *Arlington Heights* factors, as if they somehow should dominate the analysis. Not so. What is required, instead, is a "sensitive inquiry" into all the relevant circumstances—those that line up with the categories mentioned in *Arlington*

*Heights* and other relevant circumstances even if not mentioned there. It is not as easy as going down a checklist and adding up the score.

Rarely does a challenged statute or administrative decision explicitly target the disfavored group. In a typical employment case, the issue might be whether the employer adopted a facially neutral hiring practice to reduce the number of successful minority applicants. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229 (1976). In a typical voting-rights case, the issue might be whether a legislature adopted a facially neutral voting procedure to reduce minority voting. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Florida*, 66 F.4th 904 (11th Cir. 2023). In cases like these, the issue is whether a discriminatory purpose motivated the facially neutral decision.

This case is different. There is no facially neutral decision. This statute and these rules explicitly apply only to transgenders. If the proper inquiry was only whether the Legislature and Boards acted with a purpose to ban or restrict treatment of transgenders, the answer would be obvious: they did. The statute and rules single out or "target" transgenders, at least in the nonpejorative sense of that word.

The defendants say the Legislature acted not to target transgenders but only to regulate specific medical procedures. That is akin to saying that prior to *Brown v. Board of Education*, state legislatures acted not to target African Americans but

only to regulate schools—and that this was not purposeful discrimination because all students, black and white equally, were required to go to school with students of their same race. *See Kadel v. Folwell*, 100 F.4th 122, 147–48 (4th Cir. 2024). One does not need the *Arlington Heights* factors to discern whether this statute and these rules single out transgenders. They plainly do.

This frames the issue but does not resolve it. The relevant inquiry is not whether the decisionmakers targeted transgenders but *why* they targeted transgenders in this way. Did legislators and Board members act from animus against transgenders, or did they act from a belief—whether or not correct—that the treatments at issue are harmful, should be banned for minors, and should be prescribed with greater care for adults?

So which was it? There is evidence on each side.

It bears repeating: for this purpose, animus against transgenders includes not only bias of the kind sometimes directed at racial or ethnic minorities or women but also a belief that transgenders should not exist at all—or should not be allowed to pursue their transgender identities. The defendants have admitted this, acknowledging that preventing or impeding individuals from pursuing transgender identities is not a legitimate, nondiscriminatory state interest.[83]

---

[83] *See supra* notes 4–6.

### *2. Evidence of animus motivating the statute*

Some legislators plainly acted from old-fashioned discriminatory animus. A House member, for example, loudly referred to transgender witnesses at a committee hearing on a related bill as "mutants" and "demons."[84] This is direct evidence of that member's animus. And it is unlikely he would have made a public statement of this kind, knowing it was being recorded for inclusion in the legislative history, if he did not believe at least some other legislators would share his view. Others who voted for the bill were present; none called him out.[85] Any

---

[84] *Hearing on Facility Requirements Based on Sex*, CS/HB 1521 2023 Session (Fla. Apr. 10, 2023), <https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8804> (time stamp 2:30:35 to 2:34:10). The legislator said to transgender Florida citizens who spoke at the hearing that they were "mutants living among us on Planet Earth." He raised his voice and said, "[T]his is Planet Earth, where God created men, male and women, female!" He continued: "[T]he Lord rebuke you Satan and all of your demons and imps that come parade before us. That's right I called you demons and imps who come and parade before us and pretend that you are part of this world." Finally, he said, you can "take [him] on" but he "promises [he] will win every time."

[85] *See id*. 2:34:11 to 2:41:54. A legislator who voted *against* the bill said she disagreed with the comment. *Id.* at 2:34:14 to 2:36:12. A legislator who voted in favor quoted scripture and said he wished to recognize the humanity of everyone. *Id.* at 2:36:16 to 2:37:55. A room full of legislators, a majority of whom voted for the bill, just let the hateful comments pass. *See id*. at 2:34:11 to 2:41:54; *see also CS/SB 254 Vote History* 2023 Session (Fla. May 5, 2023), available at https://www.flsenate.gov/Session/Bill/2023/254/Vote/HouseVote_s00254e1482.PDF (indicating which legislators voted for and against SB 254, the bill that was enacted).

suggestion that animus of this kind did not motivate at least some legislators blinks reality.

Other House members, the Governor, and the Surgeon General have said there is no such thing as transgender identity—that transgender identity is just ideological or made up or wokeism.[86] Thus, for example, the sponsors of House Bill 1421—the House version of the Senate bill that was ultimately enacted—made these statements:

> "I can say I'm a porcupine, but that doesn't make it so."[87]

> "[W]e believe in science, and we believe in biology. And there are X chromosomes and there are Y chromosomes, and what you're born . . . with is what science said you are. And so you don't get to play 'choose your own adventure' and change it."[88]

> "[W]e cannot speak something into existence that doesn't exist. We cannot change our sex."[89]

> "[T]he ultimate gender affirming care" would be to tell children they are "creatures of God, made in his image, that they were made the way they are, and there's absolutely nothing wrong with it. God doesn't make mistakes."[90]

---

[86] *See, e.g.*, Pls.' Ex. 30, ECF No. 178-8 at 36 (House of Representatives bill sponsor); Pls.' Ex. 36, ECF No. 179-5 at 17–18 (member of House of Representatives); Pls.' Ex. 57, ECF No. 181-7 at 6 (Governor); Pls.' Ex. 50, ECF No. 180-10 at 14–15 (Governor's talking points); Pls.' Ex. 15, ECF No. 177-5 (Surgeon General); Pls.' Ex. 69, ECF No. 182-9 at 3 (Surgeon General).
[87] Pls.' Ex. 116, ECF No. 186-1 at 2.
[88] Pls.' Ex. 35, ECF No. 179-4 at 54.
[89] Pls.' Ex. 38, ECF No. 179-7 at 17.
[90] Pls.' Ex. 36, ECF No. 179-5 at 45.

These statements make clear that the sponsors' purpose, at least in part, was to prevent individuals from pursuing their transgender identities. Nobody who voted for the bill expressed disagreement or called the sponsors out.

One of the sponsors also said the "truth is there's no such thing as someone being able to change their sex."[91] This completely misunderstands gender identity and shows, quite accurately, that the sponsor does not believe gender identity is real. Consistent with this view, he said transgenderism is not a medical issue but a deterioration of our culture: "there's evil in our society."[92]

Another House member said the bill "saves trans people" and "recognizes who they are in the eyes of God."[93] Still another said all people were created "in the image of God, he created them. Male and female, he created them. Folks, this is rock solid, irreversible truth. . . . [Y]ou are either male or female. This is not subject to one's opinion."[94] Nobody who voted for the bill expressed disagreement with these statements or called the speakers out.

All of this is direct evidence—or nearly so—that these legislators acted for the admittedly impermissible purpose of preventing or impeding transgender individuals from adhering to their transgender identities.

---

[91] Pls.' Ex. 30, ECF No. 178-8 at 93.
[92] Pls.' Ex. 36, ECF No. 179-5 at 37.
[93] Pls.' Ex. 30, ECF No. 178-8 at 86.
[94] Pls.' Ex. 36, ECF No. 179-5 at 2.

There have also been statements that, while not direct evidence of
discriminatory motive, are demonstrably false. Affirmative care for transgender
minors, other than counseling, consists primarily of puberty blockers or cross-sex
hormones. Those are the treatments now at issue. Mastectomies have been
performed on minors in other parts of the country and perhaps in Florida—the
record does not confirm or refute this—but are extraordinarily rare and are not
involved in this litigation. At least insofar as has been shown by this record, no
transgender minor has ever been castrated or intentionally sterilized in Florida or
elsewhere.[95] But without any factual basis whatsoever, individuals who had a role
in adoption of this legislation repeatedly asserted the contrary. Nobody who voted
for the bill expressed disagreement or called the speakers out.

Thus, for example, the Governor said gender-affirming care "means
castrating a young boy, you're sterilizing a young girl, and you're doing
mastectomies for these very young girls."[96] He said "we cannot allow people to
make money off mutilating" our children.[97]

A House member said that "allowing child mutilation in the name of
wokeism is child abuse."[98] He said this legislation would end "the castration and

---

[95] Trial Tr., ECF No. 212 at 272–73; *see also* Trial Tr. in *Dekker*, ECF No. 228 at 69.
[96] Pls.' Ex. 57, ECF No. 181-7 at 5.
[97] Pls.' Ex. 28, ECF No. 178-6 at 2.
[98] Pls.' Ex. 116, ECF No. 186-1 at 4.

mutilation of children."[99] And perhaps most remarkably—demonstrating just how frenzied the rhetoric could become—another House member said this: "[W]e're talking about taking little children and they put them to sleep on a gurney. They cut off their breasts. They sever their genitalia. They throw them in the trash."[100] Probably about as far removed from reality as any statement by any legislator ever. Nobody who voted for the bill expressed disagreement or called these speakers out.

After the bill was signed into law, one of the sponsors quoted above added another statement: "Just got a media call for comment on people leaving FL because of my bill making child castration illegal. My reply? *Good riddance.* Take your evil elsewhere. I hear they love mutilating kids in the woke paradise of CA."[101] After entry of the preliminary injunction in this case, the sponsor said he would not stop fighting to defend children from "wokeist" judges "who support child castration and mutilation."[102]

In closing argument, the defendants, through their attorney, admitted that there was absolutely no factual basis for these remarks—that the record included no evidence that any Florida child had ever been castrated or mutilated, that the plaintiffs asserted no right to be so treated, and that the preliminary injunction did

---

[99] Pls.' Ex. 36, ECF No. 179-5 at 2.
[100] *Id.* at 21.
[101] Pls.' Ex. 116, ECF No. 186-1 at 9 (emphasis added).
[102] *Id.* at 10.

not address surgery at all.[103] The sponsor just made it up.

