IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JANE DOE et al.,

      Plaintiffs,

v.                                        CASE NO. 4:23cv114-RH-MAF

JOSEPH A. LADAPO et al.,

      Defendants.
_____/

## ORDER DENYING A STAY PENDING APPEAL

The plaintiffs have obtained declaratory and injunctive relief following a full and fair trial on the merits. The defendants have appealed and have moved for a stay pending appeal.

A four-part test governs stays pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also League of Women Voters of Fla., Inc. v. Fla. Sec'y of*

*State*, 32 F.4th 1363, 1370 (11th Cir. 2022); *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000).

The stay issue is close but on balance favors the plaintiffs. This order addresses the four criteria in turn and then adds responses to just three, not all, of the stay motion's specific assertions. This order assumes familiarity with the June 11, 2024 order, ECF No. 223, which sets out the court's findings of fact and conclusions of law following the trial. This order refers to that order as "the challenged order."

**I. Strong showing of likely success on the merits**

As set out in the challenged order, there is a circuit split on the constitutionality of banning gender-affirming care for minors, even in cases not involving the strong showing of anti-transgender animus present here. This is an issue on which reasonable jurists can disagree. The Supreme Court has granted certiorari in one of the cases. *See L.W. ex rel. Williams v. Skremetti*, 83 F.4th 460 (6th Cir. 2023), *cert. granted*, No. 23-477 (June 24, 2024).

No court has upheld restrictions on gender-affirming care for adults of the kinds at issue here.

At least as to minors, one could reasonably argue both sides of the question whether the defendants' position is "strong" enough to warrant a stay. No purpose would be served by repeating or even summarizing here the analysis of the merits

set out in the challenged order. The defendants' position is weaker for adults and weaker still for the consent forms.

Likelihood of success is often—but not always—the most important factor on a stay motion. *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1453–54 (11th Cir. 1986) (noting the "extraordinarily high standard of review" that an applicant must meet to establish likelihood of success but granting a partial stay based on the other three factors). Here, as in *Garcia-Mir*, the merits are close enough that this factor, standing alone, ought not be determinative. For what it's worth, I believe the challenged order is correct, especially on this record, but I recognize that in the Eleventh Circuit, as in the Supreme Court, there are likely to be votes on the merits on both sides. The defendants have not made a "strong showing" that they are likely to succeed.

## II. Injury to the defendants

The defendants will be injured by a stay only insofar as a state is always injured when implementation of a statute or rule is delayed against its wishes.

In the motion to stay, the defendants also suggest that absent a stay, the state will have no control over the manner in which gender-affirming care is provided in the state. That is simply not true. The state has in place abundant means of ensuring that healthcare professionals adhere to the prevailing standards of care.

The state allowed and even paid for gender-affirming care for many years before enacting the statute and rules at issue in a wave of anti-transgender bias.

With all the state's resources and the full range of discovery available under the Federal Rules of Civil Procedure, the state was unable to present evidence of even a single instance of improper provision of care in Florida. The state was unable to present evidence of even a single departure in this state from the widely accepted Endocrine Society and WPATH standards of care. Perhaps most importantly, the state was unable to present evidence of even a single patient who suffered adverse consequences or came to regret care received in this state.

In its motion, the defendants say the record includes no evidence that "some, many, or even most" patients, "particularly minors," have access to multidisciplinary care within the state. Mot. to Stay, ECF No. 226 at 9. But the record shows that care was provided at the state's own University of Florida Youth Gender Program, as well as at the Johns Hopkins All Children's Hospital gender clinic and the University of Miami. These are not fly-by-night facilities, and the record confirms what common sense would establish anyway: the facilities do not limit their services to local patients. The University of Florida's medical facilities have long attracted patients needing all kinds of specialized care from throughout the state and beyond. That the defendants must question the University of Florida's ability to operate a gender clinic conforming to the appropriate standards of care or

the willingness of parents to travel to obtain high-quality care for their children shows just how far the defendants are willing to depart from a fair analysis of the actual facts.