And even if was true, this would provide no support for a ban on puberty blockers or cross-sex hormones—the treatments at issue in this case.

Perhaps all this talk about castration and mutilation is just political hyperbole. But it casts at least some doubt on the assertion that these decisionmakers' motivation was sound regulation of medical care in the best interest of transgender patients rather than outright disapproval of transgender identity. And the "good riddance" comment is direct evidence of old-fashioned discriminatory animus against transgenders. In any event, if there was really a case to be made on the merits, why not make it on the merits, based on the actual facts?

In sum, it is clear that anti-transgender animus motivated bill sponsors and at least a significant number of legislators.

### 3. Evidence of other motivations for the statute

The statements showing anti-transgender bias were not the only statements by legislators addressing this subject. At a committee hearing, a minor from another state gave comments indicating she received gender-affirming care and a mastectomy, without meeting the prerequisites to such care under the Endocrine Society and WPATH guidelines.[104] Her comments showed that gender-affirming

---

[103] Trial Tr., ECF No. 212 at 272.
[104] *See* Pls.' Ex. 27, ECF No. 178-5 at 41–53.

care of the kind at issue for minors can—and at least in this one instance did—go terribly wrong and cause substantial harm. The comments provided a legitimate, nondiscriminatory basis for restricting the availability of gender-affirming care for minors. Restricting it, but not banning it across the board for everybody.

Several professionals provided comments at the same hearing. Perhaps only one, Dr. Stephen B. Levine, could meet the standards that would apply to testimony on this subject in court under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–593 (1993). His comments, while not denying that gender-affirming care can be beneficial, rebutted a number of arguments supporting this care and suggested a need to restrict its use.[105]

Legislators also referred to a deeply flawed, bias-driven report generated by the Florida Agency for Health Care Administration at the urging of the Executive Office of the Governor—a report that reached the predetermined conclusion that gender-affirming care for minors was experimental and so not covered by Medicaid. *See Dekker v. Weida*, 679 F. Supp. 3d 1271, 1281 (N.D. Fla. 2023). The report purportedly addressed—though in fact it reached a conclusion not supported by—generally accepted professional medical standards, and so it was known as a "GAPMS report."[106]

---

[105] *See id.* at 34–39.
[106] *See id.* I adopt the *Dekker* findings of fact by reference.

In the absence of further information or study—that is, without learning the actual facts—a legislator could rely on some of the information provided in committee hearings and the GAPMS report to conclude, contrary to the position of the American Academy of Pediatrics and every other reputable professional medical association that has taken a position on the issue, that gender-affirming care is experimental—perhaps even that it should be prohibited altogether for minors. Some legislators cited the report either explicitly or in substance as a basis for the provisions now at issue.

In sum, it is clear that anti-transgender animus was not the only factor that motivated at least a significant number of legislators.

### 4. Did animus motivate enough statutory decisionmakers?

That this statute was the product of mixed motives, including both constitutionally impermissible animus and the constitutionally legitimate goal of regulating medical care, does not settle the issue of the statute's constitutionality or even the issue of whether heightened scrutiny applies. The next question is whether enough decisionmakers were impermissibly motivated.

The burden of proving animus is on the plaintiffs. Is it enough to show a significant number of legislators acted from animus, or must the plaintiffs show a majority of one or both houses or perhaps even the Governor were so motivated?

The underlying theory is that a showing of impermissible motive undermines the presumption of good faith ordinarily afforded legislation. In *Arlington Heights*, the Supreme Court noted the deference ordinarily afforded legislators but added that when "a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265–66. The Court emphasized that discriminatory purpose need only be "a" motivating factor—not the only motivating factor. *Id.* at 265; *see also Jean v. Nelson*, 711 F.2d 1455, 1485 (11th Cir. 1983) ("Plaintiffs need not prove a discriminatory purpose was the primary, or dominant purpose, but must show that the action taken was, at least in part, because of and not merely in spite of its adverse effects upon an identifiable group.") (cleaned up).

This suggests a plaintiff meets the burden by showing a significant number of legislators in either house—not necessarily a majority in both houses, and not necessarily the Governor—were impermissibly motivated. On this view, a factor that motivates a significant number of legislators is "a" motivating factor within the meaning of *Arlington Heights*. And this view is consistent with binding decisions that have found impermissible motivation.

In *Hunter v. Underwood*, 471 U.S. 222 (1985), for example, the Supreme Court found impermissible motivation in a 1901 Alabama constitutional convention despite the obvious unavailability of direct evidence that a majority—

as opposed to a significant number—of delegates were so motivated. In *Romer v. Evans*, 517 U.S. 620, 623, 634–36 (1996), the Supreme Court found impermissible motivation in a statewide referendum that targeted gays despite the obvious unavailability of direct evidence that a majority of voters were so motivated.

This record includes overwhelming evidence that the House sponsors and a significant number of other House members were motivated by anti-transgender animus. This is clear from their own animus-based statements and from the failure of other members to call them out. While the issue is closer, the record also shows, by the greater weight of the evidence, that a majority of legislators in both houses and the Governor were so motivated, at least in part.

Perhaps the best evidence of this is another statute passed on the very same day as the statute at issue here. Florida Statutes § 1000.071(1) declares it the "policy" of every Florida public school from kindergarten through twelfth grade that "a person's sex is an immutable biological trait and that it is false to ascribe to a person a pronoun that does not correspond to such person's [natal] sex." Under Florida Statutes § 1000.071(3), an "employee or contractor of a public K-12 educational institution may not provide to a student his or her preferred personal title or pronouns if such preferred personal title or pronouns do not correspond to his or her [natal] sex." So a high school teacher, for example, who has lived and been known as a woman, but who, unbeknownst to her students or others at the

school, is a natal male, must be called "Mr.," not "Ms." The only possible purpose for a legislative mandate outing such a teacher is animus against transgenders. A majority of both houses and the Governor signed off.

The plaintiffs have shown that animus motivated a sufficient number of statutory decisionmakers.

### 5. *Animus motivating the rules*

Before adoption of the statute, the Governor and Surgeon General initiated a process that led to adoption of the rules at issue by the Florida Boards of Medicine and Osteopathic Medicine. From the outset, the Surgeon General manifested his opposition to transgender identity—not just to gender-affirming care—by insisting that even social transitioning should not be allowed.[107] For their part, the Boards departed from their usual procedures, orchestrated public hearings, and single-mindedly pursued the predetermined outcome sought by the Governor and Surgeon General.

A brief chronology is this. On the day the new GAPMS report was issued, the Surgeon General sent a letter to the Boards requesting that they establish a standard of care for gender-affirming treatment. He asserted the "current standards set by numerous professional organizations appear to follow a preferred political

---

[107] *See* Defs.' Ex. 5 in *Dekker*, ECF No. 193-5.

ideology."[108] When the letter was not enough, the Surgeon General petitioned the Boards to initiate rulemaking to ban gender-affirming care for minors and mandate informed-consent forms for adults.[109] He appeared in person at Board meetings to present the petition.[110] As the Department of Health's general counsel acknowledged, all this was a departure from the usual procedure.[111] So far as this record reflects, rulemaking had never been initiated this way.

The Boards nonetheless initiated rulemaking as requested. Through their executive directors and at least one Board member, they arranged for speakers to oppose gender-affirming care at the required public hearings—another departure from usual procedure.[112] A proposal to allow gender-affirming care as part of clinical studies at research institutions was removed at the request of the Department of Health's general counsel.[113]

The Boards imposed requirements that have no medical justification and were plainly intended to prevent or impede patients from receiving gender-affirming care. The requirements included unnecessary x-rays and DEXA scans,

---

[108] Pls.' Ex. 15, ECF No. 177-5.
[109] Pls.' Ex. 16, ECF No. 177-6.
[110] Pls.' Ex. 23, ECF No. 178-1 at 11.
[111] *Id*. at 17-18.
[112] *See, e.g.*, Pls.' Ex. 42, ECF No. 179-11 at 1–2, 6–8; Pls.' Ex. 49; ECF No. 180-9; Pls.' Ex. 51; ECF No. 181-1; Pls.' Ex. 53; ECF No. 181-3; Pls.' Ex. 54; ECF No. 181-4; Pls.' Ex 55, ECF No. 181-5.
[113] Trial Tr., ECF No. 212 at 96.

follow-up services and labs more often than medically indicated, and limitations on who can provide services.[114]

The clearest evidence of the Boards' animus—of a goal to prevent or impede individuals from pursuing their transgender identities—comes from the consent forms the Boards promulgated on an emergency basis after adoption of the statute. Emergency rules ordinarily remain in effect for no more than six months,[115] but this statute abrogates the time limit,[116] and these consent forms are still in place many months later. The forms are untrue and misleading in substantial respects, omit any discussion of benefits, address not only risks of treatments a patient will receive but also of treatments the patient will *not* receive, include incomprehensible provisions no patient could be expected to understand, and are plainly intended to dissuade patients from obtaining gender-affirming care, not to ensure that patients are fully informed of the relevant risks and benefits.[117]

There are six forms, three for adults and three for minors. The adult forms address masculinizing medications, feminizing medications, and surgery. The

---

[114] *See infra* § VIII.2.b.–e.
[115] Fla. Stat. § 120.54(4)(c).
[116] Fla. Stat. § 456.52(6)(b).
[117] Six experts testified on this. *See* Trial Tr., ECF No. 206 at 124–43 (Dr. Janssen); *id.* at 169–82 (Dr. Shumer); *id.* at 213–19 (Dr. Karasic); Trial Tr., ECF No. 207 at 44–46 (Dr. Schechter); *id.* at 72–77 (Dr. Goodman); *id.* at 162–77 (Dr. Bruggeman). I credit their testimony.

minor forms address puberty blockers, masculinizing medications, and feminizing medications.