The legislative history, including transcripts of committee hearings and floor debates, makes clear that those who supported this statute paid almost no attention to the manner in which care was being provided. The concern was that gender-affirming care was being provided at all, not that providers were failing to meet the prevailing standards. The defendants' new-found concern with the manner in which care is being provided—unsupported by anything in the record—does not call for a stay.

Leaving in place the status quo as it existed for years prior to adoption of the challenged statute and rules will cause no concrete harm to the state or anyone else.

### III.  Injury to the plaintiffs and class members

Denying the plaintiffs and class members access to gender-affirming care will cause needless suffering and will increase anxiety, depression, and the risk of suicide. *See* Challenged Order, ECF No. 223 at 16 & n.46. This is the factor that most clearly supports denial of a stay.

The effect will be most acute while the appeal goes forward but will persist afterward. If a stay is entered and the plaintiffs ultimately prevail, resuming treatment at that point will not reverse the physical effects the plaintiffs and class

members will have sustained during the appeal. The plaintiffs and class members will have suffered irreparable harm.

## IV. Public Interest

On most stay motions, the public interest closely tracks the merits. It is usually in the public interest for constitutional legislative or executive actions to be kept in place and for unconstitutional actions to be blocked. But when a stay is sought, one ordinarily cannot know, with certainty, how the constitutional issue will be decided. Here, in light of the substantial uncertainty, the public interest calls for leaving in place the status quo as it existed before adoption of the challenged statute and rules. This will allow patients, together with their parents and healthcare professionals, to control their own healthcare. The public interest supports keeping this a medical issue, not a political one, until the constitutional issue is finally resolved.

## V.  The irrelevant *Purcell* analysis

The defendants suggest a stay should always be entered when the merits are not "entirely clearcut." Mot. to Stay, ECF No. 226 at 5. That is not correct. The "entirely clearcut" language stems from a concurrence addressing application of the *Purcell* principle on the eve of an election. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). The Eleventh Circuit quoted the concurrence when discussing *Purcell* in another election case. *See League of*

*Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022). The case at bar does not involve an approaching election; *Purcell* has nothing to do with it.

The defendants' burden on their stay motion is to make a "strong showing" of likely success on the merits, just as the Supreme Court and Eleventh Circuit have said time and again. It is not enough to show the issues are not "entirely clearcut." Indeed, *Garcia-Mir*, which sets out the binding law of the circuit, put it exactly the other way around: when the merits are not clearcut, it favors denial, not grant, of a stay. *See Garcia-Mir*, 781 F.2d at 1454.

### VI. Mixed motives

The defendants assert the challenged order improperly applies the presumption of good faith that attends legislative action. The presumption stems from the courts' obligation to give broad deference to legislative decision-making. But "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Discriminatory purpose was a motivating factor here.

The defendants apparently assert that when there are mixed motives—a legitimate purpose alongside a discriminatory purpose—the presumption of good

faith requires a court to ignore the discriminatory purpose and assume the only relevant purpose was the legitimate one. Not so.

A hypothetical illustrates the point. If circumstantial evidence suggests a legislator might have acted for reason A or reason B, and reason A is constitutional while reason B is not, the presumption of good faith supports a finding that the legislator acted for reason A. This is all the case cited by the defendants suggests. *See Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1235–36 (2024) (stating the presumption of good faith "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions"). But when direct evidence—the legislator's own contemporaneous statements—unambiguously establishes that the legislator acted for reason B, the presumption of good faith does not mandate a finding that the legislator acted for reason A.

So when, as here, the undisputed evidence establishes conclusively that a legislator loudly called transgender individuals "demons" and "imps," another called them "evil," and a sponsor said "good riddance" to any transgender individual who left the state, the presumption of good faith does not require a court to ignore the evidence. The defendants have made no effort to come to grips with this evidence—to suggest how these and other remarks could be interpreted to show anything other than anti-transgender bias. The defendants argue the record

does not show that enough legislators to matter explicitly announced their animus—a fair argument explicitly addressed in section VIII.G.4. of the challenged order, ECF No. 223 at 49–52—but the evidence that animus motivated at least some legislators is overwhelming, indeed undisputed. With legislators having loudly and proudly proclaimed their bias, the defendants ought not be allowed to hide from it now.