All the forms have similar flaws. The adult feminizing form is typical. It provides no information on benefits, even though the principal drafter—a Board member—started with an existing form that had a section on benefits. The member had no explanation for deleting this section; she testified she could not remember doing it.[118] In any event, after an introduction, the form makes clear its disapproval of the proposed treatment:

> Medical treatment of people with gender dysphoria is based on *very limited, poor-quality research* with *only subtle improvements* seen in some patient[s'] psychological functioning in some, but not all, research studies. This practice is *purely speculative*, and the possible psychological benefits may not outweigh the substantial risks of medical treatments and, in many cases, the need for *lifelong medical treatments*.[119]

An appropriate informed-consent process is honest, open, and intended to convey accurate information so that the patient can make a fully informed, voluntary decision.[120] The process should not be an effort to push the patient to the physician's viewpoint—or to the state's. But this mandatory form is an advocacy

---

[118] *See* Trial Tr., ECF No. 212 at 99.

[119] Def. Ex. 6, ECF No. 175-6 at 1 (emphasis added); *see also* Defs.' Ex. 2–5 & 7, ECF Nos. 175-2 at 1, 175-3 at 1, 175-4 at 1, 175-5 at 1, & 175-7 at 1.

[120] Trial Tr., ECF No. 207 at 63–65 (testimony of Dr. Kenneth Goodman). I credit the testimony.

document—the very antithesis of what an informed-consent process should be.[121]

If "many" patients develop a "need for lifelong medical treatments," the consent form does not explain it, nor does this record. More importantly, while there is research that some would characterize as very limited and of poor quality, there is also widespread clinical experience. There are well-established standards of care and a consensus among all the reputable medical associations with relevant expertise. The consent form omits any reference to this. No honest informed-consent process would tell only one side of the story.

Moreover, this form will, by definition, be presented by a physician who has determined this care may be appropriate, to a patient who has decided at least tentatively that she may wish to proceed. Requiring the physician to present this one-sided view, while omitting any reference to clinical experience and the widely accepted standards of care, is more likely to undermine than to contribute to a proper informed-consent process. And it is likely to interfere with, not promote, the healthy physician-patient relationship that is critical to the informed-consent process.[122]

To be sure, ten pages later, perhaps in an effort to avoid the obvious First Amendment issue inherent in compelling physicians to speak words they do not

---

[121] *See id.* at 65 (informed consent should ensure no one is "beguiled" or "coerced"); *see also id.* at 46, 163–65; Trial Tr., ECF No. 206 at 124–25, 169–70.
[122] *See* Trial Tr., ECF No. 207 at 164; Trial Tr., ECF No. 206 at 170.

believe, the form includes this statement: "This form contains information required to be disclosed to you by Florida law and does not necessarily reflect the views or opinions of your physician."[123] This makes it worse, not better, suggesting, accurately as it turns out, that the State of Florida does not trust the physician to tell the patient the truth.[124]

The consent form also includes other untrue or misleading statements. The form flatly asserts, without qualification, that "[u]se of these medications," estrogen, for example, "does not have U.S. Food and Drug Administration (FDA) approval."[125] That is simply false. The FDA has approved the medications; otherwise their use would be illegal.

The form continues by saying use of the medications to treat gender dysphoria is "considered 'off label' because they are not being used for their intended purpose."[126] The form does not explain that off-label use is commonplace across all fields of medical practice and that the safety of the medications themselves—if not their efficacy in treating gender dysphoria—is well established.

---

[123] *See, e.g.*, Defs.' Ex. 6, ECF No. 175-6 at 11 (adult, feminizing hormone form); *see also* Defs.' Exs. 2–5 & 7 (same language in other forms).
[124] Trial Tr., ECF No. 207 at 164.
[125] Defs.' Ex. 6, ECF No. 175-6 at 1.
[126] *Id.*

Remarkably, the form includes a paragraph on cyproterone acetate, described as "a synthetic progestogen with strong antiandrogen activity."[127] Troubling effects are noted, including tumors and hepatitis. But this medicine is not used or even available in the United States;[128] the chance is precisely zero that any Florida physician intends to prescribe this medicine for any Florida patient and so needs the patient's informed consent. The defendants have offered no plausible explanation of how this paragraph came to be included in the form or what legitimate purpose it could plausibly serve. Inclusion of this paragraph in this form could have no purpose other than to discourage patients from proceeding with gender-affirming care.

The form includes paragraphs on other medicines that might or might not be prescribed for a given patient and that are written in language that, while perhaps suitable for a medical text, are surely impenetrable for most lay people. In addition, the form tells patients they must be under the care of a "licensed mental health care professional while undergoing treatment," even though there is no such requirement.[129] The form says that to qualify for hormone treatment, the patient must "[d]emonstrate knowledge and understand the risks, benefits, and outcomes" not only of that treatment but also of "sex reassignment surgery," whether or not

---

[127] *Id.* at 2.
[128] Trial Tr., ECF No. 206 at 181.
[129] Defs.' Ex. 6, ECF No. 175-6 at 2.

the patient has any interest in such surgery.[130] The form says the patient must "have explored reproductive options," even if, for example, the patient has had a vasectomy and does not wish to have children. The defendants have offered no defense of these provisions and no explanation for eschewing an informed-consent process tailored to the needs of a specific patient.

The form tells patients that a "range of preventive health activities are necessary" to remain healthy, including "regular STI screening" and "HIV prevention," both "depending on my level of risk."[131]

The adult masculinizing form has analogous provisions. An example of its impenetrable language is this:

> Finasteride is a treatment option for individuals experiencing bothersome alopecia resulting from higher dihydrotestosterone levels. The administration of 5α-reductase inhibitors block the conversion of testosterone to the more potent androgen dihydrotestosterone. The FDA approved indications of finasteride administration include benign prostatic hypertrophy and androgenetic alopecia. The use of 5α-reductase inhibitors may impair clitoral growth and the development of facial and body hair. Future studies are needed to assess the efficacy and safety of 5α-reductase inhibitors in treatment for gender dysphoria.[132]

Five pages later, the form says finasteride "may be an appropriate treatment option in individuals experiencing bothersome alopecia resulting from testosterone

---

[130] *Id.* at 4.
[131] *Id.* at 10.
[132] Defs.' Ex. 2, ECF No. 175-2 at 2.

treatment." The form lists side effects and says finasteride "is not approved by the FDA for use in biological women."[133] A patient reading the quoted paragraph would find it difficult to parse, and it is unclear why informed consent to hormone treatment should include a complex discussion of a different treatment the person is unlikely to receive for a side effect the person is unlikely to suffer. The purpose of this paragraph could only be to dissuade a person from pursuing gender-affirming care.

The forms for minors fare no better. They, too, are plainly designed to discourage gender-affirming care, not to provide accurate information.

The indicia of bias in the forms are not limited to their indefensible substance. At least insofar as shown by this record, the format is unlike any consent form required for anything else, save only another ideologically unacceptable treatment: medical marijuana.[134] Not only must the patient—and for minors, the parent—sign the relevant form, but they must initial the form at least 35 times. Many of the statements that must be initialed will be completely inapplicable to a given patient. The Boards could not make their position any clearer if they required each patient to sign a form saying, "I understand the State of Florida thinks this is a really bad idea."

---

[133] *Id*. at 7.
[134] *See* Defs.' Ex. 8, ECF No. 175-8.

In sum, the forms were motivated by anti-transgender animus. The same animus motivated all the Boards' transgender rules.

### 6. *Same-decision defense*

Even when, as here, animus motivated the decisionmakers, the inquiry is not at an end. A defendant may prevail on an animus-based equal-protection claim by showing the decisionmakers would have made the same decision anyway, without regard to the animus. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *Thompson v. Sec'y of State for Ala.*, 65 F.4th 1288, 1297 (11th Cir. 2023). This same-decision defense originated in a First Amendment case, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), but, as cases like *Hunter* and *Thompson* make clear, the defense also applies in equal-protection cases of this kind.

The burden to plead and prove the same-decision defense is on the defendant. *See, e.g.*, *Hunter*, 471 U.S. at 228; *see also Stanley v. City of Dalton*, 219 F.3d 1280, 1292 (11th Cir. 2000) (recognizing that *Mt. Healthy* is an affirmative defense); Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."). Here, the defendants did not plead the same-decision defense in their answers. They have not cited *Mt. Healthy* or the equal-protection cases applying *Mt. Healthy*. One could reasonably conclude the defendants have forfeited the issue.

The third amended complaint plainly alleged the Legislature and Boards acted from an improper purpose. So the defendants were on notice of the issue. But the plaintiffs' focus, prior to the Eleventh Circuit's decision in *Eknes-Tucker*, was on the other grounds for applying heightened scrutiny, not actual animus. Not surprisingly, then, the defendants' focus, too, was on those other grounds and on whether the statute and rules could survive the scrutiny. The defendants asserted, as they have throughout, that there were legitimate, nondiscriminatory grounds for the statute and rules.