As the challenged order recognizes, anti-transgender bias was not the statute's only motivating purpose. When, as here, a decisionmaker acts from mixed motives, the proper analytical framework is set out in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and *Thompson v. Secretary of State for Alabama*, 65 F.4th 1288, 1297 (11th Cir. 2023). This is properly addressed in section VIII.G.6. of the challenged order, ECF No. 223 at 61–65. In asserting the presumption of good faith means the state always wins any mixed-motive case, the defendants wholly ignore the challenged order's analysis and the controlling decisions in *Mt. Healthy*, *Hunter*, and *Thompson*.

## VII. Hypnotists and interns

The defendants say this: "The record further shows that hypnotists and interns with a few hours of training are making diagnoses." Mot. to Stay, ECF

No. 226 at 9. If that was going on, the state could and should stop it. But it is not going on.

This is a trivial diversion from the issues. But it is worth discussion to illustrate just how far the defendants are willing to stray from the actual facts. Dr. Deborah Grayson, a Ph.D. and licensed mental health counselor, diagnosed Brit Rothstein, an adult plaintiff in the related case, *Dekker v. Weida*, with gender dysphoria. Dr. Grayson has 45 years of experience and adheres to the WPATH standards of care.[1] There is absolutely no evidence calling the diagnosis into question. Dr. Grayson lists hypnosis on her schedule of services, but she did not use hypnosis to diagnose or treat Mr. Rothstein.[2] The record includes no evidence that she has ever used hypnosis to diagnose or treat any transgender patient. Or that any other provider has done so. Hypnosis may have other uses, but none are at issue here.

Another adult patient, Mr. Dekker himself, had successful surgery.[3] His long-time treating psychiatrist referred him for the surgery, and a surgeon performed it.[4] The record includes absolutely no evidence calling into question the psychiatrist's or surgeon's credentials, the diagnosis, the decision to have surgery,

---

[1] Pls.' Ex. 234 in *Dekker v. Weida*, No. 4:22-cv-325, ECF No. 216-7 at 15.
[2] Trial Tr. in *Dekker*, ECF No. 228 at 140; *see also* Pls.' Ex. 234, ECF No. 216-7 at 4–5 (the schedule of services)
[3] Trial Tr. in *Dekker*, ECF No. 228 at 165–67.
[4] Trial Tr. in *Dekker*, ECF No. 228 at 162–67.

adherence to the standards of care, or the beneficial result. But an intern, acting under the supervision of a Ph.D., signed an unnecessary letter saying the intern, too, thought surgery was indicated.[5] The letter has nothing to do with the issues in this case.

The issues are too important for the defendants' misleading assertions to make their way into the briefing. There is much to be said on the defendants' side of the case, just as on the plaintiffs' side. The defendants should stick to the merits.

## VIII. Conclusion

The defendants have not made the required "strong showing" of likely success on appeal, especially in light of the clear and indeed undisputed evidence of anti-transgender animus. More importantly, the plaintiffs and many class members will suffer needlessly if a stay is entered. The defendants will incur only intangible harm from denial of a stay—from allowing the plaintiffs and class members to make their own medical decisions, in consultation with qualified professionals, while the appeal goes forward. Nobody else will suffer any harm at all. The public interest supports leaving in place pending appeal the status quo as it existed before adoption of the challenged statute and rules. Under the well-settled four-factor test, the defendants are not entitled to a stay.

---

[5] *See id.* at 169–72; *see also* Pls.' Ex. 237A in *Dekker*, ECF No. 216-16 at 2–3.

IT IS ORDERED:

The motion for a stay pending appeal, ECF No. 226, is denied.

SO ORDERED on July 11, 2024.

                                                                           s/Robert L. Hinkle
                                                                           United States District Judge