Despite this focus, the defendants should have pled the same-decision defense if they intended to invoke it. Defenses have been forfeited for less. Even so, the defendants did not completely ignore the issue. They asserted in their trial brief, albeit without citations or elaboration, that the statute and rules would have been adopted anyway, "regardless of any purported malintent."[135] That the defendants took this position could hardly have surprised the plaintiffs.

This order does not hold the defense forfeited. The trial would have proceeded precisely as it did, with precisely the same evidence, had the defendants pled and briefed the same-decision defense. Both sides would be in the same place today. Given the lack of prejudice to the plaintiffs and the importance of the issue,

---

[135] ECF No. 190 at 35.

the better course is to address the same-decision issue on the merits. Amending the answer to assert this as an affirmative defense is not necessary—but if it were deemed necessary, leave to amend would be granted, as would be permissible even now, after the trial.

The defendants have not carried the burden of proof on this issue. A significant number of legislators—more likely than not a majority—were motivated in part by animus. Had there been no animus, gender-affirming care probably would not have come before the Legislature at all. But once the issue came up, a significant number of legislators—more likely than not a majority—were also motivated by their desire to ensure that patients receive only proper medical care. The same is true of Board members: but for animus, gender-affirming care would not have been addressed at all, but once the issue came up, both animus and the legitimate goal of ensuring proper care played a part.

Even if the legitimate goal motivated a majority, the defendants have not shown that a majority, if not motivated also by anti-transgender animus, would have made the same decision—would have voted to ban gender-affirming care across the board for all minors, without regard to their own circumstances, without regard to the views of their own parents and treating professionals, and contrary to the widely accepted professional standards of care. It is more likely than not that a majority of unbiased legislators or Board members would have agreed instead with

the many professional associations who have concluded, based on the existing research and extensive clinical experience, that in some circumstances, with adequate screening by a multidisciplinary team, gender-affirming care can be appropriate.

As *Arlington Heights* makes clear, a factor in the analysis can be the availability of less restrictive alternatives. If the Legislature or Boards truly believed gender-affirming care was being or might be provided improperly in Florida—despite the absence of complaints and despite the state's inability, even now, to find a single adversely affected Florida patient—the Legislature and Boards could have restricted the care without banning it. The Legislature could, for example, have limited care for minors to suitable facilities, perhaps those at the University of Florida, the University of Miami, or Johns Hopkins. Or the Legislature could have allowed such care only as part of a properly conducted clinical trial—a possibility that was proposed in the rulemaking process but rejected on a divided vote.[136] The Legislature or Boards could have established prerequisites to gender-affirming care, perhaps like those suggested by Dr. Levine. A majority of unbiased legislators and Board members likely would have concluded there was no legitimate reason to ban gender-affirming care across the board for all minors.

---

[136] *See* Pl.'s Ex. 25, ECF No. 178-3 at 29 –31.

The defendants have not shown that the statute and rules would have been adopted anyway, even in the absence of discriminatory animus against transgenders.

### 7. The intersection of animus and the same-decision defense

The animus issue addressed in *Arlington Heights* and the same-decision defense addressed in *Mt. Healthy* work in tandem. If a plaintiff shows animus was a motivating factor in a challenged decision, heightened scrutiny applies. But if the defendant shows it would have made the same decision anyway, without regard to the animus, then the animus drops out of the case.

When the challenged decision is made by the vote of multiple individuals, animus is a motivating factor if it motivated a significant number of those voting yes. A plaintiff need not show that animus motivated a majority. It is the same-decision defense—not the lack of a majority of biased voters—that can take animus out of the case. No Supreme Court or Eleventh Circuit sets it out this cleanly, but *Hunter* and *Romer*, as well as *Arlington Heights* itself, support this view.

Here, it is more likely than not that a majority of members in both houses and the Governor were motivated by animus. So the plaintiffs have carried their burden, even if they were required to show animus motivated a majority of each house and the Governor. Even more clearly, the plaintiffs have shown that the

House sponsors and a significant number of House members were so motivated. The statute could not have been enacted without House approval, so animus motivating a significant number of House members was a motivating factor in the statute's adoption, even if—contrary to the findings set out above—animus did not motivate the Governor or a significant number of senators.

This analysis is not inconsistent with several Eleventh Circuit rulings on constitutional challenges to local decisions. Constitutional challenges to actions of states and local governments are brought under 42 U.S.C. § 1983. A city or other local governmental entity can be held liable under § 1983 for an official's constitutional violation only if the violation was based on the entity's policy or custom or if the official is one whose edicts or acts may fairly be said to represent official policy. *See, e.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The circuit has held that a single board member's improper motivation cannot be attributed to the local entity for this purpose—that a single board member's motivation is not the entity's policy or custom and does not represent official policy. *See Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006); *Mason v. Village of El Portal*, 240 F.3d 1337, 1339–40 (11th Cir. 2001); *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297–98 (11th Cir. 2002). These are applications of *Monell*, not *Arlington Heights*, and cast no doubt on the analysis set out above.

### 8. The Arlington Heights factors

As set out above, *Arlington Heights* "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. The circumstances mentioned there, and those added by intervening Eleventh Circuit decisions, do not comprise an exhaustive list of controlling factors.

The discussion to this point reflects the required sensitive inquiry and could be left as is. This case, after all, involves a line between permissible and impermissible use of medications that is explicitly drawn to address the treatment of transgenders; the issue is not whether, but why, the line is so drawn.

But alas, it is customary to go through the *Arlington Heights* factors. The Eleventh Circuit recently said this:

> We thus summarize the *Arlington Heights* factors as follows: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321–22 (11th Cir. 2021).

These factors squarely favor the plaintiffs.

First, the impact of the challenged law falls only on transgenders. Nobody else.

Second, the historical background is that these treatments were allowed in Florida for many years until the political winds changed. The need for and availability of these treatments did not change, but the level of animus did.

Third, the sequence of events leading to the statute and rules was that the United States Department of Health and Human Services issued guidance on these treatments and this provoked a response from the state.[137] There were no complaints from patients, no adverse results in Florida, just a political issue.

Fourth, there were procedural and substantive departures. Although a prior GAPMS report had approved these treatments and they had long been allowed and indeed covered by the state's Medicaid program, a new GAPMS report was commissioned—an unprecedented departure from the norm.[138] The person who routinely prepares GAPMS reports was bypassed and a new, specially selected person was inserted.[139] The new report reached a substantive conclusion opposite the prior one.[140] This was cited as a basis for the rules, which were proposed and

---

[137] *See* Pl.'s Ex. 14, ECF No. 177-4.
[138] *See Dekker v. Weida*, 679 F. Supp. 3d 1271, 1281 (N.D. Fla. 2023); *see also* Trial Tr. in *Dekker*, ECF No. 227 at 162–201; *see also* Pls.' Ex. 302 in *Dekker*, ECF No. 183-4.
[139] *See* Trial Tr. in *Dekker*, ECF No. 227 at 162–201.
[140] *Dekker*, 679 F. Supp. 3d at 1280–81.

adopted through procedures that were a departure from the norm and indeed unprecedented, at least insofar as shown by this record.[141] The statute and rules reversed the longstanding approval of these treatments. A state of course can change tack and can act to head off problems it believes might occur in the future, even if they have not occurred in the past. *See, e.g.*, *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023). But procedural and substantive departures are an *Arlington Heights* factor, and they were present here in spades.

Fifth, the contemporary statements of key legislators, especially the House sponsors and other members of the House, as well as the Governor, were overtly biased against transgenders.[142]

Sixth, the foreseeability of the effect on transgenders—and only transgenders—was obvious.

Seventh, the legislators and Board members surely knew of the effect on transgenders—and only transgenders.

Eighth, there were readily available less discriminatory alternatives, including rigorous regulation of these treatments or even allowing them only as

---

[141] *See supra* § VIII.G.5 & nn. 107–113.
[142] *See supra* § VIII.G.2.

part of a clinical study at an approved facility. A proposal to allow clinical studies was rejected.

In sum, the *Arlington Heights* factors are not exhaustive or controlling and are poorly suited to a case like this one, where the issue is not whether a facially neutral law was intended to treat a minority adversely but instead whether a law that explicitly treats a minority adversely is nonetheless constitutional. But to the extent the Arlington Heights factors are relevant, they favor the plaintiffs.

Intermediate scrutiny applies.

### H. Applying scrutiny

For the reasons set out in subsections C, D, E, and G above—any one of which would be sufficient standing alone—intermediate scrutiny applies, or, for sections C, D, and perhaps E, would apply absent *Eknes-Tucker*. To survive intermediate scrutiny, a state must show that its classification is substantially related to a sufficiently important, legitimate state interest. *See Adams*, 57 F.4th at 801; *see also Glenn*, 663 F.3d at 1316. The state must show "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (cleaned up) (citing and quoting earlier authorities).

To survive rational-basis scrutiny, a state must show a rational relationship to a legitimate state interest. *Romer*, 517 U.S. at 631.

### 1. *The ban on care for minors*

Safeguarding health, especially of minors, is a legitimate state interest. Measures that substantially promote that interest—in reality, not just in a decisionmaker's unfounded supposition—survive intermediate scrutiny. Measures that are rationally related to achieving that interest—even without evidence that they will actually achieve the intended result—survive rational-basis scrutiny.

Banning gender-affirming care for minors across the board in all circumstances, rather than appropriately regulating such care, is not sufficiently related to the legitimate state interest in safeguarding health. This is care that, in appropriate circumstances and with appropriate screening, accords with well-established professional standards of care embraced by all reputable medical associations with relevant expertise. This is care that, when so provided, produces great benefit and avoids unnecessary suffering. Denying this care will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide.[143]

The ban on care for minors does not survive intermediate scrutiny.

---

[143] *See supra* § VI & n.46.

To be sure, the *Eknes-Tucker* concurring opinion asserted the Alabama ban on gender-affirming care for minors would survive even intermediate scrutiny. But applying intermediate scrutiny requires attention to the actual facts—not just what legislators could believe without factual support. *See Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)). This record is far more extensive than the *Eknes-Tucker* record. And in any event, single-judge concurring opinions are not the law of the circuit.

The order granting a preliminary injunction in this case concluded that the ban on care for minors also fails rational-basis scrutiny. ECF No. 90 at 12, 27. But *Eknes-Tucker* said, based on a different record, that Alabama's analogous ban survived rational-basis scrutiny. This strongly suggests—if it does not mandate a holding—that the Florida ban also survives rational-basis scrutiny. Absent *Eknes-Tucker*, this order would hold to the contrary.

The analysis to this point does not address three other possible goals of banning gender-affirming care. None are legitimate state interests supporting the ban.

First, protecting others from those receiving gender-affirming care is not a legitimate state interest. Gender-affirming care causes no harm to others—no harm to individuals who do not receive the care. Those who are not involved are not involved. So if individual A receives gender-affirming care, it makes no legitimate

difference to individual B, and the state has no legitimate interest in protecting individual B from individual A's receipt of the care. This makes the case unlike *Adams*, which upheld a school's requirement that students use only the bathroom designated for their natal sex. The school decided—correctly, the Eleventh Circuit held—that a transgender individual's presence in a bathroom affects the privacy interests of others. Not so here: gender-affirming care affects no interest of others.

Second, there are some, including the Governor and quite a few members of the Florida Legislature, who believe transgenderism—and thus gender-affirming care—is morally wrong. Enforcing this moral view is not, however, a legitimate state interest that can sustain this statute, even under rational-basis scrutiny. The Supreme Court made this clear in a series of cases addressing gay and lesbian issues. In *Lawrence v. Texas*, 539 U.S. 558 (2003), for example, the Court struck down a statute prohibiting gay sex, saying moral disapproval of the practice was not a basis on which a state legislature could ban it. Justice Scalia dissented but said, "Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause." *Id*. at 582 (Scalia, J., dissenting). He added, "Indeed, we have never held that moral disapproval, without any other asserted state interest, is a sufficient rationale under the Equal Protection Clause to justify a law that discriminates among groups of persons." *Id*. It is even more clear that legislators'

religious views disapproving transgenderism do not provide a legitimate basis for the statute.

Third, whether based on morals, religion, unmoored hatred, or anything else, prohibiting or impeding a person from conforming to the person's gender identity rather than to the person's natal sex is not a legitimate state interest. The defendants have acknowledged this.[144]

### 2. Restrictions on care

The challenged statute and rules do not prohibit gender-affirming care for adults or for minors who were already receiving the same care. The statute and rules do, however, impose restrictions on that care. Unless enjoined, the restrictions will also apply to gender-affirming care available to other minors as a result of this order.

Restrictions on gender-affirming care that comport with the Endocrine Society or WPATH standards pass constitutional muster. The plaintiffs do not assert the contrary. And states are not constrained by those standards; they can impose additional requirements for legitimate purposes, including to improve the quality of care. Here, though, the statute and rules include some requirements that will not improve—indeed, in some instances will diminish—the quality of care.

---

[144] *See supra* notes 4–6.

### a. Physicians only

The statute says gender-affirming care "may not be prescribed, administered, or performed except by a physician." Fla. Stat. § 456.52(3). Read literally, this means APRNs, physician's assistants, and other professionals cannot provide care even under the supervision of a physician. The rules do not include a parallel provision, presumably because the Boards' jurisdiction is limited to physicians.

Patients sometimes receive the drugs at issue—puberty blockers or cross-sex hormones—by injection or orally. The statute apparently means only a physician—not, for example, a nurse in the physician's office—may give a patient such an injection. Worse, the statute may mean that only a physician, not a pharmacist, may fill a prescription. *See* Fla. Stat. § 465.003(2) (stating that, as used in the Florida Pharmacy Act, "'Administration' means the obtaining and giving of a single dose of medicinal drugs by a legally authorized person to a patient for her or his consumption."). It is not clear how some of the drugs at issue could be "administered" at all without a pharmacist in the mix.

More importantly, the requirement for a physician to prescribe the drugs, while unobjectionable for minors, needlessly limits the availability of care for adults. What matters is not the kind of license the provider holds but the training and experience the provider possesses. The Endocrine Society and WPATH standards call for care to be provided only by professionals properly trained in the

treatment of gender dysphoria. Not all physicians meet this threshold, but some APRNs do.

Under Florida law, APRNs may diagnose gender dysphoria. The challenged statute and rules are not to the contrary. Under Florida law, APRNs may prescribe the drugs at issue, but only to treat other conditions. APRNs are prohibited from prescribing these drugs only to treat gender dysphoria. This is not a case like *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955), where the services a professional could provide were limited across the board, not just for one category of patients, as here.

It is more likely than not that the Legislature, even if not motivated by animus, would have provided that only physicians can prescribe gender-affirming care for minors. That requirement passes both rational-basis and intermediate scrutiny. Requiring a physician's involvement—indeed, requiring a multidisciplinary team that includes one or more physicians—is consistent with the WPATH and Endocrine Society standards of care.

The same is not true for adults. A legislator or Board member not motivated by animus might well have insisted on appropriate training for providers who treat transgender adults. But a properly trained APRN who specializes in this area is likely to be more qualified, and to provide better care, than a physician with no training or experience in this field. Prohibiting properly trained APRNs from

providing gender-affirming care to adults does not improve the quality of care. Instead, the prohibition limits the availability of care and increases its cost. This comports with the illegitimate goal of many legislators to preclude or impede individuals from pursuing their gender identities. But the prohibition is not substantially related to the legitimate, important goal of improving the quality of medical care. It is more likely than not that, absent animus, the Legislature would not have prohibited other properly trained professionals from providing gender-affirming care for adults.

The same is true for the provision precluding other professionals from providing care under the treating physician's direction. Florida law regulates the activities of nurses, physician's assistants, pharmacists, and others. The provision requiring a physician, not a nurse, to give an injection—or even perhaps precluding a pharmacist from filling a prescription—is either extraordinarily poor statutory craftsmanship or an animus-based roadblock intended to reduce access to care. The provision survives neither rational-basis nor intermediate scrutiny.

### b. Annual x-rays

The rules require annual x-rays of the hand for every minor receiving gender-affirming care.[145] For most patients, annual hand x-rays are not medically

---

[145] Fla. Admin. Code r. 64B8ER23-7(4)(f) & 64B15ER23-9(4)(f).

indicated and would not be ordered by competent providers trained in this field.[146]
The effects of radiation accumulate over time; unnecessary x-rays, especially in childhood, pose a health risk.[147] One taking seriously the admonition to "first, do no harm" would not order these unnecessary x-rays.

This requirement burdens the patient, if only a little, and increases the patient's out-of-pocket cost. As the Board members surely know, insurers typically do not cover services that are not medically indicated. Imposing such costs serves no medical purpose but may discourage patients from pursuing this care.

The Board members would not have required annual hand x-rays for all patients absent animus—absent, that is, the overriding goal of blocking or discouraging patients from pursuing their gender identities.

### c. Annual DEXA scans

Similarly, the rules require annual bone density or "DEXA" scans for every minor receiving gender-affirming care.[148] Puberty blockers can affect bone density, so dual-energy x-ray absorptiometry—DEXA scans—can be indicated. But no competent provider trained in this field would prescribe annual DEXA scans for all patients without considering their individual circumstances. This is especially true

---

[146] Trial Tr., ECF No. 206 at 174–75.
[147] *Id.* at 175.
[148] Fla. Admin. Code r. 64B8ER23-7(4)(g) & 64B15ER23-9(4)(g).

for patients being treated only with testosterone, which does not decrease bone density.[149]

Like hand x-rays, DEXA scans radiate the patient and should be performed only when medically indicated.[150] Unnecessary scans also burden patients and impose out-of-pocket costs. The Board members would not have required annual DEXA scans for all patients absent animus.

### d. Mental-health assessments

The rules require every minor who is receiving gender-affirming care to have an "annual mental health assessment."[151] In addition, the treating physician—this will usually be a pediatric endocrinologist—must "refer the patient for counseling" with a "licensed mental health care professional" as frequently as the mental-health professional recommends.[152] These requirements are unobjectionable.

The term "licensed mental health care professional" includes psychiatrists, psychologists, and others, including licensed clinical social workers ("LCSWs"). So the required referral can be to an LCSW. This makes sense. Counseling, including of adolescents, is what LCSWs do, and LCSWs are usually more

---

[149] *See* Trial Tr., ECF No. 206 at 176.

[150] *Id*. at 177.

[151] Fla. Admin. Code r. 64B8ER23-7(4)(h) & 64B15ER23-9(4)(h).

[152] Fla. Admin. Code r. 64B8ER23-7(4)(i) & 64B15ER23-9(4)(i).

available than psychiatrists or psychologists. Physicians providing this care

frequently have LCSWs on the team.[153] The rules provide, however, that the

required "annual mental health assessment," unlike an assessment on a separate

referral, must be conducted by a "licensed psychiatrist and psychologist."[154] This

makes no sense. There is no reason to have separate mental-health professionals

involved, and excluding LCSWs and other properly trained and licensed mental-

health providers departs from the accepted standard of care.[155] The exclusion

reduces the ability of patients to receive gender-affirming care—probably the

purpose of this requirement. The Board members would not have adopted the

exclusion absent animus.

### e. The frequency of follow-ups

The rules require every minor who is receiving gender-affirming care to be

seen every six months by the treating or "covering" physician and every three

months by a "licensed mental health care professional" for a suicide assessment.[156]

The rules require "[r]elevant laboratory testing" every four months.[157] There is no

medical reason to require these services to be provided this frequently in all cases,

---

[153] *See, e.g.*, Trial Tr., ECF No. 206 at 183–85.
[154] Fla. Admin. Code r. 64B8ER23-7(4)(h) & 64B15ER23-9(4)(h).
[155] Trial Tr., ECF No. 206 at 140–41.
[156] Fla. Admin. Code r. 64B8ER23-7(4)(c)–(4)(d); 64B15ER23-9(4)(c)–(4)(d).
[157] Fla. Admin. Code r. 64B8ER23-7(4)(e) & 64B15ER23-9(4)(e).

without regard to a patient's individual circumstances.[158]

These requirements burden patients and impose unnecessary out-of-pocket costs. Board members would not have imposed these requirements for all patients absent animus.

### f. Consent in person on specified forms

The statute requires the prescribing physician to inform the patient, "while physically present in the same room," of the "nature and risks" of the treatment.[159] The statute requires the physician to obtain the patient's consent "in writing on forms adopted in rule" by the Boards.[160] This precludes initiation of treatment through telehealth—that is, based only on video transmissions from a remote location.

Communication by video transmission can be effective, and telehealth has its place. But informed consent in this field is important and can be obtained more effectively in person. As the defendants apparently acknowledge, the statute and rules do not preclude remote communication for other purposes, including, for example, renewal of prescriptions.[161]

---

[158] *See* Trial Tr., ECF No. 206 at 135–36, 171–74; *see also* Trial Tr., ECF No. 207 at 170–71.
[159] Fla. Stat. § 456.52(2).
[160] *Id*.
[161] *See* Fla. Stat. § 456.52(4).

It is not clear the Legislature would have adopted any transgender legislation at all absent animus. But if the Legislature acted, it is more likely than not that even if free of animus, the Legislature would have required a provider to obtain appropriate informed consent in person. The requirement survives both rational-basis and intermediate scrutiny.

The result is different for the consent forms adopted by the Boards. As set out in section VIII.G.5. above, the forms are replete with provisions that serve no valid medical purpose, that interfere with rather than promote an appropriate informed-consent process, that impose burdens and costs on patients, and that could have had no purpose other than to prevent or discourage patients from adhering to their gender identities. The forms would not have been adopted if not motivated by animus. The forms survive neither rational-basis nor intermediate scrutiny.

## IX.  Parental rights

The plaintiffs also assert a claim under the Due Process Clause, which protects a parent's right to control a child's medical treatment. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality); *Parham v. J.R.*, 442 U.S. 584, 602–03 (1979); *Maddox v. Stephens*, 727 F.3d 1109, 1118–19 (11th Cir. 2013); *Bendiburg v. Dempsey*, 909 F.2d 463, 470 (11th Cir. 1990).

The defendants say a parent's right to control a child's medical treatment does not give the parent a right to insist on treatment that is properly prohibited on other grounds. Quite so. If the state could properly prohibit the treatments at issue as unsafe, parents would have no right to override the state's decision. *Eknes-Tucker* so holds. The plaintiffs' parental-rights claim neither adds to nor detracts from the equal-protection challenge to the ban on these treatments. The claim succeeds only because, as set out above, the equal-protection claim succeeds.

## X. The pretextual justifications for the statute and rules

In support of their position, the defendants have proffered a laundry list of purported justifications for the statute and rules. The purported justifications are largely pretextual and, in any event, do not call for a different result.

### A. *"Low quality" evidence*

A methodology often used for evaluating medical studies—for evaluating research-generated evidence on the safety and efficacy of any given course of treatment—is known as Grading of Recommendations, Assessment, Development, and Evaluation ("GRADE"). The defendants stridently assert that the evidence supporting the treatments at issue is "low" or "very low" quality as those terms are used in the GRADE system. But the evidence on the other side—the evidence purportedly showing these treatments are ineffective or unsafe—is far weaker, not

just of "low" or "very low" quality. Indeed, evidence suggesting these treatments are ineffective is nonexistent.

The choice these plaintiffs face is binary: to use GnRH agonists and cross-sex hormones, or not. It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent. There is substantial and persuasive, though not conclusive, research showing favorable results from these treatments.[162] A decision for the plaintiffs and many class members cannot wait for further or better research; the treatment decision must be made now.

Moreover, the fact that research-generated evidence supporting these treatments gets classified as "low" or "very low" quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence.

It is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as "low" or "very low" on this scale.[163] The record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by "high" quality

---

[162] *See, e.g.*, Trial Tr. in Dekker, ECF No. 228 at 40–42.
[163] *See* Trial Tr. in *Dekker*, ECF No. 227 at 98–101.

evidence on the GRADE scale.[164] The defendants' assertion that treatment should be banned based on the supporting research's GRADE score is a misuse of the GRADE system.

We put band-aids on cuts to keep dirt out not because there is "high" quality research-generated evidence supporting the practice but because we know, from clinical experience, that cuts come with a risk of infection and band-aids can reduce the risk.

Gender dysphoria is far more complicated, and one cannot know, with the same level of confidence, how to treat it. But there is now extensive clinical experience showing excellent results from treatment with GnRH agonists and cross-sex hormones. If these treatments are prohibited, many patients will suffer needlessly.[165] The extensive clinical evidence is important and indeed persuasive evidence, even if the supporting research has produced only "low" or "very low" quality evidence on the GRADE scale.

When facing a binary decision to use or not use GnRH agonists or hormones, a reasonable decisionmaker would consider the evidence on the yes side, as well as the weaker evidence on the no side. Calling the evidence on the yes side "low" or "very low" quality would not rationally control the decision.

---

[164] Trial Tr. in *Dekker*, ECF No. 226 at 68–69.

[165] Trial Tr. in *Dekker*, ECF No. 226 at 64; Trial Tr. in *Dekker*, ECF No. 238 at 97–98; *see also supra* note 46.

### B. Risks attendant to treatment

The defendants assert there are risks attendant to treatment with GnRH agonists and cross-sex hormones. Indeed there are. There are legitimate concerns about fertility and sexuality that a child entering puberty is not well-equipped to evaluate and for which parents may be less-than-perfect decisionmakers. There is a risk of misdiagnosis, though the requirement in the standards of care for careful analysis by a multidisciplinary team should minimize the risk. There is a risk that a child later confronted with the bias that is part of our world will come to believe it would have been better to try to pass as cisgender.

There also are studies suggesting not that there *are* but that there *may be* additional medical risks. An unreplicated study found that sheep who took GnRH agonists became worse at negotiating a maze, at least for a time. Another study showed a not-statistically-significant but nonetheless-concerning decrease in IQ among cisgender children treated for central precocious puberty with GnRH agonists. These and other studies cited by the defendants would surely be rated low or very-low quality on the GRADE scale and, more importantly, are not very persuasive. The latter study has not led to a ban on the use of GnRH agonists to treat central precocious puberty. One cannot know from these studies whether treating transgender adolescents with GnRH agonists will cause comparable

adverse results in some patients. But the risk that they will is a risk a decisionmaker should reasonably consider.

That there are risks does not end the inquiry. There are also substantial benefits for the overwhelming majority of patients treated with GnRH agonists and cross-sex hormones. And there are risks attendant to *not* using these treatments, including the risk—in some instances, the near certainty—of anxiety and depression and even suicidal ideation. The challenged statute and rules ignore the benefits that many patients realize from these treatments and the substantial risk posed by foregoing the treatments—the risk from failing to pursue what is, for many, the most effective available treatment of gender dysphoria. One of the *Dekker* plaintiffs attempted suicide four times before beginning successful treatment with cross-sex hormones; he is now thriving.[166]

For some class members, a failure to start GnRH agonists soon will result in unrestrained puberty consistent with their natal sex. They will live with the consequences for the rest of their lives. The likelihood is very high that they will suffer attendant adverse mental-health consequences. If, on the other hand, they *do* get GnRH agonists, they will avoid some of the adverse consequences. They also will face attendant risks.

---

[166] Trial Tr. in *Dekker*, ECF No. 228 at 150 & 166–67.

Risks attend many kinds of medical treatment, perhaps most. Ordinarily it is the patient, in consultation with the doctor, who weighs the risks and benefits and chooses a course of treatment. What is remarkable about the challenged statute and rules is not that they address medical treatments with both risks and benefits but that they arrogate to the state the right to make the decision—and to do it based in significant part on animus against the patients. Worse, the statute and rules make the same decision for everybody, without considering any patient's individual circumstances. The statute and rules do this in contravention of widely accepted standards of care.

That there are risks of the kind presented here is not a rational basis for denying properly screened patients the option to choose this treatment.

## C. Bias in medical organizations

The defendants say the many professional organizations that have endorsed treatment of gender dysphoria with GnRH agonists and hormones all have it wrong. The defendants say, in effect, that the organizations were dominated by individuals who pursued good politics, not good medicine.

If ever a pot called a kettle black, it is here. The statute and the rules were an exercise in politics, not good medicine.

This is a politically fraught area. There has long been, and still is, substantial bigotry directed at transgender individuals. Common experience confirms this, as

do some of the comments of legislators recounted above. And even when not based on bigotry, there are those who incorrectly but sincerely believe that gender identity is not real but instead just a choice. This is, as noted above, the elephant in the room.

Where there is bigotry, there are usually—one hopes, always—opponents of bigotry. It is hardly surprising that doctors who understand that transgender identity can be real, not made up—doctors who are willing to provide supportive medical care—oppose anti-transgender bigotry.

It sometimes happens that opponents of bigotry deem opposing viewpoints bigoted even when they are not. And it sometimes happens that those with opposing viewpoints are slow to speak up, lest they be accused of bigotry. These dynamics could affect a medical association's consideration of transgender treatment. The record suggests these dynamics *have* affected the tone and quality of debate within WPATH. It is entirely possible that the same dynamics could have affected the tone and quality of debate within other associations.

Even so, it is fanciful to believe that all the many medical associations who have endorsed gender-affirming care, or who have spoken out or joined an amicus brief supporting the plaintiffs in this litigation, have so readily sold their patients down the river. The great weight of medical authority supports these treatments. The widely accepted standards of care require competent therapy and careful

evaluation by a multidisciplinary team before a minor is treated with GnRH agonists and cross-sex hormones. But the widely accepted standards of care support their use in appropriate circumstances. The standards have been unanimously endorsed by reputable medical associations, even though not unanimously endorsed by all the members of the associations.

The overwhelming majority of doctors are dedicated professionals whose first goal is the safe and effective treatment of their patients. There is no reason to believe the doctors who adopted these standards were motivated by anything else.

### D. International views

The defendants have asserted time and again that Florida now treats GnRH agonists and cross-sex hormones the same as European countries. A heading in the defendants' response to the motion for a preliminary injunction is typical: "Florida Joins the International Consensus."[167] The assertion is false. And no matter how many times the defendants say it, it will still be false. No country in Europe—or so far as shown by this record, anywhere in the world—entirely bans these treatments.

To be sure, there are countries that ban gays and lesbians and probably transgender individuals, too. One doubts these treatments are available in some repressive regimes. But the treatments are available in appropriate circumstances in all the countries cited by the defendants, including Finland, Sweden, Norway,

---

[167] ECF No. 55 at 6.

Great Britain, France, Australia, and New Zealand.[168] Some or all of these insist on appropriate preconditions and allow care only in approved facilities—just as the Endocrine Society and WPATH standards insist on appropriate preconditions, and just as care in the United States is ordinarily provided through capable facilities. Had Florida truly joined the international consensus—making these treatments available in appropriate circumstances or in approved facilities—these plaintiffs would qualify, and this case likely would not have been brought. Stringent regulation of gender-affirming care based on the merits—not based on anti-transgender animus—would easily survive constitutional challenge.

### E. Malpractice

The defendants assert, with no real evidentiary support, that GnRH agonists and cross-sex hormones have sometimes been provided to minors in Florida without the appropriate mental-health therapy and evaluation by a multidisciplinary team.

If that were true, the solution would be to appropriately regulate these treatments, not to ban them. And there are, of course, remedies already in place in Florida for deficient medical care. There is no evidence that this kind of care is routinely provided so badly that it should be banned outright. Indeed, when the

---

[168] *See* Trial Tr. in *Dekker*, ECF No. 226 at 78–79; *see also* Trial Tr. in *Dekker*, ECF No. 227 at 134; Trial Tr. in *Dekker*, ECF No. 228 at 61–62.

rules were adopted, the Boards had received not a single complaint about deficient provision of this kind of care in Florida.[169] At least as shown by this record, that is still true.[170]

Along the same lines, the defendants say gender dysphoria is difficult to diagnose accurately—that gender identity can be fluid, that there is no objective test to confirm gender identity or gender dysphoria, and that patients treated with GnRH agonists or cross-sex hormones have sometimes come to regret it. But the defendants ignore facts that do not support their narrative.

Fluidity is common prior to the onset of puberty but not after. The absence of objective tests to confirm gender dysphoria does not set it apart from many other mental-health conditions that are routinely diagnosed without objective tests and treated with powerful medications. Regret is rare; indeed, the defendants have offered no evidence of any Florida resident who regrets being treated with GnRH agonists or cross-sex hormones. With all the resources available to the State of Florida and the full range of discovery under the Federal Rules of Civil Procedure, the defendants could find not a one.

---

[169]  Trial Tr., ECF No. 212 at 95–96.
[170]  *Id.*

The difficulty diagnosing a patient calls for caution. It does not call for a one-size-fits-all refusal to provide widely accepted medical treatment.[171] It does not call for the state to make a binary decision not to provide the treatment even for a properly diagnosed patient.

### F. Continuation of treatment

The defendants note that 98% or more of adolescents treated with GnRH agonists progress to cross-sex hormones. That is hardly an indictment of the treatment; it is instead consistent with the view that in 98% or more of the cases, the patient's gender identity did not align with natal sex, this was accurately determined, and the patient was appropriately treated first with GnRH agonists and later with cross-sex hormones. An advocate who denies the existence of genuine transgender identity or who wishes to make everyone cisgender might well fear progression to cross-sex hormones, but the defendants have denied that this is a basis for their current reference to this progression.

The defendants say, instead, that the high rate of progression rebuts an argument in support of GnRH agonists: that GnRH agonists give a patient time to reflect on the patient's gender identity and, if still convinced of a gender identity opposite the natal sex, to reflect on whether to go forward socially in the gender

---

[171] *See* Trial Tr. in *Dekker*, ECF No. 239 at 91–94 (defense expert Dr. Levine explaining that medical intervention such as puberty blockers and hormones should be carefully prescribed and monitored but not banned).

identity or natal sex. But if that is a goal of treatment with GnRH agonists, it is

certainly not the treatment's *primary* goal. The primary goal is to delay and

eventually avoid development of secondary sex characteristics inconsistent with

the patient's gender identity—and thus to avoid or reduce the attendant anxiety,

depression, and possible suicidal ideation.

The high rate of progression from GnRH agonists to cross-sex hormones is

not a reason to ban the treatments.

### G. Off-label use of FDA-approved drugs

The defendants note that while the Food and Drug Administration has

approved GnRH agonists and the hormones at issue as safe and effective, the

agency has not addressed their use to treat gender dysphoria. Quite so. Use of these

drugs to treat gender dysphoria is "off label."

That the FDA has not approved these drugs for treatment of gender

dysphoria says precisely nothing about whether the drugs are safe and effective

when used for that purpose. Off-label use of drugs is commonplace and widely

accepted across the medical profession. The defendants' contrary implication is

divorced from reality.

Obtaining FDA approval of a drug is a burdensome, expensive process.[172] A pharmaceutical provider who wishes to market a new drug must incur the burden and expense because the drug cannot be distributed without FDA approval. Once a drug has been approved, however, the drug can be distributed not just for the approved use but for other uses as well. There often is little reason to incur the burden and expense of seeking additional FDA approval.

That the FDA approved these drugs at all confirms that, at least for one use, they are safe and effective.[173] This provides some support for the view that they are safe when properly administered and that they effectively produce the intended results—that GnRH agonists delay puberty and that testosterone and estrogen have masculinizing or feminizing effects as expected. The FDA approval goes no further—it does not address one way or the other the question whether using these drugs to treat gender dysphoria is as safe and effective as on-label uses.

That use of GnRH agonists and cross-sex hormones to treat gender dysphoria is "off-label" is not a reason to ban their use for that purpose.

## XI.   The classes

A prior order certified two classes, one for adults and one for minors and their parents. The order named four representatives for the adult class and five

---

[172] Trial Tr. in *Dekker*, No. 226 at 182–84; Trial Tr. in *Dekker* No. 227 at 120–23; Trial Tr. in *Dekker*, ECF No. 239 at 54–55.
[173] Trial Tr. in *Dekker*, No. 226 at 182–84; Trial Tr. in *Dekker* No. 227 at 120–23.

representatives—each a parent on behalf of a minor—for the minor class. The

minor class included minors who both were and were not grandfathered. The order

certified a subclass for minors who were not grandfathered.

The trial record addresses the individual circumstances of only one

representative of the adult class, Lucien Hamel, and two representatives of the

minor class and subclass, Jane Doe, individually and on behalf of Susan Doe, and

Gloria Goe, individually and on behalf of Gavin Goe. This order removes the other

representatives and dismisses their individual claims. They remain class members.

Mr. Hamel does not assert a surgery claim. The adult class thus no longer

has a representative with standing to challenge the restrictions on surgery. This

order narrows the class accordingly.

## XII.  The Boards as defendants in their own names

The third amended complaint names as defendants not only the members of

the Florida Board of Medicine and Florida Board of Osteopathic Medicine in their

official capacities but also the Boards themselves. The Boards have not sought

dismissal based on the Eleventh Amendment, but they also have not explicitly

waived Eleventh Amendment immunity.

A state is not a "person" within the meaning of 42 U.S.C. § 1983, and in any

event a state has Eleventh Amendment immunity from a § 1983 claim in federal

court. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989)

(holding that a state is not a "person" within the meaning of § 1983); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (holding that a state sued in its own name has Eleventh Amendment immunity, regardless of the relief sought, unless the immunity has been waived or validly abrogated by Congress). The state's Eleventh Amendment immunity may extend to the Boards.

In any event, the claims against the Boards in their names are redundant to the claims against the Board members in their official capacities. Dismissal of the claims against the Boards is permissible on this basis. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (approving the dismissal of official-capacity defendants whose presence was merely redundant to the naming of an institutional defendant). This order dismisses the claims against the Boards, but the dismissal is of no substantive significance.

## XIII.  Remedy

The appropriate remedy for the constitutional violations at issue is declaratory and injunctive relief. *See, e.g.*, *Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982). The plaintiffs and class members will suffer irreparable harm if an injunction does not issue, and there is no adequate remedy at law. The balance of hardships favors the plaintiffs and class members, and an injunction will not disserve the public interest.

The scope of the declaration and injunction must match the violations. *See id.*; *Georgia v. President of the United States*, 46 F.4th 1283, 1303–04 (11th Cir. 2022).

A pending appeal of a preliminary injunction does not preclude entry of a final judgment, even if the judgment and preliminary injunction are inconsistent. In *Burton v. Georgia*, 953 F.2d 1266 (11th Cir. 1992), the district court entered final judgment for the defendants while an appeal was pending from a preliminary injunction in favor of the plaintiffs. The Eleventh Circuit affirmed the judgment and dismissed as moot the appeal from the preliminary injunction: "Once a final judgment is rendered, the appeal is properly taken from the final judgment, not the preliminary injunction." *Id.* at 1272 n.9. *See also* 16 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure* § 3921.2 (3d ed. June 2024 update) (discussing entry of final judgment while an interlocutory appeal is pending without questioning whether a district court can enter a final judgment); *Birmingham Fire Fighters Ass'n 17 v. City of Birmingham*, 603 F.3d 1248, 1254–55 (11th Cir. 2010) (dismissing an appeal from a preliminary injunction after the district court entered a permanent injunction); *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 433 (5th Cir. 1981) (not disapproving entry of a permanent injunction while an appeal of a preliminary injunction was pending and instead holding the appeal moot); *Alabama v. EPA*, 871 F.2d 1548, 1553–54 (11th

Cir. 1989) (holding the district court had jurisdiction to grant partial summary judgment and enter a permanent injunction that dissolved its preliminary injunction even though an appeal of the preliminary injunction was pending, but holding the appeal not moot).

This order grants declaratory and injunctive relief for the three plaintiffs who have proved their claims and for the classes and subclass they represent. To ensure that the declaration covers the intended parts of the statute, the declaration incorporates language from Florida Statutes § 456.52 into the declaration's definitions of gender-affirming care and natal sex.

## XIV.  Conclusion

Gender identity is real. Those whose gender identity does not match their natal sex often suffer gender dysphoria. The widely accepted standard of care calls for appropriate evaluation and treatment. For minors, this means evaluation and treatment by a multidisciplinary team. Proper treatment begins with mental-health therapy and is followed in appropriate cases by GnRH agonists and cross-sex hormones—referred to in this order as gender-affirming care. Florida has adopted a statute and rules that ban gender-affirming care for minors even when medically appropriate. The ban is unconstitutional.

The statute and rules restrict the manner in which gender-affirming care can be provided when not banned. Some of the restrictions are constitutional; others

are not. The invalid provisions include these: excluding professionals other than physicians from participating in gender-affirming care, even under the supervision of a physician; prohibiting APRNs from treating adults; requiring annual x-rays and DEXA scans without regard to an individual patient's circumstances; allowing only psychiatrists or psychologists, not other licensed mental-health professionals, to conduct the required annual assessments; requiring follow-up care and labs more frequently than medically indicated; and requiring patients to sign consent forms that include false and misleading statements, address treatments the patient will not receive, are in some respects incomprehensible, and interfere with the physician-patient relationship and an appropriate informed-consent process.

The plaintiffs are entitled to classwide declaratory and injunctive relief of appropriate scope against the appropriate defendants.

IT IS ORDERED:

1. The certified classes and subclass are the following:

   (a) The first class consists of all transgender adults in Florida who seek gender-affirming treatment with puberty blockers or cross-sex hormones.

   (b) The second class consists of all transgender minors in Florida who seek gender-affirming treatment with puberty blockers or cross-sex hormones and their parents.

(c) The subclass—a subset of the second class—consists of all transgender minors in Florida who seek but are prohibited by state law from obtaining gender-affirming treatment with puberty blockers or cross-sex hormones and their parents.

2. The class representative for the first class is named plaintiff Lucien Hamel.

3. The class representatives for the second class and the subclass are named plaintiffs Jane Doe, individually and on behalf of Susan Doe, and Gloria Goe, individually and on behalf of Gavin Goe.

4. It is declared that:

(a) Florida Statutes § 456.52(1) is unconstitutional to the extent it prohibits gender-affirming care for individuals who have reached or passed Tanner stage II.

(b) Florida Statutes § 456.52(3) is unconstitutional to the extent it prohibits a licensed individual, acting within the scope of the license, from (i) assisting a supervising physician in administering or performing gender-affirming care or (ii) filling a prescription issued by a physician or, for adults, issued by a licensed individual acting within the scope of the license, or (iii) providing gender-affirming care to adults.

(c) Florida Statutes § 456.52(5) is unconstitutional to the extent it authorizes disciplinary action or makes it a crime to violate a provision of a statute or rule this order declares unconstitutional.

(d) Florida Administrative Code rules 64B8ER23-7, 64B15ER23-9, 64B8ER23-11, and 64B15ER23-12 are unconstitutional to the same extent as Florida Statutes §§ 456.52(1), (3), and (5), and also as set out in subparagraphs (e) and (f) below.

(e) Florida Administrative Code rules 64B8ER23-7 and 64B15ER23-9 are unconstitutional to the extent they (i) require annual hand x-rays, (ii) require annual DEXA scans, (iii) require the mandatory annual mental-health assessment to be conducted only by a licensed psychiatrist and psychologist rather than another licensed mental-health professional, (iv) require in-person physician visits every six months, (iv) require suicide assessments by a licensed mental-health professional every three months, (v) require laboratory testing every four months, or (vi) require use of forms DH5079-MQA (06/23, rev. 8/23), DH5080-MQA (06/23, rev. 8/23), and DH5081-MQA (06/23, rev. 8/23).

(f) Florida Administrative Code rules 64B8ER23-11 and 64B15ER23-12 are unconstitutional to the extent they require use of forms DH5082-MQA (06/23, rev. 8/23) and DH5083-MQA (06/23, rev. 8/23).

(g) For purposes of this declaration, "gender-affirming care" means the prescription or administration of (i) puberty blockers for the purpose of attempting to stop or delay normal puberty in order to affirm a person's perception of his or her sex if that perception is inconsistent with the person's natal sex or (ii) hormones or hormone antagonists to affirm a person's perception of his or her sex if that perception is inconsistent with the person's natal sex.

(h) For purposes of this declaration, "natal sex" means the classification of a person as either male or female based on the organization of the human body of such person for a specific reproductive role, as indicated by the person's sex chromosomes, naturally occurring sex hormones, and internal and external genitalia present at birth.

5. An injunction is entered as follows:

(a) The enjoined defendants are:

(i)   Joseph Ladapo, in his official capacity as the Surgeon General of the Florida Department of Health;

(ii)  Scot Ackerman, Nicholas W. Romanello, Wael Barsoum, Matthew R. Benson, Gregory Coffman, Amy Derick, David Diamond, Patrick Hunter, Luz Marina Pages, Eleonor Pimentel, Hector Vila, Michael Wasylik, Zachariah P. Zachariah, Maria

Garcia, and Nicole Justice, in their official capacities as members

of the Florida Board of Medicine;

(iii)  Watson Ducatel, Tiffany Sizemore Di Pietro, Gregory Williams,

Monica M. Mortensen, Valerie Jackson, Chris Creegan, and

William D. Kirsh, in their official capacities as members of the

Florida Board of Osteopathic Medicine; and

(iv)  William M. Gladson, in his official capacity as State Attorney for

the Fifth Judicial Circuit of Florida.

(b) The enjoined defendants must not take any steps to enforce the

provisions this order declares unconstitutional.

(c) This injunction binds the enjoined defendants and their officers, agents,

servants, employees, and attorneys—and others in active concert or participation

with any of them—who receive actual notice of this injunction by personal service

or otherwise.

6. All claims against the Board of Medicine and Board of Osteopathic

Medicine in their names are dismissed without prejudice based on the Eleventh

Amendment and alternatively as redundant to the claims against their members.

7. All claims against the Attorney General of Florida are voluntarily

dismissed without prejudice.

8. All claims against state attorneys other than Mr. Gladson are dismissed without prejudice based on the parties' stipulation requiring, among other things, the other state attorneys to abide by the injunction against Mr. Gladson.

9. The individual claims of the plaintiffs Brenda Boe, Bennett Boe, Carla Coe, Christina Coe, Fiona Foe, Freya Foe, Linda Loe, Lisa Loe, Patricia Po, Paul Poe, Olivia Noel, Rebecca Cruz Evia, and Kai Pope are dismissed without prejudice to their rights as class members.

10. The court reserves jurisdiction to enforce this order and the judgment and to award costs and attorney's fees.

11. The clerk must enter judgment and close the file.

SO ORDERED on June 11, 2024.

s/Robert L. Hinkle
United States District Judge